UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JANELL WINFIELD, TRACEY STEWART
and SHAUNA NOEL,

                             Plaintiffs,

           -against-                         15CV5236-LTS-DCF

CITY OF NEW YORK,

                             Defendant.

_____

MEMORANDUM OPINION AND ORDER

        Plaintiffs, who allege that they are African-American residents of New York City

(the "City" or "Defendant"), challenge a City community preference policy regarding affordable

housing distribution, claiming that the policy violates the federal Fair Housing Act ("FHA"), 42

U.S.C. § 3604 et seq., and the New York City Human Rights Law ("NYCHRL"), NYC Admin.

Code § 8-107, et seq., by perpetuating racial segregation and intentionally discriminating against

and causing a disparate impact amongst racial minorities.  The Court has jurisdiction of this case

pursuant to 28 U.S.C. §§ 1331 and 1336.

        Defendant has moved to dismiss the First Amended Complaint ("FAC"), arguing

that Plaintiffs lack standing to challenge the City policy and have otherwise failed to state a

claim.

        The Court has carefully reviewed the parties' papers.  For the following reasons,

Defendant's motion to dismiss the FAC is denied.

BACKGROUND

        Plaintiffs' FAC includes the following factual allegations, which are taken as true

for the purposes of this motion practice.

      The City has been and continues to be characterized by extensive residential segregation on the basis of race, ethnicity, and national origin.  (FAC ¶ 1.)  The segregation can be traced to historical restrictions and intentional discrimination by all categories of actors in the housing market, including government entities, developers, landlords, and others.  (Id. ¶¶ 2-3.) There are fifty-nine community districts in the City, in which residential racial segregation is widely evident.  (Id. ¶¶ 47-48, 76.)  For instance, according to the 2010 Census data, the African-American population was approximately 22.8 percent citywide.  (Id. ¶ 49.)  In seventeen community districts, including Manhattan Community Districts 5 and 6, the African-American population was less than 5 percent.  (Id. ¶ 50.)  The African-American population of Manhattan Community District 7 was less than 8 percent.  (Id.)  In eleven community districts, the African-American population was more than 50 percent, including six districts in which the African-American population exceeded 65 percent.  (Id. ¶ 51.)  In forty-two community districts, including Manhattan Community Districts 5, 6, and 7, the relative difference[1] between the citywide African-American population and the community district African-American population was at least 50 percent greater or lower.  (Id. ¶ 53.)  The same was true when looking at households within different income ranges.  (Id. ¶ 62.)  For instance, looking at households earning from 60 to 80 percent of area median income, the citywide percentage of those households that are African-American was 26.43 percent.  (Id. ¶ 65.)  In forty-one community districts, including Manhattan Community Districts 5, 6, and 7, the relative difference between

---

[1]    Plaintiffs define "relative difference" as the difference between the citywide percentage of the group and the community district percentage, divided by the citywide percentage of the group.  (Id. ¶ 52.)

that citywide percentage and the percentage of community district households within that

income range that are African-American was 50 percent or more.  (Id. ¶ 66.)  There is similar

residential segregation with respect to Latinos in the City.  (See ¶¶ 54-57, 69-75.)

> According to Plaintiffs, the City has operated its affordable housing programs in a
manner that unlawfully perpetuates segregation and disadvantages the minority Plaintiffs in the
case.  (Id. ¶ 6.)  Specifically, the City has given and continues to give preference in affordable
housing lotteries for a substantial portion of units based on residency within the community
district in which new affordable housing is being built.  (Id. ¶ 7.)  Whenever the City facilitates
housing creation, it requires that the developer conducts a lottery to select applicants for further
review.  (Id. ¶ 88.)  For 50 percent of the affordable units, the City requires that preference be
given to applicants who currently live in the community district in which the development is
located and meet the relevant income criteria for the project (the "Community Preference
Policy" or the "Policy," id. ¶ 90.)[2]  Although the Community Preference Policy has a purported
purpose of "provid[ing] greater housing opportunities for long-term residents of New York City
neighborhoods where [the City's Department of Housing Preservation and Development] has
made a significant investment," preference under the Policy is given regardless of how long a
person has lived in a district.  (Id. ¶¶ 92, 133.)  In most cases, the number of applicants from
outside of the community district far exceeds the number of applicants from inside the
community district, so each out-of-community applicant has a lower chance of being selected

---

[2]     In or about 2002, the administration of Mayor Michael Bloomberg increased the
percentage of units for which preference would be given to residents of the
community district in which the development was being built from 30 percent to
50 percent.  (Id. ¶ 83.)  Plaintiffs allege that the change was implemented without
evaluating whether doing so would perpetrate residential segregation.  (See id. ¶¶
85, 154-56.)

than each in-community-district applicant.  (Id. ¶ 100.)

      Plaintiffs allege that the City's Policy operates in favor of current residents of each community district, including residents of districts that are "characterized by high levels of opportunity."  (Id. ¶ 96.)  Plaintiff's concept of "levels of opportunity" is focused on many indicators, including income, employment, educational attainment, school quality, and access to cultural and recreational facilities.  (Id. ¶¶ 76, 117-18, 176-77.)  The Policy, Plaintiffs allege, perpetuates residential segregation and has a disparate impact on Plaintiffs, other African-Americans and Latinos in New York, diminishing their chance to compete for affordable housing opportunities in "neighborhoods of opportunity" relative to the chances of existing residents of such districts, which Plaintiffs generally allege have significant white populations.  (Id. ¶¶ 101-102.)  For example, in Manhattan Community Districts 5, 6, and 7, the in-district applicants with better chances of being selected are disproportionately white, with disproportionately few African-Americans, while the out-of-district applicants are "less white and more African-American."  (Id. ¶ 102.)

      Plaintiffs assert that the City knows or should know of the negative impacts of racial segregation (see id. ¶¶ 116-136), and that the Policy must be deemed intentional discrimination by the City because the City rejected or failed to consider other pro-integrative and/or less discriminatory alternatives, such as a citywide lottery system.  (Id. ¶¶ 137-38.)  The City has had a history of enacting discriminatory zoning and housing policies, including restricting African-Americans to certain neighborhoods, concentrating public housing in minority neighborhoods, and racial steering in housing projects.  (Id. ¶¶ 3, 25-30.)  As recently as the Bloomberg administration (2001-2014), white and black neighborhoods were treated differently when it came to zoning: increases in density occurred most frequently in

neighborhoods with disproportionately high African-American or Latino populations and decreases in density occurred most frequently in white neighborhoods.  (<u>Id.</u> ¶¶ 143-45.)

The Community Preference Policy is very popular among many community boards, local politicians and advocacy groups.  (<u>Id.</u> ¶ 158.)  Plaintiffs allege that such support has been "based on a desire to preserve existing racial or ethnic demographics or culture of a neighborhood or community district."  (<u>Id.</u> ¶ 160.)  Plaintiffs allege that "the City allowed itself to be influenced by such race- or ethnicity-based positions or by fear that an abandonment of the outsider-restriction policy would generate race- or ethnicity-based opposition from these community boards, local politicians, and advocacy groups."  (<u>Id.</u> ¶ 161.)  A developer-participant in the City's affordable housing program has allegedly explained that the purpose of the policy is to "help the area retain its traditional Latino identity."  (<u>Id.</u> ¶ 164.)  The City itself has allegedly stated that "community districts throughout the City with large black and Hispanic populations want this community district preference" and that a fair housing analysis should always "account" for and "allow" for local "nuance, culture, and character."  (<u>Id.</u> ¶¶ 165-66.) Plaintiffs further allege that the City is withholding information concerning the race and ethnicity of participants in the "NYC Housing Connect" program through which individuals register to learn about and apply to the City's affordable housing opportunities, which would reveal the interest of residents of predominantly African-American or Latino neighborhoods in residential mobility.  (<u>Id.</u> ¶¶ 167-69.)

All three Plaintiffs are African-American, have entered lotteries for affordable units, and have not yet been selected for interviews.  (<u>Id.</u> ¶¶ 13-15.)  Plaintiff Janell Winfield, a Manhattan resident, entered the lotteries for affordable units in developments located at 160 Madison Avenue, 200 East 39th Street, 40 Riverside Boulevard (in Manhattan Community

Districts 5, 6, and 7, respectively).  (Id. ¶ 13.)  Plaintiff Tracey Stewart, a Brooklyn resident,

entered the lottery for affordable housing in the development located at 160 Madison Avenue (in

Manhattan Community District 5).  (Id. ¶ 14.)  Plaintiff Shauna Noel, a Queens resident, entered

the lotteries for affordable units in developments located 200 East 39th Street and 40 Riverside

Boulevard (in Manhattan Community Districts 6 and 7, respectively).  (Id. ¶ 15.)  All three

Plaintiffs allege that they "continue[] to be interested in, and intend[] to continue to apply to, the

City's affordable housing developments, including those in neighborhoods of opportunity."  (Id.

¶¶ 13-15.)  Plaintiffs assert that the Community Preference Policy has injured them by restricting

their "ability to compete for housing on an equal basis with persons who already live in high

opportunity areas."  (Id. ¶ 177.)

    Plaintiffs further allege that the City expects to apply the Policy in the allocation

of up to 100,000 housing units over the next several years, including housing units in

neighborhoods of opportunity of which Plaintiffs are non-residents.  (Id. ¶¶ 172, 174.)  Plaintiffs

allege that they have been and will be injured by the Policy's diminution of these opportunities

to compete for affordable housing in high-opportunity and other disproportionately white

community districts, relative to the opportunities of existing residents of such districts.  (Id. ¶¶

177, 180.)


DISCUSSION

I.     Standing

    The City has moved, pursuant to Federal Rule of Civil Procedure 12(b)(1), to

dismiss the FAC for lack of standing, principally on the basis that the developments to which

Plaintiffs have submitted applications to are not covered by the City's Community Preference

Policy, but rather fall within the purview of a New York State affordable housing policy that

requires the same community preference.  (See Been Decl. ¶ 15, docket entry no. 18.)

In deciding a motion to dismiss under Rule 12(b)(1), a court "must take all

uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of

the party asserting jurisdiction," but "where jurisdictional facts are placed in dispute, the court

has the power and obligation to decide issues of fact by reference to evidence outside the

pleadings, such as affidavits," in which case "the party asserting subject matter jurisdiction has

the burden of proving by a preponderance of the evidence that it exists."  Tandon v. Captain's

Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014) (citations omitted).

Standing under Article III of the Constitution requires a showing of (1) a

concrete, particularized, and actual or imminent injury-in-fact; (2) that is "fairly traceable" to the

conduct; and (3) likely to be redressed by a favorable decision.  Woods v. Empire Health Choice,

Inc., 574 F.3d 92, 96 (2d Cir. 2009).  The FHA confers standing to challenge discriminatory

housing practices on any "aggrieved person," 42 U.S.C. § 3613(a)(1)(A), a term that the statute

defines to include:

> any person who -
>
> (1) claims to have been injured by a discriminatory housing practice; or
>
> (2) believes that such person will be injured by a discriminatory housing practice
>
> that is about to occur.

42 U.S.C.S. § 3602(i) (LexisNexis 2008).  Under the FHA, a plaintiff need only allege "injury in

fact" within the meaning of Article III of the Constitution, that is, "distinct and palpable injuries

that are 'fairly traceable' to [defendant's] actions."  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412,

424 (2d Cir. 1995) (quoting Havens Realty Corp. v. Coleman, 455 U.S. 363, 375-76 (1982)); see

also <u>Comer v. Cisneros</u>, 37 F.3d 775, 789 (2d Cir. 1994) (FHA claims are accorded the "broadest possible ground" for standing). An injury need not be economic or tangible to confer standing. <u>LeBlanc-Sternberg</u>, 67 F.3d at 425 (citation omitted). Defendant principally argues that Plaintiffs cannot show that their alleged injury is "fairly traceable to the challenged action" because Plaintiffs have not applied to an affordable housing development where the challenged City Community Preference Policy has been or will be applied, and that any allegation that Plaintiffs intend to apply to City housing lotteries in the future is too speculative to confer standing. Defendant also argues that Plaintiffs do not have standing to challenge the City Community Preference Policy on a citywide basis since they have not alleged that they will be applying to lotteries in all fifty-nine community districts. However, the explicit grant of standing under 42 U.S.C. § 3602(i) to anyone who believes he "'<u>will</u> be injured by a discriminatory housing practice that is about to occur' means that a person who is likely to suffer such an injury need not wait until a discriminatory effect has been felt before bringing suit." <u>Id.</u> (quoting 42 U.S.C. § 3602(i) (emphasis in original)). For instance, in <u>Ragin v. Harry Macklowe Real Estate Co.</u>, the Second Circuit held that African-American readers of newspaper advertisements that featured only white models had standing to sue under the FHA, even though none of them were in the market for housing at the time. 6 F.3d 898, 904 (2d Cir. 1993). The Second Circuit agreed with the district court that "a plaintiff who proves that she read the challenged advertisements and that the advertisements would indicate a racial preference to the ordinary reader 'has suffered injury in precisely the form the [FHA] was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions.'" <u>Id.</u> at 904 (internal quotation marks and citation omitted); <u>see also</u> <u>Park View Heights Corp. v. City of Black Jack</u>, 467 F.2d 1208, 1214-16 (8th Cir. 1972) (holding that plaintiffs who have not

yet applied for building permits have standing to challenge a restrictive zoning ordinance).

        Even assuming that Defendant is correct that the specific housing developments Plaintiffs have applied to are not governed by the City's Community Preference Policy, Plaintiffs are not precluded from asserting standing.  The FHA grants standing to all "aggrieved persons," which is defined to include any person who "<u>believes</u> that such person will be injured by a discriminatory housing practice <u>that is about to occur</u>."  42 U.S.C. § 3602(i) (emphasis added).  The statute thus explicitly recognizes, and courts have held, that a threatened injury is cognizable.  <u>See</u> <u>LeBlanc-Sternberg</u>, 67 F.3d at 425 ("where it has been established that a zoning ordinance will likely be applied in a discriminatory manner, it is unnecessary that a municipality actually so apply it before the ordinance may be properly challenged.")  Defendant does not dispute that the "missed opportunity to compete for [] housing on an equal footing with the local residents" constitutes a cognizable injury in fact for standing purposes, <u>Comer</u>, 37 F.3d at 794, but contends that such injury to Plaintiffs was not caused by the City.  Although Plaintiffs have not yet applied to any developments under the Community Preference Policy's purview, they have alleged that the Policy restricts their ability to compete for housing on an equal basis and that they intend to continue to apply to the City's affordable housing units.

        Defendant's opposition papers make it clear that the City conducts its own extensive affordable housing program and applies the Policy in allocating units.  (<u>See</u> Been Decl., docket entry no. 18.)  Thus, Plaintiffs' threatened injury of the loss of opportunity to compete on an equal basis for affordable housing is fairly traceable to the City's policy.  <u>See</u> <u>Comer</u>, 37 F.3d at 794; <u>Ragin</u>, 6 F.3d at 904; <u>cf.</u> <u>Davis v. New York City Auth.</u>, 166 F.3d 432 (2d Cir. 1999) (addressing on the merits a housing discrimination action brought by plaintiffs "residing in or eligible for" City affordable housing).  Nor does Defendant's argument that any

injury to Plaintiffs results from their actual poor rank assignments in the lotteries to which they have applied, rather than the effect of any prejudicial allocation formula, warrant dismissal for lack of standing.  Plaintiffs' claimed injury relates to denial of the opportunity to compete on an equal footing for fair housing in their desired neighborhoods, rather than from the failure to achieve a successful result in any particular lottery.  This distinction was recognized by the Second Circuit in Comer, a case whose underlying facts are comparable to those here.

In Comer, the plaintiffs sued a local housing agency, Belmont, for adopting a local preference in favor of applicants to the Section 8 housing program who lived or worked in one of the suburban communities within Belmont's administrative jurisdiction.  37 F.3d at 781-82.  The plaintiffs sued under both the Equal Protection Clause and the FHA, and the defendants challenged the plaintiffs' standing to sue, arguing, inter alia, that the plaintiffs had never received public housing because neither of the plaintiffs qualified for a federal preference and, in light of the volume of applications, "an applicant who does not qualify for the federal preference as a practical matter would never be offered assistance."  Id. at 783.  The Second Circuit held that the plaintiffs had standing under the Equal Protection Clause, reasoning, inter alia, that the injury prong of the standing test could not be negated by showing, as a practical matter, the plaintiffs would never receive housing assistance anyway, because "[t]he injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete for suburban housing on an equal footing with the local residents."  Id. at 794 (citing Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 209-12 (1972)).  Recognizing that standing is broader under the FHA than under the Equal Protection Clause, the Second Circuit went on to hold, with respect to the FHA claim, that there was standing because each plaintiff alleged that "(1) the application of the local residency preference has a disparate impact on minority residents of the

City of Buffalo, (2) he or she is a member of the class harmed by the application of the local

residency preference that is being denied the benefits accorded under the U.S. Housing Act

because of Belmont's application of the local preference and (3) he or she applied for and was

denied housing." Id. at 795.

Plaintiffs have adequately alleged that they are persons who "will be injured by a

discriminatory housing practice that is about to occur," 42 U.S.C. § 3602(i), and have standing to

challenge the policy.


II.           Failure to State A Claim

The City further argues that the FAC should be dismissed pursuant to Federal

Rule of Civil Procedure 12(b)(6) for failure to state a claim.  To survive a motion to dismiss, "a

complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  When

considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept all allegations in

the complaint as true and draw inferences in the non-moving party's favor." LaFaro v. New

York Cardiothoracic Grp., PLLC, 570 F.3d 471, 475 (2d Cir. 2009).  "On a motion to dismiss,

the question is not whether a plaintiff is likely to prevail, but whether the well-pleaded factual

allegations plausibly give rise to an inference of unlawful discrimination, i.e., whether plaintiffs

allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" Vega v.

Hempstead Union Free Sch. Dist., 801 F.3d 72, 87 (2d Cir. 2015) (emphasis in original) (quoting

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The prima facie case for showing

discrimination is an evidentiary standard, not a pleading requirement; at the pleading stage, "a

complaint must include only a short and plain statement of the claim showing that the pleader is

entitled to relief."  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 516 (2002).

The FHA "prohibits governmental agencies from implementing or enforcing

housing policies in a discriminatory manner."  Tsombanidis v. West Haven Fire Dep't, 352 F.3d

565, 573 (2d Cir. 2003).  The FHA makes it unlawful "[t]o refuse to sell or rent after the making

of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make

unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status

or national origin."  42 U.S.C.S. §3604(a) (LexisNexis 2008).  Property owners and their agents

may not "unlawfully discriminate against any person in terms, conditions, or privileges of sale or

rental of a dwelling."  Id. §3604(b).  "An FHA violation may be established on a theory of

disparate impact or one of disparate treatment."  LeBlanc-Sternerg, 67 F.3d at 425.  Plaintiffs

have asserted, and Defendant has moved to dismiss, claims under both theories.


A.          Disparate Impact

The Supreme Court has recognized that disparate impact claims are cognizable

under the FHA.  Texas Dep't of Housing and Comm. Affairs v. Inclusive Communities Project

("ICP"), 135 S. Ct. 2507, 2525 (2015).  A prima facie case of disparate impact requires a

showing of "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly

adverse or disproportionate impact on persons of a particular type produced by the defendant's

facially neutral acts or practices."  Mhany Mgmt. Inc. v. County of Nassau, Nos. 14-1634, 14-

1729, 2016 WL 1128424, at *30 (2d Cir. Mar. 23, 2016) (citation omitted).  Disparate impact

can be proven by showing an adverse impact on a particular group or minority or harm to the

community generally by the perpetuation of segregation.  See Catanzaro v. Weiden, 188 F.3d 56,

65 (2d Cir. 1999) (citation omitted).

In holding that disparate impact claims are available under the FHA, the Supreme Court in ICP cautioned that "[t]he FHA is not an instrument to force housing authorities to reorder their priorities.  Rather the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation." ICP, 135 S. Ct. at 2522.  The Court continued, "[a] plaintiff who fails to allege facts at the pleading stage or produce statistical information demonstrating a casual connection cannot make out a prima facie case of disparate impact." Id. at 2523.

Defendant, citing ICP, principally contends that Plaintiffs have failed to allege facts or proffer statistics demonstrating that the City Community Preference Policy has contributed to racial segregation or has had a disparate impact on minorities, whether within the three Community Districts in which Plaintiffs have submitted applications or citywide. Defendant further contends that Plaintiffs have failed to plead facts showing that the removal of the Policy would affect the racial and ethnic makeup of income-eligible applications or make a practical difference to Plaintiffs' ability to receive housing given the dearth of available units.

ICP emphasized that statistics demonstrating a racial disparity in a particular location, without an adequate showing of a causal connection to the challenged policy, would not be sufficient to establish a prima facie case of disparate impact.  But a prima facie case is an evidentiary standard, and not a pleading requirement.  Swierkiewcz, 534 U.S. at 511.  ICP did not alter the plausibility standard for pleading, which requires only the plaintiff plead allegations that plausibly give rise to an inference that the challenged policy causes a disparate impact.  See Vega, 801 F.3d at 87; Iqbal, 556 U.S. at 678 ("[t]he plausibility standard is not akin to a 'probably requirement'").  Nor does ICP require Plaintiffs to proffer statistical evidence of disparate impact, if other facts are pleaded that support the inference.  See ICP, 135 S. Ct. at

2523 ("[a] plaintiff who fails to allege facts at the pleading stage <u>or</u> produce statistical

information demonstrating a casual connection cannot make out a prima facie case of disparate

impact." (emphasis added).)

    Here, Plaintiffs have alleged that there is significant racial segregation in New

York City and within community districts, and that such segregation exists at various income

levels.  There is an obvious causal link between a policy whose very purpose is to maintain the

existing racial and ethnic makeup of local communities and the corresponding perpetuation of

the racial and ethnic makeup of those communities.  Plaintiffs also specifically allege that in

"neighborhoods of opportunity," including neighborhoods within Manhattan Districts 5, 6, and

7, "the in-applicants with higher odds to be selected are disproportionately white, with

disproportionately few African-Americans; the out-of district applicants are less white and more

African-American."  (FAC ¶ 102.)  These factual allegations support plausibly the inference that

the Community Preference Policy would operate to perpetuate residential segregation by, <u>inter</u>

<u>alia</u>, giving a preference to local white applicants for housing in already disproportionately white

community districts that have higher income levels and higher levels of services and benefits

than community districts in which the existing residents are predominantly minority group

members.  (<u>See</u> <u>id.</u> 7, 117-18, 176-77.)  Discovery may well prove that removal of the

Community Preference Policy would have no impact on the racial and ethnic makeup of eligible

affordable housing applicants (and ultimate recipients of housing) whether local residents within

a community district are given a preference or not.  However, at the pleading stage, Plaintiffs are

merely required to plead plausibly disparate impact; they are not required to prove causation or

disparate impact through statistical evidence at the pleading stage.  Furthermore, even if

Plaintiffs' practical chances of receiving affordable housing are slim even in the absence of the

Policy, Plaintiffs have stated a claim with respect to an unequal opportunity to compete for the housing.  Cf. Comer, 37 F.3d at 794.  Plaintiffs have satisfied their burden of demonstrating plausibly that the Community Preference Policy perpetuates segregation, and the motion to dismiss the disparate impact-based FHA claim is therefore denied.

B.          Disparate Treatment

          Discriminatory intent may be "inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another."  Washington v. Davis, 426 U.S. 229, 242 (1976); see also Mhany, 2016 WL 1128434, at *19.  ("Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" (citation omitted).)  The existence of disparate impact on one race is thus "an important starting point" of the discriminatory intent analysis.  Mhany, 2016 WL 1128434, at *19.  Other relevant considerations for discerning racially discriminatory intent include: "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes, [d]epartures from the normal procedural sequence, substantive departures, and the legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports."  Id. (quoting Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252 (1977)); cf. Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991) ("where there are allegations of discrimination supported by such circumstantial evidence, a defendant's intent and state of mind are placed in issue, [and] summary judgment is ordinarily inappropriate.").  A plaintiff can establish a prima facie case of disparate treatment "by showing

that animus against the protected group was a significant factor in the position taken by the

municipal decision-makers themselves or by those to whom the decision-makers were

knowingly responsive." Mhany, 2016 WL 1128424, at *19 (quoting LeBlanc-Sternberg, 67 F.

3d at 425).

        The FAC, read in the light most favorable to Plaintiffs, sufficiently pleads facts

from which an inference of discriminatory intent can be drawn.  As discussed above, Plaintiffs

here have plausibly alleged the existence of a discriminatory impact of the Policy, which is a

factor weighing in favor of finding discriminatory intent.  Plaintiffs allege that the City has had a

history of enacting discriminatory zoning and housing policies, including restricting African-

Americans to certain neighborhoods, concentrating public housing in minority neighborhoods,

and racial steering in housing projects.  (FAC ¶¶ 3, 25-30).  As recently as the Bloomberg

administration (2001-2014), Plaintiffs allege that white and black neighborhoods were treated

differently when it came to zoning: increases in density occurred most frequently in

neighborhoods with disproportionately high African-American or Latino populations and

decreases in density occurred most frequently in white neighborhoods.  (Id. ¶¶ 143-44.)

Plaintiffs also allege that, although the Community Preference Policy has a purported purpose of

providing greater housing opportunities for long-term residents of City neighborhoods,

preference under the Policy is given regardless of how long a person has lived in a district.  (See

id. ¶¶ 92, 133.)  Plaintiffs allege that the policy is racially motivated, arising from efforts to

maintain the support of community boards, local politicians, and advocacy groups who want to

preserve the existing racial or ethnic demographics of particular districts, and apprehension that

the abandonment of the policy would generate "race- or ethnicity-based" opposition from those

same actors.  (Id. ¶¶ 161-63.)  The City itself has allegedly characterized the Policy in racial

terms, by making statements like "community districts throughout the City with large black and Hispanic populations want this community district preference." (Id. ¶ 165.)  The City has also allegedly withheld information that would allow analysis of the racial or ethnic background and residential information of persons who have requested information about or applied for affordable housing opportunities.  (See id. ¶¶ 167-70.)  Plaintiffs also allege that the City has implemented the Policy without studying policy questions relating to its impact on housing segregation or fair housing goals.  (Id. ¶ 154.)  These and Plaintiffs' related factual allegations, taken together, are sufficient to plead plausibly the disparate treatment claim.  The motion to dismiss the disparate treatment FHA claim is, accordingly, denied.


III.     NYCHRL

The NYCHRL is construed more liberally than its federal and state law counterparts.  See Mihalik v. Credit Agricole Chuvreux N. America, Inc., 715 F.3d 102, 109 (2d Cir. 2013) (citations omitted) (NYCHRL is a "one-way ratchet," by which interpretations of state and federal civil rights statutes only serve as a "floor below which the City's Human Rights Law cannot fall.").  Defendant moves to dismiss Plaintiffs' NYCHRL claim, arguing that NYCHRL is preempted by state law insofar as Plaintiffs' claims are based on lack of success in the lotteries to which they have applied, and that Plaintiffs have failed to plead facts suggesting disparate treatment and that "discrimination was one of the motivating factors for defendant's conduct."  (Def. Br. 20-21.)  As explained above, Plaintiffs' claims are not limited to the provision of housing at the three identified developments.  In light of the disparate opportunity-focused nature of their claims and the City's acknowledgment that it applies the Community Preference Policy on an ongoing basis with respect to other developments in the City,

Defendant's preemption argument is unavailing.  For substantially the reasons discussed in connection with Plaintiffs' federal discrimination claim, the Court also finds that Plaintiffs have pleaded their NYCHRL claims sufficiently.  Accordingly, the Court denies the motion insofar as it seeks dismissal of the NYCHRL claim.

CONCLUSION

Defendant's motion to dismiss the FAC is denied.  The next pre-trial conference is scheduled for December 2, 2016, at 10:30 a.m.  The parties must confer and prepare submissions in accordance with the initial conference order (docket entry no. 9) prior to the conference.

This Memorandum Opinion and Order resolves docket entry number 17.


SO ORDERED.


Dated: New York, New York
        October 24, 2016



                                        /s/ Laura Taylor Swain
                                       LAURA TAYLOR SWAIN
                                       United States District Judge