November 24, 2014

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410-0500

RE   [Docket No. FR-5173-N-02, *Affirmatively Furthering Fair Housing Assessment Tool:
      Solicitation of Comment--60-Day Notice Under the Paperwork Reduction Act of 1995*]

To Whom It May Concern:

This letter sets forth the comments of the City of New York (City) on the above-referenced proposed draft Assessment Tool.

The City is the largest municipal developer of affordable housing in the nation and is currently engaged in a new plan to build and preserve 200,000 affordable units across all five boroughs of the City. The City's Department of Housing Preservation and Development (HPD), the Mayor's Office for People with Disabilities, the Department of City Planning and the New York City Housing Authority (NYCHA) contributed to the comments below. HPD and NYCHA are directly responsible for siting, creating and preserving affordable housing opportunities, and both administer Section 8 programs and use other federal funding streams. NYCHA owns and operates the largest public housing program in the nation, serving over 403,120 residents.

The City wholeheartedly shares the goal of increasing access to high-opportunity neighborhoods for historically marginalized populations. Indeed, our *Housing New York* plan commits the City to "foster diverse and thriving neighborhoods." Unfortunately, the proposed Assessment Tool (the Tool) may have the unintended effect of leading local governments to take actions that may not serve the needs and priorities of their communities, and does not recognize the real-world constraints under which local governments operate. We are deeply concerned that completion of this tool will interfere with our ability to make fair and locally based decisions about the most pressing needs facing our City.

To improve the Tool's utility and its ability to further fair housing opportunity, while also ensuring that localities not become overburdened with excessive regulations, the City provides the following comments.

**1. Timing of release of the proposed tool**

The proposed Tool is presented as the mechanism by which program participants will conduct an Assessment of Fair Housing (AFH), as outlined by the 2013 Proposed Rule regarding the obligation to affirmatively further fair housing. The proposed Tool also would replace the Analysis of Impediments (AI) process currently in use.

On September 17, 2013, the City submitted extensive comments to HUD on the Proposed Rule. While expressing support for the goal of increasing access to high-opportunity

1


PLAINTIFF'S EXHIBIT 24   7-27-17

neighborhoods for historically marginalized populations, the City expressed a number of reservations and concerns about the Proposed Rule. Because neither a revised nor Final Rule has been published, program participants including the City have received no indication on whether the concerns expressed have been or will be addressed.

Asking for public comment on specific aspects of the Tool implementing a non-Final Rule, without having first addressed the comments offered on that proposal, is premature and we urge another opportunity to comment be offered once the Final Rule is published.

**2. Format of the Tool**

While the City appreciates HUD's goal of providing a Tool to help guide respondents' analysis of their communities' progress in affirmatively furthering fair housing, the City is deeply concerned about the Tool's format. The format is particularly problematic if HUD intends to develop and release the Tool as a pre-formatted template similar to the IDIS Consolidated Planning formulation and submission tool (eConPlan). The City found using the eConPlan template difficult because each response box for the pre-formulated question was limited to 4,000 characters in total. (The limit not only included alpha-numeric and punctuation characters but also special formatting characters such as Bold On/Off which further decreased the amount of characters available.) This system limitation in some cases restricted the City's ability to provide an in-depth comprehensive response to the question asked.

Short- or limited-capacity windows for narratives restrict a respondent's ability to fully answer questions. Equally limiting are multiple-choice options which provide insufficient opportunity to reflect the housing realities of large communities. In particular, the Tool does not include a way for large communities, with complex data and many neighborhoods with different ethnic and religious concentrations to adequately describe the circumstances and nature of their communities. In some circumstances, religious, immigrant or ethnic enclaves may result from residents' preferences, not segregation, and it is important that the Tool provide the opportunity to include such descriptions. Throughout the Tool we find instances of needing to describe these situations in a narrative form, and to include documentation regarding local housing conditions.

As another example, the draft Tool limits respondents' ability and opportunity to report critical information such as HUD recognitions of de-concentration attainments.

**3. Sources of data and information to complete the Assessment of Fair Housing**

HUD specifically seeks public comment on whether the Notice's description of available local data and local knowledge helps program participants understand how these terms are being used and also whether program participants understand the extent of their obligations to obtain and use data and other information. HUD also seeks comment on whether it has described clearly the circumstances under which a program participant may need to respond that there is no relevant data or local knowledge that allows the question to be accurately addressed.

As a municipality that expends tremendous resources to chart our housing demographics via the City's Housing Vacancy Survey (HVS), we appreciate HUD's recognition of the importance and

2

value of local data. In cases where a data set includes both national and local data, there is a high likelihood that the local data set will be most accurate. We urge HUD to preserve in the final Tool the ability for localities to rely on local data.

That said, the City believes that for the Tool to be effective, HUD should provide clarification regarding program participants' obligations to use available local data. For example, the Tool does not indicate the threshold for reasonable costs (time, effort and funds) associated with the collection and analysis of local data before it becomes an administrative burden. If the data set is not part of the City's HVS, for example, the procurement, collection and analysis of the alternate data through a third-party source would entail additional expenditure of resources not previously factored into the City's original work plan estimates.

Regarding HUD's question as to whether the draft Tool has clarified when a program participant would need to indicate there is no relevant data or local knowledge available to respond to a specific question, the City believes that in response to questions for which HUD has yet to provide the data, or local data is unavailable, respondents should be permitted to indicate that data is not available without prejudice.

The Tool indicates grantees are to analyze HUD-provided demographic data by jurisdiction and by region. It is important to specify whether HUD or the locality will define the boundaries of the region. If HUD predetermines the boundaries of the study region, we are concerned that it will include areas that are not necessarily germane to pertinent analysis. For example, if HUD defines the regions using the U.S. Census' Core-Based Statistical Areas (CBSAs), the New York, New York region would include Pike County, Pennsylvania, a county that is two (2) states away. [source: U.S. Census Bureau CBSA delineation files – Feb, 2013]

The Tool includes several questions requiring analysis of data located in specific tables/maps that HUD will supply. Again, to the extent certain data sets are not available respondents should be able to answer as such without prejudice. An example of this is Question IV.B.2.i. Analysis, Segregation/Integration and R/ECAPs, Geographic Analysis (i.e., What populations of limited English proficient persons reside in the jurisdiction and region, which languages do they speak, and where are they located?). In order to respond to the question a locality would first have to analyze (currently unavailable) data from Table 5 (i.e. top ten (10) LEP languages); Table 6 (i.e. Population of R/ECAP by country of origin); and Map 4 (LEP persons (i.e. by top 5 languages) for Jurisdiction and Region with R/ECAPs), respectively.

The City has concerns regarding a program participant's ability to respond to the Tool's questions in the potential situation where there is no local data available and HUD has yet to release its data. Therefore, the City urges HUD not to finalize and release the AFFH rule prior to having this data finalized and available for analysis. To do so otherwise could result in the Assessment Tool being released with one or more (unanswerable) questions included in it. Until the data is available, it is recommended that HUD either remove these questions from the Tool, or indicate that responses to these questions are optional.

According to the Tool, program participants are required to analyze sixty-four (64) maps (the sixteen maps listed in the Draft List of AFH Template Maps by jurisdiction, by region, and for

3

the years 2000 and 2010 (16 x 4 = 64)). This leads to the question of whether HUD will provide the maps or expect the program participant to generate the maps using a packaged mapping application. Our experience with HUD's eConPlanning mapping tool raises concerns about requiring localities to generate the maps, because we found the eConPlanning mapping tool was slow and prone to system failures, at least for a data-rich environment such as the City. In addition, the eConPlanning system had technical difficulties incorporating the maps into the downloaded version of the City's Proposed 2015-2019 Consolidated Plan. As a result of those system shortcomings the City had to manually insert the maps into the version that will be released for public comment, thereby creating an additional administrative burden the eConPlanning system was supposed to alleviate. The City therefore anticipates that it will be an excessive administrative burden for program participants to generate and incorporate the 64 AFH maps in a similar manner.

**4. Questions assuming causation**

The City has serious legal, philosophical and methodological concerns about many of the questions in the Tool because they imply a causal relationship that is difficult or impossible for localities to assess.

**Question IV.B.6.b.iii.** on Page 4 asks respondents to comment on the extent to which Public Housing developments in the Jurisdiction are located in segregated neighborhoods or areas. It is not clear whether this question is designed to describe current patterns in the neighborhoods surrounding public housing, or to draw conclusions about whether public housing originally was sited in communities with concentrations of minority populations.

Similarly, **Question IV.B.6.a.i.** on Page 3 asks whether certain racial and ethnic groups reside in one category of publicly assisted housing versus another, but does not make clear whether the question is asking for a description of current patterns, or a causal conclusion about the reasons for those patterns.

**Question IV.B.7.a.ii.** on Page 5 asks the respondent to discuss how public support or public opposition to different types of publicly supported housing have contributed to decisions regarding the amount of such housing, the populations served, and the siting of developments. In addition to calling for causal conclusions that would be difficult or impossible to prove. NIMBYism and parochial concerns about the siting (or non-siting) of affordable housing exist nationwide.

**Question IV.D.1.a.i.** on Page 8 asks whether, because of their race, students have less access to high-performing schools, which is a causal conclusion that we cannot reasonably make.

Aside from the inherent difficulty in answering these questions, incorrect causal conclusions may be drawn about the fair housing landscape in New York City. These are just a few of the many examples of questions in the Tool assuming causation.

4

## 5. Burdensome or Unanswerable Questions

Many of the data sets and responses requested are unreasonable.

**Question IV.B.1.b.,** on Page 2 regarding levels of segregation over time: this is a highly difficult and overly broad scope to work with, complicated by the fact that census tracts have changed over time.

**Question IV.B.6.b.i.,** on Page 4 regarding patterns of siting federally assisted property: the amount of historical work and analysis that would be required to answer this question accurately is far beyond the capacity of our City agencies.

**Question IV.B.6.b.ii.,** on Page 4 directs the respondent to "compare the demographics of residents in each publicly supported housing category to the population in general, and to persons earning 30% AMI"; and **Question IV.B.6.b.iii.** on Page 4 directs the respondent to, "describe any patterns relating to occupancy of publicly supported housing by color, national origin, family status, or religion." Although some of this data may be available for NYCHA's residents, reliable data is not available for the broader set of housing offered by HPD. Additionally in many subsidized housing projects, the law does not require data to be gathered or reported for the project.

**Question IV.D.1.b.i.** on Page 8 requests information about the proximity to jobs. This question does not take into account the reality of many urban areas that the linear distance between two locations does not account for the actual travel time between them.

**Questions in Section IV.D** on Page 8 do not provide respondents with the opportunity to highlight their efforts, outside of the scope of housing, to address adverse factors in the community.

HUD proposes using data and thresholds to describe "segregation dynamics" and will provide common social science measures of segregation, including the dissimilarity index and the isolation index. HUD states "[t]hese measures will be accompanied by guidance to help program participants and others understand whether values suggest relatively low, moderate or high levels of segregation."

By relying on a dissimilarity index, HUD equates concentrations of ethnicity with segregation and then asks grantees to select and rank possible determinants of both segregation and Racially and Ethnically Concentrated Areas of Poverty (R/ECAPS) for publicly supported housing location and occupancy, and for assisted household mobility. Again, the question assumes a causal connection that localities will not likely be able to prove and will not be comfortable speculating about. Further, the possible determinants listed do not include such matters as market forces, affordability and residents' choice, all of which may be important contributors to patterns of segregation.

**6. Burden on Respondents**

HUD asks whether program participants can complete the Tool independently (i.e., without assistance from consulting firms or outside contractors); what kinds of additional instructions would be helpful for program participants in completing the Assessment Tool; and what costs may be associated with collecting and analyzing the available local data and local knowledge necessary to complete the Tool.

The City indicated in its comment letter regarding the Affirmatively Furthering Fair Housing Proposed Rule that it believes that the analysis of the federally provided fair housing data expected by HUD will require a high level of expertise that may not be available to localities given limited budgets.

The City estimates that in order to complete the Tool independently it would have to hire additional urban planners/demographers to undertake the neighborhood-by-neighborhood analysis required and to formulate courses of action based upon the analysis.

Furthermore, unless HUD provides technical assistance to applicants or additional funds to pay for the staff to undertake the analyses, this requirement will be too great a burden in many cases. (Please see the City's comments to Docket No. FR-5173-N-01, dated September 17, 2103. Page 3. Item I.4., General Comments.)

Also, the complex format of the draft Tool, the extensive data requested, and the required public and advocate-community consultation required combine to make it highly unlikely that a jurisdiction will be able to respond within reasonable timeframes. We are concerned the Tool would require a tremendous expenditure of resources. Given the size and complexity of the City and its housing portfolio, it would require in excess of a *six-fold increase* of the HUD estimate in staff time to complete the Tool.

In addition, because the Tool will be a web-based template with structured data/response fields, HUD should formulate and publish a Desk Guide prior to the release of the final Assessment Tool so that program participants (or their hired consultants) can familiarize themselves with the analysis process. The Desk Guide should be in a format similar to the guide used by entitlement grantees to formulate their Consolidated Plans in the IDIS eConPlanning system.

Finally, in response to HUD's question regarding respondents' use of federal funds to complete the Tool, the City would expect to expend federal funds to hire additional urban planners/demographers to complete the tool. As indicated in New York City's comment letter regarding the Affirmatively Furthering Fair Housing Proposed Rule, the City believes that recent reductions on Public Housing Operating funds will limit Public Housing Authorities' (PHAs) ability to do the type of sophisticated analysis proposed by the Proposed Rule. (Please see the City of New York's comments to Docket No. FR-5173-N-01, dated September 17, 2103. Page 3. Part II.2., PHA related issues, Cost of Compliance.)

## 7. Lists of Determinants

As stated above, notably absent from the draft Tool's list of possible determinants are market forces and affordability. The Tool does not reflect a recognition or acknowledgment of the historical and multifaceted factors, characteristic of New York and other larger cities, that may cause immigrant and second-generation populations to choose housing options in communities or enclaves offering culturally defined businesses, social services and/or religious institutions. Nor does it give the City the opportunity to indicate the presence of these factors here. Consideration of such factors is essential to make a meaningful assessment of the fair housing landscape in the City.

The City is troubled by the failure of the Tool to distinguish between areas marked by intentional, discrimination-based segregation and racially/ethnically concentrated areas of poverty. For this reason, the City objects to HUD's use of the term "segregation" in reference to areas where particular populations are concentrated. There are non-invidious reasons for a particular ethnic group to be concentrated in a particular area. For this reason, we propose that HUD substitute "concentration" for "segregation."

The City recommends that those questions in the Tool seeking information about both segregated housing and R/ECAPs be divided into two separate inquiries to yield more useful guidance in developing an affirmative fair housing plan. For example, Question 5 of the Tool, "Determinants of Segregation/R/ECAPs," asks about the extent to which the factors listed contributed to "segregated housing patterns or R/ECAPs." A separate question for each type of housing pattern is likely to yield more valuable data.

## 8. Addressing Disability and Access Issues Separately

The City commends HUD for seriously examining specific issues related to challenges encountered by people with disabilities when seeking housing. We appreciate that HUD well understands the fact that high-cost markets such as the City's pose challenges of affordability.

People with disabilities face the same issues as those without disabilities – the affordability of the housing, segregation by race, ethnic or national origin, and discrimination against families with children -- but a disability often means that those problems are exacerbated. It therefore would be useful to include people with disabilities as a group to be considered when discussing general topics such as affordability, integration and family status.

We agree with HUD that it is crucial to include the sections of the Assessment Tool that focus on information specific to people with disabilities, such as the number of accessible units, location of accessible units throughout the jurisdiction, and ease of reasonable accommodation requests. That said, the City questions whether HUD has the capacity to provide program participants with sufficiently comprehensive demographic data on housing patterns of persons with disabilities given the large number of physical and mental health and mobility problems encompassed within federal disability definitions. The Tool directs program participants to "solicit input" from individuals with disabilities and from disability advocates. While advocacy groups can provide useful recommendations pertaining to housing opportunities for individuals

with disabilities, they are unlikely to be able to provide the kind of extensive, jurisdiction-wide data a responder needs to rely on to make policy regarding housing opportunities for people with disabilities. If participants are expected to answer the question comprehensively, this mandate is impractical, and contradicts the Department's assertions that the proposed rule and the Assessment of Fair Housing Tool implementing the proposed rule are not unduly burdensome.

Finally, the draft Tool would not be complete concerning people with disabilities without discussing accessibility challenges in neighborhoods, such as availability of accessible transportation, supportive services and community-based programs.

**9. Community participation process**

HUD's Notice affirmed that the community participation process is an important vehicle for soliciting input and acquiring additional information and knowledge that can be used to improve a local AFH. It further stated that program participants are responsible for obtaining, evaluating, and deciding how best to consider and respond to public comments, including by incorporating relevant and reliable information obtained through public participation into the analysis section of the AFH or through inclusion of comments in the section of the AFH reserved for describing such input, including discussion of public comments that are rejected. HUD asked if the proposed Assessment Tool makes these options clear, and if not, how can the Tool be improved or clarified.

The City finds no explicit alternatives to our existing approved citizen participation plan. The City has used these protocols for years in preparing its Consolidated Plan related reports such as its One-Year Action Plan and Affirmatively Furthering Fair Housing Statement. HUD has not found the City's citizen participation protocols unacceptable. For this reason, if the previous citizen participation plan was acceptable, the City would like to have HUD's express acceptance of it for future use in preparing the AFH.

In addition, we recommend that HUD issue guidance suggesting how a program participant may augment/enhance its existing approved citizen participation protocols (within reasonable cost and effort considerations).

**10. IT concerns**

The City strongly urges that the Tool not be put into effect without high confidence of HUD's own technical capacity to manage it. The City notes ongoing problems with other web-based applications such as the Section 3 compliance reporting system and the IDIS eConPlanning tool, which have proved burdensome to both HUD and program participants.

**11. Miscellaneous**

Because localities may find certain parts of the Tool especially difficult to complete, the rule must address implications of incomplete responses, which may constitute non-compliance. HUD should be clear about the risk such a finding would have on future funding.

The cover page of the Tool requires a signature affirming that, "the program participant(s) have prepared an assessment that fulfills the requirements at 24 CFR §§ 5.150-5.164 or comparable replacement regulations of the Department of Housing and Urban Development." The affirmation's referral to "comparable replacement regulations" is unclear. If a City official or employee is to affix his or her signature to a pre-prepared statement, the statement should clearly reference what the employee is signing off on.

## 12. Conclusion

The City's primary concern with the draft Assessment Tool is its requirement that respondents identify "determinants" of fair housing issues. While data and local knowledge may be sufficient to draw correlations, grantees will be hard-pressed to ascertain causal relationships, as the Tool compels participants to do. The Tool encourages, and may be used to require, grantees to create policy on the basis of incomplete information and personal and anecdotal perceptions. While local governments frequently have to make policy decisions on the basis of incomplete information, a tool that forces localities to assume unproven causal conclusions will not necessarily further grantees' ability to effectively increase fair housing choice and could lead to policies with negative unintended consequences. The stakes of drawing unsupported causal conclusions are high because of the critical importance of these issues, and the difficulty of having thoughtful discussions about the issues against the backdrop of local politics.

The stakes also are unknown, given the lack of clarity about the potential uses of the implications of causality the Tool asks localities to draw. It is unclear, for example, whether and how grantees' future funding could be affected by such implications. Continued federal support for local housing programs is essential to the nation's efforts to affirmatively further fair housing. At a minimum, to assure local governments across the nation that the tool will be used to help localities develop more effective programs, rather than serving as a basis for litigation and punitive actions, the tool should make clear that localities will be given a safe harbor period in which to further evaluate any causal implications drawn from the assessment and to formulate appropriate responses to any problems the assessment reveals.

The City appreciates the opportunity HUD has offered to receive stakeholders' views on this important policy initiative. If you have any questions or concerns, please do not hesitate to contact HPD's Director of Legislative Affairs and Federal Policy, Jordan Press, at pressj@hpd.nyc.gov.

Sincerely,

Vicki Been
Commissioner, New York City Department of Housing Preservation and Development

Carl Weisbrod
Director, New York City Department of City Planning

9