UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

JANELL WINFIELD, TRACEY STEWART,
SHAUNA NOEL, and EMMANUELLA SENAT

     **SECOND**
   Plaintiffs,      **AMENDED**
     **COMPLAINT**

   -against-

CITY OF NEW YORK,

     Defendant.

------------------------------------------------------------------x

<u>INTRODUCTION</u>

1. Defendant City of New York ("the City") has been and continues to be characterized by extensive residential segregation on the basis of race, ethnicity, and national origin.

2. The development of these segregated patterns was not a "natural" process; on the contrary, the patterns were developed in large measure as a function of intentional discrimination by all the categories of actor in the housing market: governmental entities, developers, landlords, and others.

3. A central feature of the City's historic discrimination in the period from the beginning of the 20th century into the 1980s was the restriction of most or all African-Americans from large parts of the City and their being funneled into a relatively small number of neighborhoods.

4. These neighborhoods were and are characterized by high concentrations of African-Americans and high concentrations of poverty.

5. A similar process, most apparent in the period after World War II, occurred with respect to Latino New Yorkers.

6. Even after the passage of the Fair Housing Act in 1968 and the passage of the disparate impact provisions of the New York City Human Rights Law in 1991, and throughout the decades when the City (as a recipient of Community Development Block Grants and other federal funds) had a mandatory obligation to affirmatively further fair housing, the City has operated its affordable housing programs in a manner that unlawfully perpetuates segregation and operates to the detriment of the minority Plaintiffs in this case.

7. Specifically, the City has given and continues to give preference in affordable housing lotteries for a substantial portion of units (currently 50 percent) based on residency within the community district where new affordable housing is being built. This preference serves to bar City residents living outside of the community district from competing on an equal basis for all available units (the "outsider-restriction policy"). The result is that entrenched segregation is actively perpetuated, and access to the neighborhoods in this City with high quality schools, health care access, and employment opportunities; well-maintained parks and other amenities; and relatively low crime rates ("neighborhoods of opportunity") is effectively prioritized for white residents who already live there and limited for African-American and Latino[1] New Yorkers who do not.

8. The City's outsider-restriction policy also constitutes intentional discrimination as its decisions to establish, maintain, and expand the policy: (a) were made in the face of a history of discrimination and segregation encouraged by and participated in by the City; (b) were made

---

[1] The term "Latino," as used anywhere in this complaint, refers to persons of Hispanic origin of any race. The term "white" refers to single-race, non-Hispanic whites. The term "Asian" refers to single-race, non-Hispanic Asians. Except where otherwise noted, the term "African-American," as used in this complaint, refers to non-Hispanic persons who are black or African-American, including people who are Carribbean-American (persons who the Census Bureau defines as persons who identify themselves as black or African-American, whether alone or in combination with another race).

knowing, or being deliberatively indifferent to, the policy's clear disparate impact on opportunity to participate on equal terms and its tendency to perpetuate segregation; (c) constituted choices to reject more pro-integrative alternatives; (d) are reflective of the City's consciousness of what policies it thought that particular racial and ethnic groups "wanted," as well as other race-awareness; and (e) responded to racially- and ethnically-influenced community and political opposition.

9. In establishing, maintaining, and expanding its outsider-restriction policy, the City ignored the negative impact on families in the City who live in racially concentrated areas of poverty; ignored the positive effects of residential mobility for families who are able to move into neighborhoods of higher opportunity; and paid no heed to the voices of New Yorkers who want to be able to move freely to any City neighborhood and to do so on equal terms with other City residents.

10. The abolition of the City's outsider-restriction policy would facilitate the City's ability to be one city, rising together, instead of 59 enclaves, rising or falling separately.


JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 2201; and pursuant to 42 U.S.C. § 3613. This court has supplemental jurisdiction over Plaintiffs' New York City Human Right Law claims pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant resides, maintains offices, and conducts business in the district.

13. As a member of an income-eligible household, Plaintiff Janell Winfield, a New York City resident, entered the lotteries for affordable units in developments located at 160 Madison Avenue, 200 East 39th Street, and 40 Riverside Boulevard (in Manhattan Community Districts 5, 6, and 7, respectively). Ms. Winfield is African-American. Ms. Winfield has not been selected to be interviewed for units in any of these developments. Ms. Winfield continues to be interested in, and intends to continue to apply to, the City's affordable housing developments, including those in neighborhoods of opportunity.

14. As a member of an income-eligible household, Plaintiff Shauna Noel, a Queens resident, has entered several lotteries for affordable units. She has entered lotteries located at 200 East 39th Street and 40 Riverside Boulevard (in Manhattan Community Districts 6 and 7, respectively). Ms. Noel is African-American. Ms. Noel has not been selected to be interviewed for units in either of these developments. Ms. Noel has continued to be interested in, has continued to apply to, and intends to continue to apply to, the City's affordable housing developments, including those in neighborhoods of opportunity.

15. As a member of an income-eligible household, Plaintiff Emmanuella Senat, a Manhattan resident, has entered several lotteries for affordable units. She has entered lotteries located in Manhattan Community District 1 (at 118 Fulton Street and 29 Cliff Street), Manhattan Community District 5 (at 221 W. 29th Street, 38-46 West 33rd Street, and 145 Madison Avenue), Manhattan Community District 6 (at 200 East 39th Street and 335 East 27th Street), Manhattan Community District 7 (at 40 Riverside Boulevard and 10 Freedom Place South), and Manhattan Community District 8 (at 321 E 60th Street). Ms. Senat is African-American. Ms. Senat has not been selected to be interviewed for units in any of these developments. Ms. Senat

continues to be interested in, and intends to continue to apply to, the City's affordable housing developments, including those in neighborhoods of opportunity.

16. Defendant City of New York (the "City") is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York. At all times relevant hereto, the City was and remains responsible for formulating, proposing, promulgating, administering, and enforcing the outsider-restriction policy challenged in this action.

FACTS

**I. The Creation of Segregated Housing Patterns in New York City**

17. The City has a long history of residential segregation.

18. During the 1863 Draft Riots, African-Americans were singled out for attack, and many were injured or killed.

19. This and later events of violence and exclusion made clear to African-Americans that they were unwelcome in large parts of the City.

20. But violence and exclusion were not phenomena limited to the 19th century.

21. After the creation of the Federal Housing Administration, mortgage lending in areas that were racially "mixed" was discouraged as a matter of federal policy throughout the country.

22. Racially restrictive deed covenants were encouraged.

23. The siting of public housing in the City was and remains a notorious example of pandering to racial prejudice. Under the leadership of Robert Moses, large areas of the City were deemed off-limits to public housing because of anticipated resistance from neighborhood residents.

24. Other areas of the City, for example, the then-Jewish neighborhood of Brownsville, Brooklyn were thought to be more malleable and accepting of public housing, and so public housing was disproportionately placed in such neighborhoods.

25. Over the last several decades and continuing, there is substantial overlap between the neighborhoods where public housing is concentrated and the neighborhoods where African-American or Latino populations are concentrated.

26. Over the last several decades and continuing, there is an inverse correlation between concentration of public housing and neighborhoods where the white population is concentrated.

27. Many disproportionately white neighborhoods remain off-limits to public housing.

28. The City's participation in fomenting and maintaining segregation did not end with the placement of public housing.

29. The City's Housing Authority, by its own admission in or about 1999, had a "racial steering component" as part of its tenant assignment policy beginning in 1960. That racial steering, again by the Housing Authority's own admission, "continued at a few predominantly white projects" even as late as the beginning of 1988. And again by its own admission, the practice resulted "in a higher proportion of whites than would have resulted from a race neutral admissions policy."

30. The City's housing authority was found by a court of law in 1999 to have, at times, used "codes denoting housing projects to which only white families could be assigned"; and used "racial goals or targets when new projects were 'rented up' and on an ongoing basis thereafter."

31. Studies released by the United States Department of Housing and Urban Development (HUD) in 2000 and thereafter have documented the continuing existence of housing discrimination against African-Americans.

## II. New York City Has Long Had High Levels of Residential Segregation

32. During the first half of the 20th century, New York City was characterized by high levels of residential racial segregation.

33. In the post–World War II period, New York City continued to be characterized by high levels of residential racial segregation.

34. A commonly used measure of the intensity of residential segregation is the "dissimilarity index."

35. Among the largest cities in the United States in 1980, New York City was the second most segregated in terms of the dissimilarity index as measured between African-Americans and whites.

36. From 1980 to 2010, New York City's dissimilarity index as measured between African-Americans and whites declined by only 1.37. Of the 30 cities with 2010 populations of 500,000 or more, New York City's decline was the smallest.

37. Compared to New York City, Chicago's dissimilarity index declined six times more during that period; Baltimore's declined seven times more; and Los Angeles' declined 13 times more.

38. Measuring the change from 1980 to 2010 as a percentage of the 1980 dissimilarity index between African-Americans and whites, New York City's dissimilarity index declined only 1.66 percent. Of the 30 cities with 2010 populations of 500,000 or more, New York City's decline was the smallest.

39. Compared to New York City, Boston's, Philadelphia's, and Baltimore's drops were seven times greater; San Francisco's was nine times greater; and Los Angeles' was 12 times greater.

40. Among the largest cities in 2010, New York City was still the second most segregated in terms of the dissimilarity index as measured between African-Americans and whites.

41. Among the largest cities in the United States in 1980, New York City was the fourth most segregated in terms of the dissimilarity index as measured between Latinos and whites.

42. From 1980 to 2010, New York City's dissimilarity index as measured between Latinos and whites *increased* by 1.62. Of the 27 cities with 2010 populations of 500,000 or more where data are available for both 1980 and 2010, New York City's trend was worse than 12 other cities.

43. Compared to New York City, Boston's dissimilarity trend was three times better during that period; Philadelphia's was six times better; and El Paso's was 10 times better.

44. Measuring the change from 1980 to 2010 as a percentage of the 1980 dissimilarity index between Latinos and whites, New York City's dissimilarity index increased by 2.53 percent. Of the 27 cities with 2010 populations of 500,000 or more where data are available for both 1980 and 2010, New York City's trend was worse than 12 other cities.

45. Compared to New York City, Boston's trend was nearly four times better; Albuquerque's and Philadelphia's five times better; and El Paso's 11 times better.

46. Among the largest cities in 2010, New York City had become the second most segregated in terms of the dissimilarity index as measured between Latinos and whites.

### III. The City Is Residentially Segregated at the Community District Level

47. There are 59 community districts in the City.

48. Residential racial segregation in the City is widely present at the community district level.

49. At the citywide level, the population according to 2010 Census data was approximately 22.8 percent African-American.[2]

50. Nevertheless, 17 community districts, including Manhattan Community Districts 1, 5, 6, and 8, had African-American populations of less than 5.0 percent. These community districts represent more than a quarter of all community districts in the City. The African-American population of Manhattan Community District 7 was less than 8.0 percent.

51. In 11 community districts, by contrast, the African-American population was more than 50 percent, including six where the African-American population was greater than 65 percent.

52. In order to measure how significant the variance was between the percentage of a group within a community district and the percentage of that group in the City as a whole, we looked at "relative difference," which we define as the difference between the citywide percentage of the group and the community district percentage, divided by the citywide percentage.[3]

---

[2] For the purposes of this section, "African-American" refers to non-Hispanic, single-race blacks or African-Americans (including Carribbean-Americans).

[3] If one didn't do this, and only looked at a percentage-point difference, one would not be able to determine the *significance* of a particular percentage-point different. Take, for example, variances between two pairs of numbers. In each pair, the percentage-point difference is nine points. In the first pair, the difference is between 1 percent and 10 percent. In the second pair, the difference is between 50 percent and 59 percent. In the first example, the nine percentage-

53. In 42 community districts, including Manhattan Community Districts 1, 5, 6, 7, and 8, the relative difference between the citywide African-American population and the community district African-American population was 50 percent or more (greater or lower).  These 42 community districts represent almost three-quarters of all community districts in the City.

54. At the citywide level, the population according to 2010 Census data was approximately 28.6 percent Latino.

55. Nevertheless, 10 community districts, including Manhattan Community Districts 1, 5, 6, and 8, had Latino populations of less than 10 percent.

56. In 12 community districts, by contrast, the Latino population was more than 50 percent, including nine where the Latino population was greater than 60 percent.

57. In 33 community districts, including Manhattan Community Districts 1, 5, 6, and 8, the relative difference between the citywide Latino population and the community district Latino population (the difference between the citywide percentage of Latinos and the community district percentage, divided by the citywide percentage), was 50 percent or more (greater or lower).  These 33 community districts represent more than half of all community districts in the City.  The relative difference between the citywide Latino population and the Latino population of Manhattan Community District 7 was slightly less than 48 percent.

58. At the citywide level, the combined population of African-Americans and Latinos was 51.4 percent.

---

point difference is nine times (or 900 percent) greater than the smaller of the two numbers; in the second example, the same nine percentage-point difference is only 18 percent greater than the smaller of the two numbers.  It is relative difference that puts the scope of a variation in context.

59. In 14 community districts, by contrast, the combined African-American and Latino population was less than 20 percent. These include Manhattan Community Districts 1, 5, 6, and 8.

60. In 17 others, the combined African-American and Latino population was 80 percent or more.

61. Residential segregation not only exists among the general population in the city, but among households who are eligible for the city's affordable housing programs.

62. Regardless of whether one examines households earning between 40 to 60 percent of area median income (AMI), 60 to 80 percent of AMI, 80 to 100 percent of AMI, 40 to 80 percent of AMI, 60 to 100 percent of AMI, or 40 to 100 percent of AMI, significant differences exist in most community districts between the percentage of households within the income range in the community district who are African-American and the citywide percentage of households in the income range who are African-American (based on 2008-12 American Community Survey data).

63. Looking at households earning from 40 to 60 percent of AMI, for example, the citywide percentage of those households who are African-American is 26.27 percent.

64. In 40 community districts (including Manhattan Community Districts 1, 5, 6, 7, and 8), however, the relative difference between that citywide percentage and the percentage of community district households within that income range who are African-American is 50 percent or more.

65. Looking at households earning from 60 to 80 percent of AMI, the citywide percentage of those households who are African-American is 26.43 percent.

66. In 41 community districts (including Manhattan Community Districts 1, 5, 6, 7, and 8), however, the relative difference between that citywide percentage and the percentage of

community district households within that income range who are African-American is 50 percent or more.

67. Looking at households earning from 80 to 100 percent of AMI, the citywide percentage of those households who are African-American is 24.94 percent.

68. In 42 community districts (including Manhattan Community Districts 1, 5, 6, 7, and 8), however, the relative difference between that citywide percentage and the percentage of community district households within that income range who are African-American is 50 percent or more.

69. Regardless of whether one examines households earning between 40 and 60 percent of area median income (AMI), 60 to 80 percent of AMI, 80 to 100 percent of AMI, 40 to 80 percent of AMI, 60 to 100 percent of AMI, or 40 to 100 percent of AMI, significant differences exist in most community districts between the percentage of households within the income range in the community district who are Latino and the citywide percentage of households in the income range who are Latino (based on 2008-2012 American Community Survey data).

70. Looking at households earning from 40 to 60 percent of AMI, for example, the citywide percentage of those households who are Latino is 29.74 percent.

71. In 28 community districts, however, the relative difference between that citywide percentage and the percentage of community district households within that income range who are Latino is 50 percent or more.

72. Looking at households earning from 60 to 80 percent of AMI, the citywide percentage of those households who are Latino is 27.03 percent.

73. In 28 community districts, however, the relative difference between that citywide percentage and the percentage of community district households within that income range who are Latino is 50 percent or more.

74. Looking at households earning from 80 to 100 percent of AMI, the citywide percentage of those households who are Latino is 24.00 percent.

75. In 32 community districts, however, the relative difference between that citywide percentage and the percentage of community district households within that income range who are Latino is 50 percent or more.

76. Another way to appreciate the extent of residential segregation in the City is to look at where approximately 50 percent of the citywide population of each major racial or ethnic group is living. According to 2010 Census data, approximately 50 percent of Latinos live in about one quarter of the City's community districts; about 50 percent of whites live in less than one quarter of the City's community districts; about 50 percent of Asians live in only 17 percent of the City's community districts; and approximately 50 percent of African-Americans live in only about 15 percent of the City's community districts.

77. There is no community district in the City where the current demographic pattern has not been influenced or shaped, at least in part, by past intentional discrimination or by past or current policies that perpetuate segregation.

78. There is no community district in the City where the current demographic pattern has been shaped exclusively by voluntary choice or by market forces.

79. There is no community district that the City has identified in analyses of fair housing or otherwise as constituting an exception to the claims made in paragraph 77 or 78, above.

**IV. The Creation and Evolution of the Outsider-Restriction Policy**

80. A significant part of the City's longstanding commitment to create affordable housing has been the City's policy of providing a variety of assistance to facilitate the inclusion of affordable housing units as part of both new rental and new for-sale housing stock. This assistance typically comes in the form of one or more of the following mechanisms: direct subsidy, tax exemptions or abatements, tax credits, site acquisition, and bond financing. Regardless of the particular mechanism used, this complaint will refer to instances where the City provides such assistance as instances of where the City "facilitates affordable housing creation."

81. In or about 1988, during the administration of Mayor Koch, a policy was introduced to give preference for 30 percent of affordable housing units in a development for residents of the community district in which the development was being built.

82. The City did not evaluate whether this policy would perpetuate residential segregation.

**V. The Current Outsider-Restriction Policy**

83. In or about 2002, near the start of the administration of Mayor Bloomberg, the City was pressured to increase the percentage of units where preference would be given to residents of the community district in which the development was being built.

84. At that time, the percentage was increased to 50 percent of units.

85. The Bloomberg Administration implemented the change without evaluating whether doing so would act to perpetuate residential segregation.

86. The Bloomberg Administration implemented the change without altering or modifying the stated justification for the outsider-restriction policy.

87. The outsider-restriction policy has remained unchanged since 2002.

88. Whenever the City facilitates housing creation, it requires that the developer conduct a lottery to select which applicants are selected for further review. For 38 percent of the affordable units, it requires that all applicants be treated equally; that is, they all have an equal opportunity to compete for the affordable units, regardless of where they reside.

89. For an additional 12 percent of the affordable units, the City requires that preference be given to applicants wherever in the City they reside, as follows: applicants who are City employees, 5 percent; applicants with mobility impairments, 5 percent; and applicants with auditory or visual impairments, 2 percent.

90. For fully 50 percent of the affordable units, however, the City requires that preference be given to applicants who currently live in the community district wherein the development is located (the City's current "outsider-restriction policy").

91. As a result of the City's outsider-restriction policy, applicants who neither live in the community district nor work for the City nor have a disability can compete initially for only 38 percent of affordable units. Similarly situated applicants who do live in the community district can compete for those 38 percent of affordable units; they then have another 50 percent of units all to themselves.

92. The City's outsider-restriction policy requires that all current residents of the community district in which the affordable housing development is being marketed get preference pursuant to the policy regardless of length of residency in the community district.

93. The outsider-restriction policy operates in favor of a current resident of a community district even if that person established residency in the community district directly prior to the commencement of the application period.

94. The outsider-restriction policy operates in favor of a current resident of a community district even if that person established residency in the community district on the final day of the application period.

95. The City's outsider-restriction policy does not grant or withhold a preference based on whether a person has been living in a community districts where he has "persevered through years of unfavorable housing conditions."

96. The City's outsider-restriction policy operates in a favor of a current resident of a community district even if that community district -- like Manhattan Community Districts 1, 5, 6, 7, and 8, where housing opportunities to which one or more of the plaintiffs applied is located -- is characterized by high levels of opportunity.

97. The City established the outsider-restriction policy without determining the range of housing options outside of a community district as to which some residents of that community district might be interested.

98. The City broadened its outsider-restriction policy (moving from 30 percent of units with a preference for community district residents to 50 percent of units) without determining the range of housing options outside of a community district as to which some residents of that community district might be interested.

99. The City maintains its outsider-restriction policy without determining the range of housing options outside of a community district as to which some residents of that community district might be interested.

100.   In most cases where affordable housing opportunities are made available through lottery, including the lotteries conducted for units in Manhattan Community Districts 1, 5, 6, 7, and 8 and other disproportionately white neighborhoods of opportunity, the number of applicants from outside of the community district far exceeds the number of applicants from inside the community district.   As such, each applicant out-of-community-district applicant has lower odds to be selected than does each in-community-district applicant.

101.   Because the overwhelming percentage of community districts in the City are characterized by residential segregation -- that is, significant overrepresentation or underrepresentation of a racial or ethnic group as compared with that group's share of the citywide population -- the outsider-restriction policy operates to perpetuate segregation in neighborhoods of New York City, including in Manhattan Community Districts 1, 5, 6, 7, and 8; other disproportionately white community districts (which are also, disproportionately, neighborhoods of opportunity); and other community districts and neighborhoods.   In other words, allowing all qualified applicants to compete on equal terms regardless of where they live in the City would predictably result in a lower level of segregation in the housing units to be tenanted than is the case under the City's outsider-restriction policy.

102.   By the same process, the outsider-restriction policy operates to impose a disparate impact on Plaintiffs, other African-American New Yorkers, and Latino New Yorkers in connection with the opportunity to compete for affordable housing opportunities in neighborhoods of opportunity, including neighborhoods within Manhattan Community Districts 1, 5, 6, 7, and 8 and other disproportionately white community districts.   Thus, for example, for Manhattan Community Districts 1, 5, 6, 7, and 8, the in-district applicants with higher odds to be

selected are disproportionately white, with disproportionately few African-Americans; the out-of-district applicants are less white and more African-American.

103.    The City's outsider-restriction policy does not have an impact on gentrification of a community district, which is to say it does not encourage or require incomes higher than the existing community district norm.

104.    Whether an insider or an outsider, an applicant must meet the same income-eligibility criteria in order to be eligible for the affordable housing being developed.

105.    In other words, under the current outsider-restriction policy, no applicant can have household income greater than the maximum established by the City and the developer.

106.    If the outsider-restriction policy were abandoned, there would still be no applicants who could earn over that maximum.

107.    To whatever extent the eligible income band established by the City and the developer in a particular case tends to encourage or reflect gentrification or not, the abandonment of the outsider-restriction policy would not increase that level of gentrification.

108.    The abandonment of the outsider-restriction policy would not limit such existing legal rights that the City may have to locate affordable housing where it choses to.

109.    The abandonment of the outsider-restriction policy would not limit such existing legal rights that the City may have to construct housing with the goal of neighborhood revitalization.

110.    The outsider-restriction policy deals not with the creation of housing but only with who gets to live in housing that is being or already has been created.

111.    There is no reason to believe that, of the New Yorkers who move into a new affordable housing development, those who had previously resided outside of the community

district would tend to be any less concerned about the health or welfare of their new building or their new neighborhood than those who had previously resided within that community district.

112.     The City has defined its most important interest as follows: there is "no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences," including differences based on race or national origin.

113.     The City knows and has known that the existence of residential segregation fosters prejudice and inter-group antagonism.

114.     The City has long known that "[r]acial segregation and discrimination in housing are persistent and constraining features of housing markets throughout the United States" and that the perpetuation of segregation can be an impediment to the goal of fair housing.

115.     The City knows that it has a non-waivable interest in "eliminating residential segregation," overcoming patterns of minority concentration, and insuring that "there is no undue concentration of Section 8 households within a particular community."

116.     The City knows or should know that racial segregation in housing "reflects not only a troubling history of racism and discriminatory policies," but also a "failure of government to recognize the role that race still plays in sorting us, even when policies are race neutral." Permitting racial segregation represents a failure to acknowledge "how our fate across communities within a metropolitan system is linked."

117.     The City knows or should know that racial segregation keeps African-Americans and Latinos "disconnected from opportunities like decent jobs, good schools and services," and thereby harms the "economic and social health of the entire region."

118.    The City knows or should know that areas of disproportionately high African-American or Latino populations tend to be characterized by higher-than-average rates of poverty, less access to health care, more exposure to toxins, lower-performing schools, and higher crime rates than other areas of New York City.

119.    The City knows or should know of studies documenting the damage to the life chances of children who grow up in neighborhoods of concentrated poverty.

120.    Indeed, New York's City Council passed legislation this year requiring the City's Department of Education to report on the demographics of schools because schools were found to be so racially segregated and that "a considerable body of research indicates that racial, cultural and economic diversity of schools is strongly associated with a range of short and long term benefits for all racial groups."

121.    The City knows or should know of studies documenting the benefits for children born into low-income who are able to move to neighborhoods of opportunity.

122.    The City knows or should know that the abandonment of the outsider-restriction policy would result in more housing citywide for African-American and Latino New Yorkers in neighborhoods of opportunity than the maintenance of the outsider-restriction policy.

123.    The outsider-restriction policy, by perpetuating residential segregation, has thus operated and operates to the detriment of the City's most important interest, as referenced in paragraph 112, other important City interests, and the interests of large numbers of African-American and Latino New Yorkers, as well.

124.    The City's outsider-restriction policy was enacted and continues though the City knew or should have known about the impact of its policy on African-Americans and Latinos and on the perpetuation of segregation.

125.     The City must be deemed to have intended the natural consequences of its actions.

126.     The City has implemented and continues to implement the outsider-restriction policy with deliberate indifference to the segregating consequences of that policy.

127.     In the alternative, the City has implemented and continues to implement the outsider-restriction policy with reckless disregard of the risk that the policy violates the civil rights of hundreds of thousands of New Yorkers.

128.     The City operates under a mandatory obligation to affirmatively further fair housing.

129.     Specifically, the City has been and continues to be a recipient of Community Development Block Grants and other federal funds.  As such, it was required to comply with the provisions of the Fair Housing Act, 42 U.S.C. §3601 *et seq.,* including the requirement of 42 U.S.C. §3608(e)(5) that it affirmatively further fair housing to the maximum extent possible.

130.     The City was and is also obligated to comply with the requirements of the Community Development Act, including the affirmatively furthering fair housing requirements of Section 104(b)(2) thereof [42 U.S.C. § 5304(b)(2)].

131.     The City knew and knows of these obligations, and operated its outsider-restriction policy in derogation of those obligations.

132.     The City's Department of Housing Preservation and Development (HPD) is responsible for implementing and overseeing the outsider-restriction policy.

133.     The only explanation for the outsider-restriction policy stated on HPD's website is that "[t]he community preference was established to provide greater housing opportunities for long-time residents of New York City neighborhoods where HPD has made a significant investment in housing."

134.    This explanation is pretextual and reflects consciousness of guilt about the operation of a policy that illegally perpetuates segregation.

135.    The City knows that, as a matter of policy, it causes housing to be developed in a way that results in the housing being built "generally in areas of relatively higher racial/ethnic concentrations and lower-income households than can be found in areas of 'higher opportunity.'"

136.    The City, instead of taking the opportunity to counteract the effect of its housing siting policies by eliminating the outsider-restriction policy, instead continues the outsider-restriction policy and thereby amplifies the restrictions on entry to high opportunity areas by African-Americans and Latinos, and limits opportunities for interracial association.

137.    The operation of the outsider-restriction policy must also be deemed intentional discrimination on the part of the City because the City rejected or failed to consider other pro-integrative alternatives to its outsider-restriction policy, as well as less-discriminatory alternatives.

138.    Since at least 2005, the City rejected proposals to replace the outsider-restriction policy with a citywide lottery system, one that could continue to set eligible income levels wherever the City wanted to.

139.    Throughout the Giuliani and Bloomberg administrations, little was done to prevent displacement of existing community district residents.

140.    Even though the City's percentage of residents with households income under $30,000 is approximately twice the percentage of the combined populations of Nassau, Suffolk, Westchester, Rockland, and Suffolk Counties; and even though the social services and other burdens of being the home of a disproportionate percentage of lower-income residents is a

financial drain on the City; the City has failed to try, formally or informally, to reduce barriers to affordable housing choice (and fair housing choice) imposed by its suburban neighbors.

141.    Throughout the period during which the outsider-restriction policy operated, the City failed to adopt a policy that would require one-to-one (or more than one-to-one) replacement for the loss due to redevelopment or otherwise of units affordable to families of low income in areas of the City that are neighborhoods of opportunity.

142.    The City's decision to accept the continuation of residential segregation is reflected by the fact that, throughout the course of the Giuliani and Bloomberg administrations, there were no active efforts to undo existing patterns of residential segregation.

143.    Indeed, the Bloomberg administration embarked on a series of rezonings of neighborhoods.  Some of these rezonings increased density.  These rezonings occurred most frequently in neighborhoods with disproportionately high African-American or Latino populations.

144.    On the other hand, a series of rezonings, advertised by the Bloomberg administration under the banner of  "preserving neighborhood character," were downzonings or "contextual rezonings."

145.    These rezonings occurred most frequently in neighborhoods with disproportionately high white populations, like central and southern Staten Island.  They tended to reduce or eliminate the ability of developers to construct multiple-dwelling housing, thereby reducing the possibility of constructing housing that contained an affordable component, and, in turn, reduced the possibility of constructing housing that had desegregation potential.

146.    That the City was content to leave residential segregation in place is also reflected by the fact that the plans, policies, and publications of the Bloomberg Administration's "New

Housing Marketplace" make no mention of the need to reduce segregation, or even of the need not to perpetuate segregation.

147. The Bloomberg administration even complained repeatedly about federal requirements to deconcentrate the locations of publicly assisted housing, including public housing.

148. The current "Housing New York" plan does not have among its "guiding principles" reducing or avoiding the perpetuation of segregation.

149. This is true even though "Housing New York" admits that many of the City's neighborhoods "remain dominated by a single racial or ethnic group" and that extensive poverty and lack of diversity in many neighborhoods "means that some families do not have access to the education, jobs, and other opportunities others enjoy."

150. "OneNYC" is the current plan for creating a "strong and just city."

151. Reducing or avoiding the perpetuation of residential segregation is not a stated goal of OneNYC's "equity vision" or of its other "visions."

152. With the exception of the allegations related to the specific plaintiffs in this case, the City has been aware of all of the foregoing facts alleged in the complaint.

153. In the alternative, to the extent that the City was not aware of any of the foregoing facts alleged in the complaint, it is because the City either recklessly disregarded the existence of these facts or else maintained itself in deliberate ignorance about these facts.

154. The City has implemented and operated the outsider-restriction policy even though HPD claims never to have produced statistical or factual tabulations or data in connection with assessing the policy questions of the impact of the use of the policy on the perpetuation of

segregation or on the advancement or impairment of the goal of affirmatively furthering fair housing.

155.    The City has implemented and operated the outsider-restriction policy even though HPD claims never to have made a final determination or issued a final policy regarding the question of the impact of the use of the outsider-restriction policy on the perpetuation of segregation or on the advancement or impairment of the goal of affirmatively furthering fair housing.

156.    The City has implemented and operated the outsider-restriction policy even though HPD claims never to have issued instructions to staff, affecting the public, concerning the question of the impact of the use of the outsider-restriction policy on the perpetuation of segregation or on the advancement or impairment of the goal of affirmatively furthering fair housing.

157.    The City has implemented and operated the outsider-restriction policy even though it claims not to track lottery outcomes by community district or by ethnic identification.

158.    The outsider-restriction policy is popular among many community boards, local politicians, and advocacy groups.

159.    Rather than try to educate these community boards, local politicians, and advocacy groups to the fact that the outsider-restriction policy perpetuates segregation and harms the City as a whole (most especially African-American and Latino New Yorkers), the City has curried favor with those supporting or thought to be supporting the outsider-restriction policy.

160.    Some of the support for the outsider-restriction policy from community boards, local politicians, and advocacy groups was based on a desire to preserve existing racial or ethnic demographics or culture of a neighborhood or community district.

161. Nevertheless, the City allowed itself to be influenced by such race- or ethnicity-based positions or by fear that an abandonment of the outsider-restriction policy would generate race- or ethnicity-based opposition from these community boards, local politicians, and advocacy groups.

162. The City considered it politically expedient to accede to the wishes of these community boards, local politicians, and advocacy groups.

163. Indeed, the City has admitted that, in its view, a requirement that it identify "determinants" of "fair housing issues" could be counterproductive because it is difficult to have a "thoughtful discussion" of issues of racial and ethnic housing segregation "against the backdrop of local politics."

164. That the outsider-restriction policy accedes to the race- and ethnicity-based backdrop of local politics is illustrated by the fact that a developer-participant in the City's affordable housing program has explicitly explained the purpose of the outsider-restriction policy as being to "help the area retain its traditional Latino identity."

165. That the City has considered the matter in stark racial terms is made clear by the fact that it has explicitly purported to know what African-American and Latino New Yorkers "want" (as if the wants of four million New Yorkers could be treated as a single, unitary position), saying, for example, that "Community districts throughout the City with large black and Hispanic populations want this community district preference."

166. In responding to an affirmatively further fair housing rule that HUD proposed in 2013 and about an affirmatively further fair housing assessment tool as to which HUD asked for comment in 2014, the City has complained that a fair housing analysis should always "account" for and "allow" for local "nuance, culture, and character," and has emphasized "choice" and

preference" among residents as important reasons for a neighborhood to be characterized by ethnic segregation (what the City calls ethnic "concentration").

167.     In the face of a Freedom of Information Law request, the City is unlawfully withholding information -- information that it can produce in a form that does not identify individuals -- that would allow an analysis, by race and ethnicity, of more than 700,000 participants in "NYC Housing Connect," the City's electronic program by which individuals can sign up and register to learn about City affordable housing opportunities and to apply for those opportunities.

168.     Specifically, the information being withheld includes the participant's race or ethnicity; any information about a participant's address (even zip code); the length of time that a participant has lived at his or her address; the participant's household size; the participant's annual household income; and the participant's reason or reasons for wanting to move.

169.     By withholding the information, the City is able to hide, among other things, the extent to which residents of predominantly African-American or Latino neighborhoods are interested in residential mobility, and the reasons for that desire.

170.     The withholding of this information reflects the City's consciousness of guilt about the operation of a policy that illegally perpetuates segregation and ignores the desires of substantial numbers of its citizens.

171.     Taken together, several factors -- the City's knowledge of, or deliberate indifference to, the impact of its outsider-restriction policy and its predecessors; the City's history and practice of racial discrimination and segregation; the City's responsiveness, for reasons of political expediency and otherwise, to racially- and ethnically-influenced community and political opposition to permitting neighborhood demographics to change and to allow all

New Yorkers equal opportunity for affordable housing opportunities in a neighborhood regardless of race or ethnicity; the City's own consideration of what it considered to be the policy desires of particular racial and ethnic groups; and the City's rejection of pro-integrative alternatives to its policy, in part because such alternatives posed political challenges -- demonstrate that the City's outsider-restriction policy constituted intentional discrimination for the purposes of the Fair Housing Act and the New York City Human Rights Law.

**VI. Ongoing Violation and Continuing Injury**

172.    Over the next several years, the City expects that the outsider-restriction policy will be applied to tens of thousands of housing units, perhaps even more than 100,000 housing units.

173.    Households with income between 40 and 100 percent of AMI will continue to be eligible to participate in lotteries for some or all of those units.

174.    Plaintiffs are now and can reasonably be expected in the future to be income-eligible for such housing units, including housing units located in neighborhoods of opportunity outside of the community district in which they live.

175.    Manhattan Community Districts 1, 5, 6, 7, and 8 are neighborhoods of opportunity as compared with many other community districts in the City.

176.    The above-average opportunity is reflected in many indicators including income, employment, educational attainment, school quality, and access to cultural and recreational facilities.

177. The outsider-restriction policy has restricted plaintiffs' ability to compete for housing on an equal basis with persons who already live in these high opportunity areas, and plaintiffs have been injured thereby.

178. Other African-Americans who have been eligible for, and who applied for, affordable housing units in high-opportunity and other disproportionately white community districts have likewise been injured by the outsider-restriction policy.

179. Latinos who have been eligible for, and who applied for, affordable housing units in high-opportunity and other disproportionately white community districts have likewise been injured by the outsider-restriction policy.

180. So long as plaintiffs continue to be interested in pursuing, and income-eligible for, affordable housing units located in high-opportunity and other disproportionately white community districts, as they are now, they will continue to be harmed by the outsider-restriction policy.

181. Other African-Americans interested in and income-eligible for affordable housing units located in high-opportunity and other disproportionately white community districts, will continue to be harmed by the outsider-restriction policy.

182. Latinos interested in and income-eligible for affordable housing units located in high-opportunity and other disproportionately white community districts will continue to be harmed by the outsider-restriction policy.

FIRST CAUSE OF ACTION

183. Plaintiffs repeat and reallege the allegations set forth in paragraph 1 to 182, above.

184. The City's outsider-restriction policy operated to perpetuate residential segregation in New York City and to cause plaintiffs to suffer a disparate impact based on race in the opportunity to compete for affordable housing opportunities, all in violation of 42 U.S.C. § 3604(a) and 42 U.S.C. § 3604(b).

## SECOND CAUSE OF ACTION

185. Plaintiffs repeat and reallege the allegations set forth in paragraph 1 to 182, above.

186. The City's outsider-restriction policy operated to perpetuate residential segregation in New York City and to cause plaintiffs to suffer a disparate impact based on race in the opportunity to compete for affordable housing opportunities, all in violation of NYC Admin. Code § 8-107(17).

## THIRD CAUSE OF ACTION

187. Plaintiffs repeat and reallege the allegations set forth in paragraph 1 to 182, above.

188. The City's outsider-restriction policy constituted intentional discrimination on the basis of race, in violation of 42 U.S.C. § 3604(a) and 42 U.S.C. § 3604(b).

## FOURTH CAUSE OF ACTION

189. Plaintiffs repeat and reallege the allegations set forth in paragraph 1 to 182, above.

190.    The City's outsider-restriction policy constituted intentional discrimination on the basis of race, in violation of NYC Admin Code § 8-107(5)(a)(1)(a) and NYC Admin Code § 8-107(5)(a)(1)(b).

## PRAYER FOR RELIEF

Plaintiffs respectfully request this Court to enter judgment against defendant, as follows:

(a) Declaring the City's outsider-restriction policy to be segregation-perpetuating, intentionally discriminatory, and violative of the Fair Housing Act and the New York City Human Rights Law;

(b) Permanently enjoining the City from operating the outsider-restriction policy; from creating or implementing other segregation-perpetuating preferences or limitations based on where in the City an applicant lives in connection with future affordable housing selection processes; and from creating or implementing other affordable housing selection processes, not based on where in the City an applicant lives, that would tend to perpetuate segregation;

(c) Requiring the City, under the supervision of this Court, to:

1. Develop and fund housing mobility programs designed to counter the effects of the City's segregation-perpetuating activities;

2. Leverage its partial or total ownership interest in, or control of, property -- both in the City and elsewhere -- to affirmatively further fair housing; and

3. Submit an annual affirmatively furthering fair housing plan that identifies, to the Court's satisfaction, all legally feasible steps to affirmatively further fair housing that the City could take and all the steps to affirmatively further fair housing that the City could take;

(d) Awarding nominal compensatory damages to each of the plaintiffs for the City's violation of their statutorily-protected rights;

(e) Awarding punitive damages to each plaintiff in an amount sufficient to punish the City for decades of a segregation-perpetuation policy and to deter future violations, all to the extent that a jury determines appropriate;

(f) Awarding plaintiffs their reasonable attorneys' fees and costs; and

(g) Awarding such other and further relief as to the Court seems just and proper.


<u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a jury trial on all claims alleged herein.


Dated: New York, New York
June 14, 2018


s/ Craig Gurian_____
Craig Gurian
Anti-Discrimination Center, Inc.
1745 Broadway, 17th Floor
New York, New York 10019
(212) 537-5824


s/ Mariann Meier Wang_____
Mariann Meier Wang
Heather Gregorio
Cuti Hecker Wang LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600

*Attorneys for Plaintiffs*