UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

SHAUNA NOEL and EMMANUELLA SENAT,

        Plaintiffs,

       -against-               15-CV-5236 (LTS) (KHP)

CITY OF NEW YORK,

        Defendant.

-------------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, Suite 7097
New York, New York 10177
(212) 537-5824
*Co-Counsel for Plaintiffs*

Mariann Meier Wang
Cuti Hecker Wang LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600
*Co-Counsel for Plaintiffs*

March 6, 2020


*On the brief:*
Craig Gurian
Roger D. Maldonado

# TABLE OF CONTENTS

TABLE OF CONTENTS............................................................................................................ i

    List of Charts................................................................................................................... iii

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION .................................................................................................................1

    A.     Defendant's distortion of the lottery process causes
            disparate impacts and perpetuates segregation .......................................................1

    B.     Defendant's asserted justifications for its policy fail as a matter of law ................5

STATEMENT OF FACTS .....................................................................................................7

ARGUMENT .........................................................................................................................7

    OUTLINE OF THE STAGES OF DISPARATE-IMPACT
    AND PERPETUATION-OF-SEGREGATION ANALYSES ..........................................7

    POINT I
    THE UNDISPUTED FACTS SHOW THAT DEFENDANT'S POLICY
    CAUSES SUBSTANTIAL DISPARATE IMPACTS BASED ON RACE ......................9

    A.     Disparate-impact liability under the FHA: initial legal principles..........................9

          (i) Injury and scope of analysis ................................................................................9

          (ii) Only one group needs to have been disadvantaged ........................................10

          (iii) Analysis must facilitate, not obscure, the existence of patterns ....................11

    B.     FHA disparate-impact liability: causation and proof that the policy
            denies New Yorkers on the basis of race the opportunity to compete
            on a level playing field...........................................................................................13

          (i) Robust causation ...............................................................................................13

          (ii) Statistical evidence: part I ...............................................................................16

               (a) Entrants...............................................................................................17

               (b) Apparently eligible applicants............................................................20

(iii) Statistical evidence: part II.............................................................................21

C.      FHA disparate-impact liability: causation
and proof at the bottom line (units awarded) .......................................25

(i) Robust causation ....................................................................................25

(ii) Statistical evidence.................................................................................27

D.      City HRL disparate-impact liability.......................................................32

POINT II
THE UNDISPUTED FACTS MAKE CLEAR THAT DEFENDANT'S POLICY
PERMITS SUBSTANTIALLY LESS INTEGRATION (PERPETUATES
SEGREGATION MORE) THAN WOULD BE THE CASE IN THE ABSENCE
OF THE POLICY ..................................................................................................34

A.      FHA perpetuation-of-segregation liability.............................................35

(i) Robust causation ....................................................................................36

(ii) Statistical evidence.................................................................................37

(a) Actual awardees.................................................................................39

(b) Apparently eligible analysis .............................................................40

(c) Simulation..........................................................................................41

B.      City HRL perpetuation-of-segregation liability....................................42

POINT III
DEFENDANT HAS FAILED AS A MATTER OF LAW TO MEET ITS STAGE
2 BURDEN OF PROVING THAT THE POLICY HAS A LEGALLY
ADEQUATE JUSTIFICATION, A BURDEN APPLICABLE TO CLAIMS OF
DISPARATE IMPACT AND PERPETUATION OF SEGREGATION ALIKE............45

A.      Justification defense under the FHA.......................................................45

B.      Justification defense under the City HRL...............................................46

C.      Partial summary judgment is sought in
relation to each justification individually ...............................................47

D.    Defendant's Justification 1: relating to ensuring local
      residents who have persevered through years of unfavorable
      living conditions can participate in neighborhood renaissance ............................48

E.    Defendant's Justification 2: relating to preventing and mitigating
      Displacement.........................................................................................................50

F.    Defendant's Justification 3: relating to preventing and mitigating
      *fear* of displacement..............................................................................................55

G.    Defendant's Justification 4: the policy is needed to cause defendant's
      own legislative branch to act in the best interests of defendant............................57

      (1) An unprecedented justification...........................................................................58

      (2) A justification that would undermine the FHA and the City HRL .................58

      (3) A justification that is speculative .....................................................................59

      (4) A justification that defendant cannot demonstrate is necessary......................60


CONCLUSION......................................................................................................................63

## List of Charts

Chart 1-  Outsider-to-insider-change method: Whites compared to
non-dominant demographic groups in majority-White CD typology (entrants) ..........................19

Chart 2 - Outsider-to-insider-change method: Whites compared to
non-dominant demographic groups in majority-White CD typology (simulated awards) ............29

Chart 3 - Outsider-to-insider-change method Blacks compared to
non-dominant demographic groups in majority-Black CD typology (simulated awards)..............29

Chart 4 -  Perpetuation of Segregation: Share of Net-Integrative Moves Among
All CB Moves as Percentage of Net-Integrative Moves Among All Non-CB Moves ..................38

<u>TABLE OF AUTHORITIES</u>

CASES

*Albunio v. City of New York*, 16 N.Y.3d 472 (2011) ........................................... 32, 33, 42, 43, 47

*Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29
 (N.Y. App. Div. 1st Dept. 2011) .................................................................................... 33, 43, 47

*Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) ........................................................ 10, 11, 12, 18

*Connecticut v. Teal*, 457 U.S. 440 (1982) ...................................................................... 12, 13

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) ...................................................................... 46, 49

*Easterling v. State of Connecticut*, 783 F. Supp. 2d 323 (D. Conn. 2011) ................................... 23

*Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC,*
 2017 WL 2022462 (W.D. Wash. May 12, 2017) ...................................................................... 52

*Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC*,
 743 F. App'x 116 (9th Cir. 2018) ...................................................................................... 52

*Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*,
 630 F.2d 79 (2d Cir. 1980) .............................................................................................. 53

*Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*,
 113 F. Supp. 3d 663 (S.D.N.Y. 2015) .............................................................................. 20, 22

*Huntington Branch, N.A.A.C.P. v. Town of Huntington*,
 844 F.2d 926 (2d Cir. 1988) ................. 35, 38, 39, 40, 43, 44, 45, 46, 47, 49, 52, 53, 57, 60, 62

*Langlois v. Abington Housing Auth.*, 234 F. Supp. 2d 33
 (D. Mass. 2002) ............................................................................................ 11, 12, 20, 22, 58

*Levin v. Yeshiva Univ.*, 96 N.Y.2d 484 (2001) ............................................................................ 46

*Loeffler v. Staten Island University Hosp.,* 582 F.3d 268 (2d Cir. 2009) ..................................... 42

*Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006) .................................. 22, 23

*MHANY Mgmt., Inc. v. County of Nassau*,
 819 F.3d 581 (2d Cir. 2016) .............................. 1, 9, 10, 11, 13, 17, 24, 35, 38, 45, 46

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978) ........................................... 10

CASES (CONTINUED)

*Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999) ................................................. 22, 23

*Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct. 2507 (2015) .......................................... 9, 12, 13, 35, 42, 44, 45, 59, 63

*Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) ........................................ 17

*United States v. City of New York* ("*Firefighters*"),
    637 F. Supp. 2d 77 (E.D.N.Y. 2009) ................................................ 22, 31, 46, 49

*United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419 (E.D.N.Y. 1995) ........................... 36

*Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989) .................................... 43

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988) ............................................... 17

*Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62
    (N.Y. App. Div. 1st Dept. 2009) ...................................... 33, 43, 44, 47, 59

*Winfield v. City of New York*, 2016 WL 6208564 (S.D.N.Y., Oct. 24, 2016) ....................... 10, 13


FEDERAL STATUTES

Fair Housing Act, 42 U.S.C. § 3601 *et seq.* .......................................................... *passim*

42 U.S.C. § 3604(a) ........................................................................................ 42


REGULATIONS

24 C.F.R. § 100.500(a) (2020) ............................................................... 11, 35, 40, 45

24 C.F.R. § 100.500(b) (2020) ............................................................... 45, 51, 52, 60

24 C.F.R. § 100.500(c) (2020) ............................................................................. 45, 49

Implementation of the Fair Housing Act's Discriminatory Effects Standard,
    78 Fed. Reg. 11460 (Feb. 15, 2013) ........................................................ 17

## NEW YORK CITY ADMINISTRATIVE CODE AND LOCAL LAWS

New York City Human Rights Law (Title 8 of N.Y.C. Admin. Code) ................................. *passim*

N.Y.C. Admin. Code § 8-107(5)(a)(1)(a) ......................................................................... 42, 43, 47

N.Y.C. Admin. Code § 8-107(17)(a) ......................................................... 32, 46, 49, 52, 60, 62

N.Y.C. Admin. Code § 8-130 ........................................................................................ 33, 43, 47

N.Y.C. Local Law 35 of 2016 (Mar. 28, 2016),
    2016 NYC Legislative Annual, at 177 .................................................................................. 33, 47

N.Y.C. Local Law 85 of 2005 ("Restoration Act") (Oct. 3, 2005),
    2005 NYC Legislative Annual, at 528-35 ............................................................. 33, 42, 43, 47

March 8, 2016 Committee Report accompanying the legislation (Intro 814-A) that
    became NYC Local Law 35 of 2016 ("Local Law 35 of 2016 Committee Report"),
    2016 NYC Legislative Annual, at 170-76 ................................................................................ 33

August 17, 2005 Committee Report accompanying the legislation (Intro 22-A)
    that became NYC Local Law 85 of 2005 (the "Restoration Act"),
    2005 NYC Legislative Annual, at 536-39 ................................................................................ 43

## LAW JOURNALS

Craig Gurian, "A Return to Eyes on the Prize", 33 Fordham Urb. LJ 255 (2006) ....................... 47

INTRODUCTION

New York City remains significantly residentially segregated. It is against that landscape that defendant City of New York conducts lotteries for the affordable housing that is in such short supply.[1] With some exceptions not relevant to this case, developers who offer affordable units to the public are subject to the marketing rules of defendant's Department of Housing Preservation and Development ("HPD") and the New York City Housing Development Corporation ("HDC"). These rules provide that the affordable housing units be distributed not by an equal-access lottery process, but by a lottery process discriminatorily warped by defendant's "community preference" policy as to unit allocation and sequencing of applicant review.

Plaintiffs have limited their summary judgment motion to their disparate-impact and perpetuation-of-segregation claims (leaving prosecution of their intentional discrimination claim for trial, if necessary).[2] The granting of partial summary judgment as to any of the six elements of plaintiffs' motion would simplify the trial of this matter substantially.

**A. Defendant's distortion of the lottery process causes disparate impacts and perpetuates segregation**

Instead of permitting all participants in a lottery to compete on a level playing field for affordable housing opportunities *regardless of where in the City the applicant household comes*

---

[1] Defendant is seeking to create and preserve 300,000 affordable units, including 120,000 new-construction units, by 2026. Some critics say that the program is not sufficiently targeted to the poorest New Yorkers or argue that too many of the "affordable" units are not really affordable. Those issues are not part of this case. Similarly, whether an apartment is awarded to someone who lives in the community district ("CD") where the development is located or to a New Yorker who lives outside that CD has no impact on gentrification: for each apartment made available through the lottery, the characteristics of the winning applicant in terms of household size and income will be the same.

[2] Plaintiffs have compiled compelling evidence from defendant's officials and documents that defendant expanded and maintains the preference as a matter of being influenced by those who wish to retain the segregated residential status quo, a set of facts that constitutes intentional discrimination. *See, e.g., MHANY Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016). Because the determination of that issue requires the weighing of factual evidence, however, plaintiffs recognize that summary judgment is not appropriate. Unfortunately, it is defendant's stated intention to burden the Court with a "cross-motion" on that issue.

1

*from and regardless of where the applicant household wishes to move*, defendant imposes what it calls a "community preference" policy in respect to 50 percent of the units.

That policy takes the highly diverse citywide applicant pool that is generated each time a lottery is announced and artificially splits that pool into two sub-pools. One consists of those applicants who live in the community district ("CD") where the development is located ("insiders" or "CP beneficiaries"); the other consists of New York City applicants who live outside of the CD where the development is located ("outsiders" or "non-beneficiaries").[3]

Defendant's policy has an *allocation* element: requiring that insiders receive priority for 50 percent of the units *regardless of how small a fraction of all applicants that insiders constitute.* Defendant's policy also has a *sequencing* element: requiring that, until the priority units are filled, insiders *(regardless of how bad their assigned lottery numbers may be)* normally have their applications reviewed by developers before any outsider applicants *(regardless of how good any outsider's number may be).*

Allocation and sequencing, of course, are critical to the selection process. In the first instance, the policy's allocation requirement means that, in most cases, outsiders are effectively barred altogether from competing for 50 percent of the units. But even when one examines the odds of getting any unit, defendant, by virtue of over-allocating units to insiders (50 percent when insiders might only be 5 percent of the overall applicant pool), takes what would otherwise be an equal-access system (when you enter, you have the same odds as everyone else to compete) and distorts the system so that insiders at the moment they enter the lottery have far better odds of getting an award than outsiders (30 times better in the case of lotteries in majority-White CDs).

Sequencing, too, has several important consequences beyond the obvious one (the

---

[3] The parties put to the side the small percentage of non-NYC applicants. Plaintiffs' delineation of insiders adjusted for the small fraction of those living in the CD who get a unit because of the operation of two disability set-asides.

sequencing ensures that a greater percentage of insiders are reached for consideration by a developer than the percentage of outsiders; being reached is a prerequisite for selection). For example, the supply of a particular unit type[4] in a lottery may be exhausted even before *any* outsiders are reached. This is because distribution of any and all available units is first-come, first-served, with the policy's sequencing distorting who is first-come, first-served. The result is that outsiders are more apt than insiders to be *partially closed-out* (have some of the unit types for which they are apparently eligible no longer available by the time they are considered by the developer) or *fully closed-out* (have *all* of the unit types for which they are apparently eligible no longer available by the time they are considered by the developer).

Defendant does not dispute the fact that its policy gives a substantial boost to insiders. Likewise, it does not dispute that the necessary correlate is that the policy disadvantages outsiders significantly.[5] The question is: given that the insider sub-pool is typically more demographically unbalanced than the outsider sub-pool, can defendant operate its policy without causing disparate impacts and without perpetuating segregation?

The answer is a resounding no. In terms of disparate impact, plaintiffs' expert, Professor Andrew Beveridge, grouped New York City's CDs into seven community district typologies: majority White, majority African American, majority Latino, majority Asian, plurality White, plurality African American, and plurality Latino. This allowed him to explore the logical probability that a policy that *operates* on a local, CD basis would have *multiple and varied localized disparate impacts*, helping and hurting different demographic groups depending on the CD typology in which the applied-for housing is located.

---

[4] *E.g.*, a two-bedroom renting for $870/month for applicants with a household income ranging from $31,225 for two-person households to $45,300 for four-person households.

[5] Hence, the accuracy of plaintiffs' description of the policy as the "outsider-restriction" policy.

In all of the majority CD typologies the advantages of insider status *always* flowed most strongly to the majority group of the CD typology. Moreover, this was true not only in terms of the opening odds in the ability to compete successfully for a unit, but also, *inter alia,* in terms of the bottom-line result of actually getting a unit.[6]

So, for example, in lotteries held in majority-White CDs, the relative increase from the entrant share of outsiders who were White to the entrant share of insiders who were White was 169 percent. That advantage in disproportionately enjoying insider status was paired with a relative decrease of 67 percent for African Americans from their share of outsiders to their share of insiders (*i.e.,* disproportionately suffering the disadvantage of *not* benefitting from insider status). The injury suffered by those African American entrants by not being able to compete on a level playing field where they chose to apply is imposed at the moment of entry in a particular lottery; the prospect of being unfairly *advantaged* if they were later to come to apply for housing as insiders in an CD that has an African American majority changes nothing about that injury.

The evidence of perpetuation of segregation in this case is unmistakable as well. Of the slightly more than 3.1 million applications that the parties agree are apparently-eligible for one or more unit types in the lottery applied for, outsiders comprise, depending on CD typology, between 87.42 of all apparently eligible applicants (majority-Asian CD typology) and 96.90 percent of all apparently eligible applicants (majority-White CD typology). As Professor Beveridge concluded, a policy that squeezes the prospective moves sought by the more-diverse outsider sub-pool down to 50 percent of the available units retards integration more than would an equal-access process where the moves made by the more-diverse outsider sub-pool are not artificially constrained.

Tellingly, the simulations run by defendant's own expert, Dr. Bernard Siskin, when

---

[6] Racial disparities were caused in plurality neighborhood typologies as well, discussed as part of Point I, *infra*.

4

disaggregated to reveal information that Dr. Siskin chose not to report, were fully confirmatory of Professor Beveridge's conclusions both as to disparate impact and as to perpetuation of segregation. In respect to perpetuation of segregation, for example, Professor Beveridge took Dr. Siskin's simulation of the awards process (which Dr. Siskin ran 1,000 times with the community preference in effect) and disaggregated the results to distinguish between CP beneficiaries (those awarded community preference in the simulations) and non-beneficiaries (everyone else awarded a unit in the simulations). The net-integrative result of the CP-beneficiary moves (the amount by which integrative moves exceeded segregative moves) was substantially *less integrative* than the net-integrative result of the non-beneficiary moves.

One further point should be mentioned here. An examination of the hundreds of thousands of unique applicant households that submitted the more than 7 million applications that Professor Beveridge analyzed showed that *87 percent* of those unique households applied *outside* of their community district *at least 75 percent of the time*. In other words, defendant's hierarchy of which moves should be encouraged with better odds and which moves should be discouraged with lower odds does not reflect the pattern established by actual applications from actual New Yorkers.


**B. Defendant's asserted justifications for its policy fail as a matter of law**

Turning to defendant's justifications for the policy (as to which defendant has the burden of persuasion), actual evidence of the policy's relationship to each of the stated justifications is so lacking that a separate grant of partial summary judgment in favor of plaintiffs must be made as to each. Legally fatal deficiencies in the justifications include but are not limited to the following:

(a) Defendant cannot prove a sufficient relationship between the policy and the asserted interest of prioritizing the needs of those who have "persevered through long years of unfavorable

living conditions." Indeed, there is no fit between the two. Preference is given to an insider even if that insider is a relative newcomer to the CD, and even if the insider has not persevered through any unfavorable living conditions. All outsiders are disadvantaged even if they have persevered through long years of unfavorable living conditions.

(b) Defendant cannot prove a sufficient relationship between the policy and the asserted interest of preventing or mitigating displacement. Again, there is no evidence of a relationship. As defendant admits, it has not quantified the scope of involuntary displacement either on a citywide, CD, or neighborhood level and it does not consider information about actual or perceived applicant risk of displacement. What there is undisputed evidence of is this: using rent burden as a proxy for displacement risk, outsiders, in percentage terms, are just as much at risk as insiders (and that, in terms of raw numbers, outsiders at risk *far exceed* the number of insiders at risk).

(c) Defendant cannot prove a sufficient relationship between the policy and the remarkably amorphous asserted interest of reducing the "fear of displacement." Here, again, the justification is put forward without being able to quantify the extent of fear or the extent to which the policy reduces fear; without being able to demonstrate the extent to which the policy would be necessary to reduce fear in relation to other tenant-protection measures; and without being able to explain how the putative fear of displacement experienced by some insiders would be lessened by the fact that, at some undetermined point in the future, there might be a development built in their CD that might, after an extended process and only if the household size and income requirements fit their needs, give them an undetermined chance to win a lottery.

(d) Defendant cannot prove that its policy is necessary to yield Council Member ("CM") support for land-use changes needed to facilitate affordable housing production or for particular affordable housing developments. Not only are there a host of factors that influence CM decisions

(including various investments in the district of the relevant CM), defendant admits that what CMs would do in a future where a community preference policy did not exist is entirely speculative. This is precisely the evidentiary posture that is insufficient to meet a defendant's burden. Moreover, to expect CMs to act in a way to deny desperately needed affordable housing to every New Yorker (including their local constituents) because their local constituents could not get a disproportionate share of that housing would be to expect them to act, as former Deputy Mayor Alicia Glen acknowledged at her deposition, in a manner contrary to the interests of their constituents and contrary to the interests of defendant.

## STATEMENT OF FACTS

Plaintiffs' Statement of Material Facts Not in Dispute and the March 4, 2020 Declaration of Professor Andrew A. Beveridge are incorporated herein by reference.[7]

## ARGUMENT

### OUTLINE OF THE STAGES OF DISPARATE-IMPACT AND PERPETUATION-OF-SEGREGATION ANALYSES

Under the Fair Housing Act ("FHA") and the New York City Human Rights Law ("City HRL"), it is plaintiffs' burden to demonstrate that the challenged practice causes the existence of a disparate impact or impacts *or* results in the perpetuation of segregation (each is a standalone theory). For both disparate impact and perpetuation, this is called "Stage 1." At the next stage ("Stage 2"), it is defendant's burden under the FHA to demonstrate that the challenged practice is necessary to achieve one or more substantial, nondiscriminatory, legitimate interests of defendant;

---

[7] Hereafter, references preceded by "PS" shall refer to Plaintiffs' Statement of Material Facts Not in Dispute; references preceded by "BD" shall refer to the March 4, 2020 declaration of Professor Beveridge.

and it is defendant's burden under the City HRL to demonstrate that the challenged practice is significantly related to a significant interest of defendant. Even if defendant were to make its Stage 2 demonstration, plaintiffs would still prevail if one or more less-discriminatory alternatives were available to defendant (less-discriminatory alternative analysis constituting "Stage 3"). The Stage 3 burdens of proof differ as between the FHA and the City HRL but are not implicated here because plaintiffs' motion is only directed at Stage 1 and Stage 2.

Specifically, plaintiffs' motion asks the Court to find as a matter of law that plaintiffs have met their Stage 1 burden as to disparate impact (defendant's outsider-restriction policy causes racially disparate impacts) under both the FHA and the City HRL. *See* Point I, *infra.* Plaintiffs' motion further asks the Court to find as a matter of law that plaintiffs have met their (alternative) Stage 1 burden as to perpetuation of segregation (defendant's outsider-restriction policy results in perpetuation of segregation) under both the FHA and the City HRL. *See* Point II, *infra.* Finally, plaintiffs' motion asks the Court to find as a matter of law that defendant cannot meet its Stage 2 burden of demonstrating a legally adequate justification for its policy under either the FHA or the City HRL. *See* Point III, *infra.* If the Court agrees that plaintiffs have met their Stage 1 burden as to either impact or perpetuation, and further finds that defendant has failed as a matter of law to meet its Stage 2 burden, then liability attaches as to the relevant claim or claims. Even if the Court were to agree with plaintiffs' view of the evidence only in part, any element of the case that is determined as a matter of law would simplify the contours of a trial.

THE UNDISPUTED FACTS SHOW THAT DEFENDANT'S POLICY
CAUSES SUBSTANTIAL DISPARATE IMPACTS BASED ON RACE.

Plaintiffs' motion asks the Court, *inter alia*, to find as a matter of law that plaintiffs have proven that the challenged policy causes a racially disparate impact or impacts (that is, that the plaintiffs have proven Stage 1 of their disparate impact case).

## A. Disparate-impact liability under the FHA: initial legal principles

As the Supreme Court reaffirmed just prior to the commencement of this case, lawsuits targeting "housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification" reside "at the heartland of disparate-impact liability." *Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.* ("*Inclusive Communities*"), 135 S. Ct. 2507, 2521-22 (2015). Consistent with both the FHA's statutory language and the purpose of the FHA to provide, to the full constitutionally-permitted maximum, "for fair housing throughout the United States," there is FHA liability for a policy that creates disparate impacts (discussed here, in Point I) and FHA liability for a policy that results in perpetuation of segregation (discussed in Point II, *infra*). *Id. See also MHANY*, 819 F.3d at 619-20 (citation omitted) (in case decided in wake of *Inclusive Communities*, Second Circuit reaffirmed the viability of two methods of proving discriminatory effect: "(1) 'adverse impact on a particular minority group,' and (2) 'harm to the community generally by the perpetuation of segregation.'").

**(i) Injury and scope of analysis.** The first principle that needs to guide the analysis of disparate impact is the nature of the injury. This Court has previously explained that plaintiffs' injury "relates to *denial of the opportunity to compete on an equal footing for fair housing in their*

*desired neighborhoods*, rather than from the failure to achieve a successful result in any particular lottery." *Winfield v. City of New York*, 2016 WL 6208564, at *4 (S.D.N.Y., Oct. 24, 2016) (emphasis added). This is longstanding doctrine in preference cases. *See Comer v. Cisneros*, 37 F.3d 775, 794 (2d Cir. 1994) ("[T]he injury to the . . . plaintiffs cannot be defeated by showing that, as a practical matter, the plaintiffs would never receive housing assistance anyway. The injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete for suburban housing on an equal footing with local residents."). This principle has important consequences even beyond the fact that the lack of a level playing field in terms of competition cannot be saved even were defendant able to show bottom-line racial balance (which it cannot do here).

It also means that it is improper to exclude from analysis those applicants who come to have very poor lottery numbers and, accordingly, would not be considered by developers even in the absence of defendant's policy. *Comer* is explicit on this point. In that case, the facts appeared to show that there were only enough federal funds to provide assistance to applicants who had a *federal* preference; since the named plaintiffs did not have a federal preference, defendants argued that the named plaintiffs would not have gotten assistance even in the absence of the suburban-resident preference that was the subject of their complaint. The Second Circuit in *Comer* rejected the argument, highlighting the injury as the denial to compete on equal terms. *Id.*[8]

**(ii) Only one group needs to have been disadvantaged.** The second principle is that there needs to be adverse impact shown as to "*a particular minority group,*" *MHANY*, 819 F.3d at

---

[8] *Comer* analogized to the situation where an applicant for medical school would not have been admitted even in the absence of a preferential program. That applicant, the Supreme Court held, had the right to compete for all 100 places in the medical school class. *Comer*, 37 F.3d at 794, *citing Regents of University of California v. Bakke*, 438 U.S. 265, 280-81 n.14 (1978).

619 (emphasis added), as opposed to *all* demographic groups.[9]  Here, it will be shown, plaintiffs have exceeded the required standard.

**(iii) Analysis must facilitate, not obscure, the existence of patterns.**  The third principle is that analysis should be designed to make comparisons that enable the determination of whether discriminatory patterns exist, not in a manner that disguises such patterns.  In this case, that means examining the data by CD typology (majority White, etc.), as plaintiffs' expert Professor Beveridge has done.  The contrast between the circumstances present in *Comer* and those present in *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002) provides a useful illustration of why.  In *Comer*, a consortium of 41 suburban communities had a *single* Section 8 housing assistance program that had a *single* waiting list.  It was appropriate in that circumstance to compare the demographics of the relevant residents of the City of Buffalo, on the one hand, and the *aggregate* demographics of the suburban consortium communities, on the other, because the application process did not differentiate between and among the individual suburban communities. *See Comer*, 37 F.3d at 793 (pointing to the fact that the plaintiffs support their argument that the local preference blocks African American residents of Buffalo from moving to the suburbs with "statistics that demonstrate that while there are many blacks who live within the city limits, many less live in suburban Buffalo").

In *Langlois*, on the other hand, the defendants were the public housing authorities of eight different suburban communities.  The court did *not* aggregate all of the applicants and all of the voucher holders from all of the communities and then look for disparities overall, but rather

[9] *See also* 24 C.F.R. § 100.500(a) (2020) (emphasis added) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on *a* group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.").

examined separately the disparities from each community. *Langlois*, 234 F. Supp. 2d at 58-63.

In this case, neither applications, waiting lists, nor awards are for "lottery housing" in general. Each time an applicant applies, he or she is entering a lottery for affordable housing in a specific development in a specific CD. [PS, ¶ 11.] The demographics of different CDs vary dramatically (*e.g.*, Brooklyn CD-16 is 72.70 percent African American and 2.94 percent White; Manhattan CD-2 is 2.04 percent African American and 75.91 percent White). [BD, Ex. 3, at 2-3; PS, ¶¶, 34-35.] Treating CDs as part of an aggregated whole: (a) ignores the fact that it is specific lotteries to which applicants apply; (b) ignores the teaching of *Comer* that the relevant inquiry is whether a preference has the effect of filtering down the percentage of a group that gets to live in the locally preferred area, *Comer*, 37 F.3d at 793; and (c) ignores the "overarching intuitive principle" that "where a community has a smaller proportion of minority residents than does the larger geographical area from which it draws its applicants . . . a selection process that favors its residents *cannot but* work a disparate impact . . . ." *Langlois*, 234 F. Supp. 2d at 62.

In explaining his methodology, Professor Beveridge, drawing on his expertise, *inter alia*, in analyzing housing discrimination and housing segregation, notes that grouping individual lotteries by CD typology "provide[d] a classification system that gave me the ability to prove or disprove the existence of a variety of localized disparities in the demographic groups benefitting from the community preference policy and those who are disfavored . . . ." [BD, at 8-9, ¶ 21.] In other words, one cannot test whether there are differing localized effects if one looks citywide.

Finally, only the localized approach is consistent with the teaching of *Connecticut v. Teal*, 457 U.S. 440 (1982).[10] Neither a victim of disparate treatment nor disparate impact may be told

---

[10] *Teal* arose in the employment (Title VII) context, but the Fair Housing Act is often analogized to Title VII. *See, e.g.*, *Inclusive Communities*, 135 S. Ct at 2522-23 (analyzing Title VII's "business necessity" standard to justifications available in disparate-impact cases in the fair housing context).

that "he has not been wronged because other persons of his or her race or sex were hired." *Id.* at 455-56. It is no help to the African American New Yorker disadvantaged when he wishes to move from a CD that has an African American majority to affordable housing being lotteried off within a majority-White CD that he would be afforded *better* than an even playing field if only he stayed where he was. *See also Winfield*, 2016 WL 6208564, at *4 (explaining that the intruded-upon right is the right to a level playing field in the neighborhoods that an applicant desires). The right in question is not a level playing field *some of the time*, but rather a level playing field *all of the time*. *See also Inclusive Communities*, 135 S. Ct. at 2521-22 (emphasis added) (identifying the prevention of the exclusion of minorities from certain *neighborhoods* as a key purpose of the FHA).[11]

## B. FHA disparate-impact liability: causation and proof that the policy denies New Yorkers on the basis of race the opportunity to compete on a level playing field

The facially neutral practice in question must be shown to produce a "significantly adverse *or* disproportionate impact on persons of a particular type," *MHANY*, 819 F.3d at 617 (emphasis added), and the Supreme Court has underlined what it calls a "robust causality requirement"; that is, the plaintiff being able to "point to a defendant's policy or policies causing [the] disparity." *Inclusive Communities*, 135 S. Ct. at 2523.

**(i) Robust causation.** Here, the robust causation is straightforward. Whether the issue is framed as outsiders (non-beneficiaries) having the *disadvantage* of not being permitted to compete

---

[11] Defendant has made clear its countervailing legal view: that a separate-but-equal citywide balancing approach (harm in one CD typology can be offset by help in another CD typology) should be adopted, even to the extent of taking the position that a hypothetical borough-based preference system that effectively operated to *completely* exclude African Americans from a 100 percent White borough and to completely exclude Whites from a 100 percent African American borough would not represent a preference system with disparate impact. [PS, ¶¶ 82-84.]

for the 50 percent of units in a lottery that are community preference units [PS, ¶¶ 20-21][12] or insiders (CP beneficiaries) having the *advantage* of being able to compete for 100 percent of units,[13] the advantages and disadvantages are caused directly by the challenged policy's allocation rules. [BD, at 19, ¶ 57; and at 20, ¶ 62.] There is not a complicated sequence: the block of units for which outsiders cannot compete are held back from them by the terms of the policy itself.

In terms of the odds of getting an award of any unit, here again it is the policy's allocation rules that create a huge differential between insiders and outsiders. Under a system *without* community preference, Professor Beveridge explains:

> entrants to a lottery would have the same 'prior probability' of getting an award, regardless of where they live in relation to where they are applying to live. These are the odds that exist at the moment one enters the lottery. Under the community preference system, by contrast, each insider applicant receives a very substantial boost in odds . . . . From that moment on under the community preference system, insiders and outsiders are competing on a playing field that is tilted in the favor of insiders."

[BD, at 19, ¶ 59 (citation omitted)]. More specifically, for each separate lottery, the outsider-restriction policy splits the single, unified pool of applicants so that a very small insider group (2.64 percent of all applicants for lottery in majority-White CDs, for example) and a very large outsider group (97.36 percent of all applicants for lotteries in majority-White CDs) compete for a similar number of units (outsiders are the overwhelming percentage of all applicants in all the other CD typologies, too). [BD, at 18-19, ¶ 56 (text and accompanying note 29); PS, ¶¶ 44-45.] In the circumstances, the policy-created odds cannot help but to be much better for insiders, ranging from more than six times better in the plurality-Black CD typology to more than 30 times better in the

---

[12] Some lotteries have not had enough qualified insiders to all of the community preference units. Even in those cases, there are a substantial percentage of units as to which outsiders cannot compete. [PS, ¶ 22.]

[13] Even if an insider is not reached by a developer during the community preference phase, that insider is able to compete in the later parts of the lottery that are open to outsiders. [BD, at 16-17, ¶ 50 n.27; PS, ¶ 31.]

majority-White CD typology. [BD, at 17-18, ¶¶ 54-57 (including Table 2); PS, ¶ 48.]

As defendant's expert acknowledged: "The more the dispersion is in the terms of the numbers applying outside from inside, the more of a preference it is. The larger the number of -- you put aside for the preference, the larger the impact of the preference is." [PS, ¶ 50.]

The critical point as to robust causation is that, whatever may come to be in the lottery process as it moves forward, *nothing else has happened yet except the imposition of the policy*. It is the *policy* that tilts the playing field against the outsider, non-beneficiaries as described above – that is true even if you, as an outsider, are the most qualified applicant ever to have applied to a New York City affordable housing lottery. *The absence of separate and additional barriers later down the road is not relevant to the creation or existence of the initial tilt.*

The same is true when looking at other advantages and disadvantages directly caused by the policy's *sequencing* rules for developers. It is agreed that a greater percentage of insider applicants are considered by developers. It is agreed that outsiders are more apt to be partially closed out of some of the unit types for which they are apparently eligible. It is agreed that outsiders are more apt to be fully closed out of *all* of the unit types for which they are apparently eligible. Having fewer choices, by definition, is not a level playing field. [BD, at 19-20, ¶¶ 59-62, PS, ¶¶ 51-53].

Why? Each lottery only has a fixed number of units of a particular type. As the lottery proceeds, units are made available on a first-come, first-served basis (as that process is controlled by the sequencing aspect of defendant's policy). Under defendant's rules, there is no limit to the percentage of apartments of any unit type that can be allocated to CP beneficiaries (or, put another way, there is not any percentage of apartments of any unit type that is "saved" until the lottery process reaches the outsider, non-beneficiary applicants). [PS, ¶ 28.] When one starts with a full

supply, and the policy's sequencing commands that insiders get to feast on that supply first, the supply will invariably be more likely to be exhausted later in the process than earlier in the process. [BD, at 52-54, ¶¶ 181-88.]

The advantages and disadvantages described above are sufficient, independent of actual awards, to produce liability, if, in fact, the advantages and disadvantages, depending on CD typology, are distributed in a way that shows substantial detriment to at least one racial group.[14]

**(ii) Statistical evidence: part I.**  The evidence shows that the advantages of the uneven playing field created for insiders by defendant's policy do indeed repeatedly flow disproportionately to one group (corresponding with the dominant group in the CD typology) and to the relative disadvantage of one or more other groups in that CD typology.  *Neither the fact of the existence of these disparities nor the fact that the disparities are almost always substantial is disputed.*  [PS, ¶ 71.]

Specifically, plaintiff are asserting that there are substantial relative disparities for each of the non-dominant groups in the majority-White, majority-Black, majority-Hispanic, majority-Asian,  plurality-White, and plurality-Black CD typologies when examining entrants and when examining the subset of entrants who are "apparently eligible";[15] and, further, that there is substantial relative advantage for Hispanics and disadvantage for Blacks in the plurality-Hispanic

---

[14] In other words, the questions of causation and proof and how each relates to awards is not necessary to the case, even though, as shown at pages 25-32, *infra*, the tilted playing field caused by the policy's allocation and sequencing elements continue to influence the bottom line.

[15] Apparent eligibility means that the applicant's self-reported income, household size, and subsidy status appear to allow them to meet the household size and income requirements for at least one unit-type.  [BD, at 10, ¶ 27 (text and accompanying note 16).]

CD typology when examining all entrants.[16]

Courts perform statistical comparisons on a case-by-case basis.  *See*, *e.g.*, *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 n.3 (1988) (citation omitted) (the case-by-case approach "reflects our recognition that statistics 'come in infinite variety and ... their usefulness depends on all of the surrounding facts and circumstances.'").[17]  Here, unlike some cases, the idea of comparing persons "affected" by the policy with those "not affected by the policy" is a *non sequitur*;[18] this is because *all* participants in all groups are affected.  As defendant's expert has testified, "By definition, preference means it's not a fair game for anybody because the preference changes the odds. . . ." [PS, ¶ 50.]

With defendant's policy, advantage and disadvantage are being conferred at the same time.  The CP-beneficiary sub-pool is given many advantages; the non-beneficiary pool has the countervailing disadvantages imposed by the policy.

(a) **Entrants.** The direct comparison to measure how the policy, while in effect, disproportionately hurts one or more groups, is to look, in each CD typology, at the racial composition of the advantaged sub-pool (CP beneficiaries) versus the racial composition of the

---

[16] For the purposes of this motion, plaintiffs are not asserting in respect to *entrants* a substantial relative detriment to Asians or Whites in the plurality-Hispanic CD typology and are not pursuing any substantial disparity among *"apparently eligible" applicants* in the plurality-Hispanic CD typology.

[17] *See also* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460, at 11468 (Feb. 15, 2013) (in explaining why it chose not to describe how data and statistics may be used in the disparate-impact or perpetuation-of-segregation context, HUD stated that "[g]iven the numerous and varied practices and wide variety of private and governmental entities covered by the Act, it would be impossible to specify in the rule the showing that would be required to demonstrate a discriminatory effect in each of these contexts."); *MHANY*, 819 F.3d at 617 (specifying the "significantly adverse or disproportionate impact" standard, but not specifying or limiting the type of proof or comparison that can be used to meet the standard).

[18] *Cf. Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 576-77 (2d Cir. 2003), *superseded by statute on other grounds as recognized by MHANY*, 819 F.3d 581 (identifying a group "unaffected" when examining a fundamentally different fact pattern).

disadvantaged sub-pool (non-beneficiaries).[19]  These are two separate and distinct sub-pools – there is no overlap.

This direct comparison is what Professor Beveridge calls the "outsider-to-insider-change" method (his "Method 1").  Measuring the change from a demographic group's share of all outsiders in a CD typology to that demographic group's share of all insiders in that CD typology will show either a benefit from the policy if there is an increase and a detriment from the policy if there is a decrease.[20]  Framing that increase in relative terms puts the scope of change in perspective.[21]

Chart 1, on the following page, uses entrants in the majority-White CD typology to illustrate the fact that benefit for one demographic group (Whites) is being combined with other effects going on at the same time for other demographic groups.[22]

As shown, White advantage is paired with Black disadvantage and Asian disadvantage – the full gap in opportunity to compete equally is only appreciated by looking at the paired effects in tandem.  This also works in the unusual case where there is some modest benefit to a non-dominant demographic group (here, Hispanics).  The modest help to Hispanics from the policy is not ignored, but one is able to see that Whites are more advantaged by far.

---

[19] *Cf.* Comer, 37 F.3d at 793 (comparing the "many blacks who live within the city limits [of Buffalo]" with the "many [fewer who] live in suburban Buffalo," not making the comparison to the totality of Blacks who live in the entire Buffalo metropolitan area).

[20] A fuller discussion of the outsider-to-insider-change method is found in BD, at 21-23, ¶¶ 64-70.

[21] A 5 percent change on a base of 10 percent is relatively larger than a 5 percent change on a base of 30 percent, for example.  For White entrants in the majority-White CD typology an increase of more than 15 percent from share of outsiders to share of insiders was recorded against a base of slightly less than 10 percent.  [BD, at 22-23, ¶ 70.]

[22] The chart is derived from BD, at 22, Table 3.



It is perhaps helpful here to underline a basic fact about defendant's preference: without it, there would be no differentiation in the chart. With an equal-access lottery, the advantage-disadvantage bar for each set of insiders in a typology and each set of outsiders in a typology would lie at the 0.00 percent level (*i.e.*, on the y-axis) because no artificial advantage or disadvantage was being conveyed as households applied (insiders and outsiders would not be differentiated). [BD, at 22, ¶ 68.]

In fact, the undisputed data for entrants show that, in all but the plurality-Hispanic CD typology, the dominant group is advantaged to the detriment of not just one, but all of the other groups. [BD, at 22, ¶¶ 68-73, and at 22, Table 3; PS, ¶¶ 57-59.] In the plurality-Hispanic CD typology, Black relative disadvantage and Hispanic advantage is substantial. *Id.*

Professor Beveridge's alternative methodology ("Method 2") is what he calls the "highest-insider-share" method. Whereas the outsider-to-insider-change method looked at outsiders in a CD typology and asked, "what is the distribution of outsiders by demographic group?" (and then asked the same question about insiders), the highest-insider-share method asks as the underlying question, "what share *of a demographic group* is made up of insiders?" This method is analogous to the use of "selection rates" in the employment context: here, having the CP beneficiary status needed to get the advantages in question is the equivalent of what percentage of a group passes a test or is otherwise selected. *See, e.g., Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 113 F. Supp. 3d 663, 675 (S.D.N.Y. 2015) (finding disparate impact due to white pass-rate for public school teacher exam substantially exceeding African-American and Latino pass-rates).[23] The highest-insider-share method relates the demographic group with the highest percentage of insiders to the percentage of insiders in each of the other demographic groups in the CD typology.[24]

Pursuant to the highest-insider-share method for entrants, all of the relative disadvantages demonstrated by the outsider-to-insider-change method are again present for all three non-dominant demographic groups in six of the CD typologies, and Hispanics in relation to Blacks in the plurality Hispanic CD typology. [BD, at 24-26, ¶¶ 74-79, and at 25, Table 4; PS, ¶¶ 57-58, and 60.]

**(b) Apparently eligible applicants.** When it comes to the subset of applicants who are apparently eligible – that is, those applicants who when reached by the developer have the opportunity to proceed further to document their apparent eligibility – the results show a similar

---

[23] *Cf. Langlois*, 234 F. Supp. 2d at 57 (not looking at impact from a selection rate perspective because the applicant pool in that case was not available).

[24] For a fuller explanation, see BD, at 24-25, ¶¶ 74-78.

pattern of advantage and disadvantage as occurred with all entrants. As with all entrants, apparently eligible applicants either receive benefits as CP beneficiaries, or suffer detriments as non-beneficiaries, *not due to anything that happens during the lottery,* but due to the allocation and sequencing rules imposed on these applicants by defendant's policy even before a random lottery number is assigned. For example, the policy-created differential in the odds of an apparently eligible applicant getting an award range from 6 to 25 times better for CP beneficiaries as compared with non-beneficiaries, depending on CD typology. [BD, at 29, ¶¶ 92-93; at 30-31, ¶¶ 98-100; and at 31, Table 5; PS, ¶¶ 49-50, and 71.]

For apparently eligible applicants, the outsider-to-insider-change method demonstrates clear evidence of disadvantage for all three non-dominant groups in six of the CD typologies (all but plurality Hispanic). [BD, at 31-32, ¶¶ 102-03, and at 32, Table 6; PS, ¶¶ 64-66.] For example, a relative increase of approximately 165 percent for Whites from their share of outsiders to their share of insiders is paired with an approximately 69 percent decrease for Blacks in the majority-White CD typology. In the majority-Black CD typology, a relative increase for Blacks of approximately 48 percent is paired, *inter alia*, with a decrease of approximately 39 percent for Hispanics. [BD, at 32, Table 6.]

Under the highest-insider-share method, there is again relative advantage for the dominant group and relative disadvantage for the each of the other groups in the six typologies other than plurality Hispanic. [BD, at 33, ¶¶ 105-06, and Table 7; PS, ¶¶ 64-65, and 67.]

**(iii) Statistical evidence: part II.** As noted previously, neither the fact of the existence of the disparities identified by Professor Beveridge's two methods, nor the fact that the disparities are substantial, is disputed. Indeed, defendant's expert conceded that Professor Beveridge's

"conclusion is correct"; both of his "alternative measures at the application/apparently eligible application stage indicate that the racial group with applications that are disproportionately CP beneficiaries within a majority CD typology will always be the majority race and will more likely be the plurality race within a plurality CD typology." [PS, ¶ 71.] Likewise, defendant's expert has not challenged the substantiality of the disparities identified, instead objecting to the CD typology approach in favor of defendant's separate-but-equal citywide approach. [PS, ¶¶ 82-84.]

Nevertheless, if a challenge to the substantiality of these findings were to be belatedly mounted in the course of this briefing, such a challenge would be unavailing.

While more typically used in disparate-impact cases in the employment context, there are two common guidelines, discussed below, each of which can be independently confirmatory of the fact that a disparity is substantial and/or statistically significant.

One method is to test to see if the result for one or more racial groups is less than 80 percent (four-fifths) of the result for the most successful (or more aided) racial group. *See Gulino*, 113 F. Supp. 3d at 675; *see also Langlois*, 234 F. Supp. 2d at 57, 60 (applying variants of four-fifths test in housing preference case). Where the result for the comparator group is less than 80 percent, the differential will generally be regarded as evidence of disparate impact; however, *even smaller differences may constitute disparate impact* where they are significant both in statistical and practical terms. *See, e.g.*, *United States v. City of New York* ("*Firefighters*"), 637 F. Supp. 2d 77, 88-89 (E.D.N.Y. 2009) (finding Hispanic relative pass-rate compared to whites of 85.3% sufficient for disparate impact).

The second test involves examining standard deviations: "Basically, looking at standard deviations indicates how far an obtained result varies from an expected result." *Smith v. Xerox Corp.*, 196 F.3d 358, 365 (2d Cir. 1999) *overruled on other grounds by Meacham v. Knolls Atomic*

*Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006). If the obtained result differs from the expected result by two standard deviations, there is only about a 5 percent probability that the disparity occurred by chance, and, at that level of statistical significance is considered sufficiently compelling to treat the disparity as meaningful. *Easterling v. State of Connecticut*, 783 F. Supp. 2d 323, 333 (D. Conn. 2011) (*citing, inter alia, Xerox*, 196 F.3d at 366).

To reiterate, the substantiality of the disparities has not to this point been raised by defendant's expert, but to be sure that no issue arises:

In every at-issue comparison for both entrant and apparently-eligible applicants, the result of the 80-percent test for the results of the outsider-to-insider-change method is less than 80 percent for each of the non-dominant demographic groups, in most cases being far less than zero percent (in negative territory because of the reduction from outsider share to insider share). [BD, at 24, ¶ 73 and accompanying n.36; and at 32, ¶ 104 and accompanying n.46; PS, ¶¶ 61, 68.]

For both entrants and apparently eligible applicants, the 80-percent test for the results for the highest-insider-share method are all below 80 percent for each of the non-dominant demographic groups in each at-issue CD typology except when looking at apparently-eligible applicants in the plurality-White CD typology, where Blacks are measured at 86 percent of Whites. [BD, at 26, ¶ 81 and accompanying n.37 and at 34, ¶ 108 and accompanying n.48; PS, ¶¶ 61, 68.]

As far as statistical significance, the standard deviations for both methods and with respect to entrants and to apparently-eligible applicants are all in excess of 2.00, in most cases substantially in excess of 2.00 standard deviations, with one exception to the rule: Asians in the plurality-White CD typology for entrants under both Method 1 and Method 2. [BD, at 27, ¶¶ 83-86; at 34, ¶ 110; and BD Ex. 13; PS, ¶¶ 62, 69.]

To sum up, the scope of substantial disparities with statistical significance is overwhelming when examining <u>all entrants</u>, running rife through the City. The 80 percent test and the minimum of 2.00 standard-deviations test is met under both of Professor Beveridge's methods for:

- All three non-dominant racial groups in the majority-White, majority-Black, majority-Hispanic, majority-Asian, and plurality-Black CD typologies;

- Blacks and Hispanics in the plurality-White CD typology; and

- Blacks in the plurality-Hispanic typology.

[BD, at 27-28, ¶¶ 87-90.] In other words, even putting Asians to the side despite meeting the 80 percent test, all seven CD typologies are implicated, and six of them cause substantial harms to all three potentially disadvantaged racial groups.

The scope of the substantial disparities with statistical significance is overwhelming when examining <u>apparently eligible applicants</u>, again running rife through the City. The 80 percent test and the minimum of 2.00 standard-deviations test is met under both of Professor Beveridge's methods for:

- All three non-dominant racial groups in the majority-White, majority-Black, majority-Hispanic, majority-Asian, and plurality-Black CD typologies; and

- Hispanics and Asians in the plurality-White typology.

[BD, at 34-35, ¶¶ 111-13.] In other words, six of seven CD typologies, involving approximately 89 percent of all entrants citywide and approximately the same percentage of all apparently eligible applicants citywide are implicated. [BD, at 35, ¶ 113.] These findings, as noted at the outset, far exceed the *MHANY* requirement that *one* group be substantially disadvantaged. [BD, at 35, ¶ 114.]

Finally, it is important to reiterate the fact that these disparities in opportunities to compete on a level playing are conclusive as to Stage 1 disparate impact liability *independent of any findings the Court makes in respect to the bottom-line results that are discussed next.*

## C. FHA disparate-impact liability: causation and proof at the bottom line (units awarded)

Here, plaintiffs put forward only the results of the majority CD typologies, where the substantial disparities remain most consistent.[25]

**(i) Robust causation.** As defendant admits, the skewing effects of its policy do not disappear as the lottery moves forward [PS, ¶ 50]; on the contrary, the outsider-restriction policy gives an initial and substantial tilt to the playing field that is never cured and thus continues to distort the entire lottery process. [BD, at 29, ¶ 94.] This is true in terms of sequencing; this is true in terms of partial and full close-out of unit types; and, most emphatically, this is true as to the limit that is set on awards to outsiders (non-beneficiaries). *Nothing can help an outsider be awarded a CP unit if there is any actually qualified CP-beneficiary available to take it, as there generally is: not the best lottery number, not the keenest interest or greatest need, not the best qualifications. Nothing.*

Consider again the moment when the lottery application process has closed. There exists at that moment a single, unified pool of applicant households. There are no upcoming written tests for applicants to take; no physical examinations to undergo. The qualifying characteristics to be awarded a lottery unit do not come into being at a future time. Each applicant household *already*

---

[25] As with the separate and independent discussion in Part B (opportunity to compete as opposed to bottom line results), there are disparities in plurality CD typologies, but an examination of majority CD typologies simplifies the issues.

*has the characteristics* that are relevant to the later lottery stage of being evaluated for definitive qualification – principally the combination of household size and household income that determines whether an applicant household fits within the (relatively narrow) parameters of eligibility for a unit type.[26] [BD, at 35-36, ¶ 115.] Defendant's expert admits this. [PS, ¶ 72.] The fact that these characteristics come to be *revealed to the developer later* does not change the fact that the characteristics *preexisted the lottery*.

Defendant's policy at the bottom line effectively amounts to its direction to developers as to *whose* pre-existing actual qualifications are to be examined. Defendant's policy of proceeding by using the CP-beneficiary sub-pool to fill the 50 percent of units to the maximum extent possible was one way to generate awardees. Proceeding by using the entire applicant pool to fill these units would have been another way to generate awardees. [BD, at 36, ¶¶ 116-17.] (There is no dispute that the units could have been filled using either method. *See, e.g.*, PS, ¶¶ 45-46, documenting the fact that almost 95 percent of apparently eligible applicants across CD typologies are outsiders.)

Each pool or sub-pool of applicants generates a particular demographic composition of awardees (the actually eligible are the actually eligible, however they may be divvied up). The key is that *whatever* the demographic composition of awardees that results from defendant's actual policy (selecting from the CP-beneficiary sub-pool for 50 percent of awards) and *whatever* the demographic composition of awardees that would result from making selections for those 50 percent of awards from the pool of all apparently eligible applicants – and *whether or not* there are differences between the demographic compositions of the two selection mechanisms – there is no getting around the fact that, from a causation point of view, defendant's policy was *by definition* the *only* factor involved *in deciding which pool to have selected for use.*

---

[26] It is sometimes the case that an applicant household may have the qualifications for more than one unit-type (*e.g.*, a studio and a one-bedroom).

**(ii) Statistical evidence.** Here at the bottom line of awards, there is not only the outcome of the "natural experiment" that shows substantial disparities, but also the outcome, courtesy of defendant's expert Dr. Siskin, of a simulation of the lottery for the 168 lotteries involved in this case. The simulation – run 1,000 times with community preference in effect [PS, ¶ 73] – underlines the fact that consistently large racial impacts are entirely predictable.

We know each racial group's demographic share of the approximately 50 percent of units awarded to CP beneficiaries in each CD typology. For comparison, we know the demographic share as to awards for *non-beneficiaries*, and we also know that those results closely mirror what the results would be for *all applicants*. This is true because the demographics of the sub-pool of entrants (and of apparently eligible applicants) in CD typologies closely match the demographics of the entire pool of entrants and of apparently eligible applicants, respectively.[27] As with the opportunity to compete analysis, it is the comparison between CP beneficiaries and non-beneficiaries (the outsider-to-insider-change method) that gives the clearest view of the combined advantaging and disadvantaging that occurs when the policy is in place.

Applying the outsider-to-insider-change method to actual awardees, Professor Beveridge's uncontradicted finding is that the dominant group in each majority CD typology was the most advantaged, and that the relative change for that racial group as compared with the other racial groups showed that the 80 percent test was met in each case. [BD, at 37-38, ¶¶ 121-24; at 37, Table 8; and at 38, ¶ 124 n.53; PS, ¶¶ 74-76, 79.]

---

[27] For apparently eligible applicants, for example, in eight comparisons across the four majority CD typologies – *e.g.*, Whites in majority-White and Blacks in majority-Hispanic – the difference between the racial group's share of the non-beneficiary apparently eligible applicants and all apparently eligible applicants was less than 0.5 percent; in five others, the difference is less than 1.5 percent; and in the remaining 3, all in the majority-Asian typology, the difference ran from under 4 percent to under 7 percent). [BD, at 36, ¶ 118 and accompanying n.51.]

Here, Professor Beveridge was also able to apply the outsider-to-insider-change method to the simulation of the lottery process performed by defendant's expert, Dr. Siskin. There were 10,245 awards made to New York City residents in the 168 lotteries being studied. [PS, ¶ 40.] Dr. Siskin ran a simulation of the lottery with community preference in effect 1,000 times (yielding 10,245,000 awards). [PS, ¶ 73.] Plaintiffs do not believe that defendant will now disavow either the predictive value or the statistical significance of those 1,000 runs.

Dr. Siskin chose not to report disaggregated results (either by CD typology or by CP-beneficiary awards versus all other awards), so Professor Beveridge did so. [BD, at 38, ¶ 126] Professor Beveridge applied his outsider-to-insider-change method to the simulated awardees. The results for the majority-White and majority-Black CD typologies are shown in turn on the following page.[28]

---

[28] The charts are derived from BD, at 39, Table 9.



**Chart 2: Outsider-to-insider-change method**
**Whites compared to non-dominant demographic groups**
**in majority-White CD typology (simulated awards)**



**Chart 3: Outsider-to-insider-change method**
**Blacks compared to non-dominant demographic groups**
**in majority-Black CD typology (simulated awards)**

As is obvious, the disparities between the dominant group and the three non-dominant group in each case is substantial.  This is also true for the majority-Hispanic and majority-Asian CD typologies, as well as for the plurality-Black CD typology.[29]  [BD, at 38-39, ¶¶ 127-28; and at 39, Table 9 and ¶128 n.54; PS, ¶¶ 74-75, 77, 79.]

Under Professor Beveridge's highest-insider-share method for actual awardees, the dominant group in each majority CD typology is the most advantaged [BD, at 40, ¶ 130 and Table 10; PS, ¶ 78],[30] and the 80 percent rule for substantiality of disparity is met: (a) for each non-dominant group in the majority-Black and majority-Asian CD typologies; (b) for Blacks and Asians in the majority-White CD typology;[31] and for Whites in the majority-Hispanic CD typology.  [BD, at 41-42, ¶¶ 131-32; and at 41, ¶ 131 n.56 (top section); PS, ¶¶ 78-79.]

When the highest-insider share method is applied to the simulation, all non-dominant groups in all of the majority typologies are substantially disadvantaged pursuant to the 80 percent test, except for Blacks in the majority-Hispanic typology.[32] [BD, at 41, ¶ 131 and 131, n.56 (bottom section); PS, ¶ 79.]

As for statistical significance, that exists, obviously, for the 1,000 simulations of awards in all cases. [BD, at 42, ¶ 133.] It also exists, with standard deviations greater than 2.00, for all demographic groups in the majority CD typologies except for Asians in the majority-White and majority-Asian CD typologies (under both methods of analysis), and for Whites in the majority-Asian CD typology (where the standard deviation is below 2.00 under Method 1, but substantially

---

[29] As previously noted, plaintiffs are not asking the Court to look beyond the majority typologies in its assessment of disparate impact at the bottom line.

[30] As is the case for Blacks in the plurality-Black CD typology.  *Id.*

[31] Hispanics in the majority-White CD typology are just at the borderline of the rule of thumb, at 80.58 percent.  *See* discussion that follows of the simulation.

[32] As well as in the plurality-Black CD typology that is not being pursued.  [BD, at 39 n.51, simulated awards portion.]

higher under Method 2). [BD, at 42, ¶ 133, and Exhibit 13; PS, ¶ 80.]

Taking all of the foregoing into account for bottom-line disparate impact, there is substantial impact meeting the 80 percent rule under both of Professor Beveridge's methods of analysis and for both the actual awards and the simulated awards, as follows:

| CD typology | Substantially disadvantaged demographic group(s) |
|---|---|
| Majority White: | Blacks |
| Majority Black: | Whites, Hispanics, and Asians |
| Majority Hispanic: | Whites |
| Majority Asian: | Blacks, Hispanics |

[BD, at 42, ¶ 134.]

In addition, plaintiffs suggest that there are two further instances where, as a matter of law, instances of disparate impact should be found: first, in connection with Hispanics in the majority-White typology. Here there is statistical significance across the board; there is substantial relative disadvantage pursuant to the 80 percent rule for actual awardees and simulated awardees under the outsider-to-insider-change method; and pursuant to the 80 percent rule for simulated awardees under the highest-insider-share method. [BD, at 43, ¶ 135.] The fact that the results of the 80 percent rule for the highest-insider-share method is just at the borderline of the rule-of-thumb (80.58 percent) does not change the reality that the disparity is, in fact, substantial. *Cf. Firefighters*, 637 F. Supp. 2d at 88-89 (finding 85.3% Hispanic relative pass-rate compared to whites sufficient for disparate impact).

The second instance concerns Whites in the majority-Asian CD typology. The fact that the standard deviation for Whites in the majority-Asian CD under the outsider-to-insider-change method for actual awardees is less than 2.00 is of no practical significance. There were literally

no actual awards to White insiders in that CD typology.  The relevant circumstances also include the fact that statistical significance was well above 2.00 under the highest-insider-share method for actual awardees and is found in the simulation using *both* methods.  Substantial disadvantage for Whites in the majority-Asian CD typology also is established under the 80 percent rule for both methods. [BD, at 43, ¶ 136.]

The critical concluding point to underline as the Court considers plaintiffs' summary judgment motion on disparate impact, however, is that, even were the court to put to the side Hispanics in the majority-White typology and Whites in the majority-Asian typology, there are one or more non-dominant demographic groups being substantially disadvantaged in relation to the dominant group in each of the four majority CD typologies (eight, leaving aside the two exclusions).  [BD, at 43, ¶¶ 137-38.]  Plaintiffs are obligated to show that there was a local impact on *one* demographic group.  They have far exceeded their burden.

### D. City HRL disparate-impact liability

The City HRL has a separate, explicit statutory scheme in respect to disparate impact.   At Stage 1, a plaintiff has to show that a policy or practice of a defendant or a group of policies or practices "*results in* a disparate impact to the detriment of *any* group protected by the provisions of this chapter."  N.Y.C. Admin. Code § 8-107(17)(a)(1) (emphases added).  Based on what has already been stated, defendant's outsider-restriction policy *automatically* results in disparate impacts to multiple demographic groups, both in respect to all entrants and to apparently eligible applicants.

We add only that any interpretative change to the FHA in the future would not result in any change to the City Human Rights Law standard for multiple reasons.  *See, e.g.*, *Albunio v. City of*

*New York*, 16 N.Y.3d 472, 477-78 (2011) (holding, in the wake of the 2005 Local Civil Rights Restoration Act,[33] that every provision of the City HRL must be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 67-68 (N.Y. App. Div. 1st Dept. 2009) (citations omitted) (the Restoration Act notified courts that "they had to be aware that some provisions of the City HRL were textually distinct from its state and federal counterparts" and that "*all* provisions of the City HRL required independent construction to accomplish the law's uniquely broad purposes"); *id.* at 72-73 and 72 n.14 (rejecting the idea that a narrowing of the interpretation of a federal or state legal doctrine would result in the narrowing of the analogous City HRL doctrine, especially where the earlier federal or state doctrine was consistent with the uniquely remedial provisions of the City HRL); *Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 34-35 (N.Y. App. Div. 1st Dept. 2011) ("[T]he identification of the framework for evaluating the sufficiency of evidence in discrimination cases does not in any way constitute an exception to the section 8-130 rule that all aspects of the City HRL must be interpreted so as to accomplish the uniquely broad and remedial purposes of the law . . . ."); and N.Y.C. Local Law 35 of 2016 (Mar. 28, 2016), *codified in relevant part* at N.Y.C. Admin. Code § 8-130(c) (expressly ratifying the holdings, analysis, and application of the law's liberal construction provision contained in *Albunio*, *Williams*, and *Bennett*).[34]

---

[33] N.Y.C. Local Law 85 of 2005 ("Restoration Act") (Oct. 3, 2005).

[34] *See also* Mar. 8, 2016 Committee Report of the Governmental Affairs Division, N.Y.C. Council, that accompanied the legislation that became NYC Local Law 35 of 2016 ("Local Law 35 of 2016 Committee Report"), excerpts annexed to the March 6, 2020 declaration of Craig Gurian ("GD") as Ex. 40, at 8 (citation omitted) ("Over at least the last 25 years, the Council has sought to protect the HRL from being narrowly construed by courts, particularly through major legislation adopted in 1991 and 2005. These actions have expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with no tolerance for discrimination in public life.").

**THE UNDISPUTED FACTS MAKE CLEAR THAT DEFENDANT'S POLICY PERMITS SUBSTANTIALLY LESS INTEGRATION (PERPETUATES SEGREGATION MORE) THAN WOULD BE THE CASE IN THE ABSENCE OF THE POLICY.**

This issue can easily be resolved as a matter of law and (mercifully) requires less briefing because: (a) whether the policy predictably creates less integration in the City as a whole than would an equal-access system can be and is examined citywide; (b) plaintiffs agree for the purposes of this motion to limit the set of 168 lotteries examined to the subset of 145 where the lottery project is contained in a single census tract, as defendant's expert has done; (c) plaintiffs have adopted for the purposes of this motion the definition of "integrative" and "segregative" moves advanced by defendant; and (d) plaintiffs are relying on three sets of data regarding whether moves in each of the six racial pairings that exist[35] are more integrative when made by CP beneficiaries or by non-beneficiaries, all of which were generated by defendant's expert. One set deals with the actual awards that were made; a second set looks at the pattern that would emerge if all apparently eligible households made the moves that they had applied for; and the third explores the results of a simulation of the lottery process run by defendant's expert. [BD, at 45-46, ¶¶ 145-50, 152; PS, ¶¶ 85-90, 92.]

In each of the six racial pairings, the outsider moves are, on net, more integrative than are the insider moves, on net. This is true for actual awards; it is true for the exercise in examining what would happen if all apparently eligible applicants moved to the development to which they applied; and it is true for the simulation. [BD, at 45, ¶ 145; PS, ¶ 93-95.]

---

[35] White vs. African American (W v AA); White vs. Hispanic (W v H); White vs. Asian (W v A); African American v. Hispanic (W v H); African American v. Asian (W v. A); and Hispanic v. Asian (H v A).

## A. FHA perpetuation-of-segregation liability

The Second Circuit decided this issue long ago. The discriminatory effect of a policy arises not only in the disparate-impact context, but in the context of "harm to the community generally by the perpetuation of segregation." *Huntington Branch, N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 937 (2d Cir. 1988), *superseded by statute on other grounds as recognized by MHANY*, 819 F.3d 581. *See Inclusive Communities*, 135 S. Ct. at 2522 (explaining that the goal of the FHA is to ensure that governmental policies proceed without, *inter alia*, perpetuating segregation); *MHANY*, 819 F.3d at 619-20 (reaffirming *Huntington's* "harm to the community generally by the perpetuation of segregation" prong).[36]

Perpetuation-of-segregation cases do not require that a specific amount of segregation be alleviated, let alone require proof that any segregation index would change by any particular amount. Instead, the examination is whether one course of action is more segregation-perpetuating (less integration-permitting) than another. In *Huntington*, the project in question was only 162 proposed units that were sought to be built in a town of approximately 200,000 people; the development had a goal of 25 percent minority renters (*i.e.*, approximately 40 units). *Huntington*, 844 F.2d at 929, 937-38. The Court found perpetuation of segregation because allowing the project (overruling the zoning) would "*begin* desegregating" a neighborhood. *Id.* at 937 (emphasis added).

If the law were otherwise – that a proposal had to effect a specific change, for example, in the citywide dissimilarity index – the consequences would be to undermine the purposes of the FHA altogether. Especially in a city as large as New York, with more than 3 million housing units [PS, ¶ 33], a single project or policy is not apt to move the citywide needle significantly. On the

---

[36] *See also* 24 C.F.R. 100.500(a) (2020) (emphasis added) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons or creates, increases, reinforces, or perpetuates segregated housing patterns because of race, color, religion, sex, handicap, familial status, or national origin.").

other hand, the elimination of a policy planned to be applicable to more than 100,000 units can certainly *begin* the process of desegregation. As will be shown, the elimination of restriction on outsider moves would hasten the process.

Finally, there is no requirement in the law that perpetuation of segregation be shown with respect to more than one racial group. In other words, it has been enough to find that segregation is being perpetuated between Whites (historically, the group to which a minority group is compared) and one non-dominant demographic group. *See, e.g.*, *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 448 (E.D.N.Y. 1995) (granting summary judgment as to plaintiffs' disparate-impact and perpetuation-of-segregation claims and holding that "[w]hether or not the [defendant's] policies violated the rights of other protected groups . . . is irrelevant to whether the government has established disparate impact of the [defendant's] policies on blacks").

**(i) Robust causation.** The population of New York City is segregated at the census tract level and is segregated (clustered by race) at the community district level, too. [BD, at 12-14, ¶¶ 36-41 and Exhibits 5-8; PS, ¶¶ 34-35.] While segregated patterns at the census tract level can mean that, from a citywide perspective, some moves within a community can be integrative, it is much more likely that outsider moves, which include moves from a community district with a concentration of one race to a community district with a concentration of a different race, will be more frequently integrative. [BD, at 43-44, ¶ 139-41.] As Professor Beveridge explains: "[I]f you start with a segregated CD (a CD with a concentration of a particular demographic group) and reserve 50 percent of the units for those already living in the CD, you will predictably have more segregation (less integration) than if those units were open to all comers." [BD, at 44, ¶ 141.]

It is defendant's policy that takes an applicant pool that is overwhelmingly made up of

outsiders and filters that pool down so that outsiders are not competing for most or all of 50 percent of the units. [BD, ¶¶ 142-44; at 48, ¶ 163; and at 51-52, ¶ 177; PS, ¶¶ 103-07.] As such, the proximate cause in the reduction of outsider moves that are likely to be more integrative in light of the demographic concentrations described above, is the policy. The commonsense proposition – that preferring those already overrepresented in a community district will lead to less integration than an equal access system would – is empirically and powerfully demonstrated next.

**(ii) Statistical evidence.** As a preliminary matter, the evidence available here is far greater than is normally the case in perpetuation claims. Net-integrative effect of CP-beneficiary moves versus non-beneficiary moves can be compared in three ways. First, actual awards; second, the moves that vast numbers of apparently eligible applicants were seeking to make; third, a lottery simulation – run by defendant's expert 1,000 times with community preference in effect – that yielded simulated awards. [PS, ¶¶ 85-86.]

In the comparisons to be discussed, the racial composition of the City is not looked at all at once. Six different lenses are applied, each one looking at only two demographic groups *in relation to each other* (*e.g.*, W v AA). The impact of the move – whether it reduces the imbalance between the two groups (an "integrative" move), increases the imbalance between the two groups (a "segregative" move), or has "no effect" on the imbalance[37] – is, by definition, one that involves moves only by members of the two groups. [BD, at 45-46, ¶¶ 149-50.] The point of having six different pairings is to examine changes in the relationship of each pairing distinctly. *Id.* Detailed discussion will follow, but the undisputed data show that the net-integrative effect of non-beneficiary moves was consistently substantially more than the net-integrative effect of CP-

---

[37] *See* BD, at 45-47, ¶¶ 147-158 for further discussion of "integrative," "segregative," and "no effect" moves.

beneficiary moves (put the other way, the net-integrative effect of CP-beneficiary moves was substantially *less* than the net-integrative effect of non-beneficiary moves). This latter formulation is depicted in Chart 4, below.[38]

As can be easily seen, five of the six pairings (all but H v A) demonstrate a net-integrative effect of CP-beneficiary moves of less than 80 percent for actual awardees (blue), apparently eligible applicant moves sought (orange), and simulated awardees (green), almost always much less. In the H v A pairing, apparently eligible and simulated awardee moves are below the 80 percent level. These showings are far in excess of what is required under *MHANY* or *Huntington*.



---

[38] Derived from BD, at 48-50, Tables 11-13; the Tables distill information contained in BD Exhibits 16-18.

38

(a) **Actual awardees.** There is no disagreement as to the net number of integrative moves and the net number of segregative moves in any of the six pairings (for any of the three methods). [BD, at 46, ¶ 152; PS, ¶ 90.] Because Dr. Siskin had failed to disaggregate moves by CP beneficiary versus non-beneficiary, Professor Beveridge did so. [BD, at 46, ¶¶ 151-53; PS, ¶ 91.] There is no dispute as to the net number of integrative moves or the net number of segregative moves that Professor Beveridge identified for either CP beneficiaries or non-beneficiaries. [BD, Exhibits 16-18.]

For each pairing, Professor Beveridge separated out and discarded those awardees "not in group" (*e.g.*, Asians and Hispanics in the W v AA comparison), as those not in group are definitionally not part of the comparison. [BD, at 46, ¶ 154; *see also* BD, Exhibit 16; PS, ¶ 91.][39] In each comparison, the net percent of awards among non-beneficiaries that was integrative[40] was compared to the net percent of awards among CP beneficiaries that was integrative. The comparison between non-beneficiaries and CP beneficiaries is critical because it shows how each type of move influences integration. [BD, at 47, ¶ 157-58.] Retarding the percentage of relatively more integrative non-beneficiary moves that can proceed constitutes perpetuation of segregation. *Cf. Huntington*, 844 F.2d at 937-38 (holding in context of minority group members concentrated in urban renewal area, zoning policy that prevented affordable housing from being constructed outside of the urban renewal area reinforced residential segregation).

In the comparisons in all six pairings, the percentage of moves that were net-integrating among non-beneficiaries was higher than the percentage of moves that were net-integrating among CP beneficiaries. [BD, at 47-48, ¶¶ 155-61, and Table 11; PS, ¶ 93-95.] As shown by the blue-

---

[39] The same procedure was used when examining apparently eligible applicants and when analyzing the results of the simulation. *See* BD, at 46, ¶ 154; *see also* BD, Exhibits 17-18.

[40] Taken as a percentage of integrative, segregative, and "no effect" moves.

colored bars in Chart 4, *supra* at 38, five of the six pairings (all but H v A) were substantial when analogizing to the 80 percent rule. [*See also* BD, at 48, ¶¶ 161-62 and Table 11; PS, 93-97.] The same five pairings for actual awardees had statistical significance well in excess of 2.00 standard deviations. [BD, at 51, ¶ 175 and accompanying n.62; PS, ¶¶ 98-99.] Even leaving aside the additional evidence to be discussed, therefore, the actual awards alone show substantial deviations that, by themselves, make out plaintiffs' Stage 1 perpetuation case.

(b) **Apparently eligible analysis.** In addition, there is undisputed evidence that corroborates and deepens the finding that the policy actually permits less integration than the equal-access lottery alternative: this additional evidence highlights the fact that the policy will *predictably continue to permit less integration* than the equal-access lottery alternative in the future. (*Huntington* only requires that a practice "actually *or* predictably" cause its illegal effect. *Huntington*, 844 F.2d at 934 (citation omitted) (emphasis added).)[41]

One such analysis explores the net integrative effects if all apparently eligible applicants from the 145 lotteries got to move to the apartments they had applied to. [BD, at 48, ¶ 164.] As Chart 4, *supra* at 38, shows in the orange-colored bars, the net-integrative effect of CP-beneficiary moves is substantially less (meets the 80 percent test) in all six racial pairings. [*See also* BD, at 48-49, ¶¶ 162-66, and at 49, Table 12; PS, ¶¶ 96-97.] The standard deviations for all six pairings are all well in excess of 2.00. [BD, at 51, ¶ 176 and accompanying n.63; PS, ¶¶ 98-99.]

It is also salient that, in this comparison, the volume of moves sought is very large, indeed. For example, the net integrating moves for non-beneficiaries in W v AA is 358,187 as against

---

[41] *See also* 24 C.F.R. § 100.500(a) (2020) (emphasis added) (providing that a practice has a discriminatory effect where it "actually *or* predictably . . . creates, increases, reinforces, or perpetuates segregated housing patterns . . . .").

5,609 for CP beneficiaries. In AA v H, the net integrating moves for non-beneficiaries is 358,681 as against only 2,033 for CP beneficiaries. [BD, at 49, Table 12; PS, ¶¶ 100-102.] In short, as the magnitude of moves subject to the policy increases over time, one can see than the relative differences between non-beneficiary and CP beneficiary moves will have large consequences.

This comparison has added salience for another reason, as well. The reason that the net-integrative numbers are so lopsided in favor of non-beneficiary moves is because, here, the percentage of non-beneficiaries who can be given awards *is not filtered down* (in contrast to what happens under the community preference policy). [BD at 49-50, ¶¶167, 170; PS, ¶ 103.][42] Unconstrained, the higher *percentage* of net-integrative non-beneficiary moves is able to be combined with a higher *number* of potential awardees, and the permitted increase in integration necessarily would be greater. [BD, at 49-50, ¶¶ 166-70]


(c) **Simulation.** Finally, Dr. Siskin ran a simulation of the lottery process for the same subset of 145 lotteries. Here, again, with the predictive value of the simulation enhanced by the fact that it was run 1,000 times, the CP-beneficiary simulated moves have significantly *less* net-integrative effect than do non-beneficiary simulated moves. As shown in the green-colored bars in Chart 4, *supra* at 38, the 80 percent test is always met. Statistical significance is not in dispute. [BD, at 50-51, ¶¶ 171-74, and at 50, Table 13; PS ¶ 97.]

Thus, for each of three analyses (actual awards, moves sought by apparently eligible applicants, and simulated awards), there is substantial disparity between CP beneficiaries and non-beneficiaries, *always* pointing strongly in the direction that eliminating the policy and the filter on

---

[42] The non-beneficiary percentage of all net-integrative moves sought in this apparently eligible context is, in each of the six racial pairings, in excess of 96 percent: specifically: W v AA, 98.43%; W v A, 99.07%; W v H, 97.33%; AA v H, 99.43%; AA v A, 99.35%, and H v A, 96.93%). [Derived from BD, at 49, Table 12.]

non-beneficiary moves would result in greater integration.  [BD, at 47, ¶ 160; *see also* 48-52, ¶¶ 161-77 and Tables 11-13; PS, ¶¶ 103-07; *see also* Chart 4, *supra,* at 38.]  Plaintiffs' Stage 1 perpetuation-of-segregation claim under the FHA is proved as a matter of law.

## B. City HRL perpetuation-of-segregation liability

Just like the FHA, the City HRL does not contain a provision that explicitly specifies perpetuation of segregation as a prohibited practice.  However, just like the FHA, with its language making it unlawful to "otherwise make unavailable or deny" a dwelling because of protected-class status, 42 U.S.C. § 3604(a), the City HRL does have a provision by which it is illegal to "otherwise deny to or withhold from" a person or group of persons a housing accommodation on the basis of a variety of protected-class bases including race and national origin.  N.Y.C. Admin. Code § 8-107(5)(a)(1)(a).  This provision, like all provisions of the City HRL in wake of the Restoration Act, must be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  *Albunio*, 16 N.Y.3d at 477-78.  Section 8-107(5)(a)(1)(a) must, therefore, be read to permit perpetuation-of-segregation claims.

Such a construction is, obviously, reasonably possible: the Supreme Court provided just such an interpretation in *Inclusive Communities*, 135 S. Ct. at 2518-19.  *See also Loeffler v. Staten Island University Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (explaining that the City HRL as amended by the Restoration Act acts as a "one-way ratchet," *quoting* Restoration Act § 1).[43]

---

[43] "Interpretations of . . . federal statutes with similar wording may be used to aid in interpretation of [the City HRL], viewing similarly worded provisions of federal . . . civil rights laws as a floor below which the [City HRL] cannot fall, rather than a ceiling above which the local law cannot rise."  *See* excerpt of Restoration Act, annexed to GD as Ex. 41.

At the time of the comprehensive 1991 amendments to the City HRL, the relevant language was already contained in the statute, and *Huntington* (1988) had already articulated an interpretation of the FHA that included perpetuation of segregation. There was no reason to believe that the City Council in 1991 believed that the local law language would or should have a more narrow result, both because: (a) the *Huntington* standard was not under threat;[44] and (b) the Council's focus was directed against narrow constructions of the law and to making sure that judges "take seriously the requirement that this law be liberally and independently construed."[45]

Moreover, N.Y.C. Admin. Code § 8-130(c) commands that the analysis of *Williams* be followed,[46] and *Williams* observed that "the text and legislative history represent a desire that the City HRL 'meld the broadest vision of social justice with the strongest law enforcement deterrent,'" *Williams*, 61 A.D.3d at 68 (citation omitted); that the Council "wanted the City HRL's provisions to be construed more broadly than federal civil rights laws and the State HRL, and wanted the local law's provisions to be construed as more remedial than federal civil rights laws and the State HRL," *id.* at 74; and that "analysis of the City HRL must be guided by the need to make sure that discrimination plays *no* role" in actions relating to housing, employment, and public accommodations. *Id.* at 76.

An interpretation of the City HRL, including N.Y.C. Admin. Code § 8-107(5)(a)(1)(a), that

---

[44] This is in stark contrast to disparate impact, where *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989) had just disrupted the theretofore existing burdens of proof in the employment context.

[45] *See* excerpt of the Aug. 17, 2005 Committee Report that accompanied the legislation ("Intro. 22-A") that became the Restoration Act, *quoting* the Hon. David Dinkins, Mayor of New York City at the time of the 1991 amendments, GD Ex. 42, at 2.

[46] N.Y.C. Admin. Code § 8-130(c) does not simply ratify the holdings and analysis of *Williams, Bennett,* and *Albunio.* The accompanying Local 35 of 2016 Committee Report states that these cases: "illustrate a correct approach to liberal construction analysis and then develop legal doctrine accordingly. It is therefore important for courts to examine the reasoning of the cases—including their extensive discussions of why the U.S. Supreme Court's analysis can be inadequate to serve the purposes of the HRL—*and then for courts to employ that kind of reasoning when tackling other interpretative problems that arise under the HRL.*" *See* GD Ex. 40, at 13 (emphasis added).

would exclude perpetuation-of-segregation claims would be an interpretation altogether at odds with each of the foregoing. Such an interpretation would say that the City HRL should not have the broadest vision of social justice or the strongest law enforcement deterrent; should be construed *less* broadly than federal civil rights law, and that discrimination should play no role . . . with the exception of perpetuating segregation.

At Stage 1, the most reasonable approach would be to conclude that, for City HRL purposes, the *Huntington* standard ("shown to have a racially disproportionate effect," *Huntington*, 844 F.2d at 936) would apply; that is, *not* importing *Inclusive Communities*' "robust" causality requirement. For the purposes of this motion and to ease the burden on the Court, however, plaintiffs are prepared to have their City HRL claim adjudicated with the requirement of robust causality.

What is important to note, as we did in connection with disparate impact under the City HRL, is that the local law is firmly protected from (not affected by) future changes in interpretation of the FHA. *See Williams*, 61 A.D.3d at 72-73 and 72 n.14 (rejecting the idea that a narrowing of the interpretation of a federal or state legal doctrine – in *Williams*, it was the continuing violations doctrine, nowhere to be found in the text of the City HRL – would result in the narrowing of the analogous City HRL doctrine, especially where the earlier federal or state doctrine was consistent with the uniquely remedial provisions of the City HRL).

DEFENDANT HAS FAILED AS A MATTER OF LAW TO MEET ITS
STAGE 2 BURDEN OF PROVING THAT THE POLICY HAS A LEGALLY
ADEQUATE JUSTIFICATION, A BURDEN APPLICABLE TO CLAIMS
OF DISPARATE IMPACT AND PERPETUATION OF SEGREGATION
ALIKE.

This point reviews, in turn, each of four justifications that defendant has advanced in the

course of discovery. Each is characterized by a lack of fit between the policy and the asserted

justification, speculation, and lack of necessity. Some are characterized by a lack of a substantial

interest sought to be vindicated by defendant. All present exactly the opposite circumstances from

those where a justification defense can be sustained.

## A. Justification defense under the FHA

Consistent with the fact that, for FHA purposes, disparate impact and perpetuation of

segregation have long been treated as two separate prongs of discriminatory "effect" liability, *see,*

*e.g., Huntington*, 844 F.2d at 937, HUD's rule treats both together in defining discriminatory

effects. *See* 24 C.F.R. § 100.500(a) (2020). For impact or perpetuation, it is the defendant's burden

to prove that "the challenged practice is *necessary* to achieve one or more *substantial*, legitimate,

nondiscriminatory interests of the . . . defendant." 24 C.F.R. § 100.500(c)(2) (2020) (emphasis

added). A legally sufficient justification "must be supported by evidence and *may not be*

*hypothetical or speculative*." 24 C.F.R. § 100.500(b)(2) (2020) (emphasis added). *See MHANY*,

819 F.3d at 618 (holding that *Inclusive Communities* implicitly adopted HUD's approach).

Independently, the law in this Circuit has for decades been similar to the rule. *See*

*Huntington*, 844 F.2d at 936-39 (holding that burden of persuasion is on defendant to demonstrate

that the facially neutral rule must be substantially related to the defendant's interest (by analogy to

business necessity rule in employment context); and that even a substantial interest of defendant

does not automatically prevail, but must be weighed carefully against the disparate effects; and the necessity of the challenged policy must be proved, not only in "theory," but "in practice" as well). *See also MHANY*, 819 F.3d at 617 (underscoring that first two stages of disparate-impact liability under the HUD rule[47] are "substantially the same as in our case law").

A critical element of defendant's burden is that there must be a fit between the policy and the goal sought to be advanced (just as a test must be job-related in the employment context). Hence, in *Dothard v. Rawlinson*, 433 U.S. 321 (1977), the Supreme Court upheld a decision striking down height and weight requirements for prison guards as imposing a disparate impact on women, finding that defendant had not made out the requisite showing that the requirements were an adequate proxy for strength (the sought-after applicant quality and job requirement). *Id.* at 331. *See also Firefighters*, 637 F. Supp. 2d at 125 ("More importantly, the City has presented no evidence that its chosen cutoff scores bear any relationship to the necessary qualifications for the job of entry-level firefighter.").

### B. Justification defense under the City HRL

The specific statutory burden set forth in the City HRL for disparate-impact claims places the burden of persuasion on defendant: as relevant here, the defendant must "plead and prove as an affirmative defense" that a challenged practice causing a disparate impact "bears a *significant relationship* to a significant business objective of the covered entity." N.Y.C. Admin. Code § 8-107(17)(a)(2) (emphasis added).[48]

---

[47] The only two at issue in this motion.

[48] While the phrase "business objective" is used in Section 8-107(17)(a)(2), the provision covers all covered entities, which include all those required to "comply with any provision of section 8-107…." *See* N.Y.C. Admin. Code § 8-102 (definitions section). *See also Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 491-92 (2001) (applying City HRL disparate-impact provision in housing context).

As explained in Point II(B), *supra*, perpetuation-of-segregation liability under the City HRL is derived from a different source, N.Y.C. Admin. Code § 8-107(5)(a)(1)(a). Lacking a specific statutory formulation, the shape of that liability must be addressed using the liberal construction principles required by N.Y.C. Admin. Code §§ 8-130(a) and (c).

At the time of the comprehensive 1991 Amendments to the City HRL, *Huntington* was the federal standard that applied. *Cf. Williams*, 61 A.D.3d at 72-73 and 72 n.14 (looking to the then-existing federal doctrine of continuing violations and not to the narrower doctrine that the Supreme Court imposed later for federal purposes). But it is the current HUD rule that best captures the intent and purpose of the City HRL in respect to perpetuation of segregation. *See Albunio*, 16 N.Y.3d at 477-78 (requiring every provision of the City HRL to be interpreted "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"). The City HRL has long been focused on keeping employer defenses narrow. The current HUD rule as it relates to the justification (Stage 2) phase means that the type of scrutiny that the City HRL demands in other contexts would be applied here.[49]

### C. Partial summary judgment is sought in relation to each justification individually

Plaintiffs take a moment to respectfully remind the Court that partial summary judgment is sought in respect to each of defendant's justifications individually. While they believe that the

---

[49] Cases required by Local Law 35 of 2016, *codified in relevant part as* N.Y.C. Admin. Code § 8-130(c), provide illustrations. *Bennett*, for example, and contrary to Supreme Court jurisprudence, held that "the maximum deterrent effect sought by the City HRL can only be achieved where covered entities understand that, whatever the urge may be to cover up their actual motivations before arriving in court, there can be no benefit for doing so once in court. *Bennett*, 92 A.D.3d at 42-44. *Williams*, in the course of rejecting the severe-or-pervasive test in harassment cases for City HRL purposes, held that, "While the specific topical provisions changed by the Restoration Act give unmistakable illustrations of the Council's focus on broadening coverage, section 8-130's specific construction provision required a 'process of reflection and reconsideration' that was intended to allow independent development of the local law 'in all its dimensions.'" *Williams*, 61 A.D.2d at 74 (*citing* Craig Gurian, "A Return to Eyes on the Prize", 33 Fordham Urb. LJ 255, 280 (2006)). *See also* N.Y.C. Admin. Code § 8-130(b) ("Exceptions to and exemptions from the provisions of this title shall be construed narrowly in order to maximize deterrence of discriminatory conduct.").

rejection of each and all is mandated – and that, thus, in conjunction with findings for plaintiffs as to either Point I or Point II, liability on the disparate-impact claims and/or the perpetuation-of-segregation claims would be fully established, with only remedy to determine – a finding that any of the justifications are inadequate as a matter of law would reduce the scope of a trial significantly.

## D. Defendant's Justification 1: relating to ensuring local residents who have persevered through years of unfavorable living conditions can participate in neighborhood renaissance

Defendant asserts that the community preference policy is premised on the idea that "local residents, many of whom have deep roots in the community and have persevered through years of unfavorable living conditions . . . deserve a chance to participate in the renaissance of their neighborhoods." [PS, ¶ 109.] In the first instance, the statement is misleading: an equal-access lottery would give everyone a chance to participate in lotteries. The justification is actually that these long-term residents *deserve a better chance* than others.

The justification is at once false and remarkably ill-fitting. First, the community preference policy does not distinguish between which applicants are more or less deserving of affordable housing units beyond the lottery's general rule that each applicant household must meet the household-income and household-size combination required for any particular unit that is subject to the lottery. [PS, ¶ 114-16.] As Vicki Been, defendant's former HPD commissioner and current deputy mayor for housing and economic development explained, community preference is "not a question of need" and not a question of who deserves an apartment more. [PS, ¶ 114.]

Moreover, the policy is not limited to insiders who are long-term residents of the CD preference area and is not limited to insiders who had had to persevere through years of unfavorable living conditions. [PS, ¶ 110.] Neither the length of time an applicant resides in the CD in which the affordable units are being built nor an applicant's housing conditions affects

eligibility under the community preference policy.  [PS, ¶ 111.]  Thus, the policy's design is not related, let alone significantly related, to the expressed objective.

The policy is applied to all CDs, even though many are not, and have not been for years, ones in which the residents have had to persevere through unfavorable living conditions.  [PS, ¶ 113.]  Again, there is a manifest lack of relationship between policy and expressed objective.

Finally, New Yorkers who *are* long-term residents of their community district, who *have* persevered through years of unfavorable living conditions, and who are applying for affordable housing *outside* of their community district are *denied* the benefits of the policy.  [PS, ¶¶ 19-20, 112.]  This despite the fact that defendant acknowledges that a newcomer to a neighborhood can be more invested in that neighborhood than a person who has lived in the neighborhood for a long time.  [PS, ¶ 117.]  This last point highlights both the lack of fit (a person meeting the criteria is not helped if that person chooses to move to another neighborhood), and the arbitrariness of defendant's policy.  This is the opposite of a substantial interest.

Defendant's Justification 1 fails each of the tests of the HUD rule, 24 C.F.R. § 100.500(c)(2) (2020), also applicable to City HRL perpetuation claims; fails the *Huntington* requirements that predated the rule of the need for a court to scrutinize closely the substantiality of the asserted interest and the fit between policy and expressed objective, *Huntington*, 844 F.2d at 936-39; and does not bear a "significant relationship" to a "significant" interest of defendant's, thus failing the City HRL's disparate-impact justification test.  N.Y.C. Admin. Code § 8-107(17)(a)(2).  *See also Dothard*, 433 U.S. at 331 (link between facially neutral practice and requirement not shown); *Firefighters*, 637 F. Supp. 2d at 125 (E.D.N.Y. 2009) (failure to demonstrate fit between facially neutral practice and needs of defendant).

### E. Defendant's Justification 2: relating to preventing and mitigating displacement

A second justification that has been articulated in the course of discovery is that the community preference policy is intended to prevent or mitigate displacement. [PS, ¶ 120.] First, it is acknowledged that the policy does not prevent any applicant to a lottery from being displaced from his or her current apartment. [PS, ¶ 122.] There is also no evidence that the policy can prevent or mitigate displacement out of New York City as much or more than an equal-access policy would. [PS, ¶ 133.] So, the interest that is purportedly being served is really a claim that the policy prevents those being displaced or at risk of displacement from being displaced from their *neighborhood*.

Defendant in the first instance cannot show why it has any more interest in preventing or mitigating displacement from a neighborhood as opposed to displacement from New York City altogether. Indeed, defendant has acknowledged that the affordable housing crisis is a citywide crisis [PS, ¶ 135], and that a New York City resident's displacement from the city as a whole is not a lower-priority concern for the City than such a resident's displacement from any particular neighborhood. [PS, ¶ 136.] As Deputy Mayor Been put it, "I would agree that having housing [] – period – is more important than where the housing may be." [PS, ¶ 136.] The specific interest of preventing or mitigating displacement from a neighborhood as opposed to from New York City cannot be understood either as a significant or substantial interest.[50]

This is especially true given the composition of lottery applicants. Professor Beveridge's examination of unique lottery applicants (each unique applicant may apply to one or many

---

[50] Many New Yorkers, historically and to this day, often move between neighborhoods within the City rather than remaining in their original neighborhood of residence. New York's neighborhoods are characterized by dynamic change. [PS, ¶ 140.] According to former Deputy Mayor Alicia Glen, "I think it's already a value statement to assume that it's bad if people move into other neighborhoods that are further *away because that just runs afoul of the history of the world.*" [PS, ¶ 136, emphasis added.]

lotteries) shows that *more than 85 percent* of them apply out-of-community-district *at least 75 percent of the time.* [BD, at 58-59, ¶¶ 201-03, and at 59, Table 15; PS, ¶ 137.] This is true across racial groups in the aggregate, and it is true separately for Whites, Blacks, Latinos, and Asians. [BD, at 61, ¶ 208 and Chart 1; PS, ¶ 138.] Defendant's policy for treatment of lottery applicants for anti-displacement purposes cannot be a substantial interest when it is working against the vast majority of applicants the vast majority of the time.[51]

Secondly, the role of the policy as a matter of preventing or mitigating displacement is entirely unsupported by evidence. Defendant has not even established the scope of involuntary displacement that exists in New York City [PS, ¶ 129], and acknowledges that displacement is often difficult to define in terms of whether it is involuntary. [PS, ¶ 128.]

Indeed, in a remarkably candid admission made between officials of HPD during the pendency of this lawsuit, one official stated: "We justify the policy because it prevents displacement. But we don't have good metrics to show that displacement is occurring. What I'd like to do is start building a 'case' for anti-displacement policy." [PS, ¶ 130]

Just as critically, among CP beneficiaries who have been awarded units, defendant has not identified and does not claim to know which, if any, had been at risk for displacement from their apartment or neighborhood. [PS, ¶ 131.] Among non-beneficiaries who were *not* awarded units, defendant has not identified, and claims not to have collected the data by which it could know, which, if any, had been at risk for displacement. [PS, ¶ 132.] In other words, the undisputed factual posture of this justification is that it is not supported by evidence as required by the HUD

---

[51] Professor Edward Goetz, put forward by defendant as an expert on the topic of displacement and its relationship, if any, to the policy, acknowledged at his deposition that the most direct and comprehensive way of determining what choices individual households are making in terms of where they want to compete in lotteries for affordable housing is simply to look at the preferences they express through the applications they make. [PS, ¶ 139.] He also asserted that "we flatter ourselves and slide into paternalism when we act on the idea that we know best about where lower income people of color should live." [PS, ¶ 183.]

rule, 24 C.F.R. § 100.500(b)(2) (2020); it cannot be shown to be necessary "in practice," as required by pre-existing Circuit case law, *Huntington*, 844 F.2d at 936; and cannot be demonstrated to be significantly related to a significant interest of defendant. N.Y.C. Admin. Code § 8-107(17)(a)(2). *See also Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC*, 2017 WL 2022462, at \*3 (W.D. Wash. May 12, 2017), *aff'd*, 743 F. App'x 116 (9th Cir. 2018) (holding, in fair housing case rejecting existing limit on the number of people who could occupy a studio, that "subjective judgments are insufficient to rebut a plaintiff's prima facie case absent objective evidence in support of those judgments").

The lack of fit between the policy and the expressed interest is breathtaking.[52] Not only has defendant failed to marshal evidence that the policy fits the expressed anti-displacement justification, it has *ignored evidence* that it has had in hand that the policy is no fit at all.

Specifically, defendant recognizes that rent burden[53] can be used as a proxy for risk of displacement. [PS, ¶ 141.] Per application data collected and maintained by defendant, similar percentages of CP-beneficiary applications and non-beneficiary applications are from rent-burdened and severely rent-burdened households. [BD, at 54-57, ¶¶ 189-96; and at 56, Table 14; PS, ¶¶ 142-44.] And the *number* of non-beneficiary applications from rent burdened households dwarfs the number of CP-beneficiary applications from rent-burdened households.[54] [BD, at 56, Table 14; and at 57-58, ¶197; PS, ¶ 145.] For example, in terms of applications where no subsidy

---

[52] Just as a preliminary matter, plaintiffs note that a community district is often composed of multiple neighborhoods; receiving a unit in one's existing community district does not mean that one is being enabled to stay in the same neighborhood. [PS, ¶ 134.]

[53] A household is considered "rent-burdened" when rent (sometimes including utilities) exceeds 30 percent of its monthly household income. [PS, ¶ 142.] A household is considered "severely rent-burdened" when rent (sometimes including utilities) exceeds 50 percent of its monthly household income. [PS, ¶ 143.]

[54] It is also the case that the number of non-beneficiary applications from *severely* rent burdened households far exceeds the number of CP-beneficiary applications from rent-burdened (less than severely) households. [PS, ¶ 147.]

is claimed and rent burden is calculated as a percentage of income based on contribution to total rent, there were more than 1.3 million applications that came from rent-burdened applicants who are not CP beneficiaries; by contrast, fewer than 70,000 applications came from rent-burdened applicants who are CP beneficiaries. [BD, at 56, Table 14; and at 57-58, ¶197; PS, ¶ 146.]

From the perspective of risk of displacement as measured by rent burden, then, a far greater number of applicants are *hurt* by the policy (the more numerous non-beneficiaries are disadvantaged by the policy, including the more numerous non-beneficiaries who are at risk for displacement). [BD, at 58, ¶¶ 197, 199.] There is not a greater percentage of CP beneficiaries who are rent-burdened as compared with the percentage of rent-burdened non-beneficiaries, so the policy cannot be said to be targeted or aimed at those at risk of displacement more than either: (a) an equal-access system; or (b) an otherwise equal-access system that *actually* prioritized those at risk of displacement.

In short, the policy's purported link to an anti-displacement effort not only has not been validated, it cannot be validated. *Cf. Huntington*, 844 F.2d at 936 (holding justification insufficient where not shown to fit interest *in practice*); *Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*, 630 F.2d 79, 100–06 (2d Cir. 1980) (finding even when, unlike here, the skills tested by an examination were adequately related to the job tested for, the examination – the policy in question – was not sufficiently validated because it had insufficient "differentiating power" as between candidates).

All of the foregoing is fatal to the assertion of the justification, but it is also important to point out defendant's inability to show the *necessity* of the policy.

The 30 percent preference policy was established more than 30 years ago; the percentage of units in a lottery subject to community preference was raised to 50 percent almost 20 years ago.

[PS, ¶ 16.]  Defendant agrees that there are a host of concrete anti-displacement measures that either were not in effect prior to 2014 (that is, prior to the start of the de Blasio administration) or that have been enhanced and amplified during the de Blasio administration.  [PS, ¶¶ 148, 149.] These include increasing preservation of affordable housing units, funding legal services for tenants facing eviction, stepping up anti-harassment efforts, and raising awareness about available resources for tenants.  [*Id.*]  These also include the passage last year of more stringent, more tenant-protective rent regulations at the state level, including the elimination of vacancy decontrol.  [PS, ¶ 152.]  When asked at her 2018 deposition about the possibility of ending vacancy decontrol, Ms. Been testified that ending it would reduce the incentive that landlords have to push tenants out of their apartments [PS, ¶ 153]; speaking at a press conference in 2019 that announced her appointment as Deputy Mayor, she described the then-in-process State legislative effort as a "once-in-a-generation chance to end failed policies like the current vacancy de-control rules and to stop the irrevocable loss of those precious rent stabilized units."  [*Id.*]

In the face of these other (new and enhanced) measures, measures which neither party disputes have had concrete effect, the idea that the community preference policy adds any measurable benefit to anti-displacement efforts is purely speculative.  The proposition that the policy can be said to be necessary without having investigated the impact of the newer measures lacks merit as a matter of law.  Defendant has not sought to identify a specific qualitative or quantitative contribution of the policy to anti-displacement efforts; in contrast, defendant (Mayor de Blasio, in fact) *has* stated that a different tool – housing *preservation* – is the "ultimate anti-displacement tool," and that the "simplest, strongest, clearest anti-displacement tool is to protect a working family *in their apartment* . . . ."  [PS, ¶¶ 150-51, emphasis added.]  The community preference policy, as previously noted, does not protect anyone "in their apartment," and there is

no evidence that it contributes *by any percentage* to the efficacy of other (actual) anti-displacement measures.  Such a policy cannot be either a necessary policy or one that is significantly related to a significant objective of defendant.

For all the foregoing reasons, defendant's Justification 2 must fail as a matter of law.

## F. Defendant's Justification 3: relating to preventing and mitigating *fear* of displacement

In the course of discovery (and faced with the reality of the absence of evidence to show that the policy actually did anything in relation to *actual* displacement), defendant began to assert the argument that the policy helps alleviate the *fear* of displacement.  [PS, ¶ 121.]  The link between the policy and reducing fear of displacement is so evidence-free as to be non-existent.

Defendant has not quantified how many New Yorkers fear displacement from their neighborhood, the degree of that fear, the extent to which the community preference policy would or should reduce that fear, or how that fear may differ as between non-beneficiary applicants and CP-beneficiary applicants.  [PS, ¶ 154.]  Furthermore, defendant recognizes that it would be an exaggeration to convey to New Yorkers seeking to remain in their neighborhood and fearful of displacement from the neighborhood that the community preference policy *would* at any specified time frame yield them an apartment, and recognizes that the policy should not *eliminate* their fear of displacement.[55]  [PS, ¶ 155.]  Defendant also recognizes that the policy cannot help those who are at imminent risk of displacement.  [PS, ¶ 123.]

The only explanations for why defendant's proposed expert on displacement believes that the policy would reduce fear of displacement from the neighborhood is that: (a) the policy sends a an unquantified "signal" – to the unquantified subset of New Yorkers who know about it – that

---

[55] If defendant were to go further and suggest to anyone that his or her fear of displacement should *in fact* be reduced because of the community preference system, defendant would be giving false and unsupportable assurances.

defendant is serious about dealing with displacement from neighborhoods; and (b) that those in the undefined subset who know about the policy should adopt the view that if an unspecified but concededly inadequate amount of affordable housing were to be made available in their community district, they would have an unspecified better chance for getting it than if the policy did not exist – thereby possibly giving them an unquantified incremental fear- or anxiety-reduction about displacement.  [PS, ¶ 156.]

All of this is impossibly vague and insubstantial.  Imagine, for example, a New Yorker who is concerned about being involuntarily displaced.  As far as the "signal" of seriousness, there is no explanation available for why the policy would reduce fear if the fearful are ignoring other, more substantive signals (like concrete anti-displacement measures).

As for the better chances of CP beneficiaries, the fact of better chances is true in relation to the lower chances of non-beneficiaries, but not salient to fear of displacement.  According to what defendant wants the Court to believe, that person who knows about the policy will have his or her fear of displacement reduced by *an unspecified amount* based on the idea that, at some indeterminate point in the future, there *may or may not* be a lottery for an affordable housing development in his or her community district; which *may or may not* be in his or her neighborhood; which *may or may not* have apartments available as to which he or she is interested (and as to which he or she *may or may not* be qualified); and which lottery the person *may or may not win*.

Even if defendant's proposition could possibly be shown to be true, that proposition could not possibly amount to a legally sufficient justification.  The link between the policy and the asserted interest is entirely amorphous and speculative.  And if the policy really did reduce fear of displacement by improving odds of CP beneficiaries (to accept, *arguendo*, defendant's speculation), it would correspondingly have to be said that the policy *increased* fear for the far

greater number of non-beneficiaries who have their odds lowered.  [BD, at 58, ¶ 198.]  Reducing

fear for some New Yorkers while increasing it for a larger number of New Yorkers cannot be a

substantial interest of defendant.[56] For all of the foregoing reasons, Justification 3 must fail.


## G. Defendant's Justification 4: the policy is needed to cause defendant's own legislative branch to act in the best interests of defendant.

Defendant has asserted as a justification for the policy the proposition that the policy is

needed because "neighborhoods throughout the City and their elected representatives often resist

approving land use actions required to allow greater density or site affordable housing," and that

resistance has to be overcome.  [PS, ¶ 158.]  In fact, it is undisputed that the needed approvals

come specifically from the City Council. [PS, ¶¶ 161-62.]  Defendant's justification thus depends

on proving a prospective, counter-factual inquiry: in a City where the community preference policy

had been eliminated (by this Court, for example), CMs would oppose land-use actions that

facilitate the construction of affordable housing, and would do so even though defendant

acknowledges that such actions would be contrary to the interests of the City and contrary to the

interests of the CMs' constituents.  [PS, ¶ 168.]  The justification is unprecedented; would, if

accepted, fundamentally undermine the FHA and the City HRL; is founded on what defendant

admits is speculation; and cannot be shown by defendant to be necessary.

---

[56] If one wanted to look at a truly substantial interest, one would look at defendant's extremely important interest of reducing segregation in New York City highly segregated public schools.  [PS, ¶ 173.]  A critical tool for reducing segregation in schools, especially at the elementary school level is reducing residential segregation.  [PS, ¶ 174.]  Yet defendant proposes to justify a policy that allows for less residentially integrated housing (and, hence, less desegregation of elementary schools) on the basis of its "maybe-we'll-reduce-some-people's-fear" argument.  In the careful weighing process described by *Huntington*, 844 F.2d at 937, it would not take a moment but to conclude that the fear of displacement argument, as a matter of law, was entirely too insubstantial.

Likewise, it is undisputed that African Americans are overrepresented in census tracts of high poverty as compared with the overall percentage of New Yorkers who are African American, and that Latinos are overrepresented in census tracts of high poverty as compared with the overall percentage of New Yorkers who are Latino.  [PS, ¶¶ 184-85.]  Overcoming those disparities is a substantial interest of defendant.

**(1) An unprecedented justification.**  The idea that disparate impact or perpetuation of segregation could be justified by an entity claiming that the policy in question was necessary to convince one part of the entity (here, defendant's legislative branch) to act consistently with what another part the entity admits is in the entity's interests (here, defendant's executive branch) is *literally unprecedented*.  Plaintiffs have found no disparate-impact and/or perpetuation case where such a justification has been raised, let alone accepted.  All that is really being said is that both parts of the same entity prefer a preference and that members of the legislative part (CMs) prefer the preference *a lot* (so much so that they would conduct a never-ending protest of the elimination of the preference by turning down desperately needed affordable housing).[57]

**(2) A justification that would undermine the FHA and the City HRL.**  Even were the Court to consider entertaining an entity-convincing-itself justification, there are powerful reasons not to do so.  First, the reasoning – the policy is necessary because the policy is desired by the defendant – is circular.  *Cf. Langlois*, 234 F. Supp. 2d at 69 (where suburban municipal defendants sought to justify policy with reasons like "they want to make it easier for their residents to keep living in their communities," and that "it is important for community morale to know that the [public housing authorities] are working for the town's *own* residents," Court ruled that the justifications "all collapse into the very definition of residency preferences.  If I accepted these as legitimate justifications, residency preferences in and of themselves would forever justify the disparate impacts that they cause.").

---

[57] As defendant itself admits, such a course of conduct would be contrary to the interests of the City and of the CMs' constituents.  [PS, ¶ 168.]

Second, the availability of such a justification would improperly *encourage* resistance to fair housing mandates among municipal entities. In any municipality in the United States, any preference, zoning practice, or other policy that had a disparate impact or that perpetuated segregation could artificially be self-justified within the entity itself with the threat or reality that, "If we don't get Policy X, we will hold needed-action Y hostage." The "we" might vary from jurisdiction to jurisdiction – in one case, it could be one or more legislators; in another, it could be the executive. Regardless, opening the door to manipulation of the justification defense to discriminatory conduct is altogether contrary to the purposes of the relevant statutes. *See Inclusive Communities*, 135 S. Ct. at 2521-22 (the FHA's objectives, defined as providing for fair housing throughout the United States, are vindicated when municipalities are stopped from enforcing arbitrary and, in practice, discriminatory ordinances); *Williams*, 61 A.D.2d at 76 (legislative history makes clear that the City HRL must be interpreted in a way consistent with the principle that the law's deterrent effect is to be maximized).

      **(3) A justification that is speculative.** The burden is on defendant to demonstrate with evidence that the prophesized negative consequence (once the community preference policy has been eliminated, CMs will oppose needed land-use measures and affordable housing developments that they otherwise would have supported) will take place.

But it is undisputed that defendant cannot do this. [PS, ¶ 169.] For example, Deputy Mayor Been acknowledged that she does not "have an alternate [] universe" where she has "tested out" having versus not having community preference to determine whether land use actions would get approved without it; she cannot answer whether rezonings would not occur "but for" community preference because "I don't have any way of assessing" the matter in "but for" terms. [*Id.*] She

admitted that, "I don't know for a fact what council members would do in that hypothetical" (regarding the elimination of the community preference policy pursuant to either Court order or at defendant's own initiative). [*Id.*]

She was joined by her successor as HPD commissioner, Maria Torres-Springer, who said it was "difficult for me to predict" which CMs would take the position that they were going to deny their constituents desperately needed affordable housing if community preference were removed because "it's asking me to speculate" as to which CMs would say that. [*Id.*]

Ms. Torres-Springer was joined by, among others, David Quart, who had served as deputy commissioner for strategy, research, and communications at HPD. Mr. Quart had *opinions* as to the potential value of the policy, but admitted that, "I have no proof or specific reason or facts." [*Id.*]

Finally, defendant is asking the Court to predict that CMs would reject otherwise meritorious land-use measures and affordable housing projects because the community preference policy had been eliminated (either by the Court or by defendant's voluntary action) at the same time that defendant acknowledges that CMs who did so would not be acting in the interest either of the City or of the CM's constituents. [PS, ¶ 168.]

This justification is emphatically not evidence-based and is thus not sustainable as a matter of law. *Cf.* 24 C.F.R. § 100.500(b)(2) (2020) (emphasis added) (providing that a legally sufficient justification "must be supported by evidence and *may not be hypothetical or speculative*"); *Huntington*, 844 F.2d at 936 (justification must be shown to be necessary both in theory and in practice). N.Y.C. Admin Code § 8-107(17)(a)(2) (defendant must prove that a justification *is* – not might be – significantly related to defendant's substantial interest).

**(4) A justification that defendant cannot demonstrate is necessary.** Necessity, by definition, is not demonstrated when, as here, the justification is speculative. But the Court should be aware of ample additional evidence that precludes a finding of necessity.

First, members of defendant's executive branch have not tried to explain to CMs that the community preference policy has negative ramifications [PS, ¶ 170];[58] as such, the reaction of CMs is not only speculative, but defendant has not even tested what it might be. This failure is not because defendant believes that persuasion is futile. To the contrary, Mayor de Blasio, using his fight to pass Mandatory Inclusionary Housing as an example, has boasted that he was able to overcome resistance to a new way of thinking about affordable housing and that it is necessary *and feasible* to: (a) resist unwarranted opposition; (b) bring together a "really broad coalition"; (c) work in the interests of all New Yorkers; and (d) change minds and thus "change our policies profoundly." [PS, ¶ 171.] This evidence is inconsistent with a hypothesis of necessity.

Second, City Council Speaker Corey Johnson, reflecting on the perniciousness of segregation in schools, has stated publicly that, while he has supported the community preference policy in the past, he would be "open to" having the conversation about "scaling back on the percentage that we allow for right now," suggesting percentages as low as twenty percent because "there's a greater good we have to look at." [PS, ¶ 172.] This evidence, too, is inconsistent with a necessity hypothesis.

Third, there have been multiple occasions in the past when a CM has asked for the percentage of units subject to community preference to be raised. In each case, defendant's

---

[58] And it is clear in the record that defendant was aware of negative ramifications. For example, Deputy Mayor Been testified that she did not believe she would retain a 50 percent community preference if her "only concern was reducing racial segregation"; asked whether a consideration in administration discussions of whether to modify the community preference policy was "that there was less race-based impact as the Community Preference was lowered," responded, "That was a consideration." [PS, ¶¶ 106-07.]

executive branch turned the CM down. And, according to Deputy Mayor Been, in each case, the CM went ahead and supported the land-use measure or affordable housing anyway. [PS, ¶ 167.] This evidence, too, is inconsistent with a necessity hypothesis.

Fourth, CMs have multiple factors that influence their position on land-use and development matters. [PS, ¶ 163.] For example, the level of affordability is an issue that is raised frequently; the extent to which needed infrastructure, or community improvements or benefits, will be provided in connection with the project is also sometimes considered. [PS, ¶ 166.] Defendant also admits that the fact that a request is mentioned does not mean that it will be insisted upon. [PS, ¶ 165.]

Defendant's executive branch has a variety of incentives to provide to CMs to influence their position on land-use and development matters, including those related to needed infrastructure or community improvements, and regularly offers such incentives. [PS, ¶ 164.]

Because of the multiplicity of factors and the idiosyncratic nature of CM response, defendant is unable to conclude what factors will be determinative in persuading a particular CM to support a particular land-use change or a particular project. [PS, ¶ 166] Not knowing which of many factors will be determinative in a CMs decision is, once more, evidence inconsistent with a hypothesis of necessity.

For all of the reasons set forth in this sub-part, defendant cannot prove that the policy is necessary pursuant to this justification. *Huntington*, 844 F.2d at 936 (justification must be necessary both in theory and in practice). N.Y.C. Admin Code, § 8-107(17)(a)(2) (defendant must prove that a justification *is* – not *might be* – significantly related to defendant's significant interest).

For all the reasons set forth in subsections (1) to (4) relating to the entity-convincing-itself justification, Justification 4 must fail.

<u>CONCLUSION</u>

It is important to emphasize some things that this lawsuit is not trying to do. It is not telling defendant where to build. It is not telling defendant what is affordable. It is not injecting racial considerations in the form of affirmative action of any sort. These are the concerns that *Inclusive Communities* expressed about disparate effects litigation.

All this lawsuit seeks to do is to have defendant allow every New Yorker to compete equally in a lottery.

As has been shown, defendant's community preference policy, designed not to allow for equal competition as between CP beneficiaries and non-beneficiaries, operates to cause disparate impacts on the basis of race and permits less integration (perpetuates segregation more) than would be the case without the policy. Defendant's justifications are, as a matter of law, without merit.

Each and all of the elements of plaintiffs' motion for partial summary judgment should be granted and defendant should be found liable for disparate-impact and perpetuation-of-segregation violations of both the Fair Housing Act and the New York City Human Rights Law.

Dated: New York, New York
       March 6, 2020

*Craig Gurian*
Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, Suite 7097
New York, New York 10177
(212) 537-5824
*Co-Counsel for Plaintiffs*