UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SHAUNA NOEL and EMMANUELLA SENAT,  :

             Plaintiffs,  :

          -against-  :  15-CV-5236 (LTS/KHP)

CITY OF NEW YORK,  :

            Defendant.  :

------------------------------------------------------------x

## EXPERT REPORT OF PROFESSOR MYRON W. ORFIELD, JR.

**I. Qualifications and expertise.**

    1.    I am the Earl R. Larson Professor of Civil Rights and Civil Liberties Law and Director of the Institute for Metropolitan Opportunity at the University of Minnesota Law School. My primary responsibilities are teaching and directing the Law School's Institute on Metropolitan Opportunity. My *curriculum vitae*, which includes my publications over the last 10 years, is annexed hereto as Exhibit 1.

    2.    I teach constitutional law, with a particular emphasis on the equal protection clause and the three major federal civil rights acts. I also teach state and local government, land use planning, and legislation.

    3.    The Institute for Metropolitan Opportunity is a legal and social science research center that studies racial segregation in schools and housing, state and local tax policy, land use policy, and regional governance in the 100 largest U.S. regions. It has recently embarked on a series of studies concerning the costs of government-supported affordable housing.

    4.    I received my law degree in 1987 from the University of Chicago Law School. I served as a law clerk to Judge Gerald W. Heaney of the United States Court of Appeals for the

Eight Circuit; was a research fellow at the Center for Studies in Criminal Justice at the University of Chicago; worked as an associate for the Minneapolis law firm of Faegre Baker Daniels; and as an assistant attorney general of Minnesota, where I represented the state in appellate litigation, including litigation before the United States Supreme Court.

5.     I was elected to the Minnesota House of Representatives in 1990, and after serving ten years, to the Minnesota Senate in 2000.  There I was the architect of a series of important changes in land use, fair housing, school and local government aid programs, transit policy and metropolitan governance. I was the co-author (with the State Representative Tim Pawlenty) of the Metropolitan Reorganization Act of 1994, which transformed the Twin Cities Metropolitan Council into the nation's most powerful regional government.  I was centrally involved with the passage of a region-wide fair share housing law, modeled on the *Mount Laurel* decision, called the Livable Communities Act. My first book, *Metropolitics: A Regional Agenda for Community and Stability* (1997), a study of local government structure and demographics, details these efforts.

6.     My areas of expertise include fair housing, including the process of and requirements for affirmatively furthering fair housing; school desegregation; state and local government law; land use planning; state and local finance; transit and regional governance; and the legislative process.  I have written three books and dozens of articles and book chapters on local government law, spatial inequality, fair housing, school desegregation, charter schools, state and local taxation and finance, and land use law.

7.     As the executive director of the Metropolitan Area Research Corporation and its successor Ameregis, I completed more than 30 reports studying the racial, fiscal and land-use patterns in the 50 largest U.S. metropolitan areas.   In 2002, I wrote a book, *American Metropolitics: The New Suburban Reality*, on patterns of racial segregation, fiscal inequality, and land use in the 20 largest U.S. regions.

8.      I have worked with civil rights groups on housing desegregation and school desegregation cases throughout the country.

9.      I've traveled to speak on these issues all over the United States in almost all the major metropolitan areas.  I am acquainted with numerous local officials in the 50 largest metropolitan areas of the country, and many smaller regions, and have worked on dozens of zoning and planning cases.  I have been involved in some way with many of the major U.S. civil rights housing litigation cases since became I became a lawyer in 1987.

10.     My research has helped lead to legislative and judicial reforms at the federal level, and state level reform in Minnesota, Illinois, Michigan, California, New Jersey, Connecticut, Massachusetts, Washington, Oregon, and Maryland, among other states and metropolitan areas.

11.     I served as an appointed commissioner on the National Commission on Fair Housing and Equal Opportunity, chaired by former U.S. Housing and Urban Development Secretaries Jack Kemp and Henry Cisneros.  The recommendations of this commission formed the basis for President Obama's fair housing agenda.

12.     I have been an academic advisor to the Congressional Black Caucus (on issues of fair housing and school desegregation), an advisor to both President Obama's transition team for urban policy and to the White House Office of Urban Affairs, and a special consultant to HUD's Office for Fair Housing and Equal Opportunity (FHEO). At FHEO, I assisted in the development of the Fair Housing Act's Discriminatory Effects Standard (the "disparate impact rule") (78 Fed. Reg. 11460) and the Affirmatively Furthering Fair Housing Rule (80 Fed. Reg. 42272).

13.     I am being compensated at the rate of $250/hour for the preparation of this report and at the rate of $300/hour for such testimony as I may be required to provide.

14.     I have not testified as an expert at trial or by deposition during the previous four years.

**II. Residential segregation is endemic in American cities, including New York, and causes wide-reaching and serious harms.**

15.     American cities have long been residentially and educationally segregated on the basis of race. Government policies, adopted for the purpose of creating or maintaining racial boundaries, have long played a critical role in that segregation. These problems remain today. This includes segregation of both black and Latino residents.[1]

16.     Contrary to popular belief and expectation, residential segregation has frequently been most severe outside of the South, in part because the absence of formal Jim Crow mechanisms induced leaders to pursue social separation between white and nonwhite populations by finding ways to keep those populations geographically separate. Residential racial segregation is particularly severe in the nation's Northeast and Midwest.

17.     Segregation is almost always exacerbated by a high degree of governmental fragmentation, whether of municipalities, school districts, or sub-municipal governmental entities. Segregation also often leads to additional fragmentation, as municipal entities form in order to bar newcomers who would cross racial boundaries. Studies of municipal fragmentation have shown it to be much higher in the Northeast and Midwest.

18.     No city or region, or any subset of any city or region, has proven immune to segregationist sentiment. While residential segregation is classically envisioned as separation between diverse cities and their white suburbs, the reality is much more complex. Large cities contain predominantly white and predominantly nonwhite neighborhoods, and segregation occurs between these areas, as well.

19.     In addition, the suburbs, in the aggregate, have been growing more racially diverse over time. In many metropolitan areas, the most racially diverse communities are now suburban,

---

[1] *See* John R. Logan and Brian J. Stults, "The Persistence of Segregation in the Metropolis: New Findings from the 2010 Census," published by the US2010 Project (2011), available at http://www.s4.brown.edu/us2010/Data/Report/report2.pdf.

and the majority of American suburban population lives in an area that is either racially diverse or nonwhite segregated. There also remain a number of predominantly white suburbs. As a result, segregation also occurs internally within suburban areas. Again, no area is immune.

20.     The New York region and New York City itself remain some of the nation's most racially segregated places. Using a dissimilarity index, a widely-used measure which represents the percentage of a group's population that would have to move to achieve perfect demographic uniformity throughout the area in question, the New York metropolitan region ranks as the second-most segregated region for black residents, and the fourth-most segregated region for Latino residents. At the city level, New York City itself is the second-most segregated in the nation for black and Latino residents alike using a dissimilarity index.  These findings are replicated in the table below.

**Segregation in Neighborhoods (Census Tracts) in 2010**[2]

| | New York Metro Area<br>Black to White | | | Hispanic to White | |
| | Score | Rank* | | Score | Rank* |
|---|---|---|---|---|---|
| Dissimilarity | 76.9 | 2 | | 62.0 | 4 |

*Ranked from worst to best out of 366 metro areas

| | New York City<br>Black to White | | | Hispanic to White | |
| | Score | Rank* | | Score | Rank* |
|---|---|---|---|---|---|
| Dissimilarity | 81.4 | 2 | | 65.8 | 2 |

*Ranked from worst to best out of 282 cities with populations of 100,000 or more.

---

[2] Data obtained from the American Communities Project ("ACP"), coordinated John R. Logan. ACP main data site: https://s4.ad.brown.edu/projects/diversity/Data/data.htm; ACP residential segregation data site: https://s4.ad.brown.edu/projects/diversity/Data/Download1.htm.

21.    New York schools are also segregated, and once again, that segregation extends to both the region and the city. The degree of school segregation is described in the table below, which uses the same measure that was used to describe residential segregation above.

**Segregation in Elementary Schools in 2010[3]**

|  | New York Metro Area | | Hispanic to White | |
|---|---|---|---|---|
|  | Black to White | | | |
|  | Score | Rank* | Score | Rank* |
| Dissimilarity | 82.1 | 3 | 69.5 | 7 |

*Ranked from worst to best out of 334 metro areas

|  | New York City | | Hispanic to White | |
|---|---|---|---|---|
|  | Black to White | | | |
|  | Score | Rank* | Score | Rank* |
| Dissimilarity | 81.7 | 6 | 68.5 | 15 |

*Ranked from worst to best out of 327 central cities.

22.    Residential segregation creates profound harms for residents and entire communities. Exposure to segregated neighborhoods for minority group members has been associated with reduced economic and health outcomes. Moreover, neighborhoods segregated African-American or Latino typically have reduced access to jobs, high-quality education, and other amenities, such as fresh food. Research suggests the negative impacts of segregation are intergenerational, and particularly severe when experienced at a young age.[4] Racially segregated minority neighborhoods tend to experience cycles of public and private disinvestment.

---

[3] ACP school segregation data site: https://s4.ad.brown.edu/Projects/usschools/SchoolDLoad.htm.

[4] *See, e.g.*, Raj Chetty and Nathaniel Hendren, "The Impacts of Neighborhoods on Intergenerational Mobility I: Childhood Exposure Effects," *Quarterly Journal of Economics*, Vol. 133(3) (2018), 1107-1162; Raj Chetty, Nathaniel Hendren, and Lawrence F. Katz, "The Effects of Exposure to Better Neighborhoods

23.    One critical harm is that neighborhood segregation results in school segregation. School segregation is associated with manifold harms to students, including reduced academic achievement, reduced educational attainment, reduced adult income, reduced ability to work in multicultural or racially diverse environments, and increased exposure to the criminal justice system. Students in schools segregated African-American or Latino typically do not have access to comparable professional or collegiate networks of opportunity as students in predominantly white or integrated schools.

24.    Segregated schools, once formed, typically become a major independent obstacle to neighborhood reintegration.

## III. Resistance to residential integration comes from leaders, organizations, and agencies invested in preserving the status quo. Although nonwhite residents prefer integration, that preference is not always expressed by those who purport to represent those residents.

25.    Through my extensive personal involvement in desegregation and integration planning, as well as my academic research, I have developed insight and expertise into the practical political and policymaking dynamics through which residential segregation is maintained.

26.    The primary locus of resistance to residential integration has always been white residents and white neighborhoods.

---

on Children: New Evidence from the Moving to Opportunity Project," *American Economic Review*, Vol. 106(4) (2016), 855-902; Michael R. Kramer and Carol R. Hogue, "Is Segregation Bad for Your Health?" *Epidemiological Reviews*, Vol. 31 (2009), 178-94; Jeffrey R. Kling, Jeffrey B. Liebman, and Lawrence F. Katz, "Experimental Analysis of Neighborhood Effects," *Econometrica*, Vol. 75(1) (2007), 83-119; Dolores Acevedo-Garcia, Kimberly A. Lochner, Theresa L. Osypuk, and S.V. Subramanian, "Future Directions in Residential Segregation and Health Research: A Multilevel Approach," *American Journal of Public Health*, Vol. 93(2) (2003), 215-221; Robert J. Sampson, Jeffrey D. Morenoff, and Thomas Gannon-Rowley, "Assessing 'Neighborhood Effects': Social Processes and New Directions in Research," *Annual Review of Sociology*, Vol. 28 (2002), 443-478; Douglas Massey and Nancy Denton, *American Apartheid: Segregation and the Making of the Underclass* (1993); Nancy McArdle and Dolores Acevedo-Garcia, "Consequences of Segregation for Children's Opportunity and Wellbeing," paper presented at *A Shared Future: Fostering Communities of Inclusion in an Era of Inequality* (2017), available at http://www.jchs.harvard.edu/sites/default/files/a_shared_future_consequences_of_segregation_for_childr en.pdf.

27.    In the United States, there is an unmistakable history of fear of and resistance to prospective racial change in white neighborhoods.  This is true in the post-WWII era, where there has been a near-universal phenomenon of resistance from white communities and their local officials.  This is documented by the writing of urban scholars like *The Origins of the Urban Underclass* by Tom Sugrue, *Building the Second Ghetto* by Allan Hirsch, and many others.

28.    These fears were based in stereotyped views of African-Americans and other "outsiders." They included fears over neighborhood trajectory, property values, and school quality, among other factors.

29.    These fears continued long after the passage of the Fair Housing Act and other civil rights legislation banning housing segregation and discrimination, and continue today. While there have been many positive changes in racial attitudes that have helped make residential integration more feasible, there is still strong evidence that fear of and resistance to racial integration remains in white communities.

30.    I have seen these fears firsthand, serving as a state representative and state senator representing District 60 in Minneapolis from 1990 to 2003.  Many of the neighborhoods in my district were white, well-educated, and affluent.  I also represented some areas undergoing racial transition and re-segregation.

31.    I have also worked on siting affordable housing and pro-integrative housing programs in the suburbs of Chicago; New York; Philadelphia; Dallas; Baltimore; Portland, Oregon; Montgomery County, Maryland; Cleveland; Detroit; and many other places. Further, since the early 1990s, I have also been in regular contact with many of the civil rights and land use planning advocacy organizations that are actively attempting to implement pro-integrative affordable housing programs.

32. In every place that I have ever worked and heard about, many local officials who represent white areas either actively or surreptitiously oppose pro-integrative affordable housing programs, especially programs that are seen as having the potential of changing existing racial demographics. While, this opposition can sometimes be overcome, I have never experienced nor even heard of a place where this opposition is not present.

33. By contrast, in my experience, the majority of nonwhite residents prefer integrative programs and want schools and neighborhoods with a greater degree of racial diversity, an observation that has been repeatedly confirmed in polling and other social scientific studies.[5]

34. Studies on housing preferences repeatedly show that black Americans prefer, on average, evenly racially mixed neighborhoods to segregated neighborhoods that are either predominantly white or predominantly black. Likewise, Latino residents prefer, on average, evenly racially mixed neighborhoods to racially segregated neighborhoods.

35. Although polling about residential diversity has been relatively limited, questions about school diversity, which serves as a reasonable proxy, have been polled for many decades. These have consistently shown that white respondents have the weakest support for school diversity, and for integrative programs to achieve that diversity, of any racial group. They have also consistently shown the strongest support for school diversity, and integrative programs, among black respondents. Support for racial diversity has risen over time among all groups.

36. A 2015 national poll by YouGov, one of the most recent to directly address the question, revealed a large white-nonwhite gap over views on the importance of sending children

---

[5] *See, e.g.*, Camille Zubrinksy Charles, *Won't You Be My Neighbor? Race, Class, and Residence in Los Angeles* (2006); Maria Krysan and Reynolds Farley, "The Residential Preferences of Blacks: Do they explain persistent segregation?" *Social Forces*, Vol. 80(3) (2002), 937-980; Lawrence Bobo and Vincent L. Hutchings, "Perceptions of Racial Group Competition: Extending Blumer's Theory of Group Position to a Multiracial Social Context," *American Sociological Review*, Vol. 61(6) (1996), 951-972. This is not to suggest that resistance to change in the racial status quo doesn't exist among some African-Americans and Latinos.

to a racially diverse school. 74 percent of black respondents, and 53 percent of Hispanic respondents, say that it is personally either "very" or "somewhat" important that their child attend a racially diverse school. By comparison, only 31 percent of whites say the same. 34 percent of whites say it is "not at all important" to them, compared to only 5 percent of black or Hispanic respondents.[6]

37.     Even though the vast majority of nonwhite Americans desire racial integration and appreciate its importance for their children, community, political, and economic leaders or groups in lower-income and nonwhite neighborhoods are sometimes opposed to pro-integrative housing programs.

38.     This counterintuitive opposition to integration is deeply connected to the decades-long growth of institutions that were forced to operate in the context of a deeply segregated society. A segregated society fosters segregated institutions who can only function in a segregated context. Thus, these institutions, in order to preserve themselves, feel that they must work to maintain segregation.

39.     There are a number of incentives for community, political, or economic leaders or groups in heavily nonwhite or segregated communities to attempt to preserve the segregated status quo, even if the bulk of the members of that community would prefer greater diversity and integration.

40.     Community, political, and economic leaders and groups in lower-income and nonwhite neighborhoods have often acquired financial and social standing within geographies that are historically segregated. They have demonstrated an ability to thrive or even profit in segregated circumstances.

---

[6] *See* YouGov, Poll on Racial Segregation Conducted Dec. 16-18, 2015, available at https://d25d2506sfb94s.cloudfront.net/cumulus_uploads/document/82ik29mdpw/tabs_HP_Racial_Segregation_20151218.pdf.

41.     In many instances, their success has partially depended on and is contingent on the residential status quo in the neighborhood, including, at times, the preservation of segregation. A segregated community may offer a reliable voter bloc, customers, or organizational "constituents."

42.     Many community leaders and organizations understand part of their mission as being to serve a specific neighborhood or geographic area, or, even more narrowly, to serve the demographic group that dominates the neighborhood. From that constrained perspective, current residents leaving the neighborhood can seem to threaten that mission.

43.     Government and community organization employees and administrators have built careers in part in creating and maintaining programs and housing in the context of a deeply segregated society.  All of their skills, relationships, and history depends on the continuation of the funds to support their programs in a segregated context.  These individuals often cannot imagine, and may not have the skills or experience to operate in, an integrated setting.

44.     Integration benefits individuals and is aligned with the demonstrated preferences of nonwhite Americans, but it necessarily alters the social and economic composition of many constituencies and neighborhoods. Community, political, and economic actors who have depended on continuity in those constituencies might oppose, in some instances, the integration that their constituents or neighbors support.

45.     This dynamic has manifested itself at critical moments in the historic struggle for civil rights. When Martin Luther King came to Chicago for his fair housing campaign in 1966, black elected officials that were part of the political machine of Mayor Richard Daley actively opposed King's effort to integrate white neighborhoods, despite King receiving enthusiastic support from black Chicagoans as a whole.

46.     A similar dynamic is observable in the affordable housing development industry.

47.     Stakeholders like government agencies, community developers, and related community-based organizations have obtained many years of expertise operating in a deeply segregated context. In addition, they have sometimes developed mechanisms, relationships, and processes for thriving in that context, including by mastering the process of acquiring funding, receiving the appropriate community support for their activities, and working within the bureaucratic barriers of the neighborhood. Thus, the transition to an integrated neighborhood potentially endangers these stakeholders' professional and financial standing.

48.     In my academic work, I have identified another set of stakeholders with a significant interest in preserving existing patterns of residential segregation, which I have termed the "poverty housing industry." I have analyzed the history of the poverty housing industry in my home state of Minnesota, and observed it at work in other regions around the country. Local advocates of integration in various regions have regularly reported that the poverty housing industry is a major opponent of integrative programs in their region.

49.     The poverty housing industry is defined as the constellation of community developers, for-profit developers, funders, investors, lenders, financial institutions, attorneys, community groups, public-private collaboratives, architects, general contractors, and public agencies which work to create affordable housing in lower-income and segregated neighborhoods in most American cities.

50.     Over time, the complex financial backend of affordable housing development has helped produce organizations that specialize in such housing development. This included dozens of neighborhood-based low-income development organizations, which actively sought to build housing in the areas they represented – which were almost invariably economically depressed central city communities.

51.     The poverty housing industry frequently resists policy programs that would result in an increase in racial or economic diversity in currently segregated urban areas, particularly if such an effort risks diverting housing funding away from those areas and the industry itself.

52.     It simply defies experience and the depth of race-linked views that the types of stakeholders described in this section would not be present to a material extent in any and every major city with a long history of deep residential segregation, including New York City.

53.     And it is simply inconsistent with the long experience of neighborhoods or communities that have a distinct demographic identity that potential change in that identity would fail to cause fear of and resistance to such a change.

54.     In contrast, acknowledgments from New York City officials about the phenomena of resistance to integration and fear of demographic change in neighborhoods correspond to the reality I have seen replayed virtually everywhere I have worked.  *See, e.g.,* former HPD Commissioner Vicki Been ("I think that opposition to racial, ethnic, religious integration in some parts of Brooklyn that are heavily occupied by the Jewish community is sometimes difficult.");[7] Alicia Glen, deputy mayor for housing and economic development at the time (testifying that she was familiar with some opposition to an affordable housing development in Brooklyn being framed in terms of the "lives of black and Latino families are not important to the City of New York" and with "this issue being quite prominent in the discussion around the approval process");[8] Purnima Kapur, executive director of City Planning at the time (acknowledging hearing the charge that the East Harlem rezoning was "a plan for ethnic cleansing" or a concept equivalent to that; acknowledging hearing charges from organizations that "communities of color" were being

---

[7] *See* excerpts of Apr. 10, 2018 deposition testimony of Vicki Been ("Been II"), annexed hereto as Exhibit 2, at 22:15-25.

[8] *See* excerpts of Nov. 3, 2017 deposition testimony of Alicia Glen ("Glen Depo."), annexed hereto as Exhibit 3, at 74:19-77:11.

targeted for rezoning and  displacement; and acknowledging that the allegation reflected, in part, a "concern that majority non-white communities were going to become less so");[9] Joseph Salvo, head of the population division of the Planning Department (explaining that he observed concerns about racial or ethnic change in a neighborhood coming up in the context of presentations to community leaders and groups, and that he is careful "not to take sides, frankly" because "I feel that perceptions are powerful" and "I don't want to somehow nullify the importance of those perceptions");[10] and Steven Banks, commissioner of the Human Resources Agency and of the Department of Social Services (acknowledging that there has been opposition in some places to the placement of homeless persons expressed by "demonizing" those New Yorkers, that part of that demonization is when the homeless people are seen as being of a different race by those doing the demonizing, and that in connection with a proposed shelter in Maspeth, Banks understood comments like "Go back to East New York" to be race-linked or race-coded").[11] *See* discussion, *infra*, at 19-23, ¶¶ 69-80.

55.    I should note that, in my experience, it is extremely common for local officials to play down the extent to which fear of racial change exists or to which race-based advocacy is part of the jurisdiction's politics. This can represent a desire not to be seen as a jurisdiction still plagued by racial division and/or a desire to avoid controversy or the appearance of controversy.

---

[9] *See* excerpts of Apr. 19, 2018 deposition of former Purnima Kapur annexed hereto as Exhibit 4, at 168:12-16, 182:4-186:15.

[10] *See* excerpts of Nov. 27, 2018 deposition testimony of Joseph Salvo, annexed hereto as Exhibit 5, at 50:10-51:15 and 55:13-56:25.

[11] *See* excerpts of Nov. 29, 2017 deposition testimony of Steven Banks, annexed hereto as Exhibit 6, at 166:2-5, 171:4-8, 174:7-10, 175:13-176:4.

## IV. Resistance to integration is often expressed indirectly, with a recognizable vocabulary, including "coded" language and pretextual concerns.

56.     As social mores regarding race have changed over time, the nature of the *explicit* objections raised by white residents to integrative housing policies has also changed. White residents have become more adept at disguising their objections behind pretextual language.[12]

57.     In modern disputes, elected officials in affluent white areas, and the administrative officials who work for them, rarely portray their opposition to integrative programs in racial terms. Instead, they argue that changes will lead to congestion, loss of open space, traffic, or be incompatible with neighborhood character or appearance.   An illustration of this is found in connection with the City's draft talking points about opposition to a proposed affordable housing development in Sunnyside, Queens: "Opposing the siting of affordable housing with no rationale or vague rationales (parking, height, bulk, AMIs aren't perfect, doesn't benefit my constituents) – is a well-honed tactic that typically suburban communities have used to exclude affordable housing and maintain privilege and economic and racial segregation."[13]

58.     Pretextual objections sometimes take the form of purported sympathy for the group that would be excluded. For instance, opponents may argue children from different racial or socio-economic backgrounds will not have any friends in a new neighborhood, or will not be prepared for the more advanced academic pace of the local schools. In other cases, opponents assert that new residents from different backgrounds will lose their local institutions or churches, won't be

---

[12] Because of the shift from explicit to pretextual, the only reasonable way to interpret comments that clearly and explicitly fear change in the racial status quo is to understand them as representing only a fraction of the totality of the desire that the racial status quo be maintained.

[13] *See* Sept. 15, 2016 email and associated talking points, annexed hereto as Exhibit 7, at Bates 28777.  *See also* excerpt of memorandum prepared for HPD Commissioner Torres-Springer in advance of press interview and public forum, annexed hereto as Exhibit 8, at Bates 167385 ("We also faced enormous community opposition to affordable housing projects across the board; opposition that is often couched as concerns about parking, infrastructure, density, public safety, but many of these are just code words for 'I don't want people in my neighborhood.'").

able to buy the correct type of foods or personal products, and will be racially and culturally isolated and unhappy.

59. Concerns about schools are often a major source of opposition to affordable housing. Research suggests that residents see racial change in schools as a proxy for educational quality, and will express concern that new housing, or housing with a different composition than currently exists in the neighborhood, will erode the quality of the schools.

60. Likewise, where there is fear of changes in school assignment or zoning procedures out of proportion to any realistic concern, and where the changes have a racial element, officials can only reasonably suppose that concerns about school-based demographic change extend to concerns about residential racial change. *See, e.g.,* feedback from participants in City's "Where We Live" (AFH) process as to community opposition ("Predominantly White and affluent communities often block attempts for integration in schools that would provide low-income communities increased access to quality schools (e.g., rezoning of schools, bussing students, or shelters in their neighborhood). Often school efforts are viewed by White families as taking opportunities away from their kids. NIMBYism is often centered on not wanting particular groups of people in a neighborhood, and there is a lack of willingness to have conversations about racial tension.").[14]

61. When community, political, and economic leaders or groups in nonwhite segregated neighborhoods oppose integrative programs, they typically raise a different set of concerns. They argue that the integrative program will change the neighborhood's character or

---

[14] *See* excerpt of Where We Live NYC, "Topic-Based Roundtable C: Education, Qualitative Data Synthesis," Sept. 5, 2018, annexed hereto as Exhibit 9, at 5. *See also* Ben Chapman, "NYC schools chancellor calls out parents against integration," *New York Daily News*, Apr. 27, 2018, annexed hereto as Exhibit 10.

"culture," or focus on fears of displacement of a particular racial or ethnic group, or lament "cultural" displacement.[15]

62.     Sometimes, I have found, concerns are expressed in an explicitly race-based way; that is, stating the importance, for example, of preserving an African-American neighborhood as African-American. These explicit appeals are relatively rare in the current day (although I have sometimes seen such behavior in, for example, my home city of Minneapolis and many of its surrounding suburbs). These kinds of comments occur in New York City, too. For example, there is advocacy decrying the "whitening" of neighborhoods,[16] as well as advocacy that asserts that development is resulting in "ethnic cleansing."[17] There is also the City Council Member who suggested that housing people by ethnic background is an option that should be considered.[18]

63.     Appeals to protect "our schools" are a classic form by which race-based resistance to outsiders is expressed (mostly in white neighborhoods). But, in New York City, these comments appear in nonwhite communities, too. So, for example, when a school rezoning plan was approved that would zone more students from white, upper-middle-class families into a school that currently principally serves lower-income African-Africans, the head of the PTA of the predominantly

---

[15] In doing so, they are not, as previously noted, following the views of the majority of their constituents. *See* discussion *supra*, at 9-10, ¶¶ 33-36.

[16] *See, e.g.,* excerpt of Sept. 2015 report of the Real Affordability for All coalition, annexed hereto as Exhibit 11, at 5 ("Race is an undeniable factor here and needs to be acknowledged: mandatory inclusionary zoning, as currently conceived by the de Blasio administration, will lead to the whitening of neighborhoods like East New York and the South Bronx that are scheduled to be rezoned.").

[17] *See* excerpt of Dartunorro Clark, "East Harlem Rezoning is 'Ethnic Cleansing,' Locals Say During Chaotic Vote," *DNA Info*, June 21, 2017, annexed hereto as Exhibit 12, at 3.

[18] *See* Michael Gartland, "NYC councilwoman: It might be 'beneficial' to assign public housing by ethnic group," *New York Post*, Mar. 27, 2015, annexed hereto as Exhibit 13.

African-American school complained, "All that we will get is another PS 8 – a school that all of the black and brown folks built, only to lose all of the stake and ownership."[19]

64.     As noted earlier, a not-as-explicit, but still clearly race- or ethnicity-based argument that is commonly made has to do with the potential of losing neighborhood "character," "culture," or "identity."   Examples of that vein of thought expressing itself in New York City include a developer's flyer for an affordable housing project in East Harlem that states explicitly that the purpose of the community preference is to "help the area retain its traditional Latino identity."[20]

65.     A specific ethnic or racial label need not be affixed to a comment to make it one that is clearly talking about race or ethnicity.  Thus, for example, a letter from the Movement for Justice in El Barrio speaks about a threat to "our community and our culture."[21]   It would be a tortured reading of "culture" to fail to accept the reality that, in the predominantly Latino neighborhood being referenced, it is Latino culture (and thus Latino people) being talked about.[22]

66.     Underlying many of the preservation-of-culture or preservation-of-identity arguments is the implicit suggestion that neighborhoods with large numbers of residents of a particular racial group "belong" to people of that racial group, and that policies which promise

---

[19] *See* Emma Whitford, "Controversial School Rezoning Plan In Gentrifying Brooklyn Wins Approval," *Gothamist*, Jan. 6, 2016, annexed hereto as Exhibit 14, at 2.

[20] *See* El Barrio's Artspace PS 109 frequently asked questions, annexed hereto as Exhibit 15, at PDF 1.

[21] *See* Nov. 17, 2016 letter from Movement for Justice in El Barrio to Carl Weisbrod, Director of City Planning, annexed hereto as Exhibit 16, at Bates 81046.  *See also* excerpt of draft of white paper about the rezoning of Inwood from the Northern Manhattan Is Not For Sale coalition, attached to a Jan. 31, 2018 email from Jordan Press, annexed hereto as Exhibit 17, at Bates 183458 (reciting belief in "preserving the cultural identity of Northern Manhattan" and "encouraging Latinx people to use their cultural identity as a tool for resistance").

[22] Deputy Mayor Glen's refusal to acknowledge a strong correlation between an area's culture identity and *people of a particular race or ethnicity* that share that culture ("it's so varied") is in conflict both with the historical reality that segregated cities containing a racially and ethnically diverse population in the aggregate have neighborhoods that are identified demographically and culturally with a particular racial or ethnic group, and with her own acknowledgment that the "ethnic distinctiveness of separate neighborhoods in New York" is "very much part of our brand and our identity" as a city.  *See* Glen Depo., at 101:4-104:18 and 96:11-100:22.

integration are an attack on that group. Although research shows that most nonwhite Americans do not subscribe to this view, my experience has shown that it can be reliably used to sow doubt and hesitation among policymakers and contribute to their failure to advance policies that maximize the ability to fight racially segregated housing patterns.

67.     Two arguments that are often paired together and deployed by public officials against policies that are apt to change racial demographics – regardless of the segregated demographics of the official's constituents – is, first, that the "need" for affordable housing exists within poorer, nonwhite neighborhoods or communities, and, second, that the need therefore should be satisfied within those neighborhoods or communities.

68.     The second argument, of course, does not follow from the first. Need for affordable housing can be satisfied in other neighborhoods or communities, especially neighborhoods of opportunity where the greater availability of affordable housing would tend to be pro-integrative. Especially in the urban context, a move to opportunity need not involve extensive relocation nor the need to find a different job.

## V.  It is implausible that New York City officials are unaware of or unaffected by the fear of racial change.

69.     Based on my experience and research, I can say that it is virtually impossible for any elected official or policymaker to be unaware that, notwithstanding the progress of the last 50 years, racial and ethnic politics still surround affordable housing policy and attempts to remedy residential segregation throughout the country. In other words, given the modern history of the United States up to the present, protestations of unawareness of continuing fear of racial change (or that there are only a few "bad apples" left) have to be understood as implausibly out-of-touch with reality or reflective of willful ignorance (that is, a see-no-evil, hear-no-evil posture). The knowledge of these fears routinely leads officials to be see the dismantling of residential

segregation as an issue that will cost them political support, and thus an issue to avoid altogether or to approach more gingerly than they otherwise would.

70. The implausibility of lack of knowledge would be true even in the face of across-the-board denials from City officials. In fact, however, available evidence shows clearly the fact that City officials are aware of: (a) the political salience and difficulty at the intersection of issues relating to race and housing; (b) that there is much more than isolated resistance to fair housing; and (c) that, in fact, there is fear of and resistance to potential racial change that leads to opposition to affordable housing development (the reduction in community and Council Member opposition to affordable housing development being a key stated goal of the community preference policy).

71. That New York City conforms to the universally observed phenomenon in multi-racial and multi-ethnic big cities that racial politics are constantly at play is no surprise. As the City's former Director of City Planning put it, in the "[o]ver 50 years [he had spent] working in New York City, racial politics are always in the ether," and that housing policy is not immune from those politics.[23] The difficulty of dealing with the intersection of race and housing was also addressed in a letter from that same Director of City Planning and the City's then-HPD Commissioner, Vicki Been, in which the two referenced "the difficulty of having thoughtful discussions" about the determinants of fair housing issues against "the backdrop of local politics."[24]

72. The City's preliminary internal guide to its Assessment of Fair Housing spoke to this issue, too: "'Contributing factors' of segregation are politically and legally sensitive. Identification of 'high priority' factor will require a balance between relevance and practical

---

[23] *See* excerpt of July 27, 2017 deposition testimony of Carl Weisbrod ("Weisbrod Depo."), annexed hereto as Exhibit 18, at 99:22-101:19.

[24] *See* excerpt of Nov. 24, 2014 letter from HPD Commissioner and Director of City Planning to HUD, annexed hereto as Exhibit 19, at 9.

feasibility."[25]   The position articulated is characteristic of the response of numerous jurisdictions subject to an AFFH requirement.  Aware of the political sensitivity of naming *and acting upon* key factors causing and maintaining segregation, and wary of causing political backlash, the analysis and program of action is compromised to adapt to that status quo, rather than taking action to AFFH that demands an abandonment of the status quo.

73.     The preliminary guide makes observations about how "Community opposition" is a contributing factor to restrictions in fair housing choice in the New York City context.  It states that the difficulty of dealing with the factor is "High," and observes specifically that, "Securing community buy-in for fair housing is very difficult."[26]   This is the only observation that would comport with what is routinely seen across the country.

74.     The guide goes on to observe that, "Both low and higher income areas don't necessary support integration,"[27] with a slightly earlier version of the guide referencing groups on "*both* sides" and identifying these two "sides" not necessarily supporting integration as "anti-displacement" on the one hand and "ethnic solidarity" on the other.[28]

75.     It is common to find that higher opportunity (typically disproportionately white) areas or jurisdictions are especially resistant to publicly supported housing.  Senior housing is frequently seen as less threatening, and typically faces less opposition than housing that is not age-restricted.  Again, the guide's observation aligns New York City with the national pattern: "For

---

[25] *See* Affirmatively Furthering Fair Housing: A Preliminary Guide to NYC's Submission (Sept. 2016) ("Sept. AFFH guide"), annexed hereto as Exhibit 20, at Bates 21056.

[26] Sept. AFFH guide, at 21076.

[27] *Id.*

[28] *See* "Affirmatively Furthering Fair Housing: A Guide to NYC's Submission and Potential Issues" (August 2016) ("Aug. AFFH guide"), annexed hereto as Exhibit 21, at Bates 105039.

publicly supported housing: Opposition can be high in higher opportunity areas (e.g. Queens, Staten Island) except for senior housing."[29]

76.     Nothing in the guide suggests that the lack of support for fair housing and integration is isolated or aberrational.  Were it to be, that would be totally out of character with what I have found to be the case across jurisdictions in which I have studied and worked.

77.     Consistent with the guide's identification of lack of support for integration are comments that then- HPD Commissioner Been made at a City Law breakfast in Nov. 2015.  She set the scene in respect to people who are *not* displaced seeing "people who are coming in" that may, among other things "look different" and have "different demographics."[30]  She described the worry of neighborhood incumbents as follows: "And so they worry that *even if they stay*, the *demographics*, the *look and feel* of their neighborhood, the *sense* of the neighborhood may change."[31]  Now these are the kinds of concerns that classically reflect fear of racial change.  But there is no need to speculate as to whether or not Ms. Been knew that there was fear of racial change, because Ms. Been explained at her deposition that she intended the term "demographics" to encompass race, and that the "looking different" encompassed people being of "different races."[32]

78.     Even if those staying in the neighborhood were worrying about those who looked different on the basis of race for what some might assert were "legitimate" reasons, that racial stereotyping (the arrival of X group means Y bad consequences) does not change the fact that the

---

[29] *See* Sept. AFFH guide, at 21076.

[30] *See* video recording of Vicki Been comments at City Law Breakfast, Nov. 13, 2013, available at https://www.youtube.com/watch?v=Eepr0XkiZzg&feature=youtu.be.  The section of the videotape that contains these comments begins at approximately the 36:10 mark (last accessed Feb. 15, 2019).

[31] *Id.*

[32] *See* excerpt of Aug. 2, 2017 deposition testimony of Vicki Been ("Been I"), annexed hereto as Exhibit 22, at 137:9-149:21.

HPD Commissioner knew that an influx of people of a different race was something that, in fact, worried the neighborhood stayers (incumbents).[33]

79.     The attitudes described are not academic – they tend to have very really consequences, most particularly the stymieing of affordable housing development. Politicians characteristically believe that this vein of thought cannot be ignored but must be mollified.

80.     When testifying at his deposition, Matthew Murphy, the City's Deputy Commissioner for Strategic Planning at HPD, acknowledged that it is likely that, both in white neighborhoods and neighborhoods dominated by other racial or ethnic groups, racial change or the prospect of racial change makes residents in such areas feel uncomfortable, and that they "correlate that change" to "new housing development. So as a result they oppose housing development, especially Affordable Housing development."[34] Asked, "Is there anything politically sensitive about broaching the idea of desegregating neighborhoods that are currently segregated by race or ethnicity?" Murphy responded, "I believe so, yes, especially voting against Affordable Housing projects."[35]

## VI. Many less discriminatory alternatives exist for accomplishing the policy goals the community preference purports to accomplish.

81.     Dealing with the problem of those who wish to maintain the racial status quo is a daunting task, but I know from my work with and study of local governments that there are

---

[33] To the extent that one claims that fear of an incoming racial group is "merely" the "trigger" that sets off fear of displacement among those already in the neighborhood, one is left obliged to recognize that when one hears fear of neighborhood change being articulated as fear of displacement, those fears may well be caused by perceived or anticipated racial change.

[34] *See* excerpt of Mar. 16, 2018 deposition testimony of Matthew Murphy, annexed hereto as Exhibit 23, at 215:3-20.

[35] *Id.* at 215:21-216:5.

effective paths available – paths that do not involve the use of community preference.

82.     I should note as a preliminary matter in this section that there have been successful affordable housing development efforts with an integrative impact, including those carried out in Montgomery County, Maryland and in the Philadelphia suburbs of New Jersey.   These jurisdictions do not have a community preference policy.

83.     Second, persuasion (as in persuading advocates and officials that affordable housing is needed or that residential segregation is harmful) does sometimes work.  But, for that to work, a concerted campaign needs to be mounted.

84.     Along these lines, the city could build cross-neighborhood constituencies for affordable housing by organizing residents interested in opening up new housing opportunities in areas where there are currently few affordable units.

85.     The city could recognize and promote the view that affordability is a *citywide* problem and that the city's affordable housing stock belongs equally to all similarly economically-situated residents. Successful applicants for a unit limited to 60 percent of Area Median Income ("AMI"), for example, are, by definition, interchangeable in terms of economic status regardless of whether they arrive from outside of the neighborhood or previously resided in it. With similar incomes, neither resident can "gentrify" the neighborhood; and, most to the point, neither, at any AMI, would gentrify more than the other.  These are important points that the City could help people understand.

86.     The city could recognize and promote understanding, particularly among housing advocacy organizations, of the many harms of residential segregation and, consequently, the importance of maximizing the pro-integrative effect of an equal access lottery.

87.     The city could recognize and promote the view that the loss of affordability is a citywide problem, and that community preferences have the effect of dramatically limiting the

affordable housing options available to all applicants, by placing applicants at a stark disadvantage when applying for units outside of their community district. The city could reorient its messaging around the city's affordable housing system to underscore that it is a shared benefit provided to all residents, regardless of where they live, and that every neighborhood belongs to every New Yorker.

88. New York City currently has some advantages in terms of its ability to shift course. Its current Mayor is on the record as explaining how he has been able (in connection with mandatory inclusionary housing) to get people to think about things in fundamentally different ways than they had:

> We were talking about thinking about our City in a whole new way . . . . And you're never surprised, when you put a whole new way of thinking on the table, that there's immediate resistance. It's normal, it's human . . . . I'm never 100 percent surprised when the community board disagrees with something emanating from City Hall. So, the early going was tough. But we rallied . . . .It was an example of a really broad coalition for change . . . . On that day we showed that things could really be done differently, and that we could marshal all our forces in the interest of working people and low-income New Yorkers and everyday New Yorkers who are just struggling to make ends meet – that we could actually change our policies profoundly and be on their side.[36]

In other words, the actual feasibility of mounting the effort described in paragraphs 84-87 is not in question; the only question is whether the Mayor is prepared to spend the political capital necessary.

89. Another advantage that the City has is that the Speaker of the City Council is now on record as saying that he may have been incorrect to support community preference in the past, that there is a "greater good" of integrating communities across New York City to consider, and

---

[36] *See* excerpt of transcript of May 11, 2016 statements of Mayor de Blasio, annexed hereto as Exhibit 24, at 4-5.

that a reduced community preference percentage (20 or 25 percent) is a conversation he is open to having.[37]

90.    It also appears that even some staunch opponents of community preference are, when engaged, prepared to reconsider their position.[38]

91.    Finally, it is always the case that local representatives have a bundle of "asks" – various things they want for their constituents.  The practice of local government (and state government, too) is seeking what is possible in a particular set of circumstances.  If the circumstances did not include community preference, there is no reason to believe that local government would shut down.  Rather, most Council Members, if they are at all like their peers across the country, would negotiate to receive other potential "carrots" that are in the interest of their constituents.

92.    To the extent that policymakers are concerned about displacement, gentrification, or affordability loss, there are more direct ways of addressing these problems than limiting residents' housing choices outside of the neighborhood where they reside.

93.     The City can continue and enhance the tools it uses to fight displacement before it occurs. This could be done by taking concrete steps to fight landlord harassment and protect tenants from eviction, and fighting for stronger rent regulation.

94.    To the extent that policymakers wish to redress historical disinvestment in areas of minority concentration (as they should), they must do so: (a) in a way consistent with the

---

[37] *See* video recording of May 3, 2018 interview of Council Speaker Corey Johnson, available at https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2018/05/04/speaker-on-school-and-housing-segregation (last accessed Feb. 15, 2019). The relevant portion of the interview commences at approximately the 1:25 mark.

[38] *See* Harry DeRienzo, Kirk Goodrich, and Ismene Speliotis, "CityViews: Affordable-Housing Advocates Must Listen to Opponents of Community Preference," *City Limits*, Sept. 25, 2018, annexed hereto as Exhibit 25.

preeminent goal of the Fair Housing Act to reduce residential segregation;[39] and (b) bearing in mind that there are numerous benefits to concerted community revitalization that flow to current residents independent of whether those residents get an enhanced chance to receive lottery housing, independent of whether they get lottery housing at all, and independent even of whether new housing is being built.

95.     Indeed, the rule's message to segregated jurisdictions was that: (a) the highest priority was to be given to overcoming barriers to fair housing choice; (b) that  new construction was to be focused in a way to redress past patterns of failure to build affordable housing in white neighborhoods of opportunity; and (c) that disinvestment in racially concentrated areas of poverty was to be fought principally with economic development, other investments in the health and vitality of the area, and housing *preservation*.[40]  A "balanced" approach is not one that fails to remedy past concentration of housing and voucher placement in poor African-American and Latino neighborhoods.  A balanced approach in the affirmatively furthering fair housing sense must be one that provides a strong counterweight to the patterns that were created over time.[41]

96.     Preference policies could be limited with a reduction in the percentage of units awarded on a preference basis.  I am given to understand, for example, that, until 2002, the preference percentage was 30 percent.  If applicants from the community district were approximately 10 percent of the total, for example, and there were a 20 percent preference, that

---

[39] The 2015 Affirmatively Furthering Fair Housing (AFFH) rule does explicitly reaffirm that jurisdictions are obligated to take meaningful action to overcome patterns of segregation and replace segregated living patterns with truly integrated and balanced living patterns.  *See* 24 C.F.R. § 5.152 (2019) (defining affirmatively furthering fair housing).

[40] See 80 Fed. Reg. 42272, 42279 (July 16, 2015).

[41] A local preference policy was never contemplated to be a part of the concerted community revitalization toolkit.

would substantially increase the odds for incumbent residents as compared to what they would be in a lottery where everyone were treated equally.

97.     To the extent that residents express concerns about gentrification or displacement, the City could seek to explain that community preference does nothing to ensure that a resident will not be displaced from his or her existing unit, and that the resident's ability in the circumstance of imminent displacement to stay in the neighborhood where they have lived is completely dependent on the vagaries of building and lottery timing.

98.     The City could also explore adopting a "no net loss" policy in terms of the availability of very low income housing, a policy that, in addition to its direct benefits, would help provide accountability and let residents at that income level know whether and to what extent steps were being taken to make sure that they were not being priced out of the city.

99.     The City could remove the effective councilmanic veto as to zoning changes or developments approvals needed for affordable housing construction in the Council Member's district.  (I am advised that, traditionally, when considering new housing projects, City Council members defer to the preference of the councilmember representing the district in which the housing has been proposed. As a result, a single Council Member can have a disproportionate impact on the process.  I am also advised that the veto is a matter of political practice, not law or regulation.)  In other cities, such as Chicago, this practice has been widely criticized as a cause of segregation, and some have proposed that it be removed.[42]   Doing so would allow the City's legislative body to determine on the merits whether a particular zoning change or development approval was in the interests of the City and its residents.

---

[42] I am advised that, in New York City, Council Member Reynoso has argued that the effective Council Member veto can be contrary to the interests of the City and the interests of equity, allowing wealthier, whiter neighborhoods the ability to forestall needed affordable housing development.

100.    I am advised that in a limited number of circumstances, typically when a development was at or near the border of a community district, the preference area was extended to more than one community district.

101.    The City did apparently consider an alternative to the current policy whereby one or more community districts non-contiguous to the community district where the affordable housing was being built would be included in the preference area in a way to have the preference area more closely match the demographics of the City as a whole.[43]  According to Vicki Been, the City rejected this proposal (a "multi-CD alternative") mainly because, "in order to reduce the political salience of displacement, try to assuage people's concerns about displacement, they need to be able to see what the preference is going to be. So if we were constructing it for each project, that wouldn't satisfy those objectives."[44]  Shortly thereafter, the following exchange ensued:

> Q Why wouldn't it be possible since projects are announced on a case-by-case basis to make a decision, okay, this development is going to be in a highly African American but much less Latino and white community district to find those demographically compensatory districts; you with me so far?
>
> A I think so.
>
> Q And then be able to present it to the public in the very same way that you do now. There's going to be -- you can feel better about displacement, this project is going to help people in these three community districts who may feel at risk of displacement.
>
> MS. SADOK: Objection.
>
> A I mean, one of the criteria that we use that I think is critically important is that any system be both objective and predictable and perceived as objective and predictable. And anytime we start –
>
> Q Tinkering?
>
> A – jerrymandering or tinkering or that kind of thing, people think that's just a political decision, they're protecting this person, they're protecting – you know, they're jerrymandering; right? And that concerned us.

---

[43] *See* Been II, at 208:21-209:20.

[44] *Id.* at 209:21-210:12.

Q But isn't a principal basis of the policy a political judgment as to how to get support? Doesn't that leave hundreds of thousands of people who applied out of community district with the impression they're being left behind because the politics of New York City demand that they be left behind?

MS. SADOK: Objection.

A I don't know what's in the minds of other people. I have not heard that expressed.

Q We had this discussion last time. You were just a moment ago when you were justifying the rejection of an alternative relying on what you believed people would perceive. So clearly, you may not know what's in the mind of others, but you try to figure out what the perception of others is, don't you?

A Mm-hmm.

Q So what about the perception of New Yorkers – whether or not it's been expressed to you or not – that people are being disadvantaged by a political judgment of who gets preference?

MS. SADOK: Objection.

A I don't think that that's the way people think about the Community Preference.[45]

102.    The rationales offered in defense of the decision to reject the multi-CD alternative simply do not correspond to what a local government is able to do in terms of communicating policy decisions as being "objective and predictable and perceived as objective and predictable." First, any decision regarding community preference or regarding any other lottery preference (municipal employee preference, artist preference, etc.)), is a political decision made by political actors and not reasonably understood as anything else.

103.    Second, a multi-CD alternative could be announced in the same way as any other lottery policy.  The key to objectivity and predictability is explaining the nature of the procedure in advance.  Moreover, each time a lottery were to be advertised, the advertisement could reinforce the application of the rule.  Different policy changes may be more or less popular with different

---

[45] *See* Been II, at 217:2-219:25.

"stakeholders,"[44] but that does not render the changes infeasible on the basis of "jerrymandering" or that constituents would not be able to see what the preference was going to be like.

104.  When discussing a prospective project in an especially segregated neighborhood, the City would explain that the preference was going to be shared with residents of one or more other community districts *whose income profiles were identical to those residents of the project's community district who would qualify for apartments* in an effort to minimize the risk of disparate impact on the basis of race.  The specific community districts with which the preference were to be shared should be immaterial so long as the type of districts sharing the preference and the reason necessitating the sharing were adequately described.

105.  The city could focus more on working with other communities in the region to promote housing affordability and affordable housing construction.  At present, New York City itself, which has by far the region's highest share of low-income residents, is attempting to meet most of the regional need for affordable housing.  This burden could be eased by cooperating with other communities to produce affordable units.

Dated: Minneapolis, Minnesota
        February 15, 2019

_____
MYRON W. ORFIELD, JR.

---

[44] I am advised, for example, that the City's decision to adopt a homeless preference for up to 25 percent of units in some buildings. including some buildings where lotteries had already been conducted, was controversial.

# MYRON WILLARD ORFIELD, JR.

Earl R. Larson Professor of Civil Rights and Civil Liberties Law
Director, Institute on Metropolitan Opportunity
University of Minnesota Law School • 229 19th Avenue South • Minneapolis, MN 55455
612-625-7976 • orfield@umn.edu • https://www.law.umn.edu/profiles/myron-orfield

## EMPLOYMENT

| | |
|---|---|
| 2016 - Present | Earl R. Larson Professor of Civil Rights and Civil Liberties Law |
| 2009 – 2016 | Professor of Law, University of Minnesota |
| 2003 –Present | Director, Institute on Metropolitan Opportunity, University of Minnesota Law School |
| 2003 – 2014 | Non-resident Senior Fellow, the Brookings Institution, Washington, D.C. |
| 2003 – 2009 | Associate Professor of Law, University of Minnesota (tenure awarded 2006) |
| 1995 – 2010 | President and Founder, Ameregis (American Research and Geographic Information Systems) |
| 2001 – 2003 | State Senator, Minnesota District 60 |
| 1991 – 2001 | State Representative, Minnesota District 60B |
| 1988 – 1993 | Assistant Attorney General of Minnesota (Solicitor General Division) |
| 1988 – 1989 | Research Fellow, Center for Studies in Criminal Justice, University of Chicago |
| 1986 – 1988 | Litigation Associate, Faegre & Benson (now Faegre Baker Daniels), Minneapolis |
| 1987 – 1988 | Law Clerk to Judge Gerald W. Heaney, United States Court of Appeals for the Eighth Circuit |

## EDUCATION

| | |
|---|---|
| 1987 | University of Chicago Law School, J.D.<br>*Law Review staff*; *Hinton Moot Court* semi-finalist |
| 1983 – 1984 | Princeton University, Ph.D. candidate in American History |
| 1983 | University of Minnesota, B.A. *summa cum laude*, History and Political Science |

## COURSES TAUGHT

- Constitutional Law II: Equal Protection and Civil Rights
- State and Local Government Law
- Land Use Planning
- Legislation
- Legislative Process
- Smart Growth and Regional Planning
- School Desegregation

- Fair Housing

## PUBLICATIONS

### BOOKS

- Myron Orfield and Thomas Luce, REGION: PLANNING THE FUTURE OF THE TWIN CITIES (2010).
- Myron Orfield, AMERICAN METROPOLITICS: THE NEW SUBURBAN REALITY (2002).
- Myron Orfield, METROPOLITICS: A REGIONAL AGENDA FOR COMMUNITY AND STABILITY (1998).

### PUBLISHED BOOK CHAPTERS AND ARTICLES

- M Orfield and Will Stancil, *The Summit for Civil Rights: Mission, Structure and Initial Outcomes*, 36 LAW & INEQ.__ (2018).

- M Orfield, *Fair Housing and Suburban Segregation*, in THE FIGHT FOR FAIR HOUSING: CAUSES, CONSEQUENCES AND FUTURE IMPLICATIONS OF THE 1968 FEDERAL FAIR HOUSING ACT (Greg Squires ed.) (2017).

- Myron Orfield and Will Stancil, *Why is the Twin Cities So Segregated*? 43 MITCHELL HAMLINE L.REV. 1 (2017).

- M Orfield, W Stancil, T Luce, E Myott, *Taking a Holistic View of Housing Policy* 26 HOUS. POL'Y DEBATE 284 (2016).

- M Orfield, W Stancil, T Luce, E Myott, *A Response to The Low Income Housing Tax Credit, Community Development and Fair Housing*, 25 HOUS. POL'Y DEBATE 619 (2015).

- M Orfield and Thomas Luce, *An Analysis of Chicago's Charter Schools: No Model for Education Reform,* 24 EDUCATION POLICY ANALYSIS ARCHIVES 111 (2016).

- M. Orfield and B. Dawes, *Metropolitan Governance Reform*, in LOCAL GOVERNMENT RECONSIDERED, Chapman University Digital Commons (February 2016) http://digitalcommons.chapman.edu/cgi/viewcontent.cgi?article=1220&context=localgovernmentreconsidered

- Myron Orfield, *Metropolitics and Fiscal Equity,* THE CITY READER (William LeGates, ed.) (2016).

- Myron Orfield, Will Stancil, Thomas Luce, and Eric Myott*, Taking a Holistic View of Housing Policy*, 26 HOUS. POL'Y DEBATE 284 (2016).

- Myron Orfield, *Milliken, Meredith and Metropolitan Segregation*, 62 U.C.L.A. L. REV. 364 (2015).

- Myron Orfield, Will Stancil, Thomas Luce, and Eric Myott*, Response to Poverty Pimping CDCs: The Search for Dispersal's Next Bogeyman,* 25 HOUS. POL'Y DEBATE 619 (2015).

- Myron Orfield, Will Stancil, Thomas Luce, and Eric Myott*, High Costs and Segregation in Subsidized Housing Policy,* 25 HOUS. POL'Y DEBATE 574 (2015).

- KS Finnigan, JJ Holme, M Orfield, T Luce, S Diem, A Mattheis, ND Hylton, *Regional Educational Policy Analysis Rochester, Omaha, and Minneapolis' Inter-District Arrangements,* 29 EDUCATIONAL POLICY 780 (2015).

- Myron Orfield and Thomas Luce*, Charters, Choice and the Constitution,* 2014 U.CHI.L.FOR. 377 (2014).

- Myron Orfield and Thomas Luce, *America's Racially Diverse Suburbs: Challenges and Opportunities,* 23 HOUS. POL'Y DEBATE 395 (2013).

- Myron Orfield, *Chapter Nine: Essay on Taxation and Revenue,* CHARTER OF THE NEW URBANISM, 2D EDITION 91 (Emily Talen, ed. (2013).

- Myron Orfield, Baris Gumus-Dawes and Thomas Luce, *Failed Promises: Assessing Charter Schools in the Twin Cities*, in EDUCATIONAL DELUSIONS: WHY CHOICE CAN DEEPEN INEQUALITY AND HOW TO MAKE SCHOOLS FAIR (Gary Orfield and Erica Frankenberg, eds.) (2013).

- Baris Gumes-Dawes, Thomas Luce and Myron Orfield, *The State of Public Schools in Post-Katrina New Orleans: The Challenge of Creating Equal Opportunity* in EDUCATIONAL DELUSIONS: WHY CHOICE CAN DEEPEN INEQUALITY AND HOW TO MAKE SCHOOLS FAIR (Gary Orfield & Erica Frankenberg, eds.) (2013).

- Baris Gumes-Dawes, Myron Orfield, and Thomas Luce, *Dividing Lines: East v. West in Minneapolis Suburbs* in THE RESEGREGATION OF SUBURBAN SCHOOLS: A HIDDEN CRISIS IN AMERICAN EDUCATION 113 (Erica Frankenberg and Gary Orfield, eds.) (2012).

- Myron Orfield and Thomas Luce, *Regional Tax-Base Sharing: A Policy to Promote Fiscal Equity And Efficient Development Practices at the Metropolitan Scale*, in REGIONAL PLANNING FOR A SUSTAINABLE AMERICA: HOW CREATIVE PROGRAMS ARE PROMOTING PROSPERITY AND SAVING THE ENVIRONMENT (Carleton Montgomery, ed.) (2012).

- Myron Orfield, *Linking Housing and School Desegregation to Growth Management*, in INTEGRATING SCHOOLS FOR A CHANGING SOCIETY: NEW POLICIES AND LEGAL OPTIONS FOR A MULTI-RACIAL GENERATION (Erica Frankenburg & Elizabeth Debray, eds.) (2012).

- Myron Orfield*, Regional Strategies for Racial Integration of Schools And Housing Post-Parents Involved,* 29 LAW & INEQ.149 (2011).

- Myron Orfield, *Metropolitics in the New Century* in THE CITY READER, (London: Routledge Press, William Legates, ed.) (2011).

- Margaret C. Hobday, Geneva Finn, & Myron Orfield, *A Missed Opportunity: Minnesota's Failed Experiment with Choice-Based Integration*, 35 WM. MITCHELL L. REV. 101 (2009).

- Manson, S. M., H.A. Sander, D. Ghosh, J. M. Oakes, M. W. Orfield, W. J. Craig, T.F. Luce, E. Myott, S. Sun*, Parcel Data for Research and Policy*, 4 GEOGRAPHY COMPASS 1 (February 2009).

- Myron Orfield and Thomas Luce*, Governing American Metropolitan Areas: Spatial Policy and Regional Governance*, in MEGAREGIONS: PLANNING FOR GLOBAL COMPETITIVENESS, Catherine Ross, ed. (Washington, D.C.: Island Press) (2009).

- Myron Orfield, *Beyond Segregation: Toward a Shared Vision of our Regions*, in BREAKTHROUGH COMMUNITIES: SUSTAINABILITY AND JUSTICE IN THE NEXT AMERICAN METROPOLIS, (M. Paloma Pavel, ed., MIT Press) (2009).

- Myron Orfield and Thomas Luce*, The Metropolitan Land Use Planning Act in* A NATIONAL SURVEY OF LOCAL LAND-USE REGULATIONS: STEPS TOWARD A BEGINNING, Robert W. Burchell and Michael L. Lahr, Principle Investigators. (Rutgers, Edward J. Bloustein School of Planning and Public Affairs) (July 2008).

- Myron Orfield and Baris Gumes-Dawes, *When the Feds Won't Act: School Desegregation, State Courts, and Minnesota's The Choice is Yours Program* in POVERTY & RACE RESEARCH ACTION COUNCIL NEWSLETTER, Volume 17, Number 1 (January/February 2008).

- Katherine Fennelly and Myron Orfield, *Impediments to Integration of Immigrants: A Case Study in Minnesota in* TWENTY-FIRST-CENTURY GATEWAYS: IMMIGRANT INCORPORATION IN SUBURBAN AMERICA, Audrey Singer, Susan W. Hardwick and Caroline B. Brettell, Editors, Brookings Institution Press (2008).

- Myron Orfield, *The Region and Taxation: School Finance, Cities and the Hope for Regional Reform*, 55 BUFF. L. REV. 91 (2007).

- Myron Orfield and Nicholas Wallace, *The Minnesota Fiscal Disparities Act of 1971: The Twin Cities' Struggle and Blueprint for Regional Cooperation*, 33 WM. MITCHELL L. REV. 591 (2007).

- Myron Orfield and Nicholas Wallace, *Expanding Educational Opportunity Through School and Housing Choice,* (with Nicholas Wallace), *in* CURA Reporter, Volume 37, Number 2 (Summer 2007).

- Myron Orfield, *Choice, Equal Protection and Metropolitan Integration: The Hope of the Minneapolis Desegregation Settlement*, 24 LAW & INEQ. 269 (2006).

- Myron Orfield, *Land Use Policies to Reduce Concentrated Poverty and Racial Segregation,* 33 FORD.URB. L.J. 877 (2006).

- Myron Orfield, *Building Regional Coalitions between Cities and Suburbs, in* GROWING SMARTER: PLANNING FOR REGIONAL EQUITY AND ENVIRONMENTAL JUSTICE (Robert D. Bullard ed., Massachusetts Institute of Technology Press) (2006).

- Thomas Luce, Jill Mazullo, and Myron Orfield, *Access to Growing Job Centers in the Twin Cities Metropolitan Area, Center on Urban and Regional Affairs*, University of Minnesota (2006).

- Myron Orfield, *Atlanta Metropatterns: A Regional Agenda for Community and Stability, in* URBAN SPRAWL: A COMPREHENSIVE REFERENCE GUIDE (David Soule, ed.) (Greenwood Press) (2006).

- Myron Orfield, *Racial Integration and Community Revitalization: Applying the Fair Housing Act to the Low Income Housing Tax Credit*, 58 VAND.L.REV.1747 (2005).

- Myron Orfield, *Segregation and Environmental Justice*, 7 MINN. J. OF LAW, SCIENCE & TECH. 147 (2005).

- Myron Orfield, *Comment on Scott A. Bollen, In Through the Back Door: Social Equity and Regional Governance*, 13 HOUS. POL'Y DEBATE 659 (2003).

- *Myron Orfield, The Region: The True City, in* TOWARD THE LIVABLE CITY (Emilie Buchwald ed., Milkweed Press (2003).

- Myron Orfield, Thomas Luce and Anne Discher, *Economic and Racial Segregation in Greater Miami Elementary Schools: Trends Shaping Metropolitan Growth*, Brookings Institution Center on Urban and Metropolitan Policy (2003).

- Myron Orfield, *Politics and Regionalism, in* URBAN SPRAWL: CAUSES CONSEQUENCES AND POLICY RESPONSES (Greg Squires, ed., Urban Institute Press) (2002).

- Robert Puentes and Myron Orfield, *Valuing America's First Suburbs: A Policy Agenda for Older Suburbs in the Midwest,* Brookings Institution Center on Urban and Metropolitan Policy (Brookings Institution) (April 2002).

- Myron Orfield, *Tax Equity and Land Use*, in CHARTER OF THE NEW URBANISM (Congress for a New Urbanism, ed., McGraw Hill) (2000).

- Myron Orfield, *Conflict of Consensus: Forty Years of Metropolitan Reform*, 16 Brookings Review 31 (1998).

- *Myron Orfield, The Need for Tax Base Sharing, in* THE VALUE OF LAND: THE LINCOLN INSTITUTE FOR LAND POLICY ANNUAL REVIEW (debate with William Fischel) (1998).

- Myron Orfield, *Regional Coalition Building and the Inner Suburbs*, SHELTERFORCE (January/February 1998).

- Jonathan Miller and Myron Orfield, *Suburbs in Flux*, 57 URB. LAND 42 (1998).

- Myron Orfield, *Metropolitics: Coalitions for Regional Reform*, 15 BROOKINGS REVIEW 6 (1997).

- Myron Orfield, *The "Push-Pull" of Regional Polarization*, LUSK FORUM (1997).

- Myron Orfield, *Economic and Racial Polarization in Twin Cities Schools,* 17 HAMLINE J. PUB. L. & POL'Y 271 (1996).

- Myron Orfield, *Model Tax Sharing Legislation Statute*, *in* AMERICAN PLANNING ASSOCIATION GROWING SMART LEGISLATIVE GUIDEBOOK: MODEL STATUTES FOR PLANNING AND THE MANAGEMENT OF CHANGE (1996).

- Myron Orfield, *Tax Equity Devices and Tax Relief Programs*, *in* AMERICAN PLANNING ASSOCIATION GROWING SMART LEGISLATIVE GUIDEBOOK: MODEL STATUTES FOR PLANNING AND THE MANAGEMENT OF CHANGE (1996).

- Myron Orfield, *Deterrence, Perjury, and the Heater Factor: An Exclusionary Rule in the Chicago Criminal Courts*, 63 U. COLO. L. REV. 75 (1992).

- Comment, *The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Police Narcotics Officers*, 54 U. CHI. L. REV. 1016 (1987).

## BRIEFS

- Brief of Amicus Curiae Myron Orfield, Supporting Petitioners in *Cruz-Guzman v. State*, No No. A15-1265  (2018) appealing 892 N.W.2d 533 (2017).

- Brief of Housing Scholars as Amici Curiae Supporting Respondent, *Texas Dep't of Housing & Comm. Affairs v. The Inclusive Communities Project*, 576 U.S. ___, 135 S.Ct. 2507 (2015).

- Brief for the Townships of Pennsauken and Montclair, New Jersey as Amici Curiae, *In re Adoption of N.J.A.C. 5:96 and 5:97*, 215 N.J. 578 (2013).

- Brief for Myron Orfield et.al., as Amici Curiae supporting Plaintiffs, *Jackson v. Mortgage Electronic Registration Systems, Inc*., 770 N.W.2d 487 (Minn. 2009).

- Brief for Housing Scholars and Research & Advocacy Organizations as Amici Curiae Supporting Respondents, *Parents Involved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701 (2007).

- Response of Housing Scholars and Research and Advocacy Organizations, Re: Residential Segregation and Housing Discrimination in the United States: Violations of the International Convention on the Eliminating of All Forms of Racial Discrimination: A Report to United Nations Committee of on the Elimination of Racial Discrimination (January 2008).

- Brief for Myron Orfield and john powell as Amici Curiae, *In re Adoption of the 2003 Low Income Housing Tax Credit Qualified Allocation Plan*, 369 N.J.Super. 1, 848 A.2D 1 (2004).

- Brief and Reply Brief of Petitioners, *Perpich v. United States Dep't of Defense*, 496 U.S. 334 (1990).

**OTHER REPORTS AND PUBLICATIONS**

*Institute on Metropolitan Opportunity*

- *The Minnesota School Choice Project: Part I Segregation and Performance* (February 2017) https://www.law.umn.edu/sites/law.umn.edu/files/imo-mscp-report-part-one-segregation-and-performance.pdf
- *The Rise of White Subsidized Housing* (May 2016).
- *Are Minneapolis and St. Paul Gentrifying?* (January 2016).
- *Why are the Twin Cities So Segregated?* (February 2015).
- *Charter Schools in Chicago: No Model for Education Reform* (October 2014).
- *Reforming Subsidized Housing Policy in the Twin Cities to Cut Costs and Reduce Segregation* (January 2014).
- *Twin Cities in Crisis: Unequal Treatment of Communities of Color in Mortgage Lending* (April 2014).
- *Integrated Magnet Schools: Best Practices* (December 2013).
- *Charter Schools in the Twin Cities: 2013 Update* (October 2013).
- *Open Enrollment and Segregation in the Twin Cities: 2000-2010* (January 2013).
- *Update of IRP Charter Report, Failed Promises: Assessing Charter Schools in the Twin Cities* (March 2012).

*Institute on Race and Poverty*

- *MPO Reform: A National Agenda for Reforming Metropolitan Governance* (September 2009).
- *A Comprehensive Strategy for Integration of Housing and Schools* (July 2009).
- *Communities in Crisis: Race and Mortgage Lending in the Twin Cities* (February 2009).
- *Failed Promises: Assessing Charter Schools in the Twin Cities* (November 2008).
- *The Choice is Ours: Expanding Educational Opportunity for all Twin Cities Children* (May 2006).
- *The Minnesota Statewide Racial Profiling Study*, (August 2003).

*Ameregis/Metropolitan Area Research Corporation*

- Myron Orfield and Thomas Luce, *An Activist's Guide to Metropolitics* (October 2003).
- Myron Orfield and Thomas Luce, *Toledo Metropatterns: A Regional Agenda for Community and Stability in Toledo* (August 2003).
- Myron Orfield and Thomas Luce, *Michigan Metropatterns: A Regional Agenda for Community and Stability in Michigan* (April 2003).
- Myron Orfield and Thomas Luce, *New Jersey Metropatterns: A Regional Agenda for Community and Stability in New Jersey* (April 2003).
- Myron Orfield and Thomas Luce, *Genesee County Metropatterns: A Regional Agenda for Community and Stability in Genesee County, Michigan* (April 2003).
- Myron Orfield and Thomas Luce, *Connecticut Metropatterns: A Regional Agenda for Community and Prosperity in Connecticut* (March 2003).

- Myron Orfield and Thomas Luce, Thomas, *Ohio Metropatterns: A Regional Agenda for Community and Stability* (December 2002).

- Myron Orfield and Thomas Luce, *California Metropatterns: A Regional Agenda for Community and Stability in California* (April 2002).

- Myron Orfield and Thomas Luce, *Wisconsin Metropatterns: Regional Cooperation, Economic growth and Environmental Protection* (February 2002).

- Myron Orfield, Thomas Luce, and Benjamin Oleson, *Boston Metropatterns: A Regional Agenda for Community and Stability in Greater Boston* (October 2001).

- Myron Orfield and Thomas Luce, *Erie Metropatterns: A Regional Agenda for Community and Stability in the Erie Region* (October 2001).

- Myron Orfield and Thomas Luce, Robert Kleidman, and Benjamin Oleson, *Northeast Ohio Metropatterns: A Regional Agenda for Community and Stability in the Northeast Ohio Region* (September 2001).

- Myron Orfield and Thomas Luce, *Ohio's Mahoning Valley Regional Metropatterns: A Regional Agenda for Community and Stability* (September 2001).

- Myron Orfield and Thomas Luce, *Cincinnati Metropatterns: A Regional Agenda for Community and Stability in Cincinnati* (August 2001).

- Myron Orfield, *Central Valley Metropatterns: Regional Challenges in California's Central Valley* (January 2001).

- Myron Orfield, *Puget Sound Metropatterns: Social Separation and Sprawl in the Puget Sound Region* (December 2000).

- Myron Orfield, *Saginaw Metropolitics: A regional Agenda for Community and Stability* (October 2000).

- Myron Orfield, *Kentucky's Rural/Metropolitan Fiscal Divide: A Statewide Agenda for Sustainable Communities* (May 2000).

- Myrohn Orfield, *Los Angeles Metropatterns: Social separation and Sprawl in the Los Angeles Region* (May 2000).

- Myron Orfield, *Denver Metropolitics: A Regional agenda for Community and Stability* (April 2000).

- Myron Orfield, *San Diego Metropolitics: A Regional Agenda for Community and Stability* (August 1999).

- Myron Orfield, *St. Louis Metropolitics: A Regional Agenda for Community and Stability* (August 1999).

- Myron Orfield, *Washington Metropolitics: A Regional Agenda for Community and Stability* (July 1999).

- Myron Orfield, *Pittsburgh Metropolitics: A Regional Agenda for Community and Stability* (June 1999).

- Myron Orfield, *Grand Rapids Area Metropolitics: A West Michigan Agenda for Community and Stability* (May 1999).

- Myron Orfield, *Seattle Metropolitics: A Regional Agenda for Community and Stability in the Puget Sound Region* (May 1999).

- Orfield, Myron, *Detroit Metropolitics: A Regional Agenda for Community and Stability* (January 1999).

- Orfield, Myron, *Atlanta Metropolitics: A Regional Agenda for Community and Stability* (December 1998).

- Myron Orfield, *Portland Metropolitics: A Regional Agenda for Community and Stability* (July 1998).

- Myron Orfield, *Milwaukee Metropolitics: A Regional Agenda for Community and Stability* (May 1998).

- Myron Orfield, *Baltimore Metropolitics: A Regional Agenda for Community and Stability* (March 1998).

- Myron Orfield, *Philadelphia Metropolitics: A Regional Agenda for Community and Stability* (March 1997).

- Myron Orfield, *Chicago Regional Report* (October 1996).

## FELLOWSHIPS, HONORS, AND APPOINTMENTS

- Earl R. Larson Chair in Civil Rights and Civil Liberties Law (2016).

- Julius Davis Professor of Law (2008).

- Fesler-Lampert Chair in Public Affairs (2006).

- Affiliate Faculty Member, Urban and Regional Planning (2005-2014).

- Bradley Fellow, The Center for Studies in Criminal Justice, University of Chicago Law School (1990-1991).

- Tony Patino Fellow, University of Chicago Law School (1984-1987).

- Edward Hinton Moot Court Semi-finalist (1987).

- Shelby Cullum Davis Fellow (full tuitions and expenses Ph.D. fellowship at Princeton University) (1983-1984).

- Phi Beta Kappa (1982).

- Selmer Birkelo Scholar (1979-1983).

- Captain, University of Minnesota College Bowl Team (1980-1983).

## GRANTS AND SUPPORT

- Grant from the Ford Foundation for General Operating Support, Principal Investigator, 4/1/16-3/31/18, $400,000.

- Grant from the Kresge Foundation for General Operations, 2016, $200,000.

- Grant from the Kresge Foundation for General Operations, 2014, $200,000.

- Grant from the Kresge Foundation for Michigan Fiscal Project, 2015, $100,000.

- Grant from the Ford Foundation for General Operating Support, Principal Investigator, 4/1/12-3/31/14, $400,000.

- Grant from the McKnight Foundation for General Operating Support, Principal Investigator, 1/1/12-12/31/14, $12,000.

- Support from Loyola University New Orleans, "Quality and Equity in Education in New Orleans," 10/15/09 – 01/15/2010, $33,000.

- Grant from the Robina Law, Public Policy, and Society Research Fund, "School and Neighborhood Impact on Minnesota Incarceration Rates," Principal Investigator, 7/1/09-6/30/10, $100,000.

- Proposal Development Grant from the Minnesota Population Center, "The Effects of Minnesota School Choice Programs on School Segregation and Student Performance," 4/15/09-12/31/09, $9,945.

- Grant from the Northwest Area Foundation, "Credit Access – Segregated and Low Income Neighborhoods," Principal Investigator, 1/1/09-7/01/09, $40,000.

- Grant from the Minnesota Dream Fund Collaborative (via the Minneapolis Foundation), "Brown Power Base Project," Principal Investigator, 1/1/09-12/31/09, $40,000.

- Grant from the Open Society Institute for General Operating Support, Principal Investigator, 10/31/08-10/31/09, $100,000.

- Grant from the Ford Foundation for General Operating Support, Principal Investigator, 4/1/08-3/31/10, $300,000.

- Support from the Spring Hill Center – General Endowment Fund of the Minneapolis Foundation, *Region: Law, Policy and the Future of the Twin Cities*, 05/01/08-10/31/08, $10,000.

- Support from the University of Minnesota Office for Public Engagement, *Region: Law, Policy and the Future of the Twin Cities* Conference, 10/23/08-10/24/08, $1,000.

- Support from the Center for Urban and Regional Affairs (CURA), *Region: Law, Policy and the Future of the Twin Cities* Conference, 10/23/08-10/24/08, $5,000.

- Support from the University Metropolitan Consortium, University of Minnesota, *Region: Law, Policy and the Future of the Twin Cities* Conference, 10/23/08-10/24/08, $5,000.

- Grant from the Northwest Area Foundation, "Funding Strategies," Principal Investigator, 12/1/07-2/20/08, $20,000.

- Grant from the Minnesota Dream Fund Collaborative (via the Minneapolis Foundation), "Brown Power Base Project," Principal Investigator, 1/1/08-12/31/08, $47,000.

- Grant from the Open Society Institute for General Operating Support, Principal Investigator, 8/1/07-8/1/08, $100,000.

- Grant from the Minnesota Dream Fund Collaborative (via the Minneapolis Foundation), "Brown Power Base Project," Principal Investigator, 1/1/07-12/31/07, $41,932.

- Grant from the McKnight Foundation for General Operating Support, Principal Investigator, 1/1/07-12/31/09, $300,000.

- Grant from the Otto Bremer Foundation for General Operating Support, Principal Investigator, 1/1/07-12/31/09, $225,000.

- Grant from the Open Society Institute for General Operating Support, Principal Investigator, 7/1/06-6/30/07, $100,000.

- Grant from the Ford Foundation for General Operating Support, Principal Investigator, 4/1/06-3/30/07, $300,000.

- Grant from the McKnight Foundation in conjunction with the Housing Preservation Project, Inc., "Affordable Housing Growth," 11/1/05-10/31/06, $19,000.

- Grant from the Minneapolis Foundation, "Assessing the Digital Divide in Minnesota, Phase II," Principal Investigator, 7/1/05-11/30/06, $49,000.

- Grant from the Minneapolis Foundation, "Community Partnership – West Bank, Phase II," Principal Investigator, 6/24/05-3/31/06, $1,000.

- Grant from the Minneapolis Foundation to research and develop communication products in support of transportation reform and strategic public investments that serve the needs of low income communities of color in the Twin Cities area, Principal Investigator, $75,000.

- Grant from the Minneapolis Foundation, "Assessing the Digital Divide in Minnesota," Principal Investigator, 6/1/04-12/31/04, $48,000.

- Grant from the Charles Stewart Mott Foundation for General Operating Support, Principal Investigator, 3/1/04-8/31/05, $50,000.

- Grant from the Minneapolis Foundation, "Community Partnership – West Bank," Principal Investigator, 2/1/04-1/31/05, $5,000.

- Grant from the Rockefeller Foundation, "Commuting Patterns and Minority Suburbanization – Atlanta Metropolitan Region," Principal Investigator, 2/1/04-1/31/06, $100,000.

- Grant from the Ford Foundation for General Operating Support, Principal Investigator, 2/1/04-1/31/06, $300,000.

- Grant from the McKnight Foundation, "Twin Cities Commuter Shed," Principal Investigator, 1/1/04-12/31/06, $40,000.

- Grant from the McKnight Foundation for General Operating Support, Principal Investigator, 1/1/04-12/31/06, $300,000.

- Grant from the Otto Bremer Foundation for General Operating Support, Principal Investigator, 12/15/03-12/14/06, $300,000.

- Grant from Detroit Branch NAACP, Minority Suburbanization, "Stable Integration, and Economic Opportunity in Fifteen Regions," Principal Investigator, 9/5/03-3/30/06, $75,000.

## BOARD MEMBERSHIPS AND ADVISORY POSITIONS

- Member, Integration Rule and Statute Alignment Working Group, Minnesota Department of Education (2014).

- Member, Committee on Equality and Justice of the Minnesota Supreme Court (2011-2013).

- Member, Minnesota Integration Aid Replacement Task Force (2012).

- Commissioner, National Commission on Fair Housing and Equal Opportunity (2008).

- Member, Transition Team for President-Elect Barack Obama, Urban and Metropolitan Policy Team (November 2008-January 2009).

- Urban and Metropolitan Policy Advisor, Presidential Candidate Barack Obama (2008).

- Board Member, Inclusive Communities Project (ICP) (2008-2010).

- Strategic Advisor, Building One America (2009-present).

- Strategic Advisor Gamaliel Foundation (1996-2010).

- Advisory Panel on Social, Economic and Environmental Determinants of Health for the Blue Cross and Blue Shield of Minnesota Foundation (2007-2009).

- Nonresident Senior Fellow, The Brookings Institution Center for Metropolitan Policy (1997-2014).

- Advisory Committee Member, Minnesota Population Center (2006-2009).

- Academic Advisory Board, Congressional Black Caucus (2003-2010).

- Member, National Academy of Sciences Committee on Establishing Data Needs for Place-Based Decision Making (2002).

- Member, National Academy of Sciences Committee on Improving the Future of US Cities through Improved Metropolitan Governance (1996-1997).

- Directorate, American Planning Association "Growing Smart" Project (1995-1998).

- Member, Policy Council, Association of Public Policy Analysis & Management (1997-1999).

- Member, Democratic National Platform Committee (1996).

## SELECTED LECTURES AND APPEARANCES

### 2016

- Presentation at Macalester College, *Segregation in Twin Cities Schools*, April 25, 2016.
- Presentation USC Conference, *California Tax Reform*, Activating Markets for Social Change, April 16, 2016.
- Presentation, *Regional Governance Reform*, Reimaging Local Government Conference, Chapman University, February 24, 2016
- Augsburg Christiansen Center *Presentation on School Desegregation*, January 14, 2016.

**2015**

- Presentation to the National Coalition on School Diversity Annual Conference, September 25, 2015.
- Presentation to the annual Building One America Conference, July 23, 2015.
- Presentation at Wayne State University on the Detroit region, June 12, 2015.
- Presentation at the Department of Housing and Urban Development, July 14, 2015.
- Presentation to the Brooklyn Center MN City Council, July 13, 2015.
- Presentation to the Kentucky Commission on Human Rights, June 11, 2015.
- Presentation to the American Law Institute's Young Scholar's Conference, NYU School of Law, April 13, 2015.

**2014**

- Presentation to the National Education Association annual meeting, San Antonio, TX, November 24, 2014.
- Minnesota Education Association, "Charter Schools, Open Enrollment and Segregation in the Twin Cities," October 16, 2014.
- Hennepin County Community Works Board, "Fair Housing Issues on the Southwest LRT Corridor" September 18, 2014.
- Presentation to the Restructuring Concepts Group Meeting, Lansing, MI, October 8, 2014.
- Presentation to the Kresge Foundation, Flint, MI, October 7, 2014.
- Richfield City Council, "The Met Council Housing Policy Plan and the Fair Housing Act," September 15, 2014.
- Debate with Randall O'Toole on "Smart Growth," sponsored by the Sensible Land Use Coalition, September 12, 2014.
- Brooklyn Park City Council, "The Met Council Housing Policy Plan and the Fair Housing Act," September 8, 2014.
- Presentation Hopkins League of Women Voters, "Educational Diversity in the Western Suburbs," July 30, 2014.
- Presentation to St. Paul NAACP, "Growing Segregation in St. Paul Schools," July 8, 2014.
- Presentation to Public Justice Alliance of Minnesota (PEJAM), "Segregation and the Achievement Gap," May 17, 2014, North High School.
- Presentation at "Brown's Suburban Promise Conference," Columbia University May 4, 2014.
- Presentation to Dallas City Council, "Racial Segregation and Housing Policy in Dallas Fort Worth," April 30, 2014.

- Speech at St. Norbert College, Green Bay, Wisconsin on "Racial Inequality in Green Bay Areas Schools," April 2, 2014.

- Presentation on IMO Research to the James L. Knight Foundation Learning Lab, March 27, 2014.

- Presentation to the Education Committee of the Illinois House of Representatives, "Charter Schools and Segregation," February 19, 2014.

- Presentation to the Minneapolis Civil Rights Commission, "Housing Segregation in Minneapolis," February 10, 2014.

- Presentation to University of Minnesota Law School Conference on the future of integration policy in the U.S., January 31, 2014.

- Presentation to the U.S. Department of HHS Meeting on Poverty and Diversity in U.S. Suburbs on racially diverse suburbs, January 14, 2014.

- Presentation to the Association of American Law Schools Annual Meeting on America's racially diverse suburbs, January 4, 2014.

**2013**

- Presentation to the Leonard, Street and Deinard Professional Association's Construction Industry Update seminar on housing development, subsidized housing and demographic change in the Twin Cities, December 3, 2013.

- Presentation to the National Education Association annual meetings on charter schools and segregation, November 25, 2013.

- Presentation at the University of Chicago Law School on demographic change in the Twin Cities, November 8, 2013.

- Interviews (Orfield and Luce) with MinnPost, MPR, the *STARTRIBUNE* on IMO's charter school research update, week of October 7, 2013.

- Presentation to the Minnesota Supreme Court on IMO research on the school to prison pipeline, October 2, 2013.

- Presentation to a meeting on the nature of suburban racial change in the U.S. (Soros Foundation), September 16, 2013.

- Presentation (Luce) to the Twin Cities Research Group on the opportunity analysis performed for the Met Council's FHEA planning process, September 11, 2013.

- Presentation to the Kresge Foundation on school segregation court cases and current segregation issues in large metropolitan areas, September 6, 2013.

- Presentation to Minneapolis Civil Rights Commission on Fair Housing and segregation in the Twin Cities, August 19, 2013.

- Presentation to the Metropolitan Opportunity group of the Ford Foundation on racial change in central city neighborhoods, August 15, 2013.

- Presentation (Myott) to Century College audience on lending discrimination in the Twin Cities, July 31, 2013.

- Presentation to Building One America national summit (Washington DC) on racial change in fully developed suburbs in the 50 largest U.S. metropolitan areas, July 18, 2013.

- Presentation to Committee on Equality and Justice on racial disparities in sentencing, July 11, 2013.

- Presentation to Minnesota Association of Counties annual meeting on segregation in Minnesota, June 27, 2013.

- Presentation on the Keyes Decision and the Denver Metropolitan Area, University of Denver Law School, February 1st 2013.

- Presentation to Education Minnesota (Teachers Union) on student performance and racial segregation in charter schools in the Twin Cities, January 25, 2013.

**2012**

- Presentation at the Fair Housing and Community Development convening by the Lawyers' Committee for Civil Rights and the Poverty and Race Research Action Council, November 28, 2012.

- Presentation to Metro Cities (Twin Cities) on school and neighborhood demographics in the Twin Cities, November 21, 2012.

- Participation on a panel on school integration in the Twin Cities, Humphrey Institute of Public Affairs, October 12, 2012.

- Presentation to the Union of British Columbia Municipalities on the Twin Cities Metropolitan Council and its powers, September 25, 2012.

- Presentation on the effects of school boundary decisions on school segregation in the Twin Cities, National Conference on School Diversity, May 16, 2012.

- Presentation of research from IMO Suburban Schools Project at the American Education Research Association Annual Research Conference, April 13, 2012.

- Presentation at HUD meetings (Washington DC) on affordable housing policy in the Twin Cities, March 22, 2012.

- Testimony to the Metropolitan Council regarding affordable housing policy and transit corridors, March 21, 2012.

- Presentation to Gamaliel group (ISAIAH) on racial transition in inner suburbs, February 23, 2012.

- Interviews (Orfield and Luce) with Minneapolis Star-Tribune, St. Paul Pioneer Press, MinnPost and Minnesota Public Radio regarding IMO's update of its report on Charter Schools, February 16-17, 2012.

- Presentation at Carleton College, Northfield MN on housing and school demographics in the Twin Cities, February 9, 2012.

**2011**

- Testimony (by IRP Research Director) to the Integration Revenue Task Force, December 2011.

- Participated in Ford Foundation meetings regarding strategies to promote fair housing and equitable community development in American metropolitan areas, October 2011.

- Spoke to and met with inner suburban planning groups in Detroit area, September 2011.

- Spoke to ISAIAH meeting regarding strategies to promote racial equity in Minnesota schools, September 2011.

- Spoke at Building One America convening at the White House regarding racial and economic change in American suburbs, July 2011.

- Spoke to several groups of Chinese officials regarding suburban development issues in Beijing and Cheng Du China, June 2011.

- Spoke to group of Chamber of Commerce and political officials and met with NC Legal Aid and Wake County School officials in Raleigh NC regarding the importance of maintaining integrated, April 2011.
- Spoke at the Irvine Law School Conference on Fair Housing, Irvine CA, March 2011.
- Participated in Ford Foundation meeting of community development and fair housing leaders, New York NY, February 2011.
- Met with HUD representatives regarding the new fair housing rule, Washington DC, February 2011.
- Participated in the Network on Inequality, Complexity and Health meetings in San Francisco, January 2011.

**2010**

- Presentation to HUD officials regarding school and neighborhood segregation, January 2011.
- Presentation for the Network on Inequality, Complexity and Health conference in San Francisco, CA, January 2011.
- Presentations for Building One America conferences in Northeastern Illinois (December 2010), Northwestern Indiana (December, 2010), and Baltimore, MD (January 2011).
- Presentation to the Hennepin County Rotary Club, Coon Rapids, MN, December 2010.
- Two presentations on: 1) environmentally sustainable metropolitan governance and 2) race and regional growth at an international conference sponsored the Institute Des Ameriques, Sorbonne (Paris IV), and CNRS Paris, France, November 2010.
- Key Note Speech Presentation at a conference on metropolitan governance, University of Pittsburgh Graduate School of Planning, November 2010.
- Panel Presentation regarding racial segregation in housing and schools in Dallas, for "Race, Place and Fair Housing" Conference at the University of Texas Law School, October 2010.
- Speech to the National Council of State Legislatures annual meeting, Louisville, KY, July 2010 (state deficits and governmental restricting).
- Speech to the National League of Cities annual meeting, Minneapolis, MN, July 2010 (state deficits and governmental restructuring).
- Keynote address for the annual meeting of the Pennsylvania Chapter of the American Planning Association, Lancaster, PA, July 2010 (reforming state and local planning in Pennsylvania).
- Presentation for the Future of Urbanism conference, University of Michigan School of Urban and Regional Planning, March 2010.
- Presentation for the annual meeting of the Association of Metropolitan School Districts, St. Paul, March 2010 (IRP's comprehensive strategy to integrate schools and neighborhoods).

**2009**

- Staff development presentation at Simpson Housing Services, "Twin Cities Poverty and Schools Demographics." December 10, 2009, Minneapolis, Minnesota.
- Participant for the Federal Interagency Roundtable: Neighborhoods of Opportunity. Washington, DC, December 2, 2009. Policy discussion focused on revitalizing distressed neighborhoods and opening access to opportunity-rich neighborhoods.
- Conference panelist for "Reaffirming the Role of School Integration in K-12 Educational Policy," November 13, 2009, Washington, DC. Focus on Twin Cities models of school integration.

- Presentation at St. John's Episcopal church for congregants and ISAIAH members, November 8, 2009, Minneapolis, Minnesota. Comprehensive strategy to integrate Twin Cities schools and neighborhoods.

- Arrested Development Symposium: Do Megaprojects have a future? Sponsored by the Institute for Urban Design, November 7, 2009, New York, New York.

- Council on Black Minnesotans Forum, "Barriers to Black Achievement," Minneapolis, Minnesota, October 29, 2009. Presentation on educational status of Black students in Minnesota.

- Multiple presentations regarding regional equity progress and future goals for the Portland, Oregon metropolitan region. Organizing and sponsoring organizations included: Metro, Coalition for a Livable Future, 1,000 Friends of Oregon, Washington County, Portland State University, and the Metro Policy Advisory Committee. Portland, Oregon, October 25-28, 2009.

- Presentation "Changing Faces, Changing Communities" for the Charles Hamilton Houston Institute for Race & Justice Inclusion Project assembly. White Oak Plantation, Jacksonville, Florida, October 20-22, 2009.

- St. Catherine University Fall Symposium panelist, "The Power of Film: An Agent for Social Equity and Social Justice," October 7, 2009, St. Paul, Minnesota.

- Presentation regarding policy dynamics and effects related to integrated neighborhoods and schools for the Integration Revenue Reform legislative committee, October 1, 2009, Minneapolis, Minnesota.

- Panel discussant for a Metropolitan Interfaith Council on Affordable Housing forum, September 24, 2009, Minneapolis, Minnesota.

- Keynote speaker and conference planning advisor for Building One America: A National Summit on Regional Opportunity, Washington, D.C. September 17-18, 2009.

- Minnesota Urban Debate League panelist, discussing current research and strategies on increasing opportunities and decreasing poverty, Augsburg College, Minneapolis, Minnesota, July 10, 2009.

- Presentation for Ramsey County Bar Association annual CLE seminar on the elimination of bias, May 19, 2009, St. Paul, Minnesota.

- Participant and panelist for the Poverty, Justice, and Jobs Think Tank, April 30-May 2, 2009. Hosted by the Charles Hamilton Houston Institute for Race & Justice and the Advanced Leadership Initiative at Harvard Law School, Cambridge, Massachusetts. Panel: "Urban Problems: Clearing Barriers to Jobs & Self-Sufficiency." Discussion topic: "Solutions for Children & Families in Distress."

- American Planning Association national conference panelist, "Regionalism: Twin Cities and the Metropolitan Council Perspectives," April 26, 2009, Minneapolis, Minnesota.

- Guest lecture for New York University colloquium on urban policy, "Regional Cooperation, Opportunity and Sustainable Development," New York, New York, April 13, 2009.

- Keynote speaker, "Learning from the Lessons of WMEP – a Community Work Session to Develop a Regional Education Model," Minneapolis, Minnesota, March 23, 2009.

- Milano The New School for Management and Urban Policy and the Center for NYC Affairs hosted the 3rd annual Henry Cohen Lecture, "Regional Solutions to Segregation and Racial Equity: Can Metro Areas Overcome Inequality?" Featured speaker. New York, New York, March 11, 2009.

- Transportation Equity Network conference panelist, Washington, DC, March 10, 2009. Focus on Metropolitan Planning Organization Reform.

- Guest lecturer, Legal Scholarship for Equal Justice course, St. Paul, Minnesota, February 20, 2009. Focus on public interest careers, impact lawsuits, and changing government programs.

- Anoka-Hennepin School District staff training presentation, "Twin Cities Schools and Demographics," February 12, 2009, Anoka, Minnesota.

- "Unequal Educational Outcomes: Is Achievement Tracking a Source or Perpetuator of Racial Segregation within Schools?" symposium, University of Minnesota Law School, Minneapolis, Minnesota, February 6, 2009. Presentation, "Segregation in Minnesota Schools – Historical and Current Perspectives at the State, District and Local School Level." Panelist, "Legal, Educational and Related Strategies to Address Segregation."

- Panel presentation "What the Future Holds: Hopeful School Integration Models" for the National Summit on Interdistrict School Desegregation, Harvard Law School, Cambridge, Massachusetts, January 16-18, 2009.

- Educational Policy Fellowship Program event speaker, Minneapolis, Minnesota, January 7, 2009. Focus on educational policy issues and educational leadership.

**2008**

- Guest for National Public Radio's "Tell Me More" segment, Washington, DC, December 9, 2008. Discussed findings, implications and recommendations of the newly issued report of the National Commission on Fair Housing and Equal Opportunity.

- North Jersey Transportation Planning Authority roundtable speaker and participant, Newark, New Jersey, December 8, 2009. Focus on environmental justice, workforce housing and transit accessibility to jobs.

- Panelist, Teach for America sponsored event, The Achievement Gap and the State of Education in the Nation, Minneapolis, Minnesota, November 19, 2008.

- Minnesota Justice Foundation Public Interest Panel, University of Minnesota Law School Student Chapter, November 19, 2008.

- Co-host, moderator, and panelist for "Region: Law, Policy and the Future of the Twin Cities," October 23-24, 2008, Minneapolis, Minnesota.

- Panelist for "A Social Contract: The Minnesota Perspective" at the 24th Annual Conference on Policy Analysis, October 15th, St. Paul, Minnesota.

- "Twin Cities Demographics and Education Trends" presentation for Discovery Team at Anoka-Hennepin County's Staff Development Center, Anoka, Minnesota, October 8, 2008.

- "Racial and Ethnic Impacts of the Subprime/Foreclosure Crisis" panelist at the National Convening on Subprime Lending, Foreclosure and Race. October 2, 2008, Columbus, Ohio.

- Commissioner, National Commission on Fair Housing and Equal Opportunity hearing, Boston, Massachusetts, September 22, 2008.

- Commissioner, National Commission on Fair Housing and Equal Opportunity hearing, Los Angeles, California, September 9, 2008.

- Presentation to Normandale Community College faculty and staff: "Twin Cities Demographics and Education Trends," August 20, 2008, Bloomington, Minnesota.

- Participant for the Northwest Area Foundation Public Policy Roundtable, July 15-16, 2008, St. Paul, Minnesota.

- Presenter for the Soros Justice Fellowships 2008 Meeting, San Francisco, California, June 15-17, 2008. "Equitable, Inclusive and Prosperous Communities: Is there a place for the criminal justice reform movement?"

- Ramsey County Bar Association Elimination of Bias Diversity CLE, panelist, St. Paul, Minnesota, May 13, 2008. Panel presentation on growing racial segregation in the schools and the housing market, and proposals to reduce these growing trends.

- Roundtable Discussion Forum on the Future of Race-Conscious Housing Programs, Columbia Law School, New York, New York, May 5, 2008.

- Guest lecture for Multicultural Teacher Development program, University of Minnesota, Minneapolis, Minnesota, April 30, 2008. Discussed state of K-12 schooling in Twin Cities region, how school districts are meeting the needs of the community and provided future teachers with professional guidance.

- Gamaliel Foundation Strategic Partners meeting, April 17-18, 2008, Chicago, Illinois.

- Guest lecture for doctoral educational administration course, Social and Cultural Contexts of Education, University of Texas (via teleconference), April 2, 2008. Discussion of Twin Cities metropolitics, including analyses of housing policies, regional development and current levels of stratification.

- Plenary speaker presentation for Minnesota Statewide Integration Conference: "Resegregation," March 10, 2008, Minneapolis, Minnesota.

- Regional Equity 08: The Third National Summit on Equitable Development, Social Justice, and Smart Growth, March 5-7, 2008, New Orleans, Louisiana. Panelist: Community Development, Charter Schools and Segregation.

- Guest lecture for Chicano Studies graduate course, University of Minnesota, March 3, 2008.

- Panelist for "Bringing Children Together: Magnet Schools and Public Housing Redevelopment" sponsored by the Charles Hamilton Houston Institute for Race & Justice at Harvard Law School and the Poverty & Race Research Action Council, Tampa, Florida, February 29, 2008. Presentation: "Combining HOPE VI and Magnet Schools: The Roe of Justice Reinvestment: Increasing Support for Housing and School Integration on the State and Local Levels, Prospects in Congress and Working with the Justice Reinvestment Movement to Support School and Housing Reform.

- Keynote address for Minnesota Dream Fund Brown Power Base Project Community Pipeline: Minnesota Integration Revenue Funding Reform. February 26, 2008, Minneapolis, Minnesota.

- Guest lecturer for College of Education and Human Development leadership class on poverty and regional policy issues, February 7, 2008, Minneapolis, Minnesota.

- Guest speaker for University of Michigan School of Public Health lecture series, "Education and Housing in the Twin Cities: Public Health Implications", January 30, 2008, Ann Arbor, Michigan.

- Charles Hamilton Houston Institute for Race & Justice's Gathering of Civil Rights Advocates and Scholars, January 17, 2008, San Francisco, California. Invitation only attendee / presenter.

**2007**

- Provided educational testimony for New Jersey State Legislature regarding the use of tax credits and funding for K-12 education, December 10 and 27, 2007, via videoconference.

- Panel presentation for NCEA 42nd Annual Conference, "New Directions: Blueprint for the Future," December 5, 2007, Minneapolis, Minnesota.

- Brown Bag presenter for the University of Minnesota College of Education and Human Development's Children, Youth and Family Consortium, December 3, 2007, Minneapolis, Minnesota.

- Panelist for national conference "Toward a Transformative Agenda Around Race", December 1, 2007, Columbus, Ohio. Panel topic: "Lessons We Still Haven't Learned: How Our Federal Housing Policies Can Be Redesigned to Support Integrated Schools."

- November 28, 2007, presentation for the Minnesota K-12 Finance Committee regarding the use of state Integration Revenue funds, St. Paul, Minnesota.

- Participant in No Legislator Left Behind, a leadership development seminar for racial justice advocates and legislators across the state sponsored by the Organizing Apprenticeship Project, St. Paul, Minnesota, November 8, 2007.

- Guest speaker for the University of Michigan / Urban Land Institute Real Estate Forum. Presentation *Detroit Commuter Sheds and Metropolitan Equity*, delivered on November 7, 2007, in Troy, Michigan.

- Invited presenter and consultant for the MOSES Urban Transportation Task Force, November 6, 2007, Detroit, Michigan.

- Co-presenter with University of Minnesota Law School Professor David Weissbrodt for the National Forum on the Human Right to Housing, November 5, 2007. Live video teleconference transmitted from the Minneapolis region.

- Presentation to Robbinsdale Area Schools teachers, administrators and parents regarding school, student, and neighborhood demographics and trends. Sonnesyn Elementary School, New Hope, Minnesota, November 2, 2007.

- Invited guest speaker for the Richfield (MN) Community Council discussing social, educational, and racial disparities in the region, October 23, 2007.

- Panelist for "The Metropolitan Council 40 Years Later: Regionalism Revisited," at the 23rd Annual Conference on Policy Analysis, *Broadening the Conversation: Cross-sector Cooperation and Public Policy*, October 17, 2007, Minneapolis, Minnesota.

- Panelist for KFAI (90.3, 106.7) radio's *Truth to Tell,* 11:00 am, October 17, 2007 discussing, Racism, Resegregation, and Remedies in Education.

- Presentation to University of Michigan graduate students on regional planning and development, September 28, 2007, Minneapolis, Minnesota.

- Guest speaker for the Robbins, Kaplan, Miller and Ciresi Foundation board of trustees. Minneapolis, Minnesota, September 11, 2007.

- Panelist for "Governing the Metropolis," August 30, 2007, Chicago, Illinois for the American Political Science Association national conference.

- Short course presentation, "Inner Ring Suburbs & Metropolitan Systems," August 29, 2007 for the American Political Science Association national conference, Chicago, Illinois.

- Advisor/Discussant for the Gamaliel Strategic Partners meeting, August 7-8, 2007, Chicago, IL.

- Participating author for Megacities, Megaregions and Spatial Planning Symposium, June 28-29, Atlanta, Georgia. Co-Author of chapter: Regional Spatial Policy and Governance.

- Guest speaker for Construction du "bien commun" à l'échelle métropolitaine: Dépasser l'insoutenabilité du découpage municipal (Construction of the "common good" for metropolitan areas), June 14, 2007, at the Ecole Normal Superieure, Paris, France. Two presentations: Race,

Taxes, and Sprawl: American Metropolitan Areas; Coalitions for Metropolitan Equality: The Common Good and Local Government Self Interest.

- Panelist for Moving Institute Studies, Services and Information Out to the Nation (MISSION 2008), Kalispell, Montana on May 30, 2007.

- Guest speaker for Metro Cities (Association of Metropolitan Municipalities), May 17, 2007, Minneapolis, Minnesota.

- Meeting with Michigan city officials to discuss regional development solutions to increasing urban congestion issues and presentation "Metro Equity" for Metropolitan Organizing Strategy Enabling Strength (MOSES) event, Detroit, Michigan, May 7-8, 2007.

- Featured speaker at the Regional Economic Development Conference, Madison, Wisconsin, May 2, 2007.

- Featured speaker at Professional Practice School program for teacher educators at Roosevelt High School, Minneapolis, Minnesota, April 27, 2007.

- Presentation "School Attendance Boundaries and Integration" at the Minnesota Department of Education 2007 Statewide Integration Conference "Coming Together for Minnesota," St. Paul, Minnesota, April 19, 2007.

- Testimony for Illinois senate regarding regional development, April 18, 2007, Springfield, Illinois.

- Presentation for McKnight Foundation roundtable discussion focusing on the benefits and advantages of having an elected Met Council for the Twin Cities' region. Minneapolis, Minnesota, April 4, 2007.

- Presentation to religious, community and elected leaders from Philadelphia's developed suburbs on common challenges encountered in rapidly expanding metropolitan areas, March 26, 2007, Philadelphia, Pennsylvania.

- Featured speaker at community gathering in Richfield, Minnesota discussing social and racial disparities in the Twin Cities region, March 21, 2007.

- Invited professional expert to discuss culturally specific schools with the Minnesota Department of Education, Roseville, Minnesota, March 21, 2007.

- Advisory Group member for Wilder Research meeting for the Twin Cities Compass focusing on Housing – Key Measures, St. Paul, Minnesota, March 15, 2007.

- Presentation to West Suburban school districts collaborative on "School Boundaries, Opportunity and Stability," March 5, 2007.

- Provided testimony to the Minnesota State Legislature regarding the benefits of having an elected Metropolitan Council for the Twin Cities, March 5, 2007.

- Special guest speaker on the topic of race and poverty disparities in the Twin Cities for the North Point Wellness Center administration and staff professional development series, Minneapolis, Minnesota, March 1, 2007.

- Presentation on metropolitan growth and regional development for Law and Inequality: The Next 25 Years symposium conducted at the University of Minnesota Law School, February 16, 2007.

- Strategic partner attendee and advisor for the Gamaliel Foundation's national Metro Equity Session, Baltimore, Maryland, February 23-13, 2007.

- Select invitee to attend the LAKESNET conference, "Sustainable Development in the Basin: the Next 20 Years," organized in conjunction with the Canadian Consulate General, Northeast

Midwest Institute, the Great Lakes National Program Office, The Brookings Institution, Pollution Probe, and the Great Lakes Fisheries Commission, February 9, 2007, Chicago, Illinois.

- Invited guest and speaker for Poverty and Race Research Action Council, Washington, D.C., February 2, 2007.

- Participant and research consultant for Northwest Area Foundation research proposal development for potential project "Effect of Large Immigration Raids on Rural Latino Communities," February 1, 2007, St. Paul, Minnesota.

- Speaking presentation, "School Choice and Metropolitan Integration" for "The Constitutionality and Efficacy of Voluntary Race Conscious School Assignment Plans" conference at the University of Minnesota Law School, Minneapolis, Minnesota, January 26, 2007.

- Featured speaker and participant for Metro-York committee work group and leadership sessions, sponsored by York Counts, York, Pennsylvania, January 24, 2007. Topics covered included breaking up the concentration of poverty, reversing racial segregation, improving poor performing schools, and overcoming impediments of government.

- Keynote presentation on "School Boundaries, Opportunity and Stability for the Minnesota Community Education Leadership organization, January 19, 2007, Saint Cloud, Minnesota.

- Testimony for New Jersey state legislature on tax credit finance benefits for regional development and school integration, Trenton, New Jersey, January 11, 2007.

**2006**

- Presentation on regional development and tax sharing to the Northeast Ohio Mayors and City Managers Association at the invitation of Hudson, Ohio Mayor William Currin, December 11, 2006.

- Invitation-only participant for the "2006-2016 Map of Future Forces Effecting Education" conference sponsored by Knowledge Works Foundation, Institute for the Future and The Johnson Foundation. Racine, Wisconsin, December 10-12, 2006.

- Gamaliel National Leadership Assembly, December 8, 2006, Minneapolis, Minnesota. Inspirational address to membership at Allies Plenary Session; Metro Equity Issues Workshop – commuter shed and transportation equity research presentation.

- Workshop in conjunction with Professor David Schultz, "De Facto Segregation in Schools" for the Minnesota Human Rights Day 2006 Conference, December 1, 2006, St. Paul, Minnesota.

- Spotlight presentation to the Twin Cities Habitat for Humanity board of directors, November 14, 2006, Minneapolis, Minnesota.

- Invited guest for "The New Metropolis Engagement Campaign" focus group sponsored by the Surdna Foundation, New York City, New York, November 10, 2006.

- Social Science and History Association 2006 Conference panel presentation, "Metropolitan Fragmentation: Contemporary Dilemmas" and "Solutions in Historical Perspective: Model Region: The Twin Cities in Flux," November 3, 2006.

- Social Science and History Association 2006 Conference panel presentation, "Suburban Gateways: Immigration and Incorporation in New U.S. Metropolitan Destinations: Part II: Reemerging Gateways in the Upper Northwest, Southwest and West "Impediments to Integration of Immigrants: A Case Study in Minnesota." In conjunction with Professor Katherine Fennelly, November 3, 2006.

- Presentations and meetings with regional planning organizations and businesses in Lexington, Kentucky, October 31, 2006, for project partner, Bluegrass Tomorrow.

- Panel presentation "Envisioning Justice: Emerging Civil Rights Challenges," at the Lawyers' Committee for Civil Rights Under Law Board and Staff Retreat, Lansdowne, Virginia, October 26, 2006.

- Presentation for the Marquette University Law School Wisconsin Constitution Conference – Is the Wisconsin Constitution Obsolete? Invited by the Wisconsin Alliance of Cities, October 5, 2006.

- Featured speaker for Eden Prairie School District board members, administration, teachers and community members, "School Boundaries, Opportunity and Stability," October 3, 2006.

- Presentation to Minneapolis United Way administration and staff members, "Understanding Racialized Poverty," October 3, 2006.

- Panel presentation for the Regional Planning Partnership Regional Equity Meeting, New Brunswick, New Jersey, September 28, 2006.

- Select participant for the European Union / United States Weak Market Cities Program. Attended and presented at the City Reformers Group Meeting, September 21-22, 2006 at the London School of Economics, England.

- Provided testimony to the New Jersey Legislature regarding tax-base sharing for school funding, September 14, 2006.

- Panel speaker for the Congressional Black Caucus Foundation Annual Legislative Conference CPAR Future Focus Series: "Poverty, Race and Policy: Advancing the Economic Conditions of Working Families. Presentation was recorded and aired by C-SPAN, September 6, 2006.

- Featured speaker for Minnesota Independent School District 196 (Rosemount, Apple Valley, Eagan) Back to School administrative workshop, "School Boundaries, Opportunity and Stability," August 15, 2006.

- Testimony to Minneapolis City Council on Racial and Fiscal Disparities/Effects on Housing and Education, August 11, 2006.

- Presentations and meetings with regional planning organizations and businesses in Lexington, Kentucky, August 8, 2006, for project partner, Bluegrass Tomorrow.

- Presentation "School Boundaries, Opportunity and Stability" to Eden Prairie School District board members, teachers, administration, parents and community members, August 2, 2006.

- Invited guest speaker for the Bush Foundation Board of Directors, July 13, 2006, St. Paul, Minnesota. Presented current IRP research findings related to minority suburbanization, affordable housing, and regional social and racial disparities.

- Featured keynote speaker for the Atlanta Regional Housing Forum, June 21, 2006. Presented IRP research on Atlanta Commuting Patterns and Minority Suburbanization.

- Invited presentation to the McKnight Foundation on Segregation and Regional Policy, June 16, 2006, Minneapolis, Minnesota.

- Washington, DC, co-presented research with UMN Professor Katherine Fennelly for the "Suburban Immigrant Gateways: Immigration and Incorporation in New U.S. Metropolitan Destinations." Brookings Institution, June 15, 2006, Washington, D.C.

- Presentation to the McKnight Foundation on Twin Cities Suburbs Demographics, May 25, 2006, Minneapolis, Minnesota.

- Invited participant for the Summit on New Suburbanism, sponsored by The Planning Center, May 17, 2006, Ontario, California.

- Keynote speaker for "Inequality: Southern California's Major Fault Line" conference in Irvine, California, May 11-12, 2006, sponsored by the Community Outreach Partnership Center.

- May 8, 2006, keynote presentation on school site demographics for the Statewide Desegregation Conference sponsored by the Minnesota Department of Education.

- Panel Participant for the "Restoring Electoral Competition: Research and Remedies for Redistricting" conference sponsored by the Hubert H. Humphrey Institute of Public Affairs, April 25, 2006, Minneapolis, Minnesota.

- Invited participant in the Metropolitan Forum Policy Review Panel on Regional Fiscal Reform, hosted by FOCUS St. Louis on April 23-24, 2006, in St. Louis, Missouri.

- Presentation to UMN Law School Visiting Committee, April 21, 2006 regarding IRP's research project, *The Choice is Ours: Expanding Opportunity for all Twin Cities Children.*

- Keynote speaking presentation, "Balancing the Demographics: Are Schools Truly Representative of our Community" for St. Paul NEAT, sponsored by the Science Museum of Minnesota, April 19, 2006.

- Hosted Robina Workshop on Equality for the UMN Law School, with special guest speakers Bruce Katz from the Brookings Institution and Professor Sheryll Cashin from Georgetown University Law School, April 14, 2006.

- Presentation to UMN community as to the benefits of GIS research in fulfilling the University's public engagement needs, April 5, 2006.

- March 29, 2006, featured speaker for UMN Law School Student Event discussing the ACLU's involvement in racial profiling research and studies.

- Panelist for the Michigan Civil Rights Summit 2006, in Detroit, Michigan on March 27, 2006. Presented findings from IRP's *Minority Suburbanization, Stable Integration and Economic Opportunity in Fifteen Metropolitan Regions.*

- Discussant for the Gamaliel Strategic Partners meeting held March 9, 2006 in Columbus, Ohio.

- Meeting with leadership of Bluegrass Tomorrow in Lexington, Kentucky, to discuss school district boundaries and integration, February 28, 2006.

- Participant in Symposium on First Suburbs, sponsored by the Brookings Institution, February 15, 2006.

**2005**

- Invited participant for "Race and Rebuilding New Orleans" sponsored by the Greater New Orleans Fair Housing Action Center, the African American Forum on Race and Regionalism, the Center for Social Inclusion, the People's Institute, the Poverty & Race Research Action Council, and the Structural Racism Caucus in Baton Rouge, Louisiana, December 5, 2005.

- Participation in the Gamaliel Foundation's National Leadership Assembly, "The Time is Now" in St. Louis, Missouri, December 2, 2005.

- Guest lecture on land use planning and regional development for Adjunct Professor Joanna L. Vossen's law class at the University of St. Thomas, November 21, 2005.

- Keynote presentation for the ISAIAH Bloomington/Richfield Caucus in Minnesota on November 17, 2005. Led facilitated Paul Roget Loeb's book, "The Impossible Will Take a Little While: A Citizen's Guide to Hope in a Time of Fear."

- Guest Lecture for Professor Sherry Enzler's course on Sustainable Land Use Planning and Policy at the University of Minnesota, St. Paul campus, November 17, 2005.

- Presentation at "The People in Our Neighborhood: University Engagement in Cedar-Riverside," meeting at the University of Minnesota, Minneapolis on November 7, 2005.

- Keynote presentation and panelist at the Forum on the Future of New Jersey, sponsored by the New Jersey Leadership Forum on Race & the Economy, in New Brunswick, New Jersey, October 20, 2005.

- Presentation on Twin Cities School District demographics for a school board candidates' meeting sponsored by ISAIAH on October 13, 2005 in Brooklyn Center, Minnesota.

- "Metropatterns: A Regional Agenda for Community and Prosperity in Connecticut," presentation at the Rural Connecticut Partners' Meeting in Hartford, Connecticut, October 4, 2005.

- Presentation for the Pittsburgh Interfaith Impact Network (PIIN) single-day conference, "Building Ministries that Promote Prosperity & Fight Injustice," in Pittsburgh, Pennsylvania, September 29, 2005.

- Keynote presentation at the 2005 Missouri American Planning Association conference, in Kansas City, Missouri, September 21, 2005.

- Presentation at the Aspen Ideas Institute in Aspen, Colorado, July 5-10, 2005, "Work and Wealth: All Economies are Local, the Neighborhood Effect on Family Economics." Other speakers included, Bill and Hillary Clinton, Jane Goodall, Toni Morrison, Arthur Schlesinger Junior, Derek Bok, Stephen Carter, Wesley Clark, William Haseltine, Lawrence Summers, & Her Majesty Queen Noor of Jordan.

- Presentation at the PolicyLink-sponsored conference in Philadelphia on May 23-25, 2005: Advancing Regional Equity: The Second National Summit on Equitable Development, Social Justice, and Smart Growth. Plenary session presentation on "Politics, Power and Land Use Policy."

- Multiple presentations at the Race & Regionalism 2005 conference in Minneapolis, Minnesota, May 6-7, 2005. "Race & The Suburbs: The Forces of Resegregation;" "Politics of Interracial Strategies;" "Regional Governance;" and "Racially Inclusive Regional Reforms: Today's Civil Rights Mandate."

- Presentation "Metropatterns: A Regional Agenda for Community and Prosperity in Connecticut," at the 23rd Annual Peace and Justice Convocation in Hartford, Connecticut, April 30, 2005.

- Presentation at the Health Care Summit sponsored by the Greater Hartford Interfaith Coalition for Equity and Justice in Hartford, Connecticut, April 8, 2005.

- Presentation to One Connecticut meeting in Hartford, Connecticut on March 22, 2005. One Connecticut is a statewide coalition of over 100 human service, labor, interfaith and advocacy organizations that began collaborating in 2000 to fight poverty and build economic security.

**2004**

- Presentation to a forum assembled by the Metropolitan Interfaith Coalition on Affordable Housing (MICAH), St. Paul, Minnesota, December 4, 2004.

- Presentation on the Digital Divide in Minnesota at the Digital Junction conference in Minneapolis, Minnesota, December 1, 2004.

- Presentation to the New Jersey Property Tax Convention Task Force regarding the need for a constitutional convention to review the property tax system, Rutgers University, New Jersey, November 9, 2004.

- Presentation on urban sprawl to youth at the North Star District's First Universalist Convention, October 30, 2004.

- Presentation to the Council on Black Minnesotans, Minneapolis, Minnesota, October 24, 2004.

- "Building Blocks for Inclusive Communities," a conference on stable integration, hosted by the Fund for an Open Society in Cherry Hill, New Jersey, October 21, 2004.

- Featured speaker at public education event in Hartford, Connecticut, October 20, 2004.

- Series of solo interviews and filmed walking tours and class lectures for PBS documentary, "The New Metropolis," Minneapolis, Minneapolis, October 10-14, 2004.

- Presentation on implementing policy reform in the state of Connecticut; Hartford, Connecticut, October 5, 2004.

- Presentation of West Bank neighborhood demographics at the West Bank Forum hosted by IRP, Minneapolis, Minneapolis, September 20, 2004.

- Presentation at the Detroit Branch NAACP Michigan State Conference in Battlecreek, Michigan, August 27, 2004.

- Keynote address to the Citizens Planning Conference, hosted by the North Star Sierra Club, St. Paul, Minneapolis, July 24, 2004.

- Presenter at the Structural Racism Conference hosted by the Council on Foundations in Washington, D.C., July 8, 2004.

- Invited speaker at a series of public events hosted by the New Jersey Regional Equity Summit, June 22-25, 2004.

- Participant in a roundtable discussion on racial justice implications in federal housing policy, hosted by the Urban Institute in Washington, D.C. on June 8, 2004.

- Numerous public appearances in Hartford, Connecticut regarding taxation issues and sprawl, May 24-28, 2004.

- Numerous presentations to regional affairs academics and local elected officials in three cities in France, May 1-11, 2004.

- Presentation to the St. Paul Public School District on diversity in the Twin Cities, St. Paul, Minnesota, April 16, 2004.

- Panel presentation at the "Environmental Threats to Children's Health" conference, April 2, 2004.

- Presentation to the Detroit Branch of the NAACP, Detroit, Michigan, April 3, 2004.

- Presentation to the Metropolitan Council Community Development Committee, March 15, 2004, comparing LCA goals with the findings from the "Next Decade of Housing in Minnesota" report.

- Presentation on land use, fiscal disparities and social separation in the Dayton region at the Regional Issues Forum hosted by the Miami Valley Regional Planning Commission in Dayton, Ohio, March 9, 2004.

- Presentation to the University of St. Thomas Law School on local issues relating to race and poverty, Minneapolis, Minnesota, March 3, 2004.

- Race & Regionalism convening by the Kirwan Institute, Columbus, Ohio, February 6, 2004.

**2003**

- Community of Opportunity Index Project presenter and discussant, Leadership Forum, Chicago, Illinois, December 11, 2003.

- Presentation of oral argument for tax credit appeals court case, Trenton, December 8, 2003, New Jersey.

- Strategic Partners meeting, lecture and planning session for national foundation Gamaliel, Milwaukee, Wisconsin, December 5, 2003.

- Presentation on Michigan Metropatterns, land use and regional development for the Michigan Land Use Funders meeting, December 2, 2003, Lansing, Michigan.

- Invited participant and presenter for Structural Racism meeting, December 1, 2003, Washington, DC.

- Community Philanthropy Team Presentation for the Minneapolis Foundation regarding current IRP research, November 21, 2003, Minneapolis, Minnesota.

- Presentation and roundtable discussant for the Miami Valley Regional Planning Commission, Dayton, Ohio, November 17, 2003.

- Congressional Black Caucus Foundation Academic Advisors meeting key participant, November 14, 2003, Washington, D.C.

- Invited guest lecture, "Metropolitics, Race, Taxes, and Suburbs" at Macalester College, St. Paul, Minnesota, November 6, 2003.

- Guest lecturer for UMN Law School professor Bradley Karkkainen, November 5, 2003.

- Invited participant for the Regional Strategies Workshop, sponsored by the Alliance for Metropolitan Stability, October 24, 2003, Minneapolis, Minnesota.

- Presentation "GIS Tools for Research," at the 19th Annual Conference on Policy Analysis, October 21, 2003, St. Paul, Minnesota.

- Invited speaker to MacArthur Foundation Board of Directors meeting, October 20, 2003, Chicago, Illinois.

- "Leveraging Housing as a Revitalization Tool and a Fiscal Winner," presentation for the 2003 Annual Housing Conference sponsored by Fannie Mae, October 17, 2003, Washington, DC.

- Presentation regarding land use and regional development in Ohio for the Toledo Office of Urban Affairs, Toledo, Ohio, October 8, 2003.

- Participant and presenter for the Connecticut Office of Social Justice, Hartford, Connecticut, October 4, 2003.

- Host and keynote presentation for IRP Racial Profiling Community Forum, September 26, 2003, University of Minnesota Law School.

- Regional press conference for release of IRP Racial Profiling study, September 24, 2003, Minneapolis, Minnesota.

- Presentation of regional development, land use and affordable housing issues relevant to Connecticut, September 18, 2003.

- Strategic Partners meeting for Gamaliel national organization, September 15-16, 2003, Chicago, Illinois.

- Co-presenter on regional inequality and development with Bruce Katz, Senior Fellow Brookings Institution, September 11, 2003, Grand Rapids, Michigan.

- Participant and presenter for the 2003 Colorlines Conference, August 30-31, 2003, Cambridge, Massachusetts.

- Presentation for the Mid-Ohio Regional Planning Commission, August 21, 2003, Columbus, Ohio.

- Woodrow Wilson School Lecture at Princeton University, "American Metropolitics," May 1, 2003, Princeton, New Jersey.

- "Regional Challenges, Regional Solutions," keynote address, Funders' Network for Smart Growth and Livable Communities, April 9, 2003.

- Feature presentation for the Connecticut Catholic Conference, April 1, 2003, "Common Ground, Common Good: Toward Greater Social, Economic, and Environmental Justice in Connecticut."

**2002**

- Presentation to Federal Reserve Bank of Philadelphia, "American Metropolitics," Philadelphia, Pennsylvania, June 13, 2002.

- Presentation to Board of Trustees, The Charles Stewart Mott Foundation, Flint, Michigan, June 6, 2002.

- Presentation to Chicago Metropolitan Planning Council, "American Metropolitics," Chicago, Illinois, May 21, 2002.

- Presentation to the Massachusetts Institute of Technology Center for Real Estate Annual Conference, "Regional Development Trends," Cambridge, Massachusetts, May 10, 2002.

- Presentation to the nation's 25 largest metropolitan planning organizations at The Lincoln Institute for Land Policy, Cambridge Massachusetts, "American Metropolitics," May 9, 2002.

- Public lecture to the Harvard University Joint Center on Housing and the Harvard Civil Rights Project, "American Metropolitics," Cambridge, Massachusetts, May 3, 2002.

- Presentation to California Cities, Counties, and School District Partnership, Sacramento, California, "California Metropatterns," April 20, 2002.

- Urban Affairs annual lecture series presentation to Michigan State University, "Regional Development Patterns in Michigan," East Lansing, Michigan, March 12, 2002.

- Presentation to Wisconsin Alliance of Cities, Milwaukee, Wisconsin, "Wisconsin Metropatterns," February 8, 2002.

**2001**

- Presentation to Yale University, "Connecticut Metropatterns," New Haven, Connecticut, November 8, 2001.

- Presentation to Governor Parris Glendenning's Smart Growth Cabinet, Seaside, Florida, November 29, 2001.

- Presentation to University of Michigan School of Architecture and Urban Planning, Ann Arbor, Michigan, "U.S. Regional Development Patterns," November 19, 2001.

- Presentation to Erie County Board of Commissioners, "Erie Metropatterns," Erie, Pennsylvania, OCTOBER 26, 2001.

- Presentation to Michigan State Catholic Conference, Lansing, Michigan, "Michigan Statewide Growth Patterns," October 17, 2001.

## SELECT MEDIA COVERAGE

- Frequent commentator on National Public Radio on the topics of racial segregation, land use trends, and suburban demographics; frequent guest on Twin Cities Public Television's Almanac and Minnesota Public Radio on racial segregation, land use trends and suburban demographics.

- Orfield's research has been featured in *The New York Times*, *National Public Radio*, *The Guardian*, *The PBS Newshour, The Washington Post*, *The Wall Street Journal*, *USA Today, US News and World Report*, *Business Week*, *The National Journal*, *Crain's Chicago Busine*ss, and dozens of local papers and radio stations throughout the country.

- Jon Bream, *Scholars Dissect Princes Legacy*, MINNEAPOLIS STARTRIBUNE, April 17, 2018

- Myron Orfield and Will Stancil, *50th Anniversary of the Fair Housing Act: Where has Minnesota's Dedication Gone*? MINNEAPOLIS STARTRIBUNE, April 10, 2018.

- Anthony Lonetree and Mary Jo Webster, *A School District that is too Open, Minnetonka Officials Criticized on Two Fronts: Race and Numbers*, MINNEAPOLIS STARTRIBUNE, January 14, 2018

- Myron Orfield and Will Stancil, *New Minneapolis Mayor Jacob Frey Could be a Significant Leader on Housing and Civil Rights,* MINNEAPOLIS STARTRIBUNE, January 10, 2018.

- Emily Badger and John Eligon, *Trump Administration Postpones an Obama Era Fair Housing Rule*, THE NEW YORK TIMES, January 4, 2018.

- Thomas B. Edsall, *White on White Voting*, The New York Times, November 16, 2017.

- Myron Orfield, *Counterpoint: Senators Are Right to Take Time with Stras Appointment*, MINNEAPOLIS STARTRIBUNE August 28, 2017

- Eric Roper, *A Not-so-happy 50th Birthday for the Metropolitan Council*, MINNEAPOLIS STARTRIBUNE, May 25, 2017

- Allison McCann, *When School Choice Means Segregation*, VICE NEWS, April 12, 2017

- Arianna Prothers, *Data and Debate over Diversity in Charters*, EDUCATION WEEK, June 13, 2016.

- Jessica Lussenhop, *The Legacy of Segregation in Muhammad Ali's Hometown*, BBC NEWS, June 9, 2016.

- Tim Nelson, *How Artist Lofts Became White Segregated Housing*, MINNESOTA PUBLIC RADIO, June 8, 2016.

- Fred Melo, *Subsidies for Artists Raising Concern: Loft Rents Lowered on the Public Dime Intensify Segregation*, ST. PAUL PIONEER PRESS, May 28, 2016.

- Mike Mosedale, *Artist Loft's Critics See Housing Inequity*, MINNESOTA LAWYER, May 26, 2016.

- Jessie Van Berkel, *Study Finds Racial Bias in Housing for Artists*, Minneapolis STARTRIBUNE, May 21, 2016.

- Fred Melo, *St. Paul City Set to Examine Concentrations of Affordable Housing as Part of Settlement*, ST. PAUL PIONEER PRESS, May 18, 2016.

- Alana Semuels, *The Artist Loft: Affordable Housing (for White People)*, THE ATLANTIC, May 19, 2016.

- Myron Orfield, *Yes, America is Still Segregated. But there's Hope in an Unlikely Quarter*, THE GUARDIAN, May 19, 2016.

- *California's 58 Counties Are Drawn Up All Wrong*, THE FRESNO BEE, March 24, 2016.

- *Judge Rejects School Integration Plan*, MINNEAPOLIS STARTRIBUNE, March 23, 2016.

- Amanda Kolson Hurley, *The Persistence of America's Easy White Enclaves*, THE ATLANTIC, February 22, 2016.

- Jake Blumgart, *Tickets Out of Poverty*, SLATE, February 9, 2016.

- Jake Blumgart, *The Next Flint*, SLATE, January 28, 2016.

- Rachel Cohen, *School Desegregation Lawsuit Threatens Charters*, AMERICAN PROSPECT, January 26, 2016.

- Henry Gass, *A Tale of Two Towns Reveals Tipping Point for America's Suburbs*, CHRISTIAN SCIENCE MONITOR, January 23, 2016.

- Fred Melo, *Twin Cities Gentrification Not Really Hurting the Poor, U Says Low Income Residents Not Being Displaced*, ST. PAUL PIONEER PRESS, January19, 2016.

- Thomas B. Edsal, Who*se Neighborhood Is It?* THE NEW YORK TIMES, September 9, 2015.

- Thomas B. Edsal, *Where Should A Poor Family Live*? THE NEW YORK TIMES, August 5, 2015.

- Gayle Reeves, *The Fight For Fair Housing*, THE TEXAS OBSERVER, August 4, 2015.

- Allan Greenblatt, *Will the New Fair Housing Rules Really Reduce Racial Segregation?* GOVERNING, July 16, 2015

- Editorial Board, *Affordable Housing, Racial Isolation*, THE NEW YORK TIMES, June 29, 2015.

- Emily Badger, *The Supreme Court Upholds a Key Tool Fighting Discrimination in the Housing Market*, WASHINGTON POST, June 25, 2015.

- Carrie Johnson, *Supreme Court Sides With Civil Rights Advocates in Fair Housing Cases*, ALL THINGS CONSIDERED, NATIONAL PUBLIC RADIO, June 25, 2015.

- Alana Semuels, *The City that Believed in Desegregation*, ATLANTIC, March 27, 2015.

- Judy Woodruff, *The American Dream is Alive in the Twin Cities, But Not for Everyone*, *PBS Newshour*, March 18, 2015.

- Derek Thompson, *The Miracle of Minneapolis*, THE ATLANTIC, March 2015.

- Emily Badger*, The Best Weapon for Desegregating Housing*, THE WASHINGTON POST, January 21, 2015.

- Nikole Hannah-Jones, *Supreme Court's Last Race Case: Housing Discrimination*, PROPUBLICA January 21, 2015.

- Myron Orfield, *Romney Was Right About Disparate Impact*, SCOTUS BLOG, January 8, 2015.

- Nicolas Schmidle*, Did the Chicago Police Coerce Witnesses into Pinpointing the Wrong Man for Murder?* THE NEW YORKER, August 4, 2104.

- Steve Berg, *Housing Programs Concentrate Poverty in a Few Metro Locations*, Report Finds, MINNPOST February 7, 2014.

- Annie Baxter, *More Affordable Housing Built in Cities, Despite Suburban Demand*, MINNESOTA PUBLIC RADIO, February 7, 2014.

- Fred Melo, *Twin Cities Housing Programs Contribute to Segregation,* ST. PAUL PIONEER PRESS, February 2, 2014.

- Cynthia Boyd, *Minnesota's New White Flight Open Enrollment Program*, MINNPOST, January 11, 2013.

- Tim Post, *Study: Open Enrollment Increasing Racial Segregation in Twin Cities schools*, MINNESOTA PUBLIC RADIO, January 11, 2013.

- Two national PBS documentaries on the law and urban development: 1) *The New Metropolis;* and 2) *Suburban America: Problems and Promise* (2011).

- *Loan program repopulating areas hit by foreclosures, but slowly*, MINNESOTA PUBLIC RADIO, January 16, 2009.

- *Housing Discrimination Leading to Foreclosures?* NATIONAL PUBLIC RADIO, December 9, 2008.

- *Steele Talkin'* (Interviewed by Jearlyn Steele), WCCO RADIO, October 26, 2008.

- *Close the Gap: The Case for Change*, TWIN CITIES PUBLIC TELEVISION, April/May 2008.

- *Lessons from Little Rock: A National Report Card*, PBS (nationally aired documentary, produced by TV One), February 10, 2008.

- *Why Dems rule the city – Republicans the outer ring*, MINNESOTA PUBLIC RADIO, February 20, 2008.

- *The Institute for Justice aims to make a mark on Minnesota*, MINNESOTA PUBLIC RADIO, February 19, 2007.

- *Minority growth in suburbs jumps*, STARTRIBUNE, March 31, 2009.

- *Rent or food? Housing costs burden one in three metro families*, TWIN CITIES DAILY PLANET, March 30, 2009.

- *Minneapolis to table plan to leave integration district*, STARTRIBUNE, March 10, 2009.

- *Standing room only crowd tells Mpls. school officials: Keep voluntary integration program*, STARTRIBUNE, March 6, 2009.

- *Many minorities cut out of prime loan market*, MINNESOTA PUBLIC RADIO, February 12, 2009.

- *Study Finds Bias in Twin Cities Mortgages*, STARTRIBUNE, February 11, 2009.

- *For Minnesota's minorities, the good life isn't as good*, PIONEER PRESS, January 31, 2009.

- *Charter schools fall short*, MINNEAPOLIS STARTRIBUNE, November 26, 2008.

- *Design for learning; Eden Prairie school officials have unveiled plans to improve achievement at its most diverse elementary school*, MINNEAPOLIS STARTRIBUNE, June 18, 2008.

- *Minneapolis: Is the Choice worth funds?* MINNEAPOLIS STARTRIBUNE, April 7, 2008.

- New Jersey School Funding Proposal legislative testimony, STAR LEDGER, December 28, 2007.

- *Segregation is back, and our future is on the line*, MINNEAPOLIS STARTRIBUNE, December 7, 2007.

- *Subsidized homes in inner city remain a hot topic of debate*, MINNEAPOLIS STARTRIBUNE, September 21, 2007.

- *A course in marketing,* MINNEAPOLIS STARTRIBUNE, September 17, 2007.

- *State's schools rank second in racial change,* MINNEAPOLIS STARTRIBUNE, August 31, 2007.

- *Minnesota ahead of the curve on integration,* MINNEAPOLIS STARTRIBUNE, July 9, 2007.

- *Northgate Forest residents petition to join Klein,* HOUSTON CHRONICLE, April 4, 2007.

- *York Counts to hold public forums this month,* CENTRAL PENN BUSINESS JOURNAL, January 2, 2007.

- *'A bold goal: Hudson's mayor, other leaders ratchet up regionalism with an economic development plan that includes tax sharing,* THE PLAIN DEALER, January 2, 2007.

- *'First suburbs' are finding strength in numbers,* THE STAR-LEDGER, September 18, 2006.

- *Older suburbs unite to face shared issues,* HOME NEWS TRIBUNE, September 18, 2006.

- *Older suburbs getting left behind*, HERALD NEWS, September 14, 2006.
- *Regional property taxation catches lawmaker interest; others wary,* NEWSDAY.COM, September 15, 2006.
- *Metro jobs, workers at a disconnect*, THE ATLANTA JOURNAL CONSTITUTION, June 23, 2006.
- *Study shows correlation between school segregation and poverty enrollment*, THE MINNESOTA DAILY, May 24, 2006.
- *Katrina's tide carries many to hopeful shores*, THE NEW YORK TIMES, April 23, 2006.
- *Money is city's biggest worry*, THE TIMES PICAYUNE, April 3, 2006.
- *Mired in segregation*, DETROIT FREE PRESS, March 29, 2006.
- *As property values rise, homeowners feel pinch*, THE NEW YORK TIMES, February 19, 2006.
- *An idea blows in from the north*, OMAHA WORLD-HERALD, November 11, 2005.
- *Separate and unequal*, THE NEW YORK TIMES, September 25, 2005.
- *As test scores jump, Raleigh credits integration by income*, THE NEW YORK TIMES, September 25, 2005.
- *States try to ease property-tax rise*, THE CHRISTIAN SCIENCE MONITOR, June 7, 2005.
- *Planners here meet on sharing tax base*, PITTSBURGH POST-GAZETTE, January 12, 2005.
- *Property taxes rising nationwide*, THE CHRISTIAN SCIENCE MONITOR, December 3, 2004.
- *A blueprint for tax sharing: In Minnesota, dividing the spoils helps cities and suburbs*, PITTSBURGH POST-GAZETTE, February 15, 2004.
- *In Twin Cities, tax-sharing gives everyone slice of development pie*, PITTSBURGH POST-GAZETTE, February 13, 2004.
- *Uncontrolled development seen harming state*, NEW HAVEN REGISTER, January 13, 2004.
- *Metro Atlanta's hidden problem: Lax septic tank oversight brews health hazards*, ATLANTA JOURNAL-CONSTITUTION, November 28, 2003.
- *Crisis on main street*, PHILADELPHIA INQUIRER, November 23, 2003.
- *Sprawl report places suburbs in 'at-risk' class*, TOLEDO BLADE, October 7, 2003.
- *Money made here flows to Sun Belt*, THE PLAIN DEALER, September 21, 2003.
- *Great haven for families, but don't bring children,* THE NEW YORK TIMES, August 13, 2003.
- *Will's growing power, pains*, CRAIN'S CHICAGO BUSINESS, July 7, 2003.
- *Under attack on smart growth, Granholm keeps the faith*, GREAT LAKES BULLETIN NEWS SERVICE, May 8, 2003.
- *Use of TIF for area projects questioned in Brookings study*, ST. LOUIS BUSINESS JOURNAL, May 2, 2003.
- *Sprawl hurting Saginaw*, THE SAGINAW NEWS, April 29, 2003.
- *Downside of urban sprawl encourages us to change,* THE FLINT JOURNAL, April 29, 2003.
- *Suburbs pay price for lack of planning*, OAKLAND PRESS, April 29, 2003.
- *Farmland dwindles as housing sprawls*, THE KALAMAZOO GAZETTE, April 28, 2003.
- *Report warns 'unbalanced growth' is hurting region*, GRAND RAPIDS PRESS, April 27, 2003.

- *Rx for Suburbia*, UTNE, March/April 2003.

- *Regionalism versus reality*, ISTHMUS MAGAZINE, February 28, 2003.

- *Ohio could learn from states where metropolitan areas cooperate*, THE COLUMBUS DISPATCH, February 11, 2003.

- *Space Crunch: There are only so many acres between the Atlantic and the Pacific. What happens when all the good land is gone?* BUILDER MAGAZINE, January 1, 2003.

- *Suburbs to city: Drop the attitude*, THE NEW YORK TIMES, November 24, 2002.

- *Poverty in a land of plenty: Can Hartford ever recover?* THE NEW YORK TIMES, August 26, 2002.

- *GOP, democrats locked in race toward decline,* WASHINGTON POST, August 4, 2002.

- *To sprawl or not to sprawl*, MINNESOTA PUBLIC RADIO, July 22, 2002.

- *District shared, but not needs*, LOS ANGELES TIMES, July 8, 2003.

- *Suburbs' character changes with age, urban researcher says*, THE OREGONIAN, June 20, 2002.

- *Larry Eichel: Regional strategies a hard sell*, PHILADELPHIA INQUIRER, June 14, 2002.

- *Philadelphia, in three easy pieces*, PHILADELPHIA DAILY NEWS, June 11, 2002.

- *Daniel Weintraub: Suburbs aren't all tile roofs and middle class*, SACRAMENTO BEE, June 11, 2003.

- *Rules mingle income groups*, THE OREGONIAN, May 15, 2002.

- *The swinging suburbs*, NATIONAL PUBLIC RADIO BOSTON (audio), May 7, 2002.

- David Broder, *Suburbs in a New Light*, WASHINGTON POST, May 1, 2002.

- *City, suburbs could gain by sharing growth's benefits*, MILWAUKEE JOURNAL-SENTINEL, February 17, 2002.

- *Where sharing the tax base works well*, SACRAMENTO BEE, January 17, 2002.

- *Detroit archdiocese tackles sprawl*, GREAT LAKES BULLETIN NEWS SERVICE, October 11, 2001.

- *How to heal our cities*, THE SIERRA CLUB, June 2000.

- *Soaring housing costs are culprit in suburban poverty*, USA TODAY, April 28, 1999.

- *The trouble with sprawl*, MINNEAPOLIS STARTRIBUNE, January 17, 1999.

- *Salvaging suburbia: How to stop communities from growing farther and farther apart*, LOS ANGELES TIMES, November 15, 1998.

- *Prosperity gap predicted for South Puget Sound*, THE NEWS TRIBUNE, September 19, 1998.

- *The quest for common ground*, GOVERNING MAGAZINE, June 1998.

- *Inner city life beset older S.F. suburbs*, SAN FRANCISCO EXAMINER, May 25, 1998.

- *Planners say curb metro sprawl or watch investments dwindle*, ATLANTA JOURNAL-CONSTITUTION, May 13, 1998.

- *Can cities escape political isolation?* THE AMERICAN PROSPECT, January, 1998.

- *Atlanta Metropolitics*, ATLANTA JOURNAL-CONSTITUTION, 1998.

- *Older suburbs are facing survival squeeze*, USA TODAY, December 2, 1997.

- *The apostle of St. Paul*, THE PHILADELPHIA INQUIRER, July 9, 1997.

- *Orfield defends studies that support regional legislation*, MINNEAPOLIS STARTRIBUNE, September 28, 1996.

- Myron Orfield, *The news, please: TV plays up crime, pays little heed to policy issues*, MINNEAPOLIS STARTRIBUNE, June 16, 1996, Op-Ed.

- *A new city-suburbs hookup*, US NEWS & WORLD REPORT, July 18, 1994.

## OTHER AWARDS

- Dr. Matthew Stark Award for Civil Rights and Civil Liberties (2009).

- Career Achievement Award, COLLEGE OF ARCHITECTURE, UNIVERSITY OF MINNESOTA (2002).

- Legislative Service Award, MINNEAPOLIS DOWNTOWN COUNCIL (2002).

- Lifetime Achievement Award, THE LEAGUE OF CONSERVATION VOTERS (1998).

- Legislator of the Year, MINNESOTA STUDENT ASSOCIATION (1996).

- Recognized by MINNEAPOLIS ST. PAUL BUSINESS JOURNAL as one of the "40 local business leaders under 40" (1996).

- Career Achievement Award, AMERICAN INSTITUTE OF ARCHITECTS (1994).

- Freshman Legislator of the year, POLITICS IN MINNESOTA (1991).

- Freshman Environmental Legislator of the Year, CLEAN WATER ACTION (1991).

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3    -------------------------------x

     JANELL WINFIELD, TRACEY STEWART

4    and SHAUNA NOEL,

5                        Plaintiffs,

6              -against-              Civil Action No.:

                                     15-CV-5236 (LTS)(KHP)

7    CITY OF NEW YORK,

8                        Defendant.

     -------------------------------x

9

10

                        April 10, 2018

11                      9:20 a.m.

12

13

14         VIDEOTAPED DEPOSITION of VICKI BEEN, held

15     at the law offices of the Anti-Discrimination

16     Center, located at 1745 Broadway, New York, New

17     York 10019, before Anthony Giarro, a Registered

18     Professional Reporter and a Notary Public of the

19     State of New York.

20

21

22

23

24

25

1                    VICKI BEEN

2      at you and say, Well, what do you mean by

3      that?

4                    But if you ask people, would

5      you like a more economically, racially

6      ethnically diverse community?  Then I

7      think there is support for that.  I think

8      there is a lot of support for that.

9          Q        So getting community support

10     for that is not difficult?

11         A        No.  I don't think it's -- I

12     mean, does everybody support it?  No.

13     But is it difficult?  No.  I don't think

14     so.

15         Q        Did you come to understand

16     during your tenure as HPD commissioner

17     that there are parts of the city where

18     opposition to racial or ethnic

19     integration is particularly high?

20                    MS. SADOK:  Objection.

21         A        I think that opposition to

22     racial, ethnic, religious integration in

23     some parts of Brooklyn that are heavily

24     occupied by the Jewish community is

25     sometimes difficult.

1      VICKI BEEN -- CONFIDENTIAL

2      Q      So the topmost e-mail on the

3   first page, that is to say the latest

4   e-mail in the chain is dated August 12th,

5   2015 from you.  And you wrote that you

6   met with HUD today.

7      A      Mm-hmm.

8      Q      Who did you meet with?

9      A      Brian Green and -- I'm

10  sorry.  I can't remember her name.

11  There's a woman.  But I can't remember

12  her name.  I can't remember her name.

13  I'm sorry.

14     Q      Liz Voigt wasn't still at

15  HUD, was she?

16     A      No.  It wasn't Liz Voigt.

17     Q      It wasn't Holly Leicht?

18     A      No.

19     Q      You report that they were

20  polite and made some suggestions about

21  how we should think about the issues.

22             Do you see that?

23     A      Mm-hmm.

24     Q      What suggestions did they

25  make?

1          VICKI BEEN -- CONFIDENTIAL

2                    MS. SADOK:  Objection.  I

3          direct the witness not to answer as

4          that was a confidentiality agreement

5          between HUD and the city regarding

6          the investigation.

7                    MR. GURIAN:  There's no

8          basis for this objection.  This is

9          something that is being talked about

10         with a third-party.

11                   MS. SADOK:  To the extent

12         these specifics are not disclosed,

13         you can't go beyond and expect her to

14         disclose any more specifics.  So if

15         she's disclosed certain information

16         to a third-party here, that's one

17         thing.

18                   But to the extent you're

19         asking her to go beyond what she

20         disclosed in this e-mail -- and I

21         haven't looked at it myself to know

22         what she's disclosed, if anything,

23         whether or not they had

24         discussions -- that would be

25         confidential.

1                    VICKI BEEN -- CONFIDENTIAL

2          Q        Ms. Been, you learned as of

3     that meeting that HUD was trying to stay

4     out of the Community Preference issue;

5     yes?

6          A        Out of the litigation.

7          Q        I don't think that's what

8     this says.  You say that they're trying

9     to stay out of the Community Preference

10    issue, given the litigation against us.

11    This is not staying out of Community

12    Preference in general, this is staying

13    out of Community Preference as it applies

14    to New York City.

15                   MS. SADOK:  Objection.

16         A        As it applies to New York

17    City, yeah.  They were in the issue.

18    That's why I was talking with Sophie.

19    They were very involved in the issue as

20    to San Francisco, right.

21         Q        Right.  I understand the San

22    Francisco part.

23                   But what I was

24    understanding -- so correct me if I got

25    it wrong from this e-mail -- was that you

David Feldman Worldwide
800-642-1099          A Veritext Company          www.veritext.com

1           VICKI BEEN -- CONFIDENTIAL

2    were able to walk away from that meeting

3    with Brian Green and someone else being

4    able to say that HUD effectively wants to

5    be hands-off on the New York City

6    Community Preference issue.

7                MS. SADOK:  Objection.

8        A        No.  As to the litigation.

9    So there was a compliance review pending

10   against us; right?  And there was the

11   litigation pending against us.  And what

12   I'm trying to say here, I'm not supposed

13   to talk about what I -- other than what I

14   said here.

15               MS. SADOK:  Exactly.

16       A        What I'm trying to say here

17   is they're not going to get involved in

18   the litigation.  And I don't know what

19   they're going to eventually do on their

20   compliance review.  I don't know.  I

21   assumed they were going to stay out of it

22   while the litigation was ongoing.

23       Q        You assumed they were going

24   to stay out of it while the litigation

25   was ongoing, but you thought that some

1        VICKI BEEN

2    day, they might return to a compliance

3    review that had begun when?  In 2013?

4             MS. SADOK:  Objection.

5        A         I don't remember when it

6    began.  When I became commissioner, it

7    started to -- HUD was in our offices all

8    summer long.  So it became very front and

9    center after I became commissioner.  I

10   don't think much had gone on before then.

11       Q         But in August 2015, you

12   thought that if there was going to be

13   more compliance review, it would be

14   something that might happen, and if it

15   happened, it would be after the

16   litigation was concluded?

17            MS. SADOK:  Objection.

18       A         On the Community Preference,

19   yes.  There were other parts of the

20   compliance review which had to do with

21   the zoning issues, et cetera.  So we

22   were -- there was a lack of clarity, to

23   put it mildly, as to what was going on

24   with the compliance review.

25       Q         You mean a lack of clarity

1                    VICKI BEEN
2      on HUD's part as to what it was looking
3      for or some other lack of clarity?
4                    MS. SADOK:  Objection.
5          A        We didn't understand.  Are
6      they going forward, is it on hold?  We
7      didn't understand what the status of the
8      compliance review was.
9          Q        Let me just ask you in terms
10     of the declaration that you submitted to
11     the court this past October in connection
12     with deliberative process privilege and
13     so forth.
14                   You didn't think that it was
15     important to give the court the
16     information that HUD is basically trying
17     to stay out of the Community Preference
18     issue?
19                   MS. SADOK:  Objection.  To
20          the extent that that was drafted in
21          consultation with attorneys, I would
22          argue that it's work product and
23          attorney-client privilege.
24                   MR. GURIAN:  I'm not asking
25          anything about the drafting.  I'm

```
 1                    VICKI BEEN
 2         asking whether the witness in terms
 3         of her own --
 4         Q       Ms. Been, your own thought
 5   process of the time.  Now I am tripped up
 6   in a negative, whether you thought it was
 7   important or not important to inform the
 8   court of this fact.
 9                MS. SADOK:  I would object
10         and direct the witness not to answer.
11         That goes directly toward a decision
12         of what may have been or not included
13         from a litigation strategy.  I object
14         to the insinuation that she failed to
15         include a pertinent fact as what you
16         are implying and also object to the
17         fact that I believe it calls for
18         privileged communications and
19         information.
20                MR. GURIAN:  Okay.  We'll
21         mark it for a ruling and move on.
22         Q       The next one I want to show
23   you -- I have to find my copy of it.
24                MS. SADOK:  It is about 5
25         after 1.  So I would just like to see
```

1          VICKI BEEN

2     when you were planning on taking a

3     lunch break.

4               MR. GURIAN:  It would be

5     helpful if we could press on for five

6     minutes or something like that.

7               MS. SADOK:  Ms. Been, is

8     that okay with you?

9      A       That's fine.

10     Q       What are you looking at?

11     A       I'm just reading --

12   remembering about the DDA issue.  I was

13   just curious.

14               (The above-referred-to

15     document was marked as Plaintiffs'

16     Exhibit 108 for identification, as of

17     this date.)

18     Q       I'm going to hand you what's

19   been marked as Plaintiffs' Exhibit 108.

20   The first Bates Stamp number at the

21   bottom of the first page is 20602.

22               MS. SADOK:  This is also a

23     confidential document.

24     Q       It's another e-mail chain

25   that you're on.  You'll see that the

1                    VICKI BEEN -- CONFIDENTIAL
2      e-mail chain begins with the news that
3      HUD rejected San Francisco's plan to
4      provide a neighborhood preference.
5           A      Okay.
6           Q      Do you recognize the e-mail
7      chain?
8           A      Having seen it, my memory is
9      refreshed.
10          Q      Again, this picks you up
11     late in the chain which is sort of
12     towards the front of the document.
13          A      Right.
14          Q      And on 20603, Ms. Sorrells,
15     director of legislative and public
16     affairs at the Housing Opportunities
17     Commission in Kensington, Maryland, asks,
18     "Would this group be interested in
19     penning a letter to HUD/Fair Housing on
20     this issue?  The problem is that Fair
21     Housing -- I think she means HUD Fair
22     Housing -- is using an outmoded
23     framework."  Do you see that at the top
24     of 20603?
25          A      Yes.

1              VICKI BEEN -- CONFIDENTIAL
2         Q         The first question is, what
3    is this group?
4         A         I'm a little confused.  I'm
5    confused.  The top group, the e-mail from
6    Claudia to me -- okay.  Let me just try
7    to work it through.  The top group in the
8    e-mail, August 17th, 2016, is --
9         Q         Under two of those.  So you
10   mean 8:34 p.m.?
11        A         Yes, 8:34 p.m., sorry, is,
12   to the best of my ability -- no.  That's
13   wrong.  Okay.  I think I know what this
14   is.  There was a group put together by
15   LISC that was a group of housers that
16   came together like once a quarter to
17   discuss common problems.  I forget what
18   it's called.  I forget what it was
19   called.
20        Q         And which group is that?
21   You know what, forget about it.
22        A         Thank you because I'm really
23   confused.
24        Q         Forget about it.
25                  Substantively, though, I

1          VICKI BEEN -- CONFIDENTIAL

2    want to cue you back to the top of 20603;

3    okay?

4          A     Yup.

5          Q     Where there's the proposal

6    to pen the letter.  The problem is that

7    Fair Housing is using an outmoded

8    framework.  Your response was --

9          A     "I'm game."

10         Q     But to give a caveat?

11         A     Right, "Given that I'm a

12   defendant in a lawsuit challenging our

13   Community Preference, you may not want

14   me."

15         Q     Except for that fact, you

16   were game to participate in penning a

17   letter?

18         A     Well, depending on what it

19   said.  But, yes, I was game to try it.

20         Q     Did you agree that HUD's

21   Fair Housing framework was outmoded?

22         A     I don't know what she means

23   by that.  I don't know that person.  I

24   don't know what she means by that.

25         Q     In terms of the way you used

1            VICKI BEEN -- CONFIDENTIAL
2     the word "outmoded," do you or did you
3     believe that HUD's Fair Housing framework
4     was outmoded?
5               MS. SADOK:  Objection.
6         A      I'm not responding to the
7     claim that it was outmoded.  I thought
8     that we needed to work with HUD to figure
9     out how to deal with gentrification and
10    displacement.
11        Q      I understand that.  And now
12    you can leave aside the exhibit because
13    I'm not going to be asking you about the
14    exhibit.
15               Did you believe at any point
16    when you were commissioner that HUD's
17    Fair Housing framework was outmoded as
18    you used the term "outmoded"?
19               MS. SADOK:  Objection.
20        A      I'm saying I didn't use that
21    term.  That's not me.  Me as I would
22    define the term?
23        Q      Yes.
24        A      I'm sorry.  Well, I
25    certainly thought their framework for,

```
1              VICKI BEEN
2   for example, the analysis of impediments
3   was outmoded.  And this is right as
4   they -- isn't this right as they're
5   adopting the AFFH rule and replacing the
6   AIs?  I'd have to put it back in context.
7   But I certainly thought that some of
8   their stuff on AIs was really outmoded,
9   yes.
10       Q       Anything else outmoded on
11  the Fair Housing end of things?
12               MS. SADOK:  Objection.
13       A       Not that I can recall.
14       Q       I'm sorry.  I was
15  distracted.  I didn't hear your answer.
16               MS. SADOK:  Can you repeat
17      the answer, please?
18               (The requested portion was
19      read back by the court reporter.)
20       Q       This is the last thing to
21  wrap up on.  I'm showing you what's
22  previously been marked in a different
23  deposition, marked at Matt Murphy's
24  deposition, Plaintiffs' 95, a sheet
25  that's headed Fair Housing Policy at HPD.
```

1                    VICKI BEEN

2    would have similar demographics is what

3    you're saying?

4                    MS. SADOK:  Objection.

5        A       No.  The radius idea was

6    rejected primarily because it's a

7    nightmare to administer.  People don't

8    understand it, people can't rely on it,

9    you know, et cetera.  So it doesn't help

10   with the fear of displacement.  If you

11   can't figure out, are you going to be in

12   the circle or not; right?  So that was

13   rejected for those reasons.

14                    I don't recall the

15   specifics.  But I think that when we

16   combined different community districts,

17   we did not find that you were seen much

18   racial -- that you were seeing sufficient

19   racial difference to make it worth the

20   effort.

21       Q        Did you explore the

22   alternative of selecting a district or

23   districts in addition to the district in

24   which the housing was located, such that

25   there would be a significant change in

1                    VICKI BEEN
2     the overall racial balance, even if that
3     meant going to noncontiguous community
4     districts?
5                MS. SADOK:  Objection.
6         A        Yes.  We did consider
7     noncontiguous community districts.  I
8     don't recall the details.  But I do
9     recall we considered noncontiguous.
10        Q        Just in the way New York is
11    organized, surely sometimes you can come
12    up with a community district
13    compensation -- you can come up with a
14    set of community districts where the
15    combined demographics are very different
16    from the demographics of the community
17    district in which the project is located;
18    isn't that right?
19               MS. SADOK:  Objection.
20        A        Yes.
21        Q        So why was that approach
22    rejected?
23               MS. SADOK:  Objection.  I
24        don't know that it's on the record of
25        whether or not that was considered or

1              VICKI BEEN

2      rejected.

3      A        It was considered, it was

4  rejected.  To the best of my

5  recollection, it was rejected primarily

6  because in order to reduce the political

7  salience of displacement, try to assuage

8  people's concerns about displacement,

9  they need to be able to see what the

10 preference is going to be.  So if we were

11 constructing it for each project, that

12 wouldn't satisfy those objectives.

13     Q        I want to ask you something

14 about that.  But first, I want to find

15 out because you said primarily.

16              What were the other reasons,

17 if any?

18     A        I don't recall all the

19 different reasons.  I recall the main

20 reason.  We had many discussions about

21 many different options.  And I don't

22 recall every single reason.

23     Q        I'm going to ask you about

24 this particular option.  And if the

25 answer is different for the different

1          VICKI BEEN

2     Q     Why wouldn't it be possible

3 since projects are announced on a

4 case-by-case basis to make a decision,

5 okay, this development is going to be in

6 a highly African American but much less

7 Latino and white community district to

8 find those demographically compensatory

9 districts; you with me so far?

10    A     I think so.

11    Q     And then be able to present

12 it to the public in the very same way

13 that you do now.  There's going to be --

14 you can feel better about displacement,

15 this project is going to help people in

16 these three community districts who may

17 feel at risk of displacement.

18          MS. SADOK:  Objection.

19    A     I mean, one of the criteria

20 that we use that I think is critically

21 important is that any system be both

22 objective and predictable and perceived

23 as objective and predictable.  And

24 anytime we start --

25    Q     Tinkering?

1      VICKI BEEN
2        A        -- jerrymandering or
3    tinkering or that kind of thing, people
4    think that's just a political decision,
5    they're protecting this person, they're
6    protecting -- you know, they're
7    jerrymandering; right?  And that
8    concerned us.
9        Q        But isn't a principal basis
10   of the policy a political judgment as to
11   how to get support?  Doesn't that leave
12   hundreds of thousands of people who
13   applied out of community district with
14   the impression they're being left behind
15   because the politics of New York City
16   demand that they be left behind?
17               MS. SADOK:  Objection.
18       A        I don't know what's in the
19   minds of other people.  I have not heard
20   that expressed.
21       Q        We had this discussion last
22   time.  You were just a moment ago when
23   you were justifying the rejection of an
24   alternative relying on what you believed
25   people would perceive.

1          VICKI BEEN

2               So clearly, you may not know

3     what's in the mind of others, but you try

4     to figure out what the perception of

5     others is, don't you?

6          A        Mm-hmm.

7          Q        So what about the perception

8     of New Yorkers -- whether or not it's

9     been expressed to you or not -- that

10    people are being disadvantaged by a

11    political judgment of who gets

12    preference?

13               MS. SADOK:  Objection.

14         A        I don't think that that's

15    the way people think about the Community

16    Preference.

17               MS. SADOK:  Can we take a

18          quick one last break?  I know we're

19          getting close to the end.

20               MR. GURIAN:  Okay.

21               THE VIDEOGRAPHER:  The time

22          is 1653.  We are off the record.

23               (A short recess was taken.)

24               THE VIDEOGRAPHER:  The time

25          is 1658.  We are on the record.

1

2    STATE OF _New York_        )

3                              )  :ss

4    COUNTY OF _New York_      )

5

6

7         I, VICKI BEEN, the witness

8    herein, having read the foregoing

9    testimony of the pages of this deposition,

10   do hereby certify it to be a true and

11   correct transcript, subject to the

12   corrections, if any, shown on the attached

13   page.

14

15   _____

16            VICKI BEEN

17

18

19

20   Sworn and subscribed to before me,

21   this _25th_ day of _May_, 2018.

22

23   _____

24         Notary Public

25

KRISTIN E SILBERMAN
NOTARY PUBLIC STATE OF NEW YORK
NEW YORK COUNTY
LIC. #01SI6197116
COMM. EXP. 2/24/22

1

2             C E R T I F I C A T I O N

3

4

5          I, ANTHONY GIARRO, a Shorthand Reporter

6    and a Notary Public, do hereby certify that the

7    foregoing witness, VICKI BEEN, was duly sworn on

8    the date indicated, and that the foregoing, to

9    the best of my ability, is a true and accurate

10   transcription of my stenographic notes.

11          I further certify that I am not employed

12   by nor related to any party to this action.

13

14                          

15

16              ANTHONY GIARRO

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------x
JANELL WINFIELD, TRACEY STEWART
and SHAUNA NOEL,

                    Plaintiffs,

        -against-                    Civil Action No.:
                                     15-CV-5236 (LTS)(KHP)
CITY OF NEW YORK,

                    Defendant.
--------------------------------x


                    VIDEOTAPED

            DEPOSITION OF ALICIA GLEN

                New York, New York

                November 3, 2017

                    9:26 a.m.


Reported by:
JUDITH CASTORE, CLR
Job No. 52429

GLEN

1

2     Q    This is one where you would

3    be saying that that was a very common

4    experience that you had of --

5     A    Of them being ill-informed?

6     Q    Yes.

7     A    Ill or misinformed?  Yes.

8          MS. SADOK:  Objection.

9          MR. GURIAN:  I think we're --

10         I think we're up to 55.

11         (Document headed, CUFFH, was

12         marked Plaintiffs' Exhibit 55, for

13         identification, as of this date.)

14    Q    This is a --

15         MS. SADOK:  Could I please

16         have a copy?

17         MR. GURIAN:  Oh, I apologize.

18         MS. SADOK:  Thank you.

19    Q    This is a just-this-week

20   press release from CUFFH.

21         You are familiar with that

22   organization?  Calling itself Churches

23   United for Fair Housing?

24    A    I'm not sure.  Are these the

25   same people who think they're also

1                           GLEN

2      called -- there is some other group I

3      met with.  I'm not sure which group

4      this is.  I met with some other group

5      of ministers two weeks ago, but I don't

6      think this is what they were calling

7      themselves.

8           Q    Yeah.  Well --

9           A    They seem to be renaming

10     themselves a lot.  I'm not clear which

11     group is which group anymore, but I'm

12     not familiar with this particular

13     group.

14          Q    Okay.  This one has

15     repeatedly characterized the proposal

16     at that Brooklyn Pfizer site as

17     discriminatory, and you see the first

18     line of the press release:  Today's

19     vote shows that the lives of black and

20     Latino families are not important to

21     the City of New York.

22               Are you familiar with that

23     kind of sentiment being expressed by

24     others in the context of the

25     controversy over the Pfizer site,

1                   GLEN

2    Brooklyn Pfizer site?

3              MS. SADOK:  Objection.

4        A    We just discussed this a few

5    minutes ago.  This is a -- this one has

6    gotten a lot, a lot, a lot of press

7    around this issue between the two

8    councilmen for this application, which

9    they ultimately have to vote on.  They

10   did vote.

11       Q    Yeah.  I'm sorry.  That

12   really was just -- it didn't respond to

13   my question at all.

14       A    I am aware of it.  I'm

15   familiar --

16       Q    Are you familiar with this

17   kind --

18       A    Yes.

19       Q    -- with this sentiment

20   that -- I'm not saying -- suggesting

21   that it's true, that the vote --

22       A    Yes, I am familiar with this

23   sentiment.

24       Q    Okay.  And where, other than

25   in relationship to this particular

1                        GLEN

2    site, are you familiar with it?

3        A    Your question was am I

4    familiar with this sentiment with

5    respect to the Pfizer site --

6        Q    Yeah.

7        A    -- and I answered the

8    question, which is, yes, I am familiar

9    with this site and this issue being

10   quite prominent in the discussion

11   around the approval process.

12       Q    And so my follow-up question

13   is are you familiar with similar

14   sentiments that have existed in

15   connection with opposition to other

16   projects or actions relating to

17   affordable housing?

18            MS. SADOK:  Objection.

19       A    I cannot think of another

20   approval of a project where this kind

21   of sentiment has been front and center.

22       Q    Other race-based sentiments

23   perhaps not front and center but

24   present in other projects?

25            MS. SADOK:  Objection.

1                          GLEN

2    Latin heritage is a different issue.

3    You don't necessarily have to be a

4    Hispanic living in East Harlem to

5    have -- have La Marqueta and other

6    historic things happening in that

7    neighborhood that recognize and

8    celebrate its historical, you know,

9    role in Latin American New York sort of

10   culture.

11        Q    When you hear -- when you

12   hear people talking about the

13   importance of preserving cultural

14   identity -- and you have heard people

15   talking about that, right?

16        A    Sure.  We just put out a

17   cultural plan, which is all about this.

18        Q    Okay.

19        A    This is a huge topic.

20        Q    Okay.

21        A    Celebrating and recognizing

22   cultural heritage of the many different

23   groups in New York City, and we take

24   that very seriously.

25        Q    Okay.  Ms. Glen -- so I have

1

2      some questions about how you understand

3      advocacy in favor of maintaining an

4      area's cultural identity.

5              Clear on that?

6          A    I'm trying.  I'm trying to

7      follow you.  I'm trying.

8          Q    Okay.  So, so far, we have

9      that -- what I want to ask you about --

10     we know that you have heard people

11     advocating for maintaining an area's

12     cultural identity, right?

13         A    Certainly, as in my work, and

14     this is mostly in the cultural and

15     tourism space, that there are

16     neighborhoods that are associated with

17     certain ethnic groups.  And we think

18     that's got some really good value to it

19     in terms of the New York story, right?

20     That we are a city of neighborhoods.  I

21     personally approved a campaign for NYC

22     to say, you know, Come eat bagels in

23     the Lower East Side.  Come eat

24     empanadas on the whatever.

25             Yes, there is a

1                      GLEN

2    acknowledgment that we have a lot of

3    different ethnicities and neighborhoods

4    in the New York City, and that it's a

5    value to us and we celebrate it, both

6    in the cultural, in the small business,

7    and in the tourism part of my life.

8         Q    So the --

9         A    The Sri Lankans.  Little did

10   you know, the largest percentage of

11   Sri Lankans live in Staten Island.  It

12   happens to be true.

13        Q    It's interesting, back in the

14   summer --

15        A    You were in Staten Island at

16   the all-you-can-eat buffet in the

17   Sri Lankan place?

18        Q    I was not -- I was not --

19        A    It's incredible yummy.

20        Q    I was not in -- I was not in

21   Staten Island.  I was here, I think,

22   and I was talking with Carl Weisbrod.

23   He also mentioned Sri Lankans?

24        A    There it is, because of the

25   all-you-can-eat buffet on the North

GLEN

1

2     Shore.  Fascinating.  Very yummy.

3         Q    I don't think that's what

4     he -- I don't think that's what he was

5     talking about, but let's --

6         A    Okay.

7         Q    -- let's move from this --

8         A    Let's move on.

9         Q    -- playful interlude.

10            So I think what you're

11    saying, in all seriousness, is that the

12    distinct -- the ethnic distinctiveness

13    of separate neighborhoods in New York

14    is a value to the city.

15            MS. SADOK:  Objection.

16        A    It is very much part of our

17    brand and our identity.  Right?  As

18    anybody who has grown up in New York

19    would be hard-pressed to not

20    acknowledge that that is one of the

21    defining characteristics of New York,

22    is that we are a city of extraordinary

23    neighborhoods and diversity of ethnic

24    makeup.  And that is something we

25    celebrate and is good for business.

1                      GLEN

2      Right?  It's very, very -- it's -- in

3      fact, our whole tourism campaign right

4      now is about this.

5           Q    So it would be bad to change

6      that?

7           A    Well, it's not even bad or

8      good.  I mean --

9                MS. SADOK:  Objection.

10          A    -- it is part of the gestalt

11     of New York City.  And so it would

12     be -- anybody would be hard-pressed not

13     to say that maintaining sort of a

14     ethnic diversity overlay of what

15     New York is -- well, first of all, it

16     would be impossible because it's

17     constantly changing.  So we should

18     celebrate it and it's great, and it's

19     great for food and it's great for

20     business and it's great for the city.

21     Yes, that is in the city's interest and

22     part of our DNA.

23          Q    And that has to do, in

24     part -- I'm not asking -- I'm not

25     asking you about, like, the cultural

1                    GLEN

2     landmarks.

3          A    Okay.

4          Q    That has to do, in part, with

5     where people of different ethnic groups

6     concentrate residentially?

7               MS. SADOK:  Objection.

8          A    What has do with -- the fact

9     that there are --

10         Q    That you have an identifiable

11    area, be it Sri Lankan or Latino --

12         A    But it's sort of changes,

13    right?  I mean, I think people still

14    think of the Lower East Side as a place

15    to get the best knish, but I don't

16    think there are even that many Jews

17    that live on the Lower East Side

18    anymore.  Right?

19              And I think there is -- I

20    actually don't know what the

21    correlation is between what people

22    think of as particular neighborhoods

23    related to ethnicity and actually lives

24    there anymore.  Right?  It's dynamics

25    and it's evolved, right?

GLEN

So I don't even think Jews
are the predominant ethnic group on the
Lower East Side, yet people still think
of the Lower East Side as a place where
you go to get Jewish food.

So I actually think there is
not -- you know what I'm saying?  So I
don't think where you live and what the
neighborhood is associated with are
necessarily synonymous.  In fact, for
sure, on the Lower East Side, for
example, there are more hipsters than
there are nice old Jewish ladies making
knishes anymore, but people still think
of it as the knish capital of New York
City.

Q    Not a hipster capital?

A     Well, it's getting more that
way, but still people would say, Ah, go
to --

Q    Okay.  I just want to be
clear.  We have a lot a -- we have a
lot else to cover today.  I just want
to -- I just want to be clear whether

1 you are telling me that there is no

2 relationship between --

3

4      A     "I don't know" is what I'm

5 telling you.  I don't have data.  I

6 don't have the data.

7      Q     You have no -- you have no

8 idea -- this is important.

9      A     I actually --

10      Q     Wait a second.  Wait a

11 second.  This is important.

12           I want you to take a minute

13 to think about it before you answer it,

14 as to whether or not there is

15 genuinely, at any given moment in time,

16 a strong association between cultural

17 identity of a particular area and the

18 dominant racial or ethnic group of the

19 area.

20           MS. SADOK:  Objection.

21      A     I have not seen a study or a

22 data set that would -- that would

23 confirm or deny that.

24      Q     Okay.  That's not what I was

25 asking you.  I didn't ask you whether

GLEN

1
2    there is a data set or a study.  I'm

3    asking you what you understand to be

4    the case.

5        A    And I think it varies.

6    That's my point.  I don't think -- I

7    think it varies.

8        Q    Is it more -- in your view,

9    is it more often the case that there is

10   strong association between an area's

11   cultural identity and people of a

12   particular race or ethnicity that share

13   that culture or not?

14           MS. SADOK:  Objection.

15       A    Again, I just can't -- I

16   can't give you an answer that is

17   absolute because I think it's so

18   varied.

19       Q    Okay.  Let me ask you a

20   different question.

21           Isn't the city's job -- isn't

22   it the city's place to let a

23   neighborhood's culture evolve

24   naturally --

25           MS. SADOK:  Objection.

1

2                    A C K N O W L E D G E M E N T

3

      STATE OF NEW YORK  )
4                          )  ss.:
      COUNTY OF NEW YORK )

5

6            I, ALICIA GLEN, certify, I have read the

7            transcript of my testimony taken under

8            oath in my deposition of November 3, 2017;

9            that the transcript is a true, complete

10           and correct record of what was asked,

11           answered and said during this deposition,

12           and that the answers on the record as

13           given by me are true and correct.

14

15                    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                              ALICIA GLEN
16

17

      Sworn and subscribed to before me
18
      this  ll   day of December 2017.
19

20

21            Notary Public

22
               KATHERINE P. COCKLIN
23          NOTARY PUBLIC-STATE OF NEW YORK
                   No. 02CO6328584
24          Qualified in New York County
          My Commission Expires August 03, 201⸱

25

1

2                    C E R T I F I C A T I O N

3

      STATE OF NEW YORK  )
4                         ) ss.:
      COUNTY OF NEW YORK )

5

6              I, JUDITH CASTORE, Shorthand Reporter

7         and Notary Public within and for the State

8         of New York, do hereby certify:

9              That ALICIA GLEN, the witness whose

10        deposition is hereinbefore set forth, was

11        duly sworn by me and that this transcript

12        of such examination is a true record of

13        the testimony given by such witness.

14             I further certify that I am not

15        related to any of the parties to this

16        action by blood or marriage and that I am

17        in no way interested in the outcome of

18        this matter.

19             IN WITNESS WHEREOF, I have hereunto

20        set my hand this 8th day of November,

21        2017.

22

23                              _____
                                    JUDITH CASTORE

24

25

# ERRATA

I wish to make the following changes, for the following reasons:

PAGE    LINE

39      5      CHANGE: add "nuts" in between "everybody goes" and "if we're". Add
                   "building" in between "if we're" and "buildings".
REASON: deponent or reporter inadvertently left out two words. The statement does not make
sense without adding these words.

78      25     CHANGE: add "not" in between "I am" and "a demographer"
REASON: reporter inadvertently left out a word

94      17     CHANGE: "Latin suburbs" for "Latinos"
REASON: deponent said "Latinos" but reported transcribed "Latin suburbs"

101     23     CHANGE: add "who" in between "and" and "actually"
REASON: statement does not make sense without the word "who"

101     24     CHANGE: remove "s" from the word dynamics
REASON: deponent said "dynamic" but reporter transcribed "dynamics"

123     9      CHANGE: "downside" to "downsize"
REASON: deponent stated "downsize" but reporter transcribed incorrectly

251     16     CHANGE: "spent" to "spend"
REASON: deponent stated "spend" but reporter transcribed incorrectly

254     15     CHANGE: add "are in" in between "they" and "stable housing"
REASON: deponent or reporter inadvertently left out the words "are in". The statement does not
make sense without these words

1

284    11    CHANGE: delete the word "not"

REASON: deponent or reporter inadvertently added the word "not".


300    18    CHANGE: delete the word "review"

REASON: the word "review" is redundant


323    8    CHANGE: add "There are" in front of "only"

REASON: deponent or reporter inadvertently left out the words "there are". The statement does not make sense without these words

WITNESS' SIGNATURE

$\frac{12 |11| 17}{\text{DATE}}$

2

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   --------------------------------x

    JANELL WINFIELD, TRACEY

4   STEWART and SHAUNA NOEL,

5                       Plaintiffs,

            -against-

6                               Civil Action No.:

                                15-CV-5236 (LTS)(KHP)

7   CITY OF NEW YORK,

8                       Defendant.

    --------------------------------x

9

10

11              VIDEOTAPED DEPOSITION OF

12                  PURNIMA KAPUR

13              New York, New York

14                April 19, 2018

15                  9:31 a.m.

16

17

18

19

20

21  Reported by:

    JUDITH CASTORE, CLR

22

23

24

25

1                        KAPUR

2              Can you read that out loud,

3     that paragraph please?

4         A    Which one are you talking

5     about?  The one just below that?

6         Q    Yes.

7         A    I don't care what they built,

8     it's not for us said one woman during

9     the meeting's public comment portion.

10    Right now this is a plan for ethnic

11    cleansing.

12        Q    Have you heard that charge

13    that the East Harlem rezoning was a

14    plan for ethnic cleansing or any

15    concept equivalent to that?

16        A    Yes.

17             MS. SADOK:  Objection.

18        Q    And said by what types of

19    stakeholders, if that's clear?

20    Community members, advocacy groups,

21    local officials who -- I'm not asking

22    for particular names?

23        A    Community members opposed to

24    rezoning.

25        Q    Anybody else?

1                    KAPUR

2        A    I'm not sure, but it's

3    likely.

4        Q    So I'd like you to take a

5    look at the document now, Plaintiff's

6    126.

7             (Document, Bates-stamped

8        NYC_0087274, was marked

9        Plaintiff's Exhibit 126, for

10       identification, as of this date.)

11       Q    Do you see in that document

12   the assertion which I'm just quoting

13   not endorsing, that, quote, the mayor

14   himself is targeting communities of

15   color throughout the city for

16   displacement.

17            Do you see that?

18       A    Um-hum.  It's --

19       Q    Third paragraph of text.

20       A    Yes, I do see it.

21       Q    Right before --

22       A    Yeah.

23       Q    Have you happen to see this

24   particular flyer before?

25       A    I don't recollect.

1                    KAPUR

2       Q     Have you seen flyers or

3  communications similar to this one?

4       A     Yes.  Not like similar to

5  this particular one, but community

6  groups pass flyers all the time when

7  there are issues of interest to them.

8       Q     And have you outside the

9  context of the exhibit you're holding

10 heard charges leveled that communities

11 of color throughout the city were being

12 targeted for rezoning?

13      A     Yes, I have.

14      Q     Have you heard the charge in

15 substance, whether or not it's the

16 precise words, that in communities of

17 color throughout the city were being

18 targeted for displacement?

19           MS. SADOK:   Objection.

20      A     We've heard concerns about

21 displacement in the communities where

22 we've been working, so --

23      Q     Well, this is -- this --

24 well, what do you understand the term

25 communities of color to mean, if

1              KAPUR

2    anything?

3         A    Non-white majority

4    communities.

5         Q    Just to take the other side

6    of that, is that to say majority

7    non-white communities?

8              MS. SADOK:  Objection.

9         A    Sure.

10        Q    So in connection with those

11   kinds of charges, do you understand

12   that part of the concern?  I'm not

13   asking about you about all the

14   concerns, I'm not asking you about what

15   the predominant part is, I'm not asking

16   you to make any comparison, I'm just

17   asking you whether you understand that

18   part of the concern is that a community

19   that is majority non-white will become

20   less so?

21        A    Do I understand that concern,

22   yes.

23        Q    And has that concern been

24   expressed?

25             MS. SADOK:  Objection.

1                    KAPUR

2       A    It's a very general question.

3   Being been expressed where, to whom, by

4   whom?

5       Q    To your knowledge?

6       A    To whom?

7       Q    To anyone.

8            MS. SADOK:  Objection.

9       A    Sure.  I mean, someone

10  somewhere has expressed that concern.

11      Q    To your knowledge?  I mean --

12      A    To my knowledge, I mean, yes.

13  This is, you know, one of those

14  instances of that concern.

15      Q    But --

16           MS. SADOK:  Let the record

17       reflect that the witness has --

18      A    Call to action Number 126.

19           MS. SADOK:  -- is reflecting

20       Plaintiff's 126.

21           Thank you.

22      Q    So the -- what I was really

23  asking about is you explained what

24  communities of color were, you

25  explained that this is a charge that

```
 1                    KAPUR
 2   you've heard made, it's a charge that
 3   you've heard made in multiple contexts;
 4   is it not?
 5            MS. SADOK:  Objection.
 6      A    In certain contexts.
 7      Q    In more than one?
 8      A    In more than one context.
 9      Q    Okay.
10            So I was asking you, did you
11   understand the charge to be, in part,
12   that there was a concern that majority
13   non-white communities were going to
14   become less so?
15      A    Yes.
16      Q    Thank you.
17            Now, this is one that you are
18   familiar with because you are part of
19   the e-mail chain.
20            MR. GURIAN:  So I'm going to
21        ask that Bates 808899, the
22        document that begins 80889 through
23        80894 be marked as Plaintiff's
24        127.
25            (Document, Bates-stamped
```

```
1
2    STATE OF New York     )
3                          )    :ss
4    COUNTY OF New York    )
5
6
7              I, PURNIMA KAPUR, the witness
8    herein, having read the foregoing
9    testimony of the pages of this deposition,
10   do hereby certify it to be a true and
11   correct transcript, subject to the
12   corrections, if any, shown on the attached
13   page.
14
15                    _____
16                         PURNIMA KAPUR
17
18
19
20   Sworn and subscribed to before me,
21   this  7th  day of  June     , 2018.
22
23   _____
24        Notary Public
25
```

DOMINICK H. ANSWINI
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02AN6289008
Qualified in New York County
Commission Expires Sept. 16, 20 2 1

1
2              C E R T I F I C A T I O N
3
          STATE OF NEW YORK  )
4                            ) ss.:
          COUNTY OF NEW YORK )
5
6                    I, JUDITH CASTORE, Shorthand Reporter
7          and Notary Public within and for the State
8          of New York, do hereby certify:
9                    That PURNIMA KAPUR, the witness whose
10         deposition is hereinbefore set forth, was
11         duly sworn by me and that this transcript
12         of such examination is a true record of
13         the testimony given by such witness.
14                   I further certify that I am not
15         related to any of the parties to this
16         action by blood or marriage and that I am
17         in no way interested in the outcome of
18         this matter.
19                   IN WITNESS WHEREOF, I have hereunto
20         set my hand this 30th day of April, 2018.
21
22                        *Judith Castore*
23                        JUDITH CASTORE
24
25

# ERRATA

I wish to make the following changes, for the following reasons:

PAGE   LINE

31      5      CHANGE: "able answer to that" to "able to answer that"
REASON: Incorrect transcription.

37      3      CHANGE: "intergraded" to "integrated"
REASON: Incorrect transcription.

38      4      CHANGE: "to any action" to "to any such action"
REASON: Clarify intent of sentence.

38      22-23  CHANGE: "density height" to "height and/or height"
REASON: Clarify intent of sentence.

42      17     CHANGE: "it has do with" to "it has to do with"
REASON: Incorrect transcription.

76      15     CHANGE: "residential right not, the" to "residential, right, not the"
REASON: Clarify intent of sentence.

87      4-5    CHANGE: "many meetings we" to "many meetings where we,"
REASON: Incorrect transcription.

94      14     CHANGE: "these messaging" to "that messaging"
REASON: Clarify intent of sentence.

102     17     CHANGE: "Counsel representatives" to "Council representatives"
REASON: Incorrect transcription.

104     2     CHANGE: "counsel" to "council"
REASON: Incorrect transcription.

104     21     CHANGE: "affordability that MIH" to "affordability than MIH"
REASON: Incorrect transcription.

119     10     CHANGE: "hole" to "hold"
REASON: Incorrect transcription.

132     10     CHANGE: "I'm not a either" to "I'm not either"
REASON: Clarify intent of sentence.

185     3     CHANGE: "Being been expressed" to "Being expressed"
REASON: Clarify intent of sentence.

194     20     CHANGE: "not e" to "not me"
REASON: Incorrect transcription.

195     6     CHANGE: "on the base of" to "on the basis of"
REASON: Clarify intent of sentence.

195     8     CHANGE: "and yet that" to "and yes that"
REASON: Clarify intent of sentence.

196     23     CHANGE: "desirable of move" to "desirous of moving"
REASON: Clarify intent of sentence.

223     17     CHANGE: "generally not a residential" to "generally not residential"
REASON: Clarify intent of sentence.

237     23     CHANGE: "counsel members" to "council members"

REASON: Incorrect transcription.


242     3     CHANGE: "now" to "know"

REASON: Incorrect transcription.


_____
WITNESS' SIGNATURE

6-7-2018
DATE

1

2   UNITED STATES DISTRICT COURT

    SOUTHERN DISTRICT OF NEW YORK

3   ---------------------------------x

    JANELL WINFIELD, TRACEY

4   STEWART and SHAUNA NOEL,

5                     Plaintiffs,

           -against-

6                               Civil Action No.:

                                15-CV-5236 (LTS)(KHP)

7   CITY OF NEW YORK,

8                     Defendant.

    ---------------------------------x

9

10

11                  DEPOSITION OF

12                  JOSEPH SALVO

13                New York, New York

14               November 27, 2018

15                  10:47 a.m.

16

17

18

19

20

21

    Reported by:

22  JUDITH CASTORE, CLR

23

24

25

```
 1                        SALVO
 2              So it is fair to say that I
 3    do, as part of an intellectual
 4    exercise, think about how people react
 5    to the data that I'm seeing in a
 6    particular neighborhood.  So I would
 7    say that I have thought about concerns
 8    regarding issues involving integration,
 9    segregation of groups.
10         Q    The concerns about racial or
11    ethnic change of a neighborhood that
12    you've described observing, those have
13    come up in the context of community
14    meetings or --
15         A    They've come up in the
16    context of presentations.  I give a
17    fair amount of presentations throughout
18    the year, some to community groups, you
19    know, the borough president of Queens,
20    for example.  And in the process I meet
21    a lot of members of the community
22    especially leaders of various groups,
23    community boards for example.  Yes.
24              (Whereupon, a discussion was
25         held off the record.)
```

1                          SALVO

2       Q    And when concerns are

3  expressed about residential or racial

4  ethnic change, how do you try to engage

5  with that?

6       A    I'm very careful not to

7  render a judgment because that's not my

8  role.  I will express concerns, you

9  know, about the -- certainly

10  acknowledge the concern that local

11  people, local community members have.

12  But I'm very careful not to -- not to

13  take sides, frankly.  That's not my

14  role.  My role is to provide view of

15  the data.

16       Q    Thank you.  That's helpful.

17            So I want to ask a similar

18  question which is:  Have you ever

19  thought, and regardless of the context,

20  that people were exaggerating the scope

21  of segregation that exists?

22            MS. SADOK:  Objection.

23            If we can take a break in a

24       few minutes when you're ready.

25       A    I'm trained as a scientist to

1        SALVO
2    where somebody was talking about the
3    mix of people in their neighborhood
4    and -- and I was able to confirm it
5    with my data.  The -- the opposite of
6    that I don't -- I don't remember an
7    experience having the -- I don't
8    remember having an experience
9    consistent with that observation.
10       Q    Could I just ask you one
11   other thing and then we'll take a
12   break.
13            You said in connection with
14   concerns expressed about racial change
15   or the prospect of racial change or the
16   perception of racial change that you're
17   very careful not to take sides, I think
18   were your words?
19       A    Right.
20       Q    It may be -- seem totally
21   obvious, but why are you careful not to
22   take sides?
23       A    Because people's perceptions
24   are powerful.  And if I go into
25   Canarsie -- this is a hypothetical.

1                    SALVO
2        Q    Yes.
3        A    Well, it was based on a town
4   meeting.  But in Canarsie in the 1990s
5   or early 2000s and some woman stands up
6   and says you need to help, what's
7   happened to my neighborhood?  And what
8   she was alluding to was the racial
9   change which came upon Canarsie which
10  was huge.  Her feelings are real.
11  She's afraid.  On the other hand the
12  demographic data is showing indeed
13  there has been a huge change.  So it
14  would be my role in that situation not
15  to render a judgment because I feel
16  that perceptions are powerful.  I
17  encounter perceptions all the time in
18  my presentations out in the field.  And
19  I don't want to somehow nullify the
20  importance of those perceptions.
21       Q    Any other reason?
22       A    That's a big one.  That is
23  the reason.
24       Q    You said that is the reason?
25       A    Yeah.

```
1
2      STATE OF  NEW YORK        )
3                                )   :ss
4      COUNTY OF  NEW YORK       )
5
6
7                  I, JOSEPH SALVO, the witness
8      herein, having read the foregoing
9      testimony of the pages of this deposition,
10     do hereby certify it to be a true and
11     correct transcript, subject to the
12     corrections, if any, shown on the attached
13     page.
14
15                         Joseph Salvo
16                         JOSEPH SALVO
17
18
19
20     Sworn and subscribed to before me,
21     this  18th  day of  January   , 2018.
                                        2019
22
23     Dominick Answini
24              Notary Public
25
```

DOMINICK H. ANSWINI
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02AN6289008
Qualified in New York County
Commission Expires Sept. 16, 20 21

```
1
2                C E R T I F I C A T I O N
3
     STATE OF NEW YORK   )
4                        ) ss.:
     COUNTY OF NEW YORK  )
5
6              I, JUDITH CASTORE, Shorthand Reporter
7         and Notary Public within and for the State
8         of New York, do hereby certify:
9              That JOSEPH SALVO, the witness whose
10        deposition is hereinbefore set forth, was
11        duly sworn by me and that this transcript
12        of such examination is a true record of
13        the testimony given by such witness.
14             I further certify that I am not
15        related to any of the parties to this
16        action by blood or marriage and that I am
17        in no way interested in the outcome of
18        this matter.
19             IN WITNESS WHEREOF, I have hereunto
20        set my hand this 6th day of December,
21        2018.
22
23                  JUDITH CASTORE
24
25
```

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
JANELL WINFIELD, TRACEY STEWART
and SHAUNA NOEL,

               Plaintiffs,

      -against-           Civil Action No.:
                            15-CV-5236 (LTS)(KHP)

CITY OF NEW YORK,

               Defendant.
----------------------------------x


DEPOSITION OF

STEVEN BANKS

New York, New York

November 29, 2017

9:18 a.m.


Reported by:
JUDITH CASTORE, CLR
Job No. 52807

BANKS

12:19 p.m., and we're off the
record.

(Whereupon, a brief recess
was taken.)

VIDEOGRAPHER:  The time is
12:31 p.m., and we're back on the
record.

Q    Mr. Banks, I want to take you
back to the mayor's speech.  You have
that in front of you.

A    Okay.

Q    Did you help draft this
speech?

A    I'm only considering the word
"draft."  I participated in discussions
with him about what he was going to say
and how in preparation to the speech.

Q    Okay.  And so looking at the
second page of it marked -- bottom --
page 7, second full paragraph:  But one
thing the government has done that's
made it harder is we send people all
over and there's not a sense that the
people who are being served are from my

BANKS

very own community.  They are just like

me, and that's something we need to

change.

           Do you recall that from the

speech?

     A    I do.

     Q    And then on the next page --

this is after the indication of

applause near the end of that

paragraph.  I'm not yet quoting the

mayor.  We can figure out what -- how

the shelter will not be a negative for

the community but, quote, And sometimes

even a positive for the community,

especially because people will note the

folks inside those doors come right

from around their own streets, their

own neighborhood, their own block.

           Do you recall that?

     A    I do.

     Q    Is it fair to say that policy

in part is designed to diffuse

opposition to the placement of homeless

New Yorkers in some neighborhoods?

1        BANKS

2        A    If what you are asking me is

3   has there been opposition in some

4   places because of demonizing our

5   clients, the answer to that is yes.

6   And is a community borough-based

7   approach aimed at both helping clients

8   and addressing that demonization of our

9   clients?  Yes.

10        Q    To the extent that New

11  Yorkers in shelter are just like me, as

12  the mayor says, mightn't they come from

13  anywhere in the city?

14            MS. SADOK:  Objection.

15        A    In fact, people do come from

16  everywhere, but the rest of the context

17  of the speech was about the people are

18  working, the people are families now,

19  and that the kind of factors that are

20  driving homelessness, both in the city

21  and, frankly, nationally, are economic,

22  and that that was the change.

23            There is other parts of the

24  speech that have that, and that's

25  really the context.  That there's a

1          BANKS

2   focus he said, and I have said it too,

3   and I think he said in the speech.  You

4   could see the person next to you in the

5   supermarket or the person on the subway

6   next to you might be living in a

7   shelter, because this sort of past

8   demonization of who is homeless really

9   doesn't have validity.

10         Q     Doesn't allow for an accurate

11  picture of or fights with what an

12  accurate picture of who is homeless

13  actually is?

14         A     Yes.  If you are connecting

15  that to the demonization of who

16  homeless people are, yes, it doesn't

17  connect to an accurate picture of who

18  homeless people are.  And so, in part,

19  public comments that the mayor has --

20         (Clarification by the

21         reporter.)

22         A     -- made and I have made

23  included in the speech are aimed at

24  addressing that demonization of people

25  who are homeless.

BANKS

Q    I think we're agreeing about
this, but just to make sure, we're
dealing now with people who do not live
anywhere close to the people in a
community district, but they may be
just like the person in the community
district insofar as they have a low
wage job, just like some people in the
community have low wage jobs, right?

MS. SADOK:  Objection.

A    You are partially right.  I'm
going to say partially yes, but I know
there is no such thing as a partially
yes.  Because really the context that
he was focused on here and that I'm
focused on is that if I'm in a
community and I'm speaking with
Ms. Calhoun, and I have known
Ms. Calhoun for my entire life, I may
have no idea that someone like her
could become homeless and is, in fact,
homeless.

    And so all of our comments
are really aimed at trying to break

BANKS

down that demonization.  Someone like

Ms. Calhoun who I have known my whole

life, she couldn't -- that person

couldn't possibly be homeless.

Homeless is the pictures that you see

in the New York Post that they always

run next to articles about family

homelessness, for example.

So that's really the context

of what he was giving in this speech,

and that both of us have been trying

to -- have been getting at in our

comments about the plan.

Q   Well, one thing which I think

you are talking about is trying to get

out the message.  You can't tell who is

homeless by some test of -- some visual

test.  Anyone may be homeless.  Is that

fair?  Anyone could turn out to be

homeless?

A   That's correct.

Q   I mean, you have said, in

relationship to your own neighborhood,

that there are some people that you

BANKS

have worked with who -- and because you
have worked with them, you know that
they are homeless, but otherwise you
wouldn't know, right?

    A    That's correct.  Similarly,
there is some neighborhoods where there
have been shelters for years and people
don't know that there is a shelter in
the neighborhood.

    Q    But the mayor is talking
about something in particular, people
knowing that the folks inside those
doors come from right around their own
streets, their own neighborhood, their
own block.

        Why is that important to know
that?

    A    For the same reason that I am
describing, that the -- what I have
observed and experienced is the
demonization of our clients, in part,
comes from a belief that they're not
just like you and me and, in part,
that's working/not working, my

1          BANKS

2    neighborhood/not my neighborhood, those

3    kinds of things.

4          Q    My race/not my race?

5          A    That -- that's part of it.  I

6    mean, the demonization may be based on

7    that too in terms of my experience,

8    yes.

9          Q    I just want to make sure I

10   understand the word --

11         A    Sure.

12         Q    -- that you are using.

13              You're saying, as far as you

14   understand, there are some times when

15   demonization is based on race --

16              MS. SADOK:  Objection.

17         Q    -- not simply that there is a

18   theoretical possibility?

19         A    Again, I think you are -- in

20   experiences that I have had, both in

21   government and out of government,

22   people demonize people who they don't

23   know.  And sometimes that can be based

24   upon stereotypical presumptions they

25   have about people and sometimes that

BANKS

falls into race too.

     Q    This is something -- the

race-linked fear or demonization,

that's something that you know has

occurred and continues to occur over

time.  It's not like one incident,

right?

          MS. SADOK:  Objection.

     A    I mean, the reason why I'm

hesitating, and I think -- and tell me

if I am on the wrong track, and then I

actually will not -- I will stop this

answer.  If you are asking about

shelter sitings, they're all different.

And I can give you some examples of

differences.

          So there is not a monolithic

response to a shelter siting, even just

in the first eight shelters that we got

up and operating since April right

after the plan.  There have been

different experiences.  Some places

there's been opposition; some places no

opposition.  So that's why I'm

BANKS

1  

2 hesitating to answer.

3     Q    Right.  I was not suggesting

4 or are pushing you to do anything about

5 saying that the same thing happens all

6 the time.  I just wanted to be clear

7 about your answer in terms of the role

8 of race in demonizing clients.

9         It's not something that just,

10 like, happened once in the last

11 40 years.  It's like one of the

12 phenomena that exists.

13         MS. SADOK:  Objection.

14     A    So the only way I can answer

15 that is by giving an example.

16         So the shelters siting in

17 Maspeth.  I conducted two large

18 community meetings there.  Thousand

19 people in one of them, close to a

20 thousand in the other one.  And there

21 were some very offensive things that

22 were said, and I reacted to them, as

23 you saw --

24         (Clarification by the

25       reporter.)

BANKS

        A    If you saw on internet what
was said, you probably saw how I
reacted to things that were said.

        Q    And you interpreted some of
those things as being race-based.  Yes?

        A    Well, the comment that was
yelled out to me, that that was denied
about, you know, Go back to East
New York, I responded to that directly.
But in those meetings and in addressing
the shelter that we're operating in
Maspeth now, we said -- I said that
people had come -- we're in the shelter
system from that community, and they
disputed that, rather loudly.  And I
think that's really what the mayor and
I have both been trying to get at,
which is that community could not
believe that people from that community
would be in our shelter system.  But
they were.

                And trying to engage them,
that's the kind of language that the
mayor is using and I was using, and,

1  BANKS

2  you know, ultimately there is 50, 60,

3  70 people that have are sheltered in

4  that neighborhood despite what

5  occurred.  But nonetheless that was

6  what I could give you as an example of

7  that kind of opposition.

8        On the other hand -- you

9  know, it's not monolithic is all I'm

10 trying to say.

11       Q    Yeah, you said it's not

12 monolithic.

13       But "Go back to East New

14 York" does not have any explicit race

15 words, but you understood that to be

16 race linked or race coded?

17       A    Yes.  I understood those

18 words and other words to be race coded,

19 and I said so from the podium.

20       Q    There was a sign, Maspeth

21 Lives Matter --

22       A    Yes.

23       Q    -- that you understood to be

24 race coded?

25       A    Right.  I think they had

BANKS

those in front of my house on the three

or so occasions that had come to

protest opening that shelter.

Q    So there's a lot of

opposition.  I'm not saying it's

monolithic, but there is a lot of

opposition to the placement of homeless

shelters for a variety of reasons.

Yes?

A    Right.  But that's why -- I

can't say yes with the word "a lot" in

that sentence.  And the only way I

can -- you are not going to want me to

do this, but I got to say it anyway, of

the first five that we opened, one of

them in Prospect Heights, totally

supported by the community.  Block

association totally for the opening of

the shelter.  A shelter in Richie

Torres' district for LGBTQIA youth,

even though there is a lots of shelters

in his district supported by him,

welcomed by the community.

        We got sued by two different

1

2  STATE OF _New York_ )

3                    )  :ss

4  COUNTY OF _New York_ )

5

6

7          I, STEVEN BANKS, the witness

8  herein, having read the foregoing

9  testimony of the pages of this deposition,

10  do hereby certify it to be a true and

11  correct transcript, subject to the

12  corrections, if any, shown on the attached

13  page.

14

15

16                        STEVEN BANKS

17

18

19

20  Sworn and subscribed to before me,

21  this _29_ day of _January_, 2̶0̶1̶7̶. _2-18_

22

23

24          Notary Public

AARON FRIEDMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 02FR6348028
Qualified in Kings County
Commission Expires 09/19/2020

25

1

2 C E R T I F I C A T I O N

3

STATE OF NEW YORK )
4                        ) ss.:
COUNTY OF NEW YORK )

5

6          I, JUDITH CASTORE, Shorthand Reporter

7     and Notary Public within and for the State

8     of New York, do hereby certify:

9          That STEVEN BANKS, the witness whose

10    deposition is hereinbefore set forth, was

11    duly sworn by me and that this transcript

12    of such examination is a true record of

13    the testimony given by such witness.

14         I further certify that I am not

15    related to any of the parties to this

16    action by blood or marriage and that I am

17    in no way interested in the outcome of

18    this matter.

19         IN WITNESS WHEREOF, I have hereunto

20    set my hand this 29th day of November,

21    2017.

22

23                    _Judith Castore_
                      JUDITH CASTORE

24

25

# ERRATA

I wish to make the following changes, for the following reasons:

PAGE   LINE

14     4-6     CHANGE: "my approach has been to in government after going in the Legal Aid Society" to "my approach has been in government after going from the Legal Aid Society"
REASON: Incorrect transcription.

15     21      CHANGE: "plaintiff" to "witness"
REASON: Clarify intent of sentence.

17     13      CHANGE: "public assistant" to "public assistance"
REASON: Incorrect transcription.

17     14      CHANGE: "personal practiced" to "personally practiced"
REASON: Incorrect transcription.

19     15      CHANGE: "intend" to "intent"
REASON: Incorrect transcription.

22     18      CHANGE: "I'm" to "I've"
REASON: Incorrect transcription.

24     11-12   CHANGE: "services with human resources administration" to "services with the human resources administration"
REASON: Incorrect transcription.

27     22      CHANGE: "equivalent to the keen kinds of" to "equivalent to the kinds of"
REASON: Deponent did not say keen.

148     9      CHANGE: "in some part of the city" to "in some parts of the city"
REASON: Incorrect transcription.

151     25     CHANGE: "Brooklyn and through" to "Brooklyn schools and through"
REASON: Clarify intent of sentence.

152     15-16  CHANGE: "that's what brought" to "that's what was brought"
REASON: Clarify intent of sentence.

157     5      CHANGE: "the promise of a plan" to "the promise of the plan"
REASON: Clarify intent of sentence.

158     12     CHANGE: "what we develop as a plan" to "what we developed as a plan"
REASON: Clarify intent of sentence.

158     24-25  CHANGE: "Is the residential segregation" to "Is there residential segregation"
REASON: Incorrect transcription.

170     7      CHANGE: "there is some neighborhoods" to "there are some neighborhoods"
REASON: Incorrect transcription.

173     16-17  CHANGE: "So the shelters siting in" to "So for the shelter siting in"
REASON: Incorrect transcription.

174     14     CHANGE: "we're in the shelter" to "were in the shelter"
REASON: Incorrect transcription.

175     2-3    CHANGE: "ultimately there is 50, 60, 70 people that have are sheltered" to
"ultimately there are 50, 60, 70 people that are sheltered"
REASON: Incorrect transcription.

176     3    CHANGE: "occasions that had come" to "occasions they had come"
REASON: Incorrect transcription.

181    24    CHANGE: "talking about the before" to "talking about before"
REASON: Incorrect transcription.

182    18    CHANGE: "hadn't" to "hasn't"
REASON: Incorrect transcription.

183    17    CHANGE: "people of multiple of all races" to "people of multiple -- all races"
REASON: Clarify intent of sentence.

184    25    CHANGE: "given the opportunity refer clients" to "given the opportunity to refer clients"
REASON: Incorrect transcription.

186    13    CHANGE: "homeless, particularly supportive" to "homeless, particularly when supportive"
REASON: Clarify intent of sentence.

188    8    CHANGE: "applied to all of the building" to "applied to all of the buildings"
REASON: Incorrect transcription.

190    12    CHANGE: "we're not eligible" to "were not eligible"
REASON: Incorrect transcription.

195    18    CHANGE: "how to best of connect them" to "how to best connect them"
REASON: Incorrect transcription.

198    2    CHANGE: "There is a lot of units" to "There are a lot of units"
REASON: Incorrect transcription.

224   12   CHANGE: "was made able to them" to "was made available to them"

REASON: Incorrect transcription.

_____
WITNESS' SIGNATURE

1-29-18
DATE

**From:** Murphy, Matthew (HPD) </O=CS HOSTING/OU=EXCHANGE ADMINISTRATIVE GROUP
(FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MURPHY, MATTHEWC64>
**Sent:** September 15, 2016 9:47 AM
**To:** Been, Vicki (HPD);Mun, Christina (HPD);Capperis, Sean (HPD);Rohlfing, Elizabeth (HPD);Bozorg,
Leila (HPD);Quart, David (HPD);Hernandez, Daniel (HPD);Hess, Patrick (HPD);Straughter, Perris (HPD)
**Subject:** RE: Talking points
**Attachments:** Main Points vb_mm.docx

Thanks Vicki- attached version with some changes. Addressing some of your comments that need follow up, with two questions highlighted for the group to please chime in on:

- **Comment 1:** On the point that 24% of HHs in the CB are severely rent burdened vs. 28.6% in the FC report, we received the data directly from Research, who pulled from the 2014 HVS data. We will use the 24% number.

- **Un-numbered comment: Can we call this an underused manufacturing district?**

- **Comment 4: Does Phipps use PW construction, and do they have a good MWBE record?**

- **Comment 6:** This 4% number is only for gov't assisted properties, meaning that it falls under an income restricted affordable housing program. It does not include rent stabilized units alone. Because this falls under the points about confronting economic and racial segregation, we do not think that the rent stabilization numbers are as strong as the affordable housing ones.

**From:** Been, Vicki (HPD)
**Sent:** Thursday, September 15, 2016 8:26 AM
**To:** Mun, Christina (HPD); Murphy, Matthew (HPD); Capperis, Sean (HPD); Rohlfing, Elizabeth (HPD); Bozorg, Leila (HPD); Quart, David (HPD); Hernandez, Daniel (HPD); Hess, Patrick (HPD); Straughter, Perris (HPD)
**Subject:** Re: Talking points

I've attached with my comments. But a couple of big picture points:
1) We should not be sending this around, or forwarding beyond this list. These are things we can talk through with people on the phone, but no document should go around beyond the people on this list (and adding Patrick and Perris).
2) We should not be playing into arguments that we don't believe in – e.g., no arguments about nonprofits versus for-profits
3) We should make the connection between voting down affordable housing and displacement. Displacement results when supply doesn't meet demand. Limiting supply in the face of increasing demand causes displacement.
4) It is always better to talk about our commitment to diverse communities, and our goal of ensuring that affordable housing is available in every neighborhood, than to go the legal route and talk about fair housing. Best to just avoid references to fair housing. No community is an island, every community has to provide affordable housing – that's what makes NYC great. Reducing inequality and ensuring diverse and thriving neighborhoods are core values that this council has repeatedly called for.
5) In general, positive rather than negative framing is more effective. We need certainty; ensuring predictability through MIH was a key goal.

Thanks, Vicki

Exhibit 39
8/2/17

**From:** "Munc@hpd.nyc.gov" <MunC@hpd.nyc.gov>
**Date:** Wednesday, September 14, 2016 at 7:31 PM
**To:** Matt Murphy <Murphyma@hpd.nyc.gov>, "Capperis, Sean (HPD)" <Capperis@hpd.nyc.gov>, Libby Rohlfing
<rohlfinge@hpd.nyc.gov>, Vicki Been <beenv@hpd.nyc.gov>, Leila Bozorg <BozorgL@hpd.nyc.gov>, David Quart
<quartd@hpd.nyc.gov>, Daniel Hernandez <hernand@hpd.nyc.gov>
**Subject:** Talking points

Hi Team,

Here's a first cut at talking points for your review.

The first page is a general background that could be shared with all stakeholders.
The remaining pages are targeted messages organized by stakeholder group.

Thanks,
Christina

---

Christina Mun
Division of Strategic Planning
Department of Housing Preservation & Development
212-863-7869 | munc@hpd.nyc.gov

Confidential

**General Background to share with all our stakeholders**

**Statement: (a few options below)**

As ~~We agree with~~ Councilmember Van Bramer has stated: ~~,~~ "We must make sure that we have enough affordable housing for this to remain a city for all, and not just for the rich." MIH was designed, and approved by the City Council, to do just that. We need affordable housing in every part of the City, and a vote against this 100% affordable housing project in Sunnyside is inconsistent with both MIH and with the commitment to ~~a vote against affordable housing~~a more equitable City that this Council has repeatedly made ~~everywhere~~.

~~If this 100% affordable housing project is blocked because a few people don't want to share their neighborhood (OR give up their parking, views, fill in the blank), what hope do we have for affordable housing in any of our neighborhoods?~~

A~~By~~ acquiescing to NIMBYism on this project -- one that provides 100% affordable housing for residents at a range of incomes in place of an unsightly ~~,~~ underused surface parking lot next to train tracks – would~~e~~ undermine our ability to develop affordable housing every anywhere in the city. The objections that have been raised to the proposal – general calls for different levels of affordability than MIH requires (and which the Council debated at length in the review of MIH); unspecified concerns about height; vague and unsubstantiated complaints about maintenance in other buildings owned by one of the City's oldest and most revered non-profits – are typical of arguments made against affordable housing in exclusionary suburbs across the United States. But that is not, and should be not become, NYC's ethos. Diversity has always been our strength. Change and growth have always been essential to our success. Each and every resident of NYC participated in that change and growth, and no one has the right to demand that now that they have a comfortable life, growth should stop and the parking lot across the street, or several blocks away should never change.

~~If we are willing to squash a good project because a few people don't want to give up their privileges, then there's no hope for affordable housing across the City~~

~~Working families across the City are being pushed out by rising rents. Voting against a 100% affordable housing project is a vote against these families in favor of parking.~~

**Primary Talking Points:**
- 100% affordable project
- Serving ~~There will be~~ a range of incomes to promote economic diversity in the neighborhood and the building
- To ~~The project will~~ replace a surface ~~an underutilized (confirm)~~ parking lot in an underused ~~[manufacturing?]~~ district

Commented [MM1]: Need group to weigh in

- With the MIH units – ~~XX~~30% of the total – permanently affordable

- Developed and operated by a non-profit, ~~owned by this~~ mission-~~oriented~~based developer with a track record over ~~XX~~10 years
- ~~Some units will be permanently affordable~~

**Secondary Talking Points:**
- ~~Transit-oriented site (confirm)~~
- ~~Providing twice the required minimum parking~~
- The community needs affordable housing
  - ~~H24%~~ of households in the community board are severely rent-burdened – paying more than 50% of their income for housing related expenses
  - XX# of shelter residents come from this community
  - Rents have been rising in the Community District ~~) would benefit from affordable housing in the face of rising rents—since 2005, rents have been rising in this Community District~~ faster than the City as a whole since 2005.[1] Without new housing supply, especially affordable housing, this trend will continue even if no new development happened.
  - ~~o~~
- Phipps has a strong track record, and this is a "home run" project
- Developer has been responsive to community needs and open to further discussion, despite the Council Member's refusal to meet until the media focused on the issue~~unreceptive CM~~
- Providing twice the required minimum parking to address the community's concerns about losing the surface parking lot

Commented [VB2]: Furman Center says 28.6% – which is right?

MM: This stat comes directly from the HVS, so the 24% number is correct.

**Targeted messages for individual stakeholders by category**

**Affordable Housing Groups**
- This is an ideal project – a slam dunk.
  - Leading mission-driven nonprofit developer
  - 100% affordable project is appropriate to local needs, reaching working families at a diverse range of incomes, is at the right scale for the block, and improves upon current conditions (an underused parking lot next to a train track)
- Voting down this ideal 100% affordable project will set a dangerous precedent for all affordable housing. Too much rezoning uncertainty will lead to less affordable housing developed.
  - The City encourages land acquisition for AH (NYAF); the only viable sites that AH developers can secure will require rezoning
  - If any NIMBY CM can kill any affordable project that requires rezoning (nearly all will), then there is huge uncertainty ~~no point~~ for AH developers and their financiers to acquire land

---

[1] 20% in the CD vs. 18% for the city as a whole

NYC_0028775

- o Given how little public land remains, this precedent ~~will~~ severely limit, or increase the costs of ~~s~~ new affordable housing opportunities
- o We are missing out on the opportunity to gain *permanently* affordable units from MIH through rezonings
- Neighborhood and private site rezonings are integral to providing affordable housing in high opportunity neighborhoods. Blocking these important projects undermines our efforts to create more inclusive neighborhoods.

**Non Profit Developers**
- State their mission. We are in a housing emergency.
  - o Incredible demand for AH housing: 1000 applications per unit examples.~~, especially family housing~~
- Voting down this ~~ideal~~ 100% affordable project will set a dangerous precedent for all affordable housing. If it can happen to another non-profit, it can happen to me. ~~This isn't anti-for-profits, its anti-affordable housing development.~~

Commented [VB3]: NO! we are not playing into that argument

  - o The City encourages land acquisition for AH (NYAF). It's already challenging to buy land, and the only viable sites that AH developers can secure will require rezoning.
  - o But if any NIMBY group can pressure the CM to kill any affordable project that requires rezoning (nearly all will), then it becomes even more~~too~~ risky for AH developers to acquire land
  - o Given how little public land remains, this severely limits new affordable housing opportunities
  - o ~~With this uncertainty around any rezonings, there's no viable model for developing new affordable housing, even on sites we already own~~
- MIH was designed ~~to~~ provide certainty around financially and legally sustainable ~~set a floor for~~ affordable housing requirements. - A council member's vague rejection of MIH requirements replaces the ~~This project shows that there are no ground rules, undermining a process that~~ should be open, fair and honest debates we had during the more than one year spent crafting the right plan. ~~, and honest~~
- ~~Allows a few obstructionist voices to dictate terms at the expense of community needs and an open process.~~

Commented [VB4]: Again, this is not an argument that we want to be espousing – MIH sets the rules, not the floor!

**For Profit Affordable Housing Developers**
- We need certainty, or in the very least a reasonable expectation to have a negotiation. Uncertainty will limit lending/investments/acquisitions
- See Affordable Developer section

**M/WBE Developers**
- Phipps strong history of partnerships and fostering prevailing wage and M/WBE support
- The City is creating opportunities for MWBEs and this is undermining those efforts just as we are making headway.
- See Affordable Developer section

Commented [VB5]: is this accurate – they don't use PW on construction, do they? And do they have a good MWBE record?

**Business Interests (Patrick)**
- Worker housing needs – locking in affordable housing opportunities for the long term
- Keep Queens competitive for commercial interests
- I want to hire local workers, and so support residential development in our communities—far more valuable than parking.

**Fair Housing Advocates**
- Opposing the siting of affordable housing with no rationale – or vague ~~hidden~~ rationales (parking, height, bulk, AMIs aren't perfect, doesn't benefit my constituents) – is a well-honed tactic that typically suburban communities have used to exclude affordable housing and maintain privilege and economic and racial segregation. That is inconsistent with everything NYC stands for. ~~Violates the objectives of the fair housing act, including a rule change that encourages municipalities to build affordable housing in higher cost areas.~~
- Neighborhood and private site rezonings are integral to providing affordable housing in high opportunity neighborhoods. Blocking these important projects undermines our commitment to economic and racial diversity in all neighborhoods. ~~Fair housing goals.~~
- ~~With each project, the City is working to address two fair housing issues: housing affordability and economic segregation. This project tackles both: we can't vote it down because a few people have to give up their parking, or views or have to share their neighborhoods.~~
- The community District where this development would be located Sunnyside has little ~~does not have its fair share~~ of affordable housing – only 4% of the total housing stock is currently government-assisted, meaning that it falls under an income restricted affordable housing program.

**Faith-Based Groups**
- Specific community needs

**Senior Advocates**
- Specific community needs
- Not a specifically senior building, but of course, all our buildings include seniors
- Threatens the wins we achieved in ZQA, because much of the land on campuses like Mitchell Lama buildings or Section 202 projects may also need Council approval for some aspect of the project or for tax incentives.
- Undermines MIH/ZQA

**~~Local Community/Neighbors~~**
- ~~Happy with Phipps Housing~~

> Commented [VB6]: No! No statements about FHA violations!

> Commented [VB7]: Is this number for CD2? It's only gov't assisted? Doesn't include rent-regulated but not gov't assisted?

NYC_0028777



**Department of
Housing Preservation
& Development**

# MEMORANDUM

**To:**      Maria Torres-Springer

**From:**   Matthew Creegan

**CC:**     Libby Rohlfing, Juliet Pierre-Antoine

**Subject:  D.C. Trip: Interview with Glenn Thrush at NYT & The Atlantic Fair Housing Forum**

New York Times Reporter Glenn Thrush will interview Commissioner Torres-Springer on fair housing, specifically Where We Live NYC and New York City's relationship with U.S. Department of Housing and Urban Development (HUD).

**WHEN:**     Thursday, April 19th at 5:30 p.m.

**WHERE:**    TBD

The Atlantic Magazine is hosting a forum to explore the current state of fair housing 50 years after the Fair Housing Act. The forum will look at the history behind the Act, what progress has been made, what still needs to be done, and the path forward. The event will consist of a series of interviews conducted by Atlantic journalists in front of a live audience.

HPD Commissioner Torres-Springer will sit on the "National Challenges, Local Solutions" Panel. The topics covered by the panel will include the status of fair housing in the New York City, the challenges the City faces on the issue, and the strategies HPD is pursuing to advance fair housing, as well as the role of other stakeholders in the issue, such as private companies and nonprofits.

**WHEN:**     Friday, April 20th at 8:30 a.m. Event Starts
            Panel: "National Challenges, Local Solutions" begins 10:05 a.m.
            Panel speakers to arrive no later than 9:20 a.m.

**WHERE:**    Newseum, 555 Pennsylvania Ave NW, Washington, DC 20001

**PANEL PARTICIPANTS:**
- HPD Commissioner Maria Torres-Springer
- Rob Breymaier, Executive Director, Oak Park Regional Housing Center
- Vann Newkirk, Staff Writer at The Atlantic (Moderator)

**GLENN THRUSH:**



Confidential

NYC_0167381

**ANTICIPATED QUESTIONS:**

**Q: What is Where We Live NYC?**

- *Where We Live NYC* is the comprehensive fair housing planning process for the City of New York.
- HPD is partnering with the New York City Housing Authority (NYCHA) to study, understand, and address patterns of residential segregation and how these patterns impact New Yorkers' access to opportunities – including jobs, education, safety, public transit, and positive health outcomes.
- *Where We Live NYC* will culminate with the release of a public report that will be informed by extensive community participation as well as data and policy analysis. The report will also include measurable goals and strategies that are designed to foster inclusive communities, promote fair housing choice, and increase access to opportunity for all New Yorkers. We look forward to using this process to make our city stronger, fairer, and more equitable.
- Despite the federal government's decision, earlier this year, to delay implementation of a requirement that cities, states, and public housing authorities perform an Assessment of Fair Housing or AFH if they want to receive federal funding, New York City is committed to pushing forward with a data-driven, collaborative fair housing planning process consistent with the original intent of the AFH.
- As part of this process, we will examine how residential living patterns relate to jobs, economic opportunity, education, safety, public transit, positive health outcomes, and other opportunities.
- We also seek to better understand the needs of specific groups of New Yorkers protected by fair housing law – including but not limited to immigrants, people with disabilities, seniors, LGBTQ individuals, and individuals with different racial, ethnic, and religious backgrounds – to determine how we can promote greater access to opportunity for all.

**Q: What is the status of fair housing in New York City?**

- We know that New York City is a city of opportunity, but opportunity is not shared equally by all New Yorkers because of historical and contemporary injustices, including housing discrimination and segregation.
- As the City of New York, we take seriously our obligation to affirmatively further fair housing, and we are working to combat individual housing discrimination, as well as ensuring our housing and community development investments are creating greater access to opportunity and housing choice.

**Q: What are some of the challenges the city faces on the issue?**

- NYC is a very expensive city, so affordability is a huge challenge that intersects with our fair housing goals. We have a huge stock of public housing and rent-regulated housing, and have benefited from a long history of innovation in housing policy that has provided us with a wide set of tools, but there are also obstacles.
- We face high land and development costs, and have less public land than in the past.
- We also face enormous community opposition to affordable housing projects across the board; opposition that is often couched as concerns about parking, infrastructure, density, public safety, but many of these are just code words for "I don't want people in my neighborhood."
- But we don't just face this opposition in wealthy neighborhoods, many low-income communities also want more or exclusively low-income units, even thought that rubs up against our fair housing goals.

Confidential

# Where We Live NYC
## Topic-Based Roundtable C: Education
## Qualitative Data Synthesis

*This document summarizes the feedback we heard from stakeholders at the Education Learn Phase Roundtable that took place on June 5, 2018*

*(++) indicates that this idea was discussed at multiple tables*

### Key Takeaways

- Participants expressed that the combination of school zoning and choice policies are major drivers of segregation and disparities in educational opportunities. Lower-income families, immigrants, and homeless families do not always have the knowledge or ability to exercise choice, due to language barriers, limited time and resources, and physical distance. White affluent families move into high performing school zones (dominating the housing market and pricing out lower income families) or exercise choice to send their kids out of low-performing school zones.
- Participants noted that neighborhood conditions impact school conditions and student performance. Areas with a high concentration of poverty have schools with deteriorating conditions, concentration of students that face compounding challenges, and limited school resources. Meanwhile, schools in affluent areas with mostly White populations have better conditions, supplemental services, and are more likely to have facilities accessible to students with disabilities.
- Participants shared that the lack of diversity and cultural competency of staff/teachers within schools can also reinforce both segregation and inequities in access to quality education.
- Participants had mixed opinions on the impacts of gentrifying neighborhoods on schools. Some noted that it may give the appearance of integration, though it may be in transition, while others noted that gentrifying parents are exercising choice to send their kids to school in better performing zones. Some also noted that gentrification and the pricing out of low-income families might cause under-enrollment in schools (as new families send children to out-of-zone schools).
- Overall, here are the top five contributing factors to disparities in access to quality education:
    - **Location and type of affordable housing:** High concentration of public housing leads to high concentrations of poverty, influencing a student's school performance and the resources allocated to schools in these neighborhoods. Higher income neighborhoods with high proficiency schools do not see a lot of affordable housing developments or often oppose them perpetuating segregation in housing patterns and schools.
    - **Location and type of proficient schools and school assignment policies:** Lower income neighborhoods usually have lower quality facilities and greater challenges due to concentrated poverty. The combination of zone and choice system can reinforce segregation due to the disparities between low-income and wealthy families in their ability to exercise choice.
    - **Community opposition:** Zoning of schools and school integration are often controlled by wealthy parents, often excluding low-income children in low performing schools and reinforcing divide. Many parents support the status quo and NIMBYism does not allow for the integration of schools and neighborhoods.
    - **Impediments to mobility to integrated and/or high opportunity areas:** Voucher holders face rent limits, discrimination, as well as cultural divides when using vouchers to move to opportunity neighborhoods. There is also a lack of knowledge by parents of school opportunities or housing services available to them.
    - **Loss of affordable housing:** There has been a lot of housing lost to gentrification, which has caused families to have to move and enroll in other schools, often in areas with more concentrated poverty. There is not enough affordable housing in higher income neighborhoods, preventing low-income families from moving into neighborhoods that could give them access to higher performing schools.



- **Rise of charter schools in low-income neighborhoods:** Low-income families, who often do not exercise choice within the public school system, are more and more likely to send their children to charter schools. More families sending their children to their local charter takes away from investment in low performing public schools, decreasing resources.
- **Location of well-resourced schools** is concentrated in mostly in White, affluent neighborhoods that lack socioeconomic and racial diversity. There is a lack of investment in the quality of schools in low-income neighborhoods.

### Community opposition (13 votes)
- **Integration efforts ++:** Predominantly White and affluent communities often block attempts for integration in schools that would provide low-income communities increased access to quality schools (e.g., rezoning of schools, bussing students, or shelters in their neighborhood). Often school integration efforts are viewed by White families as taking opportunities away from their kids. NIMBYism is often centered on not wanting particular groups of people in a neighborhood, and there is a lack of willingness to have conversations about racial tension.
- **Inequity around civic participation:** Parents that have lower educational attainment or need to spend extended hours at work face barriers in advocating for their children and fighting community opposition. Advocacy voices often do not represent broad interests or interests of those in with the most need.
- **Bullying as a form of student opposition that reinforces segregation:** Discrimination within schools through bullying can lead families to remain within their segregated neighborhoods instead of exercising choice.

### Impediments to mobility to integrated and/or high opportunity areas (11 votes)
- **Lack of education and assistance for parents with vouchers ++** on how to use their voucher to direct their children to opportunity schools.
- **Vouchers cannot be used to access neighborhoods with great schools ++:** Vouchers can limits access to high opportunity neighborhoods, which are often more expensive. Voucher holders also face private source-of-income discrimination, and voucher holders are often not aware of or choose not to exercise their rights to fight discrimination. Participants believe the City lacks an expansive program to encourage mobility.
- **Counseling parents on services:** Low-income families that move to high income neighborhoods do not get enough counseling around services and often face stigma when accessing services.
- **Lack of counseling and support for families to integrate with cultural barriers:** Meaningful mobility is more than spatial; mobility demands that residents cross cultural divides, and government often fails to understand this dynamic.

### Loss of affordable housing (11 votes)
*Table 2 combined this contributing factor with public private investment and lack of access to opportunity due to high housing cost.*
*Table 3 combined loss of affordable housing with location and type of affordable housing, and lack of access to opportunity due to high housing cost.*
*Table 1 did not get to discuss.*

### Private discrimination (10 votes)
- **Lack of enforcement of anti-discrimination laws** make it challenging for protected classes to access areas with quality schools. Enforcement is difficult because people are covertly discriminating.
- **Discrimination presents itself in different ways** and people are not always aware that they are being discriminated against, but testing shows that it still exists. Discrimination is happening based on race, criminal record, economic status, credit history, and source of income, which disproportionally affect people of color.
- **Access to brokers for higher income families** can facilitate racial steering. Some affluent families hire consultants to help them decide where to invest in real estate for their children or future children to have access to a "good school zone."

Want Unlimited Digital Access to NY Daily News? Try 13 WEEKS FOR ONLY 99¢

# NYC schools chancellor calls out parents against integration

BY **BEN CHAPMAN**

NEW YORK DAILY NEWS     Friday, April 27, 2018, 2:12 PM



Carranza, 51, the child of Mexican immigrants and a veteran educator who took the city's top schools job barely four weeks ago, first addressed the subject on Twitter at 1 a.m. Friday. (JEFFERSON SIEGEL/NEW YORK DAILY NEWS)

Schools Chancellor Richard Carranza on Friday called out white parents who oppose efforts to integrate city schools — his most aggressive statement yet on the controversial subject.

Carranza, 51, the child of Mexican immigrants and a veteran educator who took the city's top schools job barely four weeks ago, first addressed the subject on Twitter at 1 a.m. Friday.

The rookie chancellor tweeted a RawStory recap of a raucous Upper West Side school meeting Tuesday where white parents spoke out against controversial plans to integrate neighborhood middle schools.

"WATCH: Wealthy white Manhattan parents angrily rant against plan to bring more black kids to their schools," Carranza tweeted from his official @DOEChancellor account with a link to the video, which originally appeared on NY1.

The tweet linked to the RawStory write-up of the NY1 report on the issue that began: "New effort to diversify schools in the Upper West Side of Manhattan - one of the richest neighborhoods in the city - has drawn an angry reaction from many parents…."

On an unrelated school tour Friday morning in Harlem, Carranza explained his tweet and his views on school segregation, which are more militant than those of his predecessor Carman Fariña.



When Mayor de Blasio was asked about his new chancellor's tweet on his weekly appearance on the Brian Lehrer show Friday morning, he tried to tempt Carrazna's words. (JAMES KEIVOM/NEW YORK DAILY NEWS)

Fariña was widely criticized for refusing to even use the word "segregation."



PAID CONTENT BY **CHARLES SCHWAB**

### How To Navigate Volatile Markets

"These important conversations about creating opportunities for all students are necessary," Carranza said. "Parents and staff … raise the issue of segregation in schools — and I'm glad we're talking about it."

But when Mayor de Blasio was asked about his new chancellor's tweet on his weekly appearance on the Brian Lehrer show Friday morning, he tried to temper Carrazna's words.

"I don't think he at all intends to vilify anyone — he's not that type of person," said de Blasio. "This was his own personal voice … I might phrase it differently."

## Sign up for BREAKING NEWS Emails

Enter your email

Sign Up

privacy policy

© 2016 New York Daily News





**REAL AFFORDABLE COMMUNITIES: MAYOR BILL DE BLASIO AND THE FUTURE OF NEW YORK CITY**

**A REPORT FROM REAL AFFORDABILITY FOR ALL**

## CONTEXT: THE AFFORDABILITY CRISIS IN DE BLASIO'S NEW YORK CITY AND THOSE BLOOMBERG LEFT BEHIND

Across the five boroughs, the affordability crisis is growing every day. Today, low- and moderate-income New Yorkers continue to be priced out of their neighborhoods. The incomes of countless New Yorkers are not increasing while rents keep rising. The growing gap between lower incomes and higher rents is making New York City increasingly unaffordable.

Indeed, a recent study released by *StreetEasy, The High Burden of Low Wages: How Renting Affordably in NYC is Impossible on Minimum Wage*, found that a New Yorker earning $15 an hour could afford just one neighborhood: Throgs Neck in the Bronx.[i]

"The extent to which rent growth has outpaced income growth in New York City means low-wage workers face three options: find several roommates to lower their personal rent burden, take on more than one job, or move out of New York City," the study finds.

According to a close analysis of the most recent Census data[ii], Bloomberg's housing efforts generated a shortage of more than 400,000 affordable units for low-income New Yorkers. Low-income here is defined as a household earning less than 50% of Area Median Income (AMI). For a household of four, that means an approximate annual income of less than $42,000. (In 2012 New York City area median income was $83,600 for a family of four; the 2015 New York City area median income for a family of four is $86,300).



Exhibit 37
8/2/17 92

To create an average of 60% of AMI, for example, a developer could build units at 40% and 80% or 30% and 90%. But the problem is that the city's Department of Housing, Preservation and Development (HPD) does not incentivize either the higher income units (80% and 90% of AMI) or the lower-income units in a real way that would allow for a financially feasible project with a mix of units for tenants at 40% or 30% of AMI.

Unfortunately, the most common funding source for building low-income units, The Federal Low Income Housing Tax Credit program (LIHTC), incentivizes apartments to be built at 60% of AMI. The city's Department of Housing, Preservation and Development (HPD) also requires developers to build a bulk of affordable apartments at 60% of AMI in an effort to maximize the use of limited subsidy dollars. Given these priorities and funding streams, it is very difficult to achieve deeper affordability without some additional direct city capital subsidy.

As new apartments at higher income levels are introduced into low-income areas, economic integration will only be created and maintained if current residents are able to stay in the neighborhoods that will be rezoned. But none of the three options for mandatory inclusionary zoning proposed by de Blasio will achieve this goal.

Bottom line: current residents in low-income communities of color will not be the beneficiaries of new housing required under mandatory inclusionary zoning. The same low-income people whose affordable housing needs were ignored by Bloomberg will continue to be ignored.

New so-called affordable housing will overwhelmingly go to wealthier, whiter outsiders — people who come from other neighborhoods. Instead of limiting gentrification and displacement, de Blasio's mandatory inclusionary zoning plan will likely accelerate them.

**Bottom line: current residents in low-income communities of color will not be the beneficiaries of new housing required under mandatory inclusionary zoning. The same low-income people whose affordable housing needs were ignored by Bloomberg will continue to be ignored.**

Race is an undeniable factor here and needs to be acknowledged: mandatory inclusionary zoning, as currently conceived by the de Blasio administration, will lead to the whitening of neighborhoods like East New York and the South Bronx that are scheduled to be rezoned.

Based on existing income levels, residents of color in East New York and the South Bronx will not gain access to new housing. It will be too expensive for them, unless their wages are increased substantially.

The local media is increasingly running stories about gentrification, land speculation, and higher real-estate prices coming to East New York[iii]. The concern among longtime residents is that de Blasio's mandatory inclusionary zoning will exacerbate, rather than halt, these trends.

That brings us to another major deficiency of de Blasio's approach to tackling the affordability crisis: in his plan, there is no vision for job quality, even though the rezoning of neighborhoods will impact thousands of new jobs, and present opportunities to increase economic opportunity for the most vulnerable low-income residents and communities.

The lack of attention to job quality is even more disconcerting when you consider the recent evidence showing that even $15 per hour isn't enough to make low-income neighborhoods affordable. Low-wage

The DNAinfo archives brought to you by WNYC.
Read the press release here. (https://www.wnyc.org/press/acquires-gothamist/22318/)

 (/www.dnainfo.com/new-york/) | **NEW YORK ▾**

Q
Search

HARLEM (//WWW.DNAINFO.COM/NEW-YORK/MANHATTAN/HARLEM)

**Politics (//www.dnainfo.com/new-york/topics/politics)**

**Real Estate (//www.dnainfo.com/new-york/topics/real-estate)**

## East Harlem Rezoning is 'Ethnic Cleansing,' Locals Say During Chaotic Vote

By Dartunorro Clark (//www.dnainfo.com/new-york/about-us/our-team/editorial-team/dartunorro-clark) | June 21, 2017 3:06pm

🐦 @DartDClark (http://twitter.com/DartDClark)

🐦 ⬛ ✉ ➦



Protesters hissed and booed throughout the meeting, then stormed the stage to protest the vote. Â

▲ View Full Caption                                        DNAinfo/Dartunorro

EAST HARLEM — Protesters stormed the stage at a chaotic community board meeting Tuesday night, equating a controversial city plan to rezone the neighborhood (http://www.dnainfo.com/new-york/20161019/east-harlem/east-harlem-rezoning-plan) to "ethnic cleansing" and even tussling with attendees after the board voted not to reject the proposal outright.

Hundreds of residents chanted, hissed, booed and even got into physical altercations throughout the more than four-hour meeting, urging Community Board 11 to unequivocally vote "no" and claiming the rezoning would displace many working-



In April, the city triggered the formal review process to rezone a 96-block swath of the neighborhood between East 104th and 132nd streets from Park to Second avenues, and between East 126th and 132nd streets from Madison to Fifth avenues.

The process, the Uniform Land Use Review Procedure (ULURP), requires the community board, borough president, City Planning Commission, City Council and ultimately the mayor to review the proposal.

The rezoning would allow for higher density in residential and commercial areas, with new buildings permitted to rise as tall as 35 stories, the Department of City Planning said.

The city claims 3,500 units of housing could be created under the plan, with a "significant proportion" being "permanently affordable."

An impact statement by the city (https://www1.nyc.gov/assets/planning/download/pdf/applicants/env-review/east-harlem/noc_deis.pdf) also estimates that 27 residents and 14 businesses, including an estimated 209 jobs, could be displaced by the plan.

"I don't care what they build, it's not for us," said one woman during the meeting's public comment portion. "Right now, this plan is a plan for ethnic cleansing."

"You better be ready to lay your bodies out on the land," she added.

Marina Ortiz, of the group East Harlem Preservation (http://eastharlempreservation.org/), claimed the plan would "destroy the very fabric of what has historically been an affordable tenement community serving immigrants and low-income families of color."

"Politicians be forewarned: if you proceed, we will cash out everyone responsible at the ballot box in November. If we go, you go," she added in a nod to the elected officials set to review the plan.

The conditions the board requested be met in their vote included leaving Eugene McCabe playground and the Henry J. Carter Specialty Hospital out of the rezoning plan, making buildings constructed on public land "100 percent affordable, and providing city and state subsidies for housing preservation.

The board also called for making any new buildings constructed contextual with surrounding properties, hiring majority local union workers for construction projects, creating pathways to homeownership for low-income families, adding tax incentives for commercial properties to grow businesses, and beefing up anti-displacement measures through city inspections of derelict landlords.

"[City Planning] did not embrace all of our goals," acknowledged board member LaShawn Henry at the meeting. "It does not conform to our core values."

That the board agreed to the proposal assuming it met members' stipulations enraged those who were stridently against it.

METRO

# NYC councilwoman: It might be 'beneficial' to assign public housing by ethnic group

By Michael Gartland

March 27, 2015 | 7:42am



Councilwoman Laurie Cumbo
Photo: Brigitte Stelzer

A Brooklyn city councilwoman wants to know why "blocs" of Asians are living in two Fort Greene housing projects — and suggested it would be "beneficial" to assign housing by ethnic group.

"How is it that one specific ethnic group has had the opportunity to move into a development in large numbers?" Laurie Cumbo, who is black, said at a council hearing on public housing Thursday

The remark, on the Whitman and Ingersoll houses, drew criticism.

"She certainly could've chosen her words a bit more carefully," said Councilwoman Margaret Chin, a Chinese-American. "The fact is that



PLAINTIFF'S
EXHIBIT NO. 143
FOR IDENTIFICATION
DATE: 5/16/15  RPTR:
PENGAD 800-631-6989

there are many Asian-American families ... who have applied to live in public housing."

Cumbo issued an apology, saying she only wanted to know if the New York City Housing Authority "uses a cultural preference priority component" in picking tenants.

NYCHA Chair Shola Olatoye said it did not, and noted its vacancy rate is less than 1 percent, making such an influx nearly impossible.

Still, Cumbo told The Post, "There could be some benefit to housing people by culture ... I think it needs to be discussed."

FILED UNDER   **FORT GREENE, LAURIE CUMBO**

Recommended by

Search    Go

# Controversial School Rezoning Plan In Gentrifying Brooklyn Wins Approval

by Emma Whitford in News on Jan 6, 2016 10:58 am

285

Like

Share

Tweet



*Members of the Farragut community sign in at last night's meeting. Several of them would reiterate their opposition to the rezoning plan (Emma Whitford / Gothamist).*

Last night Downtown Brooklyn's Community Education Council voted in favor of a school rezoning proposal that will require predominantly white, upper-middle-class, bursting-at-the-seams PS 8 to zone incoming DUMBO and Vinegar Hill students to PS 307—a school that is currently under capacity, and predominantly serves African-American residents of the NYCHA-run Farragut Houses on York Street.

The meeting stretched until 10:30 p.m., more than an hour after its initial hard-stop deadline. The final vote was 6-3.

"I believe that tonight is historical," said City Councilmember Laurie Cumbo in her public remarks before a crowded room and bevy of news cameras. "This particular vote is being watched nationwide. My position is that we all have to make the important decisions to change the zoning to make sure that diversity happens."

However, she and others stressed that PS 307 needs further protections to preserve its racial and socioeconomic diversity. The majority of seats should be set aside for students who receive free lunch, she argued, and the City should promise that changing demographics will not ultimately make the school ineligible for Title 1 funding—additional funding for teacher training and special programing.

If the school were to lose federal funding under the rezoning, the DOE stressed that increased enrollment would increase the school's overall budget.

"We've got to make sure we preserve the integrity of the school as it was originally intended," Cumbo said.

Black and Hispanic students currently represent 34% of PS 8's student body, while PS 307 is 95% minority. Under the proposed rezoning, these percentages are expected to shift to 25-35% and 55-65% respectively.

Overcrowding has been an issue at PS 8 for years, thanks in part to robust real estate development in downtown Brooklyn. PS 8 has significantly stronger state test scores than PS 307, but was forced to cut its Pre-K program in 2013 because of overcrowding. It has no language program. At PS 307, Pre-K and kindergarten students take Mandarin lessons.

While the majority of the nine-member CEC 13 expressed qualified support for the plan, several of the speakers who took the floor on Tuesday called for its dismissal, arguing that the plan primarily benefits PS 8 by eliminating its wait list.

A large contingent of parents and community members from the Farragut Houses traveled to the meeting by school bus, and filled the majority of public comment slots. At one point the group picked up a chant: "No! No! No!"

PS 307 PTA President Faraji Hannah-Jones said that he fears the plan will fall short of preserving the influence of the school's current stakeholders in the long run.

As WNYC reported, the predominantly-white PS 8 served mostly black and Latino children in the early 2000s, before changing neighborhood demographics tipped the scales.

"All that we will get is another PS 8—a school that all of the black and brown folks built, only to lose all of the stake and ownership," Jones said.

DUMBO resident Doreen Gallo, speaking on behalf of the Dumbo Neighborhood Alliance and the Vinegar Hill Neighborhood Association, also dismissed the plan.

"The rezoning proposal is designed to only marginally address a potential for a wait list [at PS 8]," she said. "It simply confers the benefit of exclusive access to PS 8 to Brooklyn Heights."

Representatives of PS 8's PTA relinquished their allotted chance to comment on Tuesday, citing shortness of time. However, the group formally endorsed the proposal in October, describing it as "the only proposal on the table that will move us forward."



*The ODP's proposed rezoning. Black lines represent proposed zones. Blue is current PS 8, salmon is current 307 (via).*

Speaking to us earlier this week, Jones described how the PS 307 PTA would proceed in light of an approved rezoning plan. He explained that the school is updating its website to attract students from other parts of the borough, and promoting itself as a school with a powerful technology focus.

"A lot of this has caused us to circle the wagons," Jones said. "Even if the zone goes through, DUMBO parents have the option to not go to the school. But what about the kids who don't have options? I think people need to get it out of their heads that a successful school is a white school."

PS 8's PTA declined multiple requests for comment on their reaction to the vote.

The rezoning plan will impact kindergarten and Pre-K students in the 2016-2017 school year, excluding those "grandfathered" into PS 8 by older siblings.

But Gallo, of the DUMBO Neighborhood Association, predicted that some parents in her neighborhood would not send their children to PS 307 despite the vote.

"PS 8 with its overcrowding still has higher test scores," she said. "When they say that test scores don't matter—since when? These are [the DOE's] metrics for our kids to get into middle school."

She added, "If the DUMBO neighborhood wants to go with this school I'm going to work with the Farragut Community on points of mutual interest. [But] the DOE thinks they can redraw a line and people will trickle in. That's not an effective solution."

CEC 13 Member Ed Brown grew up in the Farragut Houses. Before casting his vote in favor of the plan, he admonished parents for, as he put it, being "frozen" by fear. "Adults on both sides have frozen their minds," he said.

"People are holding on to what they deem belongs to them, and now gentrification and new buildings have surrounded the Farragut houses," he added. "Gentrification is here. It's not going back to the old Brooklyn that we remember. Those times have passed."

Treasurer Renee Burke echoed his sentiment. "Don't think of it as a takeover," she said, addressing the Farragut community members in the audience. "Don't think of everyone who comes in as a threat. Just be ready for it, because inevitably diversity will happen."

"We commend the CEC's approval of this plan, an essential step that will increase diversity and ensure the needs of students and families in the district are met," said DOE spokeswoman Devora Kaye in a statement. "We'll continue to work closely with all partners to implement this plan and provide support during the transition."

In November, the DOE dropped an equally-controvoersial rezoning plan on the Upper West Side, tabling the issue of overcrowding at elite PS 199 until further notice.

Contact the author of this article or email tips@gothamist.com with further questions, comments or tips.



Tweet    Like 285        ︿ ﹀    submit

- brooklyn heights
- doe
- dumbo
- farragut houses
- rezoning
- vinegar hill
-

# Other Interesting Stories

Plaintiff's
36
11/3/17 ZZ

# artspace

## EL BARRIO'S OPERATION FIGHTBACK

# EL BARRIO'S ARTSPACE PS109
# FREQUENTLY ASKED QUESTIONS

## Q: What is El Barrio's Artspace PS109?

A: PS109 will contain 90 units of affordable live/work housing for artists and their families, and 10,000 square feet of non-residential space for arts and cultural organizations on the ground floor and lower level. It will serve the El Barrio community by creating permanently affordable housing in a neighborhood at risk of gentrification. To help the area retain its traditional Latino identity, Artspace will reserve at least 50% of the units for current El Barrio residents.

## Q: What is the definition of a "live/work" project?

A: A live/work project is a residential building in which each dwelling has extra space (100 to 150 square feet) that the artist can use as a studio. Live/work units by Artspace have consistent design elements, such as high ceilings, large windows, durable surfaces and wide doorways. These spaces are designed to accommodate and foster a variety of creative processes. Artspace live/work projects also include common spaces such as galleries, meeting rooms and green space that encourage tenant engagement, cooperation and community involvement. Most Artspace live/work projects are mixed-use buildings with housing on the upper floors and non-residential space on the lower floors.

## Q: How much does it cost to live in an Artspace project?

A: In setting our rents, we adhere to affordable housing guidelines established by the U.S. Department of Housing and Urban Development. HUD uses a formula based on the local area median income (AMI), the degree of affordability of any given unit (expressed as a percentage of the AMI), the number of bedrooms in the unit, and the number of people in the household. While rents vary by community, our goal is to provide affordable space that is adequate for artists both to live and to work in their units. Artspace buildings provide live/work spaces that are larger than other affordable spaces and usually less expensive than other comparable spaces. And as part of our sustainability model, Artspace buildings remain affordable in perpetuity.

## Q: What are the income qualifications for this project?

A: The income qualifications can be found on HPD's website. http://goo.gl/mD9aN

## Q: Are these the guidelines for all projects every year?

A: No. The guidelines are set by HPD and change every year.

## Q: Are there housing preferences to live at PS109?

A: Yes. The first applications processed must be those that meet one of the approved housing preferences:

> Non-residents of New York City can only be considered after all eligible, current New York City residents have been processed.
> Community preference: To help the area retain its traditional Latino identity, Artspace will reserve at least 50% of the units for current El Barrio residents.
> Disability preference
> Municipal employee preference
> Artist preference

## Q: Do you have to be an artist to live in an Artspace live/work project?

A: Anyone who qualifies for affordable housing may apply for residency in an Artspace project, but we give preference to those applicants who participate in and are committed to the arts. Applicants need not derive their income from their art.

# FREQUENTLY ASKED QUESTIONS

**Q: How does Artspace determine who is an artist?**

A We define the term "artist" broadly to encompass a wide variety of creative pursuits, including traditional art forms and those as diverse as clothing design, weaving and even canoe making. A community-based Selection Committee interviews all applicants. The committee looks for evidence that applicants are seriously committed to their art and that they will be mindful and positive contributors to the building and community. The application and qualification process does not include judgment of quality of work.

**Q: Can I have roommates?**

A: An applicant can apply with a roommate ONLY if they were roommates in the past.

**Q: Can I be a full time student and head of household?**

A: No. A full time student cannot be the head of household. Low-income units in the tax credit program are not to be occupied exclusively by students. For Low-Income housing tax credits, the IRS defines a "student" as a full-time student during five (5) calendar months of the calendar year at an educational institution, other than a correspondence school, with regular faculty and students.

**Q: How big are the units?**

A: The studio, one bedroom, and two bedroom units range in average from approximately 480 square feet to approximately 980 square feet.

**Q: Will there be community space available?**

A: Yes. There is gallery/exhibition space available for residents.

**Q: Is there commercial space for rent?**

A: There is space available for rent for non-profits and community organizations. There are two offices dedicated for non-profit organizations as well as flexible use space for community, arts and non-profit organization.

**Q: When can I apply and when can I move in?**

A: The applications will be available Spring 2014. Qualified applicants selected out of the lottery can move in Fall 2014.

**Q: Is there an application fee?**

A: There is not an application fee, but there is a credit check fee of $45.

**Q: When will the next information session be?**

A: Fall of 2013. Please sign up for the property updates to receive further information once we announce the session.

## EL BARRIO'S OPERATION FIGHTBACK

El Barrio's Operation Fightback Inc., (EBOF), located in the Northern Manhattan community of East Harlem, was founded in 1983 out of the struggles of tenants and community residents to secure decent affordable housing for neighborhood families in the glaring context of housing neglect, abandonment, arson, crime and drug proliferation.

Incorporated in 1986, El Barrio's Operation Fightback Inc. today focuses on the housing, economic development and social service needs of East Harlem's diverse and growing community. Additional information is available at **www.ebofb.org**.

## artspace

**America's Leader in Artist-Led Community Transformation**

For more than 30 years, Artspace has brought its hard-earned expertise to more than 200 cultural facility planning efforts from coast to coast. Of these projects, more than 35 have been developed and are owned and operated by Artspace itself, representing a unique, $500 million investment in America's arts infrastructure. With headquarters in Minneapolis and offices in New York, Seattle, New Orleans, Los Angeles and Washington D.C., Artspace is America's leading developer of arts facilities. To date we have completed more than a thousand affordable live/work units for artists and their families as well as more than a million square feet of non-residential space for artists and arts organizations. Additional information is available at artspace.org.

Movement for Justice in El Barrio
232 East 11th Street
New York, NY 10003

OFFICE OF THE
CHAIRPERSON

NOV 18 2016
30133

November 17, 2016

Carl Weisbrod
Director, Department of City Planning
Chair, City Planning Commission
120 Broadway, 31st Floor
New York, NY 10271

Dear Mr. Weisbrod,

We at Movement for Justice in El Barrio are writing to you and the Department of City Planning because we are shocked and dismayed that your department has excluded our 10-Point Plan to Preserve Rent-stabilized Housing from your East Harlem rezoning process. As you know, your office received this plan numerous times: via mail on November 5, 2015, and as part of written testimony hand-delivered for DCP hearings on rezoning on 12/22/15 and 2/10/16, and yet you have not mentioned it or included it in any of your recent presentations about the East Harlem rezoning. We are including it yet again.

Eight thousand East Harlem residents came together through Consultas – community consultations – over the course of a year to create this plan and to reject the Mayor's luxury housing plan and it is of utmost importance that our 10-Point Plan to Preserve Rent-stabilized Housing be implemented.

We know that the Mayor's "luxury housing plan" favors real estate developers who can build market rate, luxury units as the vast majority of new housing in rezoned areas under his plan. We are opposed to this plan because when the market is flooded with thousands of new luxury units, this will cause rapid rent increases in the community, displacing long-term, low-income residents from their rent-stabilized units as has been seen in rezonings of other "hot markets" like Chelsea and Williamsburg. Landlords already employ a variety of legal and extra-legal means to displace rent-stabilized tenants in our community and remove their units from the rolls of rent-stabilization. With the massive upzoning planned, that pressure will drastically increase leading to secondary displacement. Also, in every form of the Mayor's upzoning plan, the vast majority of units are market-rate, luxury apartments and the so-called affordable units are not within reach of the low-income tenants of East Harlem. Despite all of these negative impacts, our community-driven proposal for the preservation of rent-stabilized housing has fallen on deaf ears.

We are calling on you to stop excluding us from the rezoning process and to implement our 10-Point Plan in order to mitigate the multiple negative effects that any rezoning of

PLAINTIFF'S
EXHIBIT NO. 133
FOR IDENTIFICATION
DATE 4/14/18 RPTR: 2

East Harlem will bring, with displacement of long-term, low-income tenants as the greatest threat. When our 10-Point Plan is implemented, landlords will be forced to follow the law so that we, East Harlem tenants, can stay in our rent-stabilized homes.

Our plan provides needed protection for low-income tenants in rent-stabilized units. These protections are vital, as described by a recent report by the Regional Plan Association, "because East Harlem is a gentrifying neighborhood, aggressive protections for existing vulnerable residents will be critical in order to prevent displacement." We are deeply concerned about the threat to our community and our culture if tenants are displaced from rent-stabilized housing, as warned by the RPA report: "East Harlem in particular, a neighborhood characterized by diversity and opportunity throughout its history, is under threat." (*Preserving Affordable Housing In East Harlem, August 2016*).

In order to protect and preserve rent-stabilized housing and the culture and community of our beloved Barrio, we call on the Department of City Planning to implement the only community-generated plan aimed at preventing displacement and keeping long-term low-income residents of East Harlem in our homes, our 10-Point Plan. We look forward to hearing that you will indeed implement our 10-Point Plan as part of the East Harlem rezoning process, during the current period of community response to DCP's plans. We respectfully request a response by Monday, November 28, 2016.

Sincerely,

Movement for Justice in El Barrio

Enc: "10 Point Plan to Preserve Rent Stabilized Housing"

CC: Manhattan Borough President Gale A. Brewer

NYC_0081046

Movement for Justice in El Barrio
212-561-0555

Confidential

NYC_0081047

NYC_0081048

## REZONING IN EAST HARLEM

As part of his "Housing NY: A Five-Borough, Ten-Year Plan," Mayor De Blasio is planning to rezone East Harlem. Throughout the spring, summer and early fall of 2015, Movement for Justice in El Barrio organized broad community consultations in East Harlem through a series of community-wide meetings and workshops to understand, analyze and discuss this planned rezoning of East Harlem.

A primary concern raised through this community consultation process has been the likely displacement of long-time low-income community residents as a result of rezoning. Community members came out clearly against a rezoning plan where 70-75% of all new units will be market-rate, luxury housing. This, community residents argue, would be more aptly named a Luxury Housing Plan, not an Affordable Housing Plan. The thousands of market-rate, luxury apartments created in our community if the proposed rezoning plan goes through will lead to displacement of long term low-income tenants. These new luxury units and their market rate rents and higher income residents will put pressure on long term low-income tenants and small local businesses that contribute to the fabric and culture of El Barrio. Low-income tenants and small businesses will be priced out of their homes and communities.

In addition, the units set aside as "affordable" are not within reach for the current residents of East Harlem. In the plan, for the 25-30% of units set aside as "affordable," the average income eligibility level ranges from $46,620 to $62,150 for a family of three – well above $33,600 the East Harlem AMI for a family of four. Residents argue that these units designated as

1

Confidential

"affordable" are not for current East Harlem residents, but will, like the luxury units cater to newer, wealthier residents.

For these reasons and more, area residents are opposed to Mayor De Blasio's Housing New York: A Five-Borough, Ten-Year Plan, and his Mandatory Inclusionary Housing.

Community residents are deeply concerned about the potential loss of rent-stabilized housing and have developed a plan to preserve existing affordable housing.

## THE PRESERVATION OF RENT-STABILIZED HOUSING

Community members in East Harlem have developed a 10-point plan for the preservation of rent-stabilized housing in East Harlem and beyond. When enacted, the community-generated recommendations below will make systemic change in the enforcement of the housing code, reversing the trend toward displacement of low-income immigrant and people of color communities.

These across-the-board changes are needed at Mayor De Blasio's Department of Housing Preservation and Development (HPD) and will lead to actual preservation of thousands of units at risk of loss of affordability.

## DISPLACEMENT IN LOW-INCOME, PEOPLE OF COLOR, IMMIGRANT COMMUNITIES

Low-income, people of color and immigrant residents across the City find that inaction on the part of HPD leads to displacement and a weakening of their communities.

When tenants live with housing violations for years on end, many are finally driven out, paving the way for landlords to raise rents and ultimately remove units from the rolls of rent-stabilized apartments, thereby decreasing the availability of affordable, quality housing to New York's poor and working class residents.

Many community residents decided to make a systematic study to document their lived experiences by surveying residents across East Harlem (also known as El Barrio) about their interactions with HPD and to hold HPD accountable to its mission, and to use the results to develop community-driven recommendations for systemic change at HPD. The data show that HPD fails in its mission on multiple levels: educating the public about their role, providing adequate inspection, responding to the most hazardous maintenance issues, enforcing the housing code and protecting tenants from abusive and negligent landlords. (The findings of this study are available upon request).

Mayor De Blasio must act and preserve rent-stabilized housing by implementing these ten recommendations which directly address HPD's failures. These community-developed recommendations for systemic change, once implemented, will stem the tide of displacement in communities threatened with unfair rezoning and its resulting displacement.

NYC_0081049

Confidential

## RECOMMENDATIONS

We call on Mayor De Blasio to take strong action in favor of preserving rent-regulated housing. While the Mayor's "Housing New York" plan claims that "rent-stabilized apartments are a critical component of the City's affordable housing stock," the City's low income residents need a community-driven plan that will indeed preserve rent-stabilized housing units. Here we have a ten point community-generated plan to preserve affordable housing in East Harlem and citywide. Based on surveys, one-on-one conversations with hundreds of residents, group discussions, and community meetings, we have developed these recommendations for real, lasting changes at Mayor De Blasio's agency tasked with preservation, the Department of Housing Preservation and Development, HPD. These are changes that the residents of New York City's low-income, people of color and immigrant communities need and deserve.

**1. Provide true, independent citywide oversight of HPD's performance. It is of the highest importance that enforcement mechanisms are put into place to ensure HPD's execution of these recommendations and their regular duties.**

• Create an Independent Citywide HPD Oversight Commission with the power to investigate HPD, in order to ensure that HPD carries out these recommendations as well as their responsibilities to enforce the maintenance code and improve the quality of affordable housing.

• Community based housing and tenants' rights organizations will have input on the selection of the Independent Citywide HPD Oversight Commission members.

• Have HPD make regular reports to the Independent Citywide HPD Oversight Commission regarding their execution of these recommendations, housing code enforcement and the improvement of the quality of affordable housing.

• Establish a citywide hotline where tenants can lodge complaints with the Independent Citywide HPD Oversight Commission about problems with HPD.

**2. Mount a citywide public education initiative about HPD's responsibility to safeguard quality, affordable housing.**

• Publicize the 311 hotline and HPD's role in addressing housing maintenance issues using public service advertisements across all five boroughs, including on subways, buses, bus shelters, inside subway stations, newspaper ads, TV commercials, commercials on taxi TVs, billboards, radio spots, in hospitals and other readily visible public locations.

• HPD should have community outreach workers distribute multi-lingual, easy-to-understand literature about their role in addressing housing maintenance issues in El Barrio and similar neighborhoods in all 5 boroughs. Materials should publicize the 311 hotline where tenants lodge complaints regarding housing code violations.

• Consolidate all information about HPD on one web location and publicize this webpage in HPD Public Education Initiative materials and advertisements.

**3. Establish an administrative tribunal to assess and collect fines for code violations, and/or grant inspectors the power to write citations against owners which must be paid immediately upon finding violations left unrepaired during a reinspection.**

Confidential

NYC_0081051

**4. Fulfill the responsibility of the Emergency Repair Program.**

• HPD must make all emergency repairs not completed by the landlord in the designated amount of time and bill the landlord.

• Mount a special public education promotion during heat and hot water season advertising the ERP's role and budget for addressing heat and hot water violations, and publicizing the 311 hotline where tenants can lodge their heat and hot water complaints. Utilize public service advertisements across all five boroughs including print, television and radio commercials and posters in readily visible public locations.

• Hire community outreach workers to carry out this special public education promotion and publicize the ERP's role for addressing heat and hot water violations and the 311 hotline in low income neighborhoods in all 5 boroughs.

**5. Improve the quality of language-access for tenants receiving inspections.**

• Inspectors must carry violation notifications in all available languages with them at all times.

• Printed violation reports which are mailed to tenants must be provided in the tenant's primary language.

**6. Improve response to emergency violations.**

• Landlords must be required to make repairs within 24 hours for emergency violations (except lead-based paint and window guards). Inspectors must be dispatched immediately and must notify landlords immediately in person, by phone or by email.

• Dispatch inspectors in less than 24 hours in cases of lack of heat or hot water.

• Promptly fine owners when heat or hot water is not restored within 24 hours.

• Assign special emergency inspectors.

**7. Establish an East Harlem-HPD Housing Justice Program that can serve as a Pilot Program to be replicated in other similar areas with sub-standard housing at risk of worsening housing conditions and displacement.**

• Establish an East Harlem HPD Oversight Team composed of members of local tenants' associations to review HPD's performance in East Harlem. (See Recommendation 8).

• Establish an East Harlem HPD liaison who will take complaints lodged collectively by tenants' associations.

• Community outreach workers who carry out the HPD Public Education Initiative in East Harlem will report to the East Harlem HPD Oversight Team so the Team can measure the overall effectiveness of the program.

**8. Establish community-based oversight of HPD's performance in East Harlem.**

• Create the aforementioned East Harlem HPD Oversight Team composed of members of local tenants' associations to review HPD's performance in East Harlem.

• The East Harlem HPD Oversight Team will oversee HPD's performance in terms of: i) Housing code enforcement in East Harlem and ii) The implementation and effectiveness of the HPD Public Education Initiative.

6

7

Confidential

• The East Harlem HPD Oversight Team will review for approval all materials that HPD provides to tenants as part of the HPD Public Education Initiative. • HPD will provide written reports to the East Harlem HPD Oversight Team on housing complaints, inspections and code enforcement in East Harlem every 6 months.

**9. Improve the inspection process.**

• Provide inspections 24 hours a day, 7 days a week.

• Increase the number of HPD inspectors.

• Give inspection appointments with date and time to everyone who lodges a maintenance complaint so that residents suffering in poor housing conditions can make arrangements so that their apartments can be inspected.

• Inspectors to provide all tenants with a written result of the inspection in the language that the tenant can understand signed as proof of inspection with the date and time of the inspection.

• For non-emergency complaints, send tenants written notification of inspections with exact time and date at least 24 hours prior to the inspection.

**10. Improve HPD follow up on unresolved violations.**

• Guarantee HPD call-backs to tenants to find out if violations have been repaired.

Confidential

| From: | Press, Jordan (HPD) </O=CS HOSTING/OU=EXCHANGE ADMINISTRATIVE GROUP |
|---|---|
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=PRESSJ> |
| Sent: | January 31, 2018 3:00 PM |
| To: | Tauber, Lacey (HPD);Kawitzky, Simon (HPD);Stark, Dwan (HPD);Sandler, Michael (HPD);Bozorg, |
| Leila (HPD) | |
| Subject: | Inwood White paper |
| Attachments: | NMN4S Uptown Zoning White Paper.pdf |

**Jordan Press**
**Executive Director of Development & Planning - Office of Government Affairs**
**NYC Department of Housing Preservation & Development**
**t 212-863-8968**

-------- Original message --------
From: Charlie Samboy <csamboy@edc.nyc>
Date: 1/31/18 1:52 PM (GMT-05:00)
To: "Press, Jordan (HPD)" <pressj@hpd.nyc.gov>
Subject: RE: White paper

Attached.

Best,
Charlie

CHARLIE E. SAMBOY I ASSISTANT VICE PRESIDENT, GOVERNMENT & COMMUNITY RELATIONS
New York City Economic Development Corporation
110 William Street • New York, NY 10038 • www.nycedc.com
csamboy@edc.nyc • o. 212.312.3572 • m. 646.265.5740





**From:** Press, Jordan (HPD) [mailto:pressj@hpd.nyc.gov]
**Sent:** Wednesday, January 31, 2018 1:51 PM
**To:** Charlie Samboy <csamboy@edc.nyc>
**Subject:** White paper

Can you send?



Confidential

NYC_0183455

**WHITE PAPER**
**Northern Manhattan is Not for Sale/ Alto Manhattan No Se Vende**
**Principles of Equitable Development, Affordable Housing, and a Just Rezoning for Inwood**

### OUR COMMUNITY

We live in Inwood and Washington Heights, a working- and middle-class, largely Dominican and Spanish-speaking, residential community in New York City, rich in indigenous Lenape history, where small businesses and a longstanding artistic community thrive. Surrounded by forest, caves, salt marshes, and parks, Northern Manhattan stands out among Manhattan and greater NYC neighborhoods for its natural and demographic diversity. Our community deserves preservation of existing housing, equitable development of truly affordable new housing, and protection for small businesses through innovative rezoning.

### CURRENT CHALLENGES

Our housing, the largest rent-regulated housing stock in Manhattan, faces pressure from snowballing deregulation and speculators seeking to build taller, as-of-right market-rate buildings. Small businesses integral to our community are set to receive no protections from rent hikes which will drive them out and make room for higher-paying chain stores. Over-full schools and public transit and crumbling subsurface infrastructure cannot handle any population increase without immediate renovation.

### INWOOD NYC: A FLAWED PLAN

The Inwood NYC plan, an initiative of the Economic Development Corporation, advocates a rezoning that does not address the needs of our community. In effect, Inwood NYC is a plan for hyper-gentrification of our neighborhood. Our primary concerns with this plan include:

- Inwood NYC has not given our community opportunities for deliberative engagement, and in many ways it has been a top-down plan that was created prior to community input and imposed on our neighborhood.
- Preservation proposals fail to address existing displacement pressures, which will skyrocket with any actual rezoning. The plan does not include meaningful protections for current tenants in affordable housing beyond legal aid limited to only one zip code in our community.
- The overwhelming majority of new housing constructed will be market rate and the small amount of affordable housing will be out of reach to the majority of people in our community.
- Vast small business displacement will occur from the proposed upzoning of major commercial corridors. This upzoning will increase property values and continue the trend of rising rents on existing small businesses—these local businesses receive no protections from rent hikes and big-box stores in the current plan.
- The auto and wholesale industry east of 10th Ave., which services bodegas, restaurants and the taxi industry, will be displaced as zoning is changed from industrial and manufacturing to commercial and residential.
- Inwood NYC plan predicts a population increase of up to 14,000 new residents in its scoping document but does not address the severe infrastructural challenges that will result in a neighborhood where schools and transit are already overburdened and much of the subsurface infrastructure dates back 80–100 years.
- There are no guarantees that jobs created by Inwood NYC will go to members of our community, despite the precedent for local hire and pre-apprenticeship programs and support for these programs from the Building Trades unions.

### WHAT WE STAND FOR

Our coalition, Northern Manhattan is Not for Sale/Alto Manhattan No Se Vende, is dedicated to promoting housing justice in the communities of Washington Heights, Inwood, and Marble Hill and defending the rights of tenants, residents, and small business owners from exploitation by landlords, real estate developers and the politicians who support them. We formed two years ago in the fall of 2015 to devise a community-led alternative to the proposed Inwood NYC rezoning. We are a coalition of community

groups, non-profits, faith communities, tenant associations, small businesses, and other residents of Northern Manhattan.

**We believe:**

1. First and foremost, that housing is a human right.
2. In preserving and increasing Northern Manhattan's supply of public, rent controlled, and rent stabilized housing, and in strengthening the laws that protect the rights of tenants.
3. That public assets should *always* remain in the hands of the public, and never be sold to private developers.
4. That all new housing developments should be 100% affordable to the people who live in our communities and we oppose all luxury development.
5. That tenant associations and unions form the foundation necessary to protecting housing rights.
6. That, due to the historical discrimination in housing towards the Black and Latino population, we should fight harder to secure and increase access to equitable housing for this community.
7. In preserving the cultural identity of Northern Manhattan.
8. In the importance of encouraging Latinx people to use their cultural identity as a tool for resistance, for political mobilization, and as symbolic territory to create spaces for meaningful participation in the urban planning and development process.

## OUR ALTERNATIVE: A 6-POINT COMMUNITY PLAN ADDRESSING COMMUNITY PRIORITIES

### 1. Protect Existing Housing

Inwood has the largest rent regulated housing stock in Manhattan: as per the EDC's own Neighborhood Snapshot, 61% of rental units in Inwood are rent-regulated versus only 39% across Manhattan. Many converging factors have put these units at risk, including vacancy decontrol, lack of oversight on deregulation, and tenants unaware of their legal rights and unable to access legal representation. These factors have resulted in increasing loss of regulated units and an as-yet unknown amount of illegally deregulated units. Northern Manhattan consistently has the highest rates of housing code violations, with an astounding 80% of cases in Manhattan Housing Court housing court. Additionally, up to 30% of Inwood rental units are under "preferential rent" leases, putting them at immediate risk of a significant rent hike if speculation increases.

Our plan to protect existing housing involves four sets of actions that must occur *before* any rezoning takes place:

**A. Prioritize long-term affordability**

The City must set aside a fund to purchase distressed, under-utilized or vacant, and/or rent-stabilized buildings from for-profit landlords that are: closest in proximity to up-zoned areas, occupied by severely rent-burdened tenants, being held vacant and off of the market, and/or sites of known landlord abuses. The passage of the Housing not Warehousing acts provides a legal framework through which the city could maintain an accurate track of vacant or underutilized properties in Northern Manhattan, and the mayor's recent statements committing to the use of eminent domain for public good, especially in regards to housing affordability, provide a framework through which the city could acquire these buildings. These acquisitions should join other public land in portfolios of community land trusts (CLTs), including the Northern Manhattan CLT, as specified in 3C below.

**B. Enforce the rent laws**

The City of New York must take aggressive steps to enforce the rent laws in the rezoning area. This enforcement effort should include:

- Conducting an assessment of all rent stabilized building in Inwood above 155th St. to identify landlords who routinely abuse rent laws and then working with the State DHCR to audit these

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
--------------------------------x
JANELL WINFIELD, TRACEY STEWART
and SHAUNA NOEL,

                Plaintiffs,

        -against-                    Civil Action No.:
                                     15-CV-5236 (LTS)(KHP)
CITY OF NEW YORK,

                Defendant.
--------------------------------x
```

VIDEOTAPED DEPOSITION OF

CARL WEISBROD

New York, New York

July 27, 2017

9:06 a.m.

Reported by:
THERESA TRAMONDO, AOS, CLR
JOB NO. 51315

2      housing, to the best of my recollection,

3      with everybody in the administration was

4      focused on economic diversity.

5          Q.    My question, however, has to

6      do with a reluctance more generally in

7      the administration to talk about racial

8      change.

9               MR. VIDAL:  Objection.

10               MR. GURIAN:  I haven't

11          finished my question, so you will

12          probably want to wait for that.

13               MR. VIDAL:  Excuse me.

14          Q.    Were there any discussions

15      with anybody in the administration about

16      the potential political pitfalls of

17      discussing programs in terms of potential

18      racial change that might ensue?

19          A.    Not that I can recall.

20               MR. VIDAL:  Objection.

21               Please proceed.

22          Q.    During your time in the

23      de Blasio administration, were you aware

24      of there being any racial politics at

25      play in the City?

1                    Weisbrod

2        A.    Over 50 years of working in

3   New York City, racial politics are always

4   in the ether, so.

5        Q.    And that includes these last

6   few years, yes?

7        A.    In the City generally.

8   I think that's a fact of life in this

9   country and a fact of life in the City.

10       Q.    So how does that in

11  current-day terms manifest itself in the

12  City?

13       A.    I don't know.  I mean, I did

14  not -- I just don't know how to answer

15  that question.

16       Q.    What do you understand "racial

17  politics" to be?

18       A.    My understanding of racial

19  politics is that as in a pluralistic

20  city, like New York, interest groups of

21  various kinds, whether they're racial,

22  ethnic, religious, gender-related or

23  whatever, have perspectives on what

24  should happen in the City and how, and

25  that's just the reality of politics.

1                    Weisbrod

2          Q.    Sticking with the racial and

3     ethnic groups for a moment, when you say

4     "what should happen in the City," what

5     are you referring to?  Does that include

6     electoral politics?

7          A.    I think it includes a host of

8     different things.  It includes things

9     that are related to government, things

10    that are related to the private sector,

11    things that are related to the

12    marketplace.  It is the reality that a

13    variety of interest groups have their own

14    perspectives on things and also their own

15    advocates, and that's reflective in

16    social discourse in the City.

17         Q.    Advocacy in relation to

18    housing policy is not immune from that,

19    is it?

20         A.    No.

21         Q.    Is there resistance to change

22    in the racial composition of

23    neighborhoods?

24              MR. VIDAL:  Objection.

25         A.    I don't know, and I did not

1          Weisbrod

2     A.     Thank you.

3          THE VIDEOGRAPHER:  Here ends

4     video recording number 2.  This

5     concludes the video recorded

6     deposition of Carl Weisbrod taken

7     by the plaintiffs on Thursday, July

8     27, 2017.  The time is 1722.  We

9     are going off the record.

10          (Time noted:  5:23 p.m.)

11    

12          CARL WEISBROD

13

14   Subscribed and sworn to before me

15   this 15 day of September , 2017.

16

17   _____

18        Notary Public

19

20

21

22

23

24

25

```
1

2                    C E R T I F I C A T E

3       STATE OF NEW YORK      )

4                               : ss.

5       COUNTY OF NEW YORK    )

6

7              I, THERESA TRAMONDO, a Notary

8       Public within and for the State of New

9       York, do hereby certify:

10             That Carl Weisbrod, the

11      witness whose deposition is

12      hereinbefore set forth, was duly sworn

13      by me and that such deposition is a

14      true record of the testimony given by

15      the witness.

16             I further certify that I am

17      not related to any of the parties to

18      this action by blood or marriage, and

19      that I am in no way interested in the

20      outcome of this matter.

21             IN WITNESS WHEREOF, I have

22      hereunto set my hand this 31st day of

23      July, 2017.
```

24

25

*Theresa Tramondo*

November 24, 2014

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410-0500

RE    [*Docket No. FR-5173-N-02, Affirmatively Furthering Fair Housing Assessment Tool:*
          *Solicitation of Comment--60-Day Notice Under the Paperwork Reduction Act of 1995*]

To Whom It May Concern:

This letter sets forth the comments of the City of New York (City) on the above-referenced
proposed draft Assessment Tool.

The City is the largest municipal developer of affordable housing in the nation and is currently
engaged in a new plan to build and preserve 200,000 affordable units across all five boroughs of
the City. The City's Department of Housing Preservation and Development (HPD), the Mayor's
Office for People with Disabilities, the Department of City Planning and the New York City
Housing Authority (NYCHA) contributed to the comments below. HPD and NYCHA are
directly responsible for siting, creating and preserving affordable housing opportunities, and both
administer Section 8 programs and use other federal funding streams. NYCHA owns and
operates the largest public housing program in the nation, serving over 403,120 residents.

The City wholeheartedly shares the goal of increasing access to high-opportunity neighborhoods
for historically marginalized populations. Indeed, our *Housing New York* plan commits the City
to "foster diverse and thriving neighborhoods." Unfortunately, the proposed Assessment Tool
(the Tool) may have the unintended effect of leading local governments to take actions that may
not serve the needs and priorities of their communities, and does not recognize the real-world
constraints under which local governments operate. We are deeply concerned that completion of
this tool will interfere with our ability to make fair and locally based decisions about the most
pressing needs facing our City.

To improve the Tool's utility and its ability to further fair housing opportunity, while also
ensuring that localities not become overburdened with excessive regulations, the City provides
the following comments.

**1. Timing of release of the proposed tool**

The proposed Tool is presented as the mechanism by which program participants will conduct an
Assessment of Fair Housing (AFH), as outlined by the 2013 Proposed Rule regarding the
obligation to affirmatively further fair housing. The proposed Tool also would replace the
Analysis of Impediments (AI) process currently in use.

On September 17, 2013, the City submitted extensive comments to HUD on the Proposed
Rule. While expressing support for the goal of increasing access to high-opportunity

1



PLAINTIFF'S
EXHIBIT
24
7-27-17
PENGAD 800-631-6989

The cover page of the Tool requires a signature affirming that, "the program participant(s) have prepared an assessment that fulfills the requirements at 24 CFR §§ 5.150-5.164 or comparable replacement regulations of the Department of Housing and Urban Development." The affirmation's referral to "comparable replacement regulations" is unclear. If a City official or employee is to affix his or her signature to a pre-prepared statement, the statement should clearly reference what the employee is signing off on.

## 12. Conclusion

The City's primary concern with the draft Assessment Tool is its requirement that respondents identify "determinants" of fair housing issues. While data and local knowledge may be sufficient to draw correlations, grantees will be hard-pressed to ascertain causal relationships, as the Tool compels participants to do. The Tool encourages, and may be used to require, grantees to create policy on the basis of incomplete information and personal and anecdotal perceptions. While local governments frequently have to make policy decisions on the basis of incomplete information, a tool that forces localities to assume unproven causal conclusions will not necessarily further grantees' ability to effectively increase fair housing choice and could lead to policies with negative unintended consequences. The stakes of drawing unsupported causal conclusions are high because of the critical importance of these issues, and the difficulty of having thoughtful discussions about the issues against the backdrop of local politics.

The stakes also are unknown, given the lack of clarity about the potential uses of the implications of causality the Tool asks localities to draw. It is unclear, for example, whether and how grantees' future funding could be affected by such implications. Continued federal support for local housing programs is essential to the nation's efforts to affirmatively further fair housing. At a minimum, to assure local governments across the nation that the tool will be used to help localities develop more effective programs, rather than serving as a basis for litigation and punitive actions, the tool should make clear that localities will be given a safe harbor period in which to further evaluate any causal implications drawn from the assessment and to formulate appropriate responses to any problems the assessment reveals.

The City appreciates the opportunity HUD has offered to receive stakeholders' views on this important policy initiative. If you have any questions or concerns, please do not hesitate to contact HPD's Director of Legislative Affairs and Federal Policy, Jordan Press, at pressj@hpd.nyc.gov.

Sincerely,

Vicki Been
Commissioner, New York City Department of Housing Preservation and Development

Carl Weisbrod
Director, New York City Department of City Planning

9

# Affirmatively Furthering Fair Housing:
# A Preliminary Guide to NYC's Submission

Strategic Planning

September 2016



**Department of
Housing Preservation
& Development**

# Presentation Overview

1. Fair housing efforts to date (Strategy, Research and Communications)
2. AFFH submission requirements
3. AFH preliminary analysis: key takeaways
4. Data issues and preliminary findings
5. Contributing factors of segregation
6. "Balanced approach" to fair housing
7. Defining "concerted community revitalization" (CCR)
8. Next steps for NYC's AFH process
9. Appendix



Confidential

# 1.Fair Housing Efforts to Date: Strategy, Research, and Communications

- **AFH preliminary preparation**
  - Identify major data issues
  - Highlight potential political / legal concerns

- **Enterprise fair housing working group**
  - Two meetings so far with Enterprise and advocates
  - Third meeting will discuss national Qualified Allocation Plans (QAPs) and prioritization of "concerted community revitalization" factors

- **Community District preference**
  - Ongoing ~~background~~ research and preparation

- **HPD regulatory compliance**
  - Use of fair housing funds for future trainings, educational materials, or community engagement

- **SAFMR comments**
  - Lack of policy alignment with AFFH

3



NYC_0021054

# 2. What does NYC have to submit for the AFH?

**Assessment of Fair Housing (AFH)**

- *Initial submission due February 18, 2019*
  (270 days prior to the submission deadline for the next Consolidated Plan)

- Extensive analysis of federally funded housing, using HUD's data and mapping tool, supplemented with local data and knowledge

- Significant community outreach and participation requirements

- Coordination with NYCHA and other City agencies, potential to collaborate regionally

- Outline fair housing goals and priorities for HPD and the City

4



NYC_0021055

# 3. AFH Preliminary Analysis: Key Takeaways

1. Data issues present the most significant challenge to completing the AFH, both conceptually and in terms of data accuracy.

2. "Contributing factors" of segregation are politically and legally sensitive. Identification of "high priority" factors will require a balance between relevance and practical feasibility.

3. HPD needs to define "concerted community revitalization" to support our "balanced approach" to fair housing.



Confidential

# 4. AFH data issues and preliminary findings

➢ RECAPs

➢ Segregation / Integration measures

➢ Opportunity measures

➢ Publicly supported housing demographics

➢ People with disabilities



# 4. AFH Data:
# RECAPs as a fair housing analysis tool

**RECAP:** A census tract with a non-white population of 50 percent or more and a poverty rate that either exceeds 40 percent or is three or more times the average tract poverty rate for the metropolitan area, whichever threshold is lower.
- NYC will use 40 percent threshold, which is lower than three times the city's poverty rate.

- **RECAPs vs. concentrated poverty generally**
  - Including areas of concentrated poverty that are not racially concentrated

- **Public housing concentrated in RECAPs**
  - The presence of public housing can define a census tract as a RECAP

- **Non-RECAP status is not a meaningful measure of opportunity**
  - Poverty is a continuum, not a cut-off
  - 40% threshold and non-RECAP areas: 39% poverty areas, for example, not included in HUD's analysis

- **Speaks to the need to have a local definition of opportunity areas**
  - HPD to work towards definitions that make sense for NYC



Confidential

# 4. AFH Data:
# Segregation/Integration trends

**Table 3 - Racial/Ethnic Dissimilarity Trends**

| Racial/Ethnic Dissimilarity Index | (New York, NY CDBG, HOME, ESG) Jurisdiction | | | (New York-Newark-Jersey City, NY-NJ-PA CBSA) Region | | |
|---|---|---|---|---|---|---|
| | 1990 | 2000 | 2010 | 1990 | 2000 | 2010 |
| Non-White/White | 67.72 | 66.11 | 65.66 | 65.97 | 63.53 | 61.73 |
| Black/White | 83.45 | 83.12 | 83.36 | 80.30 | 78.88 | 78.80 |
| Hispanic/White | 65.51 | 67.08 | 67.39 | 66.07 | 65.23 | 63.11 |
| Asian or Pacific Islander/White | 47.65 | 49.02 | 54.20 | 47.63 | 50.39 | 54.21 |

Note 1: Data Sources: Decennial Census

Note 2: Refer to the Data Documentation for details (www.hudexchange.info).

The dissimilarity index measures the degree to which two groups are evenly distributed across a geographic area. Generally, dissimilarity index values indicate:

0 - 39: low segregation
40 – 54: moderate segregation
55 – 100: high segregation

**Data Issues**
- These measures do not capture all dimensions of segregation and integration in NYC.
- HPD could apply alternative measures of segregation and integration

**Preliminary Findings**
- NYC scores in the "high segregation" category for all ethnicities, at all time periods, with the exception of Asian or Pacific Islander/White.

- Within NYC, levels of segregation have remained mostly constant over the last 20 years, with the exception of Asian or Pacific Islander/White, which has become more segregated.

- Within the region, levels of segregation have decreased very slightly, again with the exception of Asian or Pacific Islander/White, which has become more segregated.



Confidential

# 4. AFH Data:
# Disparities in access to opportunities

HUD's five opportunity indicators:
1) Access to education
2) Employment
3) Transportation
4) Low poverty exposure
5) Environmentally healthy neighborhoods

Table 12 - Opportunity Indicators, by Race/Ethnicity

| (New York, NY CDBG, HOME, ESG) Jurisdiction | Low Poverty Index | School Proficiency Index | Labor Market Index | Transit Index | Low Transportation Cost Index | Jobs Proximity Index | Environmental Health Index |
|---|---|---|---|---|---|---|---|
| **Total Population** | | | | | | | |
| White, Non-Hispanic | 56.00 | 63.47 | 67.03 | 97.42 | 93.88 | 56.05 | 3.95 |
| Black, Non-Hispanic | 32.33 | 28.62 | 35.25 | 97.69 | 94.16 | 34.94 | 3.85 |
| Hispanic | 26.86 | 36.06 | 36.13 | 98.06 | 95.76 | 42.82 | 2.80 |
| Asian or Pacific Islander, Non-Hispa | 43.45 | 61.51 | 54.01 | 97.63 | 94.50 | 51.87 | 3.73 |
| Native American, Non-Hispanic | 34.73 | 39.40 | 39.28 | 97.52 | 93.85 | 40.84 | 4.17 |

Definition of opportunity indicators:
Higher values for a particular race/ethnicity indicate a greater likelihood that they reside in Census tracts with greater access to that opportunity indicator. The indices values range from 0 to 100. **The higher the value, the greater the access to opportunity.**

9



Confidential

# 4. AFH Data:
# Disparities in access to opportunities

**Data Issues**

- **Many issues with HUD's opportunity measures, both conceptually and with the data used.** Our AFH will likely **focus on education, employment and low poverty exposure** because measures of transportation access and environmentally healthy neighborhoods are virtually a non-issue, at least in the HUD data

- Our analysis may include other opportunity indicators, like crime.

**Preliminary Findings**

- **Black and Hispanic individuals have the lowest likelihood of living in census tracts with low poverty**, good schools, and a high labor-market index.

- **Black individuals have less access to good schools than Hispanic individuals**, despite having a greater chance of living in a low poverty neighborhood.

- **Regional analysis shows all groups performing better on these indexes than Black individuals**, with Hispanics also disproportionately likely to live in tracts with good schools (compared to their exposures to low-poverty neighborhoods, which are equal).



Confidential

# 4. AFH Data:
# Publicly supported housing analysis

HUD provides demographic data on four types of publicly supported housing:

- NYCHA public housing
- Project-based Section 8
- "Other Multifamily" (Section 202, Section 811)
- Housing Choice Vouchers (HCV)

| Data Issues | |
|---|---|
| | • **HPD is expected to provide its own demographic data on LIHTC housing, which is not currently collected** |
| | • **In general, we learned during the SAFMR process that HUD's data does not match HPD's data.** |
| | • **Given the scale of HPD's portfolio, analysis of development-level demographics (compared to demographics of other developments, and the census tract) may not be possible for 2019.** As an alternative, HPD might propose a methodology to answer these questions that does not involve a building-level analysis of each property and its census tract. |
| | • **The analysis in this section is framed by the RECAP/non-RECAP distinction, which is not necessarily a meaningful measures of fair housing success.** |



Confidential

# 4. AFH Data:
# Publicly supported housing analysis

**Preliminary Findings**

*(excluding LIHTC)*

- **Overall, publicly supported housing is not concentrated within RECAPs.** Each program has a higher percentage of units in non-RECAPs than in RECAPs. Only 35% of all households are in RECAPs.

- **NYCHA makes up a high proportion of RECAP households: of all measured households in RECAPs, 64% are in NYCHA public housing.** Public housing is also the only program with a higher share of Black households and families with children within RECAPs than outside of them.

- **HCV has the lowest share of households (22%) inside of RECAPs compared to other programs.** White households make up a larger share of HCV households than any other group (43% of all households).

- **Hispanic households appear to be underserved by HCV.** Hispanics make up only 12% of HCV households. They are underrepresented compared to their share of the city's low-income and overall population.

(Refer to Appendix slides 34 – 35 for original data tables.)



Confidential

# 4. AFH Data:
# Disparities in access for people with disabilities

**Why disability analysis in the AFFH?**

- <u>Historical discrimination against people with disabilities</u> that has limited their opportunity to live independently with appropriate supports and required them to live in institutions or other segregated settings.

- <u>"Integration" here means that individuals with disabilities can interact with persons without disabilities to the fullest extent possible</u>, consistent with the requirements of the Americans with Disabilities Act

**What is NYC supposed to present?**

- <u>To what extent persons with disabilities reside in segregated or integrated settings</u>, as well as the range of options for persons with disabilities to access affordable housing and supportive services in community-based settings.

**This section must rely on local data, with significant input from our legal department and perhaps handled by Mayor's Office for Disabilities.** Data we need includes:
- Length of wait lists for accessible units in publicly supported housing
- Availability of accessible units in non-publicly supported housing available to HCV participants, whether public funding or tax credits
- Whether accessible units are occupied by households requiring accessibility features
- Whether publicly supported housing is in compliance with accessibility requirements



# 5. AFH Contributing Factors of Segregation

- **Community opposition**
- **Displacement of residents due to economic pressures**
- **Lack of community revitalization strategies**
- Lack of private investments in specific neighborhoods
- **Lack of public investments in specific neighborhoods, including services or amenities**
- **Lack of regional cooperation**
- **Land use and zoning laws**
- Lending Discrimination
- **Location and type of affordable housing**
- Occupancy codes and restrictions
- **History of segregation in NYC**
- Cost to build and cost of available land
- Admissions and occupancy policies and procedures
- Impediments to mobility
- Quality of affordable housing information programs
- Siting selection policies, practices and decisions for publicly supported housing
- Policies that segregate the disabled.



Confidential

# 5. AFH Contributing Factors:
# Contributing factors directly related to HPD's work

**Displacement of residents due to economic pressures**

- <u>Anti-displacement strategy:</u> Can we justify anti-displacement strategies because rising rents create neighborhoods of opportunity? Do neighborhoods with rising rents always equal neighborhoods of opportunity? We don't know to what locations are residents displaced.

**Lack of community revitalization strategies / lack of public investments in specific neighborhoods**

- <u>"Siloed" LIHTC developments:</u> our LIHTC developments are not always intentionally sited in neighborhoods as part of broader revitalization strategy, and if they are, this is not clearly defined.

- <u>Concerted community revitalization strategy:</u> Such a strategy would clarify the other public ~~neighborhood~~ investments in that neighborhood that accompany new housing.

**Location and type of affordable housing / land-use and zoning laws**

- MIH in low-income neighborhoods
- LIHTC potentially concentrated in RECAPs, and who tends to apply to live in LIHTC housing?
- SAFMR: where can voucher holders afford to live?



NYC_0021066

# 5. AFH Contributing Factors:
# Big picture contributing factors

**Lack of regional cooperation**

- <u>HPD focus on displacement:</u> New York City's focus on keeping residents in the city may not be justified from a regional fair housing perspective even though it is a major theme of our housing plan.

- <u>Mobility counseling outside NYC?</u> Should the city be using mobility counseling to encourage residents living in low-income neighborhoods to move to suburbs with better performing schools?

- <u>Regional collaboration:</u> Regional collaboration could provide more opportunities to supply affordable housing in high opportunity areas outside of NYC, but too many decisions are out of our control.

**History of segregation in NYC**

- <u>Past HPD efforts in the South Bronx:</u> For example: justifying the past and present creation of affordable housing in neighborhoods with concentrations of non-white households, which may have perpetuated segregation, but also provided opportunities for households to stay in those neighborhoods.

- <u>Segregation shaped by federal policy:</u> Acknowledging that much of segregation in NYC was created through discriminatory lending practices allowed by the federal government and urban renewal policies.



Confidential

# 6. "Balanced Approach" to fair housing

**HUD's definition of the "balanced approach":**

"HUD supports a balanced approach...that connect housing and community development policy and investment planning with meaningful actions that affirmatively further fair housing."

HUD's examples of the balanced approach include:

- **Reducing disparities in access to community assets**, such as quality schools, employment, and transportation by enhancing opportunity in underserved areas where recent investments have not been made or by providing greater housing choice in areas with existing access to opportunity.

- **Using place-based strategies** in an area lacking access to opportunity to improve opportunity in that area by investing in community revitalization and preservation of existing affordable housing.

- **Providing significant affordable housing in areas with existing opportunity** that lack affordable housing in order to address segregation.

- **A mixed place-based and mobility approach:** address a racially or ethnically concentrated area of poverty through both place-based solutions to revitalize the area, as well as solutions that increase mobility for the area's residents.

Confidential

# 6. Balanced Approach: HUD's definition of Place-based vs. Mobility-based strategies

| Place-Based Strategies | Mobility Strategies |
|---|---|
| Investments in in racially or ethnically concentrated low income neighborhoods. | Investments that allow residents of segregated areas to move to areas with greater access to opportunity. |

These types of strategies may include:

- **Building rehabilitation** as a part of a concerted community revitalization effort

- **New construction** of mixed income housing designed to integrate R/ECAPs

- **Commercial redevelopment** to attract jobs, access to financial services, grocery stores, and other businesses

- **Government interagency coordination** to address multiple needs including housing, schools, criminal justice, transit, access to health care, etc., to reduce disparities in access to opportunity

These types of strategies may include:

- **HCV strategies, including mobility counseling,** increased landlord participation, exception rents, regional coordination, etc

- **Increasing the stock of scattered site affordable housing in** integrated areas and areas of opportunity

- **Increasing the availability of affordable housing, including mixed income housing, in areas of opportunity**

- **Increasing access for individuals with protected characteristics to existing affordable housing in higher opportunity areas**



Confidential

# 6. Refining place-based & mobility strategies: City of New York's work in the context of balanced approach

| | Housing located in *high-opportunity* neighborhoods | Housing located primarily in *low-income neighborhoods* | Housing located in *both types of neighborhoods* |
|---|---|---|---|
| *Demand* strategies | - Potentially small-area FMR (SAFMR) Section-8 vouchers. | - Section 8 vouchers (non-SAFMR)<br>- City-funded vouchers, i.e. LINC | |
| *Supply* strategies | - Voluntary Inclusionary<br>- 421a (if it is renewed)<br>- Tax exempt bonds<br><br>*(altogether commonly referred to as 80/20s)* | - LIHTC 9 percent tax credit projects<br>- Project Based Section-8<br>- NYCHA housing generally (though no new units) | - LIHTC 4 percent tax credit projects<br>- Mandatory Inclusionary Housing<br>- Preservation efforts<br>- Rent stabilized units<br>- Non-421a tax-exemptions<br>- NYCHA infill projects<br>- Supportive housing<br>- Other HPD programs (Hunters Point South, Seward Park, etc.)<br>- Moderate income: M^2 Mix and Match |

19

# 7. Concerted Community Revitalization

Two different terms for community development:

1.  LIHTC statute requires allocating agencies to include a preference for projects in QCTs and contribute to a "concerted community revitalization" (CCR) plan.

    — But statute provides no definition of this term, and states have interpreted it in different ways.
    — City of New York assigns an additional points for projects that that have the following: high performing schools, low crime, or less than 10% poverty.

2. In the AFFH, HUD uses the term "comprehensive community revitalization," defined as:

    "Realistic planned activities to improve the quality of life in areas that lack public and private investment, services and amenities, have significant deteriorated and abandoned properties, or other indicators of community distress." Such as:

    — *Rehabilitating housing*
    — *Offering economic incentives* for housing developers/sponsors , businesses
    — *Securing financial resources* to fund housing improvements, community facilities and services, and business opportunities in neighborhoods in need of revitalization
    — *Preserving affordable housing* when a community is being revitalized to promote integration



# 7. Concerted Community Revitalization: Questions for further discussion

- **What types of neighborhood indicators and community development plans should HPD consider when financing affordable housing?**

  - Possible indicators include: Education, Transportation, Public safety, Health, Employment, Market Context, but the choice is local
  - Such a plan would not only invest in neighborhoods with these attributes but consider them as part of the decision to site affordable housing.

- **Scale:** At what scale should we consider a CCR strategy? (e.g. community district, or more local?)

- **Prioritization:** How to weigh or prioritize certain CCR components over others? (e.g. the relative value of transit access vs. school quality)

- **QCT/DDA interaction:** How does a CCR strategy interact with static policies, such as qualified Census Tract (QCT) / Designated Development Area (DDA) designation and the basis boost?

- **Integrating CCR into the AFH:** Although CCR is specific to LIHTC and the QAP, how can we integrate the concept into other types of housing investments, and documents such as the AFH?

Confidential

# 8. Next Steps

**Next steps in the AFH process:**

1. NYCHA/regional submission decision

2. Other inter-agency coordination

3. Community engagement

**How to use the AFH:**

1. Set fair housing goals for HPD and the City:
   - Comprehensive analysis of federally funded housing program outcomes
   - Pair housing with other needed investments

2. Propose new policies, such as:
   - Including concerted community revitalization and fair housing goals in LIHTC underwriting
   - Regional collaboration to improve access to opportunity

3. Use as opportunity to create better measurement tools:
   - Compile demographic data on publicly supported housing
   - Create better, more meaningful , and more consistent measures of low and high opportunity areas



Confidential

# 9. Appendix

1.  AFH submission requirements

2.  Contributing factors  - case studies of particularly challenging examples

3.  Concerted community revitalization (CCR) – draft framework

4.  AFH tables and maps:
    - Regional map area
    - School proficiency index
    - Labor market index
    - Opportunity indicators by race/ethnicity
    - Publicly supported housing residents by race/ethnicity
    - RECAP and non-RECAP demographics by housing type
    - Examples of map-based questions
    - Local data on people with disabilities



# 9. Appendix:
# AFH submission requirements

## 1. Fair Housing Analysis

    A. Demographic Summary
    B. General Issues
        i. Segregation/Integration
        ii. Racially or Ethnically Concentrated Areas of Poverty (R/ECAPs)
        iii. Disparities in Access to Opportunity
        iv. Disproportionate Housing Needs
    C. Publicly Supported Housing Analysis
    D. Disability and Access Analysis
    E. Fair Housing Enforcement, Outreach Capacity, and Resources Analysis

## 2. Community Participation Process

    A.    Public hearing + comment period
    B.    More extensive public outreach than previously required for the Consolidated Plan submission
    C.    Must encourage participation of traditionally underrepresented communities

## 3. Fair Housing Goals and Priorities

    A.    Establish metrics, milestones, and timeframe for achievement
    B.    Identify responsible program participants (e.g. specific City agencies)



Confidential

# 9. Appendix:
# Selected contributing factors

## Community opposition

- *Difficulty*: High
- *Issues:* Securing community buy-in for fair housing is very difficult.
    - Both low and higher income areas don't necessarily support integration (AMIs not low enough vs. AMIs are too low)
    - For publicly supported housing: Opposition can be high in higher opportunity areas (e.g. Queens, Staten Island) except for senior housing.
    - However, many communities also advocate for low income housing siting

## Displacement of residents due to economic pressures

- *Difficulty:* High
- *Issues:* Implications for preservation strategy: justify anti-displacement because gentrification creates neighborhoods of opportunity? Or justify through balanced approach.
    - Gentrifying neighborhoods = neighborhoods of opportunity? Need a finer measure of opportunity/what neighborhoods would qualify for alignment with fair housing goals.
    - To where are residents being displaced?
    - Debate about the extent of gentrification and whether it's always bad for existing residents.



# 9. Appendix:
# Selected contributing factors

**Lack of community revitalization strategies**
- *Difficulty*: Moderate
- *Issues*: Revitalization as gentrification
    - Over-investment in building housing in low-income neighborhoods: New York City could be accused by some fair housing advocates as being overly focused on low-income communities instead of providing access to opportunity.
    - "Siloed" LIHTC developments – not necessarily situated in places as part of broader revitalization strategy.

**Lack of public investments in specific neighborhoods, including services or amenities**
- *Difficulty*: High (for schools). *Also not HPD's role – coordinate with DOE*
    - Huge disparities in schools, especially pronounced for LIHTC developments
    - Huge disparities in public safety across neighborhoods, with LIHTC projects, and subsidized housing generally, built in less safe neighborhoods, and with access to worse schools than other subsidized housing.
    - "CCR" strategy would ensure that new housing is accompanied by other neighborhood investments

Confidential

# 9. Appendix:
# Selected contributing factors

## Lack of regional cooperation
- *Difficulty:* Very high
- *Issues:* New York City's focus on keeping residents in the city, while justified from a city perspective, may not be justified from a fair housing perspective.
  - Should the city be using mobility counseling and encouraging residents living in low-income neighborhoods to move to suburbs outside NYC w/ better schools? What types of resources are lost when families leave the city (social, institutional etc.)
  - Regional collaboration could provide more opportunities to build affordable housing in high opportunity areas outside of NYC
  - NY State does not have requirements for jurisdictions to build affordable housing (as in NJ), but this is out of our control

## Land use and zoning laws
- *Difficulty:* High
- *Issues:* MIH targeting low-income neighborhoods
  - Exclusionary Zoning in NYC
  - Exclusionary zoning outside NYC



NYC_0021078

# 9. Appendix:
# Selected contributing factors

## Location and type of affordable housing
- *Difficulty:* Very high
- *Issues:* Disproportionate LIHTC developments in R/ECAPS. Where are we building it? demographically, who applies to live in LIHTC housing?
  - Where can voucher holders afford to live?
  - Public housing in disproportionately low-income neighborhoods.
  - MIH in low-income neighborhoods.
  - History of New York City building affordable housing in low-income neighborhoods (i.e. South Bronx).
  - Definition above seems to incorporate both naturally occurring affordable housing and subsidized affordable housing.

## History of segregation in NYC
- *Difficulty:* High
- *Issues:*
  - Justifying past and present creation of affordable housing in minority neighborhoods (i.e. the Bronx) which may perpetuate segregation.
  - Acknowledging that much of segregation in NYC was created through federal policies (redlining, urban renewal).



NYC_0021079

# 9. Appendix:
## Concerted community revitalization

**HPD draft framework:**

What does affordable housing contribute to a broader CCR strategy?

| Project Type | Immediate benefit | Direct benefit | Indirect benefit |
|---|---|---|---|
| New Construction | -High quality housing<br><br>-New community space or facilities | -Develops vacant lots<br><br>-Provides housing stability | -Displacement prevention (MIH)<br><br>-Promote economic diversity (depending on context)<br><br>-Promote private investment and increased property values |
| Preservation | -Improved housing quality through rehabilitation | -Provides housing stability | -Displacement prevention<br><br>-Promote economic diversity (gentrifying or high opportunity neighborhoods)<br><br>-Promote private investment and increased property values |

Confidential

# 9. Appendix:
# Concerted community revitalization

HPD draft framework:

HPD could work to understand more about these attributes at the neighborhood level in order to rationalize and explain our investment decisions at the development level:

- Education: Quality of existing schools, investment in new schools, after-school opportunities.
- Transportation: existing and planned transit access
- Public safety: trends in crime, street lighting, public space/park improvements
- Health: access to and quality of medical facilities/parks/rec facilities/FRESH zones
- Employment: investment in local econ development, job training, local hiring, access to jobs
- Market Context: neighborhood gentrifying, with loss of affordable housing? Existing affordable?
- Other neighborhood amenities: cultural institutions retail, non-profits, existing plans/activism



Confidential

# 9. Appendix:
# Determining the appropriate region

- The AFH requires an analysis at the jurisdictional *and* regional levels.

- HUD uses "Core Based Statistical Area" (CBSA) that <u>excludes Connecticut entirely</u> but includes parts of NJ.

- The Combined Statistical Area (CSA), for example, would include parts of Connecticut.

CBSA



CSA



Confidential

# 9. Appendix:
# School proficiency index

HUD Affirmatively Furthering Fair Housing Data and Mapping Tool



**Demographics 2010**
1 Dot = 75 People
Black, Non-Hispanic
Hispanic

**School Proficiency Index**
0 - 10
10.1 - 20
20.1 - 30
30.1 - 40
40.1 - 50
50.1 - 60
60.1 - 70
70.1 - 80
80.1 - 90
90.1 - 100

**Name:** Map 9 - Demographics and School Proficiency
**Description:** School Proficiency Index for Jurisdiction and Region with race/ethnicity, national origin, family status, and R/ECAPs
**Jurisdiction:** New York (CDBG, HOME, ESG)
**Region:** New York-Newark-Jersey City, NY-NJ-PA

School Proficiency Index is determined based on the performance of 4th grade elementary students on state exams.

Confidential

# 9. Appendix:
# Labor market index

HUD Affirmatively Furthering Fair Housing Data and Mapping Tool



**Labor Market Index**
- 0 - 10
- 10.1 - 20
- 20.1 - 30
- 30.1 - 40
- 40.1 - 50
- 50.1 - 60
- 60.1 - 70
- 70.1 - 80
- 80.1 - 90
- 90.1 - 100

The Labor Market Index measures unemployment rate, labor-force participation rate, and percent of the population age 25 and above with at least a bachelor's degree, by census tract. Darker indicates a higher labor market index.

**Name:** Map 11 - Demographics and Labor Market

**Description:** Labor Engagement Index with race/ethnicity, national origin, family status and R/ECAPs

**Jurisdiction:** New York (CDBG, HOME, ESG)

**Region:** New York-Newark-Jersey City, NY-NJ-PA

Confidential

# 9. Appendix:
# Racial / ethnic breakdown by housing type

Table 6 - Publicly Supported Housing Residents by Race/Ethnicity

| (New York, NY CDBG, HOME, ESG) Jurisdiction | Race/Ethnicity | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | White | | Black | | Hispanic | | Asian or Pacific Islander | |
| Housing Type | # | % | # | % | # | % | # | % |
| Public Housing | 8,245 | 4.94 | 75,552 | 45.28 | 75,576 | 45.29 | 7,457 | 4.47 |
| Project-Based Section 8 | 6,111 | 13.18 | 14,307 | 30.86 | 23,050 | 49.71 | 2,725 | 5.88 |
| Other Multifamily | 1,735 | 17.12 | 3,349 | 33.04 | 3,539 | 34.92 | 1,488 | 14.68 |
| HCV Program | 51,548 | 42.96 | 50,736 | 42.28 | 14,897 | 12.41 | 2,165 | 1.80 |
| 0-30% of AMI | 182,985 | 26.15 | 181,195 | 25.89 | 249,070 | 35.59 | 73,500 | 10.50 |
| 0-50% of AMI | 274,935 | 24.54 | 285,300 | 25.46 | 381,530 | 34.05 | 122,580 | 10.94 |
| 0-80% of AMI | 437,590 | 26.96 | 419,905 | 25.87 | 521,530 | 32.13 | 177,300 | 10.92 |
| (New York, NY CDBG, HOME, ESG | 2,722,904 | 33.31 | 1,861,295 | 22.77 | 2,336,076 | 28.58 | 1,030,914 | 12.61 |

Note 1: Data Sources: Decennial Census; APSH; CHAS

Note 2: #s presented are numbers of households not individuals.

Note 3: Refer to the Data Documentation for details (www.hudexchange.info).

Percentage values indicate share of households of each race/ethnicity in each housing type.



Confidential

# 9. Appendix:
# Demographic breakdown by RECAP / non-RECAP

Table 7 - R/ECAP and Non-R/ECAP Demographics by Publicly Supported Housing Program Category

| (New York, NY CDBG, HOME, ESG) Jurisdiction | Total # units (occupied) | % Elderly | % with a disability* | % White | % Black | % Hispanic | % Asian or Pacific Islander | % Families with children |
|---|---|---|---|---|---|---|---|---|
| **Public Housing** | | | | | | | | |
| R/ECAP tracts | 81,156 | 35.27 | 21.07 | 4.59 | 48.85 | 42.58 | 3.95 | 37.20 |
| Non R/ECAP tracts | 89,301 | 39.46 | 22.73 | 5.26 | 42.03 | 47.75 | 4.93 | 33.25 |
| **Project-based Section 8** | | | | | | | | |
| R/ECAP tracts | 13,185 | 38.18 | 15.03 | 2.54 | 28.66 | 68.34 | | 34.40 |
| Non R/ECAP tracts | 37,896 | 51.49 | 15.07 | 17.33 | 31.71 | 42.44 | 8.00 | 23.95 |
| **Other HUD Multifamily** | | | | | | | | |
| R/ECAP tracts | 4,544 | | | | | | | |
| Non R/ECAP tracts | 11,072 | 83.37 | 8.67 | 17.30 | 29.23 | 36.03 | 17.17 | |
| **HCV Program** | | | | | | | | |
| R/ECAP tracts | 28,122 | 22.55 | 24.85 | 33.92 | 48.03 | 16.59 | 1.02 | 45.44 |
| Non R/ECAP tracts | 106,261 | 32.80 | 30.88 | 45.50 | 40.77 | 11.15 | 2.01 | 37.60 |

Note 1: Disability information is often reported for heads of household or spouse/co-head only. Here, the data reflect information on all members of the household.

Note 2: Data Sources: APSH

Note 3: Refer to the Data Documentation for details (www.hudexchange.info).

Percentage values indicate share of households of each demographic group in RECAP/non-RECAP, in each housing type.



Confidential

# 9. Appendix:
# Map-based questions

**Central Brooklyn:** Project-based Section 8 (top) and NYCHA public housing (bottom)



- Maps show siting of housing in segregated areas, in or adjacent to RECAPs, although not exclusively.

- Maps do not reflect volume of units



Demographics 2010
1 Dot = 75
- White, Non-Hispanic
- Black, Non-Hispanic
- Native American, Non-Hispanic
- Asian/Pacific Islander, Non-Hispanic
- Hispanic
- Other, Non-Hispanic

TRACT

R/ECAP

Confidential

# 9. Appendix:
# Map-based questions

**Central Brooklyn:** HCV use rate by census tract



- High HCV concentration does not always occur inside RECAPs, but often in close proximity.

- High voucher (but not RECAP) concentration in predominantly white areas.



| Demographics 2010 | |
| 1 Dot = 75 | TRACT |
| White, Non-Hispanic | |
| Black, Non-Hispanic | R/ECAP |
| Native American, Non-Hispanic | |
| Asian/Pacific Islander, Non-Hispanic | |
| Hispanic | |
| Other, Non-Hispanic | |



**Percent Voucher Units**
- < 5.72 %
- 5.73 % - 11.18 %
- 11.19 % - 19.01 %
- 19.02 % - 39.01 %
- > 39.01 %



Confidential

# 9. Appendix:
# Local data on people with disabilities

This section must rely on local data, perhaps handled by Mayor's Office for Disabilities.

Data we would need:

- length of wait lists for accessible units in publicly supported housing,
- availability of accessible units in non-publicly supported housing available to HCV participants, whether public funding (e.g. CDBG funds) or tax credits are available for reasonable modifications in rental units and/or for homeowners,
- whether accessible units are occupied by households requiring accessibility features,
- whether publicly supported housing is in compliance with accessibility requirements.

Data Source for HUD provided data:

American Community Survey (ACS), 2009-2013; Inventory Management System (IMS)/ PIH Information Center (PIC), 2013; Tenant Rental Assistance Certification System (TRACS), 2013



Confidential