UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------- x

SHAUNA NOEL and EMMANUELLA SENAT,

                                        Plaintiffs,

                    -against-

CITY OF NEW YORK                                15 CV 5236 (LTS)(KHP)

                                        Defendant.
-------------------------------------------------------------------- x

### DECLARATION OF DEPUTY MAYOR VICKI BEEN IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN <u>OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

**VICKI BEEN**, declares pursuant to 28 U.S.C. §1746, under penalty of perjury, as follows:

1.      I am the Deputy Mayor for Housing and Economic Development for the City of New York ("City"). I have held that position since May 6, 2019. As Deputy Mayor, I oversee the City's efforts to address the housing crisis, grow and diversify New York City's economy, invest in emerging industries across the five boroughs, and help New Yorkers secure good-paying jobs. I also oversee and coordinate the operations of over 20 agencies, offices, and affiliated entities to achieve these goals. Prior to becoming Deputy Mayor, I spent years working inside and outside of government, in the fields of land use, urban policy, and affordable housing.[1] This experience gives me insight to understand the complexities of New York City's ongoing housing crisis and the City's unparalleled efforts to address New Yorkers' housing insecurity.

---

[1] For example, I was Faculty Director of NYU's Furman Center, an interdisciplinary research center focusing on housing and land use policies.

2.      Additionally, as Deputy Mayor, I have been heavily involved with Where We Live NYC ("WWL"), the City's inclusive fair housing planning process. I have led the City's efforts to secure funding to finance repairs and improve operations of NYCHA buildings and to ensure that NYCHA homes are permanently affordable. I have also assisted in securing and implementing significant tenant protections, including rent reforms for rent controlled and rent stabilized apartments and legal assistance for tenants.

3.      From February 2014 to February 2017, I served as Commissioner of New York City's Department of Housing Preservation and Development ("HPD"). As Commissioner of HPD, I was responsible for leading the nation's largest municipal housing agency, and I was involved in many initiatives to address the housing crisis. These initiatives included, but were not limited to, Housing New York: A Five-Borough, 10-Year Housing Plan ("HNY"), the City's Mandatory Inclusionary Housing program ("MIH"), Zoning for Quality and Affordability ("ZQA"), establishing programs to provide free legal services for tenants in housing court, creating policies and programs to reduce landlord harassment of tenants, working with state legislators to reform the 421-a property tax exemption program, targeting the City's subsidized affordable housing programs to provide more homes for formerly homeless individuals, people in need of supportive services, and senior tenants.  I also led the initial phase of the City's preparations to undertake a new and comprehensive assessment of fair housing.

4.      After my time as HPD Commissioner, I was retained by the City to be a consultant to then Deputy Mayor Alicia Glen on issues relating to fair housing in the City and for this litigation.

5.      In addition to my work as an official of the City of New York, I have spent years researching and studying land use and housing issues, including but not limited to,

assessing New York City's land use patterns, studying and evaluating housing programs and policies with a lens of promoting fair housing, the effects of Hurricane Sandy on housing and neighborhoods, the interplay of community benefit agreements and land use practices, and on a variety of affordable housing issues, including inclusionary zoning and supportive housing and how to increase the supply of multi-family housing, stimulate economic growth and revitalize neighborhoods by financing the creation and preservation of affordable housing for low-, moderate-, and middle-income New Yorkers. I also have written scores of articles and am co-editor of one of the nation's leading land use law textbooks.  I have taught numerous courses at New York University School of Law on land use, housing policy, state and local government, environmental justice, gentrification, property law, and empirical methods.  I organized and taught an interdisciplinary research colloquium on issues in urban policy, including housing and land use policy for NYU Law students and doctoral candidates in public policy, educational policy and sociology.

6.     This declaration is based upon my personal knowledge, conversations with employees of the City of New York, and my review of records maintained by the City of New York.

7.     I submit this declaration in support of Defendant's cross-motion for summary judgment and in support of Defendant's opposition to Plaintiffs' motion for summary judgment. As will be shown herein, the Community Preference policy ("CP policy"), which is being challenged by Plaintiffs, is an integral part of the City's anti-displacement, affordable housing, and fair housing efforts.

A.     **Introduction**

8.     I will first discuss the City's affordable housing programs (including a brief overview of their history) and the City's current and past housing crises, as it is important

to understand the context in which the CP policy has been and is currently implemented. I will then explain what the CP policy is and how it works. After that, I will discuss New Yorkers' fears of being displaced, and how that fear manifests in opposition to projects that must be approved through the Uniform Land Use Review Procedures ("ULURP"),[2] and the key role the CP policy has in mitigating this fear. I will then discuss the City's multi-faceted displacement prevention and mitigation policies and goals, of which the CP policy is an important and unique component.  Lastly, I will explain why proposed alternative policies fail to meet the purpose and goals of the CP policy. Before delving into each topic, I will present a high-level overview of the issues through a brief introduction.[3]

9.      The City has a long and complex history concerning affordable housing. The complexities of the city's affordable housing policies and programs are also compounded by the unfortunate fact that the City, like all cities in the nation, is still plagued by the nation's legacy of slavery, segregation, and discrimination. Although some significant strides have been made to address these injustices, the city's past still affects its residents today, resulting in unequal access to wealth, safety, and stability for New Yorkers of different races and ethnicities and across the city's neighborhoods.

10.      For decades the City has implemented many programs and initiatives to increase and preserve affordable housing and the housing stock overall, while also working on

---

[2] Pursuant to the New York City Charter section 197-c, certain actions that are reviewed by the City Planning Commission ("CPC") undergo a standardized procedure whereby applications affecting the land use of the city are publicly reviewed. ULURP is a multi-step and multi-participant process.

[3] It should also be noted that due to the recent COVID-19 pandemic has caused a number of new and various housing concerns throughout the City that this administration is addressing. Trying to change this long-standing, well-established policy in the middle of the pandemic or in its aftermath would exacerbate the instability and precariousness that so many New Yorkers are feeling about their housing situations. Additionally, some lottery procedures have been temporarily modified to address quarantine and social distancing requirements.

improving the quality of the aging housing stock. Despite the City's ongoing efforts, the City has been in a severe housing crisis for decades.

11.     In the 1970s and 1980s, New York City experienced a period of neighborhood disinvestment and large-scale abandonment of residential buildings. In more recent decades, this trend has reversed and many of New York City's neighborhoods have experienced an influx of capital investment and revitalization. However, the increased investment in once struggling neighborhoods often is associated with rising rents, gentrification,[4] and harassment by landlords to remove current tenants in order to raise rents. This, among other things, is associated with many low-income residents being displaced from their homes or fearing that they will be displaced.

12.     One of the City's policies to combat displacement and residents' fear of future displacement is the CP policy. The CP policy provides that, in new construction projects financed through subsidies or density bonuses from New York City (except those that are solely subsidized through a tax exemption under RPTL § 421-a(16) or (17)), 50% of the affordable units during the initial lease up of the project are reserved to be filled by eligible residents of the community district in which the new affordable housing project is located. The other 50% of affordable units are open to eligible residents from any location in the city and potentially, eligible applicants who reside outside of the city.[5] The CP policy is implemented citywide

---

[4] Gentrification, as I am using it in this declaration, means unusual increases in housing costs in low-income neighborhoods over a sustained period of time.  See for example, Maxwell Austensen et al., *State of New York City's Housing and Neighborhoods in 2015:  Focus on Gentrificaiton*  (New York: NYU Furman Center, 2016), available at https://furmancenter.org/files/sotc/Part_1_Gentrification_SOCin2015_9JUNE2016.pdf

[5] As will be explained below and in Declaration of Margaret Brown, dated August 14, 2020 ("Brown Declaration), there are other preferences and set-asides that are applied in the lease up process of affordable units. In the event that not all of the units are filled with New York City residents, non-city residents are considered.

through the City's affordable housing lottery system. It applies to projects irrespective of the racial demographics of the neighborhood in which the project is located and it can benefit an eligible applicant of any race.

13.     The CP policy provides current residents who may desire to remain in their neighborhood a better chance of obtaining new, high-quality affordable housing in that neighborhood (as proxied by community districts) even as it experiences new development and investment. Some communities have suffered from years of disinvestment or insufficient investment and the CP policy helps ensure that local residents -- who may have endured years of unfavorable conditions, worked hard to stabilize the neighborhood, and may have deep roots in the neighborhood -- have a chance to participate in their neighborhoods' revitalization.

14.     The CP policy is also essential to overcoming opposition to affordable housing stemming from the fear of displacement. Fear of displacement often causes residents to voice concerns to City officials and local elected officials in the processes to which new housing proposed in their neighborhoods may be subject, even if the new housing is all or partially composed of affordable units.[6] The opposition is often based on the belief that investment in their communities will attract an influx of higher-income residents, which will increase the cost of living in the neighborhood as neighborhood services and amenities, as well as rents, change to accommodate newer residents.[7] This can result in low-income people being forced to move to

---

[6] Many affordable housing developments must go through ULURP and ultimately be approved by the City Council. As part of the ULURP process, residents of a community can directly voice support or opposition to a proposed new development. Residents can, and do, also voice concerns and opposition to their local representatives, such as the Borough President, Community Board members, and City Council members.

[7] Although rent for HPD affordable housing is usually far below market-rate rents, the eligible household income ranges for affordable units are often still above the household incomes for the lowest income New Yorkers. Therefore, households with higher incomes than existing residents can and do move into affordable units.

less expensive areas. Even for those who are able to stay in the neighborhood, the changes may strain their budgets and make them feel like the neighborhood is no longer welcoming or familiar.

15.     The CP policy's ability to prevent displacement at the neighborhood level and allow people to enjoy the benefits of investment in their community, as well as its ability to help overcome opposition to development of affordable housing by addressing residents' fears of being displaced, makes it unique and necessary to the City's multifaceted affordable housing creation and anti-displacement agendas. Moreover, the policy addresses past inequities by acknowledging the plight of residents who have remained in a neighborhood through periods of hardship and providing an opportunity for them to remain in their communities, if they choose to stay.

16.     Additionally, it is important to note that this litigation is unique compared to other fair housing litigation. In the typical fair housing case, plaintiffs challenge a policy or practice (such as the rejection of an affordable housing development) that white residents have allegedly opposed in order to keep Black and Brown people[8] out of their communities. Such cases concern policies or practices that allegedly exclude Black and Brown people by preventing the construction or siting of affordable housing. Unlike the typical fair housing cases, this case challenges a policy that helps get affordable housing built and helps low-income people[9]—and predominantly Black and Latinx New Yorkers—remain in their communities if they choose. The

---

[8] It is a testament to the importance and complexity of the issues at stake here that there is great sensitivity and no clear agreement on the most suitable ways to refer to racial groups. At times, when referring to the terms used by Plaintiffs, experts or other data sources, I will use the terms used in the source materials.

[9] Low-income households are considered those whose household income totals 80% Area Median Income ("AMI") or less. Middle-income households are those whose household income is between 80% and 165% AMI. Some projects that go through the lottery also contain some middle-income affordable units.

CP policy does not and is not intended to respond to rich or white residents trying to keep low income and/or non-white people from moving into their community, but has always been responsive to the needs of low-income residents, as have so many of the City's housing policies and initiatives.

**B.      Affordable Housing in New York City**

17.      Every New Yorker deserves a safe and affordable place to live, in a neighborhood that provides opportunities for them to thrive.  Recognizing this basic and essential need, the City has long been committed to creating and preserving affordable housing when it can. This has been carried out in large part through HPD, whose mission is to promote the construction and preservation of affordable, high-quality housing for low- and moderate-income families in thriving and diverse neighborhoods in every borough. HPD pursues this goal by enforcing housing quality standards, financing affordable housing development and preservation, and ensuring sound management of the City's affordable housing stock.

18.       Even though many Mayors and their administrations have made great strides in creating and preserving affordable housing, the City's housing crisis and residents' concerns with being displaced persist and the City must continue its efforts.

19.      Since as far back as the 1920s, the City and State governments have worked to create affordable housing within the city through a variety of financial means, beginning with property tax abatements for privately-owned developments. Momentum behind these efforts picked up considerably in the 1930s, following the establishment of the New York City Housing Authority ("NYCHA") in 1934 and the passage of the Federal Housing Act of 1937, which significantly expanded federal financial support for the construction of housing. However, the housing developments that were created during this era often were built after removing or "clearing" residents from an area to make room for the new affordable housing.

These developments often were built on the edges of the city where the population was predominantly low-income and Black and Brown residents. Therefore, even as affordable housing was planned and constructed to help the city's low-income residents, it sometimes displaced other low-income people, especially Black and Brown residents, from their homes and communities.

20.     After World War II, these types of developments expanded and also moved into more central areas of the city. Although numerous affordable units were being created in the city, many households were again displaced in order to build this housing. There was no plan or policy in place to assist those who were displaced.

21.     Then in the 1970s, as the country experienced years of economic turmoil, including steep inflation and large-scale disinvestment in big cities, the federal government's interest in developing government-owned affordable housing waned. With the Community Development Act of 1974, the Section 8 housing choice voucher program began, implemented through partnerships between local housing agencies and private landlords. When the federal government stepped back from the public housing program across the country, many jurisdictions also reduced their efforts to create or maintain affordable housing. In fact, some cities, such as Chicago and St. Louis, intentionally tore down their public housing.

22.     However, the City did not fall into step with many other major cities; it continued to preserve its public housing, and financed the construction and rehabilitation of even more affordable housing. Instead of destroying public housing, letting it fall to ruin or ignoring the need for new affordable units, in the 1980s, the City announced a series of housing plans that created and preserved hundreds of thousands of

affordable housing units, using primarily the *in rem* housing units that the City had obtained through tax foreclosures in the 1970s and early 1980s.[10]

      23.    The City's housing plans differed significantly from prior attempts to increase affordable housing, in that they did not call for the removal of residents to make way for new affordable housing. Instead of clearing land of occupied buildings to make way for new housing, the City financed the new construction or preservation of housing based upon where the City had obtained *in rem* housing units (owned by the City through tax foreclosure) or vacant land.[11] Although the City obtained buildings and land throughout the five boroughs, there were more *in rem* buildings and vacant land in specific neighborhoods with widespread problems of abandonment and disinvestment. The residents of these neighborhoods were largely low-income and mostly Black or Brown residents, who had remained despite the many problems resulting from widespread private disinvestment and the fiscal crises of the 1970s and 1980s.[12]

---

[10] In the 1980s, the City announced a five-year program to build and rehabilitate 100,000 low and moderate-income housing units. After announcing the initial five-year plan, the plan was revised to double the initial goals and the City agreed to build and rehabilitate 252,000 units over ten years. Through this plan, the City invested billions of dollars into rebuilding devastated neighborhoods and sold many of the *in rem* housing units that the City had obtained through tax foreclosures. These *in rem* buildings were transferred to non-profit and for-profit developers at a low cost and the City provided low-interest financing and tax credits so the buildings could be renovated to address their multitude of housing maintenance issues. In the 1990s, the City's mayors and their administrations expanded the plan in response to the continuing housing crisis. Mayor Giuliani announced a plan to create or preserve 10,100 units of affordable housing (preserving 5,900 existing units and building 4,200 new units) through a combination of City-funded investment and private investment. In the 2000s, although many new affordable units had been created and many existing affordable units had been preserved under the City's prior housing plans, there was still a need for more affordable housing throughout the City. As a result, the City announced a new affordable housing plan, the New Housing Marketplace Plan. In this plan, the City endeavored to create or preserve 160,000 affordable housing units. By late 2013, under the New Housing Marketplace Plan, the City had created or preserved over 175,000 units of affordable housing.

[11] Although the City was generally the first entity to start reinvestment and revitalization of neighborhoods, private investment was often part of these initial reinvestment plans or followed shortly thereafter once a neighborhood began to become revitalized.

[12] In contrast to the many higher income households who moved to the suburbs at that time, many low-income households had no choice but to suffer through the disinvestment and remain living in subpar

24.    Even though the City has financed the construction or rehabilitation and preservation of hundreds of thousands of affordable housing units since the 1980s, housing affordability remains a critical problem for millions of city residents. The problem of displacement has shifted – it is no longer from urban "renewal" or landlord abandonment, but from market pressures, the increased desirability of living in the city, and gentrification – but it is still a top concern of city residents and City officials. In 2014, the City developed and announced the City's five-borough *Housing New York* plan to "address the City's affordable housing crisis" by "fostering diverse, livable neighborhoods."[13] More recently and as part of its continued commitment to increasing the amount of affordable housing, in November 2017, the City launched *Housing New York 2.0* ("HNY 2.0").[14]

25.    The City has also worked to create and implement a number of programs and zoning resolutions aimed at increasing the number of affordable units and economic diversity throughout all parts of the city.  HPD accomplishes these goals through a combination of loan programs, tax incentives, disposition of City-owned property, tax credits, and other

---

[13] housing conditions. Many low-income households were displaced because owners abandoned their buildings, and tenants were forced to find new housing in a diminished, poor quality housing stock.

[13] See City of New York, Housing New York: A Five-Borough, 10-Year Housing Plan. The five-borough *Housing New York* plan aimed to create and preserve 200,000 units of affordable housing throughout the City.  The most comprehensive affordable housing plan in the City's history and largest municipal housing plan in the nation, its goal was to help address the City's affordability crisis by providing new, or preserving existing, affordable housing for more than half a million New Yorkers ranging from those with extremely low incomes to those in the middle class, all of whom face ever-rising rents.  The plan incorporated dozens of initiatives "to ensure balanced growth, fair housing opportunity, and diverse neighborhoods." See Id. at 7.

[14] In HNY 2.0, the City committed to completing HNY's initial goal of preserving or creating 200,000 affordable homes two years ahead of schedule (by 2022) and generating an additional 100,000 homes over the following four years (thereby revising the goal to providing or preserving 300,000 affordable homes by 2026). As of June 30, 2020, the City has subsidized the construction of more than 50,656 new affordable units and has preserved over 114,934 affordable units across all five boroughs. *See* "HNY By The Numbers" available at https://www1.nyc.gov/site/housing/action/by-the-numbers.page

subsidies and incentives for non-profit and for-profit developers. Projects built pursuant to these subsidies, incentives and zoning programs must have a certain share of affordable units in each development[15] and most either mix affordable units with market rate housing or are 100% affordable, but targeted at a range of incomes.[16] Many of these projects require City Council approval and the CP policy is integral to that approval process.

          26.    For example, the City's Voluntary Inclusionary Housing program ("VIH")[17] and Mandatory Inclusionary Housing program ("MIH")[18] are designed to preserve and promote affordable housing within neighborhoods where zoning has been modified to encourage new development. Under both programs, a certain percentage of affordable housing must be built whenever market rate housing is built. The City also passed another zoning text amendment, Zoning for Quality and Affordability ("ZQA"), to encourage the construction of

---

[15] The affordable units are marketed and awarded through the City's lottery system, with some exceptions as noted above.

[16] Under any of the affordability options under MIH, the affordable units must always be distributed throughout at least 65% of the floors in the building and interspersed with the market rate units.

[17] VIH provides that a development may receive a density bonus (that is, allowing the construction of additional market-rate floor area) in return for the new construction, substantial rehabilitation, or preservation of permanently affordable housing for low-income households. The affordable VIH units must be permanently affordable to residents at or below 80% of the Area Median Income (AMI) and rent-stabilized. VIH has created 13,590 units as of June, 2019.

[18] MIH is the strongest and most flexible policy in any major U.S. city to create affordable housing. MIH makes affordable housing mandatory and permanent wherever certain discretionary land use actions are approved or when development occurs in an area that has been rezoned for MIH ("MIH areas"). MIH areas can be found in all five boroughs. Within MIH areas, the program requires that 20-30% of residential floor area in new developments, enlargements, and conversions to residential use above 10 units and 12,500 square feet must be permanently affordable for low- and moderate-income New Yorkers. Within the MIH program, there are one or more options a developer can choose from to meet the affordable requirements. For more information on specific affordability options, see https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/mih-fact-sheet.pdf or https://www1.nyc.gov/assets/housing/downloads/pdf/mih-fact-sheet.pdf. Through June 2019, the MIH program has produced 2,053 permanently affordable homes.

senior and affordable units, make new construction generally more affordable and ensure that new construction results in quality buildings.[19]

27.    Recognizing that many neighborhoods need investment beyond housing, the City has also allocated $672 million in capital funds to infrastructure and amenity improvements in areas in which neighborhood rezonings have enabled significant additional housing.  With these funds, the City has invested in, among other things, improving existing and creating new parks and schools, updating streetscapes, and improving transportation infrastructure and service in neighborhoods that have been in need of such improvements.

28.    Additionally, the City has long been deeply committed to ensuring that all New Yorkers have fair and equal access to housing without discrimination. For example, beginning in 1958, the City passed the Fair Housing Practices Law, which gave the predecessor to the New York City Commission on Human Rights ("CCHR") the power to investigate and hold hearings on allegations of discrimination in private housing. This was the first law in the nation that provided for discrimination protections in private housing. Subsequent amendments to the New York City Human Rights Law continued to strengthen housing discrimination protections and prohibited discrimination in private and public housing, land, and commercial spaces in New York City. Under the City's law, any person selling, renting, or leasing—

---

[19] HPD worked closely with the Department of City Planning ("DCP"), local communities, nonprofit housing groups, architects, developers, and other practitioners to identify a set of zoning barriers that constrained new housing creation and added unnecessary costs, and to remove those barriers through ZQA. The strategies ZQA adopts include making it easier to provide affordable senior housing and care facilities, enabling inclusionary housing buildings (which provide mixed-income housing) to fit the full amount of housing they are allowed under zoning, reducing unnecessarily high costs of building transit-accessible affordable housing, changing rules that lead to flat, dull apartment buildings to accommodate and encourage façade articulation, courtyards, and other elements that provide visual variety and improve the pedestrian experience,  encourage better ground-floor retail spaces and residential units with adequate ceiling    heights.    *See*    https://www1.nyc.gov/site/planning/plans/zqa/zoning-for-quality-and-affordability.page.

including landlords, superintendents, building managers, brokers, and realtors—cannot discriminate because of a person's actual or perceived protected status under the law.

29. The City continues to be deeply committed to fair housing. The City recently published a draft of its comprehensive assessment of fair housing, which included a significant public engagement process involving thousands of New Yorkers over 24 months, and resulted in a plan called *Where We Live NYC*.[20] The plan assesses the many initiatives the City undertook over the past six years to increase the amount of affordable housing in all parts of the city and thereby provide greater housing choice and opportunities for New Yorkers, but also recognizes that there is much more that must be done to undo the legacy of the centuries of racial discrimination and segregation. The plan sets forth specific fair housing objectives, including combating persistent, complex discrimination with expanded resources and protections; expanding housing options for low-income residents across New York City and the region to ensure that residents have realistic options to live in a variety of thriving neighborhoods; preserving affordable housing and preventing displacement of long-standing residents to support those New Yorkers who want to stay in their home or neighborhood, even as it changes; ensuring New Yorkers who use rental assistance have access to a diversity of neighborhoods; ensuring New Yorkers with disabilities have housing options that allow them to be independent and integrated in the community through coordinated support and more accessible options; and addressing the structural disadvantages of neighborhoods so that no one is deprived of high-quality resources and services because of their race, ethnicity, disability, religion, or other

---

[20] As noted above, it is often referred to as "WWL." Examples of the public engagement conducted include stakeholder meetings, focus groups in 15 languages, multi-media displays in public spaces, and solicitation of feedback through HPD's website.

protected characteristic and that residents of all neighborhoods have the resources they need to thrive.

30.     As part of these fair housing commitments, the City has also devoted significant time and effort to reform its affordable housing lottery system.[21] The City's lottery system is standardized and overseen carefully by HPD and the New York City Housing Development Corporation ("HDC"). Whenever and wherever affordable units are awarded through the lottery, applicants for those units are evaluated based upon standardized criteria that apply to all applicants. That is, HPD ensures that all affordable housing lotteries in the City follow the same guidelines and rules for implementation, application review, and selection criteria. The City is also committed to making affordable housing easily accessible to those who qualify for it. In 2012, the City debuted Housing Connect, the City's centralized, online database of all newly constructed housing projects that contain affordable housing units and are accepting applications for those units. In addition to being a central place to learn about affordable housing options, those interested in affordable housing can submit electronic applications through Housing Connect. An updated version, Housing Connect 2.0, was recently launched, further improving the ease of the application and leasing processes.

## C.     New York City's Housing Crisis

31. There are currently approximately three and a half million housing units in New York City, the largest number of units in the city's history.[22] However, despite the size and

---

[21] To summarize the City's affordable housing lottery very generally, any person can apply to any project that is accepting applications for affordable units by submitting an application for that project. They then receive a random lottery number. The lottery numbers are then used to establish the order that applicants will be reviewed and potentially awarded a unit, if they are eligible. For a more detailed description of the affordable housing lottery, as relevant to this case, see Brown Declaration.

[22] A large majority of NYC's occupied rental housing stock falls into one of two categories: market and rent stabilized. Market rental units are privately owned and non-regulated units comprising the following:

growth in its housing stock, the city continues to face a long-standing and ongoing housing crisis. Historically, the city's housing crisis was largely a result of the shrinking of the stock of habitable units because of disinvestment and demolition. More recently, that trend has shifted and the shortage is mainly a result of population growth outpacing the creation of new housing units.

32. Since the 1960s, New York City has continued to have a net rental vacancy rate of less than 5 percent, which is widely accepted as indicating the existence of a housing emergency.  In fact, the city's overall housing vacancy rate – both affordable and market rate units – was 3.63 percent based upon the 2017 New York City Housing and Vacancy Study ("HVS") data.[23] The vacancy rate for rent regulated units is even lower, at only 2.6 percent, again based on 2017 HVS data.[24]

---

units that were never rent regulated because their buildings contain fewer than six units or were built after 1974; units that were subject to rent regulation but decontrolled; and unregulated rental units in coop and condo buildings. Rent stabilized and rent controlled units, on the other hand, are predominately in buildings built before 1974 and containing six or more units. A small number of units in older buildings with fewer than 6 units are also subject to rent stabilization, as are units in buildings receiving tax benefits or subject to regulatory agreements with the state or City. *See* WWL Draft Plan at p. 143.

Three other types of affordable housing programs are each publicly supported in some way. Public housing provides affordable, means-tested housing for low- and moderate-income residents in developments owned by NYCHA.  Other regulated rental housing includes units that are regulated by the Federal, State or City governments under a variety of programs, including Mitchell-Lama, HUD-regulated, Article 4, Article 11, and Municipal Loans. Vouchers or other rental assistance, like public housing is means-tested and recipients' rent levels are set at a specified percentage of their incomes. But unlike public housing residents, voucher holders and recipients of rental assistance programs mostly live in privately-owned units (including units regulated under other affordability programs), and the Federal, State or City governments pays the difference between the tenant's share and the fair market rent. *See* Id.

[23]   HPD,   "Selected   Initial   Findings,"   p.   2,   available   at: https://www1.nyc.gov/assets/hpd/downloads/pdfs/about/2017-hvs-initial-findings.pdf.

[24] See HPD, "Selected Initial Findings," p. 3.  Moreover, the vacancy rate for units with a monthly rent of $800 or less was 1.15 percent, for units with a monthly rent of $800 to $999 was 2.09 percent, for units with a monthly rent of $1000 to $1499 was 2.52 percent, and for units with a monthly rent of $1500 to $1999 was 4.11 percent. See HPD, "Selected Initial Findings," p. 3.

33. New York City's present affordability crisis – due to a shortage of units as population growth has outpaced the creation of new housing units – began to take hold in the 1990s and has remained steady ever since, despite historic investments in affordable housing. Over time, housing prices have increased steadily, outpacing increases in tenants' incomes. For example, the HVS shows that, for the years 2013 through 2016, the median asking rent for a vacant unit in New York City increased by 30 percent while incomes for renters rose only by 13.7 percent.[25] Today, more than half of New York City renter households are rent burdened or paying more than a third of income toward housing costs, and about one third of renter households are severely rent burdened -- paying more than half of their income toward rent.[26]

34. Currently, less than twenty-five percent of all units in the City have a monthly rent of $1,000 or less.[27] The limited number of low-cost units that are available for rent means that many households who would like to move are unable find an apartment they can afford. Those who need a unit better suited for their physical needs (for example, access to an elevator) or those who need to move because of their household size are often unable to find adequate housing nearby, or must move to different neighborhoods, often far from where they had been living, to find affordable housing. Additionally, increasing rents and the potential increase in value to a landlord of a vacant unit (for example, a vacant unit can be renovated and rented or

---

[25] New York City, Housing Preservation & Development. 2018. "Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey." February 9. https://www1.nyc.gov/assets/hpd/downloads/pdf/about/2017-hvsinitial-findings.pdf, p. 5, and table 9, page 18.

[26] It is also worth noting that in addition to the rise in rent burdened households, in fiscal year 2018, more than 130,000 individuals spent at least one night in the city's shelters. See https://www.coalitionforthehomeless.org/basic-facts-about-homelessness-new-york-city/. Homelessness has increased dramatically over the past several decades, but is now stabilized.

[27] HPD, "Selected Initial Findings", page 23, table 14.

converted to coop or condo ownership for a higher price) often drive households from their long-term homes and communities.

35. It is also worth noting that in New York City, low-income households tend to be non-white.[28] Thus, the housing crisis and the difficulties of finding affordable housing are most acute for non-white households.

36. Rent regulation has been an important tool in addressing the affordability crisis. Beginning in the 1990s and until recently, the law allowed for decontrol of units. Once the law began to allow for decontrol, the city experienced a significant loss of rent regulated units, especially those renting at affordable levels.  Figures from the New York City Rent Guidelines Board indicate that between 1994 and 2018 there was an overall loss of at least 147,512 rent-regulated units.[29] Since 2000, the largest cause of the decline was "high-rent vacancy deregulation," which allowed owners to take a unit out of rent regulation upon turnover when rents reached a particular level (about $2775 per month in 2019, before the law was changed).[30] Although recent reforms strengthening the rent stabilization law will result in a reduction in the loss of rent-stabilized units, the City still has an extreme shortage of affordable units citywide, which these reforms alone cannot resolve. The City is only beginning to recover from decades of losing rent-regulated units through decontrol provisions.

37. The City's housing crisis has effects on a rent-burdened household that extend far beyond their ability to pay monthly rent. In general, the larger the share of one's income

---

[28] WWL Draft Plan at p. 55. Data was sourced from the 2012-2016 American Community Survey ("ACS").

[29] New York City Rent Guidelines Board, 2018. Changes to the Rent Stabilized Housing Stock in New York City in 2017, May 24. https://www1.nyc.gov/assets/rentguidelinesboard/pdf/changes18.pdf, p. 9.

spent on housing, the less money is left over to spend on food, healthcare, childcare, education and enrichment, and other critical expenses. Housing cost-burdened households may also have difficulty making rent or mortgage payments on time, which may lead to overcharges and other financial penalties and, at the extreme, eviction or foreclosure. Burdened households may experience broad financial instability in the form of delayed payments across a variety of bills, which may lead to increased stress and its adverse mental and physical health consequences.[31]

38. Furthermore, the City's housing crisis is not just limited to monetary concerns. Many residents would like to remain in their communities as they age. However, aging often involves life changes that affect the ability to remain in one's current unit. For example, a resident may no longer be able to walk up the stairs in a walk-up apartment. Residents facing those challenges may need to move to a new unit with different amenities, such as an elevator, to live comfortably. Others may outgrow their current apartment, when, for example, they have children or other individuals join or leave the household. These households may need larger apartments with more bedrooms, or smaller apartments that are easier to care for and afford. There are often shortages of affordable and available unit types in one's neighborhood.

39. Although the City has made extensive and continued efforts to address the housing crisis, the City continues to face a severe housing shortage. Therefore, the City

---

[30] New York City Rent Guidelines Board, 2018. Changes to the Rent Stabilized Housing Stock, p. 15. High-rent vacancy deregulation provides that units that rent above a certain amount are no longer subject to rent stabilization rules.

[31] See, e.g., National Low Income Housing Coalition, *Study Finds Severely Housing Cost-Burdened Households Experience Greater Food Insecurity, More Child Poverty, and Worse Health Outcomes,* March 25, 2019, available at: https://nlihc.org/resource/study-finds-severely-housing-cost-burdened-households-experience-greater-food-insecurity; Fischer, Will, et al. *Research Shows Rental Assistance Reduces Hardship and Provides Platform to Expand Opportunity for Low-Income Families,* December 5, 2019, available at: https://www.cbpp.org/research/housing/research-shows-rental-assistance-reduces-hardship-and-provides-platform-to-expand.

continues to need policies and programs that will work to address this ongoing, citywide problem.  The CP policy is one of these policies.

**D.      The City's Community Preference Policy**

40.      The CP policy was first adopted in 1988 in response to housing challenges and initiatives occurring at that time.  As noted above, New York City had experienced widespread disinvestment in the 1970s and 1980s and many buildings were abandoned or ordered to be vacated due to the lack of basic services and/or safety concerns. Many low-income residents of these buildings were displaced but remained living nearby in poor conditions. By the early 1980s, New York City had taken ownership of more than 120,000 *in rem* units (both occupied and vacant), making it the one of the largest landlords in the city.

41.      In the mid-1980s, the City announced its ten-year housing plan to return the *in rem* housing to private ownership and management and to use these units as a vital supply of affordable housing. As run-down buildings were renovated and improved, and new buildings were built through City programs on vacant lots, new residents began to move into those new or renovated buildings. However, many buildings that had not been abandoned or vacated, and therefore were not the priority for investment incentives and revitalization, remained in poor condition. The tenants who remained in those units continued to suffer from the low quality housing. These residents wanted to gain access to the newly constructed or renovated units in their neighborhoods after having lived in unfavorable conditions for so long. In response, advocates from the neighborhoods and tenants of the still derelict buildings began to voice their concern about whether residents of the surrounding neighborhood were being given sufficient access to new or renovated buildings. Out of a sense of justice and fairness for people who had remained in the disinvested communities, the City responded by creating the CP policy to give

them a better chance of securing a place in the new and rehabilitated housing.[32] At the time of its creation, the preference provided that applicants in a particular community district would receive a preference for up to 30% of newly affordable units in that community district.

42.     In 2002, then HPD Commissioner Jerilyn Perine increased the preference percentage from 30% to 50%. The percentage was increased in response to rising concern about the displacement of low-income residents in communities seeing increasing rents. As many neighborhoods across the City began to attract new investment and gentrify, these neighborhoods were seeing rapidly rising rents and becoming more expensive to live in, making it hard for low-income residents to remain in their neighborhoods. Community advocates, especially those in Harlem, expressed concerns to Commissioner Perine about the displacement of low-income, often Black or Brown, residents, from these improving neighborhoods.  Commissioner Perine responded to the increase in displacement and the growing fear of displacement by raising the CP policy to 50%. The policy has remained at 50% for the last almost 18 years.

43. Additionally, under fair housing and racial justice principles, it is just as important for the City to try to assist its residents with the opportunity and choice to remain in their communities (and enjoy improvements and wealth-building opportunities in those communities) as it is to provide opportunity and choice to move to other neighborhoods. Each is an important housing choice and both options need to be available to residents. The CP policy helps the City assure its residents that they will have both these options.

44.     Thus, the CP policy has a distinct and important historical rationale, that has only become more acute as the City and its residents grapple with fear of displacement and

---

[32] The CP policy used to be applied to new and preservation units. The de Blasio administration stopped applying it to preservation projects because most tenants return to the rehabilitated housing.

the relationship between displacement and gentrification, the inequitable opportunities people in low-income and Black or Brown neighborhoods have to build wealth, and the need for investment to address disparities in neighborhood services and amenities. As will be discussed below, addressing displacement and the fear of displacement continues to be the driving force for the CP policy today.[33]

**E.      Fear of Displacement in New York City**

45. Fear of displacement in New York City is a concern that is often voiced to City leaders and officials, including myself. It is a very real and reasonable fear for many people in New York City. When market rents increase faster than the incomes of the people living in a neighborhood, existing residents are often pushed out of that neighborhood and into neighborhoods with cheaper rents or out of New York City altogether.

46. In the many public events that I have attended as Deputy Mayor and previously as HPD Commissioner, such as town halls, community meetings, public hearings, and meetings with City Council members ("CMs"), I often have heard concerns about residents being priced out of their neighborhoods and therefore being displaced. A wide range of participants in these events, including tenants, advocates, community leaders, and elected officials, continuously and passionately express deep fear that people, especially Black and Brown residents, in low-income communities will be displaced because existing residents already are, or will be, unable to afford their rent.

47. These fears arise in part because residents are seeing market rents rise even though affordable housing is being constructed. Many New Yorkers are in households that are

---

[33] As discussed below, the City also uses a number of other anti-displacement policies that target other causes of displacement for New York City residents.

struggling to survive even in the City's lowest cost neighborhoods -- they already are rent burdened or severely rent burdened.  When they see investment coming to their neighborhood, even when development projects include affordable housing, they worry that rents will increase even further beyond their means. They are also seeing new households with higher incomes moving into their neighborhoods, and fear that those new residents will lead to a change to the retail in the neighborhood, where stores that served the low-income community are replaced by stores catering to the new residents, increasing the cost of living (such as the costs of local groceries, childcare, restaurants) in addition to the cost of rent.  Low-income residents are directly feeling these pressures, and sometimes are experiencing harassment from landlords looking to renovate their apartments and raise rents.  Or they are seeing and hearing about their neighbors' experiences with rent arrears, evictions, or harassment, or just seeing neighbors move away.  Even in neighborhoods where these changes have not yet begun to occur, residents are aware of the changes taking place in other neighborhoods across the city and fear that their neighborhood will be next.

48. Moreover, it is not just in the events I have personally attended that this concern and fear of displacement is being voiced.  Both my present City Hall and agency colleagues and my previous HPD team frequently have reported that they hear residents voicing fears of being displaced when they attend events throughout the City, in interactions with community groups and in community meetings, and in communications with advocates, community leaders, CMs, and other elected officials. For example, HPD, HDC, and DCP[34] personnel routinely meet directly with residents, community organizations, community leaders,

---

[34] In addition to HPD and other agencies, I also speak with and receive reports and updates from DCP employees as Deputy Mayor. As HPD Commissioner, I was also frequently speaking and working with DCP employees.

and CMs in connection with current and proposed projects, and to gather information about the needs and state of housing in the city.[35] My City Hall staff and colleagues also meet with residents, community organizations and leaders, and CMs and other elected officials and their staff members.[36] They report that the same concerns about displacement I have heard first-hand are repeatedly and consistently conveyed to them as well.

49. The City also heard those concerns throughout the WWL process. Many residents involved in community outreach about fair housing, a majority of whom were people of color and low-income,[37] voiced their fears of being displaced when asked their opinions on the state of housing in the City.

50. Notably, this fear of displacement is evident even when affordable housing is being built.  It was frequently and passionately expressed during our community outreach around MIH, the path-breaking legislation that mandated the inclusion of affordable housing in every building in areas rezoned to allow greater density. Even with the requirements for affordable housing in MIH, the fear of displacement has been a significant base of opposition to every MIH rezoning that I have been involved with. In the planning and approval process for these

---

[36] E.g., in just the few months before Covid-19, my staff and/or I have attended meetings with: residents convened by Community Voices Heard; NYCHA and community residents involved in the Chelsea developments working group; tenant advocates; tenant association leaders, tenants invited to resource fairs, and residents of homeless shelters.

[37] During the WWL process the City spoke with over 700 residents. These residents came from all five boroughs and were reached through 62 focus-group-style conversations conducted in 15 different languages. Additionally, these conversations were focused on hearing from communities that often have less of a voice in government decision-making, including people of color (such as Black, Latinx, and Asian New Yorkers), immigrants (such as undocumented individuals and those with limited English proficiency), people with disabilities, LGBTQ individuals, religious communities, New Yorkers who receive rental assistance, including Section 8 Housing Choice Vouchers and City-administered programs, NYCHA residents, survivors of domestic violence, justice-involved individuals, and homeless or formerly homeless individuals.

rezonings, numerous individuals and community groups loudly and emotionally expressed their concerns that the rezoning would bring new projects, which would in turn make their current neighborhoods too expensive for them.[38] They consistently and repeatedly expressed that they feared they would be pushed out of their communities and that there was too little being done to protect them from these economic pressures.

51. It is also apparent from reading news stories about any housing issue in the city that the fear of displacement is often on the minds of city residents. During my time in City service, I have seen many headlines, read numerous articles, watched or listened to interviews, podcasts, and panel discussions about residents' fear of being displaced.[39]

## F.   Fear of Displacement and ULURP Applications for Affordable Housing Projects

52.   Residents' fear of being displaced due to market pressures and new construction coming to their neighborhoods often manifests in community opposition to new construction. While any community opposition to development can be troubling and warrants a response, it is particularly necessary to listen to and respond to the opposition when the development is subject to a formal public review process and City Council approval, as many affordable housing projects are.

53.   Many affordable housing projects and most land use actions needed to facilitate the creation of affordable housing are subject to ULURP. ULURP mandates a comprehensive multi-step public review process, beginning with community board hearings and

---

[38] Public hearings are part of the ULURP process. In these hearings, the public is allowed and encouraged to voice its concerns, opposition, support or thoughts about pending land use actions, such as rezoning and new development proposals.

[39] See also, Vicki Been, *City NIMBYism*, Journal of Land Use & Environmental Law, p. 217, Vol 33, No. 2, Spring 2018.

ending with a City Council vote.[40] The public can voice their support or opposition to a project in the multiple public hearings, including, among others, community board meetings, that are mandated by ULURP. Residents also voice their concerns to their CMs, who like all elected representatives, are supposed to represent the interests and well-being of their constituents.

54.     The formal ULURP takes time. Moreover, developers and the City often begin working informally with each other and communities to discuss and plan upcoming projects months or even years before an application subject to ULURP is certified and the formal ULURP begins. In addition to informal discussions, the City Environmental Quality Review (CEQR) process also begins before ULURP. It is important for residents and CMs to have a clear and predictable understanding of who will be eligible for the preference under the CP policy because concerns about displacement are triggered and opposition starts as soon as discussions begin on a project. However, CP is implemented at the marketing stage, which occurs when the project is 70% complete. It is typically several years between when ULURP begins and when the project is marketed, and even longer between when informal discussions occur and then the

---

[40] The participants in the ULURP process are CPC, DCP, residents and advocates, Community Boards, the Borough Presidents, the Borough Boards, the City Council and the Mayor. The process requires that once applications are submitted to DCP and DCP has certified the application as complete, hearings are held before the community board in the community district ("CD") where the action will take place, which issues a recommendations to support or oppose the application, A recommendation is also submitted by the Borough President (who also may hold a public hearing) and in some cases by Borough Boards. After this is completed, there is a public hearing on the application before the CPC. The CPC's decision on the application – approval or disapproval –  is then transmitted to the City Council. At City Council, there are public hearings before the City Council Land Use Subcommittee and the entire City Council. After these hearings, the City Council then votes for or against the application. After the City Council vote, the Mayor can veto the City Council's vote. City Council can potential overcome a veto with a 2/3 vote. For a more detailed breakdown of the individual steps and timing in the process, see https://www1.nyc.gov/assets/planning/download/pdf/applicants/applicant-portal/lur.pdf                    or http://www.nyc.gov/html/mancb10/downloads/pdf/ulurp_info.pdf

project is marketed. Thus, for the CP policy to be most effective it must be easy to understand and predictable to all, which it is. [41]

55.     I have heard from CMs and other elected officials that their constituents would often prefer even no new affordable housing to a project with affordable housing because of their worries that the new project will change the economics of the neighborhood. One of the reasons these representatives, and often the residents themselves, have expressed for their opposition is that they feel that the new project, including the affordable housing contained in it, will not benefit the current residents and will ultimately contribute to the displacement of those residents, especially those with low-incomes and who are Black or Brown.

56.     When residents of a community hear that there is planned investment coming to their area, even if that investment is desperately needed, they may react with a rational fear that prices may eventually rise and they will be forced to leave their homes and communities and move to less expensive areas. Similarly, other non-housing investments in a neighborhood, such as increased or improved green spaces, new or improved infrastructure, also often trigger the fear of displacement. Low-income residents worry that these neighborhood improvements will attract higher-income people to the neighborhood, resulting in low-income people, and the stores, houses of worship, and non-profit community organizations that serve them, being pushed out of the newly improved neighborhood.  If they are forced to move out of their neighborhood because they can no longer afford to live there, they will not be able to take much advantage of the community investments, and therefore consider the investments to be of no long term personal benefit.

---

[41] Although the vast majority of projects to which the CP policy has applied contained a preference area of only the single CD in which the project was located, during the de Blasio administration I am aware of a handful of times when the preference area was expanded to include more than one CD.

57.     Additionally, fear of being displaced is most intense in the areas around where a new housing project will be located, that is, the community where the housing project is planned to be built.  It is this fear that can cause many people to oppose any development in their community, even if it contains affordable housing.

58.     Moreover, the media regularly report, and residents are aware, that the affordable housing lotteries in New York City are very competitive. Residents and advocates in neighborhoods in which housing is proposed accordingly argue that unless there is a mechanism in place to ensure that at least some of the affordable housing is reserved for them, they likely will get no benefit from the proposed development-only the risk of displacement-so they and their representatives should oppose the project.

59.     In order to address these concerns, elected representatives, when considering a land use action in their jurisdiction almost always seek confirmation from the administration that the project will have a CP.[42]  In fact, some CMs seek more units to be allocated for community preference eligibility. It is my understanding that CMs have made similar requests for a greater percentage of CP units to others at HPD and City Hall over the many years the CP policy has been in place. However, to my knowledge, requests for more than 50% CP are denied. Thus, although often unhappy, communities and CMs ultimately accept what has been the standard policy for almost 18 years.

60.     The CP policy is necessary and responsive to the fear of displacement because it ensures that at least some local residents will be able to obtain affordable units in their

---

[42] The concern with displacement is so rampant that, based on my interactions with numerous CMs, although I did not explicitly discuss the issue with them, I believe there are CMs who would vote against new construction affordable housing projects – regardless of potential benefits the project may bring to the neighborhood - without the CP policy.

existing communities and be able to enjoy the benefits the investment will bring to the neighborhood. Putting these safeguards in place makes it more likely[43] that the City will be able to overcome the opposition to new development and achieve its ambitious affordable housing goals despite neighborhoods' understandable concerns about the difficulties that new construction and growth may pose.[44]

61. Additionally, based on my experience working with CMs and communities through various aspects of housing issues, I believe that the vast majority of the voiced opposition to projects or rezonings from CMs is not based in either the CM's or constituents' desire to segregate, or maintain segregation in, the neighborhood. Nor do I believe that CMs or community members support the CP policy as a way to prevent people of different races or ethnicities from moving to the neighborhood.[45]

62. In my work to secure affordable housing in New York City, I have rarely heard opposition to affordable housing based upon the (presumed) race or ethnicity of potential

---

[43] Unfortunately, while the CP policy can be a powerful tool to address displacement concerns related to new construction in a neighborhood, it is not always enough to assuage the community's concerns and it does not guarantee all projects are approved. There have been some projects and rezonings that have been voted down (e.g. Sherman Plaza), others that are withdrawn or never pursued because the developer realizes that the vote will not be favorable (e.g., Phipps project in Sunnyside Yard; Help project in ENY), and others that are stalled because of litigation even after approved (e.g. in Inwood, litigation stalled projects for many months, until the lower court's decision was overturned.). If there was no CP policy, it is likely that even more projects would never come to fruition.

[44] Residents also voice opposition to new affordable housing projects for other reasons. The CP policy is not intended, nor does it, overcome all opposition to new affordable housing development. Even if some residents were to oppose housing for other reasons (like the income or race of new residents), that would not mean that the CP policy is responsive to those residents' biased views. The CP policy is a race neutral policy that applies wherever eligible affordable housing is being built, regardless of the racial demographics of the CD in which the housing is proposed. It is focused on overcoming opposition driven by the fear of displacement. The CP policy directly responds to that fear, as a portion of the units are nearly certain to be awarded to community members because of the policy. (Given the large applicant pools for every lottery in recent years, it is very unlikely that none of the community district applicants would be eligible for at least one unit.)

tenants, although I am certainly aware of both the history of such opposition in the City, its occurrence in other jurisdictions, and the ability of opponents to hide racial bias behind other objections. In my experience, those who would express such racial biases are looking to prevent the development of affordable housing in their neighborhood altogether and thus the CP policy, which helps get specific affordable housing approved, would not resonate with them to overcome their opposition. Moreover, even if some of them did have such invidious beliefs, the CP policy is not responsive to such people, but rather is responsive to those residents who want to avoid being displaced from their communities as investment and changes occur in their communities.

63. Additionally, it is unlikely that the CP policy will significantly reduce the amount of integrative racial change in a neighborhood. First, even if all of the CP units were to go to applicants that are the same race as the majority race in the neighborhood (which to my knowledge does not happen), the other half of the units that are not CP units and all of the market rate units (if there are any) will be open to applicants from all over the city (and outside the city), and could all go to people of different races. Those non-CP and market rate tenants might very well not move to the neighborhood if the development were instead stymied because of current residents' fear of displacement. Second, the CP policy only applies to initial lease-up. Thus, any time after a CP unit is vacated, a person from outside of the CD can lease the unit.

64. Based on my years of being involved with the operations of the City Council and land use proposals, I believe that CMs are indeed responsive to their constituents' fears about being displaced from their neighborhoods when new construction comes to those neighborhoods. I believe that if there were no CP policy, or a significant reduction in the percent of the CP, the City Council would approve fewer new affordable housing projects. If the new

development is not approved, then less affordable housing would be available to all residents of the city – those already in the neighborhood and those living in other parts of the city.

65. Based on the multitude of sources and times that the fear of displacement has been expressed as a concern of the residents of New York City, I believe that it is one of the most prominent and consistent housing concerns expressed by the public, community leaders and CMs. Thus, it is not only appropriate for the City to respond to this widespread, reasonable concern, but it is essential for the City to do so in order to overcome the opposition to affordable housing projects that are so desperately needed to help resolve the affordable housing crisis.

66. The CP policy is necessary to address this specific fear of displacement at the local level. None of the City's other anti-displacement tools – and none of the alternative tools that Plaintiffs have proposed over the course of this litigation – directly address the fears of displacement that are triggered by proposals for the construction of new affordable housing. The CP policy gives residents who desire to stay in their changing neighborhoods, although not guaranteed, a greater opportunity to remain.

## G.    Preventing Displacement in New York City

67. As I have discussed in detail above, displacement is a major concern to residents and policy makers in NYC. It is a multi-faceted threat; one can be displaced from one's home, one's neighborhood or one's city. Because of the complexity and varied ways displacement can occur, the City has created numerous policies and programs to try to prevent and mitigate displacement and the fear of displacement. These policies and programs tackle the complexities of displacement from various angles, and are each important and necessary to achieve the City's larger anti-displacement agenda. Further, more still needs to be done, as fears of displacement still dominate discussions about housing, land use, parks, policing, and other critical policies throughout neighborhoods across the city.

### (a) There are various causes of displacement

68. Displacement does not have a single cause or combination of causes. Displacement for some results from eviction, for others, from landlord harassment or refusal to renew a lease. Others may be displaced because their landlords fail to maintain the unit or building, so that the housing becomes uninhabitable and the tenant must move for health or safety reasons.[46] Some may be displaced when they are priced out of their apartment, either because the rent increases beyond their means or because their income falls or other expenses increase. Some need to move because their household size or living requirements have changed but they are not able to afford any appropriate units the neighborhood.[47] Others may need to move because the neighborhood feels unsafe to them, or fails to provide the quality or type of school they want for their children. Others may feel forced to move because the neighborhood no longer offers the supports – from houses of worship to community based social service organizations – they need or want. Though less common now, some have also been displaced by the demolition of units or the conversion of rental units to home-ownership units. Others may be displaced by any combination of these situations. While some would argue that a particular reason does not make the resulting moves qualify as "displacement," the definition of displacement is contested, may involve subjective as well as objective factors, and may depend upon one's baseline views about whether housing is a basic human right.

---

[46] Some landlords will deliberately not correct poor conditions, which are often also violations of the City's Housing Maintenance Code, in individual units or buildings with the hope that it will force the tenants out. Other landlords may not properly maintain their buildings because of bad management practices, or because expenses exceed what the current rental income will support.

[47] As discussed above, many residents are rent burdened and that number is increasing. When the rents in a neighborhood rise faster than incomes, the tenants will need to spend more of their income on rent. This leaves less income to spend on other necessities, like food, clothing, education, etc. When a household has to choose between being rent burdened or extremely rent burdened to stay in their apartment or

**(b) Displacement can be studied and understood from various sources of information**

69. The study of displacement is, like displacement itself, a complicated, complex, and nuanced matter. Researchers use many different metrics and types of data to analyze the phenomenon. But differences of opinion about how to define, measure, and assess displacement do not obscure the fact that displacement is a critical concern for all those considering, designing or implementing housing, land use and community development policy. While the City has not conducted its own specific displacement study to measure displacement across the city, there are numerous studies, metrics, and other data points available that support the conclusion that displacement is or may be occurring and that the fears expressed by residents about being displaced are rational. In particular, the data and trends reported in the City's HVS,[48] the DCP's work tracking demographic changes in neighborhoods and the city as whole,[49] reports

---

neighborhood, or having more income to spend on basic necessities, many will be forced to choose a less expensive place to live so that they can afford other necessities.

[48] For example, the fact that vacancy rates in the lowest rent housing are so much lower than vacancy rates in higher rent units, as the HVS shows, suggests that low-income households have few apartments to choose from in any particular neighborhood when they need to move, which justifies fears that should their current housing become unaffordable or unavailable, they may need to leave the neighborhood. Similarly, the HVS shows that the median income of renters in units that are not rent-stabilized (largely newer buildings) is almost 1.6 times higher than the median incomes of renters in stabilized (largely older buildings), which justifies tenants' fears that new buildings in their neighborhood are likely to will bring wealthier people to the community.  See Gaumer, E., Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey. New York, NY: New York City Department of Housing Preservation and Development; 2018.  *See*  https://www1.nyc.gov/assets/hpd/downloads/pdfs/about/2017-hvs-initial-findings.pdf

[49] DCP reports show that the Black non-Hispanic population in the City fell by 5.1% between 2000 and 2010, and fell by 12.5% in Manhattan, for example.  NYC Planning, NYC2010 Results from the 2010 Census:    Population    Growth    and    Race/Hispanic    Composition,    available    at https://www1.nyc.gov/assets/planning/download/pdf/planning-level/nyc-population/census2010/pgrhc.pdf.  This data shows that there are some households that have left their neighborhoods. This undisputed factual data, in addition to the numerous statements by City residents (in forums such as ULURP hearings or HPD community meetings) that they have been displaced, know someone who was, or are afraid they will be the next to be forced to move, make it undeniable that the City has a legitimate and rational basis to craft policies to address residents' concerns about displacement.

by community based organizations arguing that displacement is widespread in the City,[50] numerous anecdotal accounts from individuals or advocacy organizations[51] and a plethora of scholarly research from a wide variety of disciplines[52] all show that in a city, like New York, that is getting more expensive for renters while demand for housing in neighborhoods with low-income and Black and Brown populations is increasing, renters have a rational basis to fear that the housing market may render it impossible for them to remain in their homes, neighborhoods, or even the city completely.

70. While there is much we do not yet know about displacement,[53] policy makers do not have the luxury of waiting until all the theoretical and factual disputes about an issue are resolved through rigorous empirical studies. The government's job, in part, is to address the rational fears and concerns of its residents. Given what the City understands about the housing

---

[50] Although the City may not agree with all of the methodology, specific findings and/or conclusions in these reports, there is no question that these reports show that these organizations are deeply concerned with residential displacement and believe it is happening.

[51] See, e.g., Thomas Angotti and Sylvia Morse, eds., *Zoned Out! Race, Displacement, and City Planning in New York City* (New York: Terreform, 2016); Michael Greenberg, "Tenants under Siege: Inside New York City's Housing Crisis," *New York Review of Books*, August 17, 2017, available at https://www.nybooks.com/articles/2017/08/17/tenants- under-siege-inside-new-york-city-housing-crisis/.

[52] For the most recent studies, see, e.g., Quentin Brummet and Davin Reed, The Effects of Gentrification on the Well-Being and Opportunity of Original Resident Adults and Children (Fed. Res. Bank of Phil. Working Paper, 2019); Lei Ding, Jackelyn Hwang and Eileen Divringi, Gentrification and Residential Mobility in Philadelphia, 61 Reg'l Sci. & Urb. Econ. 38 (2016); Kacie Dragan, Ingrid Gould Ellen and Sherry Glied, Does Gentrification Displace Poor Children and Their Families? New Evidence from Medicaid Data in New York City, 83 Reg'l Sci. & Urb. Econ. 103481 (2019). For reviews of the earlier literature, see, e.g., Miriam Zuk, et al., Gentrification, Displacement and the Role of Public Investment, 33 J. Plan. Lit. 31 (2018).

[53] See, e.g., Vicki Been, What More Do We Need to Know About How to Prevent and Mitigate Displacement of Low- and Moderate-Income Households from Gentrifying Neighborhoods *in* A Shared Future: Fostering Communities of Inclusion in an Era of Inequality (2017), available at https://www.jchs.harvard.edu/sites/default/files/a_shared_future_what_more_do_we_need_to_know_0.pdf

crisis, gentrification, and demographic trends, the City must address displacement and the fear of displacement from as many angles as possible.

### (c) Displacement can and does harm those it affects

71. Displacement can have very real harmful consequences for those who are displaced, those left behind, and those who fear displacement. Those displaced from a neighborhood can experience disruptions and breaks in core connections with neighbors and the broader community. A person's social network within a neighborhood can provide valuable and significant support. This can be especially true for lower-income households, who are at most risk of displacement. Low-income households often rely on neighbors or nearby family in their day-to-day lives. They may depend, for example, on in-kind favors, such a childcare, assistance with travel and other logistics bartered services, networking, and advice from neighbors and friends and family in the community, instead of purchasing these services. They may have longstanding ties to places of worship, social services, community centers and stores and services in the neighborhood. When individuals are forced to move from their neighborhoods because housing becomes unaffordable or otherwise unavailable, these community ties can be broken and both the displaced individual and the people left behind can suffer stress, depression,

and other physical harms,[54] as well as social and financial harms from the involuntary loss of these connections and services.[55]

72. I am aware of the importance many people place on remaining connected to their neighborhood not only through research,[56] but also through the City's work directly with residents. During the WWL process, more than 50 percent of participating residents said they would like to remain in their current neighborhoods and not move to a new one, if given that chance.[57] The main reasons people gave for wanting to remain in their neighborhoods included having a sense of belonging in their current neighborhood and connections to family and community in their neighborhood.[58] The participants reported that they wanted to remain in their current neighborhoods because of connections to neighbors that provide childcare, assistance

---

[54] Displacement can cause overcrowding or "doubling-up" of households in a single unit. Households who cannot find affordable housing where they would like to live, or who are trying to avoid having to move far away from family, friends, work and community may move in with an existing household in the neighborhood. Overcrowding in apartments can cause not only stress, but also dangerous living situations when units are illegally modified to accommodate more households (by converting spaces that are not approved for residential use, subdividing spaces with improper or insufficient exits, or installing gas or water lines illegally, for example).These conditions can jeopardize the health and safety of those living in the units and others, such as first responders or other residents.

[55] Black and Brown New Yorkers are more likely than white New Yorkers to have low incomes. Thus, the City recognizes that displacement due to rising rents is likely to have the greatest impact on Black and Brown residents. As such, preventing and taking steps to mitigate the pressures of rising rents is an important aspect of the City's fair housing efforts by trying to ensure that those residents have real housing choice – whether to stay in their neighborhoods as rents increase or to have opportunities to live in affordable housing in a variety of other neighborhoods.

[56] See, e.g., Vicki Been and Leila Bozorg, *Spiraling: Evictions and Other Causes and Consequences of Housing Instability*, 130 Harv. L. Rev. 1408, 1423-25 (2017).

[57] WWL Community Conversations: New Yorkers Talk Fair Housing, June 2019 at p. 35. Fifty-five percent (55%) of those asked stated that they would rather stay in their current neighborhood rather than move to a new one. The majority of those who were involved with the responses recorded in the WWL Community Conversations were low-income households (approximately 25 percent of participants) and extremely low-income households (approximately 40 percent of participants), and thus, more likely to be eligible for HPD lottery affordable units to which the community preference policy would apply. See id at p. 2, 15.

[58] Id.

with food and necessities when times are hard, assistance from houses of worship with housing or job searches, and having a sense of safety and security from knowing those living around you.[59]

73. Furthermore, when WWL participants were asked what makes a neighborhood "great," participants' top two responses were: neighborhoods that they had relationships with through family, friends and neighbors, and neighborhoods with which they had personal familiarity and history.[60]

74. Additionally, throughout the WWL process, one of the consistent themes the City heard from residents was not that residents wanted to move to a "better" area, but rather that they wanted to remain in their homes but have their neighborhoods improved so that they had the same access to resources as "better" neighborhoods. They felt that they should not have to seek out neighborhoods of "better opportunity,"[61] but that all neighborhoods should provide such opportunity. The desire to remain in their neighborhoods was not a matter of city residents being unaware or uneducated about the conditions or resources in other neighborhoods, but rather reflected connections to their current neighborhood and informed decisions about wanting to stay in their communities.

75. Furthermore, displacement can cause major disruptions and negative effects on neighborhood stability. Stable neighborhoods are able to foster and increase community well-being, engagement and social bonds. When displacement forces residents out of their neighborhoods, it can destabilize those neighborhoods and weaken the positive attributes of

---

[59] WWL Conversations at 38.

[60] WWL Conversations at 45.

[61] WWL conversations, generally.

stable neighborhoods. By helping residents who want to live in a neighborhood stay in that neighborhood and feel secure in their place there, anti-displacement policies, such as the CP policy, can help promote neighborhood stability.

### (d) The City has crafted multiple policies to combat displacement

76. As noted above, there are a variety of ways in which displacement may occur – through eviction, deterioration of the housing, or harassment, for example – and the different forms may require different solutions. Further, because displacement is a complicated and multi-faceted issue, more than one policy will be needed to address it. Therefore, the City has crafted several anti-displacement policies and tools, which have various targeted and specific purposes and goals, but all work together to try to minimize and mitigate displacement in New York City.[62]

77. The City has developed anti-displacement strategies, for example, to address displacement from the city as a whole by creating policies and programs to preserve the existing affordable housing stock and to encourage construction of new affordable housing. As described above, in order to address displacement from one's neighborhood, the City created and implemented the CP policy. Finally, the City has a number of policies and initiatives that are aimed at trying to prevent displacement from one's apartment, such as providing legal services for tenants facing eviction, providing social services to help tenants secure benefits or receive services such as financial counseling that would help them pay their rent, providing temporary rental assistance, working with the state to strengthen rent regulations and increase enforcement

---

[62] Indeed, of the strategies to address displacement catalogued by researchers and policy analysts, the City has adopted all or virtually all of those strategies. See, e.g., Luke Herrine, Jessica Yager and Nadia Mian, "Gentrificaiton Response: A Summary of Strategies to Maintain Neighborhood Economic Diversity," (NYU Furman Center, 2016); Jeffrey Lubell, "Preserving and Expanding Affordability in Neighborhoods Experiencing Rising Rents and Property Values," 18 Cityscape 131 (2016).

of those regulations, enacting laws to prevent landlord harassment, and having a robust system for enforcing the Housing Maintenance Code to prevent deterioration and neglect.

78. Most fundamentally, the City is combating displacement by trying to increase the overall supply of housing units. The more new housing that is built to meet the demand for housing, the less pressure there is on rents. And as more affordable units are built in the City, the more households who can't afford market rents are able to remain in their neighborhoods and in the city.  As discussed more fully below, the CP policy also plays a crucial role in the City's ability to build more affordable housing.

### (e) *The CP policy has a specific and necessary purpose in the City's anti-displacement agenda*

79. The CP policy addresses this aspect of displacement by ensuring that some of the new affordable units will be offered to residents of the surrounding neighborhood who need to move from their current housing but want to remain in their neighborhood. At the same time, the policy allows residents of other neighborhoods to move into the neighborhood and receive the benefits of an affordable unit.

80.     The CP policy attempts to mitigate the harms that can result from displacement and fear of displacement from one's community and neighborhood – not one's apartment or the city overall, as other policies are designed to do. It addresses these concerns by giving current residents who want to remain in their neighborhood a greater chance than they would otherwise have to obtain a new, high-quality affordable unit through the City's lottery system when they otherwise might be displaced for the reasons detailed above. The CP policy allows movement within a neighborhood and thereby helps residents keep the community relationships and connections that are so important to individual households and to the community's stability and social capital. The CP policy addresses those individuals that wish to

move out of their current unit for various reasons, such as overcrowding, poor unit conditions or rapidly rising rents, but still want to stay in their neighborhood.[63]

   81. Furthermore, although the CP policy helps community members who choose to remain in the community to do so despite market pressures and changes in the community, the CP policy is not intended to prevent neighborhoods from changing at all, nor can it.[64] Even with the CP policy, units in a development are not limited to residents of that CD. Only 50% of the new affordable units within the entire project, and none of any available market rate units, are prioritized for applicants from the CD preference area. The CP policy does not prevent applicants from outside a CD from being awarded an affordable unit or from moving into any of the market rate units.[65]  It also does not affect any future residents of an affordable unit because the CP policy does not apply to re-rentals of units (when the initial resident of a unit rented to a CD resident leaves the unit, the CP policy does not apply when that unit is re-rented). Thus, the CP policy strikes a balance between welcoming new residents to the community, and giving those already living in the community a greater opportunity to remain if they so chose.

---

[63] It is also important to note that as new households move into neighborhoods, they often bring a different set of household characteristics, such as household income, education levels, type of employment, and possibly race or ethnicity. Over time, if the current residents of a neighborhood are not able to afford the increased rents in their neighborhood, they will be forced to move to a cheaper place to live. Those with higher incomes will then move into the vacated, and now more expensive, units. As this happens a neighborhood may become more economically and racially diverse for a short period; however, as more and more low-income people are displaced over time, the neighborhood will begin to become less diverse by increasingly reflecting the demographics of the new residents. The CP policy helps to improve diversity by providing a stable source of affordable units for those that lived in the neighborhood before it began to gentrify, that is, before rents began to increase rapidly, thereby helping to maintain economic diversity (and because of the correlation between income and race/ethnicity, likely also maintaining racial diversity) in neighborhoods.

[64] The CP policy is not intended to, nor does it, force anyone to remain in a particular neighborhood or prevent them from applying to lotteries anywhere in the City.

[65]Some projects have both affordable and market rate units while other projects have only affordable units.

**H.      Plaintiffs' Proposed Alternatives to the CP Policy Will Not Address the City's Interests**

82. Although not directly proposed or cited to in their moving papers, I have reviewed the "alternatives" to the CP policy that Plaintiffs' alleged experts have proposed.[66] Notwithstanding their arguments to the contrary, the CP alternatives proposed by Plaintiffs[67] are not alternative policies that I believe would be able to successfully replace the CP policy. [68] Almost none of Plaintiffs' proposed alternatives address the fear of displacement. Moreover, the few that do address the fear of displacement are nothing more than diluted versions of the CP policy already in effect. They essentially try to address the same issue using the same methods and framework, only less effectively and at levels less likely to address the fear and opposition that the CP policy addresses. First, most of Plaintiffs' proposals do nothing to address the key goals of the CP policy – preventing displacement and being responsive to the fear of displacement to help overcome opposition to development of affordable housing.

---

[66] I reviewed the alternatives sections in the expert reports of Myron Orfield, dated February 15, 2019, and Maria Krysan, dated February 15, 2019.

[67] In their motion papers, Plaintiffs have not yet articulated any alternative policy proposals. In the event that Plaintiffs present specific policy alternatives as part of their motion briefing, I reserve the right to add, expand or modify my responses set forth herein in order to reply to those articulated policy proposals.

[68] I have been advised that Plaintiffs argue that there are four distinct rationales for the CP policy. This is not an accurate presentation of the City's rationale for creating and continuing to think that the policy is necessary. The rationale behind the policy is based on complex issues affecting multiple individuals and groups. Displacement is a serious and citywide issue. It is rational for residents to be aware of this widespread housing issue and try to protect themselves from being displaced. Residents often express their fears of being displaced when there is proposed new development in their communities, as development often brings an influx of new investment and can be part of widespread changes to a neighborhood. Residents express their concerns to CMs, which is what CMs respond to during ULURP. If this fear can be addressed – even if not completely assuaged, residents and CMs are more amenable to new construction. Moreover, while the City initially implemented the CP in recognition of the inequity in residents enduring years of community disinvestment and poor housing conditions while new investment was happening around them, the rationale behind it has since evolved to address the present concerns around displacement from one's community when there is an influx of investment.

83. Plaintiffs' proposal for stronger rent regulations and landlord harassment laws cannot replace the CP policy because many low-income households that are most at risk of displacement do not live in rent-regulated apartments.[69] Additionally, stronger landlord harassment laws would also not address the displacement concerns experienced by tenants who do not have malicious landlords.[70] Thus, these alternatives do not target the types of displacement that the CP policy is designed to address.

84. Nor do rent regulation and anti-harassment programs address the cause of the displacement or fear of displacement that leads people to oppose new affordable housing. They do nothing to mitigate concern that current residents may need to move into an affordable unit because new development may lead to higher rents in unregulated apartments or higher costs for goods and services in the neighborhood. Accordingly, they do not help to enable new construction in a neighborhood. Therefore, they – even if strengthened and/or improved - cannot replace the CP policy.

---

[69] In New York City, although there are approximately 605,700 low-income households residing in a rent stabilized apartment, there are also approximately 422,300 low-income households that are living in private, non-regulated apartments. See https://www1.nyc.gov/assets/hpd/downloads/pdfs/services/rent-regulation-memo-1.pdf, Table 4.

[70] In fact, there are already a number of anti-harassment programs available to all NYC residents. These programs include the HPD Tenant Anti-Harassment Unit (TAHU), which a tenant can contact if they believe that the owner of the building is withholding essential services or not making repairs to make a tenant move out, and the Tenant Harassment Prevention Task Force (THPT), which investigates and brings enforcement actions (including criminal charges) against landlords who harass tenants by creating unsafe living conditions through illegal construction. If tenants live in rent-controlled or rent-stabilized apartments, they can contact the New York State Homes and Community Renewal (HCR) and State Attorney General for assistance when they believe they are being harassed by their landlord. Additionally, any tenant can call the New York City Tenant Protection Hotline for assistance. Lastly, tenants can also commence a housing court action against landlords who have harassed them. Tenants can commence these actions *pro se*, by hiring counsel or, if they qualify as low-income households, through the City's programs which coordinate free legal assistance through the Legal Aid Society, Legal Services NYC and/or Urban Justice Center.

85. Additionally, policies that only address displacement on a citywide level cannot and do not address the displacement from one's particular neighborhood, as the CP policy does. As explained, many residents have close ties to their communities and have a genuine desire to stay in their homes and communities.  The CP policy is focused on this displacement from one's neighborhood and community. Other policies that are focused on fighting displacement at a citywide level are important (and the City does have those types of policies), but they are not aimed at addressing, and I do not believe that they would address, residents' fears of being displaced from their local communities as effectively as the CP policy.

86. Similarly, a "no-net-loss" policy proposal has nothing to do with addressing displacement from one's community. The CP policy addresses displacement and fear of displacement from market pressures. It is not meant to address displacement due to demolition of affordable units, which is what a no-net-loss policy would address. Additionally, even if the new affordable housing were built in the same community in which units were lost, without a preference for existing residents of the local community, the people displaced and the local community will see little benefit from the policy. A no-net-loss policy also does not necessarily provide residents with assurance of exactly where the replacement or new affordable housing will be built or assuage their concerns that they will be displaced from their current neighborhoods; the CP policy does.[71]

87. Plaintiffs also completely miss the point of the CP policy by proposing that mobility programs can be a replacement for the policy. Mobility programs will not address concerns that residents have about wanting to stay in their communities. Many residents have

---

[71] It is also important to note that there is a form of a no-net-loss policy operating in the city. If any dwelling units are lost in the construction of a new building that receives tax benefits through the 421-a(16) program, then the building is required to include at least as many units on site as were lost.

close ties to others in their communities – family, friends, places of worship, doctors, etc. They also have support systems and feel a part of their neighborhoods. Many residents in the City are well aware of the amenities and resources in other New York City neighborhoods, but still want to remain in theirs. There is nothing wrong with wanting to stay in your community, and it is presumptuous for Plaintiffs to try to speak for every person and determine for them that there is no legitimate reason they should want to stay in their community or that Plaintiffs or their experts know better than the people actually living in these communities.

88. Furthermore, messaging and/or an education campaigns cannot be a replacement for policy; at most they can supplement a policy. The City, including HPD and City Hall staff and elected officials, already do extensive messaging and communicating with the public around affordable housing and the fear of displacement. Simply telling a person that they should not be afraid of being displaced not only disregards their rational fears (and may in fact exacerbate those fears), but will do nothing to change the circumstances which give rise to their fear in the first place.

89. Second, the few alternatives that Plaintiffs propose that have any arguable connection to addressing the fear of displacement are simply diluted versions of the policy already in place.

90. Plaintiffs' proposal to combine or merge CDs based on the location of the project and its demographics to make a larger preference area is merely watering down the current policy, which will simply make it less effective. The proposal also ignores the purpose of the policy, which is to mitigate people's fears of being displaced from their neighborhood because the larger the area the preference applies to the more likely a person will not have the same houses of worship, social services, school or child care, or other essential connections for

the resident.  Neither proposal would be able to address and mitigate fears of displacement or prevent displacement at a local community or neighborhood level.  People in the CD where the project is located will have less chance of being able to remain in their community in an affordable unit, and people in other CDs that have become part of the preference area will have increased odds of obtaining a unit, but may have to move from their neighborhood to obtain it.[72]

91. Additionally, having a policy that has variations on merging CDs would also destroy the CP policy's understandability and simplicity. Under the current system, community residents and CMs know and can predict whether the residents will be included in a proposed project's preference area. Applicants can easily understand whether they qualify for the CP in a project.   If the preference instead varies by hard to understand and unpredictable factors, people will lose faith that it will benefit them.

92. Moreover, changing the policy to merge CDs would cause unreasonable hardships for the City. If CDs were to be merged based on the racial demographics of each CD, there would be a question about when to decide which CDs were the ones to make up the preference area. Even if an analysis and determination regarding the racial makeup of the CDs is made at the time of the informal talks or time of first formal review, things can, and would likely, change by the time the project was ready to be marketed and the CP applied, which will be confusing for community members and undermine the stated rationale for the merger.

93. A CP of less than 50% is not a valid alternative, as it would simply be a less effective version of the current policy. The CP now provides local residents' priority to half of the affordable units in new projects, which strikes a good balance between prioritizing those in

---

[72]These same issues and concerns would be applicable to a set distance alternative, for example, applicants within two miles of the project would receive a preference.

the community who are likely to be most affected by any displacement pressures connected to new development and welcoming new residents to the community. It is also a simple to understand and accords with people's inherent notions of fairness by providing an even split of unit shares.[73] CMs and residents very frequently ask for the CP to go to a larger percentage of units, especially as there are many more CP applicants than there are units available. A lower CP would just be less effective at addressing fears of displacement and opposition to projects.[74]

94. Additionally, land use proposals are often complex and there are many issues and concerns that are discussed during the process.[75] However, the CP for a project cannot be replaced by other benefits or items because these tradeoffs do not address displacement and the fear of being displaced from the community. Moreover, other items or benefits cannot replace the CP because those benefits are by definition neighborhood-based, and residents who are displaced from the neighborhood will not be able to participate in these benefits on a daily basis. Thus, I do not believe that most CMs or residents would accept other tradeoffs for a reduced amount of CP because other factors would not address the concerns that the CP is meant to

---

[73] Moreover, in light of the major disruptions and new housing concerns that the COVID-19 pandemic has caused, housing policy and housing concerns throughout the city have become notably more severe and complex. If this long-standing and well-received policy were to be changed, it would create additional and unnecessary complexity and chaos in the debates over the City's housing agenda.

[74] I am aware that at one point City Council Speaker Corey Johnson stated that he would be willing to consider reducing the CP percentage. While I have not discussed the basis of these comments with the Speaker, I will note that Speaker Johnson has not, to my knowledge, approached the administration or HPD about reducing the CP percentage. I am also unaware of any legislation he – or any other CM – may have introduced to reduce or modify the CP policy, either before or after he made those comments more than a year and a half ago.

[75] Additionally, the executive branch, the City agencies, and even other CMs cannot force or direct a particular CM to vote any particular way. They are elected by their constituents to represent the interests of those constituents. The CMs, as the representatives of the residents of a particular area, are most knowledgeable about the needs, concerns, fears and priorities of the residents. Each CM may vote based on what they understand to be in the best interest of those that they represent. Other CMs legitimately may be swayed by the CM who is most familiar with the situation in that area and his or her views on what is best for those residents.

mitigate. In all the many discussions of tradeoffs I've been involved in, I have never heard a CM or community member offer to trade the CP for any other benefit.

95. Thus, I do not believe Plaintiffs' alternatives would be as effective as the CP policy in preventing or mitigating displacement from one's neighborhood or assuaging the fears of displacement that lead to opposition to new affordable housing, or address its purpose and goals.

**Conclusion**

96. The CP policy addresses specific issues within the larger anti-displacement work the City is doing. It is not meant to address all aspects of displacement, nor to be the only tool that the City uses to address displacement or the fear of displacement.

97. The CP policy helps to prevent residents from being displaced from their neighborhood and helps to overcome residents' fears about being displaced when investment and new housing is proposed for their neighborhoods. By addressing these real and legitimate concerns, the CP policy is a necessary and narrowly tailored tool to overcome opposition when people fear being displaced, and thus, help more projects with affordable housing be approved or approved faster, which is vitally important and necessary to the City overall.

98. The CP policy focuses on displacement at a neighborhood level when new affordable housing units are being proposed, which is a different - but no less important - anti-displacement policy than the City's other anti-displacement policies. It also provides a valuable tool to provide housing choice for residents in a neighborhood to remain and have access to high quality housing. Because it uniquely serves an important role in the City's robust anti-

displacement agenda and helps overcome opposition to new affordable housing, it is a policy that

is vital and necessary to the City.


Dated:      New York, New York
            August 14, 2020


_____
VICKI BEEN