UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------- x

SHAUNA NOEL and EMMANUELLA
SENAT,

                          Plaintiffs,

        -against-

CITY OF NEW YORK,

                  Defendant.

-------------------------------------------------- x

**DEFENDANT'S RESPONSES AND
OBJECTIONS TO PLAINTIFFS'
LOCAL RULE 56.1 STATEMENT**

15-CV-5236 (LTS) (KHP)

       Defendant City of New York, by its attorney James E. Johnson, Corporation

Counsel of the City of New York, submits this counter statement pursuant to Rule 56.1 of the

Local Civil Rules of the United States District Court for the Southern District of New York,

responding to Plaintiffs' purportedly undisputed facts.

<u>GENERAL STATEMENT</u>

       Regardless of whether an assertion set forth in Plaintiffs' Rule 56.1 Statement is

disputed or not disputed by Defendant, unless similarly referred to in Defendant's Rule 56.1

Statement, Defendant does not concede that Plaintiffs' assertions or the evidence relied upon are

relevant, admissible, or material to the Court rendering a determination as to whether the

Community Preference policy (CP policy) violates the Fair Housing Act (FHA) and the NYC

Human Rights Law (NYCHRL) by intentionally discriminating against Blacks and Latinos, or

by having a disparate impact on Blacks or Latinos, or by perpetuating segregation.

       None of Defendant's responses below raise any genuine issue of material fact

requiring a trial because the disputes are 1) actually legal issues; or 2) about things that are

irrelevant to determining whether the CP policy violates the FHA or NYCHRL; or 3) are not supported by citations to admissible evidence.

Defendant's responses regarding the Community Preference policy and the marketing and lottery processes for affordable housing units are based on these processes as they exist in Housing Connect 1.0. For any responses that reference the Marketing Guidelines/Handbook, Defendant has based its responses on the 2018 Marketing Guidelines.

1.     The data about lotteries and their applicants relied on by both parties and their respective experts in this case (Professor Andrew A. Beveridge, for plaintiffs; Dr. Bernard R. Siskin, for defendant) included the following data produced to plaintiffs by defendant: (a) the version of the "Housing Connect" database provided by defendant to plaintiffs in late March of 2017; (b) "status sheets,"[1] documents maintained by the New York City Department of Housing Preservation and Development ("HPD") and the New York City Housing Development Corporation ("HDC") in a variety of forms that tracked which applicants were awarded lottery units and whether the awards were pursuant to one or more set-asides or preferences;[2] and (c) lottery advertisements.  [BD, at 11-12, ¶ 33, and at 30, ¶ 96.]

**DEFENDANT'S RESPONSE TO 1:**  Defendant disputes subsection (b) insofar as the term "as accurate as possible" is undefined, vague, and unclear. To the extent it means that the status sheets were reconciled with the most final log available for each lottery to

---

[1] Status sheets underwent a "reconciliation" process, overseen by defendant, to try to make them as accurate as possible.

[2] In the course of 2015, HPD and HDC adopted a "nesting" rule, whereby a selected applicant would be counted against the available supply of each of the preferences or set-asides by which he or she qualified (with the exception of an applicant not being able to be counted against both the mobility impairment set-aside and the hearing or visual impairment set-aside).  [*See* excerpt of transcript of June 5, 2018 deposition of Victor Hernandez and Thomas Boman, annexed to GD as Ex. 1, at 146:2-148:18; *see also* excerpts of defendant's Oct. 2, 2019 amended responses and objections to plaintiffs' requests to admit ("Def's RTA Responses"), excerpts annexed to GD as Ex. 2, at 10-11 (Response 16).]

ensure accuracy of applicants who were awarded apartments, Defendant does not dispute this statement. *See* Discovery Stipulation, August 14, 2020 Polifione Declaration ("Polifione Decl."), Exhibit 51 at ¶¶ 6-8. This dispute does not result in a genuine factual issue to be tried because the cited stipulation describes the agreed upon reconciliation process between the parties and Defendant's expert used the same data.

2.      There are several circumstances where defendant City of New York facilitates the development of affordable housing, including the provision of subsidies and benefits of other types, and also including a Voluntary Inclusionary Housing program.  [*See* excerpts of defendant's July 20, 2018 answer to plaintiffs' second amended complaint ("Answer to SAC"), annexed as GD Ex. 3, at 5, ¶ 22 (responding to ¶ 80 in the complaint and admitting that "the City provides a variety of forms of subsidy for the creation and preservation of affordable housing"); *see also* Def's RTA Responses, GD Ex. 2, at 91 (Responses 160 and 161) (defendant has had a longstanding Voluntary Inclusionary Housing program).]

**DEFENDANT'S RESPONSE TO 2**:  Not disputed

3.      Defendant also requires the provision of affordable housing pursuant to the terms of its Mandatory Inclusionary Housing program.  [*See, e.g.*, Mandatory Inclusionary Housing webpage of NYC City Council.[3]]

**DEFENDANT'S RESPONSE TO 3**:  Not disputed

4.      Depending on the program and project, a development may be comprised exclusively of affordable units, or may mix market-rate and affordable units.  [*See, e.g.*, table of projects (in defendant's Access database) and lottery advertisements.]

**DEFENDANT'S RESPONSE TO 4**:  Not disputed

---

[3] Available online at https://council.nyc.gov/land-use/plans/mih-zqa/mih/.

5.      Depending on the program and project, there may be one or more levels of affordability set for the affordable units, including more than one affordability level for the same sized unit (for example, different sets of 2-bedroom apartments that require differing levels of household income).  [*See* lottery advertisements; BD, at 53, ¶ 182.]

**DEFENDANT'S RESPONSE TO 5:**  Not disputed

6.      Defendant has characterized five levels of affordability by income band and associated Area Median Income ("AMI") range.  This information is the most current available.

| Income Band | % of AMI | Max AMI as max income for family of 4 |
|---|---|---|
| "Extremely Low-Income" | 0-30% | $32,010 |
| "Very Low-Income" | 31-50% | $53,350 |
| "Low-Income" | 51-80% | $85,360 |
| "Moderate-Income" | 81-120% | $128,040 |
| "Middle-Income" | 120-165% | $176,055 |

[*See* Area Median Income page of HPD website.[4]]

**DEFENDANT'S RESPONSE TO 6:**  Defendant disputes that this information is the most current available at the cited source. The maximum AMIs have been updated for 2020. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

7.      In any particular project – depending on funding sources and other criteria – a development may offer one or more unit-types that fall at different points on income band(s). For example, the development may offer both a 60 percent AMI unit and an 80 percent AMI unit.  [*See* lottery advertisements.]

---

[4] Available online at https://www1.nyc.gov/site/hpd/services-and-information/area-median-income.page.

**DEFENDANT'S RESPONSE TO 7:**  Not disputed

8.     While not all affordable housing facilitated or required by defendant is made available by lottery, there are a substantial number of developments where the affordable housing is made available by lottery.  [BD Ex. 2; *see also* Housing Connect current projects.[5]]

> **DEFENDANT'S RESPONSE TO 8:**  To the extent this statement is referring to a substantial number of new developments, it is not disputed. Defendant also does not dispute that all affordable housing facilitated by the City is not made available by the lottery; for example there is no lottery process for re-rentals of affordable housing units. If this is not what was meant by this statement, there is still no genuine factual issue to be tried because both experts had the same universe of lottery data available for their statistical analysis.

9.     Defendant plans on increasing the pace of construction and rehabilitation of developments containing affordable units that are filled by lottery from what it had been at the start of the de Blasio administration to what it will be in the course of the next several years. [*See* defendant's 2017 housing plan update entitled "Housing New York 2.0."[6]]

> **DEFENDANT'S RESPONSE TO 9:**  This statement would not have been disputed prior to the COVID-19 pandemic hitting NYC. Now, however, Defendant is unsure but hopeful to able to continue construction and rehabilitation at the previously planned increased pace. (See https://www1.nyc.gov/office-of-the-mayor/news/259-20/facing-unprecedented-crisis-mayor-de-blasio-budget-plan-protects-new-yorkers-by; https://www1.nyc.gov/site/omb/publications/finplan04-20.page).

---

[5] Available online at https://a806-housingconnect.nyc.gov/nyclottery/lottery.html#current-projects.
[6] 6 Available online at https://www1.nyc.gov/assets/hpd/downloads/pdfs/about/housing-new-york-2-0.pdf, at 3.

10.     When affordable housing is made available by lottery, the lotteries are administered and overseen by HPD and HDC pursuant to their joint marketing rules.  [*See* excerpts of defendant's HPD/HDC July 2018 marketing handbook ("2018 Marketing Handbook") annexed as GD Ex. 4, at 5, ¶ 1-1(A) (delineating that Handbook contains policies, procedures and requirements for marketing and tenant selection in projects assisted by *either* HPD *or* HDC); *see also* Answer to SAC, GD Ex. 3, at 3, ¶ 12 (admitting that HPD and HDC both administer community preference policy).]

       **DEFENDANT'S RESPONSE TO 10**:  Not disputed

11.     Interested households choose whether to apply to a lottery for a particular development (in contrast to being put on a multi-development or centralized list, or on a waiting list for any development that may thereafter become available).  [*See* Housing Connect current projects[7] (listing specific projects to which applicants may choose to apply, rather than providing a centralized database or listing applications for particular units).]

       **DEFENDANT'S RESPONSE TO 11**:  Not disputed

12.     Interested households apply to a lottery, as opposed to applying for a particular type of unit (a "unit type" is a specific combination of bedrooms, rent, household size permitted, and minimum and maximum income required).  [*Id.; see also* lottery advertisements (directing applicants to projects as opposed to unit types).]

       **DEFENDANT'S RESPONSE TO 12**:  Not disputed

13.     Under the joint lottery rules, there are a variety of standard set-asides and preferences. Two of these operate citywide (that is, where in the City the applicant lives has no bearing on qualification for the set-aside or preference).  The first has two components and is for people with certain disabilities.   Five percent of units are set aside for applicants with mobility

---

[7] Available online at https://a806-housingconnect.nyc.gov/nyclottery/lottery.html#current-projects.

impairments; another two percent of units are set aside for applicants with hearing or visual impairments.  The second is a preference for municipal employees in respect to five percent of units.  [Def's RTA Responses, GD Ex. 2, at 5-6, (Response 6).  *Neither the citywide disability set-asides nor the citywide municipal preference is challenged in this case.*

**DEFENDANT'S RESPONSE TO 13:**  Not disputed

14.   The largest preference, and the subject of this case, is what defendant refers to as its "community preference" ("CP") policy (the "policy").   The policy provides a priority for applicants living in the community district preference area in which the affordable housing development is being developed as further described in paragraphs 15-32.  [BD, at 6, ¶ 13 and accompanying n.8; *see also* Def's RTA Responses, GD Ex. 2, at 5-6, (Response 6).]

**DEFENDANT'S RESPONSE TO 14:**  Not disputed, except to the extent disputes are noted in Defendant's responses to paragraphs 15-32.

15.   The community district preference area is most often a single one of New York City's 59 community districts ("CDs"), although, in a small percentage of cases, the CD preference area has encompassed more than one CD.  [BD, at 6, ¶ 13 accompanying n.8, and BD Ex. 3.]

**DEFENDANT'S RESPONSE TO 15:**  Not disputed

16.   Since 2002, CP has applied to 50 percent of the units subject to being lotteried off. Prior to that time (the policy was initiated in the late 1980s), CP had applied to 30 percent of the units subject to being lotteried off.  [Def's RTA responses, GD Ex. 2, at 11, (Response 17).]

**DEFENDANT'S RESPONSE TO 16:**  Not disputed

17.   Defendant does not claim that community preference, as currently applied, is required by New York State law (the choice to apply community preference is entirely defendant's).  [*See* excerpts of transcript of Jan. 18, 2018 deposition of Margaret Brown ("Brown"), annexed to GD

as Ex. 5, at 204:17-205:11; excerpts of transcript of May 10, 2018 deposition of Maria Torres-Springer ("Torres-Springer"), annexed to GD as Ex. 6, at 185:3-16; and excerpts of transcript of Mar. 16, 2018 deposition of Matthew Murphy ("Murphy"), annexed to GD as Ex. 7, at 9:2-10:7.]

**DEFENDANT'S RESPONSE TO 17:**  Not disputed as of the date this document is signed.

18.   The priority that CP beneficiaries have for 50 percent of the units pre-exists the random lottery number that, subsequent to the close of the period for application submission, is assigned to each applicant.  [*See* 2018 Marketing Handbook, GD Ex. 4, at 39, ¶ 5-1(B)(1) (developers are advised of community preference prior to beginning marketing); *see also* lottery advertisements (notifying public of applicability of community preference prior to any applications being received).]

**DEFENDANT'S RESPONSE TO 18:**  Defendant disputes this assertion insofar as the term "pre-exists" is unclear and confusing.  However, as the cited sources make clear, it is not disputed that developers are advised of CP prior to the beginning of marketing and the public is notified of CP through lottery advertisements prior to any applications being received. The CP has no impact on which random numerical lottery number any particular applicant will receive. This dispute does not result in a genuine factual issue to be tried because the cited sources speak for themselves.

19.   So long as applicants who live in the CD preference area (hereafter, either "insiders" or "CP beneficiaries") remain to be reviewed by a developer, and so long as the CP allocation has not been exhausted, an insider with even the worst random lottery number will have priority for any and all of the 50 percent of units that are community preference units over the applicant who lives in New York City outside of the CD preference area (hereafter, either "outsiders" or "non-

beneficiaries"), even an outsider with the best random lottery number.  [*See* 2018 Marketing Handbook, GD Ex. 4, at 26 ¶ 4-4(B)(8); *see also* Def's RTA Responses, GD Ex. 2, at 6-7 (Response 7) (developers should only consider non-disability outsiders "after the community preference units are awarded").]

> **DEFENDANT'S RESPONSE TO 19**:  Not disputed so long as it is understood that the CP beneficiary applicants must be apparently eligible (i.e., based on self-reported household size and income on their initial application, the applicant meets the parameters set for at least one affordable unit at the project), and that "any and all units" means the units that the CP beneficiary applicant is actually eligible for and are available when the applicant's log number is reached by the developer. To the extent this is not what Plaintiffs meant, there is still no genuine factual issue to be tried because the cited sources speak for themselves.

20.     In other words, leaving aside applicants with disabilities, no matter how many qualified outsiders there are, and no matter by what degree they outnumber qualified insiders, the outsiders cannot get a CP unit if there is a qualified insider to take it.  [*Id.; see also* excerpts of transcript of Aug. 2, 2017 deposition of Vicki Been ("Been I"), annexed to GD as Ex. 8, at 26:22:-27:15 (conceding that outsider who has persevered through unfavorable living conditions would be barred from 50 percent of units in a lottery as long as there are enough eligible insiders who are awarded CP-beneficiary units).]

> **DEFENDANT'S RESPONSE TO 20**:  Not disputed

21.     In most of the lotteries studied, all the CP units were awarded to insiders (that is, the CP requirement was not waived to any extent).  [*See* lottery data, specifically defendant's Access database, status sheets, and developer statistical reports.]

**DEFENDANT'S RESPONSE TO 21:**  Not disputed

22.     In the minority of cases where there were not sufficient qualified insiders to fill the CP units, it was generally the case that insiders filled a substantial majority of those units.  [*Id.*]

**DEFENDANT'S RESPONSE TO 22:**  Not disputed

23.     Pursuant to the policy, random lottery number order becomes subordinate to the order of preference or set-aside grouping.  That is, random lottery number order continues to exist within a grouping that the joint lottery rules have created, but the applicant has to wait until his or her grouping comes up.  [*See, e.g.*, 2018 Marketing Handbook, GD Ex. 4, at 39-40, ¶¶ 5-1(B)(2) and (D).]

**DEFENDANT'S RESPONSE TO 23:**  Not disputed

24.     Of the preference groupings that are generally applicable, the sequence of applicant consideration and review by the developer – and the sequence for submission to HPD or HDC of applicants proposed by the developer to be offered apartments – has historically been, and the default setting remains: mobility impairment, first; then hearing or visual impairment; then community preference; then municipal employee preference, then New York City residents without any preference or set-aside.[8]  [*See* 2018 Marketing Handbook, GD Ex. 4, at 25-26, ¶¶ 4-4(B)(2) and (5).]

**DEFENDANT'S RESPONSE TO 24:**  Not disputed

*25-27. Intentionally omitted by Plaintiffs*

28.     Units of particular types are not allocated proportionally within and between preference groups and outsiders.  Unit-type allocation is first-come, first-served.  For example, CP beneficiaries who are found qualified by a developer may, without limit, select all of the supply

---

[8]   The parties have put to the side applications from, and awards to, the small percentage of applicants and awardees who are not New York City residents.  New York City residents have a general preference over non- New York City residents that is not at issue in this case [See 2018 Marketing Handbook, GD Ex. 4, at 40, ¶ 5-1(D).]

of a unit type (or even all of the unit types at a particular income level or bedroom size) that has been offered in a lottery.  [*See* Brown, GD Ex. 5, at 199:4-200:16 (acknowledging that all units in a particular income band or unit size within a lottery maybe be allocated to CP beneficiaries with none being left for non-beneficiaries).]

> **DEFENDANT'S RESPONSE TO 28**:  Defendant disputes this statement. The cited evidence is mischaracterized. The accurate statement is as follows, as testified to by Margy Brown during her deposition: "So what you're referring to, it sounds like, is in a mixed income project say there's units at 50, 60 and 100 percent of AMI, is it possible that by the time we have processed all community preference applicants all the 50 percent AMI units would be gone, would be allocated to community preference applicants…That is a possibility…It's possible that also by unit size community preference applicants could absorb a particular unit size before we begin processing non-community preference applicants." (Brown deposition, GD Ex. 5 at 199:14-200:16). This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

29.    Because of the sequencing order of applicants, one or more of the unit types for which an applicant appeared to be eligible based on self-reported application information may no longer be available when the applicant is reached by the developer (i.e., the applicant is "partially closed-out").  [*Id.*; *see also* excerpts of transcript of Nov. 15, 2019 deposition of Dr. Bernard Siskin ("Siskin II"), annexed as GD Ex. 9, at 33:24-34:7 (agreeing that, because of sequencing rules, non-beneficiaries more likely to be partially closed-out).]

> **DEFENDANT'S RESPONSE TO 29**:  Defendant disputes this statement insofar as the term "partially closed-out" is vague and unclear.  To the extent it means that an applicant appears to be eligible for more than one unit type, and at the time their application is

reached by the developer at least one unit type is no longer available and at least one unit type is still available, this statement is not disputed. To the extent this definition is not what Plaintiffs meant, there is still no genuine factual issue to be tried because the cited sources speak for themselves.

30.     Because of the sequencing order of applicants, all of the unit types for which the applicant appeared to be eligible based on self-reported application information may no longer be available when the applicant is reached by the developer (i.e., the applicant is "fully closed-out").   [*See* ¶ 28, supra; see also excerpts of transcript of Aug. 26, 2019 deposition of Dr. Bernard Siskin ("Siskin I"), annexed to GD as Ex. 10, at 142:22-143:4 (agreeing non-beneficiary more likely to be fully closed-out).]

          **DEFENDANT'S RESPONSE TO 30:**  Not disputed

31.     It is not as though CP beneficiaries are limited to be considered for CP units.  If there are CP beneficiary applicants who have not been reviewed by the time that the CP has been satisfied, those applicants can compete in any subsequent grouping for which they are qualified.  [See 2018 Marketing Handbook, GD Ex. 4, at 39, ¶ 5-1(B)(2).]

          **DEFENDANT'S RESPONSE TO 31:**  Not disputed

32.     In a relatively small number of cases, some types of preferences for residents of New York City Housing Authority ("NYCHA") housing operate as to provide preference to insiders: specifically, when there is a preference for NYCHA residents who live in the CP preference area and when there is a preference for NYCHA residents who live within a specific NYCHA development that is located in the CP preference area.  [*See, e.g.*, lottery advertisements for Housing Connect Project Numbers 141 and 279[9] versus all lottery advertisements.]

---

[9] Available online at https://a806-housingconnect.nyc.gov/nyclottery/AdvertisementPdf/141.pdf and https://a806-housingconnect.nyc.gov/nyclottery/AdvertisementPdf/279.pdf, respectively.

**DEFENDANT'S RESPONSE TO 32**:  Not disputed

33.    There are more than 3.1 million occupied residential units in New York City.  [See HPD, "Selected Initial Findings of the 2017 New York City Housing and Vacancy Survey," Feb.9, 2018, Table 1, at 9.[10]]

**DEFENDANT'S RESPONSE TO 33**:  Not disputed

34.    New York City has long been characterized and continues to be characterized by substantial levels of residential segregation by race.[11]  [BD, at 12-14, ¶¶ 36-40; Def's RTA Responses, GD, Ex. 2, at 20 (Responses 30 and 31).]

**DEFENDANT'S RESPONSE TO 34**:  Defendant does not dispute that the City is characterized by residential segregation by race, however the cited evidence does not support Plaintiffs' statement. Rather, the accurate statement is as follows, from Defendant's RTA responses 30 and 31: "Defendant…admits that the dissimilarity index for African Americans and Whites between census tracts and the City was 84 in 1990, 84 in 2000, and 82 in 2010, which is "high" according to HUD's AFFH Guidebook.[12]" and "Defendant…admits that the dissimilarity index for Hispanics and Whites between census tracts and the City was 67 in 1990, 67 in 2000, and 66 in 2010, which is "high" according to HUD's AFFH Guidebook.[13]" RTA Responses 30-31, Polifione Decl., Ex. 52 at 19-20. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

---

[10] Available online at https://www1.nyc.gov/assets/hpd/downloads/pdfs/about/2017-hvs-initial-findings.pdf.
[11] 12 The term "race" is intended to encompass "race and Hispanic status." The terms "demographic group" and "demographic groups" are intended to refer to one or more of the following Census-Bureau designations: non-Hispanic Whites ("Whites"); non-Hispanic Blacks ("Blacks" or African Americans); non-Hispanic Asians ("Asians"); and Hispanics of any race ("Hispanics" or "Latinos")
[12] HUD has since withdrawn the AFH.
[13] HUD has since withdrawn the AFH.

35.     This segregation is reflected in the fact that most of New York City's 59 community districts have a racial composition that varies significantly from the citywide average.  [BD, at 14, ¶ 41, and at BD Exs. 5-8.]

> **DEFENDANT'S RESPONSE TO 35**:  Defendant does not dispute that most of the City's 59 community districts have a racial composition that varies from the citywide average; however, the cited evidence does not support Plaintiffs' statements because there is no analysis done to support a conclusion that the racial composition "varies significantly." This dispute does not result in a genuine factual issue to be tried because Plaintiffs' characterization is akin to a legal argument, not a factual statement. *See Sattar v. United States Dep't of Homeland Sec.*, 669 F. App'x 1, 3 (2d Cir. 2016) (holding that "Rule 56.1 statements are statements of fact rather than legal arguments."); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394 (S.D.N.Y. 2015) ("the Court can…disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement")

36.     In analyzing lottery data for the purposes of disparate impact analysis, both parties' experts examined the same 168 lottery developments.  [BD, at 14, ¶ 43; see also excerpts of Dec. 13, 2019 amended opposition report of Dr. Bernard R. Siskin ("Siskin Opp"), excerpted as GD Ex. 11, Appx. C, at 5 (referencing the "168 studied lotteries").]

> **DEFENDANT'S RESPONSE TO 36**:  Not disputed

37.     In analyzing lottery data for the purposes of perpetuation-of-segregation analysis, both parties' experts examined the same subset of 145 of the 168 lottery developments.  [BD, at 45, ¶ 146; see also Siskin Opp, GD Ex. 11, at 54 and at Appx. C, at 4.]

> **DEFENDANT'S RESPONSE TO 37**:  Not disputed

38.     Both parties' experts matched in their count of 7,245,725 applications to the 168 lotteries and had only trivial and inconsequential differences in the racial classification of a small number of applicant households.  [BD, at 14, ¶ 43; see also Siskin Opp, GD Ex. 11, at 31, Table 1.[14]]

**DEFENDANT'S RESPONSE TO 38:**  Not disputed

39.     Professor Beveridge identified 3,115,032 applications that were "apparently eligible" – which is to say, by what was applicant self-reported on the applications, the applications met the income- and household-size requirements of at least one unit-type being offered in the lottery. Dr. Siskin identified 3,118,966 such applications.  In excess of 99.6 of the apparently eligible applications matched, and the variations are trivial and immaterial, as are a small number of variations in the racial classification of a small number of apparently eligible households.  [BD, at 30, ¶¶ 97-98, and at 30, 98 n.43; see also Siskin Opp, GD Ex. 11, at 31, Table 1.]

**DEFENDANT'S RESPONSE TO 39:**  Not disputed

40.     Both parties' experts analyzed the same 10,245 awardees of units who were New York City residents.  [BD, at 7-8, ¶ 18; see also Siskin Opp, GD Ex. 11, at 31, Table 1.]

**DEFENDANT'S RESPONSE TO 40:**  Not disputed

*41. Intentionally omitted by Plaintiffs*

42.     The only information available across all applicants in all lotteries that helps determine eligibility are self-reported data: household-size, household-income, subsidy status, and self-reported relationship to applicant (the presence of a "couple" in the household is a factor that adjusts household-size eligibility).  [BD, at 29-30, ¶ 95; *see also* excerpt of defendant's answers to plaintiffs' questions posed pursuant to stipulation (ECF 518, ¶ 15), annexed to GD as Ex. 12.]

**DEFENDANT'S RESPONSE TO 42:**  Not disputed

---

[14] In referencing Table 1, plaintiffs are only referencing the "Number of Applications" column, and only in respect to "Apply," "Found Apparently Eligible," and "Awarded."

43.     Professor Beveridge accurately classified CD preference areas (most frequently single CDs) as either majority White, majority Black, majority Hispanic, majority Asian, plurality White, plurality Black, or plurality Hispanic based on 2013-17 5-year American Community Survey population data.  Each of the seven is hereafter referred to as a "CD typology." [BD, at 8-9, ¶¶ 21-23, and at Exs. 3 and 4.]

> **DEFENDANT'S RESPONSE TO 43**:  Defendant's expert disputes the efficacy of the CD typologies approach. *See* August 13, 2020 Declaration of Bernard R. Siskin ("Siskin Decl.") at ¶¶ 23-45. Dr. Siskin did not classify the data into CD typologies to conduct his analysis, therefore, Defendant did not confirm whether Professor Beveridge's classifications are accurate. Nonetheless, this does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis using CD typologies is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

44.     In each CD typology, CP beneficiaries make up only a small percentage of all entrants; non-beneficiaries make up the overwhelming percentage of all entrants.  [*See* paragraph 45, *infra*.]

> **DEFENDANT'S RESPONSE TO 44**:  Defendant's expert disputes the efficacy of the CD typologies and CP status approach. *See* Siskin Decl. at ¶¶ 23-58. Dr. Siskin did not classify the data into CD typologies to conduct his analysis, therefore, Defendant did not

confirm whether Professor Beveridge's classifications are accurate. Nonetheless, this

does not result in a genuine factual issue to be tried because the City challenges

Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate

impact analysis using CD typologies is a question of law, not an issue of fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under governing substantive law will properly

preclude entry of summary judgment…Any proof or evidentiary requirements imposed

by the substantive law are not germane to this inquiry.").

45.     Specifically, the breakdown is as follows [BD, at 18-19, ¶ 56 n.29]:

| CD typology | % CP beneficiaries | % non-beneficiaries |
|---|---|---|
| Majority White | 2.64 | 97.36 |
| Majority Black | 6.87 | 93.13 |
| Majority Hispanic | 5.48 | 94.52 |
| Majority Asian | 11.37 | 88.63 |
| Plurality White | 5.06 | 94.94 |
| Plurality Black | 11.65 | 88.35 |
| Plurality Hispanic | 4.50 | 95.50 |
| Total across typologies | 5.06 | 94.94 |

**DEFENDANT'S RESPONSE TO 45:**  Defendant's expert disputes the efficacy of the

CD typologies and CP status approach. *See* Siskin Decl. at ¶¶ 23-58. Dr. Siskin did not

classify the data into CD typologies to conduct his analysis, therefore, Defendant did not

confirm whether Professor Beveridge's classifications are accurate. Nonetheless, this

does not result in a genuine factual issue to be tried because the City challenges

Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis using CD typologies is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) "Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

46.     In each CD typology, CP beneficiaries make up only a small percentage of apparently eligible applicants; non-beneficiaries make up the overwhelming percentage of all apparently eligible applicants.  [See paragraph 47, *infra*.]

**DEFENDANT'S RESPONSE TO 46**:  Defendant's expert disputes the efficacy of the CD typologies and CP status approach. *See* Siskin Decl. at ¶¶ 23-58. Dr. Siskin did not classify the data into CD typologies to conduct his analysis, therefore, Defendant did not confirm whether Professor Beveridge's classifications are accurate. Nonetheless, this does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis using CD typologies is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

47.     Specifically, the breakdown is as follows [BD, at 44, ¶ 143 n.57]:

| CD typology | % CP beneficiaries | % non-beneficiaries |
|---|---|---|
| Majority White | 3.10 | 96.90 |

| | | |
|---|---|---|
| Majority Black | 7.37 | 92.63 |
| Majority Hispanic | 5.69 | 94.31 |
| Majority Asian | 12.58 | 87.42 |
| Plurality White | 6.45 | 93.55 |
| Plurality Black | 11.49 | 88.51 |
| Plurality Hispanic | 4.66 | 95.34 |
| Total across typologies | 5.50 | 94.50 |

**DEFENDANT'S RESPONSE TO 47:**  Defendant's expert disputes the efficacy of the CD typologies and CP status approach. *See* Siskin Decl. at ¶¶ 23-58. Dr. Siskin did not classify the data into CD typologies to conduct his analysis, therefore, Defendant did not confirm whether Professor Beveridge's classifications are accurate. Nonetheless, this does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis using CD typologies is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

48.    At the moment that the application submission period closed, the odds of insider applicants (CP beneficiaries) of being awarded a lottery unit were, because of the policy, much better than the odds of outsider applicants (non-beneficiaries) of being awarded a lottery unit. This is true in each CD typology.  [BD, at 13-14, ¶ 44; at 17-19, ¶¶ 54-57 (including Table 2).]

**DEFENDANT'S RESPONSE TO 48:**  Not disputed

49. At the moment that the lottery application submission period closed, the odds of apparently eligible CP-beneficiary applicants of being awarded a lottery unit were, because of the policy, much better than the odds of apparently eligible non-beneficiary applicants of being awarded a lottery unit.  This is true in each CD typology.  [BD, at 28-29, ¶¶ 91-93; at 30-31, ¶¶ 98-100; and at 31, Table 5.]

**DEFENDANT'S RESPONSE TO 49:**  Not disputed

50. Once the policy has given an initial and substantial tilt to the playing field in favor of insiders, that tilt is never undone or "cured" later in the lottery process.  [BD, at 29, ¶¶ 93-94; *see also* Siskin I, GD Ex. 10, at 50:5-51:2 and at 288:5-23 ("The more the dispersion is in the terms of the numbers applying outside from inside, the more of a preference it is.  The larger the number of -- you put aside for the preference, the larger the impact of the preference is."); Siskin II, GD Ex. 9, at 11:5-7 ("By definition, preference means it's not a fair game for anybody because the preference changes the odds for those people . . . .").]

> **DEFENDANT'S RESPONSE TO 50:**  Defendant disputes this statement insofar as the terms "tilt" and "cured" are vague and undefined. To the extent "tilt" means increased odds and "cured" means those increased odds are not undone, this statement is not disputed. To the extent these definitions are not what Plaintiffs meant, there is still no genuine factual issue to be tried because the cited sources speaks for themselves.

51. Another feature of CP-beneficiary status – independent of qualifications – is that a materially greater percentage of CP-beneficiary applicants and apparently eligible applicants have their applications reached and considered by a developer.  [BD at 19-20, ¶¶ 59-60, 62; and at 52, ¶ 179; *see also* Siskin I, GD Ex. 10, at 52:8-53:7.]

**DEFENDANT'S RESPONSE TO 51:**  Defendant disputes this statement. It is unsupported by the evidence cited to because Plaintiffs never measured the purported rate of occurrence, and Dr. Siskin did not make this statement. Furthermore, the terms "materially," "reached," and "considered" are vague and undefined. To the extent "materially" means more often, "reached" means that a developer has put applications into preference groups and has gotten to the applicant's log number to assess apparent eligibility, and "considered" means that a developer has invited an apparently eligible applicant that has been reached to verify eligibility and interest for at least one available unit, then Defendant does not dispute that a greater percentage of CP beneficiary apparently eligible applicants are considered by the developer. To the extent these definitions are not what Plaintiffs meant, there is still no genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

52.    Another feature of CP-beneficiary status – independent of qualifications – is that the phenomenon of being "partially closed-out" happens materially more to non-beneficiaries than to CP beneficiaries.  [BD, at 20, ¶¶ 61-62 and at 52-54, ¶¶ 181-88; see also Siskin II, GD Ex. 9, at 33:24-34:7.]

**DEFENDANT'S RESPONSE TO 52:**  Defendant disputes this assertion. It is unsupported by the evidence cited to because Plaintiffs never measured the purported rate

of occurrence and Dr. Siskin did not make this statement. Furthermore, the term "materially" is vague and undefined. To the extent it means that the phenomenon of being "partially closed-out" (as defined in Defendant's response to paragraph 29) likely happens more to applicants with no preference than CP beneficiaries, the assertion is not disputed. To the extent these definitions are not what Plaintiffs meant, there is still no genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

53.     Another feature of CP-beneficiary status – independent of qualifications – is that the phenomenon of being "fully closed-out" — happens materially more to non-beneficiaries than to CP beneficiaries.  [BD, at 20, ¶¶ 61-62 and at 52-54, ¶¶ 181-88; *see also* Siskin I, GD Ex. 10, at 142:22-143:4.]

> **DEFENDANT'S RESPONSE TO 53**:  Defendant disputes this assertion. It is unsupported by the evidence cited to because Plaintiffs never measured the purported rate of occurrence and Dr. Siskin did not make this statement. Furthermore, the term "materially" is vague and undefined. To the extent it means that the phenomenon of being "fully closed-out" (as defined in paragraph 30) likely happens more to apparently eligible applicants with no preference than apparently eligible CP beneficiaries, the assertion is not disputed. To the extent this is not what Plaintiffs meant, there is still no

genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

54.     Another feature of CP-beneficiary status – independent of qualifications – is that only an applicant whose application is reached by a developer has the opportunity to appeal from an adverse determination by the developer.  [*See* 2018 Marketing Handbook, GD Ex. 4, at 28-29, ¶¶ 4-4(D) and (E) (right to appeal to developer and thereafter to HPD or HDC is triggered by receipt of ineligibility or rejection notice from developer); *see also* Brown, GD Ex. 5, at 206:22-207:23 (if not reached by the developer, applicant does not have a right to appeal to developer).]

> **DEFENDANT'S RESPONSE TO 54:**  Defendant disputes this assertion as the term "reached" is vague and undefined. To the extent "reached" is defined as in Defendant's response to paragraph 51, the statement is not disputed. To the extent this definition is not what Plaintiffs meant, there is still no genuine factual issue to be tried because the cited sources speak for themselves.

55.     Another feature of CP-beneficiary status – independent of qualifications – is that only an applicant who is reached has the opportunity to update his or her information from what had been listed on the application.  [*See* Def's RTA Responses, GD Ex. 2, at 88, (Response 153).]

> **DEFENDANT'S RESPONSE TO 55:**  Defendant disputes this assertion. The accurate statement is as follows, from Defendant's RTA response 153: Defendant admits that the

only lottery applicant households permitted to update data that had been provided to

Housing Connect, including data related to household income and household size, are

those who either: (a) are contacted by the developer for application review and

documentation; or (b) are contacted by the developer with a negative determination. This

dispute does not create a genuine factual issue to be tried because the cited source speaks

for itself.

56.     Hence, the applicant who has been reached and rejected by a developer has the ability to

update information to show that, based on the updated information, the applicant is, in fact,

eligible.  An applicant who is not reached does not have that right.  [See Def's RTA Responses,

GD Ex. 2, at 88 (Response 154).]

> **DEFENDANT'S RESPONSE TO 56:**  Defendant disputes assertion. The accurate
>
> statement is as follows, from Defendant's RTA response 154: Defendant admits that in
>
> the intervening period between application and the developer's application review
>
> process, an applicant household may have a change in income that results in its going
>
> from under-income or over-income for a particular type of unit (per the information
>
> provided to Housing Connect) to being income qualified for that type of unit (per the
>
> updated and accurate information at the time of review by or on behalf of the developer)
>
> and that such a household would not have the opportunity to update its information if it
>
> has not been contacted by the developer. This dispute does not create a genuine factual
>
> issue to be tried because an applicant that is not reached does not have the opportunity to
>
> update their information.

57.     Analyzing entrants by CD typology, the advantages of CP-beneficiary status are

distributed disparately in favor of the dominant demographic group in each typology to the

substantial and statistically significant detriment of at least one other demographic group in each typology.  [BD, at 21-28, ¶¶ 64-90.]

> **DEFENDANT'S RESPONSE TO 57**:  Defendant disputes this assertion. *See* Siskin
>
> Decl. at ¶¶ 23-58. This dispute does not result in a genuine factual issue to be tried
>
> because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs
>
> undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See*
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that
>
> might affect the outcome of the suit under governing substantive law will properly
>
> preclude entry of summary judgment…Any proof or evidentiary requirements imposed
>
> by the substantive law are not germane to this inquiry.").

58.    Specifically, the demographic groups substantially and statistically significantly disadvantaged on the CD typology level as described in the preceding paragraph include:

| CD typology | Demographic group(s) relatively disadvantaged |
|---|---|
| Majority White | Black, Hispanic, Asian |
| Majority Black | White, Hispanic, Asian |
| Majority Hispanic | White, Black, Asian |
| Majority Asian | White, Black, Hispanic |
| Plurality White | Black, Hispanic |
| Plurality Black | White, Hispanic, Asian |
| Plurality Hispanic | Black |

[BD, at 27-28, ¶¶ 87-89.]

> **DEFENDANT'S RESPONSE TO 58**:  Defendant disputes this assertion. *See* Siskin
>
> Decl. at ¶¶ 23-58. This dispute does not result in a genuine factual issue to be tried

because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs

undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under governing substantive law will properly

preclude entry of summary judgment…Any proof or evidentiary requirements imposed

by the substantive law are not germane to this inquiry.").

59.     Professor Beveridge accurately reports in the BD the results of his "outsider-to-insider-

change" method 1[15] of assessing disparate impact for entrants within each CD typology.  [BD, at

22, Table 3.]

> **DEFENDANT'S RESPONSE TO 59**:  Defendant does not dispute that Professor
>
> Beveridge accurately reported the results of his "outsider-to-insider-change" method of
>
> assessing disparate impact for entrants within each CD typology; however, Defendant
>
> disputes that this method is a proper statistical measure used to assess disparate impact.
>
> *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not result in a genuine
>
> factual issue to be tried because the City challenges Plaintiffs' methodology, and whether
>
> or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an
>
> issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only
>
> disputes over facts that might affect the outcome of the suit under governing substantive
>
> law will properly preclude entry of summary judgment…Any proof or evidentiary
>
> requirements imposed by the substantive law are not germane to this inquiry.").

---

[15] First, examining the total number of applicants in a CD typology who were non-beneficiaries (outsiders) and determining the demographic distribution of those outsiders. Second, examining the total number of applicants in a CD typology who were CP beneficiaries (insiders) and determining the demographic distribution of those insiders. Third, for each of the four demographic groups being analyzed – Whites, African Americans, Latinos, and Asians – calculating the relative change for the group from their share of all outsiders to their share of all insiders.  This was done by subtracting the group's share of all outsiders from the group's share of all insiders and then dividing the difference by the group's share of all outsiders.

60.    Professor Beveridge accurately reports in the BD the results of his "highest-insider-share" method 2[16] of assessing disparate impact for entrants within each CD typology.  [BD, at 25, Table 4.]

> **DEFENDANT'S RESPONSE TO 60**:  Defendant does not dispute that Professor
> Beveridge accurately reported the results of his "highest-insider-share" method of
> assessing disparate impact for entrants within each CD typology; however, Defendant
> disputes that this method is a proper statistical measure used to assess disparate impact.
> *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not result in a genuine
> factual issue to be tried because the City challenges Plaintiffs' methodology, and whether
> or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an
> issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only
> disputes over facts that might affect the outcome of the suit under governing substantive
> law will properly preclude entry of summary judgment…Any proof or evidentiary
> requirements imposed by the substantive law are not germane to this inquiry.").

61.    Professor Beveridge accurately reports in the BD the results of the "80 percent tests" for entrants that he applied within each CD typology to each method.  [BD, at 24, ¶ 73 n.36 and at 26, ¶ 81 n.37.]

> **DEFENDANT'S RESPONSE TO 61:** Defendant disputes this assertion. *See* Siskin
> Decl. at ¶¶ 84-85). Nonetheless, this dispute does not result in a genuine factual issue to
> be tried because the City challenges Plaintiffs' methodology, and whether or not

---

[16] Within each CD typology, first examining each demographic group and determining what share of that demographic group is comprised of insiders (CP beneficiaries).  Second, determining which of the demographic groups had the highest such share (percentage).  Third, determining the relative percentage by which the demographic group with the highest percentage exceeded the percentage yielded for each of the other groups.  This comparison was performed by dividing the percentage for the demographic group with the highest percentage by the percentage for each of the other demographic groups, in turn.

Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue

of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under governing substantive law will

properly preclude entry of summary judgment…Any proof or evidentiary requirements

imposed by the substantive law are not germane to this inquiry.").

62.     Professor Beveridge accurately reports in the BD the standard deviations as to each

method for analyzing entrants within each CD typology, as yielded from the statistical methods

he identified for establishing statistical significance.  [BD, at 26-27, ¶¶ 82-86, and BD Ex. 13.]

**DEFENDANT'S RESPONSE TO 62:**  Defendant disputes this assertion. *See* Siskin

Decl. at ¶¶ 86-88. Nonetheless, this dispute does not result in a genuine factual issue to be

tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs

undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that

might affect the outcome of the suit under governing substantive law will properly

preclude entry of summary judgment…Any proof or evidentiary requirements imposed

by the substantive law are not germane to this inquiry.").

63.     The disparities reported in paragraph 58, *supra*, were caused by the policy.  [BD, at 5-6,

¶¶ 11-13; at 19, ¶ 57; and at 14-28, ¶¶ 43-90.]

**DEFENDANT'S RESPONSE TO 63:**  Defendant disputes this assertion. The evidence

cited does not support a finding of causation. *See* Siskin Decl. at section II(a)-(d);

Appendix C. Nonetheless, this dispute does not result in a genuine factual issue to be

tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs

undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

64.   Analyzing apparently eligible applicants by CD typology, the advantages of CP beneficiary status are distributed disparately in favor of the dominant demographic group in each typology to the substantial and statistically significant detriment of at least one other demographic group in each typology, although plaintiffs are not proffering the plurality Hispanic results for apparently eligible.  [BD, at 28-35, ¶¶ 91-114.]

> **DEFENDANT'S RESPONSE TO 64:**  Defendant does not dispute that Plaintiffs are not proffering the plurality Hispanic results for apparently eligible applicants. However, Defendant disputes the rest of this assertion. *See* Siskin Decl. at section II(a)-(f). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

65.   Specifically, the demographic groups substantially and statistically significantly disadvantaged on the CD typology level as described in the preceding paragraph include:

| CD typology | Demographic group(s) relatively disadvantaged |
|---|---|
| Majority White | Black, Hispanic, Asian |

| | |
|---|---|
| Majority Black | White, Hispanic, Asian |
| Majority Hispanic | White, Black, Asian |
| Majority Asian | White, Black, Hispanic |
| Plurality White | Black, Hispanic |
| Plurality Black | White, Hispanic, Asian |

[BD, at 34-35, ¶¶ 111-114.]

**DEFENDANT'S RESPONSE TO 65:**  Defendant disputes this assertion. *See* Siskin

Decl. at section II(a)-(f). Nonetheless, this dispute does not result in a genuine factual

issue to be tried because the City challenges Plaintiffs' methodology, and whether or not

Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue

of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes

over facts that might affect the outcome of the suit under governing substantive law will

properly preclude entry of summary judgment…Any proof or evidentiary requirements

imposed by the substantive law are not germane to this inquiry.").

66.     Professor Beveridge accurately reports in the BD the results of his "outsider-to-insider-

change" method of assessing disparate impact for apparently eligible applicants within each CD

typology.  [BD, at 32, Table 6.]

**DEFENDANT'S RESPONSE TO 66:**  Defendant does not dispute that Professor

Beveridge accurately reported the results of his "outsider-to-insider-change" method of

assessing disparate impact for apparently eligible applicants within each CD typology;

however, Defendant disputes that this method is a proper statistical measure used to

assess disparate impact. *See* Siskin Decl. at section II(a)-(e). Nonetheless, this dispute

does not result in a genuine factual issue to be tried because the City challenges

Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

67.     Professor Beveridge accurately reports in the BD the results of his "highest-insider-share" method of assessing disparate impact for apparently eligible applicants within each CD typology.  [BD, at 33, Table 7.]

> **DEFENDANT'S RESPONSE TO 67:**  Defendant does not dispute that Professor Beveridge accurately reported the results of his "highest-insider-share" method of assessing disparate impact for apparently eligible applicants within each CD typology; however, Defendant disputes that this method is a proper statistical measure used to assess disparate impact. *See* Siskin Decl. at section II(a)-(e). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

68.     Professor Beveridge accurately reports in the BD the results of the "80 percent tests" for apparently eligible applicants that he applied within each CD typology to each method.  [BD, at 32, ¶ 104 n.46 and at 34, ¶ 108 n.48.]

> **DEFENDANT'S RESPONSE TO 68**:  Defendant disputes this assertion. *See* Siskin Decl. at ¶¶ 84-85. Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

69.     Professor Beveridge accurately reports in the BD the standard deviations as to each method for analyzing apparently eligible applicants within each CD typology, as yielded from the statistical methods he identified for establishing statistical significance.  [BD, at 34, ¶¶ 109-10, and BD Ex. 13.]

> **DEFENDANT'S RESPONSE TO 69**:  Defendant disputes this assertion. *See* Siskin Decl. at ¶¶ 86-88. Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

70.     The disparities reported in paragraph 65, *supra*, were caused by the policy.  [BD, at 5-6, ¶¶ 11-13; at 19, ¶ 57; and at 28-35, ¶¶ 91-114.]

> **DEFENDANT'S RESPONSE TO 70**:  Defendant disputes this assertion. The evidence cited does not support a finding of causation. *See* Siskin Decl. at section II(a)-(e). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

71.     Defendant's expert concedes that Professor Beveridge is correct in concluding that, by both the "outsider-to-insider-change" method and the "highest-insider-share" method and in connection both with all entrants and with apparently eligible entrants, "the racial group with applications that are disproportionately CP beneficiaries within a majority CD typology will always be the majority race and will more likely be the plurality race within a plurality CD typology." [See Siskin Opp, GD Ex. 11, at 29.]

> **DEFENDANT'S RESPONSE TO 71**:  Not disputed.

72.     Defendant's expert also acknowledges that the basic characteristics of an applicant in relation to the lottery – household income, household size, actual eligibility as compared with apparent eligibility, race, and where the applicant lives – do not change whether or not there is a community preference policy or there is not.  [See Siskin I, GD Ex. 10, at 38:7-41:4.]

> **DEFENDANT'S RESPONSE TO 72**:  Not disputed

73.    Defendant's expert performed a simulation of the lottery process 1,000 times with the community preference policy in effect and, for purposes of this motion, plaintiffs are using the data generated by those simulation runs.  [BD, at 38, ¶¶ 125-26; Siskin Opp, GD Ex. 11, at Appx. C, at 4.]

**DEFENDANT'S RESPONSE TO 73:**  Not disputed

74.    Analyzing applicants who were actually awarded units ("actual awardees") by CD typology, and doing the same for applicants who were awarded units pursuant to the simulations ("simulated awardees") by CD typology, the advantages of CP-beneficiary status are distributed disparately in favor of the dominant demographic group in each majority CD typology to the substantial and statistically significant detriment of at least one other demographic group in each typology.[17] [BD, at 35-43, ¶¶ 115-38.]

**DEFENDANT'S RESPONSE TO 74:**  Defendant disputes this assertion. *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

75.    Specifically, the demographic groups substantially and statistically significantly disadvantaged on the CD typology level as described in the preceding paragraph include:

CD typology                                 Demographic group(s) relatively disadvantaged

---

[17] Plaintiffs are not proffering evidence as to the disparate impacts that occur for awardees in the plurality CD typologies.

| | |
|---|---|
| Majority White | Black, Hispanic |
| Majority Black | White, Hispanic, Asian |
| Majority Hispanic | White |
| Majority Asian | White, Black, Hispanic |

[BD, at 42-43, ¶¶ 134-137.]

**DEFENDANT'S RESPONSE TO 75:** Defendant disputes this assertion. *See* Siskin Decl. at section II(a)-(f). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

76.    Professor Beveridge accurately reports in the BD the results of his "outsider-to-insider-change" method of assessing disparate impact for actual awardees within each CD typology. [BD, at 37, Table 8.]

**DEFENDANT'S RESPONSE TO 76:** Defendant does not dispute that Professor Beveridge accurately reported the results of his "outsider-to-insider-change" method of assessing disparate impact for actual awardees within each CD typology; however, Defendant disputes that this method is a proper statistical measure used to assess disparate impact. *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis

is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under
governing substantive law will properly preclude entry of summary judgment…Any
proof or evidentiary requirements imposed by the substantive law are not germane to this
inquiry.").

77.     Professor Beveridge accurately reports in the BD the results of his "outsider-to-insider-
change" method of assessing disparate impact for simulated awardees within each CD typology.
[BD, at 39, Table 9.]

> **DEFENDANT'S RESPONSE TO 77:**  Defendant does not dispute that Professor
> Beveridge accurately reported the results of his "outsider-to-insider-change" method of
> assessing disparate impact for simulated awardees within each CD typology; however,
> Defendant disputes that this method is a proper statistical measure used to assess
> disparate impact. *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not
> result in a genuine factual issue to be tried because the City challenges Plaintiffs'
> methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis
> is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.
> 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under
> governing substantive law will properly preclude entry of summary judgment…Any
> proof or evidentiary requirements imposed by the substantive law are not germane to this
> inquiry.").

78.     Professor Beveridge accurately reports in the BD the results of his "highest-insider-
share" method of assessing disparate impact for actual awardees within each CD typology.  [BD,
at 40, Table 10.]

**DEFENDANT'S RESPONSE TO 78**:  Defendant does not dispute that Professor Beveridge accurately reported the results of his "highest-insider-share" method of assessing disparate impact for actual awardees within each CD typology; however, Defendant disputes that this method is a proper statistical measure used to assess disparate impact. *See* Siskin Decl. at section II(a)-(d). Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

79.    Professor Beveridge accurately reports in the BD the results of the "80 percent tests" that he applied within each CD typology to each method, both for actual and simulated awardees. [BD, at 38, ¶ 124 n.53; at 39, ¶ 128 n.54; and at 41, ¶ 131 n.56.]

**DEFENDANT'S RESPONSE TO 79**:  Defendant disputes this assertion. *See* Siskin Decl. at ¶¶ 84-85. Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

80.     Professor Beveridge accurately reports in the BD the standard deviations as to each
method for analyzing actual awardees within each CD typology, as yielded from the statistical
methods he identified for establishing statistical significance.  [BD, at 42, ¶ 133, and BD Ex. 13.]

>   **DEFENDANT'S RESPONSE TO 80**:  Defendant disputes this assertion. *See* Siskin
>   Decl. at ¶¶ 86-88. Nonetheless, this dispute does not result in a genuine factual issue to be
>   tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs
>   undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See*
>   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that
>   might affect the outcome of the suit under governing substantive law will properly
>   preclude entry of summary judgment…Any proof or evidentiary requirements imposed
>   by the substantive law are not germane to this inquiry.").

81.     The disparities reported in paragraph 75, *supra*, were caused by the policy.  [BD, at 35-
36, ¶¶ 115-18, and at 36-43, ¶¶ 119-38.]

>   **DEFENDANT'S RESPONSE TO 81**:  Defendant disputes this assertion. The evidence
>   cited does not support a finding of causation. *See* Siskin Decl. at section II(a)-(e).
>   Nonetheless, this dispute does not result in a genuine factual issue to be tried because the
>   City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper
>   disparate impact analysis is a question of law, not an issue of fact. *See Anderson v.*
>   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect
>   the outcome of the suit under governing substantive law will properly preclude entry of
>   summary judgment…Any proof or evidentiary requirements imposed by the substantive
>   law are not germane to this inquiry.").

82.     Defendant has taken the position that the disparate impacts identified in the foregoing are to be disregarded so long as localized disparities at the CD typology level balance out when aggregating results to a citywide level.  [See paragraphs 83 and 84, infra; see also Siskin Opp, passim (insisting that disparate impact analysis should be performed at citywide level).]

> **DEFENDANT'S RESPONSE TO 82**:  Defendant disputes this assertion. Plaintiffs' CD typology approach does not demonstrate "localized" disparities. *See* Siskin Decl. at ¶ 40. Furthermore, a proper disparate impact analysis is done at a citywide level, not by CD typologies which are based on race instead of geography. Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper disparate impact analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

83.     At his deposition, defendant's expert was provided with an illustration demonstrating the operation of a preference in a hypothetical city where each of four boroughs was populated only by members of a single demographic group (that is Whites in one borough, Blacks in a second, etc.).  The priority went to those who already lived in the borough where housing was being developed.  In the hypothetical, there were three lotteries per borough, and, in each lottery, there were the same number of White, Black, Hispanic, and Asian applicants and the same number of White, Black, Hispanic, and Asian apparently eligible applicants.  Apparently eligible applicants reached by the developers were equally likely regardless of race to follow through and be

awarded a unit.  Without the policy, 25 percent of the apparently eligible applicants reviewed by the developer in each lottery in each borough would be members of each of the four demographic groups, and 25 percent of the awards in each lottery and in each borough would go to members of each of the four demographic groups.  With the policy, in each lottery in each borough, it was only members of the dominant group that were reviewed by the developer, and the dominant group in each borough in each lottery was the group that received 100 percent of awards in the corresponding borough (*i.e.* Whites got all the awards in the White borough and Blacks got all the awards in the Black borough, etc.).  [*See* Siskin I, GD Ex. 10, at 75:12-81:21; *see also* plaintiffs' Exhibit 327 (the exhibit setting forth the hypothetical presented), annexed to GD as Ex. 13)].

**DEFENDANT'S RESPONSE TO 83:**  Not disputed

84.    Because the results described in the preceding paragraph, when aggregated to the citywide level, showed that the same percentage of each demographic group was being reviewed by the developer and that the same percentage of each demographic group got awards of units, Dr. Siskin's conclusion was that, "this would not have a disparate impact in terms of allocation of units"; "under my understanding of disparate impact, it would not have a disparate impact." [*Id.*]

**DEFENDANT'S RESPONSE TO 84:**  Not disputed

85.    Among the data that Professor Beveridge relied on in connection with analyzing perpetuation of segregation were three different sets of data ("data sets") processed by defendant's expert in relation to whether moves had an "integrative" effect, a "segregative" effect, or "no effect," as those moves would be understood in the context of the dissimilarity measure.  [BD, at 45, ¶¶ 146-48.]

**DEFENDANT'S RESPONSE TO 85:** Defendant disputes this assertion insofar as the term "data sets" is vague and undefined. Professor Beveridge took portions of the results from Defendant's expert's perpetuation of segregation analyses, not stand alone sets of data. *See* Siskin Decl. at ¶¶ 128-130. This dispute does not result in a genuine factual issue to be tried because the underlying fact that Professor Beveridge used Dr. Siskin's results is not disputed.

86.    One set applied to actual awardees ("awardee moves"); a second set applied to the moves that all of the apparently eligible applicants were seeking to make ("moves sought by apparently eligible applicants"); and a third set represented the moves generated in 1,000 runs of a simulation of the lottery ("simulated awardee moves").  [*Id.*]

**DEFENDANT'S RESPONSE TO 86:** Subject to Defendant's dispute set forth in paragraph 85 above, this is not disputed.

87.    In each case, the data sets produced by Dr. Siskin used the same 145 lotteries of the broader set of 168 lotteries that had been explored for other purposes, all of the 145 being the ones where the development was located in a single census tract.  These developments were all able to be geocoded.  Only those awardees, apparently eligible applicants, and simulated awardees whose home address could be geocoded by census tract were included.  [BD 145-47; see also Siskin Opp, GD Ex. 11, at Appx. C, at 4 (analysis limited to applicants whose home census tract could be geocoded).]

**DEFENDANT'S RESPONSE TO 87:** Subject to Defendant's dispute set forth in paragraph 85 above regarding data sets, this is not disputed.

88.     For each of the three sets, six different relationships between pairs of demographic groups were examined: White v African American; White v Hispanic; White v Asian; African American v Hispanic; African American v Asian; and Hispanic v Asian.  [BD, at 45, ¶ 149.]

     **DEFENDANT'S RESPONSE TO 88:**  Subject to Defendant's dispute set forth in paragraph 85 above regarding data sets, this is not disputed.

89.     After defendant's expert made various corrections to his analysis of the data, including corrections for errors identified by plaintiffs' expert, plaintiffs accepted the data for further use. [BD, at 45, ¶ 148 and accompanying n.59.]

     **DEFENDANT'S RESPONSE TO 89:**  Not disputed

90.     For each of the three analyses, the parties agree on the number of "integrative" and "non-integrative" moves overall (i.e., counting both insider and outsider moves).  [BD, at 46, ¶ 152.]

     **DEFENDANT'S RESPONSE TO 90:**  To the extent the "three analyses" are Plaintiffs' use of Dr. Siskin's partial results from his simulation and his consideration study for perpetuation of segregation, this assertion is not disputed. To the extent this is not what Plaintiffs mean, there is no genuine factual issue to be tried because parties agree on the number of "integrative" and "non-integrative" moves overall.

91.     Professor Beveridge disaggregated moves as between CP-beneficiary moves and non-beneficiary moves, and only included in the "no effect" category for a demographic-group pairing those moves involving the two demographic groups in the pair (*e.g.*, for the White v Black pairing, only including moves of Whites and Blacks, but not moves of Hispanics and Asians).  Dr. Siskin did not follow this practice.  [BD, at 46, ¶¶ 151, 153-54.]

     **DEFENDANT'S RESPONSE TO 91:**  Not disputed

92.    Both parties performed the perpetuation-of-segregation comparisons on a citywide basis (i.e., not disaggregating by CD typology).  [BD, at 45-46, ¶¶ 146, 149; at 48-50, Tables 11-13; and BD Exs. 16-18.]

**DEFENDANT'S RESPONSE TO 92:**  To the extent "comparisons" means analyses, this assertion is not disputed. To the extent this is not what Plaintiffs meant, there is still no genuine factual issue to be tried because both parties did their perpetuation of segregation analyses on a citywide basis.

93.    The term "net-integrative moves" in relation to number-of-moves is being used in the BD, separately for CP-beneficiary moves and for non-beneficiary moves, to describe the extent to which the number of integrative moves exceeded the number of segregative moves within a demographic-group pairing.  The same term in relation to percentage of moves is being used in the BD, separately for CP-beneficiary moves and for non-beneficiary moves, to describe the number of net-integrative CP-beneficiary moves as a percentage of all CP-beneficiary moves within a demographic-group pairing, and the number of net-integrative non-beneficiary moves as a percentage of all non-beneficiary moves within a demographic-group pairing.[18] [BD, at 47, ¶¶ 156-57.]

**DEFENDANT'S RESPONSE TO 93:**  It is not disputed that Professor Beveridge chose to define these terms in this way.

94.    In comparing the percentage of net-integrative CP-beneficiary moves to the percentage of net-integrative non-beneficiary moves for all six demographic-group pairings, across actual awardees moves, moves sought by apparently eligible applicants, and simulated awardee moves (18 comparisons in all), in 18 of out 18 cases the non-beneficiary moves were more integrative than the non-beneficiary moves.  [BD, at 47-50, ¶¶ 160-72.]

---

[18] As noted in paragraph 91, supra, "all moves" refers to moves by only the two demographic groups in a pairing.

**DEFENDANT'S RESPONSE TO 94:** Defendant believes there is a typo in this statement and it should read, "…in 18 out of 18 cases the non-beneficiary moves were more integrative than the beneficiary moves." Defendant does not dispute the statement as corrected.

95.     Professor Beveridge accurately reports in the BD the results of the comparisons described in paragraphs 93 and 94, *supra*. [BD, at 48-50, Tables 11-13; and BD Exs. 16-18.]

**DEFENDANT'S RESPONSE TO 95:** To the extent "reports" means transcribes the results of his analyses, Defendant does not dispute this assertion. To the extent this is not what Plaintiffs mean, Defendant does dispute the validity of Professor Beveridge's methodology and results, but this is not a genuine factual issue to be tried because whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

96.     In 17 out of the 18 comparisons referenced in paragraph 94, *supra*, the differences were substantial as measured by the fact that, in every pairing for each of the three data sets other than the Hispanic v Asian pairing for actual awards, the net-integrative percentage of CP beneficiaries was, in relative terms, less than 80 percent of the net-integrative percentage of non-beneficiary moves. [BD, at 48, ¶¶ 161-62 and Table 11; at 49, ¶¶ 165-66 and Table 12; at 50-51, ¶¶ 171-73 and Table 13.]

**DEFENDANT'S RESPONSE TO 96:**  Defendant disputes this assertion. *See* Siskin Decl. at ¶¶ 130-134. Nonetheless, this dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

97.     Professor Beveridge accurately reports in the BD the results of the comparison described in the preceding paragraph.  [*See* paragraph 96 *supra*, and BD Exs. 16-18.]

**DEFENDANT'S RESPONSE TO 97:**  To the extent "reports" means transcribes the results of his analyses, Defendant does not dispute this assertion. To the extent this is not what Plaintiffs mean, Defendant does dispute the validity of Professor Beveridge's methodology and results, but this is not a genuine factual issue to be tried because whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

98.     The disparities between the percentage of net-integrative non-beneficiary moves and the percentage of net-integrative CP-beneficiary moves were statistically significant across all six demographic group pairings and in respect to actual awardee moves, prospective apparently

eligible applicant moves, and simulated moves except for in the Hispanic v Asian pairing for actual awards (in other words, were statistically significant as to all 17 of the comparisons where substantial disparity was confirmed by the 80 percent test).  [BD, at 51, ¶¶ 174-76, 175 n.62, and 176 n.63.]

**DEFENDANT'S RESPONSE TO 98**:  Defendant disputes this assertion. *See* Siskin

Decl. at ¶¶ 135-141. Nonetheless, this dispute does not result in a genuine factual issue to

be tried because the City challenges Plaintiffs' methodology, and whether or not

Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not

an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only

disputes over facts that might affect the outcome of the suit under governing substantive

law will properly preclude entry of summary judgment…Any proof or evidentiary

requirements imposed by the substantive law are not germane to this inquiry.").

99.     Professor Beveridge accurately reports in the BD the results of the statistical methods he used to calculate the differences described in the preceding paragraph.   [*See* preceding paragraph.]

**DEFENDANT'S RESPONSE TO 99**:  To the extent "reports" means transcribes the

results of his analyses, Defendant does not dispute this assertion.[19] To the extent this is

not what Plaintiffs mean, Defendant does dispute the validity of Professor Beveridge's

methodology and results, but this is not a genuine factual issue to be tried because

whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a

question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[19] Plaintiffs did not provide Defendant with their data files and programs for Professor Beveridge's statistical significance tests as they had for their other analyses; therefore, Defendant's expert could not replicate the results. Nonetheless, Professor Beveridge uses an improper approach to measure significance.

248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

100.    When looking at the raw number of net-integrative moves in pairings for moves sought by apparently eligible applicants (where the filtering effect is not present), the number of net-integrative moves sought by non-beneficiaries vastly overwhelms the number of net integrative moves sought by apparently eligible CP beneficiaries.  [BD, at 49, ¶¶ 167-68; at 49, Table 12; and BD Ex. 17.]

> **DEFENDANT'S RESPONSE TO 100:**  Defendant disputes this statement. *See* Siskin Decl. at ¶¶ 135-141. Also, the term "filtering effect" is undefined and unclear. This dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

101.    In the White v African American pairing for example, net-integrative moves sought by apparently eligible non-beneficiaries constituted 98.4 percent of all net-integrative moves.  [BD, at 49, ¶ 168.]

> **DEFENDANT'S RESPONSE TO 101:**  Defendant disputes this statement. *See* Siskin Decl. at ¶¶ 135-141. This dispute does not result in a genuine factual issue to be tried

because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

102.    In the African American v Hispanic pairing, to take another example, net-integrative moves sought by apparently eligible non-beneficiaries constituted 99.4 percent of all net-integrative moves.  [Id.]

> **DEFENDANT'S RESPONSE TO 102:**  Defendant disputes this statement. *See* Siskin Decl. at ¶¶ 135-141. This dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

103.    The policy had a substantial filtering effect on the percentage of outsiders that are permitted to have awards.  [BD, at 43, ¶ 139; at 44, ¶ 143; at 48, ¶ 163; at 49, ¶ 167; and at 51-52, ¶ 177.]

> **DEFENDANT'S RESPONSE TO 103:**  Defendant disputes this assertion. *See* Siskin Decl. at ¶¶ 135-141. Again, the term "filtering effect" is undefined and unclear. This dispute does not result in a genuine factual issue to be tried because the City challenges

Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

104.    The policy permits substantially less integration than would be the case without the policy.  [BD, at 43-45, ¶¶ 139-45; at 47-48, ¶ 160; at 48, ¶ 162-63 and Table 11; at 49-51, ¶¶ 166-73, and Tables 12-13; at 51-52, ¶ 177.]

> **DEFENDANT'S RESPONSE TO 104:**  Defendant disputes this assertion. The evidence cited does not support causation between the CP policy and integration and the underlying analysis was done incorrectly as a matter of law. *See* Siskin Decl. at ¶¶ 135-141; Tables 7 and 8. This dispute does not result in a genuine factual issue to be tried because the City challenges Plaintiffs' methodology, and whether or not Plaintiffs undertook a proper perpetuation of segregation analysis is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

105.    The Mayor has acknowledged that it is the open-access (non-community preference) aspect of the lottery that has an integrative effect.  [*See* excerpt of transcript of radio broadcast, "Mayor de Blasio Appears Live on Inside City Hall", Jan. 17, 2018, annexed to GD as Ex. 14, at

3 ("50 percent [of the units] go to anyone and everyone in the whole city, reflecting the total diversity of the city and that certainly has integrative impact.").]

> **DEFENDANT'S RESPONSE TO 105:**  Defendant disputes this assertion.  The cited evidence is mischaracterized. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

106.   Deputy Mayor (and former HPD Commissioner) Been has testified that she did not believe she would retain a 50 percent community preference if her "only concern was reducing racial segregation." [*See* excerpts of transcript of Apr. 10, 2018 deposition of Vicki Been ("Been II"), annexed to GD as Ex. 15, at 113:9-22 (confirming that she did not think she would retain community preference if it did not in fact serve its purported purposes and her "my only concern was reducing racial segregation").]

> **DEFENDANT'S RESPONSE TO 106:**  Defendants disputes this assertion. It fails to comply with the requirements of Local Rule 56.1(d) because the assertion is only supported by a citation to a response to an inappropriate hypothetical question posed to a deponent at a deposition and, thus, is not supported by a citation to admissible evidence. Because the statement does not comply with the requirements of Local Rule 56.1(d), this dispute does not result in a genuine factual issue to be tried.  However, should paragraph 106 be considered, the evidence is mischaracterized and the full exchange between the parties is the appropriate evidence to cite. *See* April 10, 2018 Been deposition, Polifione Decl., Ex. 56 at 108:20-113:22.

107.   Deputy Mayor Been, asked whether a consideration in administration discussions of whether to modify the community preference policy was "that there was less race-based impact

as the Community Preference was lowered," responded, "That was a consideration." [Id. at 189:8-190:4.]

**DEFENDANT'S RESPONSE TO 107:**  Not disputed

108.    Defendant did not plead as an affirmative defense any specific justification for the community preference policy.  [Answer to SAC, GD Ex. 3, at 11-12, ¶ 76.]

**DEFENDANT'S RESPONSE TO 108:**  Not disputed

109.    In the course of the litigation, defendant has asserted as a justification that the community preference policy is premised on the idea that "local residents, many of whom have deep roots in the community and have persevered through years of unfavorable living conditions . . . deserve a chance to participate in the renaissance of their neighborhoods." [*See* excerpt of Oct. 2, 2015 declaration of Vicki Been ("Been Decl."), annexed to GD as Ex. 16, at 3-4, ¶ 8.]

**DEFENDANT'S RESPONSE TO 109:**  Defendant disputes Plaintiffs' classification and articulation of the reasons why the City maintains the CP policy. This does not result in a genuine factual issue to be tried because Plaintiffs do not get to articulate the City's legitimate government interests. Defendant will detail the reasons why the City maintains the CP policy in its papers in support of its motion for summary judgment and whether there is sufficient evidence to support the City's interest in maintaining the CP policy is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

110.    The way the policy is designed, it is not limited to insiders who are long-term residents of the CD preference area and it is not limited to insiders who had to persevere through years of unfavorable living conditions.  [Def's RTA Responses, GD Ex. 2, at 3 (Response 1).]

**DEFENDANT'S RESPONSE TO 110:**  Defendant disputes this assertion. The cited evidence is mischaracterized. The accurate statement is as follows, from Defendant's RTA response 1: "Defendant objects to this request insofar as the terms[] 'long-term residents'…[is] undefined, vague, and unclear. Defendant denies this request, and its subparts, except admits that the community preference policy is applicable to any applicant who resides in the community district(s) that is(are) subject to the community preference in a given lottery and is not limited to residents of the applicable community district(s) who: (1) have been long-term residents of the applicable community district(s); (2) have had to persevere through years of difficult conditions;..." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

111.    Neither the length of time an applicant resides in the community district in which the affordable units are being built nor an applicant's housing conditions affect eligibility under the community preference policy.  [Answer to SAC, GD Ex. 3, at 6, ¶ 32.]

**DEFENDANT'S RESPONSE TO 111:**  Not disputed

112.    The way the policy is designed, New Yorkers who are long-term residents of their community district, who have persevered through years of unfavorable living conditions, and who are applying for affordable housing outside of their community district, are denied the benefits of the policy.  [*Id.; see also* Been I, GD Ex. 8, at 26:22-27:15.]

**DEFENDANT'S RESPONSE TO 112:**  Defendant disputes this assertion insofar as it incorrectly presumes that individuals only submit applications for housing outside of

their current CDs. *See* August 13, 2020 Declaration of Edward G. Goetz ("Goetz Decl.") at 38-39, ¶¶ 66-67. Furthermore, Defendant disputes that the cited testimony from the Been Deposition is admissible in support of this assertion. This dispute does not result in a genuine factual issue to be tried because Defendant's Answer to the Second Amended Complaint, which is also cited, speaks for itself.

113.   Many community districts are not, and have not been for years, ones in which the residents have had to persevere through unfavorable living conditions.   [*See* excerpts of transcript of Oct. 26, 2017 deposition of Jerilyn Perine, annexed to GD as Ex. 17, at 216:4-217:4 and 221:16-222:10; *see also* excerpts of transcript of July 27, 2017 deposition of Carl Weisbrod ("Weisbrod"), annexed to GD as Ex. 18, at 205:18-207:5.]

> **DEFENDANT'S RESPONSE TO 113:**  Defendant disputes this statement. The cited evidence is mischaracterized. The accurate statements are as follows: former HPD Commissioner Perine stated that when she was commissioner "the areas where we were working in at the time were largely places that had gone through these kind of problems [unfavorable livings conditions] in housing…I would not have said all 59 community boards experienced the same thing. They didn't." Perine deposition, GD Ex. 17 at 216:10-22. She went on to state that in 2002, unfavorable conditions had improved "in many neighborhoods." *Id.* at 221:16-222:6. Former DCP Director and CPC Chairman Carl Weisbrod testified "I don't dispute [the] fact that there are differentials between neighborhoods, that there some neighborhoods that are better than other neighborhoods in terms of local conditions and other factors…I don't know how I would quantify it." Weisbrod deposition, GD Ex. 18 at 206:10-22. This dispute does not result in a genuine factual issue to be tried because the cited sources speak for themselves.

114.   The community preference policy does not distinguish between which applicants are more or less deserving of affordable housing units beyond the lottery's general rule that each applicant household must meet the household-income and household-size combination required for any particular unit that is subject to the lottery.   [*See* Been I, GD Ex. 8, at 31:2-34:9 (explaining, inter alia, that community preference is "not a question of need" and not a question of who deserves an apartment more).]

**DEFENDANT'S RESPONSE TO 114:**  Not disputed

115.   Income is the only proxy for "need" upon which the City relies in its affordable housing lotteries.   [*See id.*, at 29:10-31:5]

**DEFENDANT'S RESPONSE TO 115:**  Not disputed

116.   As among applicants who meet the household income and household size requirements for a unit, the community preference policy is not designed to determine, and does not determine, which applicants are more deserving or in need of affordable housing and which applicants are less deserving or in need of affordable housing.   [Id.]

**DEFENDANT'S RESPONSE TO 116:**  Not disputed

117.   A newcomer to a neighborhood can be more invested in that neighborhood than a person who has lived in the neighborhood for a long time.   [*See* Murphy, GD, Ex. 7, at 257:9-258:3.]

**DEFENDANT'S RESPONSE TO 117:**  Not disputed

118.   For any particular lottery unit that is awarded, the household income of a successful outsider applicant not relying on a subsidy would have to be in the same range as the household income of a successful insider applicant not relying on a subsidy.   [*See* Answer to SAC, GD Ex. 3, at 7, ¶ 35; *see also* Been I, GD Ex. 8, at 12:5-13:7.]

**DEFENDANT'S RESPONSE TO 118:**  Not disputed

119.    Insider and outsider applicants are equally permitted to rely on subsidies to meet the household income requirement for a unit.  [See 2018 Marketing Handbook, GD Ex. 4, at 24, ¶ 4-4(A)(5) and at 68, ¶ 5-7(C)(3)(b); see also excerpt of defendant's Jan. 7, 2019 letter replying to plaintiffs' data questions, annexed to GD as Ex. 19, at 5-6, ¶ 17.]

**DEFENDANT'S RESPONSE TO 119**:  Not disputed

120.    A second justification that has been articulated in the course of discovery is that the community preference policy is intended to prevent or mitigate displacement.  [*See* Answer to SAC, GD Ex. 3, at 5, ¶ 26; *see also* excerpt of Feb. 13, 2019 report of Edward Goetz ("Goetz report"),[20] annexed to GD as Ex. 20, at 1.]

**DEFENDANT'S RESPONSE TO 120**:  Defendant disputes Plaintiffs' classification and articulation of the reasons why the City maintains the CP policy. This does not result in a genuine factual issue to be tried because Defendant will detail the reasons why the City maintains the CP policy in its papers in support of its motion for summary judgment and whether there is sufficient evidence to support the City's interest in maintaining the CP policy is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

121.    A third justification that has sometimes been articulated in the course of discovery – a variant on the anti-displacement theme – is that the community preference policy reduces "fear of displacement." [*See* Goetz report, GD Ex. 20, at 2.]

---

[20] Professor Goetz, who teaches at the University of Minnesota, has been put forward as an expert witness by defendant.

**DEFENDANT'S RESPONSE TO 121:**  Defendant disputes Plaintiffs' classification and articulation of the reasons why the City maintains the CP policy. This does not result in a genuine factual issue to be tried because Defendant will detail the reasons why the City maintains the CP policy in its papers in support of its motion for summary judgment and whether there is sufficient evidence to support the City's interest in maintaining the CP policy is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.").

122.    The community preference policy is neither designed to nor has the effect of preventing any applicant from being displaced from his or her current apartment. [*See* Murphy, GD Ex. 7, at 167:17-170:2; *see also* excerpts of transcript of Apr. 5, 2019 deposition of Edward Goetz ("Goetz I"), annexed to GD as Ex. 21, at 30:13-16; Def's RTA Responses, GD Ex. 2, at 5 (Response 4).]

**DEFENDANT'S RESPONSE TO 122:**  Not disputed

123.    The community preference policy is not designed to reduce fear of imminent displacement from one's apartment; the policy is not designed to deal with imminent displacement [See Goetz I, GD Ex. 21, at 32:18-33:6.]

**DEFENDANT'S RESPONSE TO 123:**  Not disputed

124.    If an applicant has been displaced from his or her apartment and is now living in an apartment in another community district, that applicant is not eligible for community preference

in the community district from which he or she was displaced.  [Def's RTA Responses, GD Ex. 2, at 7 (Response 8).]

**DEFENDANT'S RESPONSE TO 124:**  Defendant disputes this assertion. The cited evidence is mischaracterized. The accurate statement is as follows, from Defendant's RTA response 8: "Defendant denies this request, except admits that an applicant household who had resided in the community preference area, but was in fact involuntarily displaced from the community preference area prior to the commencement of a lottery, is not eligible for community preference in that lottery, unless that applicant resides in a New York City shelter, in which case that applicant may be eligible for a community preference based on either their current shelter address or their last known address prior to entering City shelter." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

125.    An insider who is not at risk of displacement from either his or her apartment or neighborhood is nonetheless eligible for community preference.  [Id. at 3 (Response 1).]

**DEFENDANT'S RESPONSE TO 125:**  Not disputed

126.    Defendant has no data to show that any of the applicants who benefitted from the policy in fact have been at risk of displacement from their apartment or neighborhood.  [See id. at 5 (Responses 4 and 5); see also excerpts of transcript of July 31, 2019 deposition of Edward Goetz ("Goetz II"), annexed to GD as Ex. 22, at 64:21-65:3.]

**DEFENDANT'S RESPONSE TO 126:**  Defendant disputes this assertion. The cited evidence is mischaracterized. The accurate statement is as follows, from Defendant's RTA responses 4 and 5: "Defendant…admits that it did not specifically identify via name or tally, which or how many beneficiaries of community preference had been at risk of

involuntary displacement from their existing apartment [or neighborhood] prior to being awarded an apartment in an affordable housing lottery." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

127.   An outsider who is at risk of displacement from either his or her apartment or neighborhood is nonetheless not eligible for community preference.   [*See* 2018 Marketing Handbook, GD Ex. 4, at 39, ¶ 5-1(B)(1).]

> **DEFENDANT'S RESPONSE TO 127:**  Defendant disputes this assertion insofar as it incorrectly presumes that individuals only submit applications for housing outside of their current CDs. *See* Goetz Decl. at 38-39, ¶¶ 66-67. "Insiders" and "outsiders" are not static groups; an "outsider" in one lottery would be an "insider" in a lottery within their CD. *Id.* at 36-37, ¶ 64. To the extent Plaintiffs are referring to a single lottery outside of an individual applicant's CD, this statement is not disputed.

128.   Defendant believes that involuntary displacement is often difficult to define in terms of whether it is involuntary.   [*See, e.g.*, excerpts of transcript of Apr. 19, 2018 deposition of Purnima Kapur ("Kapur"), annexed to GD as Ex. 23, at 128:16-132:3-9.]

> **DEFENDANT'S RESPONSE TO 128:**  Not disputed

129.   Defendant has not established the scope of involuntary displacement that exists in New York City.   [*See id. See also* Def's RTA Responses, GD Ex. 2, at 4 (Responses 2 and 3); excerpt of transcript of May 18, 2018 deposition of Elyzabeth Gaumer, annexed to GD as Ex. 24, at 216:12-217:24.]

> **DEFENDANT'S RESPONSE TO 129:**  Defendant disputes this assertion in that "established" is undefined. To the extent it means conducted a mathematical analysis, this

statement is not disputed. To the extent this is not what Plaintiffs mean, there is still no genuine factual issue to be tried because the cited sources speak for themselves.

130.    Defendant was articulating an anti-displacement justification for the policy even in the absence of supporting evidence.  [Email from Matthew Murphy to Sean Capparis, *circa* June 2016, annexed as GD Ex. 25 (explaining, *inter alia*, that, "We justify the [community preference] policy because it prevents displacement.  But we don't have good metrics to show that displacement is occurring.  What I'd like to do is start building a 'case' for anti-displacement policy").]

> **DEFENDANT'S RESPONSE TO 130:**  Defendant disputes this assertion. Mr. Murphy's statements were not made in the context of an official statement on behalf of the City of New York and are not in line with the undisputable evidence Defendant has to show that displacement is occurring.  *See* August 13, 2020 Declaration of Deputy Mayor Vicki Been at 33-34, ¶ 69; Goetz Decl. at 16-17, ¶¶ 27-28; Polifione Decl. at Ex. 3, pp. 19, 24-26; and Ex. 45, 34:19-35:1. In addition, the language from Mr. Murphy's email is misquoted. This dispute does not result in a genuine factual issue to be tried because Defendant's evidence to support the fact that displacement is occurring is indisputable. .

131.    Among CP beneficiaries who have been awarded units, defendant has not identified and does not claim to know which, if any, had been at risk for displacement from their apartment or neighborhood.  [Def's RTA Responses, GD Ex. 2, at 5 (Responses 4 and 5).]

> **DEFENDANT'S RESPONSE TO 131:**  Defendant disputes this assertion. The cited evidence is mischaracterized. The accurate statement is as follows, from Defendant's RTA responses 4 and 5: "Defendant…admits that it did not specifically identify via name or tally, which or how many beneficiaries of community preference had been at risk of

involuntary displacement from their existing apartment [or neighborhood] prior to being awarded an apartment in an affordable housing lottery." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

132.   Among non-beneficiaries who were not awarded units, defendant has not identified, and claims not to have collected the data by which it could know, which, if any, had been at risk for displacement.  [See id., at 6-7 (Response 7); *see also* Goetz I, GD Ex. 21, at 81:11-18.]

**DEFENDANT'S RESPONSE TO 132:**  Defendant disputes this assertion. The cited evidence is mischaracterized. The accurate statement is as follows, from Defendant's RTA response 7: "Defendant…admits that information regarding an applicant household's actual or perceived risk of involuntary displacement is not collected in the lottery process." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

133.   Defendant has produced no evidence that the community preference policy prevents or mitigates displacement from the City as much or more than would an equal-access lottery.  [Cf. Def's RTA Responses, GD Ex. 2, at 5 (Responses 4 and 5) (defendant has not even quantified the number of CP beneficiaries at risk of involuntary displacement from their apartment or neighborhood who have been awarded apartments).]

**DEFENDANT'S RESPONSE TO 133:**  Defendant disputes Plaintiffs' classification and articulation of the reasons why the City maintains the CP policy. Furthermore, Defendant disputes this assertion because it misrepresents Defendant's burden in this litigation. This does not result in a genuine factual issue to be tried because Defendant will detail the reasons why the City maintains the CP policy in its papers in support of its motion for summary judgment and whether there is sufficient evidence to support the

City's interest in maintaining the CP policy is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under governing substantive law will properly preclude entry of summary judgment…Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry.")

134.    A community district is often composed of multiple neighborhoods; a lottery applicant being award a unit in the community district of his or her current residence is not necessarily being awarded a unit in the neighborhood of his or her current residence.  [*See* map of Brooklyn neighborhood tabulation areas versus map of Brooklyn community districts, annexed to GD as Ex. 26; see also Goetz II, GD Ex. 22, at 69:2-25.].

**DEFENDANT'S RESPONSE TO 134:**  Not disputed

135.    The affordable housing crisis is a citywide crisis.  [See, e.g., Weisbrod, GD Ex. 18, at 54:21-25; *see also* Def's RTA Responses, GD Ex. 2, at 76 (Response 132).]

**DEFENDANT'S RESPONSE TO 135:**  Not disputed

136.     A New York City resident's displacement from the city as a whole is not a lower-priority concern for the City than such a resident's displacement from any particular neighborhood.  [*See* excerpts of transcript of Nov. 3, 2017 deposition of Alicia Glen ("Glen"), annexed to GD as Ex. 27, at 282:7-21 and at 288:3-15 (the latter quoting Ms. Glen as saying, "I think it's already a value statement to assume that it's bad if people move into other neighborhoods that are further away because that just runs afoul of the history of the world"); *see also* Been I, GD Ex. 8, at 92:13-93:22 ("I would agree that having housing [] – period – is more important than where the housing may be.").]

**DEFENDANT'S RESPONSE TO 136:** Defendant disputes this assertion. The cited evidence is mischaracterized. This dispute does not result in a genuine factual issue to be tried because the cited sources speak for themselves.

137.    The vast majority of unique applicants to affordable housing lotteries (more than 85 percent) apply outside of the community district they currently live in at least 75 percent of the time.  [BD, at 58-59, ¶¶ 201-03 and Table 15.]

**DEFENDANT'S RESPONSE TO 137:** Defendant disputes this assertion. *See* Goetz Decl. at 38-39, ¶¶ 66-68. This dispute does not result in a genuine factual issue to be tried because the percentage of applications outside of the CD is irrelevant to the whether CP policy serves a legitimate government interest. *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

138.    The application pattern described in the preceding paragraph is true for White applicants, Black applicants, Hispanic applicants, and Asian applicants.  [BD, at 61, ¶ 208 and Chart 1; and BD Ex. 20.]

**DEFENDANT'S RESPONSE TO 138:** Defendant disputes this assertion. *See* Goetz Decl. at 38-39, ¶¶ 66-68. This dispute does not result in a genuine factual issue to be tried because the percentage of applications outside of the CD is irrelevant to the whether CP policy serves a legitimate government interest. *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

139.    One of defendant's proposed experts has admitted that the most direct and comprehensive way to determine what choices individual households are making in terms of where they want to compete for affordable housing via the lotteries is "what they apply for" as the expression of their preferences.  [See Goetz I, GD Ex. 21, at 122:5-23.]

> **DEFENDANT'S RESPONSE TO 139:**  Defendant disputes this assertion as it takes Professor Goetz's testimony out of context. The accurate statement is as explained by Professor Goetz in his declaration. *See* Goetz Decl. at 41-42, ¶ 72. This dispute does not result in a genuine factual issue to be tried because Dr. Goetz's testimony in his declaration is clear.

140.    In contemporary New York City, many City residents move from one neighborhood to another, as has been the case historically.  [*See* excerpt of transcript of Nov. 27, 2018 deposition of Joseph Salvo, annexed to GD as Ex. 28, at 225:22-226:11; see also Glen, GD Ex. 27, at 288:3-15.]

> **DEFENDANT'S RESPONSE TO 140:**  Not disputed

141.    Defendant recognizes that rent burden can be used as a proxy for risk of displacement. [See Goetz II, GD Ex. 22, at 93:17-22.]

> **DEFENDANT'S RESPONSE TO 141:**  Defendant disputes this statement as it takes Professor Goetz's testimony out of context. The accurate statement is as follows, testified by Professor Goetz during his deposition: "if the point were to investigate which households were at greater risk…for displacement, the things that I think you would need to look at is the percentage of their income that they are paying for rent. You would have to know about the local market in the surrounding -- in the immediate surrounding neighborhood. You would have to know something about the -- the landlord, the owner

of the -- of the building and about their intentions, about the building itself, the quality. So there are a number of different things you would probably need to take into account." *See* April 5, 2019 Goetz deposition ("Goetz I"), Polifione Decl., Ex. 50 at 53:23-54:15. This dispute does not result in a genuine factual issue to be tried because even if rent burden is an appropriate proxy, it is irrelevant to whether the CP policy serves a legitimate government interest. <u>Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

142.    A household is considered "rent burdened" when rent (sometimes including utilities) exceeds 30 percent of its monthly household income.  [*See, e.g.*, "Housing Conditions" page of HPD's "Where We Live NYC" website,[21] note 8.]

**DEFENDANT'S RESPONSE TO 142:**  Not disputed

143.    A household is considered "severely rent burdened" when rent (sometimes including utilities) exceeds 50 percent of its monthly household income.  [*Id.*]

**DEFENDANT'S RESPONSE TO 143:**  Not disputed

144.    Similar percentages of CP-beneficiary applications and non-beneficiary applications are rent burdened and severely rent burdened.  This is true whether calculated in terms of rent as a percentage of income based on total rent or in terms of rent as a percentage of income based on contribution to total rent, and regardless of whether comparing applicants who are claiming subsidy or applicants who are not claiming subsidy [BD, at 54-57, ¶¶ 189-195, and at 56, Table 14].

---

[21] Available online at https://wherewelive.cityofnewyork.us/explore-data/housing-conditions/ (near bottom of page).

**DEFENDANT'S RESPONSE TO 144**: Defendant disputes the validity of Professor Beveridge's rent burden analysis. *See* Goetz Decl. at 34-37, ¶¶ 62-64. This dispute does not result in a genuine factual issue to be tried because the comparison of rent burdened households with CP versus without CP is irrelevant to whether the CP policy serves a legitimate government interest. Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

145.    The *number* of non-beneficiary applications who are rent burdened far exceeds the number of CP-beneficiary applications who are rent-burdened.  This is true whether calculated in terms of rent as a percentage of income based on total rent or in terms of rent as a percentage of income based on contribution to total rent, and regardless of whether comparing applicants who are claiming subsidy or applicants who are not claiming subsidy.  [BD, at 57-58, ¶ 197, and at 56, Table 14].

**DEFENDANT'S RESPONSE TO 145**: Defendant disputes the validity of Professor Beveridge's rent burden analysis. *See* Goetz Decl. at 34-37, ¶¶ 62-64. This dispute does not result in a genuine factual issue to be tried because the comparison of rent burdened households with CP versus without CP is irrelevant to whether the CP policy serves a legitimate government interest. Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev., 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

146.     In terms of applications where subsidy is claimed and rent burden is calculated as "percentage of income based on contribution to total rent," there have been more than 1.3 million applications from applicants who are non-beneficiaries and who are rent-burdened or severely rent-burdened households; by contrast, fewer than 70,000 came from comparably situated CP-beneficiary applications.  [Id.].

> **DEFENDANT'S RESPONSE TO 146:**  Defendant disputes the validity of Professor Beveridge's rent burden analysis. *See* Goetz Decl. at 34-37, ¶¶ 62-64. This dispute does not result in a genuine factual issue to be tried because the comparison of rent burdened households with CP versus without CP is irrelevant to whether the CP policy serves a legitimate government interest. <u>Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.</u>, 974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

147.     The number of non-beneficiary applications who are severely rent burdened far exceeds the number of CP beneficiary applications who are rent-burdened.  This is true whether calculated in terms of rent as a percentage of income based on total rent or in terms of rent as a percentage of income based on contribution to total rent, and regardless of whether comparing applicants who are claiming subsidy or applicants who are not claiming subsidy.  [Id.]

> **DEFENDANT'S RESPONSE TO 147:**  Defendant disputes the validity of Professor Beveridge's rent burden analysis. *See* Goetz Decl. at 34-37, ¶¶ 62-64. This dispute does not result in a genuine factual issue to be tried because the comparison of rent burdened households with CP versus without CP is irrelevant to whether the CP policy serves a legitimate government interest. <u>Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.</u>,

974 F. Supp. 2d 240, 243 (S.D.N.Y. 2013) (disregarding contents of 56.1 Statement that are "conclusory, speculative, irrelevant, argumentative, unsupported or otherwise inappropriate for consideration").

148.     During the de Blasio administration, defendant has implemented or expanded a variety of concrete anti-displacement strategies, including but not limited to increasing preservation of affordable housing units, funding legal services for tenants facing eviction, stepping up anti-harassment efforts, and raising awareness about available resources.  [*See* Glen, GD Ex. 27, at 159:4-161:19.]

**DEFENDANT'S RESPONSE TO 148:**  Not disputed

149.     Prior to the de Blasio administration, defendant's response to gentrification was limited. [See excerpt of transcript of Mar. 21, 2016 Mayor de Blasio radio appearance, "Mayor de Blasio Discusses Affordable Housing on Local NPR's Morning Edition", annexed to GD as Ex. 29, at 1 ("And over the last particularly 15, 20 years, gentrification has had just a rampant impact and it's changed the nature of the city.  But guess what? The city government didn't respond.  There was no policy.  There wasn't even a serious discussion in this city.")]

**DEFENDANT'S RESPONSE TO 149:**  Defendant does not dispute that Mayor de Blasio made the quoted statements, but disputes the characterization of the statements. The term "limited" in undefined and vague. Furthermore, Plaintiffs fail to include subsequent evidence where the Mayor clarified his statements as follows: "I am aware that the Bloomberg administration had anti-displacement programs in place. My administration's anti-displacement programs and policies expand upon and add to those programs and policies." July 23, 2018 Declaration of Mayor de Blasio, at ECF 497. This

dispute does not result in a genuine factual issue to be tried because the Mayor's

testimony in his declaration is clear.

150.    According to defendant, as articulated by Mayor de Blasio, the "ultimate anti-

displacement tool" is housing preservation because the "simplest, strongest, clearest anti-

displacement tool is to protect a working family in their apartment." [*See* excerpts of transcript of

Apr. 4, 2019 press conference ("April 4 press conf"), "Mayor de Blasio Appoints Vicki Been as

Deputy Mayor for Housing and Economic Development," annexed to GD as Ex. 30, at 3.]

> **DEFENDANT'S RESPONSE TO 150:** Defendant does not dispute that Mayor de
>
> Blasio made these statements.

151.    According to defendant, as articulated by Mayor de Blasio, preservation is "the essence

and work horse" of the City's affordable housing plan, representing the majority of the plan's

affordable housing commitment.  [Id.]

> **DEFENDANT'S RESPONSE TO 151:** Defendant does not dispute that Mayor de
>
> Blasio made these statements.

152.    In 2019, New York State enacted more stringent, more tenant-protective rent regulations.

[*See* text of enacted bill available from N.Y. State Senate;[22] *see also* Brenzel, Kathryn and

Kromrei, Georgia, "Cuomo signs landmark rent regulation reform bill", The Real Deal, June 14,

2019, annexed to GD as Ex. 31, at 1 ("The New York state legislature passed sweeping rent

regulation reform on Friday, dramatically limiting how landlords can increase rents on stabilized

apartments and opening the door for rent stabilization to expand outside of New York City.  Gov.

Andrew Cuomo signed the bill almost immediately.  The bill includes the elimination of vacancy

decontrol and new caps on the Major Capital Improvements and Individual Apartment

---

[22] Available online at https://www.nysenate.gov/legislation/bills/2019/s6458.

Improvement programs, which respectively allowed landlords to hike rents on regulated apartments when a unit is vacated or renovations performed.").]

**DEFENDANT'S RESPONSE TO 152:**  Not disputed

153.    Defendant believes measures encompassed in the 2019 rent reform bill such as vacancy decontrol will operate to reduce displacement pressures in New York City.  [See Been I, GD Ex. 8, at 68:5-69:15; see also April 4 press conf, GD Ex. 30, at 6 (Deputy Mayor Been prospectively describing the 2019 rent reform legislative push as a "once-in-a-generation chance to end failed policies like the current vacancy de-control rules and to stop the irrevocable loss of those precious rent stabilized units").]

**DEFENDANT'S RESPONSE TO 153:**  Not disputed

154.    Defendant has not quantified how many New Yorkers fear displacement from their neighborhood, the degree of that fear, the extent to which the community preference policy would or should reduce that fear, or how that fear may differ as between non-beneficiary applicants and CP beneficiary applicants.  [*See, e.g.*, Goetz I, GD Ex. 21, at 177:6-191:16.]

**DEFENDANT'S RESPONSE TO 154:**  Defendant disputes this assertion. The cited evidence is mischaracterized and the term "quantified" is vague and undefined. To the extent it means counted the number of people who fear displacement, Defendant does not dispute that it does not have this information. However, Defendant has data on indicators of the degree of risk of displacement. *See* Goetz I, Polifione Decl., Ex. 50 at 53:23-54:15; GD Ex. 21 at 185:23-186:5. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

155.    Defendant recognizes that it would be an exaggeration to convey to New Yorkers seeking to remain in their neighborhood and fearful of displacement from the neighborhood that the

community preference policy would at any specified time frame yield them an apartment, and recognizes that the policy should not eliminate their fear of displacement.  [Id., at 179:23-181:2 and 188:13-24.]

> **DEFENDANT'S RESPONSE TO 155:**  Defendant disputes this assertion. The cited evidence is mischaracterized. Professor Goetz testified at length about the fear of displacement and, in the section of his deposition transcript cited, stated that Plaintiffs' counsel's statement was an "oversimplified explanation of the process." *See* Goetz I, GD Ex. 21 at 180:8-10. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

156.    The only explanations for why defendant's proposed expert on displacement believes that the policy would reduce fear of displacement from the neighborhood is that: (a) the policy sends a "signal" to those who know about it that defendant is serious about dealing with displacement from the neighborhood; and (b) that those who know about the policy should understand that, even though demand for affordable housing far exceeds the supply, that if affordable housing were to be made available in their community district, they would have an unspecified better chance for getting it than if the policy did not exist – thereby possibly giving them a non-quantified incremental fear- or anxiety-reduction about displacement.  [Id. at 180:11-181:2, 182:2-15, 187:15-191:16.]

> **DEFENDANT'S RESPONSE TO 156:**  Defendant disputes this assertion. The cited evidence is mischaracterized. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself. Furthermore, Defendant disputes Plaintiffs' classification and articulation of the reasons why the City maintains the CP policy. Defendant will detail the reasons why the City maintains the CP policy in its

papers in support of its motion for summary judgment and whether there is sufficient

evidence to support the City's interest in maintaining the CP policy is a question of law,

not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)

("Only disputes over facts that might affect the outcome of the suit under governing

substantive law will properly preclude entry of summary judgment…Any proof or

evidentiary requirements imposed by the substantive law are not germane to this

inquiry.")

157.    Defendant has produced no evidence that preventing involuntary displacement or

reducing the fear of involuntary displacement were among the justifications for the community

preference policy when it was first implemented citywide.  [*See* Def's RTA Responses, GD Ex.

2, at 9-10 (Response 14).]

> **DEFENDANT'S RESPONSE TO 157:**  Defendant disputes Plaintiffs' classification
>
> and articulation of the reasons why the City maintains the CP policy. Furthermore,
>
> Defendant disputes this assertion because it misrepresents Defendant's burden in this
>
> litigation. This does not result in a genuine factual issue to be tried because Defendant
>
> will detail the reasons why the City maintains the CP policy in its papers in support of its
>
> motion for summary judgment and whether there is sufficient evidence to support the
>
> City's interest in maintaining the CP policy is a question of law, not an issue of fact. *See*
>
> *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that
>
> might affect the outcome of the suit under governing substantive law will properly
>
> preclude entry of summary judgment…Any proof or evidentiary requirements imposed
>
> by the substantive law are not germane to this inquiry.")

158.    Defendant has asserted that the policy makes it possible to get Council Member ("CM")

support for (overcome CM opposition to) land-use measures needed to facilitate affordable

housing developments and to get CM support for particular development projects that CMs vote

on.  [See, e.g., Been Decl., GD Ex. 16, at 3-4, ¶ 8 (emphasis added) (referencing the opposition

of "neighborhoods . . . *and their elected representatives*" that the policy purportedly

overcomes).]

> **DEFENDANT'S RESPONSE TO 158:**  Defendant disputes Plaintiffs' classification
>
> and articulation of the reasons why the City maintains the CP policy. This does not result
>
> in a genuine factual issue to be tried because Defendant will detail the reasons why the
>
> City maintains the CP policy in its papers in support of its motion for summary judgment
>
> and whether there is sufficient evidence to support the City's interest in maintaining the
>
> CP policy is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*,
>
> 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the
>
> suit under governing substantive law will properly preclude entry of summary
>
> judgment…Any proof or evidentiary requirements imposed by the substantive law are
>
> not germane to this inquiry.")

159.    Defendant City of New York is a municipal corporation.  [See Answer to SAC, GD Ex.

3, at 3, ¶ 12].

> **DEFENDANT'S RESPONSE TO 159:**  Not disputed

160.    The City Council, made up of 51 Council Members ("CMs"), is an integral part of

defendant, specifically its legislative arm.  [See N.Y.C. Charter § 21.]

> **DEFENDANT'S RESPONSE TO 160:**  Not disputed

161.     Approvals of zoning changes needed to facilitate affordable housing developments are made by vote of CMs in the City Council.  [See N.Y.C. Charter § 197-d; see also Glen, GD Ex. 27, at 143:9-24.]

**DEFENDANT'S RESPONSE TO 161:**  Not disputed

162.     Many individual affordable housing projects require approvals by vote of CMs in the City Council.  [*Id.*]

**DEFENDANT'S RESPONSE TO 162:**  Not disputed

163.     CMs have a variety of concerns that influence their position on land-use and development matters.  [See Def's RTA Responses, GD Ex. 2, at 16-17 (Response 23); see also Glen, GD Ex. 27, at 117:13-118:7 (emphasizing that different CMs "have different issues" and so "it's not one size fits all" when attempting to determine how to address CM opposition); Weisbrod, GD Ex. 18, at 186:9-17 (confirming CMs attempts to negotiate "a variety of things," but the fact that an item is mentioned does not mean that it will be insisted upon); Torres-Springer, GD Ex. 6, at 173:23-175:22 (affirming CMs frequently have multiple issues of concern with regard to any given project).]

> **DEFENDANT'S RESPONSE TO 163:**  Defendant disputes this assertion. The cited evidence is mischaracterized and the terms "land use" and "development matters" are vague and undefined.  The accurate statement is as follows, from Defendant's RTA response 23: "Defendant…admits that CMs consider multiple factors when deciding whether to vote to approve or disapprove land use actions needed to facilitate construction of affordable housing or whether to vote to approve or disapprove an application regarding a particular affordable housing development, and two of the factors that may be considered are the levels of affordability of the units and the extent to which

needed infrastructure or community improvements or benefits will be provided." This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

164.     Defendant's executive branch has a variety of incentives to provide to CMs to influence their position on land-use and development matters.  [See excerpt of transcript Nov. 14, 2017 deposition of Rafael Cestero, annexed to GD as Ex. 32, at 153:10-155:3 (averring that there are "many tools, many tools" beyond community preference that can be part of the "package" the City uses to assuage CM concerns); see also excerpt of transcript of June 28, 2018 deposition of Jordan Press, annexed to GD as Ex. 33, at 148:10-150:6 (agreeing the City has many different "carrots" and means of pushing back to get CMs "onboard" with land-use proposals); excerpts of transcript of June 14, 2018 deposition of David Quart ("Quart"), annexed to GD as Ex. 34, at 177:16-178:13 (confirming that the type of "carrots" that will work with any CM will be particular to the needs of that CM district's needs and will vary); Glen, GD Ex. 27, at 117:13-118:7 (confirming that the administration has variety of tools it can use to deal with any particular Council member's concerns and "it's not one size fits all").]

>        **DEFENDANT'S RESPONSE TO 164**:  Defendant disputes this assertion in that the
>        term "incentives" is vague and undefined. To the extent it means tools for addressing
>        councilmember concerns, this statement is not disputed. To the extent this is not what
>        Plaintiffs mean there is still no genuine factual issue to be tried because the cited sources
>        speak for themselves.

165.     It is very unusual for a CM to be given all of the items for which the CM has negotiated in the context of land-use actions or approval of affordable housing developments.  [See Glen,

GD Ex. 27, at 130:18-131:9 (confirming this fact); see also Weisbrod, GD Ex. 18, at 186:9-17 (same).]

**DEFENDANT'S RESPONSE TO 165:**  Not disputed

166.  Defendant is unable to conclude that the same factor will be determinative in persuading CMs to support a particular land-use change or a particular project, although the level of affordability is an issue that is raised repeatedly.  [See, e.g., Glen, GD Ex. 27, at 117:13-21 (stating "different council members have different issues," so finding a way to overcome their opposition "is not one size fits all"); Quart, GD Ex. 34, at 177:16-178:13 (agreeing that the types of "carrots" that work for a particular CM will depend on the particular project and not every "carrot" is applicable in each project); Def's RTA Responses, GD Ex. 2, at 16-17 (Response 23) (admitting that "CMs consider multiple factors when deciding whether to vote to approve or disapprove land use actions needed to facilitate construction of affordable housing or whether to vote to approve or disapprove an application regarding a particular affordable housing development, and two of the factors that may be considered are the levels of affordability of the units and the extent to which needed infrastructure or community improvements or benefits will be provided").]

**DEFENDANT'S RESPONSE TO 166:**  Not disputed

167.  When CMs have asked defendant's executive branch to expand the percentage of units subject to the community preference policy, the defendant's executive branch has said "no," and the CMs often have supported the land-use measure or development project in question anyway. [See Been II, GD Ex. 15, at 32:3-21.]

**DEFENDANT'S RESPONSE TO 167:**  Not disputed

168.    If defendant did not have the policy and a CM decided to oppose an otherwise meritorious land-use measure or affordable housing development because of the absence of the policy, that CM would not be acting either in defendant's interest or in the interest of the CM's constituents.  [See Been I, GD Ex. 8, at 299:2-21 ("If I thought it was in the interest of the city to have the affordable housing and the council member turned it down solely because there was no community preference, I would not think that was in the interest of the community."); see also Glen, GD Ex. 27, at 134:7-14 (stating it would not be in the interest of the city or CM's constituents to turn down affordable housing projects).]

> **DEFENDANT'S RESPONSE TO 168:**  Defendant disputes this assertion. It fails to comply with the requirements of Local Rule 56.1(d) because the assertion is only supported by citations to responses to inappropriate hypothetical questions posed to deponents at a deposition and, thus, is not supported by a citation to admissible evidence. Because the statement does not comply with the requirements of Local Rule 56.1(d), this dispute does not result in a genuine factual issue to be tried.

169.    Defendant does not know that CMs would reject land-use measures that facilitate the development of affordable housing or particular affordable housing developments in a landscape where the community preference policy no longer existed; and defendant has affirmatively stated that what CMs would do in that circumstance is entirely speculative.  [See Been I, GD Ex. 8, at 74:4-75:10 (acknowledging that she "does not have an alternate [] universe" where she has "tested out" having versus not having community preference to determine whether land use actions would get approved without it, and that she cannot answer whether rezonings would not occur "but for" community preference because "I don't have any way of assessing 'but for'") and 290:6-291:7 (admitting "I don't know for a fact" what CMs would do once community

preference had been disallowed by the Court or eliminated by defendant voluntarily); see also Torres-Springer, GD Ex. 6, at 202:3-203:6 (testifying that it is "difficult for me to predict" which CMs would take the position that they were going to deny their constituents desperately needed affordable housing if community preference were removed because to do so would be "to speculate") and 212:16-214:12 (confirming that she did not know the answer to the "difficult hypothetical" of which CMs would reject projects without community preference even if they thought the projects were on balance beneficial to their constituents because it is "too much of a matter of speculation"); Kapur, GD Ex. 23, at 98:14-100:20 (declining repeatedly to identify even one CM who would automatically turn down land use actions needed for affordable housing simply because there was no community preference because that would be "speculating"); and Quart, GD Ex. 34, at 113:17-114:18 (contrasting his "sense" that he could see that some CMs would act differently with the actual reality that, "I have no proof or specific reason or facts").]

> **DEFENDANT'S RESPONSE TO 169:**  Defendant disputes this assertion. It fails to comply with the requirements of Local Rule 56.1(d) because the assertion is only supported by citations to responses to inappropriate hypothetical questions posed to deponents at a deposition and, thus, is not supported by a citation to admissible evidence. Because the statement does not comply with the requirements of Local Rule 56.1(d), this dispute does not result in a genuine factual issue to be tried.

170.   Defendant has not attempted to explain either to CMs or to the public generally any negative features of the policy (including, but not limited to, the argument that the policy allows for less residential integration and causes disparate impact more than a lottery system without the policy).  [*See* Been I, GD Ex. 8, 288:24-289:21 (admitting that she never discussed reducing or

eliminating the preference with any CM) and 302:17-303:3 (confirming that HPD has not gone

"around the city explaining that as one New York all of us should have access to all affordable

housing without preference being given to members of the community district"); see also excerpt

of transcript of Jan. 16, 2019 deposition of James Patchett, annexed to GD as Ex. 35, at 79:21-

80:12 (stating that he did not recall ever suggesting to any CMs that community preference

should be reduced, and explaining that he had not had any conversations with CMs and more

broadly did not "think we [the administration] would have raised [] to the council" questions of

whether community preference perpetuated segregation or caused a disparate impact because "I

don't believe that this was something that there was a significant concern of ours"); Torres-

Springer; GD Ex. 6, 122:13-123:4 (stating she has not suggested to any CM that community

preference be decreased, nor was she aware of any such conversations being had with CMs by

other members of defendant); Weisbrod, GD Ex. 18, 233:20-24 (same).]

> **DEFENDANT'S RESPONSE TO 170**: Defendant disputes that there are negative
>
> features of the CP policy. This dispute does not result in a genuine factual issue to be
>
> tried because whether the CP policy causes a disparate impact or perpetuates segregation
>
> is a question of law, not an issue of fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S.
>
> 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under
>
> governing substantive law will properly preclude entry of summary judgment…Any
>
> proof or evidentiary requirements imposed by the substantive law are not germane to this
>
> inquiry.")

171.   Mayor de Blasio is on record as believing (using the fight to get Mandatory Inclusionary

Housing passed as support) that he was able to overcome resistance to a new way of thinking

about affordable housing and that it is necessary and feasible to: (a) resist unwarranted

opposition; (b) bring together a "really broad coalition"; (c) work in the interests of all New Yorkers; and (d) change minds and thus "change our policies profoundly." [See excerpt of speech transcript, "Mayor de Blasio Delivers Remarks at NYSAFAH Housing for all Conference", May 11, 2016, annexed to GD as Ex. 36, at 4-5.]

> **DEFENDANT'S RESPONSE TO 171:**  Defendant disputes this assertion. The cited evidence is mischaracterized and quoted out of context. This dispute does not result in a genuine factual issue to be tried because the cited source speaks for itself.

172.   City Council Speaker Corey Johnson, in discussing the City's imperative to address persistent school segregation, has explained that while he has supported the community preference policy in the past, he would be open to "scaling back on the percentage that we allow for right now," suggesting percentages as low as twenty percent because "there's a greater good we have to look at." [See Inside City Hall, "Speaker on school and housing segregation", NY1, May 3, 2018.[23]]

> **DEFENDANT'S RESPONSE TO 172:**  It is not disputed that the City Council Speaker made this statement.

173.   New York City public schools are highly segregated and desegregating them is an extremely important interest of defendant.  [See excerpt of NYC Department of Education School Diversity Advisory Group, "Making the Grade: The Path to Real Integration and Equity for NYC Public School Students," Feb. 2019, annexed to GD as Ex. 37, at 6 (stressing that 65 years after Brown, "New York City has taken only very modest steps" to live up to the challenges presented by racially segregated schools).]

---

[23] Video recording available online at https://www.ny1.com/nyc/all-boroughs/inside-city-hall/2018/05/04/speaker-onschool-and-housing-segregation.

**DEFENDANT'S RESPONSE TO 173:**  Defendant disputes this assertion because the terms "highly segregated" and "desegregating" are vague and undefined. To the extent it means that diversity and integration are a top priority for New York City Department of Education schools, this statement is not disputed.

174.    A critical tool for reducing segregation in schools, especially at the elementary school level, is reducing residential segregation.  [See excerpt of transcript of radio broadcast, "Mayor de Blasio Appears Live on Inside City Hall", June 12, 2017, annexed to GD as Ex. 38, at 3 (calling for "more clarity and I would argue honesty" in discussion of school desegregation, arguing that "[m]any of our school districts don't afford us that opportunity at the elementary school level [for integration] because you can have a huge geography that is overwhelmingly people of one particular background and that is the reality in New York City"); *see also* excerpt of transcript of radio broadcast, "Mayor de Blasio Appears Live on the Brian Lehrer Show", May 11, 2018, annexed to GD as Ex. 39, at 7 (asserting that the "schools didn't create segregation" because school segregation is "based on economics and structural racism" that play out, *inter alia*, "in housing and then eventually all that affects who goes to school where," and suggesting that "it's a mistake" to believe that "the schools can solve this problem without first focusing on the root causes").]

**DEFENDANT'S RESPONSE TO 174:**  To the extent this statement means that the demographics of an elementary school's student population may be strongly affected by the demographics of the surrounding residential areas, this statement is not disputed.

175.    Defendant first applied its community preference policy to developments benefitted by defendant's voluntary inclusionary housing program prior to 2007, and defendant is currently applying its community preference policy to developments benefitting from its voluntary

inclusionary housing program.  [See Def's RTA Responses, GD Ex. 2, at 91 (Responses 160 and 161).]

      **DEFENDANT'S RESPONSE TO 175:**  Not disputed

176.    160 Madison Avenue, 200 East 39th Street, and 40 Riverside Boulevard are all buildings that have benefitted from defendant's voluntary inclusionary housing program.  [See Def's RTA Responses, GD Ex. 2, at 90 (Response 159).]

      **DEFENDANT'S RESPONSE TO 176:**  Not disputed

177.    Defendant has produced no documentation in discovery that there was ever a period during which it suspended applying its community preference policy to buildings benefitting from its voluntary inclusionary housing program.

      **DEFENDANT'S RESPONSE TO 177:**  Not disputed

178.    Plaintiffs have each applied, *inter alia*, to 200 East 39th Street and 40 Riverside Boulevard.  [*See* Answer to SAC, GD Ex. 3, at 3, ¶¶ 10-11.]

      **DEFENDANT'S RESPONSE TO 178:**  Not disputed

179.    HDC co-administers the defendant's community preference policy, not a separate policy.  [*See, e.g.*, Answer to SAC, GD Ex. 3, at 3, ¶ 12]

      **DEFENDANT'S RESPONSE TO 179:**  Not disputed

180.    Five of seven members of HDC's governing body are either appointees or defendant's commissioners who were appointed to their commissionerships by the mayor.  [*See* Def's RTA Responses, GD Ex. 2, at 100 (Response 180).]

      **DEFENDANT'S RESPONSE TO 180:**  Not disputed

181.    All members of NYCHA's board are appointed by the mayor.  [*See* Def's RTA Responses, GD Ex. 2, at 100-01 (Response 182).]

**DEFENDANT'S RESPONSE TO 181:**  Not disputed

182.     Professor Goetz agreed at his deposition that the community preference policy, if it is working as designed, reduces the chances of many families who want to move to different neighborhoods and could benefit from that mobility.  [*See* Goetz I, GD Ex. 21, at 126:4-127:6.]

**DEFENDANT'S RESPONSE TO 182:**  Not disputed.

183.     Professor Goetz takes the position that "we flatter ourselves and slide into paternalism when we act on the idea that we know best about where lower income people of color should live." [*Id.* at 129:4-13.]

**DEFENDANT'S RESPONSE TO 183:**  Not disputed

184.     African Americans are overrepresented in census tracts of high poverty as defined by HUD (more than 40 percent of residents living in poverty) compared with the overall percentage of New Yorkers who are African American.  [*See* Def's RTA Responses, GD Ex. 2, at 43 (Response 73).]

**DEFENDANT'S RESPONSE TO 184:**  Not disputed

185.     Latinos are overrepresented in census tracts of high poverty as defined by HUD (more than 40 percent of residents living in poverty) compared with the overall percentage of New Yorkers who are Latino.  [See Def's RTA Responses, GD Ex. 2, at 43 (Response 74).]

**DEFENDANT'S RESPONSE TO 185:**  Not disputed

Dated:        New York, New York
              August 14, 2020

                         JAMES E. JOHNSON
                         Corporation Counsel of the
                           City of New York
                         *Attorney for Defendant*
                         100 Church Street

- 82 -

New York, New York 10007
(212) 356-2194


By:     /s/
         _____
         GATI DALAL
         *Assistant Corporation Counsel*


TO:     ANTI-DISCRIMINATION CENTER, INC.
        CRAIG GURIAN
        *Co-Counsel for Plaintiffs*
        250 Park Avenue, Suite 7097
        New York, New York 10177
        (212) 537-5824


        CUTI HECKER WANG LLP
        MARIANN MEIER WANG
        *Co-Counsel for Plaintiffs*
        305 Broadway, Suite 607
        New York, New York 10007
        (212) 620-2600