UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

SHAUNA NOEL, and EMMANUELLA SENAT

                               Plaintiffs,

                                                              15 CV 5236 (LTS)(KHP)

             - against -

CITY OF NEW YORK,

                            Defendant.

-------------------------------------------------------------------x

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

                                  JAMES E. JOHNSON
                                  Corporation Counsel of the
                                  City of New York
                                  Attorney for Defendant
                                  100 Church Street
                                  New York, New York 10007
                                  (212) 356-4371

SHERYL R. NEUFELD,
MELANIE V. SADOK,
FRANCES POLIFIONE,
GATI DALAL,
              Of Counsel.

August 14, 2020

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .............................................................................. 1

ARGUMENT ...................................................................................................... 5

POINT I .............................................................................................................. 5

PLAINTIFFS CANNOT ESTABLISH INTENTIONAL
DISCRIMINATION ............................................................................................ 5

        A.  Plaintiffs Lack Evidence of Discriminatory
            Intent ............................................................................................ 6

        B.  The City Has Legitimate Non-Discriminatory
            Reasons for the CP policy ........................................................... 13

POINT II ............................................................................................................ 14

THE CP POLICY DOES NOT HAVE A DISPARATE IMPACT ........................... 14

        A.  Plaintiffs Have Failed to Demonstrate that the
            CP policy has a Disproportionate Impact on
            Black New Yorkers Applying for Affordable
            Housing ....................................................................................... 15

        (a)  Plaintiffs' Analysis Fails to Show an Impact on
            a Protected Class ......................................................................... 16

        (b)  Race-Based "CD typologies" is the Improper
            Aggregate .................................................................................... 19

        (c)  Plaintiffs' CP v. Non-CP Analysis Identifies
            the Incorrect Outcome of Interest .............................................. 27

        (d)  Plaintiffs Analyze the Incorrect Lottery Stages ......................... 30

        (e)  Plaintiffs' Statistical Significance Tests Must
            be Disregarded ............................................................................ 32

        (f)  Plaintiffs' Fail to Demonstrate Robust
            Causation .................................................................................... 34

        B.  Disparate Impact Analysis Done Properly ................................. 37

        (b)  Simulation ................................................................................... 40

POINT III ................................................................................................................. 42

THE CP POLICY INTEGRATES AND DOES NOT PERPETUATE
SEGREGATION .......................................................................................................... 42

        A.   Integrating Less is Not Perpetuating
            Segregation ................................................................................ 43

        B.   The CP policy Does Not Result in Significantly
            Less Integration ......................................................................... 46

        C.   Perpetuation of Segregation Analysis Done
            Properly by Dr. Siskin ............................................................... 47

        D.   Plaintiffs' "Measure" of the CP Impact is
            Flawed ......................................................................................... 49

        E.   Plaintiffs Failed to Demonstrate that the CP
            policy "Causes" Perpetuation of Segregation .................................. 50

POINT IV ................................................................................................................... 51

THE CP POLICY IS NECESSARY TO ACHIEVE VALID INTERESTS .............................. 51

        A.   The CP policy is Necessary to Address
            Displacement and the Fear of Displacement .................................... 52

        B.   The City Has Demonstrated Sufficient
            Evidence of its Legitimate Interests .................................................. 54

        C.   Plaintiffs Mischaracterize the City's Legitimate
            Interests ....................................................................................... 59

        D.   Plaintiffs' Use of Housing Connect Data to
            Attack the Legitimacy of the CP policy Fails ................................... 61

POINT V ..................................................................................................................... 64

THERE ARE NO LESS DISCRIMINATORY ALTERNATIVES ........................................... 64

CONCLUSION ........................................................................................................... 68

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*,
   691 F. Supp. 2d 372 (S.D.N.Y. 2009).....................................................................18

*Bank Leumi USA v. Ehrlich*,
   98 F. Supp. 3d 637 (SDNY 2015) ..........................................................................24

*Bryan v. Koch*,
   627 F.2d 612 (2d Cir. 1980), The NYC HRL.............................................64, 65, 67

*Churches United for Fair Hous., Inc. v De Blasio*,
   180 A.D.3d 549 (1st Dep't 2020) ..............................................................................8

*Comer v. Cisneros*,
   37 F.3d 775 (2d Cir. 1994)..............................................................12, 22, 23, 38

*Conn. Fair Hous. Ctr. v. Corelogic Rental Prop. Sols., LLC, No. 3:18-CV-705
   (VLB)*,
   2020 U.S. Dist. LEXIS 11867 (D. Conn. 2020) ......................................................35

*Conn. v. Teal*,
   457 U.S. 440 ...........................................................................................23, 24, 31

*Criley v. Delta Airlines, Inc.*,
   119 F.3d 102 (2d Cir. 1997)...........................................................................18, 29

*Davis v. N.Y.C. Hous. Auth.*,
   103 F. Supp. 2d 228 (S.D.N.Y. 2000)..............................................................41, 49

*Davis v NYCHA*
   166 F.3d 432 (2d Cir 1999)......................................................................42, 46, 67

*Dist. Council 37 v. N.Y. City Dep't of Parks & Rec*
   (2d Cir 1997).............................................................................................................31

*Fair Housing in Huntington Comm., Inc. v. Town of Huntington*,
   316 F.3d 357 (2d Cir. 2003)....................................................................................15

*Fisher v. Vassar College*,
   70 F.3d 1420 (2d Cir. 1995)....................................................................................21

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
   388 F. Supp. 3d 145 (E.D.N.Y 2019) ........................................................32, 35, 51

*Gallagher v. St. Paul*
   619 F.3d 823 (8th Circuit 2010) ................................................................10, 11

*Gilmore v. Montgomery*,
   417 U.S 556 (1974)................................................................................42, 46

*Hazelwood Sch. Dist. v. United States*,
   433 U.S. 299 (1977)................................................................................34, 38

*Hollander v. American Cyanamid Co.*,
   *172 F.3d 192* ................................................................................................21

*Huntington Branch NAACP v. Town of Huntington*,
   844 F.2d 926 (2d Cir.)*, aff'd*, 488 U.S. 15 (1988) ........................................ *passim*

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977)................................................................................32

*Keepers v. City of Milford*,
   807 F.3d 24 (2d. Cir. 2015)................................................................................5

*Langlois v. Abington Hous. Auth*,
   234 F. Supp.2d 33 (D. Mass 2002) ................................................22, 23, 28

*Lowe v. Commack Union Free Sch. Dist.*,
   886 F.2d 1364 (2d Cir. 1989)................................................................18, 19, 21

*McAnaney v. Astoria Fin. Corp.*,
   665 F. Supp. 2d 132 (E.D.N.Y. 2009) ................................................................24

*MHANY Management v. County of Nassau*,
   819 F.3d 581 (2d Cir. 2016)................................................................................ *passim*

*Saint-Jean v. Emigrant Mortg. Co.*,
   337 F. Supp. 3d 186 (E.D.N.Y. 2018) ................................................................35

*Shannon v. Fireman's Fund Ins. Co.*,
   156 F. Supp. 2d 279 (SDNY 2001)................................................................21

*Smith v. Xerox Corp.*,
   196 F.3d 358 (2d. Cir. 1999), *overruled on unrelated grounds by Meacham v.*
   *Knolls Atomic Power Lab*., 461 F.3d 134 (2d Cir. 2006) ................................................ *passim*

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusve Cmtys. Project*,
   135 S. Ct. 2507 (2015)................................................................................ *passim*

*Tsombanidis v. W. Haven Fire Dep't*,
   352 F.3d 565 (2d Cir. 2003), *superseded on other grounds as stated in*
   *MHANY* 819 F.3d..................................................................................15, 17, 29

*U.S. v. Starrett City Assocs.*,
   840 F.2d 1096 (2d Cir. 1988).....................................................................................8

*Ungar v. NYCHA*
   363 F. App'x 53 (2d. Cir 2010) .................................................................................42

*United States v. City of New York*,
   637 F. Supp. 2d 77 (E.D.N.Y. 2009) .......................................................33, 34, 58

*United States v. Johnson*,
   616 F.3d 85 (2d Cir. 2010)........................................................................................24

*United States v. Yonkers Board of Education*,
   837 F.2d 1181 (2d Cir. 1987), *cert. denied,* 486 U.S. 1055, 100 L. Ed. 2d 922,
   108 S. Ct. 2821 (1988)..........................................................................................6, 11

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
   429 U.S. 252 (1977)....................................................................................5, 7, 10, 12

*Ward Cove v. Atonio*,
   490 U.S. 642 (1989), *superseded on other grounds by statute as explained in*
   *Smith v. City of Jackson,* 544 U.S. 228, 125 S. Ct. 1536 (2005) ................27, 29, 30

*Washington v. United States HUD*,
   2019 U.S. Dist. LEXIS 127027 (E.D.N.Y 2019)................................................35

*Williams v. N.Y. City Hous. Auth.*,
   879 F. Supp. 2d 328 (E.D.N.Y. 2012) ...................................................15, 20, 29

*Winfield v. City of N.Y.*,
   No. 15-CV-5236, 2016 U.S. Dist. LEXIS 146919 (S.D.N.Y. Oct. 24, 2016).............15, 40, 41

**Statutes**

42 U.S.C 3604(a) ........................................................................................................17

42 U.S.C. § 3613(a) ......................................................................................................5

336. The NYC Human Rights Law........................................................................17

Fair Housing Act ("FHA")........................................................................ *passim*

New York City Human Rights Law ("HRL") ...................................... *passim*

**Other Authorities**

24 CFR 42.325(a)...................................................................................................53

24 CFR § 100.5(d) ................................................................................................57

24 CFR § 100.500 d(1)(ii) .....................................................................................57

84 FR 42854 ..........................................................................................................57

Fed.R.Civ.Pro. Rule 37(c)(1) ...............................................................................33

NYC Admin. Code § 8-107(5)(a)(1) ......................................................................17

NYC Admin. Code § 8-107(17)(a)(1) ........................................................17, 35, 42

NYC Admin. Code § 8-107(17)(a)(2)

........................................................................................................51, 56, 59, 64

NYC Admin Code § 8-107(17)(b) ..........................................................................35

NYC Admin. Code § 8-504(d).................................................................................5

## <u>PRELIMINARY STATEMENT</u>

Like all cities across the United States, New York City grapples today with the consequences of the nation's history of slavery and racist laws, policies, and customs. This legacy of discrimination, segregation, and injustice has shaped the City's built and social environments, and is manifested in unequal access to wealth, safety, and stability among New Yorkers of varied racial and ethnic backgrounds. New York City – its residents and its public officials – have struggled to address these injustices over the course of many decades, taking steps forward and backward, sometimes simultaneously.[1]   More still needs to be done, but the City has been prioritizing policies and programs that promote fairness, equity, and justice for all New Yorkers.[2]

The City recently undertook an extensive review of its fair housing initiatives through its Where We Live NYC ("WWL") process. During the WWL process, the City solicited extensive stakeholder and public input to examine housing accessibility, affordability, and discrimination, as well as racial justice in transportation, schools, infrastructure, and public safety, and other areas, that impact fair housing. In a draft report made available to the public, the City outlined the barriers to fair housing identified during the WWL process and set forth its goals for the future.[3]

---

[1] For instance, in the 1950s the City passed some of the nation's first housing anti-discrimination laws, now set forth in the New York City Human Rights Law ("HRL"). The HRL law is enforced by the City Commission on Human Rights ("CCHR"), which investigates complaints of discrimination, conducts investigations, and commences lawsuits.  Also in the 1950s and 1960s, urban renewal programs demolished neighborhoods predominantly occupied by Black and Brown New Yorkers, displacing them from their homes and communities. *See* Been Dec. at ¶ 20.

[2] The City's broader strategy for building a stronger and more equitable City is set forth in OneNYC 2050. *See* https://onenyc.cityofnewyork.us/   The City's housing plan, Housing New York (HNY) and HNY 2.0 is also an essential part of the City's plan to build a more equitable city.   HNY and HNY 2.0 can be accessed at: https://www1.nyc.gov/site/housing/plan/download-the-plan.page

[3] The WWL draft report can be found at https://wherewelive.cityofnewyork.us/draft-plan/the-draft-plan/

Also a necessary part of fair housing and building an equitable city is the City's comprehensive housing plan. Building upon decades of programs and initiatives to increase and preserve the housing stock,[4] and the investment of tens of billions of dollars in housing development over the past thirty years, the City launched and is currently implementing an aggressive new housing plan, HNY and its successor, HNY 2.0. HNY and HNY 2.0 call for, and have succeeded in, producing record numbers of new affordable housing, in part through the passage of legislation mandating that affordable housing be built whenever developers obtain increases in density.[5] While the City's affordable housing program still has much work to do in order to meet the highest aspirations of the Fair Housing Act, the work already done in the WWL process, along with OneNYC 2050 and HNY and HNY 2.0, and the many policies and programs implemented as a result, serve as the blueprints for continued progress fighting discrimination, confronting segregation, and taking action to advance opportunity for all.

Tackling the housing crisis and promoting fair housing requires a multi-faceted strategy, combining housing preservation and construction with other anti-displacement and tenant protection measures. Such measures are critical because displacement and the fear of displacement caused by the severe housing crisis, and salaries that do not keep up with the rent, have been and continue to be a serious concern for the City and its residents. After suffering through a history of segregation, housing abandonment and disinvestment, and displacement

---

[4] For example, the City created the nation's first public housing authority in 1935. As early as the 1980s, the City began selling its *in rem* properties for the development of affordable housing while most cities facing similar disinvestment and abandonment were shrinking their affordable housing stock.

[5] Through the implementation of HNY and HNY 2.0, as of June 30, 2020, the City has subsidized the construction of more than 50,656 new affordable units and has preserved over 114,934 affordable housing units, and prior to COVID-19, had been on track to build or preserve 300,000 affordable units by 2026.   *See* Been Dec. ¶ 24 fn 14.

through urban renewal, low-income and Black and Brown communities are particularly fearful that they will not benefit from new investment in their neighborhoods and, instead, will ultimately be pushed out of their communities. This fear of displacement can be traumatic and all too often results in opposition to the development of desperately needed affordable housing.

At issue in this case is one piece of the City's complex efforts to address its affordable housing crisis. Plaintiffs have challenged the City's long-standing policy of prioritizing local residents in the allocation of half of newly built, City-supported affordable housing,[6] claiming that the policy intentionally and unintentionally discriminates against Black and Hispanic[7] New Yorkers on the basis of race. Although residency preferences are most often associated with the exclusion of Black and Brown people from predominantly White communities, that simply is not the case here. As the extensive discovery taken in this case demonstrates, the City's community preference ("CP") policy and its affordable housing program overall are unlike the residency preferences and affordable housing programs typically challenged under the Fair Housing Act.

Most importantly, the uniquely comprehensive data analyzed in this lawsuit show:[8] (1) Black and Hispanic New Yorkers disproportionately receive newly built affordable housing; (2)

---

[6] The City allocates a significant portion of the new affordable housing that it subsidizes through its Housing Lottery.  The New York City Department of Housing Preservation and Development ("HPD") uses a centralized electronic application database, which both advertises projects and allows applicants to apply for projects electronically (paper applications are also accepted).  When the application period ends, the database generates a log assigning each applicant a random log number. The log contains applicant information such as income and household size, which the private developers use to assess apparent eligibility for a unit in the project.  If at the time the developer reaches an apparently eligible applicant on the log, and an appropriate unit is still available, the developer will invite the applicant to verify eligibility. If the applicant is eligible, she will be offered a unit. The log also notes whether the applicant is eligible for a preference, such as the Community Preference.  Preference applicants are considered before non-preference applicants, in log order within the preference group.  For a more comprehensive explanation of the Housing Lottery, please see the accompanying Declaration of Margaret Brown.

[7] Although the complaint uses the terms "African American" and "Latino," the City has adopted the terminology used by both parties' experts in describing race, which is based on census categories of race.

[8] This list is not exhaustive, and is meant to only highlight some of the findings.

the City's newly built affordable housing projects undoubtedly improve the diversity of neighborhoods within a majority White population;[9] (3) among the recipients of newly built affordable housing in majority White neighborhoods, the largest share of local residents who had the benefit of the CP policy were Hispanic New Yorkers; (4) the rates at which Black New Yorkers and White New Yorkers are invited to verify their eligibility for newly built housing is almost identical; (5) the City's affordable housing projects have an overall integrative effect on the City's level of segregation.[10]

Together, this data indisputably shows that the CP policy does not have a negative and disproportionate impact on Black and Brown communities, nor does it perpetuate segregation in majority White neighborhoods or any other neighborhoods. While Plaintiffs present oversimplified conclusions regarding the purported discriminatory effect of the CP policy, they arrive at these conclusions through a convoluted methodology that does not conform to the generally accepted disparate impact methodology, and is thus both statistically and legally invalid.

In addition, these findings provide no support for Plaintiffs' allegation that City officials created, expanded, or currently maintain the CP policy in order to discriminate on the basis of race or to promote segregation. Moreover, since the CP policy does not discriminate on the basis of race or perpetuate segregation, it would be wholly irrational for City officials to support the CP policy with those goals in mind. Unsurprisingly, and despite years of discovery, Plaintiffs will be unable to meet their burden of proof to demonstrate that the reason City officials support

---

[9] This is based upon Plaintiffs' expert, Dr. Beveridge's majority White CD typology data.  While the City disagrees with the use of CD typologies, it is helpful here to understand how the projects improve diversity in majority White neighborhoods.

[10] This is based upon the Dissimilarity Index, a common measure of segregation.

the CP policy is to discriminate on the basis of race or to perpetuate segregation. Thus, the City is entitled to summary judgment dismissing all of the claims set forth in the Second Amended Complaint ("Complaint" or "Compl.").

## ARGUMENT

### POINT I

### PLAINTIFFS CANNOT ESTABLISH INTENTIONAL DISCRIMINATION

Plaintiffs cannot meet their burden to demonstrate that the City intentionally discriminated against Black New Yorkers[11] in the maintenance of the CP policy.[12] A plaintiff can establish a *prima facie* case of disparate treatment (intentional discrimination) "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *MHANY Management v. County of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016) (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 425 (2d. Cir. 1995)). A plaintiff need not rely on direct evidence of discriminatory intent, but can use circumstantial evidence to infer discriminatory intent. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) (setting forth the traditional factors considered in inferring discriminatory intent

---

[11] Although Plaintiffs are two Black women, *see* Compl. ¶¶ 14 and 15, Plaintiffs purport to assert their claims on behalf of Blacks and Hispanics *See* Compl. ¶¶ 178 and 179. Plaintiffs do not have standing to assert a claim on behalf of Hispanics, or any other protected class, other than the protected class that they are part of. *See Keepers v. City of Milford*, 807 F.3d 24, 40-43 (2d. Cir. 2015). As such, discussion of the CP policy's impact on Hispanics is generally limited. Nevertheless, even if Plaintiffs did have standing to assert a claim on behalf of Hispanics, they have failed to establish a *prima facie* on behalf of that protected group as well.

[12] The Complaint alleges that the City intentionally discriminated against Black New Yorkers applying for affordable housing in the adoption, expansion and maintenance of the CP policy. However, the adoption occurred in 1988 and the expansion in 2002, and consequently Plaintiffs are barred from challenging the adoption and expansion of the CP policy by the applicable statute of limitations. *See* 42 U.S.C. § 3613(a) (setting a 2 year statute of limitations for FHA claims); NYC Admin. Code § 8-504(d) (setting a 3 year statute of limitations for NYC HRL claims). However, even if not barred, as discussed below, Plaintiffs can point to no direct or circumstantial evidence of intentional discrimination in the adoption or expansion of the policy.

in the housing context); *MHANY,* 819 F.3d at 606. (quoting *Arlington Heights,* 429 U.S. 252 (1977)); *United States v. Yonkers Board of Education,* 837 F.2d 1181, 1221 (2d Cir. 1987) ("*Yonkers*")*, cert. denied,* 486 U.S. 1055, 100 L. Ed. 2d 922, 108 S. Ct. 2821 (1988). Disparate impact may also be considered evidence of intent but "impact alone is not determinative, and the Court must look to other evidence[.]" *MHANY,* 819 F.3d at 606. In the instant case, there is neither evidence of discriminatory intent—direct or circumstantial—by the City in maintaining the CP policy, nor does the CP policy cause any disparate impact on Black New Yorkers' ability to compete for affordable housing.

Moreover, even if Plaintiffs were able to meet their burden of inferring discriminatory intent, after doing so "the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its actions." *MHANY,* 819 F.3d at 612. Under this mixed-motive analysis, even if there is a finding of discriminatory intent, if the defendant demonstrates that it would have undertaken the challenged action for a legitimate purpose alone, there is no liability. *Id*. at 613. It is indisputable that the City has maintained the CP policy for a legitimate purpose.

### A.      Plaintiffs Lack Evidence of Discriminatory Intent

The City is entitled to summary judgment as Plaintiffs will be unable to produce evidence of discriminatory intent or evidence that could infer discriminatory intent. Not only have Plaintiffs failed to demonstrate that the CP policy has a disparate impact, it is undisputed that the housing lottery and lease-up process ("Lottery Process") with the CP policy in place has an integrative effect on the city. *See infra* Sections II and III. Moreover, Plaintiffs did not plead

their allegation of intentional discrimination based upon the *Arlington Heights* factors; a clear concession that they cannot meet this well-established standard.[13]

Instead, Plaintiffs propose their own five-part "test" for demonstrating circumstantial evidence of discriminatory intent, and allege that they have met their burden under this "test" because "[t]he City's . . . decisions to establish, maintain, and expand the [CP] policy: (a) were made in the face of a history of discrimination and segregation encouraged by and participated in by the City; (b) were made knowing, or being deliberatively indifferent to, the policy's clear disparate impact on opportunity to participate on equal terms and its tendency to perpetuate segregation; (c) constituted choices to reject more pro-integrative alternatives; (d) are reflective of the City's consciousness of what policies it thought that particular racial and ethnic groups "wanted," as well as other race awareness; and (e) responded to racially- and ethnically-influenced community and political opposition." Compl. at ¶ 8. Plaintiffs' attempt to demonstrate intentional discrimination in such a manner fails as a matter of law and is also unsupported by the evidence.

First, while the City acknowledges that, like all cities in this nation, it has been shaped by decades of discrimination against Black and Brown communities; that tragic history does not render any race-neutral policy that has been developed since then intentionally discriminatory, and Plaintiffs are unable to produce evidence of any nexus between the CP policy and that history.

---

[13] Nor do Plaintiffs have evidence to satisfy the well-established *Arlington Heights* factors that would be sufficient to create a material issue of fact. The Arlington Heights factors include the following: the historical background of the decision, departures from the normal procedural sequence, substantive departures, and the legislative or administrative history. *See Arlington Heights,* 429 U.S. at 267-68.

To the contrary, the CP policy originated out of a sense of justice and equity for the low-income and predominantly non-White communities that had struggled through years of abandonment and disinvestment in the city, which caused many residents to suffer from displacement and relocation, often to poor quality housing. In the 1980s, when the City started to sell *in rem* properties for the development of affordable housing in what were predominantly low-income communities, residents of those communities wanted and deserved a chance to benefit by having a greater opportunity to move into the high-quality affordable housing being built or rehabilitated in their neighborhoods. *See* Declaration of Deputy Mayor Vicki Been, dated August 14, 2020 ("Been Dec.") ¶ 41.

Second, Plaintiffs are unable to demonstrate that the City maintained the CP policy knowing of or being deliberately indifferent to its alleged disparate impact or tendency to perpetuate segregation. As set forth in sections II and III, *infra*, the CP policy does not have a disparate impact nor does it perpetuate segregation. In fact, it disproportionally serves Black New Yorkers and diversifies neighborhoods. *See* Declaration of Bernard R. Siskin, dated August 13, 2020 ("Siskin Dec.") at Table 5 and ¶ 7 .[14]

Third, Plaintiffs' assertion that they will demonstrate that the City "rejected more pro-integrative policies" lacks merit. The underlying premise to this assertion is that there is a clear definition of what is the "most" integrative policy, and that there is an obligation to pursue the *most* integrative policy option. However, there is no such legal obligation. *See e.g. U.S. v. Starrett City Assocs.,* 840 F.2d 1096 (2d Cir. 1988) (holding that quotas intended to maintain

---

[14] Further, prior to adopting a policy, the City does not have an obligation under the FHA to undertake disparate impact analyses. *See Churches United for Fair Hous., Inc. v De Blasio*, 180 A.D.3d 549 (1st Dep't 2020). Even if the City had undertaken such analysis it would have been impossible to predict in the 1980s,or even prior to the 2002 expansion, the dramatic changes in the city's neighborhoods and demographics, and in people's preferences about where to live that would be necessary to conduct such analysis.

integration violated the FHA). Moreover, cities have many competing goals and priorities that must be carefully balanced. The City seeks to both create opportunities for people to move to neighborhoods of their choice, which may have different racial demographics or amenities, while also ensuring that neighborhoods in which people now live receive the investment they need to provide their residents better amenities and opportunities if they choose to stay. Indeed, the Supreme Court opined that "[t]he FHA is not an instrument to force housing authorities to reorder their priorities." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusve Cmtys. Project,* 135 S. Ct. 2507, 2522 (2015) ("*Inclusive Communities*").

Finally, Plaintiffs' fourth and fifth assertions likewise fail. Plaintiffs have little to no evidence demonstrating that the City knows what particular racial groups "want."[15] Nor is "racially- and ethnically-influenced community and political opposition" necessarily invidious. As the Supreme Court explained, "mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset." *Inclusive Communities,* 135 S. Ct. at 2525. People often organize around others of their race or ethnicity to address concerns that matter to their community. "This is particularly true and important for communities that have been historically discriminated against and disenfranchised." Declaration of Edward G. Goetz, dated August 13, 2020 ("Goetz Dec.") at ¶ 75. That the City may be responsive to Black and Brown communities' legitimate concerns (in particular here, the fear of displacement) does not

---

[15] Plaintiffs' initial disclosures include the City's "Proposed Consolidated Plan Annual Performance Report 2012: Affirmatively Furthering Fair Housing Statement" in which the City, in response to a public comment explains that "community districts with large Black and Hispanic populations want this community district preference...." *See* Polifone Dec. Ex. 41. Even if acknowledging the racial makeup of particular neighborhoods or of particular advocates for a position were evidence of discriminatory intent, it would be evidence discriminatory intent against White New Yorkers, not Black New Yorkers, as is alleged by Plaintiffs in the Complaint.

mean that the City has discriminatory intent with regard to other racial or ethnic communities (or the community to which it is responding).

Moreover, it is well-settled that in order to establish a *prima facie* case based upon the racial animus of others, a plaintiff must demonstrate that the decision-makers "were knowingly responsive" to those with invidious concerns. *MHANY,* 819 F.3d at 611 (internal quotations and citations omitted). Thus, even to the extent that Plaintiffs believe they have evidence demonstrating there are people who oppose affordable housing out of racial animus or a desire to maintain the city's current residential patterns by race,[16] such purported evidence is meaningless because Plaintiffs cannot demonstrate that the City was motivated to maintain (or adopt or expand) the CP policy in response to such invidious opposition. *See Arlington Heights* 49 U.S. at 269-70 (although the District Court found that some opponents of plaintiffs' requested zoning change "might have been motivated by opposition to minority groups," the evidence evaluated by the Supreme Court did not warrant the conclusion that this motivated defendants); *See also Gallagher v. St. Paul* 619 F.3d 823 (8th Circuit 2010) ("Merely calling these statements evidence of racial animus is not enough to create a genuine dispute of fact.").

Furthermore, Plaintiffs' claim that the CP policy is responsive to such race-based opposition is not logical. Those concerned with trying to "maintain the racial status quo" of their neighborhood by excluding Black and Brown New Yorkers would not be satisfied with the CP policy, because the CP policy can "promise" nothing more than the mere possibility that fewer

---

[16] To the extent that Plaintiffs will rely upon the opinions of their purported expert, Myron Orfield, as evidence that the CP policy is responsive to people who fear racial change or want to maintain the racial status quo, such reliance is misplaced. The City has moved to exclude the testimony of Professor Orfield as his report contains nothing more than unsupported and conclusory opinions based upon a lack of understanding of the City's legitimate government interests and the housing needs in New York City. Moreover, the assertion of any opinion that the City has been responsive to such animus through the maintenance of the CP policy is not an appropriate expert opinion.

non-White New Yorkers might move into 50% of the units subject to a lottery at the time the units are first leased (as the CP policy does not apply once an original tenant vacates a unit). *See* Been Dec. ¶¶ 62, 63. Moreover, this "logic," which is based on the assumption that the CP units will go to the majority race in the Community District ("CD"), is counter to Plaintiffs' own data. Hispanic New Yorkers living in majority White areas were the largest number of applicants and recipients of housing with the CP preference in those areas.[17] *See* Siskin ¶ 146. Black New Yorkers living in plurality White areas were the largest number of applicants and recipients of housing with the CP preference in those areas. *Id.*

In reality, the CP policy helps to enable the City to build affordable housing by overcoming opposition to such housing caused by fears of displacement. As a result of the CP policy, affordable housing—which has an integrative effect and disproportionately houses Black New Yorkers—is approved and built, not blocked. This is wholly distinct from the typical fair housing cases, in which opposition often results in the affordable housing (or zoning change to facilitate affordable housing) in majority White areas being stalled or rejected. *See e.g., MHANY,* 819 F.3d 581 (denying application to rezone to facilitate construction of affordable housing), *Huntington Branch NAACP v. Town of Huntington,* 844 F.2d 926 (2d Cir.)*, aff'd,* 488 U.S. 15 (1988); *Yonkers*, 837 F.2d at 1220 ("over a period of more than three decades, the City approved no housing for minorities in any area that was not in or close to an already heavily minority area.") *See also Inclusive Communities,* 135 S. Ct. at 2522-23 (lawsuits targeting "housing restrictions that function unfairly to *exclude* minorities from certain neighborhoods without any

---

[17] This statistic is based upon Dr. Beveridge's majority White CD typology (data groupings he created based upon the racial demographics of the community preference area).  Further, the reference to applicants is technically apparently eligible applicants, applicants that, based on self-reported income and household size, are eligible for at least one unit in the project applied to.

sufficient justification" "reside at the heartland of disparate-impact liability" (emphasis added)). *See* also Goetz Dec. ¶ 79. There simply is no nexus between the CP policy and preventing the construction of affordable housing or the perpetuation of segregation because the CP policy has the opposite effect—increasing the number of newly built affordable housing units, which helps reduce the level of segregation and serves Black and Brown New Yorkers disproportionately.

Finally, while the Complaint alleges that the City is discriminating against Black and Hispanic New Yorkers, the "evidence" [18] of raced-based opposition to affordable housing Plaintiffs have presented to their purported experts is predominantly opposition from Black and Brown communities. *See* ECF 894-1 This "evidence" of "racially- and ethnically-influenced" opposition to development does not establish the harm alleged by Plaintiffs— that Black affordable housing applicants have a lack of access to White neighborhoods of opportunity. *See* Compl. at ¶¶ 7 and 100.

In sum, Plaintiffs will not be able to present direct or circumstantial evidence to demonstrate discriminatory intent. They do not even attempt to do so under the well-established *Arlington Heights* factors, nor will they be successful in their attempt to demonstrate intent based on their own five part "test." Additionally, Plaintiffs have no evidence of a nexus between the "evidence" of race-based opposition or a desire to maintain the racial status quo and the CP policy. Thus, as the Second Circuit decided in *Comer*, "summary judgment is warranted [here,]

---

[18] Plaintiffs will likely point to approximately twenty documents (out of over 27,000 documents produced) and 8 deposition excerpts from 7 fact witnesses (out of 23 fact depositions from 21 witnesses) resulting from over three years of discovery (during which the City searched for documents from some custodians dating as far back as Jan. 1 2002, and for the majority of the custodians from Jan. 1, 2010) that they believe are evidence that there is race-based opposition to affordable housing. These are the documents and deposition excerpts that Plaintiffs provided to their purported expert Professors Orfield from which he drew his opinions. *See* ECF. 894-1. Presumably, if Plaintiffs believed that they had further evidence of racial animus to infer discriminatory intent they would have shared it with their purported expert so he would have a more full foundation for his opinion. Moreover, much of the "evidence" is likely inadmissible, as several of the Exhibits are not even City documents and many of the deposition excerpts contain objections to the operative questions.

where the non-moving party has no evidentiary support for an essential element on which it bears the burden of proof." *Comer v. Cisernos* at 787 (quoting *Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1217 (2d Cir. 1994)).

**B.     The City Has Legitimate Non-Discriminatory Reasons for the CP policy**

Under the mixed-motive standard, even if the Court were to find that there was a question of fact as to whether Plaintiffs could establish their *prima facie* case of intentional discrimination, the City is still entitled to summary judgment, because the City has indisputable, legitimate, non-discriminatory reasons for the maintenance[19] of the CP policy and it would have maintained the CP policy for these non-discriminatory reasons alone. *See MHANY,* 819 F.3d at 612 (citing *Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown,* 294 F.3d 35, 49 (2d Cir. 2002)). See also Palmer v. Mae, 755 F. App'x 43, 45 (2d Cir. 2018) ("once a plaintiff has established a prima facie case of discrimination, the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision")

As discussed more fully in section IV, *infra*, the CP policy helps prevent the displacement of low‑income people from their communities, assuages the fear of displacement, and helps overcome opposition to affordable housing that is rooted in a fear of displacement. Many affordable housing projects and all zoning actions that facilitate affordable housing development are subject to a comprehensive public review process in which several public hearings are held, culminating in a vote by the City Council. The fear of displacement "is one of the most prominent and consistent housing concerns expressed by the public, community leaders and CMs. "[O]ne of the most prominent and consistent housing concerns expressed by the

---

[19] The CP policy was adopted in 1988. *See* Been Dec. ¶ 40.

public, community leaders and CMs" is the fear of displacement, which the CP policy helps mitigate. *See* Been Dec. ¶ 65.

It is undisputed that displacement of low-income people in the city is occurring and that such displacement is a serious public policy concern. *See* Declaration of Frances Polifione, dated August 14, 2020 ("Polifione Dec.")  at Exs. 45 (Beveridge at 34:22-35:1) and 49 (Orfield at 63:18-20 and 53:3-20; 56:13-20; 79:13-80:1) and 44 (Beveridge rebuttal report, generally). Studies estimate the rate of displacement in New York City to be between 5.1 and 7.1 percent a year. Consequently, since 2015, the year the complaint in this lawsuit was filed, 50,000 to 90,000 households (or approximately 128,000 to 231,000 people) have been displaced. *See* Goetz Dec. at¶ 27.  Further, the record is replete with evidence of the fear of displacement by community members and Council Members, and the opposition to affordable housing triggered by such fear. *See* Been Dec. ¶¶41-51; City's Statement of Facts ("City 56.1")[20] ¶¶ 9,14,15,77,82,84,85,109,110,111,112, and 113. Therefore, under the mixed-motive standard, the City is entitled to summary judgment even if the Court were to find an issue of fact as to whether Plaintiffs could meet their *prima facie* burden.

**POINT II**

**THE CP POLICY DOES NOT HAVE A DISPARATE IMPACT**

Plaintiffs, two Black women, allege that the CP policy caused them to "suffer a disparate impact based on race in the opportunity to compete for affordable housing opportunities." Compl. at ¶¶15, and 184. In order to establish a *prima facie* case of disparate impact, Plaintiffs must show that an outwardly neutral practice had a significantly adverse or disproportionate

---

[20] Citations to the City's 56.1 include references to the exhibits referenced therein.

impact on a protected class. *See MHANY,* 819 F.3d at 617 (citation omitted); *Tsombanidis v. W. Haven Fire Dep't,* 352 F.3d 565, 574-75 (2d Cir. 2003), *superseded on other grounds as stated in MHANY* 819 F.3d at 619; *Winfield v. City of N.Y.,* No. 15-CV-5236, 2016 U.S. Dist. LEXIS 146919, at *18-19 (S.D.N.Y. Oct. 24, 2016); *Fair Housing in Huntington Comm., Inc. v. Town of Huntington*, 316 F.3d 357, 366 (2d Cir. 2003) (citation omitted).

If a plaintiff demonstrates a "significantly adverse or disproportionate impact on a protected class," a plaintiff must also prove the challenged "practice actually or predictably results in discrimination." *Tsombanidis,* 352 F.3d at 575  (emphasis added). In other words, "the *plaintiff* must show a causal connection between the *facially neutral* policy and the alleged discriminatory effect." *Id*.; *Accord Williams v. N.Y. City Hous. Auth.,* 879 F. Supp. 2d 328, 336 (E.D.N.Y. 2012). A plaintiff has not met its burden "if it merely raises an inference of discriminatory *impact.*" *Tsombanidis,* 352 F.3d at 575*; Accord Williams* 879 F. Supp. 2d at 336. As the Supreme Court in *Inclusive Communities* explained "[a] robust causality requirement ensures that racial imbalance does not, without more, establish a prima facie case of disparate impact and thus protects defendants from being held liable for racial disparities they did not create." *Inclusive Communities,* 135 S. Ct. at 2523 (internal citations omitted).

A.     **Plaintiffs Have Failed to Demonstrate that the CP policy has a Disproportionate Impact on Black New Yorkers Applying for Affordable Housing**

Plaintiffs assert that there are "substantial relative disparities" for "non-dominant" racial groups (1) relative to the CD typology they are applying to, (2) depending on the stage in the lottery; and (3) whether or not their application benefits from the CP policy (meaning is either a CP beneficiary or non-CP beneficiary, which is referred to as "CP status" hereafter). Pls. MOL at 16 (ECF 882 at 23). There are multiple, fundamental flaws in Plaintiffs' analysis, each of which, individually or together, necessitates granting the City's motion for summary judgment.

As will be demonstrated further below, the first fundamental flaw in Plaintiffs' analysis is Dr. Beveridge's failure to demonstrate or even conclude that the CP policy has a disparate impact on Black people as a group or on any other protected class. Second, Dr. Beveridge improperly aggregates the data into artificially contrived "CD typologies" as the basis for his analysis. Third, Dr. Beveridge studies the incorrect outcome of interest, focusing on CP status rather than the impact of the CP policy on the Lottery Process (and therefore housing outcomes). Fourth, Plaintiffs' analysis is done at the incorrect stage of the Lottery Process, and thus fails to isolate the impact of the CP policy. Fifth, Plaintiffs' "statistical significance analysis," which had not been included in Dr. Beveridge's reports or supplemental reports, was conducted improperly and should not be considered. Finally, Plaintiffs fail to meet their burden to demonstrate that the CP policy causes the purported impact that they claim.

### (a) Plaintiffs' Analysis Fails to Show an Impact on a Protected Class

Plaintiffs' expert, Dr. Beveridge, fails to conclude that the CP policy has a disparate impact on Blacks as a group, or any protected class, no matter where or when they apply for affordable housing. Instead, Dr. Beveridge concludes that the CP policy "generally operates to the material detriment of members of a racial or ethnic group when members of that group are applying for housing outside of the CD typology in which they are dominant." *See* Beveridge Dec. (ECF 883) at ¶ 8. Based upon this conclusion, Dr. Beveridge's purported "protected class" comprises any "members of a racial or ethnic group when members of that group are applying for housing outside of the CD typology in which they are dominant."  Ostensibly, Plaintiffs' asserted protected class translates to "Black applicants depending on the racial demographics of where they apply for housing and their CP status when applying." Not having the CP (or being an "outsider" in Plaintiffs' terms) and not being the same race as the dominant race of the CD typology in which you apply to housing is not a protected class under the law.

A protected class is a static and defined group of individuals – it does not change based on other outside factors, such as CP status, location of where one lives, or the characteristics of people other than the class members living in an area. The Fair Housing Act ("FHA") makes it unlawful to "refuse to ... otherwise make unavailable or deny, a dwelling to any person *because of race, color, religion, sex, familial status, or national origin*." 42 U.S.C 3604(a) (emphasis added). *See also Tsombanidis,* 352 F.3d at 575; *Willliams* 879 F. Supp. 2d at 336. The NYC Human Rights Law ("NYC HRL") provides that a plaintiff may demonstrate "a disparate impact to the detriment of any *group* protected by the provisions of this chapter." NYC Admin. Code § 8-107(17)(a)(1).[21]

Plaintiffs' purported protected class of some Black applicants depending on their CP status and the racial demographics of where they apply constitutes an inappropriate attempt to bring a disparate impact action based upon a fluid subgroup of a protected class.[22] Under Plaintiffs' theory, an applicant could both be in a protected class and not in a protected class at the same time, which is wholly improper for a disparate impact analysis.[23]  *See* Siskin at ¶ 30. Contrary to Plaintiffs' results-driven position, the protected class at issue here is Black New Yorkers, wherever and whenever they apply for affordable housing. As the Second Circuit has explained, "the discriminatory effect of a rule arises in two contexts: adverse impact on a

---

[21] The chapter defines protected groups as "actual or perceived race, creed, color, national origin, gender, age, disability, sexual orientation, uniformed service, marital status, partnership status, or alienage or citizenship status of any person or group of persons, or because of any lawful source of income of such person or persons, or because children are, may be or would be residing with such person or persons." NYC Admin. Code § 8-107(5)(a)(1).

[22] Plaintiffs' "class" depends not on the characteristics of a person, but on the characteristics of that person in relation to the racial demographics of where she applies and her CP status for a given project.

[23] For instance, a Black New Yorker who is a non-CP beneficiary applying in a majority Black CD typology would not be harmed under Plaintiffs theory (while a White non-CP beneficiary would be harmed) and thus would not be part of the protected class. Yet, when that same Black non-CP beneficiary applies to a majority White CD typology, she is allegedly harmed and is part of the protected class.

particular minority group and harm to the community generally by the perpetuation of segregation." *See Huntington*, 844 F.2d at 937.

Courts routinely reject claims of disparate impact based upon subgroups of a protected class, because the fundamental notion of disparate impact is that the neutral policy has an adverse effect on a protected class as a whole, not an arbitrary sub-set of the protected class. *See, e.g., Smith v. Xerox Corp.*, 196 F.3d 358, 369 (2d. Cir. 1999), *overruled on unrelated grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134, 141 (2d Cir. 2006) ("[I]t would be nonsensical for a court to decide that only some of these plaintiffs established a prima facie case of disparate impact when they all purport to specify the identical employment practice as causing a disparate impact"); *Criley v. Delta Airlines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997) (affirming summary judgment in favor of defendant where plaintiffs acknowledged that the policy at issue had "no negative impact" on the entire protected group). *See also* Siskin at ¶ 19. To state a claim, the disparate impact must be against the entire protected class, not just the plaintiffs, or a subgroup of the protected class. *See Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989) ("the Supreme Court generally has focused not on the individual plaintiff as much as on the adverse effect of the challenged practice *on the protected group* of which the plaintiff is a member"); *Attenborough v. Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 386 (S.D.N.Y. 2009) ("[d]isparate impact claims concern the entire population affected by the identified practice, not merely the subset of affected laborers who happen to have brought suit").

Plaintiffs here are not only asserting claims based upon a subgroup of a protected class, but because of their analysis results, have abandoned asserting claims with regard to some races in some CD typologies (the data groups created by Dr. Beveridge based upon the racial

demographics of a project's CP area) at certain stages of the lottery. *See* Pls. MOL 16, 17 fn 16 (ECF 882 at 23-24) and Siskin ¶¶ 32-36 and Table 1. Thus, Plaintiffs have not only improperly defined their protected class as a fluid subgroup of a protected class (e.g. Black applicants when they are non-CP beneficiaries and the non-dominant group in a CD typology), but based upon their analysis results, they have cherry-picked even smaller subgroups from which they assert their claims of disparate impact.[24] However, determining the protected class based upon the analysis results is not only legally unsupported, see *Xerox* 196 F.3d at 369-71, but is an invalid statistical analysis. *See* Siskin Dec. ¶¶ 37-38.

As a result of Plaintiffs' cherry-picking from their analysis results, Plaintiffs are now only asserting a disparate impact claim on behalf of 42.41% of apparently eligible applicants.[25]  *See* Siskin at ¶ 35; Table 1. This translates into an acknowledgment by Plaintiffs that more than half of Black apparently eligible applications are not disparately impacted in their ability to be awarded a unit. Such "'disparity' [does not] support the inference of discrimination that the disparate impact approach permits when those outside a statutorily protected group are preferred over those included in that group." *Lowe*, 886 F.2d at 1373.

### (b)  <u>Race-Based "CD typologies" are the Improper Aggregate</u>

---

[24] Most notably, Plaintiffs have abandoned any claim on behalf of any race regarding awards in any plurality CD typology because Dr. Beveridge's analysis demonstrates that the dominant group for each plurality CD typology is *not* the dominant group selected. For example, in a plurality White CD typology, Blacks are the group with the highest percentage of CP awards. *See* Beveridge Dec. (ECF 883) at Table 10 ¶ 130; Table 8 ¶ 121. *See also* Siskin Dec. at ¶ 34.

[25] "Apparently eligible applicants" are those applicants that meet income and household eligibility criteria for a specific project based upon self-reported information submitted on their application.  Each affordable housing project typically has multiple income bands, multiple size apartments (e.g. 1 bedroom, 2 bedroom), and corresponding income ranges and household sizes.  For instance, a one bedroom unit at 40% Area Median Income ("AMI") will allow a household of one, two or three people, and an income of range of $25,338 to up to $36,400 for a household of two. A two bedroom unit at 40% AMI will allow a household of two, three, four or five people and an income range of $30,960 to up to $36,400 for a household of two. The incomes ranges are set so that the rent for each unit will be no greater than 30% of the household's income.  *See* Brown Declaration at ¶ 6.

Rather than simply looking at the aggregated affordable housing project data to compare the citywide impact of the CP policy on Black applicants with the impact on White applicants, Dr. Beveridge grouped projects together based upon the racial demographics of the community preference area ("CP area")[26] in which projects are located,[27] which he labeled "CD typologies." Dr. Beveridge then undertook his analysis based upon these race-based CD typologies.

However, the CP policy is applied throughout the city, irrespective of the racial demographics of the location in which the project is built. In circumstances where a challenged policy is being applied consistently across multiple locations, there is no basis to analyze each location separately. *See* e.g. *Williams,* 879 F. Supp. 2d at 337-338 (suggesting that a proper disparate impact analysis of a policy that applied to all NYCHA complexes should not be limited to a single complex so as to use the proper population for comparison). As Dr. Siskin explained:

> undertaking the analysis on race-based CD typologies is like analyzing the results of an employment test by the racial demographics of the location of the test takers. The location of where a test is taken, let alone the racial demographics of that test location, is irrelevant to the issue of any disparate impact of the test on a particular race. If passing the test in each location is valued the same in the hiring process, then it is the overall pass rate of each race that matters, and not the pass rate at each location.

Siskin at ¶ 24. Thus, as the CP policy is uniformly applied across the City, it should be analyzed based upon the citywide data, and not smaller race-based groupings. *See* e.g. *Smith v. Xerox Corp.*, 196 F.3d at 369-70.

---

[26] Most often, the preference area is the CD in which the project is located. For some projects, multiple CDs received the preference.

[27] The experts studied 168 projects' applicant and award data. These projects went through the Lottery Process between 2012 and 2017.  The projects studied were located in many different parts of the City.

By aggregating the data into the small racially defined groups that Beveridge created, Dr. Beveridge deliberately and improperly manipulated the data toward a self-serving outcome. *See Hollander v. American Cyanamid Co., 172 F.3d 192, 203 (2d. Cir 1999* (finding that the expert's age groupings for analysis were misleading); *Xerox*, 196 F.3d at 370; *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364, 1373 (2d Cir. 1989); *Fisher v. Vassar College*, 70 F.3d 1420, 1443 (2d Cir. 1995) (plaintiff may not "gerrymander" data to skew the results of statistical analyses); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279 (SDNY 2001).[28]

The methodology employed by the Plaintiffs here is similar to that which was used by the plaintiffs and rejected by the Second Circuit in *Smith v. Xerox*. In *Xerox*, a group of plaintiffs alleged that Xerox's decision-making process for reducing its work force had a disparate impact based on age. *Xerox*, 196 F.3d at 363. The expert for the plaintiffs undertook analysis based upon the work units that the plaintiffs had been laid off from, sometimes combining work units to create a larger pool. The expert found a disparate impact based upon age in all of the work units he studied. *Xerox*, 196 F.3d at 366-67. The Second Circuit rejected that analysis, granting the defendant summary judgment due to the improper subgroup analysis. The Court explained its rejection of the subgroups in the following manner:

> In any large population a subset can be chosen that will make it appear as though the complained of practice produced a disparate impact. Yet, when the entire group is analyzed any observed differential may disappear, indicating that the identified employment practice was not the cause of the disparity observed in the subset....

*Xerox,* 196 F.3d at 369. The Court thus concluded that:

---

[28] Although these cases involve employment rather than housing discrimination, the case law is applicable here. *See Inclusive Communities*, 135 S. Ct. at 2522-23

> [I]t would be nonsensical for a court to decide that only some of these plaintiffs established a prima facie case of disparate impact when they all purport to specify the identical employment practice as causing a disparate impact. The decision-making process either caused a disparate impact or it did not.

*Xerox,* 196 F.3d at 369-71.

Similarly here, Plaintiffs are challenging a policy used in affordable housing lotteries throughout the city. Despite this, Plaintiffs undertook their analysis based upon small race-based groupings of the population—CD typologies—rather than the citywide aggregated data. That improper analysis purports to show a disparate impact in some, but not all, of the CD typologies against some, but not all, Black applicants, and it fails to assess the impact of the CP policy on any protected class. Thus, based upon *Xerox,* Plaintiffs' analysis by CD typology fails as a matter of law.

Plaintiffs clearly recognize the weaknesses in their use of CD typologies, and go to great lengths to try to justify their self-serving analysis. Despite Dr. Beveridge acknowledging that there is no disparate impact if the analysis is done citywide, ("one can imagine some saying, what is the problem...each racial group is helped somewhere...") Beveridge Dec. (ECF 883) at ¶ 28, Plaintiffs insist that his analysis by CD typology is necessary to address applicants' "local preferred area" and show a "discriminatory pattern" of how the CP policy operates. Pls. MOL at 11, 12 (ECF 882 at 19, 20). However, Plaintiffs have cited to no case law in support of their race-based CD typologies.

Instead, Plaintiffs, in a strained argument, attempt to distinguish their approach from a Second Circuit case, *Comer v. Cisneros,* 37 F.3d 775 (2d Cir. 1994), and attempt to align themselves with a Massachusetts district court case, *Langlois v. Abington Hous. Auth,* 234 F. Supp.2d 33 (D. Mass 2002). Pls. MOL at 11 (ECF 882 at 18). However, neither case is on point

because neither case addresses the scenario before the Court, which is Plaintiffs' aggregation of data based upon race. *Comer*, which challenged a local preference for the Section 8 waitlist applied to a consortium of suburban towns, was decided on standing grounds and not the merits, and the decision contains no discussion of expert analysis or how to analyze data. Nor does Plaintiffs' reliance on *Langlois* serve their purposes. In *Langlois,* the plaintiffs also challenged a local preference for Section 8 waitlists in multiple towns, but while the analysis was undertaken for each town separately, the issue of whether that was the correct approach was not raised or addressed by the court.[29] Moreover, each town was a separate defendant with separate records, and each defendant implemented the challenged preference at different times.

Furthermore, the expert in *Langlois* treated each municipality separately and did not combine municipalities based upon racial demographics, or break down each municipality into groups based on racial demographics, in the way that Plaintiffs' expert created CD typologies here. *Id.*, 234 F. Supp.2d at 59-60. Here, there is a single defendant, a single set of records, and a single policy at issue. Thus, Plaintiffs' reliance upon *Langlois* and attempted juxtaposition of *Comer* with *Langlois* is misplaced.

Plaintiffs' reliance upon *Connecticut v. Teal,* this Court's decision on Defendant's Motion to Dismiss the Complaint (ECF 42), and *Inclusive Communities* to support their use of the "locally preferred area" approach is likewise misplaced. *Teal* stands for the proposition that a defendant cannot rely upon bottom-line analysis that demonstrates that there is no disparate impact when there is a dispositive step in the hiring process that impacts the plaintiff's

---

[29] In fact, the defendants did not even hire an expert. *Langlois*, 234 F. Supp.2d at 59.

opportunity to compete for the job. *Teal* does not address the degree to which the data should be aggregated for analysis, but instead addresses the proper stage in which to undertake analysis.

Like *Teal*, the Supreme Court in *Inclusive Communities* did not address the proper methodology for analyzing data, and Plaintiffs take this Court's decision on Defendant's motion to dismiss the complaint out of context. Contrary to Plaintiffs' arguments, that decision addressed whether Plaintiffs had sufficiently alleged there was an injury in order to confer standing to maintain the lawsuit, not how the parties should undertake their disparate impact analysis, and is not binding. *See e.g. Bank Leumi USA v. Ehrlich*, 98 F. Supp. 3d 637, 647 (SDNY 2015) (recognizing the "divergent standard of review applicable to motions to dismiss and motions for summary judgment"); *McAnaney v. Astoria Fin. Corp.*, 665 F. Supp. 2d 132, 135 (E.D.N.Y. 2009). *Cf. United States v. Johnson*, 616 F.3d 85, 93 (2d Cir. 2010) ("the application of law-of-the-case doctrine is generally inappropriate when relevant issues are governed by different standards of review").

Not only do Plaintiffs' CD typologies lack support in the law, but Plaintiffs' arguments in support of them are unsupported by the data. Despite trying to advance their "locally preferred area" argument in support of CD typologies, Plaintiffs have not conducted any analysis to support the proposition that there are "preferred areas" where all or even most Black applicants seek to live, or preferred affordable housing projects where all or even most Black applicants apply for housing units. Plaintiffs' analysis treats all CD typologies and all the affordable housing units within all the CD typologies as interchangeable. Plaintiffs' expert never identifies what the preferred affordable housing units are, what the preferred CD typologies are, or any

criteria for how such determinations would be made.[30]   Additionally, there is nothing "local" about the CD typologies. Any given CD typology will include projects from multiple CDs, and even multiple Boroughs, as the projects are grouped by racial demographics of their community preference area, and not based on their actual locations.

To the extent that Plaintiffs are assuming that Dr. Beveridge's majority White CD typology is the "preferred area," *see* Compl. at para 100, the Supreme Court explained that "disparate impact liability 'does not mandate that affordable housing be located in neighborhoods with any particular characteristic.'" *Inclusive Communities*, 135 S. Ct. at 2523(quoting 78 Fed. Reg. 11476). Nor does the data support the assumption that the preferred area among New Yorkers who have applied to newly built affordable housing is a majority White CD typology.[31]   Of all the applicants that applied to only one CD typology outside their CD, only 25.7% of Black applicants applied to one or more projects only in a majority White CD typology. *See* Siskin Dec. ¶ 43. Indeed, Plaintiff Noel testified that she applied to at least two projects due to their proximity to Harlem (one of the projects was studied in the litigation and was categorized by Dr. Beveridge as a majority Black CD typology).[32]   *See* Polifone Dec. at Ex. 42 (at 61:13-62:16). Notably, Plaintiff Noel explicitly stated "no" when asked whether racial demographics of a neighborhood mattered to her in where she lived. *See* Polifone Dec. at Ex.

---

[30] In order to undertake a disparate impact analysis based upon a "preferred area" Plaintiffs' expert would have had to rank the CD typologies based upon objective facts and then analyzed whether the protected class had a fair chance to compete for housing in the preferred areas.  *See* Siskin ¶ 44 fn 40.

[31] Plaintiffs' only differentiation between CD typologies is race. Thus, this "preferred area" argument is based upon the unproven and unstated assumption that the only consideration people make when deciding where to live is the racial demographics of the CD typology. In fact, when Plaintiffs themselves testified about how they choose which affordable housing lotteries to apply to, neither discussed the racial demographics of the neighborhood in which the project is located as a factor. *See* Polifone Dec. at Ex 42 (at 89: 17-19) and Ex. 43 (at 32:20-33:3; 33:14-20).

[32] Harlem is a majority Black neighborhood. *See* WWL at 71.

42 (at 52:2-13).  Plaintiff Senat applied to over 100 projects all over the City.  *See* Declaration of Margaret Brown, dated August 14, 2020 ("Brown Dec.") at ¶ 26. The projects that Dr. Beveridge studied in this litigation that Plaintiff Senat applied to were categorized as each CD typology type except majority Asian. *See* Siskin Dec. ¶ 43 fn 39.

Finally, there is no merit to Plaintiffs' attempt to justify their use of CD typologies by arguing that they illustrate the "existence of [discriminatory] patterns" (i.e. racial groups are disadvantaged in their ability to access housing areas where they are not the dominant race) created by the CP policy. Dr. Beveridge's analysis demonstrates that the dominant race in a CD typology does *not* always benefit most from the CP policy. As a result of the inconsistent results from Dr. Beveridge's analysis, Plaintiffs are now pursuing their disparate impact claim as to awards on behalf of only 38.20% of apparently eligible applicants of all races. *See* Siskin Dec. Table 1.

Moreover, even if such pattern were shown, it is irrelevant to a disparate impact analysis. Disparate impact asks *whether* Black New Yorkers are able to compete fairly in comparison to other racial groups. *See* Siskin  at ¶ 41. The racial demographics of *where* Black New Yorkers are able to compete for housing says nothing about *whether* the policy prevents them from competing for housing fairly. The racial demographics of *where* Black New Yorkers are awarded housing is a question that is relevant for an analysis of perpetuation of segregation, and as discussed in part III, *infra*, Plaintiffs have not only failed to demonstrate that the Lottery Process perpetuates segregation, but have shown that it in fact has an overall integrative effect.

In sum, Plaintiffs' expert's creation of and reliance on these race-based CD typologies is nothing more than an attempt to gerrymander the data for favorable results, is unsupported by the law, and has no legitimate basis.

### (c) **Plaintiffs' CP v. Non-CP Analysis Identifies the Incorrect Outcome of Interest**

Plaintiffs' analysis also improperly focuses on results by CP status (CP beneficiary v. non-CP beneficiary). More specifically, Plaintiffs' expert uses two methods, the "outsider-to-insider change" method (Method 1) and the "higher insider share" method (Method 2).[33] *See* Beveridge Dec. (ECF 883) at ¶¶ 64 and 74. Both methods are trying to describe the same thing—the extent to which a racial group is able to take advantage of being a CP beneficiary or having "insider" status. *See* Siskin at ¶ 48. However, the outcome of interest is not whether an applicant is a CP beneficiary. What is at issue here is whether and to what extent the CP *policy* has an *impact* on Black affordable housing applicants in their ability to compete for housing. *See* Siskin at ¶ 48. The allegation in the complaint is *not* that Black New Yorkers are being discriminated against in their ability to be CP beneficiaries, but that the CP policy discriminates against them in their ability to compete for housing. Dr. Beveridge's analysis that is limited to CP status only highlights the ability of Black New Yorkers to be CP beneficiaries as entrants, apparently eligible applicants,[34] and awardees, but not their ability to compete for housing.

While being a CP beneficiary does improve your odds, it does not guarantee that an applicant or apparently eligible applicant will be able to compete for affordable housing

---

[33] Contrary to Plaintiffs assertion, Method 2 is not a "selection rate" similar to what is used in the employment context. Plaintiffs' Method 2 looks at the number of CP awards of a race among all the awards, not among all the apparently eligible applicants. In the employment context, the selection would be the number of people hired of a particular race out of all the eligible applicants of that particular race. *See* Siskin at ¶¶ 54, 55; *Ward Cove,* 490 U.S. at 653 (1989) ("if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection probably does not have a disparate impact."). Thus, Plaintiffs undertake the incorrect comparison in addition to pursuing the incorrect outcome of interest.

[34] An apparently eligible applicant is one that, based upon the applicant's self-reported income and household size as set forth on her application, appears to meet the income and household size requirements for at least one unit in the project.

(meaning being reached and considered by a developer and given the opportunity to confirm eligibility and interest) or be awarded affordable housing. Some CP beneficiary entrants will never be considered by a developer, irrespective of the greater odds the CP policy confers on them because their log number is too high to be reached. Other CP beneficiary entrants will be considered and even awarded units but not because of their CP beneficiary status.[35]  Similarly, not being a CP beneficiary does not mean an entrant or apparently eligible applicant will not be able to compete for affordable housing or be awarded affordable housing because 50% of the affordable units are open to non-CP beneficiaries. In short, being a CP beneficiary is not a proxy for being able to compete for housing. *See* Siskin ¶ 49. *See also Langlois*, 234 F. Supp.2d at 61.

Moreover, Plaintiffs' methodology causes nonsensical results. Despite identifying the outcome of interest as being a CP beneficiary, under Plaintiffs' approach, not all non-CP beneficiaries are harmed equally. If a Black non-CP beneficiary applies to a CD typology in which her race is the majority race, Dr. Beveridge would claim that she is not harmed. Yet, if a White non-CP beneficiary applies to a project in that same CD typology, where her race is not the majority race, she would be harmed. Such inconsistent results, when both applicants are non-CP beneficiaries, undermines Plaintiffs' analytical framework focusing on the increased odds of a CP beneficiary as compared to a non-CP beneficiary.

Plaintiffs claim that they must undertake their analysis by CP status because they cannot compare "persons 'affected' by the policy with those 'not affected by the policy'" here "because all participants in all groups are affected." Pls MOL at 17 (ECF 882 at 24). As the Second Circuit

---

[35] For instance, a CP beneficiary may not be considered for one of the units allocated to people in the CD because the CP units are filled by the time her log number is reached, however, her log number may still be good enough that she is considered and awarded a non-preference unit. For a greater understanding of the Lottery Process, please see the accompanying Brown Declaration and Appendices B and D to the Siskin Declaration.

has explained, "to be probative of discrimination, statistics must compare the impact of a particular [policy] decision or practice on those within the protected group and those outside it." *Criley*, 119 F.3d at 105. *See also Tsombanidis*, 352 F.3d at 575 ("The basis for a successful disparate impact claim involves a comparison between two groups"); *Williams,* 879 F. Supp. 2d at 337-338*.* In the typical disparate impact case, all applicants are impacted by the policy in some way, as they are in this case. The question is whether applicants of a certain race (or other protected class) are disproportionately impacted. *See e.g. Ward Cove  v. Atonio*, 490 U.S. 642, 650-51 (1989)*, superseded on other grounds by statute as explained in  Smith v. City of Jackson,* 544 U.S. 228, 125 S. Ct. 1536 (2005).

Even if the issue before the Court were to determine which group had the most CP beneficiaries and could take advantage of the policy most, Plaintiffs' claim would fail. Simply looking at the overall percentage of each race's apparently eligible applications by CP status demonstrates that there is no practical or substantial difference between the racial demographics of apparently eligible CP beneficiaries and the racial demographics of apparently eligible applicants that do not have any preferences. *See* Siskin Table 2. For instance, apparently eligible applications submitted by Black CP beneficiaries constitute 39.7% of all apparently eligible applications submitted by CP beneficiaries, and applications submitted by Black apparently eligible applicants without any preference make up 36.6% of the apparently eligible applications submitted by apparently eligible applicants without any preference. *See* Siskin Table 2.

Indeed, Dr. Siskin demonstrated that Dr. Beveridge's CP status methodology is statistically invalid. Dr. Siskin tested Dr. Beveridge's methodology on a simple set of hypothetical facts in which it is clear that the CP policy has no impact on who is awarded a unit, and found that Dr. Beveridge's methodologies still resulted in an "impact" on Blacks. *See* Siskin

Appendices B and C. Although the facts of the hypothetical are simplified and thus not representative of the lottery, a fundamental mathematic axiom is that if a methodology is valid, it should be valid with any facts. *Id*. However, when Dr. Beveridge's methodologies were applied to the hypothetical facts that clearly demonstrate that the CP policy has no impact on the outcomes, Dr. Beveridge's methodologies failed to reach the same conclusion, and instead find a significant impact that Dr. Beveridge would attribute to the CP policy. *See* Siskin Dec. ¶¶ 55, 56; Appendix C. Consequently, Dr. Beveridge's analyses are statistically invalid and inaccurately attributes "impact" to the CP policy that is not caused by the CP policy at all. *Id.*

### (d) Plaintiffs Analyze the Incorrect Lottery Stages

The City is also entitled to summary judgment because the Plaintiffs have not studied the correct stage of the Lottery Process to establish their claim of a disparate impact in the ability to compete for affordable housing opportunities. While Plaintiffs fail to clearly define what the "ability to compete" means, Dr. Beveridge's analysis addresses the odds of being a CP beneficiary entrant and apparently eligible applicant (as compared to the odds of being a non-CP beneficiary entrant and apparently eligible applicant) and the rate of being a CP beneficiary awardee (as compared to the rate of being non-CP beneficiary). Thus, his analysis focuses on the purported impact of the CP policy on applicants, apparently eligible applicants, and awards.

However, the CP policy's impact is in determining the order in which applicants are reached and considered by a developer for a unit, because preference units, including CP units, are allocated first in the Lottery Process. The CP policy has no impact at the application (or entrant) and apparently eligible application stages. Anyone can apply for a unit in an affordable housing project. Similarly, the CP policy has no role in the determination of which applications are apparently eligible (i.e. satisfy income and household eligibility criteria for at least one unit based upon self-reported information). Thus, Dr. Beveridge's studies of entrants and apparently

eligible applications tells us nothing about the impact of the CP policy on the ability to compete for housing, and consequently cannot establish Plaintiffs *prima facie* case of disparate impact.

While the CP policy does have an impact on the awards, which Dr. Beveridge does study, such "bottom-line" study is not appropriate. A "bottom-line" analysis of the Lottery Process is not appropriate when the challenge is to a dispositive barrier at a specific stage of the overall process (i.e., here, the CP policy is part of the Consideration Stage, which is explained below).[36] *See Conn. v. Teal,* 457 U.S. 440, 452; *Dist. Council 37 v. N.Y. City Dep't of Parks & Rec* (2d Cir 1997).[37] Moreover, a "bottom-line" analysis studying awards confounds the CP policy with other factors such as actual eligibility and interest, each of which impact whether an applicant is awarded a unit. *See* Siskin Dec. ¶¶ 67, 68.

While Dr. Beveridge only studies the odds of being a CP beneficiary, entrant and apparently eligible applicant, and the rate of being a CP beneficiary awardee,[38] Dr. Beveridge argues that the "ability to compete" is about being reached and considered by the developer. *See* Siskin Dec. ¶ 149 (discussing Beveridge Dec. ¶¶ 180-181). That is the stage—the Consideration Stage—that Dr. Siskin actually studied, and that Dr. Beveridge should have studied. *See* Section III, *infra*, and Siskin Dec. ¶ 149. Despite his acknowledgment of what the "ability to compete" means, Dr. Beveridge failed to undertake any analysis at the appropriate stage in the Lottery

---

[36] While the CP policy is not a dispositive barrier, it has its impact during the Consideration Stage of the Lottery Process, which can be separated out from the overall Lottery Process, and is dispositive. *See* discussion of the Consideration Stage in Section II.B.a, *infra*.

[37] Indeed, Plaintiffs acknowledge that Dr. Beveridge's analysis of awards is improper, conceding that "the lack of level playing field in terms of competition cannot be saved even were defendant able to show bottom-line racial balance..." Pls. MOL at 10 (ECF 882 at 17).

[38] Dr. Beveridge also studies the odds of being a non-CP beneficiary entrant and apparently eligible applicant, and the rate of being a non-CP awardee.

Process to measure whether the Black applicants (entrants, apparently eligible applicants or awardees) were disparately impacted in being considered by a developer.

To the extent that Plaintiffs *are* actually asserting that the CP policy *does* influence who applies for housing, *see* Beveridge Dec. ¶ 115 fn 50, then their use of any application data at any stage is inappropriate because all of the application data would be tainted by the CP policy itself. The appropriate analysis would then be a bottom-line analysis looking at the selection rate of awards based upon potential applicants, rather than actual application data. *See Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.,* 388 F. Supp. 3d 145, 171-72 (E.D.N.Y 2019) (*citing E.E.O.C. v. Joint Apprenticeship Comm. of the Joint Industry Bd. of the Electrical Indus.,* 164 F.3d 89, 97 (2d Cir. 1998)); *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324, 365 (1977). Given the ambiguity of Plaintiffs' position on this point, Dr. Siskin did a bottom-line analysis using the potential applicant pool (here income eligible New Yorkers) rather than the actual applicant pool and found that Black awardees are overrepresented in the affordable housing projects in comparison to the income-eligible potential applicant pool of Black New Yorkers. *See* Siskin ¶ 109; Table 5.

Finally, despite Dr. Siskin's disagreement with Dr. Beveridge's CP status analysis at the entrant, apparently eligible, and award stages, he applied Dr. Beveridge's CP status approach to the citywide data, and accounted for the factors that impact the awards other than the CP policy. In doing so, he demonstrated that Black entrants, apparently eligible applicants and awardees are not disparately impacted by the CP policy and pass the 80% rule. *See* Siskin ¶ ¶89-90; Appendix E, Tables E1-E5.

### (e) <u>Plaintiffs' Statistical Significance Tests Must be Disregarded</u>

Plaintiffs' statistical significance analysis and discussion should be disregarded by the Court. Tellingly, Plaintiffs' expert failed to disclose any of his analysis related to statistical

significance in his multiple reports and amended reports and supplemental disclosures and amended supplemental disclosures. For the first time in his declaration in support of Plaintiffs' partial motion for summary judgment, Dr. Beveridge attempts to assess the degree of the purported disparities from his analysis by undertaking what he claims to be the 80% test and a standard deviation test. The law is clear that an expert cannot present analysis or new conclusions that have not been disclosed during expert discovery. *See* Fed.R.Civ.Pro. Rule 37(c)(1).

Not only is Plaintiffs' reliance improper procedurally, it is improper substantively. The 80% rule is a commonly applied test of practical significance undertaken in disparate impact analyses. It compares selection rates between the group for which there is an allegation of discrimination with the selection rate of the dominant group (i.e., the group that is not discriminated against). "Essentially, this means that if the minority group performs less than 80% as well as the highest performing group, disparate impact will generally be inferred." *United States v. City of New York*, 637 F. Supp. 2d 77, 87 (E.D.N.Y. 2009) ("*City of New York*").[39]

Courts also commonly look at the *unit* of standard deviation between the selection rates of two racial groups. "Standard deviation analysis measures the probability that a result is a random deviation from the predicted result--the more standard deviations the lower the probability the result is a random one." *Id*. (quoting *Waisome v. Port Auth. of New York & New Jersey, 948 F.2d 1370, 1376 (2d Cir. 1991)*. "Basically, looking at standard deviations indicates how far an obtained result varies from an expected result." *Id*. (quoting *Xerox,* 196 F.3d at 365). A standard deviation of two units is typically accepted by courts as evidence that the outcome is

---

[39] Dr. Siskin uses the 80% rule and shortfalls (another of method of measuring practical significance) to measure the scope of the disparity between Blacks and Whites. Thus, the use of the 80% rule is not in dispute. The issue is that Dr. Beveridge failed to do demonstrate his application of the 80% rule in his CD typology analyses in his reports, and also applied the rule incorrectly.

not due to chance and is legally significant. *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 fn14 (1977); *City of New York*, F. Supp. 2d at 87.

Dr. Beveridge undertook both analyses incorrectly. Dr. Beveridge attempted to apply the 80% rule to his "outsider to insider change" analyses (Method 1), yet Method 1 does not calculate any selection rate. Consequently, the 80% rule is inapplicable and provides no statistical insight into the data.[40] *See* Siskin at ¶ 84. Further, Dr. Beveridge's "standard deviation" did not calculate a *unit* of standard of deviation and did not undertake any comparison between racial groups. *See* Siskin at ¶¶ 86, 87. Therefore, Plaintiffs' conclusion that the purported disparities Dr. Beveridge's analysis demonstrates are "substantial" based upon these analyses must not be considered by the Court as these analyses are procedurally and substantively flawed.[41]

### (f) Plaintiffs' Fail to Demonstrate Robust Causation

It is well established that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Communities Project*, 135 S. Ct. at 2523. In establishing disparate impact the plaintiff must satisfy a "robust causality requirement" *Id*. "A plaintiff who fails to allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection cannot make

---

[40] While the 80% rule could be applied to Dr. Beveridge's Method 2, as it is a version of a selection rate, it is not a proper selection rate, see footnote 31 *supra*, and the CD typologies and other flaws discussed above skew the results. As discussed in section II(c), Dr. Beveridge's CP v. non-CP methodology applied to the citywide data (rather than CD typologies) passes the 80% rule. *See* Siskin at ¶ 89.

[41] Plaintiffs' repeated claim that Defendant's expert has not challenged the substantiality of the findings lacks merit. *See* Beveridge Dec. (ECF 883) at ¶ 72. Dr. Siskin refuted Dr. Beveridge's methodology on multiple grounds. Moreover, Dr. Beveridge previously never included any analysis to support his claim of substantiality so there was nothing to respond to directly. Because Dr. Beveridge has now included the analysis in his declaration, Dr. Siskin now has something to respond to, and has identified many flaws in Dr. Beveridge's analysis in support of his conclusion of "substantiality." *See* Siskin ¶¶ 82-83.

out a prima facie case of disparate impact." *Id.* at 2523. *See also Conn. Fair Hous. Ctr. v. Corelogic Rental Prop. Sols., LLC, No. 3:18-CV-705 (VLB),* 2020 U.S. Dist. LEXIS 11867 (D. Conn. 2020)*; Washington v. United States HUD,* 2019 U.S. Dist. LEXIS 127027 at *63 (E.D.N.Y 2019); *Fortune Soc'y* , 388 F. Supp. 3d at 173; *Saint-Jean v. Emigrant Mortg. Co.*, 337 F. Supp. 3d 186 (E.D.N.Y. 2018).

Plaintiffs argue that the causation standard for their disparate impact claim under the City HRL is less stringent than under the FHA, because it only states the challenged practice must "result[] in a disparate impact." NYC Admin Code § 8-107(17)(a)(1). While there is no reason to believe that "result" and "cause" have different meanings, Plaintiffs disregard subsection (17)(b) of the City HRL, which clarifies that "[t]he mere existence of a statistical imbalance between a covered entity's challenged demographic composition and the general population is not alone sufficient to establish a prima facie case of disparate impact violation unless...there is an identifiable policy or practice or group of policies or practices that allegedly *causes* the imbalance." NYC Admin Code § 8-107(17)(b) (emphasis added). The NYC HRL also provides that the defendant may demonstrate an affirmative defense that the challenged policy "does not contribute to the disparate impact." *Id.* at (17)(a)(2).

Plaintiffs' methodology of comparisons by CP status and analysis at the incorrect stages of the Lottery Process confounds many other factors that impact whether an applicant is a CP beneficiary or likely to be awarded a unit. Contrary to Plaintiffs' assertion, the CP policy does not determine the racial demographics of the pool of CP beneficiaries for a specific housing lottery and the pool of non-CP beneficiaries for a specific housing lottery. As a result, it cannot be said, and Plaintiffs have not shown, that the CP policy causes any disparate impact on Black New Yorkers applying for affordable housing.   *See* Siskin at ¶¶ 73, 80.

The CP policy is also not determinative of who will be awarded housing or who is able to compete for housing. There are additional factors and policies that influence whether an apparently eligible applicant will be considered (and thus able to compete for housing), such as log numbers, unit type distribution, and other preferences. There are also additional factors which influence whether a Considered Applicant will be awarded housing. Of key significance is whether an applicant follows through with the application process by showing up for any eligibility meetings, by providing the requested paperwork, by actually being eligible, and by not withdrawing from the application process (i.e. expressing interest).[42] *See* Siskin at ¶ 66.

Comparing the percentage of applicants each racial group represents within the CP beneficiary group and within the non-CP beneficiary group (at any stage) will help demonstrate why comparisons by CP status are inappropriate and do not establish causation. Within the CP beneficiary group, any difference in the rates of representation of each race cannot be attributable to the CP policy, as all those within the group are CP beneficiaries. Likewise, comparing within the non-CP beneficiary group, any difference in the rates of representation is not due to the lack of the CP beneficiary status, since none of the applicants in that group are CP beneficiaries. Thus, it is clear that there are factors other than CP status that are causing the differences in the rates of representation between races within each group.

Having established that both the CP and non-CP beneficiary groups have racial disparities within the groups that are not caused by the CP policy, any difference in selection rates by race between the two groups (CP v. non-CP) are at least in part attributable to factors that have nothing to do with the CP policy. *See* Siskin Dec. ¶¶ 74-76. When comparing the

---

[42] For instance, many applicants for whom developers reach out to for verification of eligibility decide not to pursue the housing.  Plaintiff Senat testified that she made such a decision about at least one project because she did not like the location of the project.  *See* Polifione Dec. at Ex. 43 (at 80:17-81:8)

selection rate of CP beneficiary awardees with non-CP beneficiary awardees by race on the citywide data, after removing differences among applications within the same CP status group in order to isolate the effect of CP status, the adjusted selection rates for Black, White and Hispanic awardees were almost identical and pass the 80% rule. *See* Siskin Dec. at App. E, Table E5. Dr. Beveridge fails to account for the differences that have nothing to do with the CP policy, and erroneously attributes the entirety of the "impact" to the CP policy alone, resulting in a conclusion that greatly inflates the impact of the CP policy. *See* Siskin Dec. ¶ 79.

In sum, Dr. Beveridge's CP status methodology greatly exaggerates the purported impact of the CP policy as it confounds factors other than the CP policy that have an impact on outcomes. Even taking an expansive interpretation of the City HRL, as Plaintiffs argue is appropriate, does not give the Court *carte blanche* to find a disparate impact under the City HRL when the City has demonstrated that Plaintiffs' methodology does not actually assess or isolate the impact of the CP policy. *See* Siskin Dec. at Section II. Dr. Beveridge's analysis fails to establish that the CP policy actually causes the purported impact and, thus, Plaintiffs have failed to meet their burden to demonstrate causation. As such, the City is entitled to summary judgment dismissing the disparate impact claims.

## B.  Disparate Impact Analysis Done Properly

While the City is entitled to summary judgment because Plaintiffs have failed to meet their burden to demonstrate a disparate impact as a matter of law, the City's expert undertook a proper disparate impact analysis, which demonstrates that the CP policy does not disparately impact Black or Hispanic New Yorkers applying for affordable housing. In this regard, Dr. Siskin first isolated the step in the Lottery Process where the CP policy has its impact on the ability to compete for housing and examined the selection rate at that stage to determine if Black

applicants were disparately impacted by the CP policy. Second, he simulated the Lottery Process with and without the CP policy in order to isolate the impact of the CP policy.[43]

### (a) Consideration Study

Unlike Dr. Beveridge's attempt at a selection rate analysis, which was done at the incorrect lottery stage, Dr. Siskin actually isolated the stage in which the CP policy has its impact on the ability to compete for housing and analyzed that dispositive stage of the Lottery Process. *See* Siskin Dec. ¶ 94.  By evaluating the role of the CP policy in the Lottery Process, Dr. Siskin concluded that the appropriate stage in the Lottery Process to best measure the CP policy's impact on applicants' ability to compete for housing is what Dr. Siskin calls the "Consideration Stage." This stage falls between an initial finding of apparent eligibility by the developer and the Confirmation Stage, where actual eligibility and interest[44] is confirmed, leading to an award.[45] *See* Siskin Dec. ¶¶ 63-64; 94 An applicant who passes the Consideration Stage (or a "Considered Applicant") is one that has been found apparently eligible for at least one unit,[46] and who is

---

[43] As discussed above, *see* section IIA.(d), Dr. Siskin also did a basic bottom-line analysis of the selection rate of awards from the income eligible potential applicant pool. This analysis, which showed that Black and Hispanic New Yorkers were overrepresented in the awards, was undertaken because Plaintiffs' experts were unclear on whether they were alleging that the CP policy had an impact on who applies. *See* Siskin Dec. at Table 5.

[44] We describe the Confirmation Stage as assessing actual eligibility and interest because some applicants, when invited to verify their eligibility, decide that they are not interested in the project, and thus choose not to verify their eligibility (i.e. not show up at the meeting or provide required documents. *See* Siskin Dec. at ¶ 66.

[45] The first step in the Lottery Process is identifying apparently eligible applicants.  Then, the developer will consider the apparently eligible applicants in the various set-aside and preference groups by log order. The CP beneficiary apparently eligible applicants are reached and considered by the developer after the disability preference applicants and before the municipal employee applicants. Once the preference units are filled, the developer returns to the log and fills the non preference units in log order. For an explanation of the Lottery Process, please see the Brown Declaration.

[46] Plaintiffs' reliance upon *Comer* for the proposition that it is appropriate to study applicants and not just apparently eligible applicants is misplaced. As discussed above, the Court in *Comer* was addressing standing (among other defenses), and was not addressing the appropriate group to analyze in disparate impact. *See also Hazelwood* 433 U.S. at 308. ("a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market")).

apparently eligible for at least one available unit at the time the developer reaches that applicant's lottery number for further consideration, and is thus invited to verify eligibility. *See* Siskin Dec. ¶ 63. A Considered Applicant has gotten through the front gate, and is able to compete for affordable housing by verifying their eligibility and interest during the Confirmation Stage. The CP policy, among other things (such as the log number and other preference), influences the order in which applicants are reached by a developer for consideration and thus impacts who passes the Consideration Stage. The Consideration Stage is where the CP policy is implemented and has its impact. If an applicant does not pass the Consideration Stage, they are not able to compete for housing by confirming their eligibility and interest. *See* Siskin Dec. ¶ 64. Thus, in order to determine whether the CP policy has an impact on Black applicants in the ability to compete for housing, one must study the rate in which apparently eligible applicants are considered (invited to verify eligibility) (i.e. the Consideration rate) by race. *Id*. at ¶ 67.

When Dr. Siskin studied the Consideration rate, he found that the Consideration Stage does not have a disparate impact on Black apparently eligible applicants. *See* Siskin Dec. ¶ 96. In other words, the rate by which Black apparently eligible applicants passed the Consideration Stage (i.e. were invited to further verify their eligibility and compete for housing because they were apparently eligible and there was a unit available for them at the time they were reached by the developer) was almost the same as the rate for Whites. *See* Siskin Dec. ¶ 96; Table 3.

The Consideration rate for Black apparently eligible applicants was 12.54% while the rate for White apparently eligible applicants was 12.80%, resulting in passing the 80% rule at 97.97%. *See* Siskin Dec. ¶ 97; Table 3. This means that Consideration rate for Black apparently eligible applicants was 97.97% of the Consideration rate of White apparently eligible applicants. *See* Siskin Dec. ¶ 99; Table 3.

Another way to understand practical significance is to calculate how many more (or fewer) awards would have resulted for each race if there had been no difference in the Consideration rate between the races, and therefore no impact on any race (also known as racial parity). Dr. Siskin determined that only 90 (or 0.9%) of the 10,245 awards would need to change in order to achieve racial parity. With racial parity in the Consideration rate and award rate, there would have been 25 fewer White awards, 29 more Hispanic awards, 61 more Asian awards, and 43 fewer Black awards. *See* Siskin Dec. ¶ 100; Table 3 This is a very small difference and does not support a finding of disparate impact. *See* Id.

Therefore, the City is entitled to summary judgment because not only did Plaintiffs fail to study the part of the Lottery Process where the CP policy has its impact, but the City's analysis of the proper stage demonstrates that Black apparently eligible applicants are not disparately impacted during the Consideration Stage, when the CP policy has its impact.

### (b) <u>Simulation</u>

In order to isolate the impact of the CP policy, Dr. Siskin simulated the lottery both with the CP policy in effect and not in effect.[47] Dr. Beveridge conceded that the proper " baseline comparison is an equal-access lottery (no community preference)." *See* Polifone Dec. at Ex. 47 at ¶ 83. This Court also reiterated that to establish causation one must compare the results with and without the CP policy. *See Winfield v. City of N.Y.*, No. 15-CV-5236, 2016 U.S. Dist. LEXIS 146919, at *21-22 (S.D.N.Y. Oct. 24, 2016) (explaining that at the pleading stage causation need not be established but that "[d]iscovery may well prove that *removal of the Community*

---

[47] Dr. Siskin's simulation assumes that the same amount of affordable housing in the same locations would be built without the CP policy in place. It is the City's contention that less affordable housing would actually be built without the CP policy, as the ability to address community members and Council Members' fear of displacement would be severely hindered.

*Preference Policy* would have no impact on the racial and ethnic makeup of eligible affordable housing applicants…") (emphasis added). Further, Dr. Beveridge adopted Dr. Siskin's simulation outcomes with the CP policy in effect-although he then converted them into his convoluted CD typology and CP status analysis instead of comparing them to the simulation outcomes without the CP policy in effect. *See* Beveridge Dec. (ECF 883) at Table 9. Thus, Dr. Siskin's simulation is not in dispute, nor is it in dispute that comparing the results with and without the CP policy is the appropriate measure method to actually isolate impact of the CP policy.[48]

Dr. Siskin's simulation results show that there is no legally significant difference by race in who is awarded housing with or without the CP policy.[49]  *See* Siskin Dec. ¶ 105; Table 4. Without the CP policy, Black apparently eligible applicants would have received only 141 more units out of 10,245 units. *Id.* Applying the 80% rule to compare the difference in the impact of the CP policy on each racial group shows that all groups were at least 80% of the rate for Whites, meaning that the disparity is not practically significant and is insufficient to establish a *prima face* case.[50]  *Id.* at ¶ 106. Therefore, as it is undisputed that the proper comparison is between the results with and without the CP policy and as the simulation results demonstrate a very small, but not legally significant difference in the results by race with and without the CP policy, the City is

---

[48] Simulations have been relied upon by the Courts to demonstrate disparate impact under the FHA. *See e.g. Davis v. N.Y.C. Hous. Auth.*, 103 F. Supp. 2d 228, 231-32 (S.D.N.Y. 2000)

[49] Dr. Siskin's simulation, which compares the awards with the CP policy in place and the awards without the CP policy in place, is not a bottom-line study. The simulation controls for the confirmation stage (where actual eligibility and interest is confirmed and in real life many people drop out or are found ineligible) by assuming that anyone who passes the Consideration Stage is awarded a unit.  Thus, for purposes of the simulation, Considered Applications and awardees are one and the same.

[50] In fact, if the CP policy were eliminated, the Black share of the awards would only increase by 1.38 percentage points. *See* Siskin ¶ 105.

entitled to summary judgment dismissing the Plaintiffs' disparate impact claims. *See Ungar v. NYCHA* 363 F. App'x 53, 55-56 (2d. Cir 2010) ("the policy in question imposes a 'significantly adverse or disproportionate impact' on a protected group of individuals." quoting *Tsombanidis*, 352 F.3d at 575.)

## POINT III

## THE CP POLICY INTEGRATES AND DOES NOT PERPETUATE SEGREGATION

Plaintiffs have also failed as a matter of law to establish that the CP policy perpetuates segregation. The Second Circuit has made clear that to establish a *prime facie* case of perpetuation of segregation; Plaintiffs must demonstrate that the CP policy "significantly" perpetuates segregation. *See Davis v NYCHA* 166 F.3d 432, 438 (2d Cir 1999), *Huntington*, 844 F.2d at 938. *See also Gilmore v. Montgomery*, 417 U.S 556 (1974). In other words, the perpetuation of segregation must be "legally significant." *Davis, 166 F.3d at 438*. As with disparate impact, Plaintiffs must also establish robust causation. *Inclusive Communities*, 135 S. Ct. at 2523[51] "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from

---

[51] Plaintiffs argue that their purported perpetuation of segregation claim under the City HRL should not be governed by the Supreme Court's "robust causation" standard, but rather what Plaintiffs claim to be a more lenient standard set forth in *Huntington* ("shown to have a racially disproportionate effect"). Pls. MOL at 44 (ECF 882 at 51). Such argument lacks merit. If such perpetuation of segregation claim is read into the City HRL (and Plaintiffs cite to no case law making such interpretation, nor is the City aware of any), it would be done through the disparate impact provision in the City HRL, and should thus follow the same standards as the disparate impact provisions. *See* NYC Admin. Code §§ 8-107(17)(a)(1)(the challenged practice must "result[] in a disparate impact.") and 8- 107(17)(b) ("there is an identifiable policy or practice or group of policies or practices that allegedly *causes* the imbalance") (emphasis added).

being held liable for racial disparities they did not create. *Inclusive Communities*, 135 S. Ct. at 2523. (quoting *Wards Cove*, 490 U. S. at 653).[52]

Segregation is commonly measured on an index called the Dissimilarity Index. It assesses segregation between pairs of racial groups (such as Black-White, Asian-Hispanic), measuring on a scale from 0 to 1 the extent that each race's representation in a census tract differs from that race's citywide representation. The closer to 1, the more varied the Black and White representation in the census tracts are from their overall citywide representation, or in other words, the more segregated the two races are in comparison to each other. [53] Thus, the best way to measure whether the CP policy perpetuates segregation is to determine what impact it has on the Dissimilarity Index.[54]

## A.       Integrating Less is Not Perpetuating Segregation

It is undisputed by the parties that the Lottery Process with the CP policy has a small integrative effect, or in other words, slightly reduces the Dissimilarity Index. *See e.g.* Pls. MOL at 34 (ECF 882 at 41) (defining the issue as "whether the policy predictably creates *less integration* in the City as a whole than would an equal access system")(emphasis added) and Beveridge Dec. ¶  161 (Table 11), 152 and 158 (demonstrating and comparing "outsider net-

---

[52] The robust causation and burden shifting set forth in *Inclusive Communities* applies both to disparate impact and perpetuation of segregation claims under the FHA, as they are simply two ways of demonstrating discriminatory effect.  *See Huntington*, 844 F.2d at 937.  *See also Inclusive Communities* 135 S. Ct. at 2513-14; 2522 (deciding disparate impact liability exists under the FHA in a case where the allegation was that the defendant "caused continued segregated housing patterns').

[53] For instance, if Blacks represented 35% of a city and Whites represented 50% of a city, the Black-White Dissimilarity Index would be 0 if there were perfect representation of each race in every census tract. The closer to 1, the more the Black and White representation in the census tracts vary from their overall citywide representation.

[54] Dr. Beveridge relied upon the Dissimilarity Index in his reports in an attempt to demonstrate perpetuation of segregation. Dr. Siskin responded to Dr. Beveridge's conclusory arguments by actually measuring the impact of the Lottery Process with and without the CP policy on the Dissimilarity Index.

integration with insider net-integration"). Unable to dispute the integrative effect of the Lottery Process with the CP policy in place, Plaintiffs attempt to change the issue before the Court from whether the CP policy perpetuates segregation to whether the Lottery Process would be even *more* integrative without the CP policy. While Plaintiffs are attempting to persuade this Court to adopt such an interpretation of "perpetuation of segregation," Plaintiffs have cited no case law that supports the notion that a practice with an integrative effect actually perpetuates segregation if removing or changing one aspect of the practice would result in an even greater integrative effect.[55]  Nor is the City aware of any case law to support such a proposition.

The facts before the Court are the opposite of the fact patterns where the Second Circuit has held that a policy or decision perpetuates segregation. For instance, in *MHANY*, the Second Circuit affirmed the district court's finding of a *prima facie* case of perpetuation of segregation because the county's decision not to change the zoning to allow multi-family housing "decrease[d] the availability of housing to minorities in a municipality where minorities constitute approximately only 4.1% of the overall population . . . and only 2.6% of the population living in households [as opposed to group environments such as dormitories]." *MHANY*,  819 F.3d at 620 (internal citations to district court removed). In *Huntington,* the Second Circuit found that blocking a multi-family project that was dedicated to being at least 25% minority tenants in a 98% White area of the city and limiting affordable housing

---

[55] Plaintiffs' reliance upon *Huntington* (which they cite to with a *Cf*) for the proposition that "retarding the percentage of relatively more integrative non-beneficiary moves that can proceed constitutes perpetuation of segregation" is misplaced. Pls. MOL at 39 (ECF 882 at 46). In *Huntington* the zoning policy mandated that affordable housing be built in areas that were segregated and prevented affordable housing from being built in areas that would result in an integrative effect. That is wholly distinguishable from the facts here, in which the housing is not being blocked from being built, and is already having an integrative effect.

development to segregated areas of the city where minorities already live constituted perpetuation of segregation. *See Huntington*, 844 F.2d at 937.

In contrast, here, the Lottery Process with the CP policy has an integrative effect on New York City as a whole, and it also diversifies the majority White CD typologies, on which Plaintiffs focus their most attention. According to Dr. Beveridge's own data, the affordable housing projects in the majority White CD typology have a population of 22.6% White, 19.4% Black and 33.9% Hispanic, while the surrounding neighborhood (the White CD typology) has a population of 60.65% White, 6.34% Black and 18.78% Hispanic. *See* Siskin Dec. ¶ 147. This demonstrates that the Lottery Process with the CP policy in place results in housing projects that are substantially more racially diverse than the majority White CD typology in which it is located. Thus, following the approach taken by the Second Circuit in the cases discussed above, the CP policy does not perpetuate segregation as a matter of law.

Further, adopting Plaintiffs' interpretation of perpetuation of segregation (i.e., less integration) would have extreme practical ramifications for municipalities. Such an interpretation would require municipalities to pursue the most integrative policy, even when they are already pursuing a policy that is integrative, and notwithstanding other valid interests. The City, like all municipalities, has many very important housing policy initiatives and goals that require attention, as well as non-housing goals and initiatives.[56]  The City's housing initiatives are intended to help low-income communities that are often disproportionately Black and Brown communities. The Supreme Court held that the FHA "does not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of

---

[56] For example, the City is confronted with a homelessness crisis, a housing crisis that is most severe for low-income renters, an aging housing stock in need of recapitalization and rehabilitation, and a variety of new housing issues resulting from COVID-19.

liability" when pursuing complex and sometimes competing housing issues. To further interpret perpetuation of segregation to mean that the City must pursue the most integrative policies, even if their policies do not segregate and are integrative, will make it impossible for the City to achieve its housing goals without being dragged into lengthy and costly litigation, as has been the circumstances here. Such an outcome is inconsistent with the Supreme Court's ruling in *Inclusive Communities* and will do more harm than good.

**B.      The CP policy Does Not Result in Significantly Less Integration**

However, even if, *arguendo*, the Court were to agree that a *prima facie* case of perpetuation of segregation can be made based upon a finding that the challenged policy results in less integration than may be possible without it, the City is still entitled to summary judgment. The case-law on perpetuation of segregation makes clear that a defendant will not be liable for perpetuating segregation unless it has a *significant* effect. *See Davis* 166 F.3d at 438, *Huntington*, 844 F.2d at 938. *See also Gilmore v. Montgomery*, 417 U.S 556 (1974). Thus, if a small amount of perpetuation of segregation is not legally sufficient to establish a *prima facie* case of perpetuation of segregation, then a policy that minimally reduces the integrative effect of a process certainly cannot be legally sufficient to establish a *prima facie* case. Dr. Siskin has demonstrated that the housing lottery without the CP policy in place would only have a trivially greater integrative effect, a change in the fourth decimal point on the Dissimilarity Index, which is typically only reported to the second decimal place.[57] *See* section III.C, *infra* and Siskin Dec. at  ¶ 127; Table 8. Moreover, as more fully discussed in section III.D *infra*, Plaintiffs' attempt to

---

[57] Dr. Beveridge, who calculated the Dissimilarity Index in his Declaration and expert reports in this case reported it to the second decimal place. See Beveridge Dec. at ¶  37 (Table 1). Thus, these changes in the fourth decimal place would not result in any change in the Dissimilarity Index as reported by Dr. Beveridge.

measure the amount of additional integration that would occur without the CP policy in place is seriously flawed.

## C.     Perpetuation of Segregation Analysis Done Properly by Dr. Siskin[58]

Similar to his disparate impact analysis, Dr. Siskin measured the extent to which the CP policy impacts the Dissimilarity Index in two ways. First, Dr. Siskin used his simulation of the housing lottery outcomes with and without the CP policy and applied those outcomes to the Dissimilarity Index in order to isolate the impact of CP policy on the Dissimilarity Index. The impact of the CP policy on the Dissimilarity Index with regard to all six racial pairings[59] is trivial, resulting in the Dissimilarity Index being slightly higher (a change in the 4th decimal place) than it would be without the CP policy in place. *See* Siskin Dec. ¶ 127; Table 8. However, the awards as a result of the Lottery Process (with the CP in effect) have an overall integrative effect, reducing the Dissimilarity Index in the fourth decimal place. *See* Siskin Tables 7 and 8. Thus, as the net effect of the awards allocated through the Lottery Process with the CP policy in place is integrative, it is an issue of integrating less, rather than perpetuating segregation.

For instance, with the White-Black Dissimilarity Index, the Lottery Process with the CP in effect resulted in a decrease of .00075 on the Dissimilarity Index. The Lottery Process without the CP in effect resulted in a decrease of .00119 on the Dissimilarity Index. Thus, the CP

---

[58] It is necessary to explain Dr. Siskin's perpetuation of segregation analysis before addressing the flaws in Dr. Beveridge's analysis because Dr. Beveridge's analysis is based off of Dr. Siskin's analysis. During expert discovery with two rounds of reports for each expert and amended reports, Dr. Beveridge's "perpetuation of segregation" analysis was nothing more than pointing to the "pattern" that his "disparate impact" analysis purportedly created in a segregated city. However, as discussed above, *see* II.A.a, *supra*, no true pattern was actually shown and Plaintiffs abandoned much of the "disparate impact" claim. Consequently, in a "supplemental report" served after the close of expert discovery, Dr. Beveridge adopted Dr. Siskin's perpetuation of segregation data and manipulated it into his "analysis."

[59] The six racial pairings are: Black-White, Black-Hispanic, Black-Asian, White-Hispanic, White-Asian, and Hispanic-Asian.

policy's effect is the difference between the two, or a trivial increase of .00044. *See* Siskin Dec. at Table 8.

Second, Dr. Siskin studied the impact of the Lottery Process[60] on the Dissimilarity Index and further isolated the impact of the Consideration stage, the stage in the Lottery Process in which the CP policy has its impact in determining which applicants will be given the opportunity to verify eligibility and interest and be awarded a unit. As with the simulation, the Consideration study demonstrated the integrative effect of the awards allocated through the Lottery Process. *See* Siskin Dec. at Table 7. It also demonstrated that the Consideration Stage (during which the CP policy is implemented and has its effect) makes the Dissimilarity Index trivially higher than it would if the Lottery Process excluded the Consideration Stage. Specifically, the impact of the awards allocated through the Lottery Process on the White-Black Dissimilarity Index with the CP in effect is to decrease it by .00055 (thus making it more integrative), while the Consideration Stage the impact on the Dissimilarity Index is to decrease it by .00114 (thus making it more integrative and more integrative than before the Confirmation Stage impact)  *See* Siskin Dec. at  Table 7. Said differently, without the impact of the Conformation  Stage, in which the CP policy has its impact, the White-Black Dissimilarity Index would decrease by .0001 as opposed to .00055 (the actual amount it decreased with the Conformation Stage in place). *See* Siskin Dec. Table 7. Thus, the Consideration Stage results in a trivial amount of less integration.[61]

The *de minimus* amount of greater integration measured by both of Dr. Siskin's approaches that would occur without the CP policy is not substantial enough to be "legally

---

[60] While the study of awards will not isolate the impact of the CP policy, it is the awardees that actually have an impact on the Dissimilarity Index, as they are the people moving into the housing.

[61] It also demonstrates that the Confirmation Stage also results in slightly less integration.  *See* Siskin at Table 7.

significant" and therefore is insufficient to support a finding of perpetuation of segregation as a matter of law. *See, e.g., Davis*, 278 F.3d at 66 (holding that a reasonable delay in desegregation mandated by a consent decree due to the working family preference did not constitute perpetuation of segregation).

### D. Plaintiffs' "Measure" of the CP Impact is Flawed

Plaintiffs do not challenge Dr. Siskin's perpetuation of segregation simulation or consideration analyses. In fact, Plaintiffs adopt the outcomes from parts of each of Dr. Siskin's analyses and then categorize the outcomes by CP status to evaluate whether CP beneficiaries are more integrative than non-CP beneficiaries. However, an applicant's CP status is irrelevant to whether that applicant will have an effect on the level of segregation in New York City if awarded housing, and given Dr. Siskin's clear findings, of which Dr. Beveridge adopts part, there was no valid reason to take the additional step he takes. Dr. Beveridge's analysis is simply a manipulation of the undisputed outcomes.[62]

Dr. Beveridge's "analysis" finds that both CP beneficiaries and non-CP beneficiaries have a net integrative effect, but that non-CP beneficiaries are more integrative than CP beneficiaries. *See* Siskin Dec. ¶ 131. Dr. Beveridge's calculation attempting to "measure" the difference in the integrative effect between CP beneficiaries and non-CP beneficiaries is flawed. His calculation greatly inflates the outcomes, making it seem like non-CP beneficiaries are significantly and materially more integrative than CP beneficiaries. *See* Siskin ¶ 133.

Finally, Dr. Beveridge includes, for the first time in his declaration in support of Plaintiffs' motion, analysis results from the application of the 80% percent rule and a statistical

---

[62] If Dr. Beveridge were to dispute the simulation outcomes, he would be putting his own analyses into question, as they rely upon part of Dr. Siskin's outcomes.

significance test. As discussed above in section II.A.e, *supra*, these results should not be considered by the Court as they are procedurally and substantively flawed. In addition to the reasons discussed above, the valid tool to measure segregation, and changes in segregation, is the Dissimilarity Index, as presented by Dr. Siskin. The application of the 80% rule and "standard deviation" have no role in measuring the CP policy's effect on integration. *See* Siskin Dec. ¶ 141.

**E.     Plaintiffs Failed to Demonstrate that the CP policy "Causes" Perpetuation of Segregation**

As discussed in Section II(A)(f), Plaintiffs' attempt to demonstrate "robust causation" likewise fails. Plaintiffs do not actually demonstrate causation, but instead appear to rely upon their original perpetuation of segregation "analysis" that simply concluded from the disparate impact analysis that "if you start with a segregated CD you will predictably have more segregation...." because the "dominant race" is more likely to benefit from the CP policy.  Pls. MOL at 36 (ECF 882 at 43). Yet, Dr. Beveridge's own analysis demonstrates that this is not the case, in particular in plurality CD typologies (and Plaintiffs abandoned that aspect of their disparate impact claim). For instance, Dr. Beveridge's data demonstrates that in the plurality White CD typology, Black CP beneficiary awardees received the largest percentage of CP beneficiary awards. Even in majority White CD typologies, Dr. Beveridge's data demonstrates that Hispanic CP beneficiary awardees received the largest percentage of CP beneficiary awards. *See* Siskin Dec. ¶ 7 and Beveridge Dec. at Exhibit 11.  Thus, Plaintiffs' argument relies upon an assumption that Dr. Beveridge's own analysis actually and definitively disproves.[63]

---

[63] In addition to Dr. Beveridge's own analysis demonstrating that this conclusion is unfounded, there are several other problems with such assumption. These include, but are not limited to, the fact that Plaintiffs make this assumption without assessing the racial demographics of where an awardee moved from. They also fail to recognize

Continued…

## POINT IV

## THE CP POLICY IS NECESSARY TO ACHIEVE VALID INTERESTS

Even if the Court were to find that Plaintiffs had established their *prima facie* case of disparate impact or perpetuation of segregation (or that there is an issue of fact as to whether they could establish their *prima facie* case), summary judgment should still be granted to the City because the City can demonstrate with irrefutable evidence that the CP policy is "necessary to achieve a valid interest." *Inclusive Communities,* 135 S. Ct. at 2523. *See also MHANY*, 819 F.3d at 617 (holding that a policy must be necessary to "a legitimate, bona fide governmental interest"). In its guidance on what constitutes a "valid interest," the Supreme Court in *Inclusive Communities* explained that government officials "must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture). These factors contribute to a community's quality of life and are legitimate concerns for housing authorities." *Inclusive Communities,* 135 S. Ct. at 2523. "[T]he inquiry is whether the proffered justification is of substantial concern such that it would justify a reasonable official in making this determination." *Huntington*, 844 F.2d at 939. The standard under the City HRL is that the challenged practice "bears a significant relationship to a significant business interest."  NYC Admin. Code § 8-107(17)(a)(2). As set forth below, the City's interests easily meet both the FHA and City HRL standards.[64]

---

that the racial demographics of a project's census tract may differ from the overall CD demographics. *See* Siskin Dec. at ¶ 144.

[64] Indeed, it has been held that "'NYCHRL housing discrimination claims are analyzed under the same standard as claims made under the FHA' because they contain language that is substantively identical to that of the FHA..." *Fortune Soc'y*, 388 F. Supp. 3d at 178 (quoting *Haber v. ASN 50th St. LLC*, 847 F. Supp. 2d 578, 588 & n.5 (S.D.N.Y. 2012).

**A.        The CP policy is Necessary to Address Displacement and the Fear of Displacement**

The CP policy is necessary to address two significant, bona fide public policy issues: preventing the displacement of low-income residents, thereby giving them a greater opportunity to remain in their communities if they choose, and responding to the fear of displacement, which in turn helps overcome opposition to the construction of new affordable housing and helps garner necessary approvals for affordable housing. *See* City 56.1 ¶¶ 67, 68, 71, 75, 14, 15, 95.

Given the longstanding housing crisis with extremely low vacancy rates, and rents increasing faster than wages, low-income households have been and continue to be at risk of displacement from their homes and communities. See City 56.1 ¶¶ 96, 97, 99, 102. As noted above, studies estimate the rate of displacement in New York City to be between 5.1 and 7.1 percent a year. *See* Goetz Dec. ¶ 27. The City has taken a comprehensive and aggressive approach to addressing the housing crisis and preventing displacement, including subsidizing new affordable housing and preserving affordable housing, creating laws to prevent landlord harassment, providing free legal services to tenants in housing court, and having a robust reporting system for Housing Maintenance Code violations. *See* Been Dec.¶ 77; City 56.1 ¶¶ 87-94. The CP policy is a necessary part of this multi-faceted housing and anti-displacement strategy. *Id*. ¶¶ 77-81 *See* Goetz Dec. ¶ 55; City 56.1 ¶ 95.

The CP policy ensures that some low-income community members who want to remain in their neighborhoods will be able to do so by being given a greater opportunity to access the new affordable housing constructed in their community district. This provides opportunities for local residents to age in place in a building with an elevator, to move to an apartment that fits their growing family, or find a newly constructed home of much higher quality while not uprooting their family. The policy also enables those residents who secure an affordable unit to enjoy the benefits of rent stabilization, which provide protection from market pressures  (such as

sharply rising rents), for as long as they remain in the home. Further, the policy allows those residents to enjoy and benefit from the City's investment in the community over time. *See* Been Dec. ¶¶ 43, 60.

The harms of displacement are well documented and varied. *See* Goetz Dec. ¶¶ 41-50. To name only a few, displacement can have a negative effect on mental health, result in the loss of connections to social networks and support systems, and cause problematic outcomes in employment and school. See City 56.1 ¶¶ 79-80. School instability has in turn been shown to be detrimental to achievement. *See* Goetz Dec. ¶ 49.  Displacement due to gentrification has been found to cause a sense of fear and anxiety that the displaced household will be displaced again in the future. *Id*. ¶ 41-42. "A recent study of New York City published in a major science journal found that 'displaced residents were more likely to make emergency department visits and experience hospitalization, mainly due to mental health.'" *Id.* ¶42. Indeed, due to the seriousness and pervasiveness of displacement of low-income people, HUD has required municipalities to create anti-displacement plans when receiving federal funds. *See* 24 CFR 42.325(a).

In addition to actually preventing the displacement of low-income people from their communities, the CP policy also helps address community members' rational fears of displacement. City 56.1 ¶¶ 102-104. Those fears create of displacement most often get expressed when new development—even affordable housing development—is proposed in a community vulnerable to gentrification and displacement. See City 56.1 ¶¶ 109, 111, 112. The fear of displacement among low-income New Yorkers is a significant force in the opposition to the construction of housing in New York City. *See* Been Dec. ¶¶ 45, 52; City 56.1 ¶¶110, 113. Low-income residents fear that development and investment, along with market changes that are often already taking place, will spur increased housing and living costs, making their apartments and

neighborhoods unaffordable. City 56.1 ¶¶ 111, 112. They also fear that the increased value of their apartments may cause landlords to refuse to renew their lease or harass them to leave the apartment. This fear is particularly strong in Black and Brown communities, where there is a history of discrimination, segregation and displacement. *See* Been Dec. ¶¶ 46, 47 and 69; City 56.1 ¶¶ 104. The CP policy provides assurance that some current residents will not be displaced when investment comes to their neighborhoods.

By addressing people's fears of displacement when development is proposed in their communities through assurances that residents will have a greater chance at obtaining the affordable housing, and thereby avoid displacement, the CP policy helps overcome opposition to affordable housing caused by such fear. Overcoming community opposition plays a crucial role in obtaining the approvals needed for many affordable housing projects. Most land use actions related to affordable housing are subject to the review and approval of the members of the City Council, and thus Councilmembers seek assurance that the CP policy will be in place so that they, in turn, can assure their constituents that the development will serve them and help them avoid displacement from their community. *See* City 56. 1 ¶¶ 107, 82-84

B.    **The City Has Demonstrated Sufficient Evidence of its Legitimate Interests**

Plaintiffs do not dispute that the City is dealing with a housing crisis and an even more severe housing crisis for affordable housing serving low-income people. *See* Polifione Dec. at Ex.    It is also undisputed that displacement of low-income people from their homes and neighborhoods is a phenomenon that is occurring in New York City and in many other cities across the nation. Dr. Beveridge himself stated "there is evidence of displacement, some displacement going on in New York...." Polifione Dec. at Ex. 45 (at 34:22-35:1). Additionally

Professor Orfield[65] oversaw a study on displacement across the country, finding that the level of displacement in New York region was "severe" and agreed that there has been a significant trend of low income displacement in New York City compared to other cities in the Midwest. *See* Polifone Dec. at Ex. 49 (at 79:13-80:1). He further agreed that given the rate of displacement in New York City, the fear of displacement was a reasonable fear. *See Id.* (at 81:23-82:1). It is further undisputed that displacement can be harmful to people and warrants a public policy response. *See* Polifone Dec. at Exs. 49 (Orfield at 63:18-20 and 53:3-20; 56:13-20) and 44 (Beveridge rebuttal report, generally). Indeed, Professor Orfield acknowledged that when Black families are "pushed out of neighborhoods... that certainly is a harm to black families that would be a Fair Housing issue." Polifone Dec. at Ex. 49 (at 64:10-14; *see also* 63:21-63:25). Plaintiff Noel described gentrification as meaning "here comes people with a lot more money taking away from other people that didn't have as much," and further testified that she did not think it was fair when people had to leave their homes due to gentrification. *See* Polifone Dec. at Ex. 42 (at 65:17-18; 91:16-19). She also answered affirmatively when asked whether she thought the CP policy helped people remain in their communities. *See Id.* (at 91:20-22).

Given these undisputed and indisputable facts, Plaintiffs' attack on the City's interests addressed by the CP policy is fundamentally an attack on whether the CP policy achieves the goals it aims to achieve and whether there is sufficient "evidence" in support of those results. Plaintiffs' attack is based on the misplaced assumption that the City must have highly specific data to support each policy it has. More specifically, Plaintiffs also assume that the City must

---

[65] Although the City has moved to exclude Professor Orfield's proposed testimony in this case, his admissions regarding displacement in New York City are still valid.  The City is seeking to exclude his proposed testimony as set forth in his expert report because it lacks relevance and support.  However, the study of displacement that he oversaw, and the admissions about displacement, were not discussed in his expert report.

have data demonstrating the need for the CP policy on a citywide level and an individual level (i.e. data on displacement in New York City overall and data demonstrating that individual CP beneficiaries are at risk of displacement). Finally, Plaintiffs assume that the City must have data on the effects of such policy (again, citywide and individual), as well as the effects of the policy as compared to other policies that address similar goals, such as the City's other anti-displacement tools that together make up a comprehensive anti-displacement strategy.

Underlying Plaintiffs' attack is the argument that unless the CP policy addresses all types of displacement, and all people at risk of displacement at once, it is invalid. Not only are these expectations inconsistent with how government often must work, *see* Goetz Dec. ¶ 73, Plaintiffs fail to cite to, nor is there any, case law that supports such a heavy burden be imposed on the City.

Plaintiffs make a convoluted argument regarding the possible multiple standards it believes are applicable to assess whether the City has met its burden. Rather than acknowledge the standards articulated by the Supreme Court and Second Circuit in *Inclusive Communities* and *MHANY*, respectively, Plaintiffs predominantly rely on *Huntington*, a pre-*Inclusive Communities* decision, and the HUD disparate impact rule. Plaintiffs' intent appears to be to emphasize the amount and type of evidence a defendant must produce in support of its interests to bolster their argument for a heightened evidentiary standard.[66] Plaintiffs' arguments fail.

---

[66] To add to this confusion, Plaintiffs argue that the standard for their "perpetuation of segregation" claim under the City HRL, assuming the Court were to read such claim into the City HRL, should follow the HUD rule, and not the standard set forth in the City HRL for disparate impact claims ("bears a significant relationship to a significant business interest." NYC Admin. Code § 8-107(17)(a)(2).). Plaintiffs cite to no case law, nor is the City of aware of any case law that would support such a proposition. Even if the Court were to read a perpetuation of segregation claim into the City HRL as Plaintiffs argue it should, it would be a component of the City HRL disparate impact claim, as it is under the federal law, and thus the standards set forth in the City HRL for disparate impact should be applicable.

First, *Huntington's* "in theory and in practice" language does not support the data-driven evidence Plaintiffs assert is required. The *Huntington* Court held that "a concern may be non-frivolous, but may not be sufficient because it is not reflected in the record." *Huntington*, 844 F.2d at 939. However, the Court did not address the nature of the evidence in the record, let alone require data-driven evidence substantiating each component of the interests expressed.

The HUD rule, which provides that the interest "may not be hypothetical or speculative," also does not require the data Plaintiffs assert is necessary. Moreover, HUD has indicated that it believes that its disparate impact rule is inconsistent with the Supreme Court's decision in *Inclusive Communities*, and thus proposed significant amendments to the rule.[67] *See* 84 FR 42854. Of key relevance, the proposed amended language requires a defendant to "produc[e] evidence showing that the challenged policy or practice advances a valid interest (or interests)..." and does not address the nature of the evidence. 84 FR 42854 at 42862-63 (proposed amended 24 CFR § 100.500 d(1)(ii)).[68]

The few other cases Plaintiffs cite to also do not stand for imposing such a burden on the City and are distinguishable. For instance, *Dothard v. Rawlison* does not address the nature of the evidence supporting the height and weight requirement that was challenged, but held that the

---

[67] However, even if the HUD rule were still applicable, there is nothing "hypothetical or speculative" about the interests the CP policy serves.

[68] The proposed rule further clarifies that "Nothing in this part requires or encourages the collection of data with respect to race, color, religion, sex, handicap, familial status, or national origin. The absence of any such collection efforts shall not result in any adverse inference against a party." 84 FR 42854 at 42862-63 (proposed 24 CFR § 100.5(d)). The proposed rule also modifies the burden shifting, and clarifies that to demonstrate a *prima facie* case plaintiffs must demonstrate "[t]hat the challenged policy or practice is arbitrary, artificial, and unnecessary to achieve a valid interest or legitimate objective such as a practical business, profit, policy consideration, or requirement of law; robust causation; the alleged disparity harms a protected class; the alleged disparity is significant; and there is a link between the policy challenged and the plaintiffs' alleged injury. *See* 84 FR 42854 at 42862-63 (proposed 24 CFR§ 100.500(b)).

defendant "failed to offer evidence of any kind..." *Dothard*, 433U.S, 321, 331 (1977). *Guardians Ass'n of NYC Police Dep't v. Civil Serv. Comm'n* and *United States v. City of New York* are distinguishable, as they address a specific analysis for assessing the validity of employment exams. The unique fact pattern of an employment examination is not present here nor is there a similar or analogous fact pattern here, and thus the validation standard established in *Guardians* and relied upon in *New York City* is not applicable here. While the Supreme Court in *Inclusive Communities* held that the interest must be "valid," it did not require that a specific validation be undertaken, as is the case with employment exams. *Fair Housing Center of Washington v. Breier-Scheetz Properties*, the only fair housing case relied upon by Plaintiffs other than *Huntington*, likewise does not support Plaintiffs' arguments. In *Fair Housing Center of Washington*, a Western District of Washington case, affirmed by the 9th Circuit, the district court did not find that a valid interest was unsupported by the data-based evidence but instead found one of the interests asserted to be *post hoc* and the other to be a worthy goal easily and more effectively addressed through means other than the challenged practice.

Here, it is undisputed that displacement and the fear of displacement is a significant public policy concern that requires a response. City 56.1 ¶¶ 75-76. Unlike in the cases relied upon by Plaintiffs, the City has produced ample evidence, including declarations of Deputy Mayor Been (who is also a former HPD Commissioner) and Edward G. Goetz, Ph.D— a professor and expert in affordable housing, fair housing, displacement, and the housing issues facing low-income communities and Black and Brown communities—public records, transcripts from public hearings, documents, deposition transcripts, and news articles demonstrating the necessary and significant role the CP policy plays in addressing displacement and the fear of

displacement. [69] *See* City 56.1 generally. That the City does not have a specific study measuring the efficacy of the CP policy, let alone the efficacy in comparison to or in light of other anti-displacement policies, does not make the interests the policy serves invalid or speculative. [70] *See* Goetz at ¶ 27. Certainly, if traffic patterns and historic preservation are legitimate government interests sufficient to defend against a finding of disparate impact or perpetuation of segregation, as the Supreme Court in *Inclusive Communities* opined, efforts to prevent displacement and overcome opposition to affordable housing resulting from the fear of displacement are legitimate interests. *See Inclusive Communities,* 135 S. Ct. at 2523. And, the City has established through ample evidence that the CP policy is necessary to achieve those valid interests. [71]

## C.    Plaintiffs Mischaracterize the City's Legitimate Interests

In addition to applying the incorrect legal standard, Plaintiffs' arguments fail for many other reasons. First, Plaintiffs take the City's interests out of context and treat each dissected part as an independent "justification." [72] As a result, many of their arguments are strained, because the City's legitimate government interests as presented work in concert. For example, Plaintiffs'

---

[69] Plaintiffs' reliance upon a single email exchange regarding documenting the metrics of displacement to imply that the City has had no factual basis from which to determine that displacement is serious public policy concern warranting a response fails. Plaintiffs have chosen to ignore the many documents that the City produced that included a variety of data points that paint the picture of displacement and displacement risk. *See* Polifone Dec. Ex 40.  Moreover, Matthew Murphy does not speak on behalf of the City and the document is not admissible.

[70] Moreover, as more fully explained in the Been and Goetz declarations, the CP policy focuses on displacement differently than those other policies (in particular it focuses on the preventing displacement at the neighborhood level) and thus a comparison with other anti-displacement tools is meaningless. *See* Been Dec. at ¶¶ 71-80 and Goetz Dec. at ¶¶ 60, 65. Further, as discussed in the Goetz declaration, displacement is extremely difficult to measure due to a variety of factors. *See* Goetz Dec. at ¶ 24.

[71] Even if the Court were to agree that *Huntington* and the HUD rule provided a heightened evidentiary standard and should be applied, the City's evidence meets these standards. Likewise, the City's evidence also demonstrates that the CP policy has "significant relationship to a significant interest." NYC Admin Code § 8-107(17)(a)(2).

[72] Plaintiffs seek summary judgment on each of their "justifications" independently, claiming that doing so would reduce the scope of trial. However, the City need only meet its burden with regard to a single interest, and thus, if the Court holds that the City has met its burden regarding one interest, and Plaintiffs are unable to meet prong three, no trial is needed.

"justification 1" (giving local residents a better chance to participate in the renaissance of their neighborhoods) while part of the original purposes of the CP policy, remains one of the reasons why preventing displacement (Plaintiffs' "justification 2") is so important. As Deputy Mayor Been explained: "[T]he CP policy has a distinct and important historical rationale, that has only become more acute as the City and our residents grapple with fear of displacement and the relationship between displacement and gentrification, the inequitable opportunities people in low-income and Black or Brown neighborhoods have to build wealth, and the need for investment to address disparities in neighborhood services and amenities." Been Dec. ¶ 44.

Additionally, addressing the fear of displacement (Plaintiffs' "justification 3") is directly related to overcoming opposition to affordable housing and gaining City Council Members' ("CM") support (Plaintiffs' "justification 4").[73] *See* Been Dec. ¶ 52. A passionate and frequent basis for opposition to development by communities and CMs is the fear that the development, or gentrification triggered by the development, will displace low-income community members. *See id.* ¶¶ 46, 50, 56; City 56.1 ¶¶ 83-85. Many affordable housing projects and all zoning changes that facilitate affordable housing development are subject to ULURP, a comprehensive public review process in which several public hearings are held, culminating in a vote by the City Council. The fear of displacement expressed is one of the strongest reason for opposition to these projects, which the community preference policy helps mitigate. *See id.* ¶ 57; City 56.1 ¶¶ 107-110. Thus, the City is not arguing that the policy is "necessary to convince one part of [the

---

[73] Failing to recognize the relationship between the fear of displacement and garnering Council Member approval of land use actions and housing projects has lead to Plaintiffs making nonsensical arguments. For instance, Plaintiffs argue that it is unrealistic for someone that fears displacement to have that fear reduced because "at some indeterminate point in the future, there may or may not be a lottery for an affordable housing development in his or her community..." Pls. MOL at 56 (ECF 882 at 63). Further, the idea that the CP policy increases the fear of displacement for non-CP beneficiaries is not only unsupported, and likewise makes no sense, as it is the fear of displacement from a particular project seeking approval that the City is seeking to address.

City]" Pl. MOL at 58 (ECF 882 and 65). The CP policy is necessary to address a serious and legitimate concern of elected officials (and their constituents), who are ultimately responsible for approving many actions needed to facilitate affordable housing development. *See* City 56.1 ¶ 107;  Been  ¶ 59. While Plaintiffs argue that the executive branch ought to simply try to persuade the CMs that the CP policy is not needed, or offer them other "incentives" in lieu of the CP policy and in exchange for their approval of a project delegitimizes and belittles the depth of the fears of displacement held by communities.[74] There is nothing improper about the executive branch being responsive to the legislative branch's legitimate concerns, in particular when the executive branch shares such concerns.

### D.     Plaintiffs' Use of Housing Connect Data to Attack the Legitimacy of the CP policy Fails

Plaintiffs' use of data from the City's online application database, Housing Connect, to attack the nexus between the CP policy and its legitimate interests also fails. Plaintiffs rely upon two analyses of Housing Connect—one that purports to demonstrate that applicants do not want to live in their neighborhoods and that the CP policy is "working against the vast majority of applicants the vast majority of the time," Pls. MOL at 51 (ECF 882 at 58) and the other which purports to demonstrate that more non-CP applicants are rent burdened than CP beneficiary applicants and that "a far greater number of applicants are hurt by the policy...." Pls. MOL at 53 (ECF 882 and 60).

---

[74] It also implies that Council Members can be bought by incentives. The City does not offer "incentives" but makes investments in the community where and when appropriate. Their fundamental purpose is a recognition that the City needs to invest in communities beyond housing, and that increasing density will impact other aspects of a community which the city must be prepared to address (such as open space and schools) as well. While these investments may help garner support for project approval, they will not address fears of displacement, as they are neighborhood-based investments which displaced people will not benefit from.  *See* Been Dec. ¶ 94.

While Dr. Beveridge's participation analysis shows that many applicants apply for housing outside of their CD, Dr. Beveridge's study demonstrates nothing more than the fact that people are actively applying for affordable housing wherever it may be available; the study says nothing about where people would prefer to obtain housing.[75] *See* Siskin Dec. ¶ 156-157.  In fact, Dr. Beveridge conceded as much at his deposition, testifying: "I would say that [my participation study] probably shows neither that they want to leave nor that they necessarily want to stay, but it's you know – we don't know what it shows." Polifione Dec. at Ex. 45 (at 112:24-113:1). On the other hand, Dr. Siskin demonstrated that the closer an applicant lives to a project the more likely the applicant is to apply. *See* Siskin Dec. at Table 9.

Dr. Beveridge's rent burden analysis is also flawed. First, the City has not conceded that rent burden is a proxy for displacement risk. The City has recognized that rent burden is one of *many* factors that may predict displacement. *See* Been Dec. ¶ 69; Goetz Dec. ¶ 62. Thus, a study of rent burden alone is insufficient to determine displacement risk.

However, even if one were to accept, *arguendo*, the validity of the premise of Dr. Beveridge's study, the fact that there are more non-CP beneficiaries than CP beneficiaries that are rent burdened does not undermine the validity of the CP policy. There will always be more non-CP beneficiaries, as there is typically only 1 CD obtaining the preference, thereby leaving applicants from 58 other CDs without a preference for that project. Further, the City applies the CP policy wherever the applicable housing is built, and thus, while an applicant may be a non-CP beneficiary for many applications, she may also be a CP beneficiary for others. The CP

---

[75] As Dr. Goetz explained, a policy need not address the needs and desires of every person all at once. Even if Dr. Beveridge's study were accurate, it still demonstrates a significant number of applicants who only want to remain in their CD. The CP policy is directed at these people.  *See* Goetz Dec. ¶ 65.

beneficiary group is not a static group, but changes with every project based on the location of the project. *See* Siskin Dec. ¶ 30; Goetz Dec. ¶ 64.

Ultimately, Dr. Beveridge's studies demonstrate that there are many low-income New Yorkers at risk of displacement (by Dr. Beveridge's definition) and they are applying for affordable housing wherever it may be located. Those findings do not support, as Plaintiffs argue, removing one of the City's anti-displacement tools simply because it cannot resolve the entirety of the problem. If anything, those findings suggest that the CP policy and other anti-displacement policies must be maintained. Simply because the CP policy cannot help every person at risk of displacement at the same time does not make it an invalid policy.[76] *See* Goetz Dec. ¶ 73. The CP policy is a part of the City's multi-pronged anti-displacement strategy. It is by no means the only anti-displacement tool that the City has implemented. *See* City 56.1 ¶¶ 87-95. Moreover, to the extent the CP policy helps get more affordable housing approved, it makes more affordable housing available for non-CP-beneficiaries too, as the CP policy applies to only 50% of the affordable units. *See* Been Dec. ¶¶ 60, 64 and Goetz Dec. ¶ 59; City 56.1 ¶ 117.

There is no doubt that the CP policy is necessary to serve the City's substantial, valid interests to address displacement and fear of displacement. Just as "[i]t would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable[,]" it would be paradoxical to construe the FHA to impose liability on the City for trying to help prevent the displacement of low-income people from their communities, mitigate the fear of

---

[76] Furthermore, it is important to note the contradictory nature of Plaintiffs' arguments. On the one hand, Plaintiffs argue that the CP policy is not sufficiently tailored to people who are actually at risk of displacement, and that the City lacks evidence that the applicants benefiting from the CP policy are at risk of displacement. On the other hand, Plaintiffs rely upon a study demonstrating that large numbers of the housing applicants are at risk of displacement by Dr. Beveridge's measurement of rent burden.

displacement and reduce the impediment that fear imposes on the city's efforts to provide additional affordable housing develop because Plaintiffs' "prefer" for the City to pursue the most integration possible. *Inclusive Communities,* 135 S. Ct. at 2523. "The FHA is not an instrument to force housing authorities to reorder their priorities." *Inclusive Communities,* 135 S. Ct. at 2522. Therefore, Plaintiffs' request for summary judgment in their favor must be denied and the City's cross-motion should be granted.

## POINT V

## THERE ARE NO LESS DISCRIMINATORY ALTERNATIVES

Having established that the CP policy serves the City's legitimate government interests, that the burden shifts to Plaintiffs to show "that there is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" *Inclusive Communities,* 135 S. Ct. at 2518 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). *Accord MHANY,* 819 F.3d at 617-18. Alternatives must be reasonable and "comparable." *Bryan v. Koch*, 627 F.2d 612, 619 (2d Cir. 1980).[77] The Court should not endeavor on an "open-ended" inquiry into alternatives, so as to avoid "substituting its own judgment for that of the city's elected officials and appointed specialists…concerning alternative ways to carry out municipal functions." *Id*.

Plaintiffs' purported alternatives fail both the "serves the entity's legitimate needs" requirement and the "less disparate impact" requirement. The vast majority of the alternatives

---

[77] The NYC HRL has a slightly different standard.  Plaintiffs must demonstrate that they have a less discriminatory alternative, and if they do so, then the defendant may still succeed if they show that the less discriminatory alternative will not serve their interests as well.  *See* NYC Admin Code § 8-107(17)(a)(2). As the City has explained why Plaintiffs' purported less discriminatory alternatives do not meet its interests, the City has met its burden under the NYC HRL.

proposed by Plaintiffs[78] are based on the assumption that the goal of the CP policy is "to maintain the racial status quo," *See* ECF 894-1 at ¶ 81, or the argument that the City's interests in preventing displacement and responding to the fear of displacement are not valid. Consequently, Plaintiffs' proposals are unresponsive to the City's interests. For instance, Professor Orfield suggests a communications campaign promoting the view that affordability is a citywide problem; specifically, that the city's affordable housing "belongs equally to all similarly economically-situated residents," and promoting the understanding of the harms of residential segregation. *Id.* at ¶¶ 85 and 86. These proposed messages have nothing to do with displacement or the fear of displacement. Moreover, the City already has extensive communication with the public around affordable housing and the fear of displacement. Deputy Mayor Been explained, "[s]imply telling a person that they should not be afraid of being displaced not only disregards their rational fears (and may in fact exacerbate those fears), but will do nothing to change the circumstances which give rise to their fear in the first place." Been Dec. ¶ 88. Further, the city's residents want and deserve policies to be put in place to support the messaging. Messaging is never a replacement for policy, but is a supplement. *See Id.*

Nor would somehow ending the "councilmanic veto" serve as an alternative to addressing the opposition triggered by the fear of displacement. That Council Members often defer to the Council Member whose district houses the proposed land use action is not unreasonable, as it is that Council Member who understands best the issues in that district. In a democracy, we cannot direct how Council Members vote. *See* Been Dec. ¶ 94 fn 75

---

[78] Plaintiffs appear to be relying upon their purported expert Professor Orfield to propose alternatives, as he dedicated a section of his expert disclosure to this topic. While the City has responded to his proposed alternatives herein, the City has also moved, in an accompanying motion, to deem Professor Orfield's proposed testimony inadmissible.

When Professor Orfield does recognize the City's interests surrounding displacement, he recommends that the City explain to community members that the "community preference does nothing to ensure that a resident will not be displaced." ECF 894-1 ¶ 97. Such a proposal delegitimizes what has been established as a legitimate government interest, and is not an alternative that addresses such interest. Professor Orfield's suggestions of a reduction of the CP policy to 20%[79] or an expansion of the preference areas would simply dilute the preference for those seeking to remain in their neighborhood in exchange for Plaintiffs' priorities (seeking to have the most integrative policy possible regardless of its impact on other legitimate priorities). Given the severe housing crisis and the significance of displacement as a public policy concern, reducing the effectiveness of the policy that addresses these significant and important issues is not a valid or reasonable alternative to the current policy. *See* Been Dec. ¶ 93.

Finally, and significantly, Plaintiffs failed to undertake any analysis to demonstrate that any of their "alternatives," including a reduction of the CP policy to 20% or an expansion of the policy to multiple CDs, would reduce the impact of the current policy. Without any analysis, one cannot properly conclude that these "alternatives" are "less discriminatory." Even if one were to accept Plaintiffs' assumption that this is true, without measuring the extent by which the reduced percentage or addition of CDs to the preference area would reduce the disparate impact, it is impossible to properly evaluate how much less discriminatory these alternatives would be, if at all. In the same way that the law requires that the amount of disparate impact or perpetuation of

---

[79] Plaintiffs' reliance upon City Council Speaker Johnson's statement about being open to the possibility of reducing the CP policy percentage is inapposite. Despite his title, Speaker Johnson is a single vote in the Council. Moreover, these comments were made over two years ago and since then Speaker Johnson has taken no public steps, such as proposing legislation, to follow up on his prior statements. *See* Been ¶ 93 fn 74.

segregation be legally significant, *see Davis* 166 F.3d at 438, arguably, a *de minimis* reduction in the impact should not be a basis to find that the Plaintiffs have met their burden.

In sum, Plaintiffs will be unable to meet their burden to demonstrate that there is a less discriminatory alternative to the CP policy that meets the City's legitimate needs. A finding otherwise would disregard the Second Circuit's important warning against exploring broad alternatives that would result in the courts making "policy choices…without broad public participation and without sufficient assurance that the alternative selected will ultimately provide more of a benefit to the minority population." *Bryan* 627 F.2d at 619 (rejecting alternatives proposed by the plaintiffs). Therefore, the City is entitled to summary judgment dismissing the disparate impact and perpetuation claims.

## <u>CONCLUSION</u>

In light of the foregoing, Plaintiffs' motion for partial summary judgement should

be denied and Defendant's cross-motion for summary judgment should be granted.

Dated:      New York, New York
          August 14, 2020

                    JAMES E. JOHNSON
                    Corporation Counsel of the
                     City of New York
                    Attorney for Defendant
                    100 Church Street, Room 5-192
                    New York, New York 10007
                    (212) 356-4371

                    By:   /s/ _____
                          MELANIE V. SADOK