UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

| | |
|---|---|
| SHAUNA NOEL AND EMMANUELLA SENAT, | 15 CV 5236 (LTS)(KHP) |
| Plaintiffs, | **DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL UNDISPUTED FACTS IN SUPPORT OF ITS CROSS-MOTION FOR SUMMARY JUDGMENT** |
| - against - | |
| CITY OF NEW YORK, | |
| Defendant. | |

-------------------------------------------------------------------------x

Pursuant to Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York, Defendant, the City of New York, by its attorney, James E. Johnson, Corporation Counsel of the City of New York, hereby submits the following statement of material undisputed facts as to which Defendant contends there is no genuine issue to be tried in support of its motion for summary judgment in the above-captioned action.

### A. The Community Preference Policy

1. The only policy being challenged in this case is the Community Preference Policy ("CP policy"). *See* Second Amended Complaint at ¶¶ 83-90.

2. The CP policy provides that up to 50% of the affordable housing units in an applicable new affordable housing project that are subject to the housing lottery ("lottery") will be allocated to applicants that live in the CP area, most commonly the Community District ("CD"). *See* Declaration of Vicki Been, dated August 13, 2020 ("Been Declaration") at ¶¶ 41-42.

3. The CP policy is implemented by the New York City Department of Housing Preservation and Development (HPD) and the New York City Housing Development Corporation

1

("HDC") through the lottery. *See* Declaration of Margaret Brown, Dated August 13, 2020 ("Brown Declaration") at ¶ 3.

4.   The CP policy is only applied during the initial lease-up of the affordable units through the lottery. If the first household that is awarded an affordable unit vacates that unit, when that unit is re-rented, the CP policy is not applied when the next, or any subsequent, tenant is selected. *See* Brown Declaration at ¶ 21.

5.   The CP policy gives low-income households a greater opportunity to remain in their neighborhoods in new affordable housing, if they choose to apply for housing in their CD. *See* Been Declaration at ¶¶ 66, 80-81.

6.   The CP policy was first implemented in 1988. *See* Been Declaration at ¶ 40.

7.   The CP policy was originally created to help long-term local residents who had lived through harsh conditions, including abandonment and disinvestment in their neighborhoods, to have a greater opportunity to take advantage of the new investment in their community by having a better chance to be awarded a unit in rehabilitated or new buildings. *See* Been Declaration at ¶ 40-41; Exhibit 54 at 18:25-21:19.

8.   In September 2002, then HPD Commissioner Jerilyn Perine increased the percentage of CP units from 30 percent to 50 percent.  *See* Exhibit 1[1]

9.   Former Commissioner Perine increased the percentage of the CP in response to concerns from community advocates about low-income residents being displaced.  *See* Exhibit 54 at 168:22-174:5, 175:5-178:11.

---

[1] Unless otherwise noted, all exhibits are annexed to the Declaration of Frances Polifione, dated August 14, 2020.

10. Former Commissioner Perine stated that she heard these concerns from community advocates in neighborhoods across the city. *See* Exhibit 54 at 175:9-176:11, 182:7-183:3.

11. Intentionally omitted.

12. In a letter dated November 8, 2002, former Commissioner Perine wrote that the "community preference is intended to ensure that local residents, many of whom have deep roots in the community and have persevered through years of unfavorable living conditions, have an opportunity to rent or purchase homes in their newly revitalized neighborhoods.  As a neighborhood stabilizes and becomes a desirable location, housing costs may increase to the point where long-term residents are displaced. This is a harsh and inequitable outcome for people who have endured years of unfavorable conditions, and who deserve a chance to participate in the renaissance of their neighborhoods.  The community preference ensures that affordable units will be offered to these residents."  *See* Exhibit 2.

13. While the CP policy still has an equitable purpose, the rationale behind the CP policy has evolved to address the concerns around displacement from one's community when there is an influx of investment. *See* Been Declaration at ¶ 82, n. 69; *See* Exhibit 54 at 168:22 -178:11, 182:7-183:3, 189:17-23.

14. The City maintains the CP policy because it helps prevent displacement of some low-income households from their neighborhood when new affordable housing is built in their CD, if they choose to remain. *See* Been Declaration at ¶ 66, 79-81; *see also,* Exhibit 54 at 197:8-199:14, 205:10-206:12; 53, 55, and 57.

15. The City also maintains the CP policy to address displacement and the fear of displacement that many low-income New Yorkers express and that often manifests in opposition to

housing development, even affordable housing development. *See* Been Declaration at ¶14-15, 52-59; *see also* Exhibit 53, 54 at 257:4, 55 and 57, Exhibit 7; Exhibit 10; Exhibit 11 and Exhibit 26.

16. Intentionally omitted.

17. Intentionally omitted.

18. The CP policy is applied to applicable housing projects across the city, irrespective of the racial demographics of the CD in which the project is built. *See* Been Declaration at ¶ 60, n. 44.

19. The applicants who are eligible for CP changes depending on the location of the affordable housing project and the applicants' residences. *See* Brown Declaration at ¶ 17, n. 22.

20. An applicant may be eligible for CP for some affordable housing projects but not be eligible for CP in other affordable housing projects, depending on the location of the affordable housing project and the applicant's residence. *See* Brown Declaration at ¶ 17, n. 22.

21. Intentionally omitted.

22. Intentionally omitted.

23. Intentionally omitted.

**B. New York City's Affordable Housing Lottery**

24. Many housing projects that receive subsidies or density bonuses provided by the City are required to allocate their affordable units through the lottery. *See* Brown Declaration at ¶ 3.

25. When an affordable housing project is about 70% constructed, the developer (or their marketing agent)[2] works with HPD or HDC to begin the marketing and lease-up process for the affordable units in the project. *See* Been Declaration at ¶ 54; Brown Declaration at ¶ 11.

---

[2] Developers may also work with a market agent to complete the marketing and lease-up process. Developer herein will refer to actions by the developer or its marketing agent.

26. Housing Connect is the City's centralized, online database of all newly constructed housing projects that contain affordable housing units and are accepting applications for those units through the lottery. *See* Brown Declaration at ¶ 3.

27. A person who wants to apply to one or more lotteries can submit either an electronic application through Housing Connect or a paper application. If a person submits a paper application, that information is entered into Housing Connect by either HPD or HDC and is then evaluated with and according to the same standards as the electronically submitted applications. *See* Brown Declaration at ¶ 14.

28. The CP policy does not impact the applicant information that is collected in Housing Connect. That is, the same information is collected from applicants that are eligible for CP and those that are not eligible for CP. *See* Brown Declaration at ¶ 14.

29. After the deadline to submit applications for the project has passed, Housing Connect assigns a random number to each application that was submitted.[3] *See* Brown Declaration at ¶ 15.

30. The random number assigned to each application becomes that application's log number. *See* Brown Declaration at ¶ 15.

31. After each application has been assigned a log number, a list of the applications in sequential order by log number is generated by Housing Connect. This is called the log. *See* Brown Declaration at ¶ 15

32. The log is the document that a developer uses to track and process the applications for the affordable housing project. *See* Brown Declaration at ¶ 16.

---

[3] The description of the lottery process provided herein is based on the process that was in effect when the lotteries that are part of the data set in this case took place. There have been some additional modifications to the lottery process between the last lottery in the data set, which closed in 2017, and the current lottery procedures. Some of those modifications are noted in the Brown Declaration.

33. Log numbers are used to establish the order, subject to set-asides and preferences, in which applicants will be reviewed and potentially awarded a unit, if they are eligible. *See* Brown Declaration at ¶ 15, 17.

34. A "low" log number means that the log number was low enough (closer to 1) to be reached by the developer. A "high" log number means that the log number was high enough (farther from 1) that it was not reached by a developer. *See* Brown Declaration at ¶ 15.

35. A preference means that applicants with specific qualifications are prioritized for a certain number of units. If a preference is not filled and approval from HPD or HDC is provided, the developer can fill the remaining units with applicants who do not meet those specific qualifications. *See* Brown Declaration at ¶ 20.

36. Each project has at least the following set-aside and preference categories: 7% of the units are set-aside for applicants with disabilities, up to 50% of the units are allotted for those with CP, up to 5% of units are allotted for those who are municipal employees ("municipal employee preference"). There is also a preference for any New York City resident to be processed before a non-New York City resident, which is not limited by a specific percentage of units. *See* Brown Declaration at ¶ 17-18.

37. Applicants who live in the CD in which the project is located, or CP area (if more than one CD is eligible for the CP) will be eligible for the CP ("CP beneficiaries"), and those applicants who do not live in the CD or CP area for that project ("non-CP beneficiaries") will not be eligible for the CP for that project. *See* Brown Declaration at ¶ 17, n. 22.

38. Upon receiving the log with all of the project's applications, a developer determines which applicants are apparently eligible for a unit in the project. *See* Brown Declaration at ¶ 16

39. "Apparently eligible" means that, based on self-reported application information, including the stated household size (taking into consideration the relationship between the household members), and income, that applicant meets the requirements for at least one type of unit in the project. *See* Brown Declaration at ¶ 16

40. "Apparently ineligible" means that, based on self-reported application information, including the stated household size (taking into consideration the relationship between the household members), and income, that applicant does not meet the requirements for at least one type of unit in the project. *See* Brown Declaration at ¶ 16.

41. An applicant's race or ethnicity is not a factor that determines apparent eligibility. *See* Brown Declaration at ¶ 16, n. 15.

42. There are no limitations on who may apply for affordable housing through the lottery. See Brown Declaration at ¶ 9.

43. The CP policy plays no role in whether an applicant meets the income and household size requirements to be apparently eligible for a unit. *See* Brown Declaration at ¶ 16.

44. Not all CP beneficiaries are apparently eligible for a unit. *See* Brown Declaration at ¶ 16.

45. The CP policy does not influence whether an applicant will not meet the income and household size eligibility requirements for a unit. *See* Brown Declaration at ¶ 16.

46. Developers process the applicants in log number order within each set-aside or preference category in the following order: disability set-aside, CP, municipal employee preference, and NYC resident. *See* Brown Declaration at ¶ 17-18.

47. When an applicant's log number is reached, the developer confirms that there is still a unit available for which the applicant is apparently eligible and, if so, the developer invites

7

the applicant to further verify eligibility and interest.  An apparently eligible applicant that has been reached and is invited to further verify eligibility and interest has passed is called a "Considered Applicant" *See* Brown Declaration at ¶ 17-18; Siskin Declaration at ¶ 63.

48. When an apparently eligible applicant's log number is reached by the developer, but there is no longer at least one unit type available for which that applicant is apparently eligible, the applicant will not be invited to verify their actual eligibility and interest for a unit. *See* Brown Declaration at ¶ 16. For purposes of this litigation, the applicant is called "fully-closed out." See Declaration of Andrew Beveridge, dated March 4, 2020, Section J.

49. When an apparently eligible applicant's log number is reached by the developer, and there is at least one unit type available but fewer than all unit types available for which that applicant is apparently eligible, for purposes of this litigation, the applicant is called "partially-closed out." See Declaration of Andrew Beveridge, dated March 4, 2020, Section J.

50. A developer may either choose (1) to identify all apparently eligible applicants on the log and then sort applicants into the preference/set-aside categories, or (2) to sort all applicants into preference/set-aside categories and then identify those who are apparently eligible. The order of this initial apparent eligibility determination does not change the order in which applications are reached for further processing, as that is based upon preference order and log number. *See* Brown Declaration at ¶ 16.

51. To verify one's eligibility, as relevant to the issues in this case, means that the Considered Applicant must appear for a meeting with the developer, provide required documentation so that the developer can confirm that the applicant's stated income and household size are accurate, and meet any other eligibility requirements.  *See* Brown Declaration at ¶ 18.

52. Affordable units that are not part of the 50% allotted for CP are available for any eligible applicants, regardless of where they live, subject to the general New York City resident preference. *See* Brown Declaration at ¶ 17-20.

53. Applicants that do not have any set-aside or preference, that is, those who do not have CP (50%), disability (7%), or municipal employee (5%), can compete for 38% of the affordable units in a project. *See* Brown Declaration at ¶ 17.

54. The CP policy plays no role in whether an applicant meets the income and household size requirements to be actually eligible for a unit. *See* Brown Declaration at ¶ 16.

55. Not all CP beneficiaries are actually eligible for a unit. *See* Brown Declaration at ¶ 16.

56. Being a CP beneficiary for a project does not mean that the applicant will be awarded a unit. *See* Brown Declaration at ¶ 22.

57. An applicant that is apparently ineligible (and has not succeeded on an appeal of that determination) will not be awarded a unit. *See* Brown Declaration at ¶ 16, 22.

58. Some CP beneficiaries will never be reached by a developer for an assessment of apparent eligibility because their log numbers are too high. *See* Brown Declaration at ¶ 15.

59. Some CP beneficiaries, even if reached and  apparently eligible, will never be invited to verify their eligibility because their log numbers are too high. *See* Brown Declaration at ¶ 15.

60. Some CP beneficiaries, even if determined to be apparently eligible, will never be invited to verify their eligibility because there were no units left for which they were apparently eligible when their log number was reached for consideration. *See* Brown Declaration at ¶¶ 15-16.

61. Some CP beneficiaries will be reached, considered, and even awarded a unit, but not because they were CP beneficiaries. *See* Brown Declaration at ¶¶ 15, n. 13, 17, 20, 22.

62. The CP policy influences the sequencing of which apparently eligible applications will be reached and considered for a unit. Brown Declaration at ¶¶ 17-18.

63. The CP policy influences the sequencing of which apparently eligible applications will be reached and invited to verify their eligibility for a unit. Brown Declaration at ¶¶ 17-18.

64. The CP policy influences whether a unit type that an apparently eligible applicant is apparently eligible for will still be available when the applicant's log number is reached by the developer. *See* Brown Declaration at ¶ 18.

65. The CP policy does not influence the log number an application is assigned. *See* Brown Declaration at ¶ 15.

66. The CP policy does not influence if an applicant is eligible for any other set-asides or preferences. *See* Brown Declaration at ¶ 17.

## C.  Displacement

67. Residential displacement ("displacement") is occurring in New York City. *See* Been Declaration at ¶¶ 67-70; Declaration of Edward G. Goetz, dated August 13, 2020 ("Goetz Declaration") at ¶¶ 21-29; *see also* Rebuttal Report Deposition transcript of Dr. Andrew Beveridge, dated September 24, 2019 ("Beveridge Rebuttal Deposition") at 34:19-37:6; Exhibit 12; Exhibit 13; Exhibit 32; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

68. Displacement of low-income people from their homes and neighborhoods in New York City is occurring. *See* Been Declaration at ¶ 69; Goetz Declaration at ¶ 6, 21-29; Exhibit 3 at 25.

69. Based on the 2012-2016 American Community Survey ("ACS"), almost 60 percent of low-income households in New York City were Black or Hispanic. *See* Where We Live NYC ("WWL") Draft Plan at 55.

70. Displacement of low-income people from their homes and neighborhoods is a phenomenon that is occurring not only in New York City, but many other cities across the nation. *See* Goetz Declaration at ¶ 28, 30-31, 35-37; Exhibit 3.

71. Plaintiffs' proposed expert, Myron Orfield, oversaw a study on displacement in cities across the country. One of the study's findings was that the level of displacement in New York City was "severe" and that New York City has a significant trend of low-income household displacement. *See* Exhibit 3 at 19, 25.

72. Intentionally omitted.

73. Dr. Andrew Beveridge did not dispute that displacement of low-income people in New York City is a serious public policy concern. *See* Exhibits 44 and 45.

74. Displacement of low-income people in New York City is also a fair housing concern, as the majority of low-income households are Black and Hispanic households. WWL Draft Plan at 55; Exhibit 15; Exhibit 25; Exhibit 32; Exhibit 49.

75. Displacement is a significant public policy concern that warrants a public policy response. *See* Been Declaration at ¶ 67; Goetz Declaration at ¶ 15-20; *see also* Exhibits 44, 45 and 49.

76. Fear of displacement is a significant public policy concern that warrants a public policy response. *See* Been Declaration at ¶¶ 45; Goetz Declaration at ¶ 15-20; *see also* Exhibits 44, 45 and 49.

77. Displacement of low-income residents is a serious concern in New York City for elected officials and policy makers. *See* Been Declaration at ¶¶ 58-61, 64-65; Exhibit 8; Exhibit 15; Exhibit 33; Exhibit 35; Exhibit 44 and Exhibit 45.

78. Displacement can be harmful to those who experience it. *See* Been Declaration at ¶ 71; Goetz Declaration at ¶ 41-50; Exhibit 44 and Exhibit 45.

79. Some examples of harms from being displaced include losing family- or friend-based support networks, being separated from faith based organizations, no longer having personal relationships with local stores and community-based resources, negative mental health impacts, root shock, loss of ontological security, the loss of one's place attachment, and problematic outcomes in employment and school. *See* Been Declaration at ¶ 71, Goetz Declaration at ¶ 41-50; Exhibit 25.

80. Many residents have close ties to their communities and have a genuine desire to stay in their homes and communities. *See* Been Declaration at ¶ 72, Goetz Declaration at ¶¶ 41-43; WWL Community Conversations at 35; Exhibit 10, Exhibit 16; Exhibit 25; Exhibit 31; Exhibit 32.

81. Residents, especially low-income residents, in New York City are aware that displacement is occurring. Goetz Declaration at ¶¶ 32-34; Exhibit 10; Exhibit 12; Exhibit 13; Exhibit 14; Exhibit 15; Exhibit 16; Exhibit 20; Exhibit 22; Exhibit 23; Exhibit 25; Exhibit 27; Exhibit 29; Exhibit 31; Exhibit 32; Exhibit 33; Exhibit 35; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

82. The City is aware of these concerns about residents, many of whom are low income, being displaced from their neighborhoods, because community members, community representatives and Council Members ("CMs") have been repeatedly voiced them. *See* Been

Declaration at ¶ 49-51; Exhibit 6; Exhibit 8; Exhibit 10; Exhibit 14; Exhibit 15; Exhibit 20; Exhibit 22; Exhibit 23; Exhibit 18; Exhibit 24; Exhibit 26; Exhibit 27; Exhibit 29; Exhibit 31; Exhibit 32; Exhibit 33; Exhibit 35.

83. CMs often express the concern that development will result in the displacement of the residents whom they represent from their neighborhoods. *See* Been Declaration at ¶ 59; Exhibit 6; Exhibit 15; Exhibit 23.

84. CMs have reported to City officials and/or agency employees that they often hear from the residents they represent that residents are concerned that development in their neighborhood will result in their displacement. *See* Been Declaration at ¶ 55; Exhibit 6; Exhibit 15

85. Many New York City organizations and community groups have expressed that preventing or mitigating displacement is one of their objectives. See Exhibit 9; Exhibit 10; Exhibit 12; Exhibit 13; Exhibit 14 Exhibit 16; Exhibit 19; Exhibit 20; Exhibit 31; Exhibit 32; Exhibit 35; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57; Goetz Declaration at ¶ 32-34.

86. Displacement can have many causes. *See* Been Declaration at ¶ 68; Goetz Declaration at ¶ 56; Exhibit 44 and 45.

87. The City has a multi-prong anti-displacement strategy. It includes many policies, programs, and tools that are intended to work together to tackle displacement from many perspectives, causes, and locations. *See* Been Declaration at ¶ 76-78, 83, Housing New York ("HNY"), Goetz Declaration at ¶ 51-57.

88. Increasing the total amount of affordable housing in the city is vital to the City's overall strategy to address displacement. *See* Been Declaration at ¶ 78; HNY.

89. The City has established funding and coordination for legal services for low-income people who are faced with an eviction filing in Housing Court. *See* Been Declaration at ¶ 3.

90. As of June 30, 2020, the City has subsidized the construction of more than 50,600 units of affordable housing since 2014. *See* "NHY By the Numbers" available at: https://www1.nyc.gov/site/housing/action/by-the-numbers.page.

91. As of June 30, 2020, the City has subsidized the preservation of over 114,350 affordable housing units since 2014, in order to ensure that residents of those units experience better housing quality and continued affordability. *See* "NHY By the Numbers" available at: https://www1.nyc.gov/site/housing/action/by-the-numbers.page.

92. The City has successfully lobbied the State Legislature for stronger rent regulation laws. *See* Been Declaration at ¶ 77.

93. The City has implemented programs to help prevent and redress landlord harassment of tenants. These programs include the HPD Tenant Anti-Harassment Unit (TAHU), the Tenant Harassment Prevention Task Force (THPT), and the New York City Tenant Protection Hotline. The City also educates tenants about resources at the New York State Department of Homes and Community Renewal (DHCR) and Attorney General's Office, whom tenants can contact if they believe they are being harassed. *See* Been Declaration at ¶ 83.

94. The City has a robust system for enforcing the New York City Housing Maintenance Code to prevent deterioration and neglect of housing by landlords. *See* Been Declaration at ¶ 77.

95. The CP policy is part of the City's anti-displacement efforts. *See* Been Declaration at ¶¶ 79-81; Goetz Declaration at ¶¶ 51-60.

96. New York City has a severe housing crisis. *See* Goetz Declaration at ¶ 8-10.; HVS; Been Declaration at ¶ 31-38.

97. The City's housing crisis is even more severe for affordable housing serving low-income people. *See* Been Declaration at ¶ 32-34; Goetz Declaration at ¶ 11; Exhibit 16; Exhibit 25.

98. New York City has a shortage of affordable housing. *See* Been Declaration at ¶ 34, 36; Goetz Declaration at ¶ 11, 13.

99. Based on 2017 New York City Housing and Vacancy Study ("HVS") data, the vacancy rate across the entire housing stock in New York City is 3.63 percent. *See* Been Declaration at ¶ 32; Goetz Declaration at ¶ 11.

100. Based on 2017 HVS data, the vacancy rate in New York City for rent-regulated units is 2.6 percent. *See* Been Declaration at ¶ 32.

101. Dr. Beveridge testified that the size of the housing problem in New York City is such that it is "not surprising… that people will go wherever they can to get such housing." See September 24, 2019 Beveridge Deposition, 171:16-172:4.

102. The City has access to a variety of data and information that indicates the existence of displacement in New York City. *See* Been Declaration at ¶ 69; Exhibit 12; Exhibit 13; Exhibit 20.

103. The City has access to a variety of data and information that indicates that fear of displacement in New York City has a rational basis. *See* Been Declaration at ¶ 69; Exhibit 12; Exhibit 13; Exhibit 20.

104. Given the history of discrimination, segregation and displacement in this country and in New York City, Black and Brown communities are particularly fearful of

government action that may result in their displacement. *See* Goetz Declaration at ¶ 75, 79; Been Declaration at ¶ 9-11, 19-23; Exhibit 16.

105.     Rent burden is only one of the many factors that together influence whether a household is at risk of displacement. *See* Goetz Declaration at ¶ 62; Been Declaration at ¶ 33.

**D.  Community Opposition**

106.     Intentionally omitted.

107.     Intentionally omitted.

108.     Opposition to the development of housing, including affordable housing, is often expressed during ULURP. *See* Been Declaration at ¶ 52-59; Exhibit 31; Exhibit 32; Exhibit 35; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

109.     Community opposition based upon low-income communities fearing that they will be displaced as a result of new development in their neighborhoods is often expressed at the ULURP public hearings by members of the public, community groups, and CMs. *See* Been Declaration at ¶¶ 52, 56; Exhibits 38 and 39; s*ee also* Exhibit 9; Exhibit 16; Exhibit 17; Exhibit 21; Exhibit 25; Exhibit 27; Exhibit 29; Exhibit 30; Exhibit 31; Exhibit 32; Exhibit 35; see also *Churches United for Fair Hous., Inc. v De Blasio*, 180 A.D.3d 549 (1st Dep't 2020).

110.     There was community opposition resulting from fear of displacement in the following ULURPs. *See* Exhibits 38 and 39 and Youtube videos of public hearings noted in paragraph 42 of Polifione Declaration.

111.     Residents in neighborhoods where new development is proposed often express fear that the development will spur increased housing and living costs. *See* Exhibit 6; Exhibit 9; Exhibit 16; Exhibit 17; Exhibit 21; Exhibit 23; Exhibit 18; Exhibit 25; Exhibit 27;

Exhibit 29; Exhibit 30; Exhibit 31; Exhibit 32; Exhibit 53; Goetz Declaration at ¶ 38, 40; Been Declaration at ¶ 47.

112.     Residents in neighborhoods where new development is proposed often express fear that the development will spur increased harassment from landlords; Exhibit 16; Exhibit 18; Exhibit 21; Exhibit 27; Exhibit 29; Exhibit 28; Exhibit 30; Exhibit 31; Exhibit 32; Exhibit 53; *See* Been Declaration at ¶ 47.

113.     Intentionally omitted.

114.     Community opposition to affordable housing projects has been expressed in neighborhoods across the city. *See* Exhibit 9; Exhibit 17; Exhibit 21; Exhibit 18; Exhibit 25; Exhibit 30; Exhibit 31; Exhibit 32; Exhibit 35; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

115.     Community opposition to affordable housing in New York City occurs in many low-income neighborhoods. *See* Exhibit 6; Exhibit 21; Exhibit 25; Exhibit 30; Exhibit 31; Exhibit 32; Exhibit 35; Exhibit 53.

116.     Community opposition to affordable housing in New York City often comes from residents in neighborhoods where the majority of residents are Black and/or Hispanic. *See* Been Declaration at 55; Exhibit 25; Exhibit 28.

117.     The CP policy helps the City obtain more approvals for affordable housing by addressing fears of displacement.  Been Declaration at ¶ 60; Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

118.     Community benefits that are connected to a project, e.g., community centers, improved park spaces, etc., cannot replace the CP because those benefits are by definition

neighborhood-based for that project and if a resident is displaced from that neighborhood they will not be able to participate in these benefits on a daily basis. Been Declaration at ¶ 56.

119.     Opposition to the construction of affordable housing based upon the assumed race or ethnicity of the low-income residents who will move into the project is not commonly expressed to HPD. *See* Been Declaration at ¶ 62;  Exhibit 36; Exhibit 53; Exhibit 54; Exhibit 55; Exhibit 57.

120.     CMs have asked for an increase in the amount of CP for a project on more than one occasion. *See* Been Declaration at ¶ 59; Exhibit 4; Exhibit 5.

**E.  The CP Policy Does Not Cause a Disparate Impact Against African Americans or Hispanics**

121.     Plaintiffs are two African American women. *See* Second Amended Complaint.

122.     The protected class at issue in this case is Black affordable housing applicants.[4] *See* Second Amended Complaint.

123.     Dr. Siskin's disparate impact analyses differs from Dr. Beveridge's analyses in several way. In summary, these key differences are:

  i.     Dr. Siskin applies his analyses on the entire data set from projects located across the city, and not smaller groups of data, such as Dr. Beveridge's CD typologies. *See* Siskin Declaration at ¶ 91

  ii.    Dr. Siskin does not compare CP beneficiaries with non-CP beneficiaries, other than to demonstrate that Dr. Beveridge's CP status approach undertaken on

---

[4] For facts that are based in the explanation of data analyses and because the data points use the generic term "Blacks," references to the data and its findings herein will use the same terminology as that used in referenced expert reports and data.

the citywide data shows there is no disparate impact. *See* Siskin Declaration at ¶¶ 89-90.

    iii.    Dr. Siskin analyzes whether apparently eligible applications pass the Consideration Stage, whereas Dr. Beveridge's analyses focus on the whether an entrant, apparently eligible applicant, and awardee are CP beneficiaries. *See* Siskin Declaration at ¶¶ 50, 52 94; Beveridge Declaration (ECF 883) at ¶¶ 64 and 74.

    iv.    Dr. Siskin compares the difference in outcomes with and without the CP policy in place. *See* Siskin Declaration at ¶ 103

124.    The CP policy does not cause a disproportionate impact on Black apparently eligible applications, in the ability to be considered by a developer for a unit. *See* Siskin Declaration at ¶ 96 and Table 3.

125.    The CP policy does not result in a disproportionate impact on Hispanic apparently eligible applications, in the ability to be considered by a developer for a unit. *See* Siskin Declaration at ¶ 97 and Table 3.

126.    White, Black, and Hispanic apparently eligible applications are considered by a developer and thus invited to verify eligibility at almost the exact same rates. *See* Siskin Declaration at ¶ 97 and Table 3.

127.    Dr. Beveridge concludes that the CP policy has a disparate impact on some Black entrants, apparently eligible applicants, and awardees depending on the racial demographics of the area to which they applied and their CP status. *See* Bev Dec. (ECF 883) generally.

128.    Although Dr. Siskin does not agree with Dr. Beveridge's approach comparing CP beneficiaries with non-CP beneficiaries, and does not agree that the stages Dr. Beveridge undertook in his analysis are appropriate, Dr. Siskin nevertheless applied Dr. Beveridge's CP status approach to the citywide data to show there is no disparate impact when applied citywide. *See* Siskin Declaration at ¶¶89-90; Appendix E.

129.    Dr. Siskin's analysis applying Dr. Beveridge's Method 1 to the citywide data for entrants is accurate. *See* Siskin Declaration at ¶ 89; Appendix E, Table E1; Beveridge rebuttal report, generally.

130.    Dr. Siskin's analysis applying Dr. Beveridge's Method 1 to the citywide data for apparently eligible applicants is accurate. *See* Siskin Declaration at ¶ 89; Appendix E, Table E3; Beveridge rebuttal report, generally.

131.    Dr. Siskin's analysis applying Dr. Beveridge's Method 2 to the citywide data for entrants is accurate. *See* Siskin Declaration at ¶ 89; Appendix E, Table E2; Beveridge rebuttal report, generally.

132.    Dr. Siskin's analysis applying Dr. Beveridge's Method 2 to the citywide data for apparently eligible applicants is accurate. *See* Siskin Declaration at ¶ 89; Appendix E, Table E4; Beveridge rebuttal report, generally.

133.    When the 80% rule is applied to Dr. Beveridge's Method 2 applied to the citywide data, the rates of Black and Hispanic CP beneficiary apparently eligible applications are over 80% of the rate of White CP beneficiary apparently eligible applications. *See* Siskin Declaration at ¶ 89; Appendix E, Table E4.

134.     When the 80% rule is applied to Dr. Beveridge's Method 2 applied to the citywide data, the rates of Black and Hispanic CP beneficiary entrants are over 80% of the rate of White CP beneficiary entrants. *See* Siskin Declaration at ¶ 89; Appendix E, Table E2.

135.     Dr. Beveridge does not dispute this fact. *See* Beveridge rebuttal report, generally.

136.     Within the CP beneficiary group, any difference in the selection rates by race cannot be attributable to the CP policy, as all members of this group are CP beneficiaries. *See* Siskin Declaration at ¶ 74.

137.     Within the non-CP beneficiary group, any difference in the selection rates by race cannot be due to the CP policy since all members of the group are non-CP beneficiaries. *See* Siskin Declaration at ¶ 74.

138.     When comparing the selection rate of CP beneficiary awardees with non-CP beneficiary awardees by race, after removing differences among applications within the same CP status group, the adjusted selection rates for Black, White and Hispanic apparently eligible applicants are almost identical. .  *See* Siskin Declaration at ¶¶ 75-78, 90; Appendix E, Table E5.

139.     When the 80% rule is applied to adjusted selection rates of awardees applied to the citywide data the selection rates of Black and Hispanic awardees are over 80% of the adjusted selection rate of White awardees.  *See* Siskin Declaration at Appendix E5.

140.     The adjusted selection rate analysis does not adjust for factors that impact awards by race across groups (CP beneficiary and CP beneficiary), such as whether an applicant is actually eligible and interested in a unit. *See* Siskin Declaration at ¶ 79; see also Beveridge rebuttal report and SJ Dec, generally (did not rebut or address)

141.    The CP policy impacts whether an applicant is reached and considered by a developer.  *See* Siskin Declaration at ¶ 149; *See* Exhibits 46, 47, 48, Beveridge Declaration, dated March 4, 2020.

142.    An applicant will not be able to continue in the Lottery Process to be awarded a unit unless they are considered.

143.    Dr.  Beveridge did not undertake any analysis that demonstrated that being "partially closed-out" has a disproportionate impact on Blacks or Hispanics. *See* Exhibits 46, 47, 48, Beveridge Declaration, dated March 4, 2020.

144.    Dr. Beveridge did not undertake any analysis that demonstrated that being "fully closed-out" has a disproportionate impact on Blacks or Hispanics. *See* Siskin Declaration at ¶ 149; Exhibits 46, 47, 48 and Beveridge Declaration, dated March 4, 2020.

145.    Dr. Siskin's first disparate impact study ("the DI Consideration study"), focused on the consideration stage (i.e. the stage in which a developer determines that there is a unit available for an apparently eligible applicant and thus invites the applicant to verify eligibility and interest) because that is the stage of the lottery process when the CP policy has its impact on which apparently eligible applications will be considered by a developer. Siskin Declaration at ¶ 94.

146.    The DI Consideration study analyzes the rate in which apparently eligible applications for each race are invited by the developer to verify their eligibility and interest for a unit (or the rate of being "considered" or "Consideration rate").  *See* Siskin Declaration at ¶¶ 63, 64, 94; *see also* Beveridge rebuttal report and SJ Dec, generally (didn't rebut or address)

147.    The Consideration Stage falls between an initial finding of apparently eligibility by the developer and the Confirmation Stage which leads to an award.    Siskin Declaration at ¶¶ 61-66.

148.    Once a Considered Application passes the Consideration Stage they will have to verify their actual eligibility and interest. This is the "Confirmation Stage." Dr. Beveridge does not dispute this fact. *See* Bev, generally. Siskin Declaration at ¶ 66.

149.    An applicant that passes the Consideration Stage (the Considered Applicant) is one that has been found apparently eligible by the developer and who is apparently eligible for at least one unit at the time the developer reaches its lottery number for further consideration. *See* Siskin Declaration at ¶ 63.

150.    The DI Consideration study demonstrates that the rate at which Black and Hispanic apparently eligible applications are considered is very similar to the rate at which White apparently eligible applications are considered. *See* Siskin Declaration at Table 3.

151.    The DI Consideration study demonstrates that the Consideration rate for Blacks was 12.54%. *See* Siskin Declaration at ¶ 97; Table 3.

152.    The DI Consideration study demonstrates that the Consideration rate for Whites was 12.80%. *See* Siskin Declaration at ¶ 97; Table 3.

153.    The DI Consideration study demonstrates that applying the 80% rule to the Black and White consideration rates, Blacks' consideration rate was 97.97% of Whites.  *See* Siskin Declaration at ¶ 99; Table 3.

154.    The DI Consideration study demonstrates that the Consideration rate for Hispanics was 12.30%. *See* Siskin Declaration at ¶ 97; Table 3.

155.     The DI Consideration study demonstrates that applying the 80% rule to the Hispanic and White consideration rates, Hispanics' Consideration rate was 96.09 % of Whites. *See* Siskin Declaration at ¶ 99; Table 3.

156.     If each race had the same overall consideration rate and the same overall award rate – that is, if racial parity existed in the process – Blacks would have received 43 fewer awards than they did. *See* Siskin Declaration at ¶ 101; Table 3.

157.     To have racial parity as defined above, the racial distribution of only 90 of the 10,245 awards would have to change. *See* Siskin Declaration at ¶ 101; Table 3.

158.     Factors other than the CP policy impact whether an applicant will be awarded a unit. *See* Siskin Declaration at ¶¶ 49, 66-67, 69, 73-80.

159.     A Considered Applicant who is found not actually eligible based upon the documentation submitted will not be awarded a unit, unless they appeal that decision and succeed on appeal. *See* Siskin Declaration at ¶ 66.

160.     A Considered Applicant in the projects studied needs to attend a meeting with the developer to submit documentation, notwithstanding the right to appeal. *See* Siskin Declaration at ¶ 66.

161.     A Considered Applicant in the projects studied who does not attend a meeting with the developer will not be awarded a unit. *See* Siskin Declaration at ¶ 66.

162.     A Considered Applicant who does not meet eligibility requirements other than income will not be awarded a unit, unless they appeal that decision and succeed on appeal. *See* Siskin Declaration at ¶ 66.

163.     When studying the rate at which CP beneficiaries are awarded units by race, Dr. Beveridge's does not control for factors other than the CP policy that impact whether an

applicant will be awarded a unit. *See also* Beveridge rebuttal report and SJ Dec, generally (didn't rebut or address) Siskin Declaration at ¶ 79.

164.    Among all of the apparently eligible applications, there is no meaningful difference by race in who passes the Consideration Stage when the CP policy is in effect. *See* Siskin Declaration at Table 3.

165.    Among all of the apparently eligible applications, there is no meaningful difference by race between CP beneficiaries and those without any preferences. *See* Siskin Declaration at Table 2.

166.    Among all of the apparently ineligible applications, there is no meaningful difference by race in between CP beneficiaries and those without any preferences. *See* Siskin Table 2; see also Beveridge rebuttal report and SJ Dec, generally (didn't rebut or address)

167.    Dr. Beveridge's only criticism of the DI Consideration study, other than not following his CP status and CD typologies approach, was that the ability to accurately determine who was considered was prone to error. See Beveridge rebuttal report generally.

168.    Dr. Beveridge does not dispute the DI Consideration study is reliable for analysis purposes because Dr. Siskin corrected the errors identified by Dr. Beveridge. See Beveridge rebuttal report at generally.

169.    Dr. Siskin's sensitivity study of the DI Consideration study, which reduced the number considered by 131,571, did not change Dr. Siskin's conclusions. *See* Siskin Declaration at ¶ 95 fn 71; Appendix F; see also Beveridge rebuttal report, generally (Did not dispute).

170.    Dr. Siskin's simulation experiment of the lottery with the CP policy implemented and without the CP policy implemented (the "DI Simulation") isolates the impact of

the CP policy. *See* Siskin Declaration at ¶ 103; see also Beveridge rebuttal report and SJ Dec, generally (did not rebut or address).

171.    The DI simulation is an accurate measure of the Lottery Process with and without the CP policy implemented. *See* Siskin Declaration at ¶ 103 and Table 4; *see also* Beveridge Oct. 27 rebuttal report, generally (did not dispute) and Table 9.

172.    The results of the DI simulation are accurate. *See*  Siskin Declaration at ¶ 103; Table 7.

173.    The DI Simulation study is reliable for analysis purposes. See Beveridge Declaration at 39, Table 9.

174.    Dr. Beveridge did not do an analysis to show that the applications that were not reached by a developer were disproportionately submitted by Black or Hispanic applicants. *See* Siskin Declaration at ¶ 149; See Beveridge Declaration, dated March 4, 2020, at section J.

175.    The DI simulation without the CP policy in place is the same as the simulation with the CP policy in place, except for the use of the CP policy. *See* Siskin Declaration at ¶ 105.

176.    The DI simulation study demonstrated that Black applicants received 141 or 3.9% fewer units with the CP policy in place than they would have received without the CP policy in place. *See* Siskin Declaration at ¶ 105; Table 4.

177.    The DI simulation study outcomes demonstrated that the award rate for Black apparently eligible applications with the CP policy in place was 96.1% of the award rate for Black apparently eligible applications without the CP policy in place. *See* Siskin Declaration at ¶ 106.

178.     The DI simulation study outcomes demonstrated that the relative differences in selection rates with and without the CP policy in effect for Black apparently eligible applications was 83.5% of the relative differences in selection rates with and without the CP policy in effect for White apparently eligible applications. *See* Siskin Declaration at ¶ 106, fn 78.

179.     The DI simulation study demonstrated that Hispanics received 8 or .2% fewer units with the CP policy in place than they would have received without the CP policy. Siskin Declaration at ¶ 105; Table 4.

180.     The DI simulation study outcomes demonstrated that the award rate for Hispanic apparently eligible applications with the CP policy in place was 99.8% of the award rate for Black apparently eligible applications without the CP policy in place.  *See* Siskin Declaration at ¶ 106.

181.     The DI simulation study outcomes demonstrated that the relative differences in selection rates with and without the CP policy in effect for Black apparently eligible applications was 86.7% of the relative differences in selection rates with and without the CP policy in effect for White apparently eligible applications. *See* Siskin Declaration at ¶ 106 fn 78.

182.     The DI simulation study outcomes demonstrated that if the CP policy were eliminated, the Black share of the awards would only increase by 1.38 percentage points.  *See* Siskin Declaration at ¶ 105.

183.     The DI simulation demonstrated that in order for the lottery with the CP policy in place to have the same racial distribution of awardees (which are also Considered Applications) as the lottery without the CP policy in place, the race of 169 out of 10,245 awardees would have to change.  See Siskin Declaration at ¶ 105; Table 4.

184.     Black and Hispanic lottery applicants are disproportionately awarded units through the lottery in their favor compared to their representation among Black and Hispanic low-income New York City residents (between 40% and 80% AMI). *See* Siskin Declaration at ¶ 109; Table 5; *See also* Beveridge reports, generally (did not dispute).

185.     Dr. Beveridge has not articulated a static group that is the purported protected class in his analysis. See Siskin Dec. at ¶¶ 27, 30; Beveridge Dec para 28 5c (victims).

186.     Dr. Beveridge defines the harmed group as a "member of a demographic group when members of that group are applying for housing outside of the CD typology in which they are dominant." Beveridge's Declaration para 24, page 9

187.     The dominant racial group for each plurality CD typology is *not* the dominant group awarded units in the plurality CD typology. See Bev Table 8 para 121 and Table 10 para 130.

188.      Plaintiffs are a claim that Asian entrants are disparately impacted when they apply to a project in a plurality White CD typology. *See* Beveridge SJ, para 88, fn. 39.

189.     Plaintiffs are not pursuing their claims that Asian or White entrants are disparately impacted when they apply to a project in a plurality Hispanic CD typology. *See* Beveridge SJ, para 88, fn. 39; MOL fn 16 at 17 (ECF 882 24).

190.     Plaintiffs are not pursing a claim that apparently eligible applicants of any race are disparately impacted when applying in the plurality Hispanic CD typology. See Beveridge SJ, para 103, fn. 45. MOL fn 16 at 17 (ECF 882 24)

191.     Plaintiffs are not pursuing a claim that awardees of any race in any plurality CD typology are disparately impacted. See Beveridge SJ, para 122, fn. 52; para 134; Bev Table 10 para 130; Bev Table 8 para 121.

192.     Plaintiffs are not pursuing a claim that Asian awardees in a majority White CD typology are disparately impacted. MOL 31 (ECF 882 38)

193.     Plaintiffs are not pursuing a claim that Black awardees in a majority Hispanic CD typology are disparately impacted. MOL 31 (ECF 882 38)

194.     Plaintiffs are not pursuing a claim that Asian awardees in a majority Hispanic CD typology are disparately impacted. MOL 31 (ECF 882 38)

195.     Plaintiffs are pursuing a claim that White awardees are disparately impacted in majority Hispanic CD typology. MOL 31 (ECF 882 38)

196.     Plaintiffs are pursuing a claim that White awardees are disparately harmed in majority Asian CD typology. MOL 31 (ECF 882 38)

197.     CD typologies do not represent a single CD. They represent data from CDs from across the city that have been sorted and combined based on the racial or ethnic composition of the community preference area. See Beveridge Declaration, dated March 4, 2020 at ¶ 21.

198.     Intentionally ommitted

199.     The only difference between the CD typologies is the racial demographics of the CDs from which they are constituted. See *See* Siskin Dec. at ¶ 42.

200.     Dr. Beveridge's analyses treat all CD typologies the same. *See* Siskin Dec. at ¶ 42; See Beveridge Declaration, dated March 4, 2020, generally.

201.     Dr. Beveridge's analyses treat all units in each CD typology the same. *See* Siskin Dec. at ¶ 42; Beveridge Declaration, dated March 4, 2020, generally.

202.    Dr. Beveridge did not undertake any analysis to demonstrate that certain CD typologies were preferred by applicants. *See* Beveridge Declaration, dated March 4, 2020, generally.

203.    Dr. Beveridge has not identified applicants' preferred CD typology or typologies. *See* Beveridge Declaration, dated March 4, 2020, generally.

204.    Of the applicants who applied outside their CP area to projects in only one of Dr. Beveridge's CD typologies, 34.3% of White applicants chose to apply to a project or projects only in a majority White CD typology. *See* Siskin Dec. at ¶ 43.

205.    Of the applicants who applied outside their CP area to projects in only one of Dr. Beveridge's CD typologies, 25.7% of Black applicants applied to a project or projects only in a majority White CD typology.  *See* Siskin Dec. at ¶ 43.

206.    Of the applicants who applied outside their CP area to projects in only one of Dr. Beveridge's CD typologies, 30.9% of Hispanic applicants applied to a project or projects only in a majority White CD typology. *See* Siskin Dec. at ¶ 43.

207.    The data reflects that there is no consensus that majority White CDs are preferred by Black applicants or applicants of any other racial group. *See* Siskin Dec. at ¶ 43.

**F.  The CP Policy Does Not Perpetuate Segregation**

208.    Dr. Beveridge's analysis is undertaken on small groups of data based upon the racial demographics of the CP area for each project. Dr. Beveridge refers to these groups as "CD typologies." *See* Siskin Declaration at ¶ 23.

209.    In Dr. Beveridge's "majority White CD typology," there is a greater percentage of Black and Hispanic New Yorkers in affordable housing projects than their representation in the CD typology. *See* Siskin Declaration at ¶ 147; Beveridge Exhibits 4 and 11.

210.     The racial demographic makeup of Dr. Beveridge's "majority White CD typology is 60.65% White and 6.34% Black. *See* Siskin Declaration at ¶ 147; Beveridge Exhibits 4 and 11.

211.     The racial demographic makeup of the projects in the Dr. Beveridge's "majority White CD typology" is 22.55% White and 19.40% Black. *See* Siskin Declaration at ¶ 147; Beveridge Exhibits 4 and 11.

212.     Dr. Beveridge's data shows that Hispanic CP beneficiary awardees received the largest percentage of CP beneficiary awards in Dr. Beveridge's "majority White CD typology." *See* Siskin Declaration at ¶ 146; Beveridge Exhibit 11.

213.     Dr. Beveridge's data shows that Black CP beneficiary awardees were the largest percentage of CP beneficiary awards in Dr. Beveridge's "plurality White CD typology." *See* Siskin Declaration at ¶ 146; Beveridge Exhibit 11

214.     Dr. Beveridge's data shows that Hispanic CP beneficiary apparently eligible applicants were the largest percentage of CP beneficiary apparently eligible applicants in Dr. Beveridge's "majority White CD typology." *See* Siskin Declaration at ¶ 146; Beveridge Exhibit 10

215.     Dr. Beveridge's data shows that Black CP beneficiary apparently eligible applicants were the largest percentage of CP apparently eligible applicants in Dr. Beveridge's "plurality White CD typology." *See* Beveridge Exhibit 10.

216.     The Dissimilarity Index is a statistical measure that is commonly used to assess residential segregation. *See* Siskin Declaration at ¶ 112.

217.     The Dissimilarity Index is relied upon by Dr. Beveridge in assessing the level of residential segregation in New York City. *See* Beveridge Dec, Table 1.

218.     The Lottery Process with the CP policy implemented has an overall integrative effect in New York City.  *See* Siskin Table 7. See also Ps memo at 34 (whether the policy creates less integration." and Bev table 11 shows insiders and outsiders having a net integrative effect and Bev para 152 and 158 (comparing net integrative of outsider and insider).

219.     Dr. Siskin measures the change in the Dissimilarity Index resulting from the Consideration Stage ("PS Consideration study").  *See* Siskin Declaration at ¶ 119; Table 7.

220.     The PS Consideration study demonstrated that the Consideration Stage reduces the level of integration of the affordable housing lottery by a trivial amount in the fourth decimal place. *See* Siskin Declaration at  Table 7.

221.     The Consideration Stage makes the awards less integrative among Blacks and Whites than random selection from the pool of apparently eligible applications. *See* Siskin Declaration at Table 7.

222.     The Consideration Stage makes the awards less integrative among Blacks and Whites than random selection from the pool of apparently eligible applications. by an amount in the fourth decimal place on the Dissimilarity Index. *See* Siskin Declaration at Table 7.

223.     Dr. Siskin also simulated the lottery with and without the CP policy, and determined what impact those results had on the Dissimilarity Index for all six pairs of races ("PS Simulation"). *See* Siskin Declaration at ¶ 125; Table 8.

224.     The PS Simulation isolated the impact of the CP policy on changes to the Dissimilarity Index.  *See* Siskin Declaration at ¶ 125; Table 8.

225.     The PS Simulation demonstrated that the CP policy reduces the level of integration of the Lottery Process by an amount in the fourth decimal place on the Dissimilarity Index for all pairs of races. *See* Siskin Declaration at Table 8.

226.     The PS simulation demonstrates that without the CP policy in place, the lottery would decrease New York City's Dissimilarity Index by an additional .00044, as between Black and White New Yorkers. *See* Siskin Declaration at Table 8

227.     If apparently eligible applicants were randomly awarded apartment unit, the majority of those awards would have no impact on the Dissimilarity Index. *See* Siskin Declaration at Table 6.

228.     Dr. Siskin's PS simulation of the lottery with and without the CP policy is accurate. See Beveridge Declaration, dated March 4, 2020, which used the data

229.     Dr. Beveridge's perpetuation of segregation analysis was based upon Dr. Siskin's perpetuation of segregation study outcomes. See Beveridge Declaration, dated March 4, 2020, generally.

230.     Dr. Beveridge does not dispute the PS Consideration is reliable for analysis, since he uses the outcomes of this study as the basis of his own analyses. See Beveridge Declaration, dated March 4, 2020, ¶¶ 152, 153.

231.     Dr. Beveridge does not dispute the PS Simulation is reliable for analysis, since he uses the outcomes of this study as the basis of his own analyses. See Beveridge Declaration, dated March 4, 2020, ¶¶ 152.

232.     Dr. Beveridge used part of the outcomes from Dr. Siskin's PS Consideration and then grouped them into a comparison of the integrative effect of CP beneficiaries compared to the integrative effect of non-CP beneficiaries. See Beveridge Declaration, dated March 4, 2020, ¶ 152.

233.     Dr. Beveridge used outcomes of the PS Simulation with the lottery in effect and then grouped them into a comparison of the integrative effect of CP beneficiaries

compared to the integrative effect of non-CP beneficiaries.  See Beveridge Declaration, dated March 4, 2020, ¶ 154.

234.    Dr. Beveridge determined that both CP beneficiaries and non-CP beneficiaries have an integrative effect. See Beveridge Table 11.

**G.  The CP Policy Does Not and Did Not Have Any Intention to Discriminate**

235.    There is no direct evidence that the City intended to discriminate against any racial group, including Black or Hispanic New Yorkers, in the creation, expansion, or maintenance of the CP policy.

236.    There is no circumstantial evidence that the City intended to discriminate against any racial group, including Black or Hispanic New Yorkers, in the creation, expansion, or maintenance of the CP policy.

237.    There is no direct evidence that the City intended to perpetuate segregation in the creation, expansion, or maintenance of the CP policy.

238.    There is no circumstantial evidence that the City intended to perpetuate segregation in the creation, expansion, or maintenance of the CP policy.

239.    There is no direct evidence that the City's adoption, expansion, or maintenance of the CP policy was knowingly responsive to people who have racial animus toward potential tenants of affordable housing projects.

240.    There is no circumstantial evidence that the City's adoption, expansion, or maintenance of the CP policy was knowingly responsive to people who have racial animus toward potential tenants of affordable housing projects.

241.    There is no direct evidence that the City's adoption, expansion or maintenance of the CP policy was knowingly responsive to people who desire to perpetuate segregation in New York City.

242.    There is no circumstantial evidence that the City's adoption, expansion or maintenance of the CP policy was knowingly responsive to people who desire to perpetuate segregation in New York City.

243.    Intentionally omitted

244.    Intentionally omitted

245.    Intentionally omitted

246.    Intentionally omitted

**H.  There Are No Viable Alternatives to the CP policy**

247.    Plaintiffs' proposal for stronger rent regulations and landlord harassment laws do not address displacement or the fear of displacement experienced by tenants who do not have landlords who harass them. See Been Declaration at ¶ 83-84.

248.    Plaintiffs' proposal for stronger rent regulations and landlord harassment laws do not address displacement or the fear of displacement experienced by tenants who do not live in rent regulated apartments. See Been Declaration at ¶ 83-84.

249.    Plaintiffs' proposal for policies that address displacement on a citywide level do not address displacement or the fear of displacement from one's particular neighborhood. See Been Declaration at ¶ 85.

250.    Plaintiffs' proposal for a "no-net-loss" policy does not address displacement or the fear of displacement from one's neighborhood. See Been Declaration at ¶ 86.

251.    Plaintiffs' proposal for a mobility program does not address displacement or the fear of displacement from one's neighborhood. See Been Declaration at ¶ 87.

252.    Plaintiffs' proposal for a messaging and/or an education campaigns does not address displacement or the fear of displacement from one's neighborhood. See Been Declaration at ¶ 88.

253.     Plaintiffs' proposal to combine or merge CDs based on the location of the project and its demographics to make a larger preference area is simply a less effective version of the current policy and harder to understand. See Been Declaration at ¶ 90-92.

254.     Plaintiffs' proposal to reduce the percentage of the CP to less than 50% is simply a less effective version of the current policy and harder to understand. See Been Declaration at ¶ 93.

255.     Dr. Beveridge did not undertake any analysis of the discriminatory effect of potential alternatives to the CP policy. See Beveridge reports generally; Plaintiffs' Summary Judgment motion, generally for lack of analysis of alternatives.

256.     Professor Orfield did not undertake any analysis of the discriminatory effect of potential alternatives to the CP policy. See Orfield report, generally; Plaintiffs' Summary Judgment motion, generally for lack of analysis of alternatives.

257.     Intentionally omitted.

I.   **Miscellaneous**

258.     Dr. Beveridge's participation analysis does not demonstrate that people want to live outside their community district. See Exhibits 44 and 47.

259.     The racial demographics of the neighborhood in which the project is located did not impact Plaintiff Noel's desire to live in that area. See Exhibit 42 at 89:17-19.

260.     In describing what areas of the city Plaintiff Noel would be interested in living in, she listed a number of characteristics other than race that influenced her desire to live in a neighborhood, such as the presence of culture and the arts, restaurants, and high-quality food markets.  See Exhibit 42.

261.     Harlem is a majority Black neighborhood. See WWL Draft plan at 15-17, 70, 103.

262.     Plaintiff Noel applied to at least two projects due to their proximity to Harlem. See Exhibit 42 at 61:13-6216.

263.     Intentionally omitted.

264.     Plaintiff Noel applied to 9 lotteries between February 2015 and May 2018. *See* Brown Declaration at ¶ 29.

265.     Plaintiff Noel has not applied to a lottery for affordable housing since May 2018.  *See* Brown Declaration at ¶ 29.

266.     The racial demographics of the neighborhood in which the project is located did not impact Plaintiff Senat's desire to live in that area. *See* Exhibit 43 32:20-33:3; 33:14-20.

267.     In describing what areas of the city Plaintiff Senat would be interested in living in, she did not state that living in a White majority area was her goal.  She listed a number of characteristics other than race that influenced her desire to live in a neighborhood, such as the architecture and maintenance of the buildings and restaurants in the area.  Exhibit 43.

268.     Plaintiff Senat applied to 105 lotteries between March 2014 and July 2018. *See* Brown Declaration at ¶ 26.

269.     Plaintiff Senat has not applied to a lottery for affordable housing since July 2018. *See* Brown Declaration at ¶ 26.

270.     When she applied for housing, Plaintiff Senat applied to projects that were both within and outside her community district in various parts of the City.  *See* Brown Declaration at ¶ 26.

271.     Plaintiff Senat was approved for an affordable unit awarded through the lottery in 2018.  *See* Brown Declaration at ¶ 27.

272.     Plaintiff Senat signed a lease for the unit, which is in project located in Manhattan CD 10. *See* Brown Declaration at ¶ 27.

273.     Plaintiff Senat was a resident of Manhattan CD 10 at the time she applied for and was offered an affordable housing unit. *See* Brown Declaration at ¶ 27.

274.     Plaintiff Senat was a CP beneficiary for the housing project that she applied to and was awarded housing. *See* Brown Declaration at ¶ 27.

275.     Plaintiff Senat was awarded a CP unit in Manhattan CD 10, which she accepted. *See* Brown Declaration at ¶ 27.

276.     Plaintiff Noel described gentrification as "here comes people with a lot more money taking away from other people that didn't have as much…." *See* Exhibit 42 65:17-18.

277.     Plaintiff Noel testified that she did not think it was fair when people had to leave their homes due to gentrification. *See* Exhibit 42 91:16-19.

278.     Plaintiff Noel answered affirmatively when asked whether she thought the CP policy helped people remain in their communities. *See* Exhibit 42 at 91:20-22.

Dated:        New York, New York
              August 14, 2020


_____s/_____
**FRANCES POLIFIONE**