```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------------------------------X
      JANELL WINFIELD, TRACEY STEWART and SHAUNA NOEL,
 3
                                        PLAINTIFFS,
 4

 5            -against-            Case No.:
                                   15-CV-05236(LTS)(KHP)
 6

 7    CITY OF NEW YORK,

 8                                      DEFENDANT.
      ------------------------------------------------------X
 9

10                    DATE:  January 11, 2018

11                    TIME:  11:11 A.M.

12

13

14             DEPOSITION of the Plaintiff, SHAUNA NOEL,

15    taken by the Defendant, pursuant to an Order and to the

16    Federal Rules of Civil Procedure, held at the offices of

17    the New York City Law Department, 100 Church Street, 4th

18    Floor, New York, New York 10007, before Gerard Caravella, a

19    Notary Public of the State of New York.

20

21

22

23

24

25
```

S. NOEL

1  same year.  I think, if I recall, two or three years.

2     Q.     When deciding to apply for affordable housing at

3  a particular location, what do you consider?

4     A.     Well, when I get the little pop up e-mails or if

5  I see it online, I look to see where it is, and then what's

6  around it, what's accessible, and then from there -- but

7  it's usually what's around because that's what's important

8  to me.

9     Q.     What do you mean by what's around?  What's

10 important to you?

11    A.     Restaurants, cultural things, markets where I can

12 actually get duck when I want it, so accessibility.  So

13 those things I look for first.

14    Q.     If you had been eligible and offered a lease in

15 any of the projects that you applied to, would you have

16 accepted the housing?

17    A.     Yes.

18    Q.     Are there any of the projects that you might not

19 have accepted a lease for?

20    A.     No.

21           MS. SADOK:  I would like to take a two

22           minute ladies' room break.

23           MS. WANG:  Sure.

24           (Whereupon, an off-the-record discussion was

25           held.)

S. NOEL

1      Q.      Do you know the other named plaintiffs in this

2    case?

3      A.      No.  As in -- no.

4      Q.      Have you met them prior to this lawsuit?

5      A.      No.

6      Q.      Have you met them at all?

7      A.      No.

8      Q.      Does your sister, Shanice, have any children?

9      A.      No.

10     Q.      You said that you applied for about seven

11   lotteries.  Do you know where those buildings were located?

12     A.      Honestly, I don't remember exactly where, but I

13   know I applied to certain areas.  So yeah, but I don't know

14   exactly where they are, or I don't recall, I should say.

15     Q.      All right, I have applications that you provided.

16   I'm looking at Plaintiff's 01374 and the address of the

17   project is 200 East 39th Street?

18     A.      Midtown.

19     Q.      What do you know, if anything, about that

20   neighborhood?

21     A.      East 39th, generally, the midtown area.  So let's

22   see, I can -- I can get to Lincoln Center in about 15 to 17

23   minutes.  I can also get to my favorite farmer's market in

24   about the same time.  The Long Island Railroad is not too

25   far away from there.  Grand Central Terminal is not too far

S. NOEL

1   away.  They have a pretty decent market there, too.  So
2   yeah, it's a good place to be.
3       Q.      What were your expectations when you applied for
4   a housing lottery?
5               MS. WANG:  Objection.
6       A.      I don't know.  Can you really explain what you
7   mean?  Like what you're --
8       Q.      Well, I guess I'm trying to understand a few
9   things.  Let me think about how to break that down a little
10  bit more for you.
11      A.      Yeah.  Thanks.
12      Q.      What is your understanding about your chances in
13  terms of getting housing through the lottery system?
14      A.      So like, my understanding is -- I think we've
15  touched on it a bit before.  You apply.  There's a certain
16  amount of units that are available.  Let's say, there are
17  30 units available, and they'll list what they are and the
18  criteria for each unit, you know, three, four people, three
19  people, whatever and the income.  And so then you choose
20  the ones that suit you.  And if it's like, okay, there are
21  five apartments now available to you in this unit that fit
22  your income, what you're looking for, and so you apply.
23  And then -- my understanding is, so then you're now
24  eligible to be in the pool for, like, half of that based
25  on, you know, if I'm outside the community.  So yeah, so my

S. NOEL

| | | |
|---|---|---|
| 1 | Q. | Have you ever applied for an apartment for an |

2  affordable housing lottery outside of New York City?

| | | |
|---|---|---|
| 3 | A. | No. |
| 4 | Q. | I have a copy of an application that you |

5  produced, Plaintiff's 01390 where you applied for housing

6  at the Riverton apartment; is that correct.

7     A.    So I don't remember names of like, which, you

8  know, the building developments, but is that the one that's

9  -- it should be on the Upper Manhattan.

10    Q.    I believe so.  I believe it is around 2156

11 Madison Avenue?

12    A.    Mmhmm.

13    Q.    What do you know about that neighborhood?

14    A.    So that's not too far from Harlem.  So again,

15 that would be the cultural aspect that I'm looking for to

16 be closer to.

17    Q.    What, specifically, what cultural aspect?

18    A.    Generally, so I want to be close to shows and

19 plays and art and, you know, on the rare Saturday night

20 when I'm home, I would like to be able to be a few subway

21 stops or a short cab ride from an art exhibit.  Or you

22 know, a really, really great restaurant and not have to get

23 in the car or a bus, so that's what I mean by cultural.

24 And Harlem is full of that.  And I can actually go to a

25 supper club for once in my life, so yeah.

S. NOEL

1    Q.    And what about an application that you made for
2    133 Equities, which I believe that project was located --
3    well, it's a variety of buildings but either on 116th
4    Street or 133rd Street on the west side or 137th?
5    A.    Yeah, again, that would be for the same reasons.
6    Q.    So what do you know, specifically, about that
7    neighborhood?
8    A.    Well, one of my best friends lives on 125th.  So
9    again, it's close to -- it's close to everything.  Those
10   are the pockets that I'm trying to get into.  You know,
11   again, proximity to culture.  You can actually take the
12   subway across, the green light over.  You can get to Hunts
13   Point Market from there.  So it's still close to a lot of
14   things that I'm looking for.  And again, what I'm looking
15   for is proximity to food, culture, and to have a life
16   that's not spent commuting.
17   Q.    I understand that.
18   A.    Yeah.  Right.
19   Q.    So I have another application here, Plaintiff's
20   01386 where you applied for Camba Gardens phase 2.
21            MS. SADOK:  The 133 Equities was also phase
22         2, for the record.
23   Q.    Do you know where that project was located, or is
24   located?
25   A.    Is that one in Brooklyn.

S. NOEL

1    Q.    This is in Brooklyn, yes.  Do you know the
2    neighborhood in Brooklyn?
3    A.    I don't recall exactly which neighborhood, but
4    would it be close to the Clinton Hill or Park Slope area?
5    Q.    It is Winthrop Street so my understanding is that
6    that's Lefferts Garden?
7    A.    Yeah, it's down close to, 2 Park Slope-ish area.
8    Q.    I'm not so familiar with that neighborhood
9    myself, so I can't confirm.  And what do you know about
10   that neighborhood?
11   A.    Lots.  So the Brooklyn museum is not too far
12   away.  Prospect Park is not too far away.  The DeKalb
13   Market is not too far away.  The Atlantic Terminal is not
14   too far away.  So they have, probably, the most amazing
15   vegan restaurants not too far away.  Maybe like two miles,
16   two miles away, if you can get to Clinton Hill, it's like a
17   cluster that neighborhood of just all foodie fun art.  It's
18   my demographic of, in terms of, younger, you know, people
19   so 35ish, 45, a lot of young families.  So it's -- that's
20   the place to be.  My opinion.
21   Q.    And would you say the same about the project that
22   you applied for at 535 Carlton Pacific Park?
23   A.    Yeah, it's all that cluster neighborhood of
24   Clinton Hill, Bushwick, Park Slope, Prospect Heights,
25   they're all easy, commutable to get to something that's

1   happening in the area.
2   Q.   So I don't have too many more questions, but it
3   is 1 o'clock, and I would like to take a break just to sort
4   of organize and make sure that I hit everything that I need
5   to.  So I recall that you said you would like to eat around
6   1 o'clock.  So that would give me the opportunity to grab a
7   bite and organize myself, but I don't expect it will take
8   very much longer on the other end.  Off the record.
9            (Whereupon, an off-the-record discussion was
10           held.)
11  Q.   Have you heard the word gentrification before?
12  A.   Yes.
13  Q.   And what does the word gentrification mean to
14  you?
15  A.   I guess, it's when a neighborhood changes and the
16  original population is phased out by others who make more,
17  change the neighborhood.  I guess, a synopsis of what I
18  understand it is.
19  Q.   And do you believe that there are neighborhoods
20  in New York City that are gentrifying?
21           MS. WANG:  Objection.
22  A.   Probably.
23  Q.   Have you observed, from your opinion, certain
24  neighborhoods that have gentrified?
25           MS. WANG:  Objection.

S. NOEL

1      A.      I currently don't, you know, like live in a
2   neighborhood that has been gentrified, but I'm sure there
3   are neighborhoods that are.
4      Q.      Do you consider your neighborhood gentrifying?
5              MS. WANG:  Objection.
6      A.      I don't think so.
7      Q.      Do you think of gentrification as a good or bad?
8              MS. WANG:  Objection.
9      A.      Um, for how it stands and how it happens, I
10  wouldn't consider it necessarily a positive thing.
11     Q.      What do you mean, "how it happens"?
12     A.      So by that I mean, usually, it's not --
13  gentrification is not a melting of neighborhoods.  It's not
14  "Oh, well, all of sudden it's like a black neighborhood."
15  And then "Oh, yay, here comes some white people or Spanish
16  people."  Like, that's usually not what it means.  It
17  usually means, here comes people with a lot more money
18  taking away from other people who didn't have as much.  So
19  that's what I mean, "How it happens."  It's not like "Oh,
20  we're just melting and mixing a neighborhood.  It's just
21  people who can afford things coming up and buying up things
22  from other people who can't afford things.  So how it
23  happens like that, usually, gentrification happens like
24  that, then it's not necessarily a good thing.
25     Q.      And what is your understanding of what happens to

1  those people who have the housing or the things taken away
2  from them by the people coming in with higher incomes?
3              MS. WANG:  Objection.  It's just on the most
4          broad level.
5      A.    Yeah, I don't know what happens to like, to the
6  people.  I don't know.
7      Q.    Do you see development of new buildings happening
8  in your neighborhood?
9      A.    My neighborhood, no.
10     Q.    Do you see any investment in your neighborhood in
11 terms of infrastructure?
12     A.    There's nothing in my neighborhood --
13             MS. WANG:  Objection.
14     A.    -- no.
15     Q.    Do you see any investment happening in terms of
16 stores or amenities?
17             MS. WANG:  Objection.
18     A.    Not that I've noticed.  In my neighborhood, you
19 mean, right?
20     Q.    Yes.
21     A.    No.
22     Q.    Your current neighborhood?
23     A.    No.
24     Q.    If there was new investment in your neighborhood,
25 would you want the opportunity to stay?

S. NOEL

1          MS. WANG:  Objection.
2     A.     It depends on how much new development.  And
3  again, my interest is in food, culture, arts, that kind of
4  thing, so it depends if my neighborhood, if all of that,
5  which I don't think would happen but possibly.
6     Q.     And if all of that investment did come to your
7  neighborhood and you thought, "Wow, this is great," and a
8  new building went up with affordable housing.  Would you
9  want a slightly better chance of being awarded an apartment
10 there?
11         MS. WANG:  Objection.
12    A.     No.  Because I wouldn't think that was fair, and
13 -- no, that would be -- that would make me part of being
14 unfair because then I have a leg up where somebody doesn't.
15 I should have the same opportunities as everybody else.
16    Q.     Have you ever communicated with the news or press
17 concerning this lawsuit?
18    A.     No.
19    Q.     Have you communicated with them regarding the
20 issues around the community preference policy that this
21 lawsuit is focussed on?
22    A.     No.
23    Q.     Have you communicated with advocacy groups?
24    A.     No.
25    Q.     Like a not-for-profit organization?

S. NOEL

1   neighborhood?

2       A.      So I would describe that as, obviously, in my

3   opinion, I'll see a neighborhood that has -- just like what

4   the name says, opportunity, so better schooling, better

5   services, better cultural access, better quality of regular

6   services.  Like, I stated before, you know, a supermarket

7   where I can actually get a duck breast.  I can't get that

8   around -- no, it's not funny.  I can't get that around my

9   neighborhood.

10              MS. WANG:  I'm sorry.

11      A.      You can't get tarragon, you know, I have to

12  always just have sage.  So for me, a neighborhood of

13  opportunity would have that, so I think it's -- it might be

14  a lot individual to a person.  But for me, it's where you

15  have more opportunities to grow as a person and live and

16  flourish, so that's what I think.

17      Q.      In choosing a neighborhood in which to live, does

18  the racial demographics of that neighborhood matter to you?

19      A.      No.

20              (Whereupon, at 2:46 P.M., the testimony was

21              deemed confidential and placed in a separate

22              booklet.)

23              (Whereupon, at 3:19 P.M., the

24              non-confidential testimony resumed.)

25      Q.      I apologize.  I'm coming to an end here.  I'm

S. NOEL

1   A.   Yeah, I can.  My income changed and my living
2   situation changed.  And I was also married before, and it
3   was something that my husband wasn't interested in doing.
4   And so my situation for me changed.  And it was something
5   that I figured I was at the right point with my -- I had
6   income that actually qualified for something.  And so I did
7   it.  You know, it was a different point in my life.
8              MS. SADOK:  All right.  So if you want to
9         give me just like a five minute break, and I'll
10        just try to make sure that I hit everything and
11        you guys can feel free to take a stretch and use
12        the ladies' room.
13             MS. WANG:  Sure.  Off the record.
14             (Whereupon, an off-the-record discussion was
15        held.)
16  Q.   Do you think it is fair if people have to leave
17  their homes when gentrification occurs?
18             MS. WANG:  Objection.
19  A.   No.
20  Q.   Do you think that the community preference policy
21  helps people to stay in the community?
22             MS. WANG:  Objection.
23  A.   Yes.
24  Q.   Prior to meeting Roger, were you aware of the
25  community preference policy?

1   think you said that you wanted the system to be more fair
2   for everyone; is that correct?
3       A.   Correct.  So I -- what I'm hoping to get is that,
4   again, this might not change anything for me, personally,
5   but in general, what I'm hoping to happen is that everyone
6   who applies to affordable housing, has a more even
7   opportunity or equal opportunity to actually qualify based
8   on them rather than based on where they're applying from.
9   So it should be based off of their fitness for whether it
10  be income or whatever else are the background necessities
11  that that's the driving force on a broader scale rather
12  than; "Well, here's half of them just because you live
13  here," and then the other stuff applies so --
14      Q.   Okay.  And do you think that the community
15  preference policy is more unfair for blacks or African
16  Americans?
17           MS. WANG:  Objection.
18      A.   So I feel that in a lot of ways it is because the
19  neighborhoods of opportunity normally are not minority
20  neighborhoods.  And let's just be real about that, most
21  optimistic's refer examples (sic) like what I said, I'm
22  looking for most neighborhoods with great culture and great
23  music and great food and great schools and great farmer's
24  markets, they don't have a demographic that looks like me
25  or that looks brown or that looks any other shade of color.

S. NOEL

1           C E R T I F I C A T E

2

3   STATE OF NEW YORK            )
                                  : SS.:
4   COUNTY OF RICHMOND           )

5

6           I, GERARD CARAVELLA, a Notary Public for and

7   within the State of New York, do hereby certify:

8           That the witness whose examination is

9   hereinbefore set forth was duly sworn and that such

10  examination is a true record of the testimony given by that

11  witness.

12          I further certify that I am not related to any

13  of the parties to this action by blood or by marriage and

14  that I am in no way interested in the outcome of this

15  matter.

16          IN WITNESS WHEREOF, I have hereunto set my hand

17  this 26th day of January 2018.

18

19

20          _____
              GERARD CARAVELLA

21

22

23

24

25

**Diamond Errata Sheet**

Plaintiff(s): Shauna Noel, Janell Winfield, Tracey Stewart

Defendant(s): City of New York

| Page | Line | Correction | Reason for Correction |
|---|---|---|---|
| | | See attached sheets for all corrections. | |

Date: 3/14/18

Name of Witness: Shauna Noel-Robinson

Signature: /s/ Shauna

Subscribed and sworn to before me
This 14 of March, 2018.

NOTARY PUBLIC — STATE OF NEW YORK
SWORN TO AND SUBSCRIBED
BEFORE ME THIS DATE

Notary Public

MAR 14 2018

LISA E. CHRISTMAS
No. 01CH6321238
Qualified in Kings County

**Corrections to Shauna Noel's Deposition Transcript**:

Page 7, line 23:
Change: "Surf safe"
Corrected To: "ServSafe"

Page 11, line 3:
Change: "any where"
Corrected To: "anywhere"

Page 11, line 19:
Change: "injured to the preference"
Corrected To: "injured by the preference"

Page 12, line 22:
Change: "if I live, too, far away"
Corrected To: "if I live too far away"

Page 26, line 14:
Change: "puddy"
Corrected To: "putty"

Page 27, line 15:
Change: "when I'm presenting a new lease"
Corrected To: "When I'm presented a new lease"

Page 30, line 9:
Change: Terrice"
Corrected To: "Terrias" (appears twice)

Page 45, lines 4–5:
Change: "you've sold a certain amount of money"
Corrected To: "you've made a certain amount of money"

Page 54, line 14:
Change: "2014"
Corrected To: "2015." Ms. Noel first met Roger Maldonado on the street in 2015, not in 2014.

Page 62, line 12:
Change: "green light"
Corrected To: "green line"

Page 63, line 7:
Change: "2"
Corrected To: "to"

Page 63, line 17:
Change: "foodie fun art"
Corrected To: "foodie fun and art"

Page 73, line 25:
Change: "an advance"
Corrected To: "in advance"

Page 82, lines 14–15:
Change: "legal advised"
Corrected To: "legal advice"

Page 83, line 6–8:
It has now been clarified that this email from Roger Maldonado to Shauna Noel constituted legal advice and was protected by attorney-client privilege.

Page 83, lines 13–14:
Change: "an e-mail which legal advice was starting to provided"
Corrected To: "an e-mail in which legal advice was starting to be provided.''

Page 90, lines 24–25:
Change: "torn client"
Corrected To: "attorney client"

Page 92, line 23 – page 93, line 1
As noted in the correction to page 54, line 14, Ms. Noel met Mr. Maldonado in 2015, not in 2014.

Page 98, lines 20–21:
Change: "most optimistic's refer examples (sic) like what I said"
Corrected To: [We are unable to determine what this phrase should be corrected to, but as the transcription stands it is clearly incorrect.]

Page 99, lines 14–15:
Change: "other people who don't want to look like me and maybe want to"
Corrected To: "other people who look like me and maybe want to"

Page 99, line 18:
Change "because you're here"
Corrected To: "because you're here"" (include closing quotation mark)

Page 112, line 20:
Change: "their"
Corrected To: "they're"

Page 114, line 13:
Change: "make contributions"
Corrected To: "make in contributions"

Page 117, line 14:
Change: "Terrice"
Corrected To: "Terrias"

Page 120, line 8:
Change: "Terrice"
Corrected To: "Terrias"

Page 124, line 23:
Change: "tax slayer"
Corrected To: "TaxSlayer"

3