UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SHAUNA NOEL and EMMANUELLA SENAT,

        Plaintiffs,

        -against-                         15-CV-5236 (LTS) (KHP)

CITY OF NEW YORK,

        Defendant.

-----------------------------------------------------------------x

### PLAINTIFFS' MEMORANDUM OF LAW IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, 7th Floor
New York, New York 10177
(212) 537-5824
*Co-Counsel for Plaintiffs*

Mariann Meier Wang
Cuti Hecker Wang LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600
*Co-Counsel for Plaintiffs*

November 5, 2020

*On the brief:*
Craig Gurian
Roger D. Maldonado

## TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................i

LIST OF CHARTS...............................................................................................v

TABLE OF AUTHORITIES..................................................................................vi

LIST OF ABBREVIATIONS ...............................................................................xi

INTRODUCTION ...............................................................................................1

POINT I
THE CHALLENGED RULE LEAVES STANDARDS IN
PLACE THAT ARE FATAL TO DEFENDANT'S CASE...........................................5

    A. The Challenged Rule is unrelated to plaintiffs'
    FHA intentional discrimination claims....................................................5

    B. The Challenged Rule does not and could not limit or change the City HRL.. ......................6

    C. Perpetuation-of-segregation claims continue to be viable.....................6

    D. The Challenged Rule acknowledges that a defendant's
    asserted interest must be substantial......................................................6

    E. The Challenged Rule specifies that it is not enough to have
    a substantial interest; defendant must present evidence that the
    justification advances the interest.........................................................7

    F. The Challenged Rule precludes remote or speculative justification evidence. ......................7

POINT II
THE POLICY'S DISPARATE IMPACTS AT CD-TYPOLOGY LEVEL
REMAIN UNDISPUTED; BOTH DEFENDANT'S SEPARATE-BUT-EQUAL
THEORY AND ITS BID TO HAVE THE FRONT END OF THE LOTTERY
PROCESS IGNORED SHOULD BE REJECTED. ....................................................7

    A. The Court should reject defendant's separate-but-equal approach........................8

    B. The Court should reject defendant's bid to ignore the start of the process...........................12

    C. There is no dispute that outsiders are considered materially
    less frequently than insiders because of the policy...................................14

    D. It is the policy that causes the disparate impact.................................16

E. Defendant's methodological critiques are wholly lacking in merit. .....................................18

  1. The appropriateness of performing analysis at the CD-typology level. ...........................18

  2. CD-typology analysis allows for a full analysis
of the totality of the relevant protected class. ........................................................................19

  3. Dr. Siskin's employment analogies fail to reckon
with disparate impact in housing. ...........................................................................................21

  4. Professor Beveridge's analytical methods are appropriate................................................23

  5. Defendant's attacks on the practical and statistical significance
of the results obtained by Professor Beveridge are misguided...............................................24

F. Dr. Siskin's approaches to simulated and actual awards,
disaggregated to CD typology, are strongly confirmatory
of the policy's causing racially disparate impacts. ..................................................................26

  1. Dr. Siskin's approach to simulations dilutes the disparities
that exist, but nevertheless confirms those disparities............................................................27

  2. Dr. Siskin's approach to actual awarded is
problematic, but nevertheless confirmatory of
the existence of multiple disparate impacts. ...........................................................................28

G. Defendant's other assertions are without merit ...................................................................29

  1. Defendant fails to come to grips with the lessons of *Comer*
and *Langlois* as they relate to the appropriate scope of analysis.........................................29

  2. Bottom-line analysis is an appropriate supplemental analysis. ........................................29

  3. Defendant's "abandonment" of claims argument demonstrates
the opposite of what defendant suggests it does.....................................................................30

  4. Dr. Siskin's "mathematical axiom" is inapposite.............................................................30

POINT III
DEFENDANT FAILS TO RAISE ANY ISSUE THAT PRECLUDES
A FINDING THAT THE POLICY PERPETUATES SEGREGATION.....................................31

  A. The policy stymies integration (perpetuates segregation) significantly. .............................32

B. Change in the dissimilarity index is not the measure of
whether a policy is perpetuating segregation or whether it
is perpetuating segregation significantly; to adopt defendant's
approach would seriously hamper the vitality of fair housing laws. ........................................34

C. There is no "a little integration is enough" defense. ...........................................................36

D. Safeguards for defendants ..................................................................................................38

E. Each racial pairing must stand alone. ................................................................................38

F. Comparing the "with preference" simulation
to the "without preference" simulation ...................................................................................40

POINT IV
DEFENDANT'S OPPOSITION PAPERS HIGHLIGHT DEFENDANT'S
LACK OF EVIDENCE IN SUPPORT OF ITS JUSTIFICATIONS. ..........................................41

A. Displacement and fear of displacement. ...........................................................................43

1. It is undisputed that almost every type of displacement
and fear of displacement is not addressed by the policy. .....................................................43

2. The policy is not designed to advance, and does not
advance, the articulated goal of reducing non-imminent
displacement from neighborhood. ........................................................................................44

3. If possible, defendant's evidentiary problem is
yet more acute when it comes to fear of
non-imminent displacement from neighborhood. .................................................................48

4. There is no substantial interest of defendant in
singling out the neighborhood level in respect to
displacement or fear of displacement. ..................................................................................50

5. It is not a legitimate nor substantial interest of defendant
to reduce fear of non-imminent displacement from
neighborhood by the means of misleading New Yorkers .....................................................55

B. Defendant ignores the multiple hurdles
that bar "Council Member support" from
being a legally sufficient justification. ..................................................................................56

C. Persevering through long years of difficult conditions ......................................................62

POINT V
DEFENDANT HAS AVAILABLE A VARIETY OF ALTERNATIVES
THAT ARE LESS DISCRIMINATORY THAN THE POLICY. .................................63

Alternative 1. Be honest about what the policy does and does not do.. ....................64

Alternative 2. Explain to residents and CMs the importance of
reducing residential segregation to the maximum extent possible
and of fighting the citywide housing crisis on a united, citywide basis. ...................64

Alternative 3: Take account of and communicate improvements
in rent regulation and other tenant protections. ............................................66

Alternative 4.  Persist in building and preserving more
affordable housing throughout the city as a means,
*inter alia*, of preventing displacement from neighborhood......................................67

Alternative 5: Mobility counseling.............................................................69

Alternative 6: Provide funding for neighborhood
renewal and enhancement that benefit all residents. ...................................70

Alternative 7: A no net-loss policy.............................................................70

Alternative 8: Eliminate the councilmanic veto. .........................................71

Alternative 9:  Combine CDs in implementing the preference. ..................72

POINT VI
EXTENSIVE EVIDENCE OF INTENTIONAL DISCRIMINATION
PRECLUDES THE GRANT OF DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT ON THESE CLAIMS AND POINTS
INSTEAD TO PLAINTIFFS' LIKELIHOOD OF SUCCESS ON THE MERITS. .....................73

A. Defendant's responsiveness....................................................................75

B. Defendant's knowledge of resistance to residential racial change. ....................75

C. Defendant's clear pattern of treating the prospect of residential
racial integration as fraught and politically sensitive. ...............................78

D. The fact that the policy causes disparate impacts
and perpetuates segregation is another *Arlington
Heights* factor that weighs in plaintiffs' favor..........................................79

E. The expansion and maintenance of the policy
represent departures from how HPD policy is
usually made, another *Arlington* factor. ....................................................................80

F. The willingness of defendant to engage in other
segregation-perpetuating housing practices and to
fail to remedy other such practices is probative of
discriminatory intent in relation to the policy. ........................................................82

G. Evidence of pretext and consciousness of guilt. ................................................83

POINT VII
THE CHALLENGED RULE IS INVALID ON
A VARIETY OF GROUNDS AND THUS COULD
NOT BE APPLIED IN THE INSTANT MATTER. ....................................................89

CONCLUSION ...........................................................................................................95

## LIST OF CHARTS

Chart 5: Presence of material disparate impact found as to one or more racial groups…………..26

<u>TABLE OF AUTHORITIES</u>

CASES

*Attenborough v. Const. & Gen. Bldg. Laborer's Local 79,*
   691 F. Supp. 2d 372 (S.D.N.Y. 2009), ...................................................................24

*Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29
   (N.Y. App. Div. 1st Dept. 2011) ..................................................................78, 91, 92

*Cadet-Legros v. N.Y. Univ. Hospital Ctr.*, 135 A.D.3d 196
   (N.Y. App. Div. 1st Dept. 2015) ........................................................................76, 92

*Comer v. Cisneros,* 37 F.3d 775 (2d Cir. 1994) ...............................................12, 17, 32

*Connecticut v. Teal,* 457 U.S. 440 (1982) .................................................................13, 32

*Criley v. Delta Air Lines, Inc.*, 119 F.3d 102 (2d Cir. 1997)......................................24

*Davis v. NYCHA*, 278 F.3d 64 (2d Cir. 2002) ...............................................................40

*Davis v. NYCHA,* 60 F. Supp. 2d 220 (S.D.N.Y. 1999) ...............................................40

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019)...............................77, 93, 97

*Dist. Council 37 v. N.Y.C. Dep't Parks & Rec.*, 113 F.3d 347 (2d Cir. 1997)............33

*Dothard v. Rawlinson*, 433 U.S. 321 (1977) .................................................................50

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016)......................................93

*F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ................................96, 97

*Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties,*
   *LLC*, 2017 WL 2022462 (W.D. Wash. May 12, 2017) ...........................................50

*Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC*,
   743 F. App'x 116 (9th Cir. 2018) ...........................................................................50

*Ferrill v. Parker Grp., Inc.*, 168 F.3d 468 (11th Cir. 1999)........................................76

*Fisher v. Vassar College*, 70 F.3d 1420 (2d Cir. 1995) ...............................................22

*Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987) ....................................................76

*Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).........................................................94

CASES (CONTINUED)

*Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*,
   630 F.2d 79 (2d Cir. 1980) ........................................................................50

*Hollander v. American Cyanamid Co.*, 172 F.3d 192 (2d Cir. 1999) ...........................................23

*Huntington Branch N.A.A.C.P. v. Town of Huntington*,
   844 F.2d 926 (2d Cir. 1988), ...............................................................*passim*

*In re County of Erie*, 546 F.3d 222 (2d Cir. 2008) ........................................................64

*Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324 (1977)........................................27

*Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369 (2004)..........................................76

*Langlois v. Abington Hou. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002)............................22, 32, 46

*Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364 (2d Cir. 1989)....................................24

*Mack v. United States*, 814 F.2d 120 (2d Cir. 1987) ....................................................61

*MHANY Mgmt. v. Inc. Vill. of Garden City*,
   985 F. Supp. 2d 390 (E.D.N.Y. 2013)....................................................................39

*MHANY Mgmt., Inc. v. County of Nassau*,
   819 F.3d 581 (2d Cir. 2016) ..............................................................*passim*

*Mihalik v. Credit Agricole Cheuvreux North America, Inc.*,
   715 F.3d 102 (2d Cr. 2013) ..........................................................................9

*New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. Jan. 2019).....................77

*New York v. U.S. Dep't of Health and Human Servs.*,
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...................................................................97

*Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572 (2d Cir. 1969)....................................61

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .............................................77

*Regents of University of California v. Bakke*, 438 U.S. 265 (1978)............................................17

*Ricci v. DeStefano*, 557 U.S. 557 (2009)........................................................................97

*Richardson v. City of New York*,  2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018)........................20

CASES (CONTINUED)

*Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032 (2d Cir. 1979) ....................................7

*Rosen v. Thornburgh*, 928 F.2d 528 (2d Cir. 1991) .....................................................77

*Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279 (S.D.N.Y. 2001) .............22

*Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999) ...........................................23, 24

*Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
   576 U.S. 519 (2015) ...........................................................................................*passim*

*Tirado v. Shutt*, 2015 WL 6866265 (S.D.N.Y. Nov. 9, 2015) ........................................5

*Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003) .......................24, 95

*United States v. Apple Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013) .......................77, 78

*United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015) .........................................78

*United States v. Bilzerian*, 926 F.2d 1285 (2d Cir. 1991) .......................................63, 64

*United States v. Starrett City Assocs.*, 840 F.2d 1096 (2d Cir. 1988) ..........................41

*United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181 (2d Cir. 1987) ..........................76

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977) ..................77, 82, 84

*Wards Cove Packing Co, Inc. v. Atonio*, 490 U.S. 642 (1989) .........................32, 94, 95

*Washington v. Davis*, 426 U.S. 229 (1976) .................................................................76

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977 (1988) .............................................27

*Weiss v. La Suisse*, 141 F. App'x 31 (2d Cir. 2005) ....................................................76

*Williams v. NYCHA*, 61 A.D.3d 62 (N.Y. App. Div. 1st Dept. 2009) ....................38, 41

*Williams v. NYCHA*, 879 F. Supp. 2d 328 (E.D.N.Y. 2012) .......................................22

*Winfield v. City of New York*, 2016 WL 6208564 (S.D.N.Y. Oct. 24, 2016) ........................*passim*

FEDERAL STATUTES

   42 U.S.C. § 2000e....................................................................................................94

## FEDERAL STATUTES (CONTINUED)

42 U.S.C. § 2000e-2 .................................................................................................93, 94

42 U.S.C. § 3615 ............................................................................................................9

Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et seq (1964) (Title VII) .........................passim

Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat 1071 (1991) .......................................94

Fair Housing Act, 42 U.S.C. § 3601 *et seq.* ..............................................................passim

## FEDERAL REGULATIONS AND RULES

24 C.F.R. § 100.500(a) (2013)...........................................................................................9

24 C.F.R. § 100.500(a) (2020).........................................................................................9

24 C.F.R. § 100.500(b) (2013) ...............................................................................9, 10, 45

24 C.F.R. § 100.500(b) (2020) ...................................................................................9, 19

24 C.F.R. § 100.500(c) (2013)......................................................................................*passim*

24 C.F.R. § 100.500(c) (2020)......................................................................................*passim*

Fed. R. Civ. P. 26...........................................................................................................56

HUD's Implementation of the Fair Housing Act's Disparate Impact Standard,
    85 Fed. Reg. 60288 (Sept. 24, 2020) ..........................................................................*passim*

Implementation of the Fair Housing Act's Discriminatory Effects Standard,
    78 Fed. Reg. 11460 (Feb. 15, 2013) ...........................................................................8, 96

## NEW YORK CITY ADMINISTRATIVE CODE AND LOCAL LAWS

N.Y.C. Admin. Code § 8-107(17) ......................................................................................34

N.Y.C. Admin. Code § 8-107(17)(a)(1) .............................................................................19

N.Y.C. Admin. Code § 8-107(17)(a)(2) ........................................................................45, 66

N.Y.C. Admin. Code § 8-107(5)(a)(1)(a)..........................................................................35

N.Y.C. Admin. Code § 8-130(c) ...................................................................................38, 78

NEW YORK CITY ADMINISTRATIVE CODE AND LOCAL LAWS (CONTINUED)

N.Y.C. Admin. Code § 8-502(h)(2)..................................................................................17

N.Y.C. Local Law 35 of 2016 (Mar. 28, 2016)..............................................................38

New York City Human Rights Law (Title 8 of N.Y.C. Admin. Code).................................*passim*

## LAW JOURNALS

Craig Gurian, "Let Them Rent Cake: George Pataki, Market Ideology, and the Attempt to Dismantle Rent Regulation in New York," 31 Fordham Urb. L.J. 339 (2004)..........................69

## LIST OF ABBREVIATIONS

| Abbreviation in Current Brief and/or Response to Defendant's 56.1 | Alternative or Additional Abbreviation Used Heretofore | Document Description |
|---|---|---|
| **Briefs** | | |
| DOX Brief | | Defendant's Aug. 14, 2020 opposition and cross-motion brief (ECF 902) |
| PI Brief | | Plaintiffs' Mar. 6, 2020 initial brief for summary judgment (ECF 892) |
| PRO Brief | | Plaintiffs' memorandum of law in reply to defendant's opposition to motion and in opposition to defendant's cross-motion |
| **Declarations** | | |
| BD | | March 4, 2020 declaration of Professor Andrew Beveridge (ECF 883) |
| Been Aug. 2020 Dec | | Aug. 14, 2020 declaration of Vicki Been (ECF 899) |
| Been 2015 Dec | Been Decl | Oct. 2, 2015 declaration of Vicki Been (ECF 18) |
| BROD | | Oct. 29, 2020 declaration of Professor Andrew Beveridge |
| de Blasio Dec | | July, 23 2018 declaration of Mayor de Blasio (ECF 497) |
| | GD | March 6, 2020 declaration of Craig Gurian (ECF 885) |
| Goetz Aug. 2020 Dec | | Aug. 13, 2020 declaration of Professor Goetz (ECF 898) |
| Gurian LM Dec | | Oct. 29, 2020 legislative materials declaration of Craig Gurian |

| Abbreviation in Current Brief and/or Response to Defendant's 56.1 | Alternative or Additional Abbreviation Used Heretofore | Document Description |
|---|---|---|
| **Declarations (continued)** | | |
| MD | | Nov. 5, 2020 reply and opposition declaration of Roger Maldonado |
| Orfield Oct. 2020 Dec | | Oct. 29, 2020 declaration of Professor Myron Orfield |
| SD | | Aug. 13, 2020 declaration of Dr. Bernard Siskin (ECF 897) |
| **Other Filings** | | |
| D56.1 | | Defendant's Aug. 14, 2020 statement of material facts not in dispute (ECF 904) |
| D56.1PR | | Plaintiffs' Nov. 6, 2020 responses and objections to D56.1 |
| P56.1 | PS | Plaintiffs' statement of material facts not in dispute (ECF 881-1) |
| P56.1DR | | Defendant's objections and responses to P56.1 (ECF 901) |
| **Other Documents** | | |
| | Answer to SAC | Defendant's July 20, 2018 answer to plaintiffs' second amended complaint |
| Def. amended responses to RTAs | Def's RTA Responses | Defendant's Oct. 2, 2019 amended responses to plaintiffs' requests to admit |
| Goetz Feb. 2019 Report | Goetz report | Feb. 13, 2019 report of Edward Goetz |
| | Siskin Opp | Dec. 13, 2019 amended opposition report of Dr. Bernard R. Siskin |

| Abbreviation in Current Brief and/or Response to Defendant's 56.1 | Alternative or Additional Abbreviation Used Heretofore | Document Description |
|---|---|---|
| **Deposition Transcript Excerpt(s)** | | |
| Banks Depo | | Nov. 29, 2017 deposition of Steven Banks |
| Been I | | Aug. 2, 2017 deposition of Vicki Been |
| Been II | | Apr. 10, 2018 deposition of Vicki Been |
| Bozorg Depo | | Jan.10, 2019 deposition of Leila Bozorg |
| | Brown | Jan. 18, 2018 deposition of Margaret Brown |
| Glen Depo | Glen | Nov. 3, 2017 deposition of Alicia Glen |
| Murphy I | Murphy, Murphy Depo | Mar. 16, 2018 deposition of Matthew Murphy |
| Goetz I | | Apr. 5, 2019 deposition of Professor Edward Goetz |
| | Goetz II | July 31, 2019 deposition of Professor Edward Goetz |
| Kapur Depo | Kapur | Apr. 19, 2018 deposition of Purnima Kapur |
| Noel Depo | | Jan. 11, 2018 deposition of Shauna Noel |
| Perine Depo | | Oct. 26, 2017 deposition of Jerilyn Perine |
| | Quart | June 14, 2018 deposition of David Quart |
| Siskin I | | Aug. 26, 2019 deposition of Dr. Bernard Siskin |
| Siskin II | | Nov. 15, 2019 deposition of Dr. Bernard Siskin |
| T-S Depo | Torres-Springer | May 10, 2018 deposition of Maria Torres-Springer |
| Weisbrod Depo. | Weisbrod | July 27, 2017 deposition of Carl Weisbrod |

INTRODUCTION

Per longstanding Circuit precedent, this Court has already ruled in this matter that each applicant for housing is entitled to compete on a level playing field.  *Winfield v. City of New York*, 2016 WL 6208564, at *4 (S.D.N.Y. Oct. 24, 2016).   There was no "only some of the time" limitation.  The right to equal competition exists each time an individual chooses to apply.

This should be easy: defendant could simply *honor the choices that New Yorkers applying for affordable housing actually make.*  But defendant remains committed to continuing its housing lottery sequencing and unit-allocation policy,[1] even though the data make painfully clear that doing so causes significant race-based disparate impacts and significantly stymies integrative moves.  Its response is characterized by three main themes: conceal, distract, and propose theories that would substantially undermine the viability of the Fair Housing Act ("FHA") and New York City Human Rights Law ("City HRL").  This introduction points only to a few illustrative examples.

Starting with disparate impact (*see* Point II, *infra*), defendant tries to make significant racial disparities at the level of community-district ("CD") typology magically disappear by using a citywide analysis that embraces separate-but-equal reasoning.   According to defendant, for example, the policy's harm to African Americans when denied equal opportunity in lotteries in majority-White CDs can be "offset" by the policy's relative benefit to African Americans when they apply to lotteries in CDs where African Americans are in the majority.

Defendant also wants the Court to ignore the start of the process, where the policy – and *only* the policy – takes what would otherwise be a level playing field consisting of a unified applicant pool, and (a) creates a favored sub-pool of insiders and a disfavored sub-pool of outsiders; (b) eliminates the opportunity for the newly-created class of outsiders to compete for all

---

[1] Defendant calls the policy "community preference," while plaintiffs, more aptly, have dubbed it "outsider restriction."  This brief will generally refer to the policy simply as "preference," "preference policy," or "the policy."

units (let alone compete fairly for all units); and (c) thus creates a variety of significant disparate impacts across CD typologies.  As defendant admits, the preference tilts the odds (denies a level playing field), and the distorted odds are never "un-tilted" or "cured" later on in the process.

Furthermore, as to lottery units being awarded, even the methods that defendant seeks to employ confirm significant racial disparities when applied to individual CD typologies rather than to citywide data. This is true in all the majority-race typologies and in the plurality-Black typology.

As for perpetuation of segregation (*see* Point III, *infra*), defendant tries to distract from the policy's significant curtailing of integrative moves in *all six* race-pair analyses.  One strategy: the misleading suggestion that changes in the "dissimilarity index" (an oft-used measure of how much segregation *exists* in a jurisdiction or regional to assess *perpetuation* of segregation in relation to a project or projects. In fact, those expert in the field of housing segregation *never* rely on changes in segregation indices to measure perpetuation of segregation.[2]  Plaintiffs' expert, Professor Andrew Beveridge, who does have extensive experience in analyzing housing segregation and its perpetuation, confirms this, noting that "housing segregation experts instead look to whether a policy predictably reduces integrative moves that would otherwise occur."[3]

---

[2] Defendant's expert Dr. Bernard Siskin admits that he is *not* a housing segregation expert beyond the basic computation of a dissimilarity index.  *See* excerpts of transcript of Aug. 26, 2019 deposition of Dr. Siskin ("Siskin I"), annexed as Ex 1 to Nov. 5, 2020 reply and opposition declaration of Roger Maldonado ("MD"), at 111:7-112:7 (acknowledging, *inter alia*, that, prior to this case, he was probably retained in "only one actual housing segregation case"); and at 290:16-292:5 (acknowledging that the indices are "not an area I've studied off the top of my head"; that to "refresh my memory" on these indices, "I talk to my daughter, who has a Ph.D. in sociology"; and that, as "we're talking about knowledge in terms of the conceptual concepts of [segregation indices] that go beyond the computation which is what they measure[, t]hat I think is really a more sociological issue that I could not claim expertise in").  *See also* excerpts of transcript of Nov. 15, 2019 deposition of Dr. Siskin ("Siskin II"), MD Ex 2, at 76:9-77:2 (declining to answer whether there is a minimum amount that an index of segregation has to change for there to be perpetuation of segregation: "I'm not answering that question because it's not in my area of expertise"); and at 14:12-19 ("I don't claim to study the housing area literature,").  *Cf. Tirado v. Shutt*, 2015 WL 6866265, at *9 (S.D.N.Y. Nov. 9, 2015) (Swain, J.) (citation omitted) (applying principle that experts must stay within reasonable confines of their subject area as admission of an expert does not provide that individual with carte blanche to opine on every issue in the case).

[3] *See* Oct. 29, 2020 declaration of Professor Andrew Beveridge ("BROD"), at 30, ¶ 108.  **A list of abbreviations, cross-referenced with those used in plaintiffs' other papers, including their Mar. 6, 2020 initial brief ("PI Brief"), is found,** *supra*, **at xi.**

As to its proffered justifications for the policy (*see* Point IV, *infra*), defendant openly suggests that they should *not* be scrutinized carefully.   Why?   Defendant's justifications are shifting and vague and defendant, contrary to the FHA and City HRL requirements to do so, offers *no evidence* that any of its justifications are actually *advanced* by the policy.

In terms of displacement and "fear of displacement," defendant now *admits* that the policy does *not* prevent displacement or fear of displacement from one's apartment or displacement from the City. Defendant further admits that the policy does *not* grapple with *imminent* displacement.

To the extent that defendant is pursuing a justification that some amount of affordable housing would not be built in the absence of the policy,[4] it again has no evidence.   Though defendant attempts to shroud its Council Member ("CM") justification in terms of *constituent* concerns, CMs are officers of defendant who have it entirely in their control to vote for zoning and other measures to facilitate affordable housing development.   Despite conclusory assertions in Deputy Mayor Been's declaration that contradict her deposition testimony, *defendant has admitted that it has no evidence* that in a world where the policy no longer operated, CMs would oppose the facilitation of affordable housing development *that they otherwise would have supported*.[5]

Because defendant's policy causes significant disparate impacts and perpetuates segregation as a matter of law, and because no reasonable jury could conclude that defendant has a legally sustainable justification for the policy, there will be no reason to take up the question of less discriminatory alternatives ("Stage 3").   If the Court came to do so, however, it would see that defendant has misconstrued the alternatives and evidence plaintiffs advance (*see* Point V, *infra*).

In defendant's argument for summary judgment on the intentional discrimination claims,

---

[4] There has never been any evidence produced of what the quantum of such a housing shortfall would be.

[5] Even though doing so would only reduce the amount of affordable housing constructed, not bring back the policy.

defendant predicted that plaintiffs would refer to about 20 documents and several depositions.[6] Even if true, this says nothing: clever defendants routinely conceal their discriminatory motives.[7] In fact, as obliged to by the broad nature of a series of defendant's propositions in its FRCP 56.1 statement,[8] plaintiffs have cited substantially more pieces of evidence.[9]

More important than number, of course, is substance (*see* Point VI, *infra*). Defendant makes no bones about the fact that the policy was responsive to those who opposed affordable housing development. And multiple documents, testimony, and formal admissions demonstrate that defendant, *inter alia*: (a) knows that opposition is often triggered by the prospect of residential racial change; (b) is highly sensitive even to the discussion of fair housing or impediments to fair housing choice, a sensitivity probative of its a willingness to appease those who prefer the residential racial status quo; (c) maintains (and expanded) the policy in a way altogether inconsistent with the normal procedural and substantive standards at HPD; (d) has a history of segregation-perpetuating housing policies; (e) falsely claims – including in the context of this lawsuit – that it takes segregation seriously, assertions which require a jury to weigh evidence of consciousness of guilt and allow a jury to disregard testimony of many officials; (f) pursues the policy to the detriment of what itself claims to consider paramount interest in eliminating school segregation and the housing segregation that underlies it; and (g) puts forward numerous pretexts.

A final point. Both when this case was commenced, and when previously briefing was

---

[6] *See* defendant's Aug. 14, 2020 opposition and cross-motion brief ("DOX Brief"), at 12 n.18. Defendant failed to confront that evidence specifically, thus failing to meet its burden that no jury could find for plaintiffs on those claims.

[7] *See Huntington Branch N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir. 1988), *superseded by statute on other grounds as recognized by* 819 F.3d 581 (2d Cir. 2016) (citations omitted) (underscoring "as this court noted in *Robinson*, 'clever men may easily conceal their motivations'").

[8] *See* defendant's Aug. 14, 2020 Statement of Material Facts Not in Dispute (D56.1), ¶¶ 235-242. Plaintiffs' Nov. 6, 2020 responses and objections to D56.1 will be denominated as "D56.1PR."

[9] D56.1PR, ¶¶ 235-42, referencing D56.1PR, Appendix.

filed, the U.S. Department of Housing and Urban Development ("HUD") rule applicable to disparate impact and perpetuation of segregation under the FHA was that adopted in 2013 ("2013 HUD Rule").[10]  In September, HUD published a rule that purports to replace the 2013 HUD Rule. The new rule has already been challenged;[11] it is referred to in this brief as "the Challenged Rule."[12] The Challenged Rule is contrary to law and otherwise invalid (as discussed in Point VII, *infra*), and thus the Court would necessarily continue to apply the 2013 HUD Rule.  But even were the Challenged Rule to stand, plaintiffs still prevail on all of their claims (*see* Point I, *infra*).  Both the 2013 HUD Rule and the Challenged Rule are irrelevant to plaintiffs' intentional discrimination claim under the FHA and to all of plaintiffs' claims (intentional discrimination, disparate impact, and perpetuation of segregation) under the independently interpreted (and uniquely broad and remedial) City HRL.  In terms of disparate impact and perpetuation of segregation under the FHA, the Challenged Rule *retains* evidentiary requirements that defendant has not and cannot meet.

POINT I

THE CHALLENGED RULE LEAVES STANDARDS IN PLACE THAT ARE FATAL TO DEFENDANT'S CASE.

There are important continuities between the 2013 HUD Rule and the Challenged Rule.

**A. The Challenged Rule is unrelated to plaintiffs' FHA intentional discrimination claims.** It deals with disparate impact and perpetuation of segregation but does "nothing" to alter

---

[10] The preamble of (explanation for) the Rule and the text of the Rule itself are found at 78 Fed. Reg. 11460 (Feb. 15, 2013), annexed as Ex 1 to the Oct. 29, 2020 legislative materials declaration of Craig Gurian ("Gurian LM Dec"). The relevant portion of the Rule was codified at 24 C.F.R. § 100.500, annexed to Gurian LM Dec, as Ex 2.

[11] *See* Gurian LM Dec, at 1-2, ¶ 6.  Note that Vice-President Biden, the apparent President-elect, has promised to reverse the Challenged Rule if elected.  *See* https://joebiden.com/housing/#.

[12] The preamble and text of the Challenged Rule are found at 85 Fed. Reg. 60288 (Sept. 24, 2020), annexed to Gurian LM Dec, as Ex 3.  The relevant portion of the Rule is codified at 24 C.F.R. § 100.500, annexed to Gurian LM Dec, as Ex 4. To distinguish between versions of 24 C.F.R. § 100.500, we append the year (*i.e.*, 2013 versus 2020).

the FHA's legal "mechanisms" regarding intentional discrimination.  85 Fed. Reg. at 60297.

**B. The Challenged Rule does not and could not limit or change the City HRL.**  The rule does not purport to change local law, nor could it: the FHA acts as a floor, not a ceiling, in respect to the protection of rights.[13]  And, as the Second Circuit has recognized, "courts must analyze [City HRL] claims separately and independently from any federal and state law claims." *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).

**C. Perpetuation-of-segregation claims continue to be viable.**  The 2013 HUD Rule specifies that a "discriminatory effect" encompasses not only a practice the results in a "disparate impact," but also a practice that "perpetuates segregated housing patterns." 24 C.F.R. § 100.500(a) (2013).  The Challenged Rule states that a "discriminatory effect" is prohibited where it has a "disproportionately adverse effect."  24 C.F.R. §§ 100.500(a) and (b)(2) (2020).  The preamble, however, makes clear that removal of the phrase "perpetuates segregated housing patterns" was part of "HUD's streamlining of the regulation" and was "not meant to imply that perpetuation of segregation could never be a harm prohibited" nor "modifies" the rule. 85 Fed. Reg. at 60306.[14]

**D. The Challenged Rule acknowledges that a defendant's asserted interest must be** *substantial*.  As relevant here, the 2013 HUD Rule defined a "legally sufficient justification" as a practice that is necessary to achieve one or more "substantial, legitimate, nondiscriminatory interests" of the defendant.  24 C.F.R. § 100.500(b)(1)(i) (2013).  The Challenged Rule speaks in terms of a "valid" interest.  24 C.F.R. §§ 100.500(b)(1) and (c)(2) (2020).  The preamble to the

---

[13] *See* 42 U.S.C. § 3615 (establishing that nothing in the FHA "shall be construed to invalidate or limit any law of a State or political subdivision of a State, or of any other jurisdiction in which this subchapter shall be effective, that grants, guarantees, or protects the same rights as are granted by this subchapter").

[14] *See also Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 540 (2015) (identifying the aim of the FHA as ensuring that governmental priorities are being achieved without arbitrarily "creating discriminatory effects or perpetuating segregation").

Challenged Rule, however, makes clear that "an interest that is intentionally discriminatory, non-substantial, or otherwise illegitimate would necessarily not be 'valid.'" 85 Fed. Reg. at 60322.[15]

**E. The Challenged Rule specifies that it is not enough to have a substantial interest; defendant must present *evidence* that the justification *advances* the interest.**  A defendant's obligation still includes "producing evidence showing that the challenged policy or practice advances a valid interest (or interests)."  24 C.F.R. § 100.500(c)(2) (2020).

**F. The Challenged Rule precludes remote or speculative justification evidence.**  The 2013 HUD Rule explained, "A legally sufficient justification must be supported by evidence and may not be hypothetical or speculative." 24 C.F.R. § 100.500(b)(2) (2013).  While the Challenged Rule's text refers to the defendant's obligation of "producing evidence," 24 C.F.R. § 100.500(c)(2) (2020), the preamble states, "HUD has concluded that evidence which is remote or speculative would necessarily not be allowed under administrative and judicial rules of evidence."  85 Fed. Reg. at 60320.  Thus, there remains no warrant for speculative or hypothetical justifications.

<u>POINT II</u>

THE POLICY'S DISPARATE IMPACTS AT CD-TYPOLOGY LEVEL REMAIN UNDISPUTED; BOTH DEFENDANT'S SEPARATE-BUT-EQUAL THEORY AND ITS BID TO HAVE THE FRONT END OF THE LOTTERY PROCESS IGNORED SHOULD BE REJECTED.

In the course of a 68-page brief, an 89-page declaration from its statistical expert, and 83 pages of objections and responses to plaintiffs' FRCP 56.1 Statement,[16] defendant offers no data

---

[15] The use of the disjunctive "or" demonstrates that the presence of any of the three items listed renders an interest "not valid."  Thus, for example, it could not be a defense that, while an interest was "intentionally discriminatory," it nevertheless passes muster because it was "substantial."  Likewise, an interest that is "non-substantial" cannot be saved by the fact that it is not "otherwise illegitimate" or "intentionally discriminatory."  Whether defendant needs to show that the interest is substantial, or plaintiffs need to show that the interest is "non-substantial," is a different question.  What is not disputed is that the interest must *in fact* be substantial in order to be valid.

[16] References to plaintiffs' FRCP 56.1 statement are indicated by "P56.1."  References to defendant's objections and responses to plaintiffs' FRCP 56.1 statement are indicated by "P56.1DR."

7

at the CD-typology level to rebut plaintiffs' showings that the policy does cause disparate impacts at that level.  Defendant does not dispute the fact that: (a) it is the policy that substantially tilts the playing field in favor of insiders (CP beneficiaries) at the outset; (b) that the policy's tilt cannot later be remedied; or (c) "the racial group with applications that are disproportionately CP beneficiaries within a majority CD typology will always be the majority race and will more likely be the plurality race within a plurality CD typology."  [P56.1DR, ¶¶ 48-50, 71.]

Instead, defendant seeks to evade its culpability in three principal ways.  First, defendant asks the Court to ignore disparate impacts at the CD-typology level, arguing, in true separate-but-equal fashion, that disadvantage in one CD-typology can be "offset" by advantage in another.  Second, defendant seeks to have the Court ignore the fundamental task that the policy performs *as soon as all applications are in* (and as to which there is no dispute): take what would otherwise be equal odds for and equal access to *all* apartments for *all* applicants,[17] and distort the sequencing and allocation in a way that limits access to approximately half of the apartments (and gives insiders distinctly superior odds to get any apartment) to the insider group, the group that is the dominant racial group in the CD-typology.  Third, defendant seeks to divert the Court's attention with a series of misleading and irrelevant arguments, including those treating "consideration," methodology, and "selection rate."

**A.  The Court should reject defendant's separate-but-equal approach.**  In defendant's view, a disparate impact only occurs if a racial group's disadvantage in one area is not "offset" by advantage in another.[18]  In the same vein, defendant falsely attempts to distinguish two inextricably linked concepts, arguing that analysis at the CD-typology level addresses *where* applicants are able

---

[17] Leaving aside preferences and set-asides not relevant to this case.

[18] *See* Siskin II, at 13:6-22.

to compete for housing, not *whether* they are able to compete for housing fairly.[19]

By so doing, defendant would have even the most massive disparities ignored, arguing that citywide "balance" negates disparate impact even if a policy denies all but White applicants the opportunity to be reached in lotteries in a 100 percent White borough, all but Black applicants the opportunity to be reached in lotteries in a 100 percent Black borough, etc. [P56.1DR, ¶¶ 83-84.][20]

Defendant's premises are mistaken. First, you can only compete *fairly* if you can do so *wherever* you choose. If that were not the case, *Comer*'s[21] injunction against denying the opportunity to compete equally with local residents would be meaningless. "Yes, you can compete without disadvantage in one or two typologies" is not the same as, "Yes, you can compete without disadvantage whenever and wherever you apply." *See* this Court's ruling in *Winfield*, 2016 WL 6208564, at *4 (citing *Comer* holding that outsiders must be able to compete equally for housing with locals). *See also Inclusive Communities*, 576 U.S. at 521 (emphasis added) ("Suits targeting unlawful zoning laws and other housing restrictions that unfairly exclude minorities from *certain neighborhoods* without sufficient justification are at the heartland of disparate-impact liability.").

Second, disparate impact doctrine is not and could not be limited in the way defendant suggests. Under defendant's system, a New Yorker does not make an overarching application for affordable housing "in general"; instead, he or she makes one or more *specific* applications as he

---

[19] *See* declaration of Dr. Bernard Siskin ("SD"), ECF 897, at 20-21, ¶ 41, and *see* DOX Brief, at 26.

[20] Similarly, Dr. Siskin offers a hypothetical where Whites are disproportionately the policy beneficiaries of a lottery in a majority-White CD and Blacks are disproportionately the policy beneficiaries of a lottery in a majority-Black CD. According to him, the fact that Whites and Blacks have the same number of awards when you aggregate the results of both lotteries) means that no disparate impact is established for a protected class. *See* SD, at 13, ¶ 28 and "Illustration 1"; and at 14, ¶ 29. The illustration provided contravenes the actual data. Here, he has 100 insider and 100 outsider applicants. If the applications in the hypothetical were like actual apparently eligible applications in majority-White CDs, there would be 6-7 insiders and 193-194 outsiders. *See* March 4, 2020 declaration of Professor Andrew Beveridge ("BD"), at 44, ¶ 143 and n.57 (showing outsiders at 96.90 percent of apparently eligible applicants in majority-White CDs, and that, across CD typologies, outsiders are 94.5 percent of apparently eligible applicants).

[21] *Comer v. Cisneros*, 37 F.3d 775, 794 (2d Cir. 1994).

or she chooses.  When a New Yorker *specifically* applies to a *specific* lottery and is denied by the policy an equal opportunity to compete without regard to race, he or she is injured at that moment.

An injury that accrues when one is denied an equal opportunity to compete without regard to race in one CD typology cannot be "undone" by what happens in respect to the right to compete equally, without regard to race, for housing opportunities in *other* CD typologies.  *See Connecticut v. Teal*, 457 U.S. 440, 455-56 (1982) (neither a victim of disparate treatment nor disparate impact may be told that "he has not been wronged because other persons of his or her race or sex were hired").  That, for example, the policy advantages Black applicants in competition for housing in dominant-Black CDs does nothing to change the answer to the question: "Have Black applicants been disadvantaged when applying for housing in dominant-White CDs?"  (A: They have.)

In other words, what defendant is offering as an offset to Black applicants ("we'll help you when you apply in CD typologies where your group is dominant") is irrelevant to the detriments Black applicants suffer when they choose to apply elsewhere, as in a lottery for housing in a majority-White CD typology.  That would be true even were it not the case that each "offset" injures one or more other racial groups (*e.g.*, Hispanics in the majority-Black CD-typology).[22]

Once it is appreciated that the policy causes *multiple injuries*, Dr. Siskin's "paradox" – that the same applicant who applies for housing in multiple CD typologies can be "both favored and discriminated against"[23] – is not paradoxical at all.  On some occasions, the applicant is discriminated against on the basis of race; on other occasions, that same applicant is not.

---

[22] Dr. Siskin states that "Black and Hispanic New Yorkers disproportionately benefit from the Housing Lottery." *See* SD, at 56-57, ¶ 109.  In fact, even if one took the misleading-for-disparate-impact citywide view, and the misleading approach of not disaggregating insiders from outsiders, African Americans represent 37.21 percent of apparently eligible applicants and 32.63 percent of awardees.  *See* BD Ex 10, Section 3b (apparently eligible) and BD Ex 11, Section 3b (awardees).  Latinos represent 36.33 percent of apparently eligible applicants and 35.87 percent of awardees.  *Id.*  There is no "disproportionate benefit" when one examines apparently eligible households who are actually applying.  Where benefits and detriments do occur *among applicants* is at the CD-typology level.

[23] *See* SD, at 14-15, ¶ 30.

Defendant's observation that the policy is "applied consistently at each project across the city"[24] adds nothing to its argument: "applied consistently" citywide is only another way of describing the policy as one that is facially neutral.  The existence of a facially neutral policy does not end the inquiry; on the contrary, it is the beginning of the disparate impact inquiry.[25]

Finally, defendant's bid to have the Court limit its view to a citywide perspective on disparate impact is a *post hoc* rationalization.  In 2014, when then-HPD Commissioner Vicki Been was corresponding with HUD about "HUD's concerns about the fair housing implications" of the policy, the information she detailed was at *the CD level.*[26]

<span style="color:red">Redacted over plaintiffs' objections. Note: full, non-redacted document is in public domain, having been provided to plaintiffs by HUD in response to a FOIA request.</span>

The reason for the *post-hoc* rationalization of a citywide approach is plain: conceal from the Court the varied disparate impacts at the CD-typology level that are fully confirmed by the data – including data generated by defendant's expert's simulations.

Because citywide analysis is the wrong lens to use in analyzing the disparate impacts of a policy executed each time on a CD level, all of defendant's disparate-impact analyses must be

---

[24] *See id.*; *see also* DOX Brief, at 20.

[25] *See* BROD, at 2, ¶ 6 (footnotes omitted) ("We know that the policy is implemented at the CD level.  We know that the racial demographics of CDs differ substantially.  The only way to determine whether there are any patterns to what, if anything, the policy is doing in terms of causing disparate racial impacts is to create a reasonable classification system (majority-race CD typologies and plurality-race CD typologies) and *look*.").  The appropriateness of measuring impact at the level of CD typologies is discussed further, *infra,* at 18-19.

[26] See Been letter to HUD, Sept. 5, 2014, MD Ex 3, at 3 ("we have analyzed a variety of ways in which we might modify the community district preference"); and *id.* (in the next section on "Measuring the diversity of community districts," noting that the "racial diversity index" of "individual community districts ranged from a low of .21 (BK 17: Flatbush, Brooklyn) to a high of .84 (QN 10: South Ozone Park and Howard Beach, Queens).  The RDIs for all 59 community districts are arrayed in Appendix A").

[27] *See id.* at 4   <span style="color:red">Redacted over plaintiffs' objections. Note: full, non-redacted document is in public domain, having been provided to plaintiffs by HUD in response to a FOIA request.</span>
*See also* App. A, at 4 (last page) (showing that the eight most-segregated (ranked 52-59) include, as confirmed by https://communityprofiles.planning.nyc.gov/, four majority-White, two majority-Black, and two majority-Hispanic CDs).

disregarded as irrelevant and immaterial.

**B. The Court should reject defendant's bid to ignore the start of the process.** Once applications are in, *before* anything else happens, the policy kicks in. *The policy* takes 50 percent of the units and decrees that outsiders *cannot* get them unless and until all the insider applicants have been exhausted, regardless of how poor the insiders' lottery numbers are and how good the outsiders' lottery numbers are. [P56.1DR, ¶¶ 18-23.] *The policy* changes the odds, with *the policy* giving insider entrants much better odds of getting a unit than outsider entrants, and with *the* policy giving insider apparently eligible applicants much better odds of getting a unit than outsider apparently eligible applicants. [P56.1DR, ¶¶ 48-49.] This initial tilt to the playing field imposed by *the policy* is never undone or "cured" later in the process. [P56.1DR, ¶ 50.]

The policy, in other words, is dispositive in conferring benefits and imposing detriments, and is doing so with clear racial impacts. For entrants, all three non-dominant racial groups suffer significant disparate impacts in five of seven CD typologies; in the remaining two CD typologies, one or two non-dominant racial groups suffer significant disparate impacts.[28] So there are impacts in CD typologies comprising 100 percent of entrant applicants. For apparently eligible applicants, all three non-dominant racial groups suffer significant disparate impacts in five CD typologies; and two non-dominant racial groups suffer significant disparate impacts in a sixth CD typology.[29] So there are impacts in CD typologies comprising 89 percent of apparently eligible applicants.[30]

The reality of these disparities should not get lost in the blizzard of defendant's distractions. There is no substantive challenge to the existence of the disparate impacts in the CD typologies

---

[28] *See* PI Brief, at 24 (summarizing).

[29] *See id.*

[30] *See* BROD, at 6, ¶ 21; BD, Ex 10, Section 3a.

just described.  Defendant – who offers no data analysis at the CD typology level – acknowledges that Professor Beveridge accurately reported the results of both his "outsider-to-insider-change" method and his "highest-insider-share" method of assessing disparate impact, and that this was true both for entrants and for apparently-eligible applicants.  [P56.1DR, ¶¶ 59-60, and 66-67.]

Second, defendant wants the Court to ignore the fact that the policy's denial of the opportunity to compete on an equal playing field, without regard to race, wherever one wants is dispositive: it "vests" immediately; nothing else has to happen or be analyzed.  (As such, awards-based arguments should not be allowed to polluted analysis of the denial of a level playing field.)

Continuing its misdirection, defendant urges the proposition that, "Anyone can apply for a unit in an affordable housing project."[31]  Yes, and that person would then compete on a level playing field with all other applicants *but for the policy*.  Then: "[T]he CP policy has no role in the determination of which applications are apparently eligible."[32]  Yes, each applicant's apparent eligibility pre-exists the lottery process; *what the policy does* is override what would otherwise be access to all units and normal lottery-number sequence, replacing them with allocation and sequencing rules that deny apparently-eligible applicants who are outsiders a level playing field.

Defendant also asserts that the "Consideration Stage" is *the* "stage" to be analyzed for "ability to compete."[33]  Here, again, defendant is incorrect, and not only because defendant's definition of "considered" understates the detriments that the policy visits on the outsiders who are

---

[31] *See* DOX Brief, at 30.

[32] *See id.*

[33] *See id* at 31.  Defendant misquotes Professor Beveridge when citing to BD, at 52, ¶¶ 180-81.  He does *not* say that impact on being reached and considered are the policy's *only* impacts.  The section is labeled "*Other* benefits of CP beneficiary status; corresponding detriments of non-beneficiaries." *See* BD, at 52, heading to § J (emphasis added). *See also id.* at 19, ¶ 57 ("To be clear as to what causes the difference in odds: it is purely the community preference policy itself. There is simply nothing else at work in terms of the opportunity to compete on a level playing field – the odds have been modified before a single application has been reviewed or a random lottery number assigned.").

disproportionately members of non-dominant racial groups.[34]  Defendant is confusing what the policy does in the first instance[35] with some of its *follow-on consequences*.

Defendant simply cannot rebut the fact that the policy's denial of the opportunity to compete on a level playing field occurs when it requires the dividing up of what otherwise would be a single pool of applicants for a lottery into a favored (insider) sub-pool and a disfavored (outsider) sub-pool.[36]  Professor Beveridge found that the denial of a level playing field to outsiders translated into racially disparate impacts.[37]  This denial is thus a legally cognizable event; subsequent events cannot rehabilitate the policy.

**C. There is no dispute that outsiders are considered materially less frequently than insiders because of the policy.**    First, defendant's construction of "considered" by Dr. Siskin is one that does not fully represent the extent of harm that flows through the process because of the policy.  To wit, it does not measure the extent to which outsiders are disproportionately burdened by being "fully closed out" of all the unit types for which they were apparently eligible, and it treats applicants who have been partially closed out of some of the units types for which they were apparently eligible as having been considered identically to applicants who had the full range of

---

[34] *See* discussion in Point II, Section C, below.

[35] Entrants who are *not* apparently eligible still have the right to compete fairly from the outset.  *See* SD, at 37, ¶ 72 ("Dr. Beveridge is correct that all entrants begin 'competing' upon applying to a lottery . . . .").  *See also Winfield*, 2016 WL 6208564, at *4 (reciting controlling law that even an applicant who, as a practical matter would not receive housing assistance anyway, was still injured by the missed opportunity to compete on equal footing).  The case relied on, *Comer*, itself cited *Regents of University of California v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (holding applicant to medical school who would not have been admitted even in absence of challenged program still had *right to compete* for *all* 100 places in the medical school class). *See also* Admin. Code § 8-502(h)(2) ("A person is aggrieved even if that person's only injury is the deprivation of a right granted or protected by [the City HRL].").

[36] The initial log provided to a developer already contains preference information on which the developer is supposed to rely.  *See* excerpts of June 5, 2018 data 30(b)(6) deposition, MD Ex 4, at 245:3-9 (testifying that initial logs identify whether applicant lives in the CD); and June 2, 2017 defendant letter re data, MD Ex 5, at 4-5 (responding to question 12 that developers "are expected to rely upon the addresses and community district information provided on the logs")).

[37] *Cf.* Siskin II, at 11:5-8 ("By definition, preference means it's not a fair game for anybody . . . .").

units for which they were apparently eligible available to them when "reached" by the developer.[38]

Those issues aside: (1) a materially greater percentage of insiders than outsiders are considered; and (2) it is the policy's insistence on propelling insiders to the front of the line until all preference units have been filled that accounts for the difference.[39]  Not being considered works another detriment beyond the denial of the right to compete equally that already has occurred. Namely, one cannot continue the competition process for an award if not considered.[40]  Defendant tries to limit its agreement to the fact that a "greater" percentage of apparently eligible insiders than outsiders are considered, P56.1DR, ¶ 51, but defendant knew from Dr. Siskin's deposition testimony, cited in the P56.1, that the materiality of the difference is not in dispute.[41]

Because defendant purports to reopen an issue as to which there had been agreement, Professor Beveridge has reconfirmed the point, going back to the data from Dr. Siskin's now-abandoned "regression" analysis.  Insider advantage over outsiders in relation to consideration is indeed often massive.[42]  That translates into multiple significant disparities by race in all CD typologies but plurality-Hispanic.[43]  For example, in the majority-White typology, relative advantage for Whites is +177.95 percent; relative disadvantage for Blacks is -63.28 percent.[44]

---

[38] *See* BROD, at 10-11, ¶ 36; BD, at 52-54, ¶¶ 181-88.

[39] "Pursuant to the policy, random lottery number order becomes subordinate to the order of preference or set-aside grouping. That is, random lottery number order continues to exist within a grouping that the joint lottery rules have created, but the applicant has to wait until his or her grouping comes up." [P56.1DR, ¶ 23.]  "[L]eaving aside applicants with disabilities, no matter how many qualified outsiders there are, and no matter by what degree they outnumber qualified insiders, the outsiders cannot get a CP unit if there is a qualified insider to take it."  [P56.1DR, ¶ 20.]

[40] *See* BD, at 20, ¶ 60; *see also* Siskin I, at 48:3-5 ("[I]f you're not considered, you can't get an award.").

[41] *See* Siskin I, at 52:24-53:7 ("Q: …You know that there's a significantly higher percentage of apparently eligible community preference applicants who are considered than the percentage of apparently eligible non-community preference applicants, right? A: That's correct.").

[42] *See* BROD, at 8, ¶ 31 and Ex 24.

[43] *See id*. at 8-10, ¶¶ 31-34 and Table 17.

[44] *See id*. at 9, Table 17.

Note that defendant calls the consideration stage "dispositive."[45]

**D. It is the policy that causes the disparate impact.**  It does not matter whether the Court looks at "results,"[46] "cause[s],"[47] impacts "produced by facially neutral acts or practices,"[48] "robust causality,"[49] "direct cause,"[50] or "direct relation."[51]  Under any of these rubrics, it is the policy that causes and is directly tied to the disparate impacts.

As already described, applicants would begin with the ability to compete on a level playing field were it not for the policy.  The policy is determinative in taking that level playing field away.  There are no "confounding" issues (we will show later why this is true for the separate issue of impact in respect to awards, as well).  There is literally nothing else that has happened.  Without the policy, there is a pool of applicants for a lottery.  Each applicant has an equal opportunity to compete for all units.  The policy is imposed.  The equal opportunity to compete for all units exists no more.  Faced with these inescapable facts, defendant puts forward a remarkable proposition:

> CP policy does not determine the racial demographics of the pool of CP beneficiaries for a specific housing lottery and the pool of non-CP beneficiaries for a specific housing lottery. As a result, it cannot be said, and Plaintiffs have not shown, that the CP policy causes any disparate impact on Black New Yorkers applying for affordable housing.[52]

---

[45] *See* DOX Brief, at 31, n.36.

[46] *See* Admin. Code § 8-107(17)(a)(1) (requiring showing that policy "results" in disparate impact to "any" group).

[47] *See* 24 C.F.R. § 100.500(c)(1) (2013) (the 2013 HUD Rule) (requiring proof that a "challenged practice caused or predictably will cause a discriminatory effect").

[48] *See MHANY Mgmt. v. County of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (citations omitted) (reciting Circuit's causation language).

[49] *See Inclusive Communities*, 576 U.S. at 521 (stating that a "robust causality requirement" is important).

[50] *See* 24 C.F.R. § 100.500(b)(3) (2020) (the Challenged Rule) (requiring a "robust causal link" between policy and adverse effect, "meaning that the specific policy or practice is the direct cause of the discriminatory effect").

[51] *See id.* at (b)(5) (requiring "direct relation between the injury asserted and the injurious conduct alleged").

[52] *See* DOX Brief, at 35.

Were this radical interpretation of "direct cause" accepted, disparate impact doctrine would cease to function.  Facially neutral policies often have disparate impacts exactly because there are broad, underlying societal conditions that position members of different racial groups disparately.  Requiring a college degree as a condition of employment, for example, bears more heavily on some groups.  Yet defendant would say the employer did not "cause" the impact because the employer did not cause different racial groups to possess college degrees at different rates.[53]

Or take *Huntington*, 844 F.2d at 938, where the Circuit, finding that black families had disproportionate need for subsidized housing, concluded that a zoning policy caused a disparate impact.  There was no inquiry about historical underpinnings; the relevant point was that a facially neutral policy *acted on a pool that had pre-existing characteristics*.  The only question was whether that action caused impact.[54]

Here, we have a well-defined universe that exists by virtue of actual New Yorkers making actual applications.  Nothing else happens other than the policy's action of splitting each lottery's pool.  We then observe who benefits and who is hurt.  As Professor Beveridge points out, "there are actually many fewer moving parts than would normally be the case in a disparate-impact action; what is additive from the usual is that there have been more *observations* made in respect to multiple impacts on multiple racial groups in multiple CD typologies."[55]

Unlike the policy's initial and determinative denial of a level playing field, plaintiffs can

---

[53] This illustration also disposes of defendant's "correlation not causation" argument.  The policy acts to *cause* there to be a favored group (whether college graduates or insiders) and a disfavored group (those without college degrees or outsiders).  The questions are which racial groups are disproportionately helped or disproportionately hurt by the policy's classification system.  This is not "mere" correlation; it *is* the impact of creating the classifications.

[54] *See also Richardson v. City of New York,* 2018 WL 4682224 (S.D.N.Y. Sept. 28, 2018) (refusing to require plaintiffs to allege "City's shortcomings in human resource policy are the *only* contributors to racial imbalance at FDNY," noting "the City has pointed to no authority for the unlikely proposition that a plaintiff can establish disparate-impact liability only by pinpointing every last cause of unjustified racial disparity within an employer's workforce").

[55] *See* BROD, at 14, ¶ 49 n.31.

see why there might be the *illusion* that "other factors" are at play with awards – because awards occur after a "process." But it *is* an illusion. Applicant characteristics come with the applicant;[56] they exist whether the policy is in place or not. Individuals can differ; indeed, racial groups could, on average, differ. "But the only thing that actually *happens in the lottery process* is the natural experiment defendant performs on individuals who come with their pre-existing qualifications: treating insiders better than outsiders, to the detriment of non-dominant groups in a CD."[57]

In each and all of the majority-group CD typologies, the policy caused disparate impacts to actual awardees and to Dr. Siskin's simulated awardees.[58] As to the former, Dr. Siskin acknowledges the facts; as to the latter, he acknowledges that there are no "confounding" factors.[59]

**E. Defendant's methodological critiques are wholly lacking in merit.** As Professor Beveridge observes, "the point of statistical analysis is to illuminate, not to distract, confuse, or obscure."[60] He has proceeded in accordance with those goals. Dr. Siskin has done the opposite.

1. The appropriateness of performing analysis at the CD-typology level. *Defendant* identified location as the policy's definitional element by making advantage and disadvantage hinge on whether an applicant resides in the CD where housing is offered. The policy proceeds

---

[56] *See* P56.1DR, ¶ 72 (acknowledging that the basic characteristics of an applicant in relation to the lottery – household income, household size, actual eligibility as compared with apparent eligibility, race, and where the applicant lives – do not change whether or not there is a community preference policy).

[57] *See* BROD, at 14, ¶ 49.

[58] *See* PI Brief, at 25-32.

[59] *See,* Siskin I, at 107:8-15 and errata, page 2 ("Disparate impact looks at the assignment of awards among the races . . . Is a race less likely or more likely to be given apartments based on preference policy[?] And, as Dr. Beveridge states, there are areas where races are awarded more apartments and there are areas where those races are awarded fewer."); and SD, at 53, ¶ 104, and n.77 (asserting the simulations "eliminate any confounding impact" and provide "a very good estimate of the expected impact of the CP policy on the lottery results").

[60] *See* BROD, at 12, ¶ 42.

against a background of deep and abiding residential segregation. [P56.1DR, ¶ 34.][61]   It was reasonable to test *whether or not* race-based patterns of disparate impacts existed in one or more of the racially-defined CD typologies.[62]   Moreover, the aggregation of lotteries within particular CDs to their CD-typology grouping allowed for more robust analysis and also allowed for lotteries of different sizes to be accounted for properly.[63]   In sum, the use of CD typologies did nothing more, and no less, than allow the discriminatory effects created by the policy to come into view.[64]

2. CD-typology analysis allows for a full analysis of the totality of the relevant protected class.   Contrary to defendant's assertions about "cherry-picking" and "sub-groups," Professor Beveridge's analyses involved *all* members of the relevant pools.   Because of the possibility that more than one group would or would not be advantaged or disadvantaged in a CD-typology, all the entrants (or apparently eligible applicants, or awardees) were examined.   In other words, everyone applying in a CD-typology was examined, and the process is entirely transparent.[65]

The cases cited by defendant are all inapposite.   Some deal with (or discuss) manipulation of data for self-serving advantage.[66]   The use of CD-typologies involves no manipulation; on the contrary, it mirrors the location-based nature of the policy and tests to see whether racial patterns

---

[61] *See also* BD, at 12-14, ¶¶ 36-41 and Exs 5-8.

[62]   *See* BD, at 14, ¶ 42; and BROD, at 2, ¶ 6. *Cf. Langlois v. Abington Hou. Auth.*, 234 F. Supp. 2d 33, 62 (D. Mass. 2002) (citing "overarching intuitive principle" that "where a community has a smaller proportion of minority residents than does the larger geographical area from which it draws applicants . . . a selection process that favors its residents cannot but work a disparate impact").

[63] *See* BD, at 8-9, ¶ 21; *see also* BROD, at 6, ¶ 23 (reaffirming cited approach in BD).

[64] Defendant's citation of *Williams v. NYCHA*, 879 F. Supp. 2d 328 (E.D.N.Y. 2012) is odd since the Court discussed how disparate impact could have been shown as to a single housing complex with adequate data. *Id.* at 337-38.

[65] *See* BROD, at 5-7, ¶¶ 17-26.

[66] *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 203 (2d Cir. 1999) and *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp. 2d 279, 294-95 (S.D.N.Y. 2001); *see also Fisher v. Vassar College*, 70 F.3d 1420, 1443-44 (2d Cir. 1995) (finding statistical correlation was "spurious" in disparate treatment tenure-denial case because correlation was created, *inter alia* by "purposefully defining which sciences are hard and which are not"; by "treating anecdotes as statistics"; by disregarding data; and by other misleading practices – none of which plaintiffs engaged in here).

exist in relation to benefit and harm caused by the policy.  All groups are treated in Professor Beveridge's analyses in the same way in every case.  This is entirely different from, *e.g.*, the cited age discrimination in employment case where the expert, in order to capture the plaintiff within the age group within which jobs were disproportionately eliminated, changed from using 10-year age-bands to a 15-year age band (capturing the plaintiff) instead.  *See Hollander*, 172 F.3d at 203.

Defendant's other cases are offered to suggest that examining less than the entire racial group is improper, but the cases bear no relation to the instant matter.  *Smith v. Xerox Corp.*, 196 F.3d 358 (2d Cir. 1999), for example, was a reduction-in-workforce employment-discrimination case.  The plaintiffs were not alleging that there was either a disparate impact only to some of Xerox's work groups, or that there was more than one impact within any protected class category (*e.g.*, race, sex, age).  To the contrary, they alleged that there was "*a* disparate impact" against older (or male) workers at Xerox *overall*.  *Id.* at 367-68 (emphasis added).  Nevertheless, plaintiffs only examined small sub-groups of workers without identifying the group of all workers at Xerox who were subject to termination. *Id.* at 368-69 (emphasis added).   Indeed, the decision, focusing on the fact that that the claim was that the practice was alleged to cause "a disparate impact," concluded that the process either "caused a disparate impact or it did not."  *Id.* at 369-70.

Defendant's preference policy, by contrast, is executed at the CD level.  Given New York City's segregated residential demographics, it was reasonable to *anticipate* multiple effects. Given the applications made, the CD-typology analyses tell the story: there *were* multiple effects.  Unlike *Smith*, the *same* process can and does have different effects depending on where it is applied.

Defendant's objection that a protected class must be a "static and defined group"[67] is a *non sequitur* in this context.  It does not account for the fact that, within a CD-typology, each protected

---

[67] *See* DOX Brief, at 17.

class group *was* static and defined.  What happened to each *entire* racial group in that CD-typology tells us the impact(s) the policy had in that typology.  Professor Beveridge followed the caution in *Smith* to include "all persons who were subject to the process." *Id.* at 370.[68]  All persons subject to the process *as it played out* in lotteries in majority-White CDs *were* analyzed, as were all persons subject to the process *as it played out* in lotteries in majority-Black CDs, etc.[69]  It is defendant and Dr. Siskin who wish to pollute the issue by inserting into the analysis of one CD typology applications made to other CD typologies.

> 3. <u>Dr. Siskin's employment analogies fail to reckon with disparate impact in housing.</u>  He propounds a hypothetical wherein candidates for a job have an opportunity to take the required test at two different locations: the results at each location appear different, but, when aggregated, are equal.[70]  Embedded in that hypothetical are five fundamental errors.  First, unlike the actual policy, the establishment of two tests sites does not create a *barrier* to anyone (a requirement for a disparate impact case).  Second, the analogy does not recreate the most critical feature of the actual policy:  the policy's very existence, *ab initio*, makes equal opportunity *to compete* impossible.

> Third, using "pass rates" is inapt.  The policy is not like a "test" – people's qualifications

---

[68] Instead of proceeding with the assumption that only one racial group was hurt, or that only two racial groups were involved, Professor Beveridge allowed the data to show which groups were hurt in relation to which other groups in each typology.  *See* BROD, at 6, ¶¶ 22-25.  *Compare Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575-76 (2d Cir. 2003) (addressing allegations of impact as to just one group, so fact pattern of four groups was not present).

[69] Defendant does no better with its other cases.  In *Lowe v. Commack Union Free Sch. Dist.*, 886 F.2d 1364 (2d Cir. 1989), plaintiffs failed because, among many other reasons, they sought to show disparate impact against those aged 50 or older when the protected group under the ADEA was persons 40 or older.  *Id.* at 1370-71 and 1373.  A similar narrowing of age class was attempted and rejected in *Criley v. Delta Air Lines, Inc.*, 119 F.3d 102, 105 (2d Cir. 1997).  By contrast, in this case, no member of a protected class is excluded.  Finally, in *Attenborough v. Const. & Gen. Bldg. Laborer's Local 79*, 691 F. Supp. 2d 372 (S.D.N.Y. 2009), the court rejected a disparate impact challenge because there was no link between the challenged practice and the claimed disparity in referring out union jobs – plaintiffs offered "no statistical evidence as to the racial breakdown of the 7,000 union members, their position on the OOWL, the job and location preferences they specified, the jobs to which they were referred, or the pay that they earned."  *Id.* at 379-80.  Here the causal link is clear, and all applications in all CD typologies were examined.

[70] *See* SD, at 12, ¶¶ 25-26.

are whatever they are.  Regardless of "pass rate," the policy's role is to reduce the number of outsiders competing for and being awarded apartments from what their numbers would be without the policy.[71]  The policy *distributes* benefits and detriments in ways that cause disparate impacts in racial composition.  If at all test-related, the policy is more like *not being permitted to take the test* (in relation to half the jobs) or, at best, only being allowed to take a test at a later date *though various jobs are distributed on a first-come, first-served basis.*

Fourth, Dr. Siskin's analogy posits the existence of a single type of job that is altogether fungible.  There is no room for an applicant to prefer one job to another, or to want to be considered for a variety of jobs.  But this one-size-fits-all analogy has nothing to do with defendant's housing lotteries: there are many different developments to which an applicant can apply.  The applicant may prefer an apartment in one building or may want to be considered for a variety of apartments.  One cannot assume fungibility *from the point of view of the applicant.*[72]

Fifth, the analogy hides a critical factor: *whatever* choices that the applicant (not defendant) has made about where he or she is applying to live, the applicant is entitled to equal consideration in every instance.  Under questioning from defendant, plaintiff Emmanuella Senat put it well:

> I don't think that it's fair because I live in Harlem that I get a preference from somebody else who lives in Brooklyn.  Who says I want to live in Harlem forever, I never said that. If I'm putting down different areas, I'm putting Brooklyn, that means I'm open to living [in] other places.  So then I should be given the same equal rights as someone else who lives in that area.[73]

This is altogether different from defendant's notion that an applicant has to "prefer" one area over

---

[71] Dr. Siskin's analogy does not even account for the existence of insiders and outsiders in a critical regard: contrary to the lottery-reality, his hypothetical does not account for a difference in the size of the group getting a benefit.

[72] *See* Siskin I, at 103:7-17, 254:11-19, and 88:3-14 (acknowledging that he does not know whether lotteries are fungible; that he does not consider fungibility from the point of view of the applicant; and that if jobs were not fungible, he would analyze them separately).

[73] *See* excerpt of transcript of Jul. 30, 2018 deposition of Emmanuella Senat, MD Ex 6, at 78:20-79:2.

another in order for this injury to count.[74]   An African American applicant's right to equal treatment depends on that applicant's not just applying for housing in a majority-White CD, but *also* on proof that another apartment she applied for in a majority-Black CD was not "just as satisfactory"?   The right to equal opportunity cannot be contingent in that way.   Professor Beveridge's analysis does not depend on deciphering what each applicant "wants."   Instead, he brings into view the fact that the policy precludes applicants from competing on equal terms in whichever lotteries to which *they choose* to apply.[75]

4. Professor Beveridge's analytical methods are appropriate.   The thrust (and intent) of the policy can be stated simply: it provides a variety of good things to insiders.   Correspondingly, it imposes a variety of bad things on outsiders (like a much lower consideration rate).   The question that had to be resolved was how the benefits and burdens were distributed by race in each CD typology. The utility of the "outsider-to-insider-change" method is clear.   "By comparing the change in demographic distribution from the outsider group to the insider group, we are able, in one snapshot, to compare directly how the policy as implemented is helping and hurting different demographic groups in each CD typology at the same time."[76]   The method shows change from a racial group's share of all outsiders to a racial group's share of all insiders (from share of those suffering the policy's detriments to share of those enjoying the policy's benefits).[77]

"Highest-insider-share" looks only at insiders.   "It examines each demographic group and

---

[74] *See* DOX Brief, at 24.

[75] Dr. Siskin also compares the policy to the receipt of "bonus points."   *See* SD, at 24-26, ¶¶ 51-53.   But, again, he is seeking to sow confusion.   Each applicant comes to the process with whatever his or her "score" may be (the applicant's characteristics in relation to apartment requirements).   *See* discussion in BROD, at 25-26, ¶¶ 85-89.

[76] *See* BD, at 22, ¶ 68.   *See also id.* at n.34 ("[A] demographic group's share of the outsider sub-pool of applicants in a CD typology is very similar to that demographic group's share of the total applicants for that CD typology.").

[77] *See* BROD, at 11-12, ¶ 39.

asks, 'what share *of the demographic group* is comprised of insiders?' . . . A higher share means a greater percentage of the demographic group is taking advantage of CP beneficiary status."[78]

Defendant's criticism boils down to the fact that these methods did not mimic "selection rate" analysis in employment discrimination cases.[79] So? The methods used probe directly the *shift* in the racial distribution of the sub-pools that the policy creates. That is because it is those shifts that have to be assessed.[80] In other words, defendant's critique of Professor Beveridge is actually a critique of what the Supreme Court has long held: that statistics come in "infinite variety" and that their usefulness depends on "all of the surrounding facts and circumstances." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977); *see also Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 995 n.3 (1988) (citations omitted) (confirming case-by-case approach). Professor Beveridge's approach was appropriately attuned to the policy's facts and circumstances.

5. Defendant's attacks on the practical and statistical significance of the results obtained by Professor Beveridge are misguided. First, while the 80-percent-test was developed in the context of selection rates, it can be used in other contexts: it is simply a shorthand way of stating that a differential of at least a particular size is reasonable to be treated as one that is material.[81]

Second, statistical significance can be calculated across a wide range of problems, not just "selection rate." "The fact that statistical significance is relatively easily found with the large

---

[78] *See* BD, at 24, ¶ 74.

[79] *See, e.g.*, DOX Brief, at 27 n.33; SD, at 26-27, ¶ 54.

[80] *See* BROD, at 6-7, ¶ 26 and 11-12, ¶ 39; *see also id.* at 4, ¶ 12 (footnotes omitted) ("To the extent that defendant suggests that not every insider is ultimately awarded a preference unit, defendant continues to misunderstand what a level playing field is. The policy gives *all* insider applicants better odds and allows *all* insider applicants to compete for all units. Therefore, because of the policy, *all* insiders are competing from a privileged position in relation to *all* outsider applicants. The policy has assigned *all* of those outsiders worse odds and has prohibited *all* of them from competing for the approximately 50 percent of units that are held for insiders until no insiders are left to take them.").

[81] *See* BROD, at 12, ¶ 42.

number of applicants here only emphasizes what is already plain.  The variations in share by racial group are not due to chance; the differences observed are indeed meaningful, as reported."[82]

Third, contrary to defendant's contentions, Professor Beveridge *did* compare racial groups *to one another*, comparisons shown throughout his declaration. He used an appropriate statistical procedure to test the likelihood of the distributions occurring by chance;[83] it required him to compare one group at a time to *all others*.[84]  The same underlying data were used for the statistical significance testing as were used for the racial comparisons.[85]

Finally, "practical" significance is undoubtedly present.  One could not even begin to suggest lack of practical significance in connection with entrants and apparently eligible applicants: the context in which the policy makes the opportunity to compete equally definitively impossible (independent of awards).  Separately and additionally, there is practical significance to the disparities observed at the awards level.  "The numbers are large enough," Professor Beveridge explains, "that significant *relative* differences in majority-race typologies in the racial groups' share of the outsider versus the insider sub-pool *constitute* practical difference."[86]  In addition, the policy is ongoing.  The racial differences have already run into the dozens or hundreds of awards, depending on race and typology.[87]  These disparities, will compound over time.[88]

---

[82] *See id.* at 13, ¶ 43.

[83] The procedure ("RISKDIFF") was executed and documented in the statistical software package that Dr. Siskin uses, and was described in BD, at 27, ¶ 84 n.38.

[84] *See* BROD, at 13, ¶ 44-46.

[85] For underlying data, *see* BD, at Exs 9-11.  For standard deviation, contrary to defendant's complaint, *see* DOX Brief, at 34, standard deviations are in fact reported in each cell of BD Ex 13.  *See* BROD, at 13, ¶ 46.

[86] *See id.* at 24, ¶ 78 (noting that the differences are captured by the 80-percent-test and standard deviation).

[87] Each individual disparity, of course, is consequential: a family is being denied needed affordable housing.

[88] *See id.* at 24-25, ¶¶ 79-83.

**F. Dr. Siskin's approaches to simulated and actual awards, disaggregated to CD typology, are strongly confirmatory of the policy's causing racially disparate impacts.** There is remarkable accord in the analyses, regardless of approach, as shown in Chart 5, below. [89]

| Chart 5: Presence of material disparate impact found as to one or more racial groups | | | | |
|---|---|---|---|---|
| CD Typology | Beveridge: actual awards | Beveridge: Siskin "with policy" simulations (comparing insiders with outsiders) | Siskin: "with policy" simulations versus "without policy" simulations | Siskin: actual awards |
| Majority-White | ✔ | ✔ | ✔ | ✔ |
| Majority-Black | ✔ | ✔ | ✔ | ✔ |
| Majority-Hispanic | ✔ | ✔ | ✔ | ✔ |
| Majority-Asian | ✔ | ✔ | ✔ | ✔ |
| Plurality-Black | | ✔ | ✔ | ✔ |

As the chart makes clear, for all the *seeming* disputes that defendant manufactures, once one removes the protective shield of defendant's citywide, separate-but-equal approach, there is no question but that there are multiple racial disparities. Even adopting the *conservative* view as to awards by putting aside awards in the plurality-Black typology, disparities occur in all majority-race typologies. That is in addition to: (a) all seven typologies where *entrants* are denied an equal playing field from before the starting gun; and (b) six of seven typologies where *apparently eligible applicants* are denied an equal playing field before anything else has happened.

---

[89] "Beveridge: actual awards" references BD, at 37-38, ¶¶ 121-24 (including n.53) and Table 8, and at 40-42, ¶¶ 129-32 (including n.56) and Table 10. "Beveridge: Siskin 'with policy' simulations (comparing insiders with outsiders)" references *id.* at 38-40, ¶¶ 126-28 and 131 (including n.56) and Table 9; "Siskin: 'with policy' simulations versus 'without policy' simulations" references BROD, at 16-20, ¶¶ 58-66 (including n.42) and Tables 19 and 20. "Siskin: actual awards" references *id.* at 21-22, ¶¶ 69-70 and Table 21.

1. <u>Dr. Siskin's approach to simulations dilutes the disparities that exist, but nevertheless confirms those disparities.</u> The policy favors insiders, who have a demographically different distribution from that of outsiders.  Comparing insider and outsider results from Dr. Siskin's "with preference" simulations, as Professor Beveridge does, captures the difference in outcomes between insiders and outsiders as it pertains to racial advantage and disadvantage.  Dr. Siskin, by contrast, dilutes that difference, because his comparison of "with preference" results to "without preference" results includes the units in each where you would not expect for there to be any difference:

> Even though *all* of the difference to be observed arises from the half of the units that are preference units *versus* an equivalent number of non-preference units, Dr. Siskin includes non-preference units that could not add to the difference but that *do* double the base as to which the difference is calculated. This artificially reduces the magnitude of the difference.[90]

Despite the dilution effect, however, there are still significant disparities that emerge *when looking at the CD-typology level*.  The dominant racial group is materially advantaged in all majority-race typologies and in the plurality-Black typology; 14 of 15 non-dominant racial groups in those five typologies get fewer than 80 percent of the awards of the dominant racial group (the exception is Hispanics in the majority-Black typology, where the percentage is 87.45).[91]

It must be added that Dr. Siskin's presentation of simulated awards powerfully illustrates the mischief of defendant's citywide, separate-but-equal approach.  Dr. Siskin presents *citywide* shortfalls in awarded units for African Americans because of the policy at 141, and White gains at 144.[92]  In fact, "*Just in the majority-White* typology, Whites gained 173 units from the policy and Blacks lost 199 units from the policy.  And rather than these deviations relating to a total of 10,245

---

[90] *See* BROD, at 16, ¶ 56*; see also id.* at n.36 (explaining same using math equation illustration).

[91] *See id.* at 19-20, ¶¶ 65-66 (including n.42) and Table 20.

[92] *See* SD, at 53-55, ¶ 105 and Table 4.

awards, they relate to the much smaller total of 2,031 simulated awards in the majority-White typology."[93]  Dr. Siskin reported Black disadvantage citywide as -3.9 percent;[94] in the majority-White typology level that defendant wants the Court to ignore, the shortfall for Blacks because of the policy, even under Dr. Siskin's preferred method of comparing "with preference" to "without preference" results, shows (again, still diluted) disadvantage of -30.17 percent.[95]

2. Dr. Siskin's approach to actual awarded is problematic, but nevertheless confirmatory of the existence of multiple disparate impacts.  Dr. Siskin's approach is invalid because its citywide lens must be replaced by one that looks at each CD typology.  Beyond this, Dr. Siskin also made various adjustments to arrive at a "selection" rate.  Included in his adjustments is a step to extinguish each racial-group's deviation from the average number of insider awards (he performs the same procedure on outsider awards).  "To say that they should be extinguished as 'non-policy' phenomena," writes Professor Beveridge, "ignores the fact that: (a) they are present; and (b) the policy's allocation element favors insiders and disfavors outsiders, *regardless* of what the demographic distribution of either sub-pool may be."[96] Professor Beveridge's approach captures defendant's choice to favor the insider sub-pool *as that insider sub-pool exists.*

Despite the methodological issue, if one disaggregates the data and applies Dr. Siskin's approach to the actual awards, there are, once again, significant racial disparities in all majority-race typologies and in the plurality-Black typology.  The dominant group is always advantaged.  13 of the 15 non-dominant groups receive less than 80 percent of the awards than the relevant dominant group.  This includes Blacks at 42.53 percent and Hispanics at 67.12 percent of Whites

---

[93] *See* BROD, at 19, ¶ 64 (footnote omitted).

[94] *See* SD, at 53-55, ¶ 105 and Table 4.

[95] *See* BROD, at 17-18, ¶¶ 60-62 and Table 19.

[96] *See id.* at 23, ¶ 73.

in the majority-White typology; Asians at 60.75 percent of Blacks in the majority-Black typology; and Whites at 65.87 percent of Hispanics in the majority-Hispanic typology.[97] In short, multiple, significant racial disparities are confirmed by Dr. Siskin's approach, not placed in dispute.

**G. Defendant's other assertions are without merit.**  As there is much else to be covered, we will limit ourselves to four more items of note.

1. Defendant fails to come to grips with the lessons of *Comer* and *Langlois* as they relate to the appropriate scope of analysis.[98]  In *Comer*, there was a single pool; in *Langlois,* there were multiple.[99]  The fact that the policy is having its multiple effects within the single jurisdiction of New York City does not alter the fact that, like *Langlois*, the policy presents multiple pools (CD-typologies).  The effects on competition within each typology must be assessed separately.

2. Bottom-line analysis is an appropriate supplemental analysis.  Defendant's contention that the bottom-line is not appropriate for disparate impact analysis is simply wrong.  Bottom-line balance does not, of course, shield a defendant from a policy that denies the right to compete equally.[100] *See Teal*, 457 U.S. at 451; *Wards Cove Packing Co, Inc. v. Atonio*, 490 U.S. 642, 653 n.8 (1989), *superseded by statute on other grounds as recognized by* 576 U.S. 519 (2015) (same). But those holdings do not give a green light to bottom-line *imbalance* caused by a challenged policy.  Nevertheless, defendant cites *Dist. Council 37 v. N.Y.C. Dep't Parks & Rec.*, 113 F.3d 347

---

[97] *See id.* at 22, Table 21 for the data reported in this paragraph.  The two non-dominant groups in the five typologies referenced that do not meet the 80-percent-rule only marginally miss: Hispanics are at 81.70 percent of Blacks in the plurality-Black typology, and Blacks are at 84.47 percent of Hispanics in the majority-Hispanic typology.

[98] *See* DOX, at 22-23.

[99] *See* relevant discussion of *Comer* and *Langlois* in PI Brief, at 11-12.

[100] As applicable here, this mandates liability because the policy is dispositive in terms of denying the right to compete on an equal playing field that was established in *Comer* and reaffirmed in *Winfield.*

(2d Cir. 1997) for the proposition that analysis of the bottom-line is not appropriate.[101]   In fact, *Dist. Council 37* states that, "if the plaintiffs here established that the Parks Department's decision had a significant disparate impact on plaintiffs at the bottom line, they would have made a prima facie case of disparate impact."  *Id.* at 352.

3. Defendant's "abandonment" of claims argument demonstrates the opposite of what defendant suggests it does.   First, defendant exaggerates.  For all entrants and for apparently-eligible applicants, out of 14 cases (two sets of seven CD-typologies), 10 showed significant disparities (confirmed by the 80-percent test and by statistical significance) for *all* non-dominant groups, two showed significant disparities (confirmed in the same ways) for *two* non-dominant groups, and one showed significant disparities (confirmed in the same ways) for one non-dominant group.[102]   Liability is established independent of anything having to do with awards.

Second, at the awards level, it is striking that defendant takes the position that the policy "only" affects awards in lotteries where 71.4 percent of the awards were made (counting only majority-race typologies), or 74.1 percent of the awards were made (counting the plurality-Black typology).[103]   That is a policy that infects a very substantial portion of the awards process.

Third, the approach is confirmatory of the candor of Professor Beveridge's approach.  The methods were the ones that he thought appropriate to apply to the natural experiment created by the policy being superimposed on the lottery system; results were reported out accordingly.

4. Dr. Siskin's "mathematical axiom" is inapposite.  Dr. Siskin presents a hypothetical to show that Professor Beveridge's methods should be disregarded because they do not work in all

---

[101] *See* DOX Brief, at 31.

[102] *See* PI Brief, at 24 (summarizing).

[103] *See* BROD, at 22-23, ¶ 72.

circumstances – at the same time that Dr. Siskin admits that the hypothetical is unrealistic and is unrepresentative of the lottery.  The critical point, however, is that the hypothetical presents a circumstance where it is immediately evident that the hypothetical practice is *not* conferring an advantage due to insider status.[104]  As such, one would never get to the question of "what does insider status benefits mean in racial distribution terms," and would not have occasion to use methods designed to measure insider benefits and outsider detriments.[105]

\*   \*   \*

*Any* meaningful disparity that the policy causes to a racial group either at the front end of the lottery (denial of a level playing field) or at the back end (awards) would have been sufficient to establish impact as a matter of law; on the facts presented, a reasonable jury could only conclude that the policy causes multiple, meaningful impacts at both ends.

## POINT III
## DEFENDANT FAILS TO RAISE ANY ISSUE THAT PRECLUDES A FINDING THAT THE POLICY PERPETUATES SEGREGATION.

Perpetuation of segregation has long been actionable under the FHA.[106]  As discussed in Point I, *supra*, at 6, even the challenged rule would not displace that proscription.  As for the City HRL, defendant may be suggesting that perpetuation of segregation is *not* proscribed.[107]  If that is its suggestion, defendant is wrong: defendant has failed to rebut (has literally ignored) plaintiffs' explanation of why the prohibition of practices that perpetuate segregation is indeed encompassed

---

[104] *See* SD, at 27-28, ¶¶ 55-57 (citing fact patterns in SD Appendices B and C); DOX Brief, at 29-30 (citing same).

[105] *See* BROD, at 26-27, ¶¶ 90-94 (discussing the above and noting the "axiom" has no place in empirical analyses).

[106] *See* PI brief, at 35 (citing *Huntington*).

[107] *See* DOX Brief, at 42, n.51 (referencing plaintiffs' "purported" claim and stating that "if" a such claim is "read into" the City HRL, it would be through the City HRL's disparate impact provision, Admin. Code § 8-107(17)).

by the City HRL's basic fair housing provision, Admin. Code § 8-107(5)(a)(1)(a).[108]  (If defendant belatedly takes a definitive position, we will respond in our sur-reply.)  For now, we turn first to the fact that it is actually not factually disputed that: (a) outsider moves are significantly more "net-integrative" than insider moves; (b) the policy is directly responsible for limiting these moves; and (c) the policy thus stymies the extent of integrative moves (perpetuates segregation).

**A. The policy stymies integration (perpetuates segregation) significantly.**  The overwhelming percentage of apparently eligible applicants are outsiders (about 94.5 percent of them).[109]  It is also undisputed that *it is the imposition of the policy* that substantially reduces the percentage of apparently eligible outsiders who are able to get awards).  [P56.1DR, ¶¶ 19, 49-50.] Direct causation is basic in each demographic-pairing: since outsider moves tend to be predictably more integrative than insider-moves, then the policy's limitation of those moves results in less integration now and in the future than would be the case without the policy.[110]  By definition, less integration now and in the future is the same thing as more segregation now and in the future.

There are no "confounding" factors: with or without the policy, the applicants are the same and the characteristics that they bring to the lottery (objective and subjective) are the same.

The evidence that outsider-moves tend to be predictably and significantly more integrative than insider-moves is overwhelming.  The parties each examine perpetuation of segregation citywide.  There are six demographic pairings that are separately examined.  There are also three data sets: one that reflects actual awardee moves; another that examines the moves sought by apparently eligible applicants; and a third that looks at simulated awardee moves.  Defendant does

---

[108] *See* unrebutted discussion in PI Brief, at 42-44.

[109] *See* BD, at 44, ¶ 143 (including n.57) and Ex 10.  Professor Beveridge and Dr. Siskin do not differ as to applicants, apparently eligible applicants, awardees, or any of their characteristics except as what are agreed to be trivial and immaterial variations. [P56.1DR, at 14-15, ¶¶ 36-40.]

[110] *See* BD, at 51-52, ¶ 177; *see also* BROD, at 32, ¶114.

not dispute the fact that, in all 18 cases, non-beneficiary moves were more integrative on net ("net-integrative") than beneficiary moves.  [P56.1DR, ¶ 94.]

Professor Beveridge found that in 17 of 18 of the comparisons (all except actual awards as between Hispanics and Asians), the net-integrative percentage of CP beneficiaries was, in relative terms, less than 80 percent of the net-integrative percentage of non-beneficiary moves.[111] Defendant does not dispute that Professor Beveridge accurately reported these results.  [P56.1DR, ¶ 97.]  Professor Beveridge found that, for actual awardees, in all pairings except Hispanic-Asian, standard deviations were well in excess of the 2.0 that is usually considered sufficient (ranging from 4.67 to 17.02); for moves sought by apparently eligible applicants, the standard deviations for all six pairings were all well in excess of 2.0 (ranging from 57.81 to 339.20).[112]  Defendant does not dispute that Professor Beveridge accurately reported these results.  [P56.1DR, ¶ 99.] There is no challenge to the statistical significance of 1,000 runs of the simulation.

When the Court reviews the 17 of 18 comparisons that plaintiffs assert show a significant difference in net-integration, it will see strong disparities: 11 of the 17 actually show relative net-integrative moves of insiders at *less than 40 percent* of that of outsiders; the other six show relative net-integrative moves of insiders at *less than 66 percent* of that of outsiders.[113]

As with disparate impacts, Professor Beveridge approached the data as they exist.  The demographic compositions of the different CD typologies are what they are.  They yielded the demographic compositions of outsider and insider applicants that they did.  Outsiders turn out to make and want to make significantly more net-integrative moves than insiders.  The policy filters

---

[111] *See* PI Brief, at 38, Chart 4, for a chart that summarizes the results for all 18 comparisons.

[112] For the data referred to in this paragraph, *see* BD, at 51, ¶¶ 175-76 ns. 62-63.

[113] *See* BD, Ex 16, at 2 (providing actual awardee "Relative percentage" values); Ex 17, at 2 (same for apparently eligible moves sought); and Ex 18 at 2 (listing simulated awardees "cb net % as percentage of non-cb net %" values).

down substantially the number and percentage of outsiders who can get awards.  By definition, such a policy directly causes a significant reduction in the integration that would otherwise occur.

**B. Change in the dissimilarity index is not the measure of whether a policy is perpetuating segregation or whether it is perpetuating segregation significantly; to adopt defendant's approach would seriously hamper the vitality of fair housing laws.**  Given what the 80-percent-test and Dr. Beveridge's measure of statistical significance show, it is not surprising that defendant wants the Court to ignore those well-established tools.  The proper measure as far as defendant is concerned is change in the dissimilarity index.[114]  This is wrong on every level.

First, the dissimilarity index is *not* looked to in order to measure perpetuation of segregation. *See Huntington*, 844 F.2d at 929-31, 937-38 (holding that preventing approximately 40 units from being occupied by minorities in town of 200,000 "significantly perpetuated segregation in the Town" as a whole, without reference to a change in dissimilarity index or any comparable metric); *MHANY*, 819 F.3d at 619-20 (dissimilarity index not referred to or relied on). It is a function of Dr. Siskin's lack of familiarity with housing segregation[115] that he would not be able to distinguish the dissimilarity index's proper use (measuring current and historical segregation) from its improper use (displacing the comparison that needs to be made as to whether *a challenged policy or its alternative* tends to provide more desegregating opportunities).[116]

Second, imposing a change-in-index requirement would materially undermine the ability of the FHA to play what the Supreme Court has described as its "continuing role in moving the Nation toward a more integrated society." *Inclusive Communities*, 576 U.S. at 547-48.

---

[114] *See* SD, at 73-74, ¶ 140; *see also* DOX Brief, at 43.

[115]  *See* n.2, *supra*, at 2.

[116] *See* BROD, at 30-31, ¶¶ 108-11.

Specifically, it would make it impossible to *begin* the process of remedying segregation in many jurisdictions – including New York – even though beginning the process of desegregation is one of the things that the perpetuation-of-segregation prong of the FHA is designed to address.  *Cf. Huntington*, 844 F.2d at 937-38 (perpetuation found because the development being blocked by a zoning ordinance would, if allowed, "begin desegregating" a neighborhood).

In a city like New York, with more than *three million* housing units [P56.1DR ¶ 33.], there is not likely to be *any* housing initiative (single-project or multi-project) that, *on its own*, moves the City's dissimilarity index by a large amount over a limited period of time.  Dr. Siskin, for example, even imagined the counterfactual (and deeply unrealistic) scenario where e*very one* of the more than 10,000 actual moves involved here were an integrating one.  Even under those conditions, he concluded that there would only be a "small" change in the dissimilarity index.[117] A less unrealistic scenario (with some segregating moves and some "no effect" moves) would obviously yield even a smaller change.

Were defendant's change-in-dissimilarity-index test adopted, it is impossible not to imagine every or nearly every case being thrown out, even in the face of evidence that the policy in question reduced opportunities for racial groups in areas where they were represented, because the scope of the project(s) involved paled in relation to the size of the jurisdiction as a whole.[118] This is not the way to measure "practical significance"; on the contrary, this is a formula for immobilizing the FHA.[119]  A recognition of practical significance starts from the premise that what is at stake under the FHA is a *comparative* examination of how two alternatives work: is the policy

---

[117] *See* SD, at 60-61, ¶ 116.

[118] *See* BROD, at 30-31, ¶¶ 110-111.

[119] And the City HRL, too.  *See Williams v. NYCHA*, 61 A.D.3d 62, 76 (N.Y. App. Div. 1st Dept. 2009) (holding that analysis of the City HRL must be guided by the need to make sure that discrimination plays no role"); *legislatively ratified* by N.Y.C. Local Law 35 of 2016, Gurian LM Dec, Ex 7, *codified* at Admin. Code § 8-130(c) ("NYC LL 35").

operating to delay or deny more desegregating opportunities for the units covered by preference than would be the case in its absence?[120]

**C. There is no "a little integration is enough" defense.** Defendant complains that "[i]ntegrating less is not perpetuating segregation."[121]  It ignores the caselaw, including caselaw it cites.  The District Court decision in *MHANY Mgmt. v. Inc. Vill. of Garden City*, 985 F. Supp. 2d 390 (E.D.N.Y. 2013) spoke directly to the point.  There were three scenarios in place: the first was the zoning status quo (referred to as the "P-Zone"); the change the defendants wanted to make was what was referred to as an "R-T" zone; and the change that defendants rejected was to an "R-M" zone.  Like defendant here, defendant in MHANY argued that its "R-T" zone "increased the housing for minorities" and thus was insulated from challenge.  *Id.* at 427.  The Court confirmed its prior rejection of that theory: the comparison was not between defendant's preferred policy and the status quo it was replacing, but rather on the housing opportunities that would have been made available under the rejected R-M zone versus the approved R-T zoning (defendant's policy).  *Id.*

In affirming the District Court in relevant part, the Circuit affirmed the finding that the policy (the R-T zone) "decrease[d] the availability of housing to minorities" where they had been underrepresented.  *MHANY*, 819 F.3d at 619-20.  To reiterate, the only conclusion about reducing the availability of housing was the R-T zone as compared to the rejected R-M zone, not the R-T zone as compared with the status quo ante.

A similar issue arose in a long-running, highly complicated case involving the New York

---

[120] The pool of moves sought by apparently eligible applicants is instructive.  In the White-Black pairing, there are 358,187 net-integrative moves from outsiders, but only 5,609 from insiders.  *See* BD, Ex 17, at 1 (showing counts). The data provide "a glimpse into what happens when the percentage of outsiders is not constrained by the . . . policy. These are vast numbers of apparently eligible applicants, and it cannot be denied that the number of net-integrative outsider moves completely overwhelms the number net-integrative insider moves" – Professor Beveridge notes by way of example that, for the White-Black pairing, net-integrative *outsider* moves sought "constitute 98.4 percent of all net-integrative moves" sought by apparently eligible applicants in that pairing.  *See id.* at 49, ¶¶ 167-68.

[121] *See* DOX Brief, at 43.

City Housing Authority ("NYCHA").  NYCHA's policies had been revised pursuant to a consent decree to create a tenant selection and assignment plan ("TSAP") in order to desegregate housing that had been disproportionately White.  Thereafter, a "working family preference" ("WFP") was adopted.  As the District Court explained: "NYCHA contends that so long as the white occupancy rates would decline under the WFP, regardless of the rate of decline, then the WFP cannot be said to perpetuate segregation."  *Davis v. NYCHA,* 60 F. Supp. 2d 220, 238 (S.D.N.Y. 1999), *aff'd in relevant part, Davis v. NYCHA*, 278 F.3d 64 (2d Cir. 2002).  The plaintiffs, however, asserted that "perpetuate" means "to extend in time," and the District Court agreed: the "relevant inquiry here is not whether desegregation will occur eventually, but whether the WFP will significantly delay desegregation at the Disproportionate Projects."  *Id.*  The Circuit concurred: the court had "adopted the reasonable premise that past segregation may be perpetuated by actions that slow the pace of desegregation, even though they do not reverse it."  *Davis*, 278 F.3d at 83.

As noted above, the *Davis* litigation presented a series of complicated issues not present here – including the enforcement of a consent decree and different applicable balancing tests.  And, here, the "universe" whose composition we look at is fully accounted for: those who moved or who sought to move in the lotteries under consideration.  But the unmistakable message of *Davis* is that "some integration" is not a shield: that it is indeed appropriate to see whether a policy or the absence of a policy generates more integrating moves (and therefore more integration faster).

It could not be otherwise.  Simply put, defendant's proposition would allow any jurisdiction to use a policy that minimally fostered some integration as an excuse to reject policies that allowed for much more integration.  That cannot be countenanced.

Restricting the amount of integration that would otherwise occur if the preference units were open to all is inconsistent with the purposes of the FHA and of the City HRL.  *Huntington*

stated that liability for perpetuation of segregation advances the principal purpose of the FHA to promote open, integrated residential housing patterns. *Huntington*, 844 F.2d at 937. As *Inclusive Communities*, handed down 37 years later, acknowledged, "Much progress remains to be made in our Nation's continuing struggle against racial isolation."[122] *Inclusive Communities*, 576 U.S. at 546. *Williams* reaffirmed that discrimination was to play "no role" in the City's life and that Court doctrine must tailored to best achieve that goal. *Williams v. NYCHA*, 61 A.D.3d at 76.[123]

**D. Safeguards for defendants.** Both in connection with its proposal use a change-in-dissimilarity-index test, and in connection with its proposed safe harbor for any policy that has any integrative effect whatsoever, defendant raises the usual alarms about how disruptive it would be to fail to follow its proposed course. Its professed fears are without foundation. Looking at how a policy stymies integrative moves that would otherwise occur *still leaves any defendant with ample safeguards.* First, it is not as though "any" policy could be attacked. The large stymieing of integration that occurred here is not the inevitable result of *any* policy, but the specific result of defendant's *specific* policy as it relates to the *specific* (and enormous) pool of applicants that was looked at. Second, to the extent that a defendant is concerned about adopting "more integrating" or "most integrating" alternatives, such an obligation would exist *only where defendant did not have an adequate justification for the less-integrating policy it wanted in place.* In other words, defendant is trying to manipulate the initial stage (did the policy perpetuate segregation compared to its alternative?) when its stated concerns can be fully addressed at Stage 2 (justifications).

**E. Each racial pairing must stand alone.** Defendant insists that examination of relative

---

[122] Sadly, this is particularly true in New York City, where segregation levels have remained especially substantial, with only limited progress since 1980, much less than many other large cities. *See* BD, at 13-14, ¶¶ 40-41.

[123] Defendant's citation of *United States v. Starrett City Assocs.*, 840 F.2d 1096 (2d Cir. 1988), for the proposition that "some" integration is enough is inapposite and extraordinary. The point being made by the Circuit was that "Starrett's quotas do not provide minorities with access to Starrett City, but rather act as a ceiling to their access." *Id.* at 1102.

integration contributed by outsiders versus insiders in any of the six, two-group demographic pairings be polluted by moves made by groups not in the pairing.[124]  This is profoundly wrong. As Professor Beveridge has stated: "It is absolutely basic to the social science of measuring segregation, and, more specifically, to the application of the dissimilarity measure, that two-group pairs are assessed entirely separately, one pairing at a time."[125]

As a preliminary matter, there is no dispute about the raw number of net-integrative moves generated by outsiders versus insiders, and there is no dispute that the net-integration from outsiders is larger than from insiders.  This is true regardless of pairing and regardless of whether one is examining actual awards, simulated awards, or the moves sought by apparently eligible applicants.  It is also the case that Professor Beveridge's method fully accounts for all moves: each is assessed for all pairings as to which the move could be relevant.[126]

A move within a two-group pairing that *turns out* to have "no effect" is categorically different from a move by someone outside of the two-group pairing that, by definition, *could never have had* an effect.[127]  What Dr. Siskin is really arguing for is a system that would report net-integrative moves as an artificially low percentage of total moves.  Net-integrative moves (the numerator) can *never* include any out-of-pairing moves (it is impossible for a move by an Asian or Hispanic to have an impact on the White-Black comparison, for example).  Nevertheless, Dr. Siskin insists that the *denominator* expand beyond White and Black moves to include all 100 percent of the Asian and Hispanic moves.  By importing into the denominator something that

---

[124] *See* SD, at 72, ¶ 138.

[125] *See* BD, at 46, ¶ 150; *see also* BROD, at 33-34, ¶¶ 118-21.

[126] *See id.* at 34, ¶ 122.

[127] *See id.* at 34, ¶ 121.

cannot be imported into the numerator, the fraction is invariably (and improperly lowered).[128]

Dr. Siskin says that two net-integrative moves are the same whether they are yielded from 40 members of a two-group pairing or from 80 members of a two-group pairing.[129] He thus ignores the fact that the net-integration rate found in the 40-member group is twice the rate of the 80-member group. This is the very point that defendant would like to hide: the policy's restriction of outsiders is a restriction that limits the sub-pool with a significantly higher net-integration rate.

Tellingly, defendant has not included with its critique any data suggesting that Dr. Siskin's method would have any material impact on the *relative* rates of net-integration between outsider-moves and insider-moves. This is because there is no impact to be found. So that there can be no misunderstanding, Professor Beveridge has documented that there is no such material impact.[130]

**F. Comparing the "with preference" simulation to the "without preference" simulation.** This is defendant's approach,[131] and it imposes the same dilution-of-results problem discussed earlier in connection with disparate impacts.[132] Here, the *overall* "with preference" results do not isolate the fact that it is non-beneficiaries who are driving the clear majority (two pairings) or the overwhelming majority (four pairings) of the net-integrative effect.[133] The relatively meager net-integration from CP-beneficiaries is counted not in terms of the proper base (approximately 50 percent of units), but on a base approximately twice the size.

---

[128] *See id.* at 34-35, at ¶¶ 124-25.

[129] *See* SD, at 73, ¶139.

[130] *See* BROD, at 36-39, ¶¶ 131-136 and Tables 22-24.

[131] *See* SD, at 65, ¶¶ 124-125.

[132] *See* BROD, at 39-41, ¶¶ 137-140.

[133] For example, 88.50 percent of the net-integrative simulated moves in the Black-Hispanic pairing were made by non-beneficiaries, a disparity that shows up in relative terms as CD-beneficiary net-integrative moves being only 13.63 percent of non-beneficiary net-integrative moves. *See id.* at 40-41, ¶ 139 and Table 25.

Nevertheless, were the Court to consider defendant's approach, it would find that net-integrative effect is *still* distinctly less in the overall "with preference" simulations than in the overall "without preference" simulations.[134]   As Professor Beveridge states: "The results are most striking for the pairings involving Blacks: 'with preference' net-integrative moves are only 63.04 percent of 'without preference' net-integrative moves in the pairing with Whites; 59.96 percent in the pairing with Asians; and 57.43 percent in the pairing with Hispanics."[135]   Moreover, these results are in addition to those already reported for actual awards, simulated "with preference" awards (CP-beneficiaries versus non-beneficiaries), and moves sought by apparently eligible applicants.[136]   The origin of Dr. Siskin's change-in-dissimilarity-index idea now comes into focus: use of the normal comparative techniques was inculpatory, so a distraction had to be invented.

*   *   *

As discussed in plaintiffs' opening brief, there is no requirement that perpetuation occur across multiple racial pairings.  Here it does, and a reasonable jury could only conclude that the policy does cause perpetuation of segregation.

<u>POINT IV</u>
DEFENDANT'S OPPOSITION PAPERS HIGHLIGHT DEFENDANT'S LACK
OF EVIDENCE IN SUPPORT OF ITS JUSTIFICATIONS.

Organizationally, it made sense to follow plaintiffs' showing that the policy, as a matter of law, causes disparate impacts and perpetuation of segregation with a demonstration of why defendant's justifications also fail as a matter of law. However, that obliges plaintiffs to defer until

---

[134] *See* BROD, at 41-43, ¶¶ 142-46 and Table 26.

[135] *See id.* at 42, ¶ 144 (referencing data presented in Table 26).

[136] *See* BD, at 47-52, ¶¶ 160-177 and Exs 16-18.

Point VI presentation of evidence of intentional discrimination – including evidence of the pretextual nature of defendant's proffered justifications.  As such, we ask the Court to bear in mind that, here, we are simply taking the varied and varying justifications that defendant has offered, accepting *arguendo* the fiction that they were more than pretextual, and demonstrating that defendant has not met its burdens.  *See MHANY*, 819 F.3d at 617 (quoting 24 C.F.R. § 100.500(c)(2) (2013)) (requiring defendant to prove "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant," in keeping with existing case law).  *See also Inclusive Communities*, 576 U.S. at 541 (holding housing authorities and private developers can "maintain a policy if they can prove it is necessary to achieve a valid interest," just like in Title VII context).  Defendant has not made out legally sufficient justifications, moreover, because defendant relies on speculation.[137]

As to perpetuation of segregation under the City HRL, where there is not a specific statutory test, the justification regime set out in the 2013 HUD Rule best comports with the uniquely broad and remedial purposes of the statute.[138]  As to disparate impacts under the City HRL, there is specific statutory language, and defendant has failed to "plead and prove as an affirmative defense"[139] that the policy "bears a significant relationship to a significant business objective." Admin. Code § 8-107(17)(a)(2).  There is no dispute that the term "significant business objective" is synonymous with "significant governmental objective."

---

[137] *See* 24 C.F.R. § 100.500(b)(2) (2013).  As noted in Point I, *supra*, at 6-7, Items D-F, even under the Challenged Rule, a defendant must present non-speculative evidence that the justification advances a substantial interest.

[138] *See* PI Brief, at 47.

[139] Plaintiffs have been prejudiced by defendant's failure to plead as an affirmative defense any specific justification [P56.1DR, ¶ 108], as was required under the City HRL, *see* Admin. Code § 8-107(17)(a)(2).  For example, when plaintiffs quoted the justification set forth in Deputy Mayor Been's 2015 declaration as part of plaintiffs' FRCP 56.1 statement, defendant was defiant: "Plaintiffs do not get to articulate the City's legitimate government interests. Defendant will detail the reasons why the City maintains the CP policy in its papers in support of its motion for summary judgment."  *See* P56.1DR, ¶ 109.  Defendant was five years late.

**A. Displacement and fear of displacement.**  Deputy Mayor Been asserts that "addressing displacement and the fear of displacement" is the "driving force for the CP policy today."[140]  (She says this even though she admits that the policy justification is *not* about insider applicants needing or deserving apartments in their CDs more than outsiders deserve those apartments.)[141]

1. It is undisputed that almost every type of displacement and fear of displacement is *not* addressed by the policy.  Defendant now admits that the policy does not address imminent displacement, fear of imminent displacement, displacement from one's apartment, fear of displacement from one's apartment, displacement from New York City altogether, or fear of displacement from the city altogether.  [P56.1DR, ¶¶ 122 and 123.][142]  So as to displacement-related justifications, defendant is left only with the claim that the policy addresses *non-imminent* displacement from *neighborhood* and fear of *non-imminent* displacement from *neighborhood*.

It is immediately apparent that this highly specialized sub-species of displacement and fear of displacement: (a) has been constructed specifically for this litigation;[143] and (b) is really nothing more than a justification to "make it easier for  . . . residents to keep living in their communities," a justification that "collapse[s] into the very definition of residency preferences."  *Langlois*, 234 F. Supp. 2d at 69.  If accepted as a legitimate justification, "residency preferences in and of themselves would forever justify the disparate impacts that they cause."  *Id.*

---

[140] *See* Aug. 14, 2020 declaration of Vicki Been, ECF 899 ("Been Aug. 2020 Dec,") at 21-22, ¶ 44.

[141] *See* excerpts of transcript of Aug. 2, 2017 deposition of Vicki Been ("Been I"), MD Ex 7, at 31:6-34:9 (acknowledging, *inter alia*, that the community preference is not a "who-deserves-the-apartment-more" question or "a question of need"; that who deserves the apartment is "not the justification"; in terms of whether "insiders deserve apartments in their community districts more than outsiders deserve those apartments," saying, "I don't think you can make those [deservingness]-based determinations"; and saying that community preference is "not a need-based determination").

[142] *See also* Been Aug. 2020 Dec, at 39, ¶ 80 (excluding displacement and fear of displacement from "one's apartment or the city overall" from the harms that the policy attempts to mitigate).

[143] Neither the Been Aug. 2020 Dec nor the Aug. 13, 2020 declaration of Professor Edward Goetz, ECF 898 ("Goetz Aug. 2020 Dec") claim that the displacement literature uses this classification.

If one were nevertheless to proceed to assess this phenomenon, it is essential that the Court be vigilant of generalized discussions in defendant's papers about displacement, discussions appearing to speak to *non-imminent* displacement from *neighborhood* and the associated fear but are not.  It is a pervasive problem.[144]

In Sections 4 and 5, *infra*, at 50-56, we explain why addressing *non-imminent* displacement from *neighborhood* and the corresponding fear (to the extent that it is not subsumed by risk of displacement from one's apartment or risk of displacement from the city) does not constitute addressing "substantial" or "significant" interests of defendant.  But assume for a moment these were substantial or significant interests.  Defendant's justifications fail because it has proffered no evidence, empirically or logically, that the policy actually *advances* the articulated goals.[145]

2. The policy is not designed to advance, and does not advance, the articulated goal of reducing *non-imminent* displacement from *neighborhood*.  The policy is not *designed* to achieve that goal.  An insider *not* at risk of displacement from either his or her apartment or neighborhood is *nonetheless eligible* for community preference.  [P56.1DR, ¶ 125.] An outsider to a particular lottery who *is* at risk of displacement from either his or her apartment or neighborhood is nonetheless *not eligible* for community preference.  [P56.1DR, ¶ 127.]

As the policy has operated in practice, defendant has no evidence of what subset of insiders who were awarded apartments under the policy had been at risk of displacement from their

---

[144] It includes the fact that none of Professor Goetz's discussion of estimates of displacement are specific to neighborhood. Professor Beveridge explains how Housing and Vacancy Survey ("HVS") data Professor Goetz relies on do not even isolate involuntary displacement from voluntary movement, let alone specify displacement from neighborhood (*see* BROD, at 48, ¶ 167).  Professor Myron Orfield explains how Professor Goetz and defendant have materially distorted a report from Orfield's Institute on Metropolitan Opportunity (*see* Oct. 29, 2020 declaration of Professor Myron Orfield ("Orfield Oct. 2020 Dec"), at 40-44, ¶¶ 134-48.

[145] Plaintiffs do not assert that the policy has to ameliorate all kinds of displacement, *compare* DOX Brief, at 56, but do assert that the policy has to (1) be in furtherance of a substantial goal and (2) advance that goal. Even under the Challenged Rule, a defendant's obligation would include "producing evidence showing that the challenged policy or practice advances a valid interest (or interests)."  24 C.F.R. § 100.500(c)(2) (2020).

apartment *or* neighborhood [P56.1DR, ¶ 131.]  As such, defendant also has no evidence of what subset of the undefined number of awardees-at-risk-of-displacement was at risk specifically for *non-imminent* displacement from *neighborhood*.  Defendant tries to skirt the overall lack of evidence by saying it only admitted that "it did not *specifically identify via name or tally*, which or how many beneficiaries of community preference had been at risk of involuntary displacement from their existing apartment [or neighborhood] prior to being awarded an apartment in an affordable housing lottery."  *Id.*  But, in fact, defendant has not identified either the beneficiaries who were at risk of displacement, or the relevant subset of that group, in *any way*.

Likewise, defendant does not have evidence of the *scope* of involuntary displacement *from neighborhood* (or non-imminent risk thereof) that occurs in New York City.  Deputy Mayor Been tries to elide the issue by saying that there are data that show that "some households . . . have left their neighborhoods."[146]  As Purnima Kapur, defendant's former executive director of the Department of City Planning acknowledged, however, "What we cannot discern is why people have moved"; this includes the inability to distinguish whether someone has moved because of a new job or just deciding that he or she would "like to be living in [a] new part of the city."[147]

Without evidence as to the scope of insider awardees saved by the policy from non-imminent displacement from neighborhood, and without evidence as to how that (undefined) quantum of assistance relates to the (undefined) magnitude of non-imminent displacement-from-neighborhood in the city, it would be entirely speculative to assert that the policy *advances the goal* of mitigating displacement from neighborhood.

The Court will search defendant's papers in vain for something more than a conclusory

---

[146] *See* Been Aug. 2020 Dec, at 33, ¶ 49.

[147] *See* excerpts of transcript of Apr. 19, 2018 Purnima Kapur deposition ("Kapur Depo"), MD Ex 8, at 128:3-132:9.

assertion that the policy advances the goal of mitigating displacement-from-neighborhood.  To find out the role "the CP policy plays in addressing displacement and the fear of displacement," defendant's brief provides only the following direction to the Court: "*See* City 56.1 generally."[148] When one gets to defendant's FRCP 56.1 statement, it turns out that there is actually only one, extremely general, statement ("The CP policy is part of the City's anti-displacement efforts"), which in turn refers one only to three paragraphs of the Been declaration and to 10 paragraphs of the Goetz declaration.[149]  When one gets to the Been declaration, no mechanism is described by which the policy identifies an insider applicant who was at risk of displacement from the neighborhood and then directs a preference unit to that applicant.[150]

Defendant says that plaintiffs ask for too much of a fit between the policy and the goals it supposedly advances.[151]  But a solid fit is required.  Justifications, after all, only come into play because a policy has been shown to cause one or more racially disparate impacts or to perpetuate segregation.  As the Circuit has held in the wake of *Inclusive Communities*:

> [W]e are mindful of the Supreme Court's admonishment that all too often "zoning laws *and other housing restrictions* ... function unfairly to exclude minorities from certain neighborhoods without any sufficient justification" and that "[s]uits targeting such practices reside at the heartland of disparate-impact liability." *Inclusive Communities Project*, 135 S.Ct. at 2521–22.

---

[148] *See* DOX Brief, at 58-59.

[149] *See* D56.1PR, ¶ 95, referencing Been Aug. 2020 Dec at ¶¶ 79-81 and Goetz Aug. 2020 Dec, ¶ 51-60.  (A second statement, D56.1PR, ¶ 117, hinges on the unproven contention that the policy *does* address fears of displacement.)

[150] There could not be, because information regarding an applicant household's actual or perceived risk of involuntary displacement is not collected in the lottery process.  [P56.1DR, ¶ 132.]  When one gets to the Goetz declaration, seven paragraphs (51-56 and 60), as relevant, contain only a twice-repeated conclusory assertion that the policy is necessary.  Paragraph 59 does not speak to the actual effect of the policy on displacement from neighborhood, but to rather a hoped-for perception among residents that defendant is trying to help.  Finally, paragraphs 57 and 58 speak to "preserving affordability" for "selected residents" and giving incumbent residents a "better chance" to remain in their neighborhood – all without touching the issue of whether those residents were at-risk for displacement or were, like others (including the far greater number of outsider applicants) simply looking for good, affordable housing.

[151] *See* DOX Brief, at 55-58.

*MHANY*, 819 F.3d at 619 (emphasis added).

In fact, all plaintiffs seek to have applied are basic rules: there must be evidence that the policy advances the articulated goal; the evidence cannot be speculative; and the evidence must prove necessity of the policy (FHA) or substantial relation to the policy (City HRL).[152]  Defendant misapprehends the teaching of cases like *Huntington*, 844 F.2d at 936 and *Guardians Ass'n of N.Y.C. Police Dep't, Inc. v. Civil Serv. Comm'n of City of New York*, 630 F.2d 79, 100–06 (2d Cir. 1980).  Their fundamental proposition is that a policy must be achieving what it claims to be achieving.[153]  For all of defendant's complaints, defendant neither: (a) proposes a standard against which to test evidence of a policy's *advancement* of a goal,[154] let alone necessity or substantial relationship; nor (b) provides evidence that could meet any evidentiary standard.[155]  Defendant's showing is that two things exist side-by-side: the policy on the one hand, and articulated concerns about a particular sub-type of displacement on the other.  That is not sufficient.

---

[152] *See* recitation of caselaw and applicable regulation, *supra*, at 7 (Point I(E)-(F)) and 42.

[153] The same is true for *Dothard v. Rawlinson*, 433 U.S. 321, 331 (1977) (holding link between facially neutral practice and job requirement not shown).  Defendant also mischaracterizes *Fair Hous. Ctr. of Washington v. Breier-Scheetz Properties, LLC*, 2017 WL 2022462, at *3 (W.D. Wash. May 12, 2017), *aff'd*, 743 F. App'x 116 (9th Cir. 2018).  *See* DOX Brief at 58.  In fact, the court did hold that "subjective judgments are insufficient to rebut a plaintiff's prima facie case absent objective evidence in support of those judgments," even if the goal is "worthy."  *Fair Hous. Ctr. of Washington*, 2017 WL 2022462, at *3-*4.

[154] *See* DOX Brief, at 57 n.67 (revealing, in making the false claim that defendant's interests are not hypothetical or speculative, that defendant fails to appreciate that there is *separate* advancing-the-interest requirement).

[155] Defendant suggests that requiring "data-driven" evidence would impose a "heightened" standard.  *See* DOX Brief, at 56-59.  In fact, defendant cannot explain: (a) why data would *not* be part of an evidentiary showing in the case; (b) why it has *no* data supporting a link between the policy and the supposed goal; and (c) why the Court should accept the absence of evidence – data-based or otherwise – and simply accept defendant's conclusory allegations.

3. If possible, defendant's evidentiary problem is yet more acute when it comes to *fear* of non-imminent displacement from neighborhood. First, plaintiffs in their opening brief had pointed out that the justification was amorphousness built on amorphousness:

> According to what defendant wants the Court to believe, [the] person who knows about the policy will have his or her fear of displacement reduced by *an unspecified amount* based on the idea that, at some indeterminate point in the future, there *may or may not* be a lottery for an affordable housing development in his or her community district; which *may or may not* be in his or her neighborhood; which *may or may not* have apartments available as to which he or she is interested (and as to which he or she *may or may not* be qualified); and which lottery the person *may or may not win.*[156]

Defendant has no answer.

Second, much of defendant's papers speak to fear of "displacement," without further specification. Defendant has not explained to the Court how much of that ill-defined overall fear of displacement is attributable specifically to fear of the non-imminent threat of displacement from a neighborhood (rather than to fear of displacement from one's apartment or from the city altogether). An answer of "some" is unsatisfactory. It is defendant that is asking the Court to believe that the policy *does* address a specific sub-type of fear of displacement; it is on defendant to show, with evidence, that the policy does reduce *that* fear. Defendant has not done that *at all*.

Moreover, the internal logic of defendant's argument that the policy has an impact on fear precludes such a showing: such help as the policy promises to insiders comes with the *detriment* it promises to outsiders.[157] So, to the extent that the policy somehow did reduce the fears of

---

[156] *See* PI Brief, at 56.

[157] *See* Goetz Aug. 2020 Dec, at 35, ¶ 63 ("Rent burden is a significant issue across all 59 community districts . . . ."). Defendant admits that there is a citywide affordable housing crisis. [P56.1DR, ¶ 135.] Deputy Mayor Been points to rent burden in explaining that, "The City's housing crisis has effects on a rent-burdened household that extend far beyond their ability to pay monthly rent. In general, the larger the share of one's income spent on housing, the less money is left over to spend on food, healthcare, childcare, education and enrichment, and other critical expenses. Housing cost-burdened households may also have difficulty making rent or mortgage payments on time, which may lead to overcharges and other financial penalties and, at the extreme, eviction or foreclosure. Burdened households

insiders, it would correspondingly take New Yorkers who are outsiders and *increase* their fear that an affordable apartment would not be available to them when they needed it.   Indeed, under defendant's theory, a multi-lottery applicant would have his or her fears reduced when applying as an insider *but augmented* when applying as an outsider.   Forever ratcheting the fears of various New Yorkers (or even the same New Yorker) up and down is very different from the stated goal.

Defendant's intriguing and callous rejoinder is buried in a footnote that reflects still further backtracking.   The assertion splashed across it papers that the policy addresses fear of non-imminent displacement-from-neighborhood that any New Yorker may feel has a caveat: it is only "the fear of displacement *from a particular project seeking approval that the City* is seeking to address."[158]   Documenting the extent to which the policy advances that goal of reducing fears within what is now a subset of a subset of a subset of a subset[159] is also something for which defendant provides no evidence.   Moreover, if the policy is tied only to "a particular project seeking approval," then defendant's claim that the policy broadly reduces one subtype of fear of displacement – the fear of *non-imminent* displacement from *neighborhood,* fear that is supposedly widespread throughout the city (independent of a particular lottery project) – is overstated.

Finally, defendant admits that a "community district is often composed of multiple neighborhoods; a lottery applicant being award a unit in the community district of his or her current

---

may experience broad financial instability in the form of delayed payments across a variety of bills, which may lead to increased stress and its adverse mental and physical health consequences."  Been Aug. 2020 Dec, at 18-19, ¶ 37.

[158] *See* DOX Brief, at 60, n. 73 (emphasis added).  Presumably, too, it is only the fears of the insiders to the prospective project with which defendant is concerning itself; but, to the extent that these fears exist, there is no reason why outsiders would not experience them.  The policy, after all, is described as "*not* a crisis intervention," but rather one that spares households "the considerable anxiety of fighting near-term displacement."  Goetz Aug. 2020 Dec, at 32, ¶ 58 (emphasis added).  Some outsiders could decide that the best way to adapt and avoid "considerable anxiety" is to learn about new neighborhoods and try to move to one or more of them, a decision that the policy makes more difficult.

[159] In this iteration of defendant's idea, there is a subset of New Yorkers who fear displacement; and a subset of those who have a fear of non-imminent displacement; and a subset of those who have a fear of non-imminent displacement from neighborhood; and a subset of those who have a fear of non-imminent displacement from neighborhood that coincides with the development process for a particular lottery; and, finally, a subset of those who are insiders.

residence is not necessarily being awarded a unit in the neighborhood of his or her current residence." [P56.1DR, ¶ 134.]  Beyond that, if the policy's goal were actually to help people stay close to home, it is a poor fit: twice as many outsiders (who the policy disadvantages) than insiders (who the policy advantages) applied for projects within two miles of their homes.[160]

4. There is no substantial interest of defendant in singling out the neighborhood level in respect to displacement or fear of displacement.  Plaintiffs agree that efforts to prevent a household from being displaced from its apartment constitute an important interest of defendant.  Likewise, plaintiffs agree that preventing households from being displaced from the city as a whole is an important interest.  Critically, both types of efforts redound to the benefit of all New Yorkers.

The claimed goal of specifically preventing displacement from neighborhood (which, by contrast, sets New Yorker against New Yorker) is largely subsumed by the previously described interests.  By definition, strategies that help keep a household in its current apartment keep the household in its neighborhood and in the city.  Moreover, citywide strategies – like affordable housing preservation (which defendant describes as its most important anti-displacement tool)[161] – operate both to keep the *citywide* supply of affordable housing from shrinking, and to keep the *neighborhood* supply of affordable housing from shrinking (directly or by reducing rent pressure).

As such, to the extent that addressing displacement-from-neighborhood *were* a distinct interest of defendant, it is hardly a primary or substantial interest.  This relative lack of significance or substance is confirmed by Deputy Mayor Been: "I would agree that having housing [] – period – is more important than where the housing may be."[162]

---

[160] *See* BROD at 45-46, ¶¶ 156-158, and Chart 2.  Meanwhile, *just* outsiders seeking to be considered in lotteries *six or more miles* away outnumbered *total* insiders by nearly *nine times*. *See id.* at 46-47, ¶¶ 159-161 and Chart 3.

[161] *See* excerpts of transcript of Mayor de Blasio Apr. 4, 2019 press conference, MD Ex 9, at 3 (calling preservation the "ultimate" and "simplest, strongest, clearest anti-displacement tool" for "keeping people in their neighborhoods").

[162] *See* Been I, at 92:13-93:22.

To the extent that displacement-from-neighborhood is *not* a subset of the other interests, what is it?  It involves one group of New Yorkers (incumbents to a neighborhood) competing with each other and with another group of *income-equivalent* New Yorkers (neighborhood outsiders) for *currently unoccupied apartments they all want for their own varied reasons.*  If the incumbent gets the apartment, the New Yorker who is an outsider does not.  Defendant wants the Court to believe that defendant's decision to allocate this scarce resource disproportionately in favor of the neighborhood incumbent constitutes a substantial interest of the City of New York.  It does not.

Since defendant asserts that the lottery policy advances the supposed displacement-from neighborhood goal, the lottery can tell us a lot about the insubstantiality of that goal.  And it does.  Lottery data (involving nearly 700,000 unique, actual applicant-households) show that only 7.30 percent of entrants apply exclusively within their CD (to housing which may or may not be in their neighborhood).[163]  By contrast, more than 87 percent of unique applicant-households apply outside of their CDs at least 75 percent of the time; 70 percent of unique applicant-households apply outside of their CDs 100 percent of the time.[164]  The percentage of unique applicant-households applying outsider of their CDs at least 75 percent of the time is virtually the same between and among racial groups.[165]  These are data conclusively debunking defendant's fantasy narrative of a large portion of applicants being interested only in staying in their neighborhoods.

In other words, defendant is claiming as substantial a purported interest (how unoccupied,

---

[163] *See* BD, at 58-59, ¶¶ 201-203 and Table 15 (total row).

[164] *See id.*

[165] *See id.* at 61, ¶ 208 and Chart 1.  Professor Goetz says that demand for preference units is greater than supply, as reflected by 50,000 applicants who only applied in-CD.  *See* Goetz Aug. 2020 Dec, at 40-14, ¶ 71.  He does not point out that insiders are also permitted to compete for outsider units; nor that 483,348 unique applicants applied out-of-CD 100 percent of the time; nor that 116,401 unique applicants applied out-of-CD at least 75 percent of the time.  *See* BD, at 59, Table 15.  These data reflect a far greater gap for outsiders than insiders between availability and need.

income-bounded apartments should be allocated) that interferes with what the vast majority of actual applicants are seeking and doing.  As Professor Goetz puts it, "we flatter ourselves and slide into paternalism when we act on the idea that we know best about where lower income people of color should live."  [P56.1DR, ¶ 183.]  That cannot be a substantial interest of defendant.

Because the data about applicant willingness to seek housing outside of one's CD are so compelling, defendant feels compelled to argue that the applications do not actually reflect what applicants want.  Professor Goetz states:

> While finding an affordable housing unit in a different CD may not be a household's preference, it is likely to be more preferable to them than becoming homeless, being forced to move out of the city, or finding another unit where they are forced to spend an even higher percentage of their income on rent, or a unit that is of lower quality.[166]

Defendant has chosen to blindly value any incumbent for an unoccupied affordable apartment over other New Yorkers who, without that apartment, face what defendant itself is describing as extremely serious issues.  In other words, the purported interest in arresting displacement-from-neighborhood as distinct from other forms of displacement (the mitigation of which do not set New Yorker against New Yorker) is in direct and profound *conflict* with defendant's unquestioned and more substantial interests in preventing homelessness, the imposition of higher rent burden,[167] or the need to leave the city.  As such, the purported interest cannot be substantial or significant.[168]

---

[166] *See* Goetz Aug. 2020 Dec, at 39, ¶ 69.

[167] It is ironic that defendant seeks to downplay the importance of rent burden.  *See* n.157, *supra*, at 48-49.  Professor Goetz's critique of Professor Beveridge's comparison of the insider and outside rent burdens is equally unavailing.  *See* BROD, at 47-48, ¶¶ 163-64  (stating there is no reason to believe multi-application households are more or less rent-burdened than single-application households; and, in any event, each application represents a snapshot in time where outsider applicant is being denied a level playing field).  Professor Goetz is correct that a household can be tabulated on both the beneficiary and non-beneficiary sides of the table, but this only underlines that households do not become more or less in need of housing or at risk of losing housing depending on the location of where they apply. *See id.* at 48, ¶ 165. That is, *independent of need or risk*, defendant prefers the insider. *See id.*, at 47, ¶ 162.

[168] This is another area where vigilance is necessary.  Defendant will oftentimes subtly shift from trying to prove that the policy has a *direct* impact on displacement to an argument that fewer apartments will be built without the policy.  That is a different argument, and, as shall be addressed in Section B, *infra*, the argument lacks evidentiary support.

The purported interest also conflicts with defendant's strong claimed interest of integrating the City's segregated schools.[169]  As Mayor de Blasio has recently reemphasized, people should not "just act like the schools can solve the problem alone.  They simply can't . . . . [L]et's desegregate the neighborhoods and you will desegregate the schools."[170]  A claimed interest that prioritizes an unoccupied apartment for a neighborhood incumbent undercuts those goals by, as demonstrated in Point III, *supra*, perpetuating segregation.  Such a conflicting interest, particularly when it undercuts a "top priority," cannot be a substantial interest of defendant.

There are still further reasons that it cannot be a substantial interest of defendant to prioritize those who wish to *stay* in a neighborhood over those who wish to become *part of* that neighborhood.  First, it is not disputed that newcomers to a neighborhood can be more invested in the neighborhood than long-time incumbents.  [P56.1DR, ¶ 117.]  And, defendant's rhetoric to the contrary, it is not as though everyone's existing neighborhood is one that he or she has chosen and loves.  For all of the discussion of displacement contained in defendant's papers, including such discussion as there is about attachment to neighborhood,[171] defendant's own, non-scientific sample of several hundred New Yorkers found that the majority of low-income New Yorkers were *not* in their neighborhoods by choice in the first place: they "end[ed] up in neighborhoods due to forces outside of their control, such as affordability, discrimination, or government housing programs."[172]

---

[169] *See* P56.1DR, ¶ 173 (confirming integration is a "top priority" for the Department of Education).

[170] *See* excerpt of transcript of Mayor de Blasio's Aug. 2020 appearance on The Brian Lehrer show, MD Ex 10, at 4.

[171] We note in this connection that significant portions of Deputy Mayor Been's declaration are in the nature of opining as an expert.  This is improper; she was never proffered as an expert witness.  *See* FRCP 26(a)(2).

[172] *See* excerpt of City of New York, "Community Conversations: New Yorkers Talk Fair Housing," ("Community Conversations"), MD Ex 11, at 35.

Indeed, 45 percent of respondents indicated that the wanted to move out of their neighborhoods.[173]

Defendant's presentation about disruption to family networks is misleading in the New York City context. When Professor Goetz writes about contemporary displacement being likely to force households into the peripheries of urban areas and the related consequences,[174] he cites a study of displacement in Australia.[175] What Professor Goetz does not tell the Court is that he realizes that, here, even an involuntary move out of one's CD could be a relatively short distance move, as from East 102nd Street in East Harlem to East 93rd Street on the Upper East Side).[176]

Indeed, in the small survey that defendant performed, "family and community" or "sense of belonging" showed up in the top reasons for why respondents wished to remain in their neighborhoods . . . *and* in the top reasons for why respondents wished to *move to another neighborhood*.[177] There is no reason to prefer one group (insiders) to another on this metric, either.

The same problem emerges when Deputy Mayor Been discusses a household who needs to move to an elevator building or who needs a larger apartment.[178] Lottery participants could just as easily meet those needs by applying to lotteries as outsiders.[179]

Notably, another of the top answers given by those wished to move to another

---

[173] *See id.* The 45 percent *all* need access to an affordable apartment outside of their neighborhood to achieve what they want (the policy disadvantages them). By contrast, only a subset of the 55 percent who say they want to stay in their neighborhoods would find themselves in the distinct category of at-risk-of-displacement-from-neighborhood.

[174] *See* Goetz Aug. 2020 Dec, at 29, ¶ 48. Deputy Mayor Been also refers (without evidence) to displaced households having to move "often [to areas] far from where they had been living." *See* Been Aug. 2020 Dec, at 17-18, ¶ 34.

[175] *See* excerpts of transcript of Apr. 5, 2019 deposition of Professor Goetz ("Goetz I"), MD Ex 12, at 83:20-25.

[176] *Id.* at 84:2-85:2.

[177] *See* Community Conversations, at 35.

[178] *See* Been Aug. 2020 Dec, at 19, ¶ 38.

[179] The Deputy Mayor says residents want to stay in their neighborhoods as they age. *See id.* One could just as well say that adult children want to move to a neighborhood to be with an elderly parent but are hindered by the policy. Or that an aging New Yorker would like to move to her adult child's neighborhood but is hindered by the policy.

neighborhood was "safety."[180]  Defendant cannot have a substantial interest in reducing the ability of New Yorkers who wish to move for safety reasons (New Yorkers who would be "outsiders" in the lottery context) compared to the ability of other New Yorkers seeking affordable housing.

Finally, defendant is claiming as a substantial interest preventing something that, in fact, is neither new nor anomalous.  Defendant admits, "In contemporary New York City, many City residents move from one neighborhood to another, as has been the case historically." [P56.1DR, ¶ 140.]  As its former deputy mayor for housing and community development has pointed out, "I think it's already a value statement to assume that it's bad if people move into other neighborhoods that are further away because that just runs afoul of the history of the world."[181]

As with displacement itself, there is no legitimate and substantial reason to place responding to fear of non-imminent displacement from neighborhood over other fears of displacement that the policy either does not purport to deal with or that the policy exacerbates.

5. It is not a legitimate nor substantial interest of defendant to reduce fear of non-imminent displacement from neighborhood by the means of misleading New Yorkers.  Defendant has made a point of asserting that the "fears expressed by residents about being displaced are rational."[182]  If true, defendant has no business trying to diminish those fears except by actions that *actually* reduce the threat.  The policy does step in to enhance the chances of insiders of securing a lottery apartment far beyond that of an outsider.  But that is very different from the rank speculation that

---

[180] *See* Community Conversations, at 35.

[181] *See* excerpts of Nov. 3, 2017 of Alicia Glen ("Glen Depo"), MD Ex 13, at 288:3-289:5.

[182] *See* Been Aug. 2020 Dec, at 33-34, ¶ 69.  This is a fine example, found throughout defendant's papers, of eliding differences between fear of displacement in general and any particular form thereof, fear of imminent versus non-imminent displacement, and fear of displacement from neighborhood as compared with fear of displacement from one's apartment or the city.  It is only at the end of the paragraph that one realizes that no distinctions are being drawn at all: "renters have a rational basis to fear that the housing market may render it impossible for them to remain *in their homes, neighborhoods, or even the city completely*."  *Id.* at 34. ¶ 69 (emphasis added).

the policy will secure an insider facing a non-imminent threat of displacement from neighborhood an apartment for which he or she is qualified in the relevant timeframe.[183]   Defendant should clearly communicate the uncertainties. In other words, if the purported fear-reducing interest is an interest in reducing fear by any means including misleading, then the interest is not legitimate.   If the interest is in using only truthful means, then the policy does not advance the interest.[184]

**B. Defendant ignores the multiple hurdles that bar "Council Member support" from being a legally sufficient justification.**   Plaintiffs respectfully refer the Court to Point III(G) in plaintiffs' opening brief.[185]   We note that defendant has not disputed the fact that this kind of justification would be unprecedented; the fact that this kind of justification would undermine the FHA and the City HRL; or the fact that the justification is entirely speculative.

What defendant tries to do instead is to mix-and-match justifications, effectively saying that CMs need to be *persuaded* to approve affordable housing with the carrot of the policy, in part because the policy softens opposition to affordable housing.   This argument fails in every way.

First, the City Council, made up of 51 CMs, is an "integral part *of defendant*."   [P56.1DR, ¶ at 160 (emphasis added).]   There is no argument but that building affordable housing is in the interests of the city and its residents, including the interests of the constituents of the CM in whose

---

[183] As opposed to displacement from apartment (no help from the policy) or displacement from the city as a whole city (policy works against you if you are among the vast majority of lottery applicants who are outsiders).

[184] Defendant invites the Court to skip all of the analysis; agree that, in general terms, "anti-displacement" sounds more important than "traffic patterns"; and conclude that automatically means defendant has propounded a valid and substantial interest.   *See* DOX Brief, at 59.   But proffered justifications have to be assessed specifically.   Maintaining a particular traffic pattern may or may not be a substantial interest, depending on evidence; a policy may advance that interest, depending on evidence.   It is the same here.   "Anti-displacement" in general is not on trial; the *specific subtype of anti-displacement interest crafted for this case* is.   Defendant has not shown through evidence that the latter is a substantial interest.   Even if it had done so, defendant failed to show by evidence that the policy advances that interest.

[185] *See* PI Brief, at 57-62.

district new affordable housing is being contemplated.[186]  It is CMs who have full authority to approve zoning changes needed to facilitate affordable housing developments and to approve the many individual affordable housing projects that need defendant's approval.  [P56.1DR, at ¶¶ 161-62.]  They are *fully able* to do so with or without the policy.

Second, as detailed in Section A(4)-(5), *supra*, reducing the specialized sub-category of non-imminent displacement from neighborhood and fear of non-imminent displacement from neighborhood is not a substantial interest of defendant, and, in any event, such reduction is not advanced by the policy.  Hence, the CM justification cannot be based on those concerns.[187]

Third, even if it were the case that the question before the Court were the landscape that exists today, defendant's link between reducing opposition to affordable housing and how CMs vote is saying nothing other than reduction in opposition would make it easier for defendant to act in its own interest and build affordable housing.   Enhancing political convenience for officers of defendant to take actions in the interest of defendant cannot be a legally sufficient justification for defendant.  If it were otherwise, legislators (in any jurisdiction) could *always* hold hostage something that is in the jurisdiction's interest to do unless a *popular discriminatory policy* were included as part of the deal; the executive (who agreed with the discriminatory policy) could always just shrug his or her shoulders and say "we were obliged by the legislators to do this."

Fourth, it is *not* the current landscape that is at issue.  The question is what CMs would do in a future scenario where the policy was not in place.  Are there projects that they would not approve *that they would have approved with the policy in place*?  Defendant's actual answer is that

---

[186] *See* Been I, at 299:2-21 ("If I thought it was in the interest of the city to have the affordable housing and the council member turned it down solely because there was no community preference, I would not think that that was in the interest of the community."); Glen Depo, at 134:4-14 (stating it would not be in the interest of the city or CM's constituents to turn down affordable housing projects).   Note that this represents one of many instances where defendant improperly refused to respond to a proposition in plaintiffs' FRCP 56.1 statement.  *See* P56.1DR, at ¶ 168.

[187] A reason why the Court ought to disregard defendant's idea that individual elements of justification not be probed.

it does not know what would happen in a non-policy landscape.  For example, Deputy Mayor Been admitted at her deposition "I don't have an alternate [] universe" where she has "tested out" having versus not having community preference to determine whether land use actions would get approved without the policy, and that she cannot answer whether rezonings would not occur "but for" community preference because "I don't have any way of assessing 'but for.'"[188]

Nevertheless, in contradiction to her deposition testimony, Deputy Mayor Been now sprinkles into her declaration her opinion that less affordable housing would be approved without the policy.  This, unfortunately, is the definition of a sham declaration.[189]

Defendant claims that examining how CMs would act in a city where the policy was no longer in effect involves addressing "inappropriate hypothetical questions."  [P56.1DR, at ¶ 169.] This is a fundamental misunderstanding on defendant's part.  What defendant calls "hypothetical" is precisely the justification that defendant is urging upon this Court: that, *without the policy*, CMs, *in the future*, will not approve or facilitate affordable housing *that they would otherwise approve*.

---

[188] *See* Been I, at 74:4-75:10.  *See also id. at* 290:6-291:7 (admitting "I don't know for a fact" what CMs would do once community preference had been disallowed by the Court or eliminated by defendant voluntarily).  *See also* excerpts of May 10, 2018 deposition of then-HPD Commissioner Maria Torres-Springer ("T-S Depo"), MD Ex 14, at 202:3-203:6 (conceding it is "difficult for me to predict" which CMs would take the position that they were going to deny their constituents desperately needed affordable housing if community preference were removed because to do so would be "to speculate") and 212:16-214:12 (confirming she did not know the answer to "difficult hypothetical" of which CMs would reject projects without the policy even if they thought projects were on balance beneficial to their constituents because it is "too much of a matter of speculation").  *See also* Kapur Depo, at 98:14-100:20 (declining repeatedly to identify even one CM who, simply because there was no policy, would automatically turn down land use actions needed for affordable housing, because that would be "speculating").  *See also* excerpts of deposition of June 14, 2018 deposition of David Quart, defendant's former deputy commissioner for strategy, research, and communications, MD Ex 15, at 113:17-114:18 (contrasting his "sense" that he could see that some CMs would act differently with the actual reality that, "I have no proof or specific reason or facts").

[189] Leaving aside the hearsay problems, *see* Been Aug. 2020 Dec, at 28, ¶ 59 n.42 (showing belief not based on explicitly discussing the policy) and at 30-31, ¶ 64 (showing, again, not based on a discussion of the policy with CMs), regarding the implications of the contradiction, *see Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.").  The Second Circuit has explained that "[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Id.* at 124–25 (quoting *Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969)).

Even if defendant were trying, it would be quite difficult to meet its burden in light of a series of facts as to which there is no dispute, the first being that:

> CMs consider multiple factors when deciding whether to vote to approve or disapprove land use actions needed to facilitate construction of affordable housing or whether to vote to approve or disapprove an application regarding a particular affordable housing development, and two of the factors that may be considered are the levels of affordability of the units and the extent to which needed infrastructure or community improvements or benefits will be provided.[190]

In addition, defendant's executive branch has a variety of tools to meet CM concerns and thereby influence their position on land-use and development matters; and it is very unusual for a CM to be given all of the items for which the CM has negotiated in the context of land-use actions or approval of affordable housing developments.  [P56.1DR, at ¶ 164-65.]  Plus, defendant is unable to conclude that the same factor will be determinative in persuading any CM to support any particular land-use change or a particular project, although the level of affordability is an issue that is raised repeatedly. [P56.1DR, at ¶ 166.]   Finally, when CMs have asked defendant's executive branch to expand the percentage of units that are subject to the community preference policy, defendant's executive branch has said "no," and yet the CMs often have supported the land-use measure or development project in question anyway.  [P56.1DR, ¶ 167.]

Thus, in the presence of multiple and varying factors, and given the fact that CMs have supported affordable housing development even when their desired level of preference was rejected, the belated opinions of Deputy Mayor Been are impermissibly speculative.

Plaintiffs respectfully reemphasize that the question at hand is the future landscape of a city without the policy.  An examination of that future brings into focus the conduct that defendant asserts will ensue: decisions by CMs to torpedo affordable housing *that they otherwise would*

---

[190] *See* excerpts of defendant's Oct. 2, 2019 amended responses to plaintiffs' requests to admit ("Def. amended responses to RTAs"), MD Ex 16, at 16-17 (RTA 23 and response thereto).

*approve*, even though doing so would accomplish nothing except to constrict the supply of affordable housing to everyone – including the CM's constituents – something that is contrary to the interests of defendant and contrary to the interests of the CM's constituents.[191]  Defendant cannot prove that this will happen, and, in any event, an entity cannot have as a justification for a discriminatory policy the prospect of irrational (or discriminatory) conduct by its officials.

Two further considerations arise from the fact that, *after* defendant successfully precluded plaintiffs from getting discovery of CMs on the basis that there was a "lack of relevance of the city council members to this dispute,"[192] defendant admitted that "the best source for providing a CM's own explanation for why he or she would or would not act in the future" (concerning land-use measures that facilitate affordable housing or approvals of a particular affordable housing development) "is the CM himself or herself."[193]

First, defendant has failed to produce evidence from the best source.  Second, in ways that went beyond what defendant has done before, defendant is now, through Deputy Mayor Been, *relying on conversations between CMs and the Deputy Mayor.*  This is fundamentally unfair[194] and should preclude the proffer of the justification.  Even in the context of a rock-solid privilege, this unfairness has been recognized.  "[T]he attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). It "may implicitly be waived when defendant asserts a claim that in fairness requires examination of

---

[191] Deputy Mayor Been's statement that neither the executive branch nor others can "force or direct a particular CM to vote any particular way," Been Aug. 2020 Dec, at 46-47, ¶ 94 n.75, is a *non sequitur.* The question is not what CMs would be forced to do, but rather what they themselves would choose to do in their roles as officers of the city.

[192] *See* excerpt of Sept. 14, 2017 conference before Hon. Katharine Parker, MD Ex 17, at 9:6-7; plaintiffs' objections overruled by order of this Court, Dec. 12, 2018, ECF 656.

[193] *See* Def. amended responses to RTAs, at 15 (RTA 21 and response), referencing the issues raised by RTAs 19 and 20 (RTAs which defendant refused to answer, *see id.* at 12-15).

[194] As would be the belated production of such evidence well after the close of discovery.

protected communications." *Id.*   The broad principle is that "'the type of unfairness to the adversary that results in litigation circumstances when a party uses an assertion of fact to influence the decisionmaker while denying its adversary access to privileged material potentially capable of rebutting the assertion.'" *In re County of Erie*, 546 F.3d 222, 229 (2d Cir. 2008) (citation omitted). Here, where no privilege was found to exist, it is especially iniquitous to permit the justification when plaintiffs have had their hands tied from acquiring what defendant came to admit was the best evidence relating to that justification.

A final observation to conclude this section has to do with another showing of the failure of the policy to be necessary on CM-support grounds.   It is undisputed that Council Speaker Corey Johnson, in discussing the City's imperative to address persistent school segregation in May 2018, explained that while he has supported the policy in the past, he would be open to "scaling back on the percentage that we allow for right now," suggesting percentages as low as twenty percent because "there's a greater good we have to look at."   [P56.1DR, ¶ 172.]   The statement was referenced in a July 2018 declaration from Mayor de Blasio resisting his deposition.[195]

Deputy Mayor Been now admits that, more than two years later, she has not spoken with the Speaker about these remarks – remarks that suggest directly that a 50 percent preference policy is not necessary.[196] (There has been no evidence put forward that anyone else in the executive branch has spoken to Speaker Johnson on this.) All the Deputy Mayor writes is that the Speaker has not *approached* the administration nor introduced legislation (the policy has never been legislative).   Put another way, neither the Mayor nor Deputy Mayor has deigned in two years to

---

[195] *See* excerpts of July 2018 declaration of Mayor de Blasio in support of cross-motion for protective order ("de Blasio Dec"), ECF 497, MD Ex 18, at 6, ¶ 19. The Mayor also acknowledged that he has "regular interactions with the City Council Speaker." *See id.*   By that date at the latest, therefore, the Mayor knew of Speaker Johnson's remarks, made on the nightly Errol Louis program on NY1 that the Mayor has continued to be a guest on every week.

[196] *See* Been Aug. 2020 Dec, at 45-46, ¶ 93 n.74.

61

walk from one side of City Hall to the other (or ask the Speaker to do so, or pick up the phone) in order to talk about the policy.  There could be no showing of policy necessity when defendant has avoided finding out that the leading CM might think that it was not necessary in its current scope.

**C. Persevering through long years of difficult conditions.**  This was a justification of the policy that defendant proffered to the Court through Deputy Mayor Been's declaration in 2015.[197]  Most of defendant's papers suggest that this justification has been abandoned, including Deputy Mayor Been's direct statement that the policy, while initially implemented for this reason, has "since evolved."[198]  If not, plaintiffs respectfully refer the Court to Point III(D) in our opening brief,[199] and note the profound lack of fit between the policy and the stated concern (*e.g.*, a long-term resident of a CD who has persevered through long years of unfavorable living conditions always suffers the detriments of the policy when applying as an outsider; an insider new to a CD and who has not persevered through anything always enjoys the benefits of the policy).[200]

\*   \*   \*

Defendant has not met its burden of persuasion[201] as to any of its justifications; indeed, even were the FHA burden of persuasion to be shifted to plaintiffs,[202] Plaintiffs are entitled to summary judgment as to each justification.

---

[197] *See* excerpt of Oct. 2, 2015 declaration of Vicki Been ("Been 2015 Dec"), ECF 18, MD Ex 19, at 3-4, ¶ 8.

[198] *See* Been Aug. 2020 Dec, at 41, ¶ 82 n.68.  This "evolution" raises serious concerns.  There is no way to read defendant's submissions and believe that the evolution only just took place over the past five years.  Yet the Deputy Mayor submitted a declaration under penalty of perjury in October 2015 that the "persevered through years of unfavorable living conditions" rationale was still an active justification of the policy.  *See* Been 2015 Dec, at 3-4, ¶ 8.

[199] *See* PI Brief, at 48-49.

[200] *See* P56.1DR, ¶¶ 110-14; *see also* Def. amended responses to RTAs, at 3 (RTA 1 and response thereto).

[201] Independent of the FHA, it is clear under the City HRL that the burden of persuasion is on defendant.  Under Circuit precedent (*MHANY*) and the 2013 HUD Rule, the FHA burden of persuasion is on defendant, as well.

[202] Shifted under the Challenged Rule in contradiction to *Inclusive Communities*.  *See* Point VII, *infra*.

POINT V

## DEFENDANT HAS AVAILABILE A VARIETY OF ALTERNATIVES THAT ARE LESS DISCRIMINATORY THAN THE POLICY.

Under the City HRL, it is defendant's burden to prove that an alternative would "not serve the covered entity as well."  Admin. Code § 8-107(17)(a)(2).  Two things are notable: first, that the burden of persuasion is on defendant; and, second, that there is an element that compares the efficacy of alternatives to the efficacy of a challenged policy.  These things are true regardless of what happens with or to HUD regulations.  Under the FHA, the burden of persuasion in terms of less discriminatory alternative is on plaintiffs, but there is no "as well" element – all that is required is that the interests supporting the challenged practice "could be served" by alternatives.[203]

Defendant misapprehends the nature of the alternatives proposed.  First, one of the purported rationales for the policy is reducing opposition to the development of affordable housing.  There are many ways to reduce opposition – regardless of whether that opposition is based on fear of non-imminent displacement-from-neighborhood, on fear of other types of displacement, or not related to fear or displacement at all.  Second, defendant pretends that the assessment of alternatives is akin to *negotiating* with community members and CMs when, in fact, the *post-policy city* would have individuals and CMs choosing between non-policy benefits on one hand and no benefits (if CMs blocked development) on the other.

Third, defendant's arguments fail to appreciate the ways in which what happens in one part of the city affects other parts of the city.  If there ae fewer expulsive pressures on tenants living on the Upper West Side, for example, that translates to less competition for new affordable housing in parts of Brooklyn.  Fourth, defendant's arguments also fail to take into account the fact that an element of fear of non-imminent displacement from neighborhood consists of the anticipated

---

[203] *See* 24 C.F.R. § 100.500(c)(3) (2013).  Under the Challenged Rule, plaintiff must show that the alternative would "result in the same outcome" as that of the challenged practice, 24 C.F.R. § 100.500(c)(3) (2020).

*consequences* of that prospective displacement; that is, if an alternative can ameliorate the anticipated consequences, then the alternative will be ameliorating the fear.

Alternative 1. Be honest about what the policy does and does not do.  Defendant could be honest with its residents and acknowledge that the policy: (a) did not deal with imminent displacement; (b) did not deal with displacement from one's apartment; (c) did not deal with displacement from the city as a whole; and (d) left it highly uncertain as to *if and when* a resident could expect to be saved from non-imminent displacement from the neighborhood.

This honesty could extend to the fact that whether or not gentrification occurs in a neighborhood is completely and entirely unrelated to the policy.  Each applicant-household, whether insider or outsider, must meet the same household-income requirements.  In terms of *economics*, insiders and outsiders are not at all different.  [P56.1DR, ¶¶ 114-16, 118-19.]

Being honest in these ways would help the undefined subset of those worried about non-imminent displacement from neighborhood distinguish between *concrete* anti-displacement measures that properly reduce fear based on changing the underlying conditions and *rhetorical* anti-displacement theatrics that do not actually protect people (*i.e.*, a policy whose actual ability to protect them is something in which people ought not put their "faith").[204]

Alternative 2. Explain to residents and CMs the importance of reducing residential segregation to the maximum extent possible and of fighting the citywide housing crisis on a united, citywide basis.  The policy causes disparate impacts that would not occur with an equal-access lottery and stymies integrative moves that would be able to be made under an equal-access lottery.

---

[204] In a revealing comment on why a simple change to the policy would be unwise, Deputy Mayor Been expresses the concern that people will lose "faith" that the policy "will benefit them."  *See* Been Aug. 2020 Dec, at 45, ¶ 91.  As the Deputy Mayor acknowledges elsewhere, a proper way to deal with people's fears is something much more concrete than faith-based: "chang[ing] the circumstances which gave rise to their fears in the first place."  *Id.* at 44, ¶ 88.

*See* Points II and III, *supra*.  Residential segregation causes a multitude of harms and has resulted in "unequal access to wealth, safety, and stability for New Yorkers of different races and ethnicities and across the city's neighborhoods."[205]  Among the many societal inequities at whose root is found residential segregation is the plague of segregation in schools.[206]

Focusing on these facts is not "telling a person that they should not be afraid of being displaced."[207] This focus would be a means by which to broaden understanding of the critical importance of reducing residential segregation and of the fact that the construction of equal-access affordable housing all across the city is an essential means to that end.  Such increased understanding would help increase support for (*i.e.*, reduce opposition to) affordable housing.[208]

Similarly, focusing both on the fact that New Yorkers across the city are facing an affordability crisis and on the idea that all of our neighborhoods belong to all of us would reduce opposition to affordable housing that stems from the pro-policy impulse that says in effect, "This neighborhood belongs to people who are already here."[209]

---

[205] *See* Been Aug. 2020 Dec, at 4, ¶ 9.

[206] *See* excerpt of transcript of Mayor's May 2018 appearance on Brian Lehrer show, MD Ex 20, at 7 (stating "schools didn't create segregation," and focusing on "root causes" like housing).  *See* also Orfield Oct. 2020 Dec, at 5-6, ¶¶ 22-24.

[207] *See* Been Aug. 2020 Dec, at 44, ¶ 88.

[208] *See* Orfield Oct. 2020 Dec, at 31-34, ¶¶ 105-15.

[209] Defendant still cannot wean itself from this pernicious, turf-based idea.  Deputy Mayor Been, in defending the 50 percent preference to this Court, says that it "accords with people's *inherent notions of fairness* by providing an even split of unit shares."  *See* Been Aug. 2020 Dec, at 45-46, ¶ 93 (emphasis added).  To the Deputy Mayor, in other words, the 3.1 percent of the apparently eligible applicants in the majority-White CD typology who are insiders (*see* BD, at 44, ¶ 143 n.57 and Ex 10 (comparing Sections 1a and 3a )), getting 50 percent of the units accords with "inherent notions of fairness."  Her position is akin to saying that pre-tax income distribution is fairly split 50/50 – even though the components of that "even" split are the top 10 percent of income earners obtaining half of all pre-tax income on the one hand, and the remaining 90 percent of Americans getting their "half" on the other.  *See* excerpt of Federal Reserve Bank of St. Louis, "What Wealth Inequality in America Looks Like," MD Ex 21, at 2.  However one might characterize either of these propositions, "according with people's inherent notions of fairness" would not be what came to mind.

Alternative 3: Take account of and communicate improvements in rent regulation and other tenant protections.    The preference policy was increased from 30 to 50 percent of units in 2002. At the time, there was not a defendant-funded program for providing legal counsel to tenants threatened with harassment or displacement; conversion of rental apartment buildings to coops or condominiums could be effected by getting agreements to purchases for only 15 percent of units, none of which had to be units current tenants were occupying; and New York was in the first years of landlord-oriented rent-law changes designed to consign rent regulation to oblivion.[210]

Only during the current mayoral administration was a robust system of legal counsel for tenants put into place,[211] and it was only in 2019 that major changes were made to the rent regulation system. "High-rent vacancy deregulation" had, in the period from 1998 (the year after then-Governor Pataki's legislation went into effect) to 2019, caused the loss of 164,029 units from the rent-stabilized housing stock.[212] The 2019 changes to the rent regulation system – which defendant says it lobbied for successfully[213] – ended vacancy decontrol.[214]  This change had been prospectively described by Deputy Mayor Been as a "once-in-a-generation chance to end failed policies like the current vacancy de-control rules and to stop the irrevocable loss of those precious rent stabilized units."[215]  Indeed, arresting a vacancy decontrol process that lost more units than are slated to be built under the current mayoral administration's housing plan is far more

---

[210] As to the last, see Craig Gurian, "Let Them Rent Cake: George Pataki, Market Ideology, and the Attempt to Dismantle Rent Regulation in New York," 31 Fordham Urb. L.J. 339 (2004).

[211] See Been Aug. 2020 Dec, at 3 ¶ 2 (stating she oversaw HPD's "establishing" free legal services in housing court).

[212] See excerpt of NYC Rent Guidelines Board, "Changes to the Rent Stabilized Housing Stock in NYC in 2019" ("Changes to Rent Stabilized Housing"), May 27 2020, MD Ex 22, at 16 (Appendix 6 table).

[213] See D56.1PR, at ¶ 92.

[214] See Housing Stability and Tenant Protection Act, 2019 N.Y. Laws 6458 (delineating repeals of various provisions relating to rent increases after vacancy of a housing accommodation and vacancy decontrol).

[215] See excerpts of transcript of Mayor de Blasio Apr. 4, 2019 press conference, at 6 (containing Been comments).

consequential than anything the policy might do for the fraction of New Yorkers concerned specifically about displacement-from-neighborhood.

As for coop and condo conversions, Deputy Mayor Been acknowledges that process as one that can drive households from their long-term homes *and communities.*"[216]  In the period from 1998 to 2019, coop and condo conversion caused the loss of 32,207 units from the rent-stabilized housing stock in the same period.[217]  That process, too, was modified by the 2019 rent-regulation law, changing the conversion procedure to one where purchase agreements are required from 51 percent of tenant in occupancy.[218]

What is striking – and relevant not just to less-discriminatory-alternatives but to the lack of a legally sufficient underlying justification for the policy – is that the policy continues as it has been since 2002, as though completely oblivious to these major changes in conditions underlying displacement-risk, including displacement-from-neighborhood risk.[219]  Just as striking is the fact that defendant, in seeking summary judgment on this issue, chose not to explain either what it had done to communicate these changes to residents or what the effect of any such communication had on fears about displacement in general, let alone fears of displacement from neighborhood.

Alternative 4.  Persist in building and preserving more affordable housing throughout the city as a means, *inter alia,* of preventing displacement from neighborhood.  Each success in

---

[216] *See* Been Aug. 2020 Dec, at 17-18, ¶ 34.  To the extent that defendant seeks to convey that long-term renters' applications are necessarily or primarily at stake, defendant's own data contradict that view.  *See* Affordable Housing Study (AHS), Preliminary Findings, May 20, 2016, MD Ex 23, at 17 (finding in defendant's study of lottery applicants that more than a quarter of unique applicants had been at current address for a year or less; nearly 47 percent had been at current address for three years or less; and fully 60 percent had been at current address for six years or less).

[217] *See* Changes to Rent Stabilized Housing, at 16.

[218] *See* Housing Stability and Tenant Protection Act, 2019 N.Y. Laws 6458 (effecting amendments to Section 352-eeee of the N.Y. General Business Law; previously, only 15 percent of units had to have purchase agreements, none of which had to be agreements from tenants in occupancy).

[219] *See* Glen Depo, at 160:5-10 ("I believe the mayor feels pretty strongly that the Bloomberg Administration didn't have policies that were focused on maintaining affordability and keeping people in their houses . . . .").

keeping a New Yorker from losing his or her apartment – whether by anti-harassment measures, housing preservation, or other efforts – first redounds to the benefit of the particular household. Then it redounds to the benefit of other residents of the neighborhood where the family has not lost its home: there are fewer people competing for unoccupied affordable housing units in that neighborhood.   Last, this success also redounds to the benefit of New Yorkers in *other* neighborhoods who may be concerned about displacement from *their* neighborhood.  Each New Yorker not forced from his or her home is also not adding to the competition for housing in other neighborhoods throughout the city.

This is a very straightforward proposition,[220] and it applies to the construction of new housing as well. Wherever affordable housing is built or preserved, it increases supply in relation to demand, reduces rental pressure around the city, and reduces competition in the ways described in the previous paragraph.[221]  Indeed, Carl Weisbrod, the former director of the Department of City Planning, pointed out that  even the failure of the surrounding suburbs to build affordable housing *hurts New York City*: "[T]he more housing that is produced in the region generally the better off we are.  The laws of supply and demand still hold in my view."[222]  Deputy Mayor Been testified that adding to the supply of *non-affordable* housing – that is, even housing that New Yorkers worried about non-imminent displacement from neighborhood are not eligible for – helps prevent displacement.[223]  There is only one thing that confuses this otherwise clear picture about how citywide efforts and tenant-based efforts both contribute to reducing such displacement from

---

[220] *See* Orfield Oct. 2020 Dec, at 29-30, ¶¶ 95-98.

[221] *See* D56.1PR, at ¶ 88 (stating, without excluding displacement-from-neighborhood, that increasing "the total amount of affordable housing in the city is vital to the City's overall strategy to address displacement").

[222] *See* excerpts of transcript of Jul. 27, 2017 deposition of Carl Weisbrod, MD Ex 24, at 278:8-18.

[223] *See* Been I, at 72:19-22.

neighborhood as exists: defendant's attempt to pretend that the policy can "uniquely" deal with non-imminent displacement from neighborhood.

In fact, therefore, the less discriminatory way to proceed is for defendant to continue and expand on its existing preservation and construction efforts.[224]  (Defendant could also choose *not to exclude any CD* from the construction of *robust numbers* of affordable units.  The 168 lotteries that were studied for this case, by contrast, reflected zero developments in 18 of 59 CDs.)[225]

Alternative 5: Mobility counseling.  Defendant mocks the idea that mobility counseling could address concerns of those who fear non-imminent displacement from their neighborhoods.[226] But defendant surely understands that the essence of mobility counseling – and the evidence shows that defendant has only done the bare minimum on this front[227] – encompasses learning about a new neighborhood or neighborhoods, learning what they offer, and learning how to navigate those new places.[228]  A person who feared non-imminent displacement from his or her neighborhood

---

[224] There is powerful, recent evidence of how supremely important it is to maintain (if not expand) defendant's affordable housing and preservation efforts, efforts that dwarf any speculated-about anti-displacement effect of the policy.  Two weeks ago, after the Mayor had been under heavy criticism for having deferred a substantial amount of funding for such efforts, he restored $466 million in deferrals. In so doing, he stressed, "There's no surer or more important investment than safe and livable communities, anchored by affordable housing."  *See* excerpt of defendant's Oct. 2020 press release on announcement of funding for Housing New York, MD Ex 25, at 1.

[225]  Brooklyn CDS 10, 11, 12, 14, 15, and 18; Bronx CDs 10 and 11; Queens CDs 3, 5, 6, 8, 10, 11, and 13; Staten Island CDs 1, 2, and 3 (or *all* of Staten Island's CDs).  *See* BD Ex 3, identifying the CDs in which lotteries *were* held.

[226] *See* Been Aug. 2020 Dec, at 43-44, ¶ 87.

[227] *See* May 3, 2016 email to Matthew Murphy, MD Ex 26, at Bates 104862 (describing how HPD deals with mobility issues among New Yorkers with housing subsidies, HPD deputy commissioner explained, "We're doing bare bones basic required").  *Cf.* excerpt of Been and Bozorg, "Spiraling: Evictions and Other Causes and Consequences of Housing Instability," MD Ex 27, at 1431 ("Mobility counseling must be made more robust, to help voucher holders sort through their various needs and values, identify neighborhoods that might meet those needs, and find landlords with available units who are ready and willing to accept the voucher.").

[228] *See, e.g.,* Poverty and Race Research Action Council, "Housing Mobility Programs Available in the U.S. 2018," https://prrac.org/pdf/mobilityprogramsus2018.pdf, at 1, 5-6 (noting "housing mobility has not yet been 'taken to scale' in most cities"; but describing, *e.g.*, Baltimore program that provides "comprehensive counseling services and other special provisions to create and sustain mobility moves to opportunity areas," like "referral and other assistance such as connecting participants to quality schools, transportation, and employment resources in their new neighborhoods").

may or may not ultimately be *happy* to leave, but concrete information about how to deal with the new reality would, in any event, reduce fear of the consequences of such a move.  The more mobility counseling, the more reduction in fear for more people.

Alternative 6: Provide funding for neighborhood renewal and enhancement that benefit all residents.  Defendant admits that its executive branch uses a variety of incentives to influence CMs in relation to land-use and development matters.  [P56.1DR, ¶ 164.][229]  Indeed, "the City has also allocated $672 million in capital funds to infrastructure and amenity improvements in areas in which neighborhood rezonings have enabled significant additional housing."[230]  The continuation, in such incentives, let alone an increase, has much greater potential for reducing opposition to affordable housing than the policy for an obvious reason: it applies to all residents of the CD, not the fraction of CD residents who may be hoping for a lottery unit.  The Deputy Mayor's objection that "I have never heard a CM or community member offer to trade the CP for any other benefit"[231] is misplaced.  By definition, in a *post-policy* city, incentives would not be traded for giving up a policy that no longer existed (the policy would not be a negotiable item).  The trade (or the question to be considered) would be "do we bring in the desperately needed affordable housing and the infrastructure and amenity improvements that come with it, or do we opt for none of those things?"

Alternative 7: A no net-loss policy.  As contemplated, a no-net-loss policy would have defendant commit to maintaining or increasing, on a citywide basis, the number of apartments

---

[229] Defendant apparently thought the term "incentives" was indecorous and used instead the term "tools for addressing councilmember concerns."  *See id.*  Deputy Mayor Been is less squeamish on this point: her term is "tradeoffs."  *See, e.g.*, Been Aug. 2020 Dec, at 46-47, ¶ 94 (referencing "all the many discussions of tradeoffs I've been involved in").

[230] *See* Been Aug. 2020 Dec, at 13, ¶ 27.  "With these funds, the City has invested in, among other things, improving existing and creating new parks and schools, updating streetscapes, and improving transportation infrastructure and service in neighborhoods that have been in need of such improvements."  *Id.*

[231] *See* Been Aug. 2020 Dec, at 46-47, ¶ 94.

available to very-low-income and extremely-low-income households.[232]  Defendant has admitted

publicly that it needs to do more to increase the supply of this housing.[233]  To the extent that very-

low-income and extremely-low-income New Yorkers oppose the development of affordable

housing because it is not affordable to people with their household income or because they worry

that they are losing their city,[234] this policy would assure them that finding an affordable apartment

*for them* at *their* income level somewhere *in the city* is feasible, thus reducing opposition.

Moreover, with the citywide supply of such apartments at their income level either growing or at

least not shrinking, competition for such apartments in their own neighborhood would be less

intense.[235]  That, in turn, would lessen fears of displacement from one's own neighborhood.

 <u>Alternative 8: Eliminate the councilmanic veto.</u>  To defendant, it is "not unreasonable" for

CMs to defer to the CM whose district encompasses the land-use matter at issue.[236]  But the CM

veto is not a matter of law or regulation, but one of political tradition that defendant, through its

legislative branch, could *choose* to abandon.  It is not a matter of directing how CMs vote,[237] but

rather of having a system that *allowed* (or *encouraged*) each CM to vote based on the merits of a

proposal designed to facilitate or approve affordable housing – and do so by taking the needs of

---

[232] Very-low-income households are those who household income is at or below 50 percent of area median income ("AMI"); extremely-low-income households are those whose household income is at or below 50 percent of AMI.

[233] *See* excerpts of transcript of Mayor de Blasio Apr. 4, 2019 press conference, at 2-3 (the Mayor states, "We have to go a lot farther when it comes to preserving affordability" and "We have more to do to make sure our affordable housing plan reaches lower income New Yorkers").

[234] *See* excerpt of Mayor de Blasio's 2017 State of the City address, MD Ex 28, at 3 (emphases added) ("[S]o many people in this city are afraid that they cannot stay *in the city they love* . . . . This affordability crisis threatens who we are, threatens the very soul of this city.  And people have told me so many times with such passion they feel *their own city* slipping away.").

[235] *See* n.220, *supra*, at 68; *see also* discussion in Alternative 4, *supra*, at 67-69.

[236] *See* DOX Brief, at 65.

[237] *See id.*

defendant for more affordable housing citywide more into account.  It is a reform with the prospect of reducing the influence of "not in my backyard" (NIMBY) opposition to affordable housing.[238]

Alternative 9:  Combine CDs in implementing the preference.  Quite evidently, CDs can be matched in a way that reduces the variance of each from citywide demographics, and defendant, on occasion, has done so.[239]  Even if two or three CDs were combined in that way, insiders would retain a tremendous odds advantage over outsiders, while causing fewer disparate impacts.[240] Deputy Mayor Been's professed concerns about understandability, simplicity, and unpredictability[241] are groundless.  There is nothing complicated about explaining to people (both as a general matter and in the context of a particular development) that preference will involve more than one CD so as to avoid disparate impacts and the perpetuation of segregation.  As Professor Beveridge explains, one would principally rely on the decennial (2020) census, then update if one wished in 2028 to data that centered on 2025.[242]

\* \* \*

A closing observation as to Stage 3: the best case for defendant is that, in its reply, it will be able to raise specific *factual questions* about the relative efficacy of the policy versus the relative efficacy of the combined alternatives proposed. Such questions preclude the grant of summary judgment.  Otherwise, summary judgment would properly be granted to plaintiffs at Stage 3.

---

[238] *See* Orfield Oct. 2020 Dec, at 36-37, ¶ 127.  Note that, as discussed in Point IV(B), *supra*, a discriminatory practice cannot be justified in the first place with the argument that defendant's officers need to be helped to do what is in defendant's interest.

[239] *See* excerpts of transcript of Apr. 10, 2018 deposition of Vicki Been ("Been II"), MD Ex 29, at 40:23:41:5 (the salience of the different demographic profiles of the CDs was that "it could promote integration to share the Community Preference").  *See also* BROD, at 51-52, ¶¶ 178-81 (discussing practicality of a preference shared by more than one CD).

[240] *See id.* at 52, ¶ 182.

[241] *See* Been Aug. 2020 Dec, at 45, ¶ 91.

[242] *See* BROD, at 51, ¶ 180.

POINT VI

**EXTENSIVE EVIDENCE OF INTENTIONAL DISCRIMINATION PRECLUDES THE GRANT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THESE CLAIMS AND POINTS INSTEAD TO PLAINTIFFS' LIKELIHOOD OF SUCCESS ON THE MERITS.**

Knowing responsiveness to those who wish to preserve the racially segregated status quo has long been illegal. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1224-26 (2d Cir. 1987) (catering to the prejudice of constituents constitutes disparate treatment). *See Winfield,* 2016 WL 6208564, at *7, *quoting MHANY,* 819 F.3d 581 at 606 (citation omitted) (prima facie case of disparate impact made out "by showing that animus against the protected group was a significant factor in the position taken by the municipal decisionmakers themselves or by those to whom the decisionmakers were knowingly responsive").

This is the principal route that plaintiffs will pursue, bearing in mind that it is enough that an action be premised on race,[243] and also bearing in mind that, as *Winfield* reaffirmed, there is a wide array of evidence to which a plaintiff may turn: "Discriminatory intent may be 'inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another.' *Washington v. Davis*, 426 U.S. 229, 242 (1976) . . . ." *Winfield*, 2016 WL 6208564, at *7. *Winfield* went on to reaffirm a longstanding principle: "Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make a '*sensitive inquiry into such circumstantial and direct evidence of intent as may be*

---

[243] *See, e.g., Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987), *superseded by statute on other grounds as recognized by* 541 U.S. 369 (2004) (citation omitted) (holding for Title VII and Section 1981 purposes, it is acting because of race that is unlawful, "regardless of whether, as a subjective matter, its leaders were favorably disposed toward minorities"); *Weiss v. La Suisse*, 141 F. App'x 31, 33 (2d Cir. 2005) (summary order) (reaffirming *Goodman* by stating plaintiff "need not show that the defendant acted with racial animus"); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472-73 (11th Cir. 1999) (holding liability attaches when decision is "premised on race"; no requirement that decision "be motivated by invidious hostility or animus"). For the same principle under the City HRL, *see Cadet-Legros v. N.Y. Univ. Hospital Ctr.*, 135 A.D.3d 196 (N.Y. App. Div. 1st Dept. 2015) ("An 'animus' requirement is not supported by statutory language or by legislative history. Whether a defendant is motivated by animus, or misguided benevolence, or some other consideration, the conduct in question is illegal so long as it was (at least in part) because of protected class status and operated to the disadvantage of the plaintiff.").

*available.*' (citation omitted).)." *Winfield,* 2016 WL 6208564, at *7, *quoting MHANY,* 819 F.3d at 606 (emphasis added).

"The existence of disparate impact on one race is thus 'an important starting point' of the discriminatory intent analysis." *Id.*, *citing MHANY,* 819 F.3d 581 at 606.

*Winfield* also set out *Arlington Heights*' illustrative (not comprehensive) list of considerations for discerning racially discriminatory intent:

> Other relevant considerations for discerning racially discriminatory intent include: "[t]he historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes, [d]epartures from the normal procedural sequence, substantive departures, and the legislative or administrative history ... especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* (quoting *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977)); *cf. Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991) ("where there are allegations of discrimination supported by such circumstantial evidence, a defendant's intent and state of mind are placed in issue, [and] summary judgment is ordinarily inappropriate.").

*Winfield*, 2016 WL 6208564, at *7.

Other evidence of a plaintiffs' mosaic, of course, may include pretext and "consciousness of guilt evidence." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("[T]he trier of fact can reasonably infer from the falsity of the [employer's] explanation that the employer is dissembling to cover up a discriminatory purpose."); *New York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 661-62 (S.D.N.Y. Jan. 2019), *aff'd in relevant part*, 139 S. Ct. 2551 (2019) (holding, as in the criminal context, where courts "frequently refer to false exculpatory statements as evidence of consciousness of guilt," it is appropriate to apply that "common-sense evidentiary principle" in civil matters and to "infer from the various ways in which [the relevant official] and his aides acted like people with something to hide that they *did* have something to hide"); *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 693 n.59 (S.D.N.Y. 2013), *aff'd*, 791 F.3d

290 (2d Cir. 2015) (finding that defendants' "denials at trial that they discussed the Apple Agreement with one another in those communications, or that those conversations occurred at all, in the face of overwhelming evidence to the contrary, strongly supports a finding of consciousness of guilt").

> Under the City HRL, the import of this evidence is underscored even more emphatically:

> > Once there is some evidence that at least one of the reasons proffered by defendant is false, misleading, or incomplete, a host of determinations properly made only by a jury come into play, such as whether a false explanation constitutes evidence of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive coexisting with other legitimate reasons. These will be jury questions except in the most extreme and unusual circumstances.

*Bennett v. Health Mgmt. Sys., Inc.*, 92 A.D.3d 29, 43 (N.Y. App. Div. 1st Dept. 2011) (footnote omitted).[244] (*Bennett* elaborates: "If one explanation offered by a defendant is able to be construed by a jury as false and therefore evidence of consciousness of guilt, that same jury would be permitted to weigh that evidence when assessing the veracity of the other explanations the defendant has offered." *Id.* at 43 n.13.)

**A. Defendant's responsiveness.** Defendant's responsiveness has never been in question. A purpose of the policy is to "mak[e] it possible for the City to overcome [local] resistance."[245]

**B. Defendant's knowledge of resistance to residential racial change.** This knowledge is extensive and multi-sourced. Defendant's own preliminary guide to the Assessment of Fair Housing process identifies the difficulty of overcoming "community opposition" as "high," noting, "Securing community buy-in for fair housing is very difficult."[246] The document adds that, for

---

[244] The holdings and methods of analysis in *Bennett* were legislatively affirmed by NYC LL 35.

[245] *See* Been 2015 Dec, at 3-4, ¶ 8 (reciting opposition of neighborhoods and their elected officials to affordable housing development and asserting that the policy "makes it possible for the City to overcome that resistance").

[246] *See* "Affirmatively Furthering Fair Housing: A Preliminary Guide to NYC's Submission," Sept. 2016, ("Sept. 2016 Preliminary AFFH Guide"), MD Ex 30, at 21076.

publicly supported housing, opposition "can be high in higher opportunity areas (e.g. Queens, Staten Island) except for senior housing."[247]  A slightly earlier version of the document specified that one of the "sides" not necessarily supporting integration is the "ethnic solidarity" side.[248]

Matthew Murphy, HPD's deputy commissioner for strategic planning when he was first deposed, agreed that it is likely that, both in white neighborhoods and neighborhoods dominated by other racial groups, racial change or the prospect of racial change makes residents in such areas feel uncomfortable – and that they "correlate that change" to "new housing development. So as a result they oppose housing development, especially Affordable Housing development."[249]

When Deputy Mayor Been was Commissioner of HPD, she made a public presentation at which she was speaking about fears of neighborhood change.  At one point, she was discussing the fears of people who were *not* being displaced.  They were seeing "people who are coming in" that may, among other things "look different" and have "different demographics."  She described the worry of neighborhood incumbents as follows: "And so they worry that even if they stay, the demographics, the look and feel of their neighborhood, the sense of the neighborhood may change."[250]  Ms. Been confirmed at her deposition that she intended the term "demographics" to encompass race, and that the "looking different" encompassed people being of "different races."[251]

Sometimes, resistance to racial change (or pandering thereto) is open and explicit.  Thus,

---

[247] *Id.*

[248] *See* "Affirmatively Furthering Fair Housing: A Guide to NYC's Submission and Potential Issues," Aug. 2016, MD Ex 31, at 105039.

[249] *See* excerpts of Mar. 16, 2018 deposition testimony of Matthew Murphy ("Murphy I"), MD Ex 32, at 215:3-20.

[250] *See* video recording of Vicki Been comments at City Law Breakfast, Nov. 13, 2015.  The section of the video that contains these comments begins at approximately the 36:10 mark (last accessed Nov. 5, 2020). The video as available at: https://www.youtube.com/watch?v=Eepr0XkiZzg&feature=youtu.be.

[251] *See* Been I, at 137:9-149:21.

for example, one developer of housing made available through the lottery created a flyer that was advertised publicly (and that was in the possession of defendant). The flyer said explicitly that the preference policy's purpose was to "help the area retain its traditional Latino identity."[252]  Other times, however, fear of and opposition to racial change are expressed in more "coded" language, frequently in terms of the prospect of losing neighborhood "character," "culture," or "identity."[253] *See MHANY*, 819 F.3d at 608-10 (citation omitted) (observing that, "'[d]iscrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms'" and that references to fear of changes to a jurisdiction's "character" and "flavor" were reasonably construed by the court below to be "code words for racial animus").

An example: a Northern Manhattan coalition recited its belief in "preserving the cultural identity of Northern Manhattan" and "encouraging Latinx people to use their cultural identity as a tool for resistance." This came to defendant's attention.[254]

In addition, concerns about change in the racial composition of schools characteristically reflects and propels fears of residential racial change and vice versa.[255]  Participants in defendant's education component of the "Where We Live" process, for example, included the following feedback under the heading of "community opposition":

> Predominantly White and affluent communities often block attempts for integration in schools that would provide low-income communities increased access to quality schools (e.g., rezoning of schools, bussing students, or shelters in their neighborhood). Often school integration efforts are viewed by White families as taking opportunities away from their kids. NIMBYism is often centered on not wanting particular groups of people in a neighborhood,

---

[252] *See* El Barrio's Artspace PS109 frequently asked questions, MD Ex 33, at 69798.

[253] *See* Orfield Oct. 2020 Dec, at 16-19, ¶¶ 60-67.

[254] See excerpt of draft white paper about Inwood rezoning from "Northern Manhattan Is Not For Sale" coalition, attached to a Jan. 2018 email from Jordan Press of HPD, MD Ex 34, at 183458.

[255] *See* Orfield Oct. 2020 Dec, at 14-16, ¶¶ 54-59.

and there is a lack of willingness to have conversations about racial tension.[256]
A jury would be hard-pressed to conclude anything but that defendant was aware that "NIMBYism
is often centered on not wanting particular groups of people in a neighborhood."

**C. Defendant's clear pattern of treating the prospect of residential racial integration as fraught and politically sensitive.**   Defendant exhibits a hallmark sign of an entity responsive to the race-based fears it knows about: over time it has seen the prospect of residential racial desegregation (and even discussions about that prospect) as politically fraught and sensitive.

Defendant's preliminary guide to the Assessment of Fair Housing, explicitly cautioned against simply taking *relevant* steps to identify and deal with "contributing factors" of segregation. The identification of "high priority" factors had to balance "relevance and practical feasibility." The preceding sentence had just explained that contributing factors of segregation are "politically and legally sensitive."[257]   A jury could certainly conclude that defendant was worried that some "high priority" factors were too politically or legally sensitive to be identified as such.

Mr. Murphy also made plain his understanding of the sensitivity and its consequences for how CMs acted on affordable housing proposals.  Asked, "Is there anything politically sensitive about broaching the idea of desegregating neighborhoods that are currently segregated by race or ethnicity?" he said, "I believe so, yes, especially voting against Affordable Housing projects."[258]

Deputy Mayor Been, when she was HPD Commissioner, reviewed a draft staff memo designed to get various outside actors to push back against a CM's resistance to an affordable

---

[256] See excerpt of Where We Live NYC, "Topic-Based Roundtable C: Education, Qualitative Data Synthesis," Sept. 5, 2018, MD Ex 35, at 5.

[257] *See* Sept. 2016 Preliminary AFFH Guide, at 21056.

[258] *See* Murphy I, at 215:21-216:5.

housing development in Queens.  The staff described vague rationales for opposition – "vague" referring to expressed concerns about "parking, height, bulk, AMI's aren't perfect, doesn't benefit my constituents" – as a "well-honed tactic that typically suburban communities have used to exclude affordable housing and maintain privilege and economic and racial segregation."  The staff had proposed to continue with the statement that the opposition "violates the objectives of the fair housing act," a section that the then-Commissioner deleted with the comment, "No! No statements about FHA violations!"[259]

The then-Commissioner was already concerned about the difficulty of having "thoughtful discussions" about determinants of fair housing issues "against the backdrop of local politics."[260]

Defendant would like the Court to take the fact that defendant was being responsive to those opposing affordable housing, the fact that defendant knew that that opposition was polluted by the desire to maintain the segregated residential status quo, and the fact that defendant thought that wading in the waters of racial desegregation was fraught…and then grant it summary judgment because Deputy Mayor Been avers that the policy "is not responsive to such people."[261] That conclusory assertion is plainly insufficient to remove the issue from jury consideration.

**D. The fact that the policy causes disparate impacts and perpetuates segregation is another *Arlington Heights* factor that weighs in plaintiffs' favor.**  As described in plaintiffs' opening brief and in Points II and III, *supra,* the policy causes disparate impacts and perpetuates

---

[259] *See* draft talking points annexed to Sept. 2016 email chain between Matthew Murphy and Vicki Been, MD Ex 36, at 28777.

[260] *See* excerpt of Been and Weisbrod Nov. 2014 letter to HUD, MD Ex 37, at 9.

[261] *See* Been Aug. 2020 Dec, at 29-30, ¶ 62.  The Deputy Mayor's passing suggestion that the policy would not resonate with those who wish to maintain the segregated status quo because they would want no affordable housing altogether, *id.*, is at once speculative and illogical.  That those who wish to retain the status quo might want a higher preference percentage does not mean that a 50 percent preference does not placate them.

segregation.  As noted earlier, "The existence of disparate impact on one race is thus 'an important starting point' of the discriminatory intent analysis."  *Winfield*, 2016 WL 6208564, at *7, *quoting MHANY*, 819 F.3d at 606.  It is more even more important because defendant clearly knew that the policy stymied integrative moves.  When then-Commissioner Been was asked at her second deposition whether she would retain the preference at 50 percent if her only concern were "reducing racial segregation to the maximum extent that you can," she said, "I don't think so."[262]

**E. The expansion and maintenance of the policy represent departures from how HPD policy is usually made, another *Arlington* factor.**  In a March 2019 op-ed written by six former HPD commissioners, including Deputy Mayor Been and Jerilyn Perine (the commissioner who expanded the preference from 30 percent to 50 percent in 2002), they explained how they tried to "juggle multiple interests and goals": "*Before* making a decision, we *collected the facts* and weighed our options."[263]  But this is not what was done with the expansion and subsequent maintenance of the policy.  Former Commissioner Perine did not know and did not investigate why the policy was set at 30 percent in the first instance.  The entirety of her thinking that the change was "fair" was "because it was half."  It never occurred to her that going from 30 to 50 percent could increase the risk of perpetuating segregation.  She did not investigate the issue or cause the issue to be investigated: "this issue was never raised" and "it never dawned on me" that

---

[262] *See* Been II, at 112:11-113:22.  *See also* Aug. 2014 email from then-Commissioner Been to Mayor de Blasio, MD Ex 38 at 53604-05 (informing Mayor that a project was on hold because it is in "one of the Community Boards that is the least racially diverse" and thus HPD has "to share the community board preference with adjacent boards under the agreement we are negotiating with HUD to end their fair housing investigation"; and relating that, while local CM is "very unhappy about having to share the preference," proceeding with standard preference would "result in an immediate new lawsuit (which we would likely lose)").  Note that defendant was *not* viewing the issue from a citywide perspective.

[263] *See* New York Daily News, "A price we can't afford: Requiring affordable housing projects to pay prevailing wage would hurt New Yorkers who badly need help," Mar. 5, 2019, MD Ex 39, at 3 (emphasis added).

perpetuation of segregation would "have anything to do with Community Preference."[264]   This simply is not the kind of careful collection and weighing of facts that the HPD Commissioners, including Ms. Perine, said was the normal process.   *See Winfield*,   (citing *Arlington for the proposition that* [d]epartures from the normal procedural sequence, substantive departures represent evidence of intentional discrimination).

(Note that Ms. Perine claimed not to remember speaking to Bill Perkins, a CM in 2002 and now, and claimed to be unaware of any influence he had on increasing the percentage.   At the time, CM Perkins was identified as having persuaded HPD to raise the preference requirement from 30 to 50 percent.[265]   CM Perkins is someone who former Deputy Mayor Glen identified when asked about those of whom she was aware of having concerns that "neighborhoods [were] becoming too white": "I have heard Councilman Perkins screaming about that kind of thing."[266])

The policy was maintained thereafter without analyzing, at least through 2012, whether it caused disparate impacts or perpetuated segregation,[267] even though comments on defendant's proposed 2007 and 2012 affirmatively furthering fair housing (AFFH) statements asserted that the policy was perpetuating segregation.[268] Again, this reflects the opposite of carefully collecting and

---

[264] *See* excerpts of transcript of Oct. 26, 2017 deposition of Jerilyn Perine, MD Ex 40, at 188:7-16, 190:8-192:6.  Ms. Perine wanted the increase to happen and "thought it was a good idea," but described the decision as "one of a million things" she was dealing with, and "just a decision."   *See id.* at 179:2-181:9.   The increase "wasn't what people [meaning advocacy organizations] were asking for."  *See id.* at 183:4-22.  According to Ms. Perine, no CMs asked for the percentage to be increased.  *See id.* at 184:2-15.

[265] Amsterdam News, "Brokering deal for affordable housing uptown," Aug. 29, 2002, MD Ex 41, at 1.

[266] *See* Glen Depo, at 58:25-59:16.

[267] *See* Def. amended responses to RTAs, at 23-24 (RTAs 37-38 and responses thereto).   Defendant refused on the basis of privilege claims to answer requests for admission that dealt with the *fact* (not the content) of whether defendant performed any such analyses in 2014-18.  *See id.* at 24-28 (RTAs 39-44 and responses thereto).

[268] *See* excerpts of 2007 AFFH statement, MD Ex 42, at 14297 (Item 10) and response thereto at 14301.  *See* excerpts of 2012 AFFH statement, MD Ex 43, at 14506 and 14517 and HPD statement on preference policy at 14509.

weighing facts before implementing or continuing a policy.

**F. The willingness of defendant to engage in other segregation-perpetuating housing practices and to fail to remedy other such practices is probative of discriminatory intent in relation to the policy.** For example, according to a report from the Furman Center for Real Estate and Urban Policy analyzing several dozen rezonings carried out between 2003 and 2007, downzoned lots (that is, lots where development capacity was reduced) were more likely to be located in census tracts with a higher share of whites than the city median; likewise, "contextual" rezoning (where the changes can limit the ability to build to a lot's full Floor Area Ratio) was executed in respect to lots with still-higher percentages of whites.[269] The report was co-authored by Vicki Been. In other words, there was a recent-era practice that made it more difficult to build affordable housing in White areas. The de Blasio administration, however, has chosen not to revisit those zoning changes.[270]

Another admitted segregation-perpetuating policy is reflected in a 2013 letter from the High-cost Cities Housing Forum ("HCHF") (of which defendant was a participant) and explained that: "As a matter of City policy, HPD generally economizes in its new construction projects by using City-owned vacant land and privately owned sites. HPD develops where the economics work – and this is generally in areas of relatively higher racial/ethnic concentrations and lower-income households than can be found in areas of 'higher opportunity.'"[271]

---

[269] *See* Furman Center, "How Have Recent Rezonings Affected the City's Ability to Grow?", MD Ex 44, at 9-10; Been II, at 76:11-77:24 (confirming findings), and 78:8-22 (confirming that the report's call for a "larger conservation" regarding disparities in zoning patterns was intended to encompass disparities between communities of different racial characteristics).

[270] *See* background memo and talking points for HPD Commissioner interview with New York Times reporter, MD Ex 45, at 10 (explaining in answer to the anticipated question of how defendant chooses neighborhoods for rezoning that "[m]uch of the City was rezoned since 2000 and this administration was/is determined to look to communities that hadn't been rezoned since the 1960s").

[271] *See* excerpts of HCHF Sept. 2013 letter to HUD, co-signed by then-HPD Commissioner, MD Ex 46, at 19.

Yet, when Alicia Glen, the former deputy mayor for housing and economic development was asked at her deposition in 2017 whether defendant had a plan for ending residential racial segregation, her answer was, "Not that I'm aware of."[272]

It is not as though defendant had done better in earlier years. From 2004 to 2009, when the HPD Commissioner was Shaun Donovan, neither HPD, City Planning, nor the Office of the Mayor had a policy specifically and explicitly targeted at reducing residential racial segregation.[273]

Lastly, defendant's AFFH Preliminary Guide referenced earlier observes that "New York City could be accused by some fair housing advocates as being overly focused on low-income communities instead of providing access to opportunity."[274] If defendant sees that the evidence can be interpreted in that way, certainly a jury could interpret it that way as well. Indeed, the location of subsidized housing disproportionately outside of white-dominant CDs is vividly displayed in mapping.[275]

**G. Evidence of pretext and consciousness of guilt.** It is hard to know where to begin. Certainly, the presentation to the Court of the justification that the policy is intended "to ensure that local residents, *many of whom have deep roots in the community and have persevered through years of unfavorable living conditions*, are able to remain in their neighborhoods as those neighborhoods are revitalized,"[276] is a good candidate. It was presented to the Court even though

---

[272] *See* Glen Depo, at 262:8-24. Defendant separately confirmed in Nov. 2018 that "[t]hroughout the de Blasio administration, which took office on January 1, 2014, HPD has not maintained a formal written policy or procedure regarding compliance with the Fair housing Act's affirmatively furthering fair housing requirements, nor is it required to do so." *See* defendant's Nov. 9, 2018 letter regarding formal AFFH written policy, MD Ex 47, at 1.

[273] *See* Def. Amended Responses to RTAs, at 44-45 (RTA 78 and response thereto).

[274] *See* Sept. 2016 Preliminary AFFH Guide, at 21077.

[275] *See* BROD, at 50-51, ¶¶ 172-77, and Exs 33-39.

[276] *See* Been 2015 Dec, at 3-4, ¶ 8 (emphasis added).

the policy had "evolved"[277] beyond this justification, and even though, the justification does not fit what the policy is or does: neither the length of time an applicant resides in the CD in which the affordable units are being built nor an applicant's housing conditions affect eligibility under the policy, and income is the only proxy for need upon which defendant relies [P56.1DR, ¶¶111, 114-15.]  By definition, an outsider to a lottery who has persevered through long years of unfavorable conditions is disfavored by the policy compared to a short-term insider who has not.

Or there is the email from Matthew Murphy to a colleague at HPD, apparently written sometime after this litigation began,[278] referring to a "Community Preference working group" and saying the following as to how the policy "relates to displacement": "We justify the policy because it prevents displacement.  But we don't have good metrics to show that displacement is occurring. What I'd like to do is start building a 'case' for anti-displacement policy."[279]

Or there is on the one hand Deputy Mayor Been's statement that the preference policy is not only a tool to fight displacement but "the *best* tool we have for fighting displacement";[280] and on the other hand the fact that it is now clear that the policy does not deal with imminent displacement, displacement from one's apartment, or displacement from the city as a whole (not to mention the fact that there is no evidence of whether and to what extent the policy helps fight displacement from neighborhood as opposed to from apartment or from the city).[281]

---

[277] *See* Been Aug. 2020 Dec, at 41, ¶ 82 n.68.

[278] *See* Murphy I, at 122:5-19 (estimating approximately mid-2016 to mid-2017 – the email produced was undated).

[279] *See* Matthew Murphy email re "next steps on displacement policy," MD Ex 48, at 53247.

[280] *See* Been II, at 24:2-21 (emphasis added).

[281] *See* Point IV(A)(1), *supra*.  The Deputy Mayor's exaggerated claims for the policy were even undercut by the Mayor, who, describing preservation efforts, called those efforts the "ultimate anti-displacement tool" (he explained the significance of preservation as follows: "the simplest, strongest, clearest anti-displacement tool is to protect a working family in their apartment, in their neighborhood").  *See* excerpts of transcript of Mayor de Blasio Apr. 4, 2019 press conference, at 3.

Then there is evidence of consciousness of guilt.  When pressed to justify the policy by a reporter, Mayor de Blasio claimed falsely that "Community Board districts are very diverse, in and of themselves."[282]  He likewise falsely claimed that the "vast majority of people" who are applying as insiders to the lottery "have been in their neighborhood a long time."[283]  These false explanations are easily understood as consciousness of guilt, perhaps even more so in light of the excuse that the Mayor submitted as part of his support of the motion to preclude his having to testify during discovery: "those statements *were not based upon specific facts, statistics, or data,* but rather reflect my general impressions having lived and worked in the City for many years."[284]

Deputy Mayor Been presents to the Court currently the double-hearsay that some undetermined number of New Yorkers would prefer no housing to one with affordable housing "because of their worries that the new project will change the *economics* of the neighborhood."[285] Leaving aside the fact that the insider/outsider distinction created by the policy *simply cannot* make a difference (the economics of the households in *particular affordable units* are the same whether they are insiders or outsiders; the *rent levels of the building* exist independent of whether there is preference or not), the Deputy Mayor withholds from the Court the race-based element of what she had previously identified: a concern among neighborhoods incumbents about newcomers

---

[282] *See* excerpt of transcript of Mayor de Blasio Jul. 13, 2015 press conference, MD Ex 49, at 9-10.  *See also* BD Exs 5-8 (demonstrating segregation reflected at CD-level).

[283] *See* excerpt of transcript of Mayor de Blasio Jan. 17, 2018 appearance on Inside City Hall, MD Ex 50, at 3. *Compare* lottery-applicant length-in-current-home data analyzed by defendant, and discussed, *supra*, at 67 n.216 (finding, *inter alia*, nearly 46 percent of unique applicants had been at their current address for three years or less).

[284] *See* de Blasio Dec, at 3-4, ¶ 10 (emphasis added).

[285] *See* Been Aug. 2020 Dec, at 27, ¶ 55 (emphasis added).  As discussed, *supra*, at 60-61 and 60 n.193, defendant admits that best source for providing an explanation of *how the CM would vote on affordable housing in the future* is the CM himself or herself, information denied to plaintiffs.

looking different and change in the racial demographics of the neighborhood.[286]

Consciousness of guilt can be seen in defendant's averment that, at least from 2002 onwards, fear of and resistance to neighborhood residential racial change "is not or was not" a "common phenomenon" in New York City.[287] This consciousness of guilt can also be seen in defendant's denial of having knowledge or information sufficient to admit or deny that, in the period of 1945-1990, fear of and resistance to neighborhood residential racial change was a common phenomenon.[288]

Consciousness of guilt can be seen in the fact that, throughout this litigation, defendant and its personnel have tried to play down the fact and consequences of the segregation that exists, and falsely play up the efforts that the city has purportedly made to fight segregation.[289] For example, then-HPD Commissioner Maria Torres-Springer was questioned in 2018 about an op-ed under her name in Crain's New York Business.[290]  She refused to repeat the flat statement in her op-ed that "opportunity is not shared equally across the city" because "I think it's a nuanced answer."  In answer to the question, "In your mind is it pretty clear cut that African Americans, as a group, do not share equally in opportunity in New York City," she said, "I don't think there's anything clear

---

[286] *See* discussion, *supra,* at 76. Even at the deposition where she was asked about these remarks, then-Commissioner Been reflected consciousness of guilt.  Having acknowledged that seeing newcomers of a different race was a concern to some neighborhood incumbents and having remarked that those incumbents could also be concerned about whether newcomers had "purple or green hair," she insisted that she did not know which was a greater worry or fear.  *See* Been I, at 142:4-150:22.  Whether that is credible is a question for a jury.  Moreover, it is illegal for defendant to be responsive to opposition to affordable housing based on concern about changing racial demographics regardless of whether the concern is a preference for the pre-existing racial demographics or whether the concern reflects using race as a proxy to determine "there goes the neighborhood" in any other respect.

[287] *See* defense co-counsel Frances Polifione May 21, 2019 email clarifying defendant's initial May 10, 2019 responses to plaintiffs' RTA 100, MD Ex 51, at 1.

[288] *See* Def. Amended responses to RTAs, at 61-62 (RTA 99 and response thereto).

[289] *See also* Orfield Oct. 2020 Dec, at 20-22, ¶¶ 71-77.

[290] The Jan. 15, 2018 op-ed, MD Ex 52, was timed for Martin Luther King, Jr. Day in 2018.

cut about that question actually." She refused to acknowledge that "New York remains one of the most segregated cities in the country." She even refused until pressed repeatedly to identify *any* of the city's 59 CDs as principally having three characteristics: (a) wealthy; (b) White; and (c) high opportunity.[291]

Consciousness of guilt can be seen when former HPD Commissioner Shaun Donovan, asked whether he believed when he was HPD Commissioner that defendant "had turned *with all the purpose at its command* to try to reduce and ultimately eliminate racial segregation in housing," stated, "I did."[292] This despite neither HPD, City Planning, nor the Office of the Mayor having a policy specifically and explicitly targeted at reducing residential racial segregation throughout Secretary Donovan's tenure as HPD Commissioner.

A jury could conclude that Ms. Torres-Springer and Mr. Donovan (and other officials) are unwilling to be candid about issues relating to race and the efforts to fight segregation and can conclude that they, and defendant: (a) have a pattern of unwillingness to be candid about issues of race, including issues implicated by the policy; and (b) provide testimony not worthy of credence.

* * *

In addition to all of the foregoing, plaintiffs call the Court's attention to *substantial additional evidence probative of their intentional discrimination claims* that is set forth in the Appendix to plaintiffs' objections and responses to defendant's FRCP 56.1 statement.

Plaintiffs respectfully submit that the evidence in this brief and the Appendix shows that it is likely that plaintiffs will prevail on the merits of the intentional discrimination claims. But more pertinent to defendant's cross-motion, it is *impossible* to look at the evidence and conclude that,

---

[291] *See* T-S Depo, at 52:22-25, 59:2-12; 59:21-60:4; 69:22-79:23; and 256:7-260:9.

[292] *See* excerpts of transcript of Jun. 1, 2018 deposition of Shaun Donovan, MD Ex 53, at 47:4-10 (emphasis added).

making all inferences in favor of plaintiff, a jury *could not* find in plaintiffs' favor on these claims.

We add only three comments on defendant's suggestion that mixed-motive analysis could somehow yield it summary judgment.[293]  First, under the Circuit's interpretation of the FHA, it is defendant's burden to prove its affirmative defense that it "would have taken the adverse action on the basis of … permissible reason[s] alone." *MHANY*, 819 F.3d at 613 (citation omitted).  This trial-level showing is simply a showing defendant cannot make, either in terms of showing that it would have had the policy *at all* or in terms of showing that it would have had a policy covering *50 percent* of units or in terms of showing it would have applied the policy in *all circumstances*.

Here, of course, the burden to meet is still greater because defendant's burden on its motion for summary judgment is demonstrating that no factfinder could evaluate the evidence, drawing all inferences in favor of plaintiffs, and answer the "would have taken" question in a way favorable to plaintiffs.  In this connection, it is important to note that, even though a mixed-motive analysis only arises in the disparate treatment context, the Circuit confirmed that the district court "appropriately questioned the strength of [defendant's] interest" and examined whether the policy in question furthered the interest.  *Id.* at 614-15.  In this case, extensive evidence of the weakness of the relevant interest and lack of connection between the policy and advancing the relevant interest operate to foreclose defendant's ability to meet its burden.

Last, defendant is apparently unaware that, unlike the FHA, liability is established under the City HRL when there is proof that it was motivated in part by discrimination.  The "City HRL proscribes such 'partial' discrimination since '[u]nder Administrative Code § 8-101, discrimination shall play no role in decisions relating to employment, housing or public accommodations"; indeed, "the City HRL 'requires only that a plaintiff prove that [protected class]

---

[293] *See* DOX Brief, at 6, 13-14.

was 'a motivating factor' for an adverse employment action.'" *Bennett*, 92 A.D.3d at 40 (citations omitted). *Bennett* analogizes the City HRL here to Title VII, noting that statute's structure whereby liability is made out when discrimination has been shown to be "a motivating factor." *Id.* at 40 n.12. *See also Cadet-Legros*, 135 A.D.3d at 200 n.1 (the City HRL's mixed-motive standard "permits a plaintiff to defeat summary judgment if he or she can show that the defendant was motivated at least in part by the plaintiff's protected status").


POINT VII

THE CHALLENGED RULE IS INVALID ON A VARIETY OF GROUNDS
AND THUS COULD NOT BE APPLIED IN THE INSTANT MATTER.

Under the 2013 HUD Rule, once a plaintiff shows that a challenged practice has caused a disparate impact, "defendant has the burden of proving that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests of the respondent or defendant." 24 C.F.R. § 100.500(c)(2) (2013). The Challenged Rule would shift defendant's burden from a burden of persuasion to a burden of production – allowing a defendant to proceed by "producing evidence showing that the challenged policy or practice advances a valid interest (or interests) and is therefore not arbitrary, artificial, and unnecessary." 24 C.F.R. §100.500(c)(2) (2020). If the defendant does so, "is ultimately the plaintiff's burden to prove a case, and the plaintiff must do so by rebutting any evidence produced by the defendant." 85 Fed. Reg. at 60320.

This change is impermissibly in conflict with *Inclusive Communities.* The Supreme Court specified that, as in the Title VII context, "so too must housing authorities and private developers be allowed to maintain a policy if *they can prove* it is necessary to achieve a valid interest." *Inclusive Communities*, 576 U.S. at 541 (emphasis added).

Moreover, Supreme Court case law is clear on what an agency must do when it changes its

position.  An agency must provide a "reasoned explanation" for changing its position and "show

that there are good reasons for the new policy" *Encino Motorcars, LLC v. Navarro*, 136 S. Ct.

2117, 2125-26 (2016) (citations omitted).  A pretextual or contrived explanation is, by definition,

neither a reasoned explanation nor one that provides good reasons for the new policy.  *See Dep't*

*of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019) (applying principle).

In *Dep't of Commerce*, a case involving whether a citizenship question would be permitted

to be added to the 2020 census, the Supreme Court found that there was "a significant mismatch

between the decision the Secretary made and the rationale he provided."  *Id.* at 2575.  The

Secretary's stated reason "seems to have been contrived."  *Id.*  The Supreme Court went on to

explain that "we cannot ignore the disconnect between the decision made and the explanation

given," *id.*, and explained why:

> The reasoned explanation requirement of administrative law, after all, is meant
> to ensure that agencies offer *genuine* justifications for important decisions ….
> Accepting contrived reasons would defeat the purpose of the enterprise.  If
> judicial review is to be more than an empty ritual, it must demand something
> better than the explanation offered for the action taken in this case.

*Id.* at 2575-76.  Here, for example, HUD emphasizes that it is "*clarifying* provisions in light of

*Inclusive Communities.*"  85 Fed. Reg. at 60296 (emphasis added).  This is facially pretextual when

it comes to the burden-shifting regarding the justification defense.  Contradicting *Inclusive*

*Communities* is not "clarifying" *Inclusive Communities.*[294]

HUD acknowledges that it finds the Supreme Court's analogy to the Title VII "business

necessity" standard "persuasive," 85 Fed. Reg. at 60320, but then chooses to ignore it.  In fact, the

---

[294] The Preamble is rife with these false recitations.  For example: that the rule is "clear and consistent with the language used in *Inclusive Communities.*"  85 Fed. Reg. at 60296.  The burden placed on defendant by the Challenged Rule, in fact, is facially *inconsistent* with the language used in *Inclusive Communities*.  Or, even more disingenuously, claiming that the Challenged Rule is "similar to the 2013 Rule's burden shifting approach," but provides "more detail and clarity." 85 Fed. Reg. 60320.  Again, this is contrived: it puts down to "more detail and clarity" a 180 degree turn away from the 2013 HUD Rule's requirement that *defendant* prove that a challenged policy is necessary.

analogous Title VII provision does just what the 2013 HUD Rule does: places the burden of persuasion on defendant in relation to justification.  An unlawful employment practice based on disparate impact is established where the complaining party establishes that a challenged practice causes a disparate impact and *"respondent fails to demonstrate* that the challenged practice is job related for the position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added).[295]

HUD's sleight-of-hand here is to cite to *Wards Cove* as though it were currently the law. HUD is correct in describing what *Wards Cove* had held: "if a Title VII plaintiff establishes a prima facie case of discrimination, the burden of producing evidence of a legitimate business justification for those practices will shift to defendant, but the burden of persuasion will remain with the plaintiff at all times."  85 Fed. Reg. at 60320, citing *Wards Cove,* 490 U.S. at 644.  The dishonesty of HUD's explanation could not be more patent:  Congress explicitly rejected *Wards Cove* when it passed the Civil Rights Act of 1991.[296]  In its place, Congress enacted the disparate-impact burden-shifting regime, set out here in the preceding paragraph, whereby defendant bears the burden of persuasion on justification.[297]  Thus, for the past 29 years, the "business necessity" analogy to which *Inclusive Communities* cited has placed the burden of persuasion in respect to justification on defendant.[298]

---

[295] *See* 42 U.S.C. § 2000e(m) ("The term 'demonstrates' means meets the burdens of production and persuasion.").

[296] *See* Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat 1071 (1991). Specifically, Paragraph 2 of Section 2 of the Act found that the decision in *Wards Cove* has weakened the scope and effectiveness of Federal civil rights protections.  A central purpose of the Act, set out in paragraph 2 of Section 3, was "to codify the concepts of 'business necessity' and 'job related' enunciated by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971), and in the other Supreme Court decisions prior to *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642 (1989)."

[297] *See* Civil Rights Act of 1991, Pub. L. No. 102–166, 105 Stat 1071 (1991), at Section 105(a).

[298] Nevertheless, HUD pretends that the Supreme Court was actually signaling that the rejected *Wards Cove* standard should apply – even though the words used stated the opposite: "housing authorities and private developers [must] be allowed to maintain a policy *if they can prove it is necessary to achieve a valid interest.*"  *Inclusive Communities*, 576 U.S. at 541 (emphasis added).  How does HUD execute this contrivance?  It points to the fact that *Inclusive*

HUD's second maneuver is to point to the fact that Congress, when it amended Title VII to reject *Wards Cove*, did not also amend the FHA.  85 Fed. Reg. 60320.  According to HUD, Congressional failure to amend the FHA means that "*Wards Cove* is still operative in Fair Housing Act cases."  85 Fed. Reg. at 60320.  This contention is utterly without merit.  There was no reason for Congress to amend the FHA because the benighted Title VII analog (*Wards Cove*) no longer existed.  It would be paradoxical to conclude that, at the same time that Congress believed that *Wards Cove* had to be excised from the domain that it spoke to directly, it also believed that *Wards Cove* should continue to help shape other areas of law, including the FHA.[299]

There is still another pretextual explanation for the change in the Challenged Rule: "HUD also notes that the burden of production is a more logical burden for the defendant because the defendant may effectuate a defense by challenging other elements of the plaintiff's case, without reaching the issue of a valid interest."  85 Fed. Reg. at 60320.  This is a *non sequitur*, another contrivance.  If the professed concern about there being circumstances where defendant does not reach the issue of a value interest were *real*, HUD would have drafted something like, "Where defendant interposes as a defense the fact that its challenged policy advances a valid interest, it shall be defendant's burden to prove that defense."

---

*Communities* cited *Wards Cove* in support of a "robust causality" requirement.  85 Fed. Reg. at 60320.  This, of course, has nothing to do with the allocation of burden of persuasion as to justification.  *See also* n.299, *infra*.

[299] HUD believes the coup-de-grâce is the fact that the Supreme Court's citation to *Wards Cove* included a "superseded" signal – specifically "superseded by statute on other grounds, 42 U.S.C. §2000e–2(k)," *Inclusive Communities,* 576 U.S. at 542.  This supposedly means that "the Supreme Court still believes that *Wards Cove* is controlling for disparate impact fair housing cases even if not now controlling for Title VII cases."  85 Fed. Reg. 60320.  This is breathtakingly wrong and pretextual.  The "other grounds" were, *inter alia*, that *Wards Cove* was being rejected for disparate-impact burden-shifting purposes (as shown by the portion of the citation referencing the replacement of the burden-shifting provision).  That the Supreme Court was somehow endorsing *Wards Cove* is – there is no other way to put it – entirely fictional.

Note that the Second Circuit placed the burden of persuasion as to justification on the defendant both before *Wards Cove* (*see Huntington*), and after *Wards Cove*, but long before the 2013 HUD Rule (*see Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003)).

Where, as here, proffered justification after proffered justification does not withstand any scrutiny – is make-believe, in other words – the only conclusion to draw is that the agency's recitations were pretextual and contrived.

This element of the challenged rule also does not meet the requirement that a "reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009). An agency must supply such an explanation as "[i]t would be arbitrary or capricious to ignore such matters." *Id.* at 515.  In 2013, HUD had explained, *inter alia,* that the burden-shifting framework it was adopting had a long history, was consistent with the burden-shifting frameworks applied under other laws, and would cause the least disruption since it was consistent with the way most courts had proceeded.  78 Fed. Reg. at 11473-74.  In addition, given HUD's experience with the framework (both using the framework itself and seeing courts use it), the agency reached the following conclusion: "HUD does not believe that the rule will lead to frivolous investigations or create excessive litigation exposure for respondents or defendants." *Id.* at 11472.[300]

In promulgating the Challenged Rule, HUD had the obligation to come to grips with these previous findings.  Instead, the agency wrote only: "In HUD's view, the 2013 Rule presents only a brief explanation of the requirements for prevailing on a disparate impact claim, and therefore invites speculation and does not provide sufficient clarity about the standard used by the courts." 85 Fed.Reg at 60296.  The agency does not explain why HUD's previous assessment was wrong, and, indeed, HUD specifically disclaims the argument that it was issuing the Challenged Rule

---

[300] The Preamble to the 2013 HUD Rule went on to point out that "the Federal Rules of Civil Procedure provide various means to dispose of meritless claims, including Rules 11, 12, and 56. Moreover, a respondent or defendant may avoid liability by rebutting the charging party's or plaintiff's proof of discriminatory effect. If the fact-finder decides that the charging party or plaintiff has not proven that the challenged practice resulted in a discriminatory effect, liability will not attach."  *Id.* (citation omitted).

"because of the results of disparate impact cases over the prior decades."  85 Fed. Reg at 60300.

Thus, HUD's change of policy was not supported by good reasons or adequate explanation. *See Fox Television Stations*, 556 U.S. at 515-16 (agency cannot disregard circumstances that underlay prior policy); *see also New York v. U.S. Dep't of Health and Human Servs.*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) (citations omitted) (holding, in light of an agency's prior assessment, the agency's bare contrary assumption is inadequate, noting that deference must be based on "some logic and evidence, not sheer speculation").[301]

The Challenged Rule is invalid and cannot be applied.

---

[301] As with the burden of persuasion as to justification, HUD has no adequate explanation for why the Challenged Rule includes at the less discriminatory alternative stage of burden shifting (Stage 3) the requirement that the plaintiff's alternative not impose "materially greater costs on" or create "other material burdens" for the defendant.  24 C.F.R. §100.500(c)(3) (2020).  Neither the 2013 HUD Rule nor Title VII contain this element.  *Cf.* 24 C.F.R. § 100.500(c)(3) (2013) (providing that at Stage 3, the "charging party or plaintiff may still prevail upon proving that the substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect"); *see Ricci v. DeStefano*, 557 U.S. 557, 578 (2009) (holding, in the Title VII context, that even if an employer meets the burden of persuasion as to justification, "a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs").

HUD's proffered explanation is that *Inclusive Communities* "noted" that it would be "paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable."  85 Fed. Reg. at 60321, *quoting Inclusive Communities*, 526 U.S. at 541-42.  First, the reference to "onerous" costs was dealing with questions specifically related to where to build. *Inclusive Communities*, 526 U.S. at 541-42.  Just as important, "onerous" is a term that implies a distinctly greater burden than "material."  A cost may be "material" in the sense that it is "important" – *see* The New Oxford American Dictionary (2001), at 1054 (defining "material" as important; essential; relevant") – while *not* being "onerous" in the sense of "involving an amount of effort and difficulty that is oppressively burdensome."  *See id.* at 1196.

Even if it were the case that *Inclusive Communities'* reference to "onerous" were connected to less discriminatory alternatives, if HUD actually wished to comport with that word in *Inclusive Communities*, it would have used language consistent with "oppressively burdensome," not merely "material."  Here, again, the explanation is contrived, more of a "distraction" than the reasoned decision-making called for.  *See Department of Commerce*, 139 S.Ct. at 2576.

CONCLUSION

The Court should find that the policy causes disparate impacts; that the policy causes perpetuation of segregation; and that each of defendant's justifications fail as a matter of law. Defendant's cross-motion should be denied in its entirety.

Dated: New York, New York
          November 5, 2020

*Craig Gurian*
_____
Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, 7th Floor
New York, New York 10177
(212) 537-5824
Co-counsel for Plaintiffs