November 24, 2014

Regulations Division
Office of General Counsel
U.S. Department of Housing and Urban Development
451 7th Street SW., Room 10276
Washington, DC 20410-0500

RE  *[Docket No. FR-5173-N-02, Affirmatively Furthering Fair Housing Assessment Tool: Solicitation of Comment--60-Day Notice Under the Paperwork Reduction Act of 1995]*

To Whom It May Concern:

This letter sets forth the comments of the City of New York (City) on the above-referenced proposed draft Assessment Tool.

The City is the largest municipal developer of affordable housing in the nation and is currently engaged in a new plan to build and preserve 200,000 affordable units across all five boroughs of the City. The City's Department of Housing Preservation and Development (HPD), the Mayor's Office for People with Disabilities, the Department of City Planning and the New York City Housing Authority (NYCHA) contributed to the comments below. HPD and NYCHA are directly responsible for siting, creating and preserving affordable housing opportunities, and both administer Section 8 programs and use other federal funding streams. NYCHA owns and operates the largest public housing program in the nation, serving over 403,120 residents.

The City wholeheartedly shares the goal of increasing access to high-opportunity neighborhoods for historically marginalized populations. Indeed, our *Housing New York* plan commits the City to "foster diverse and thriving neighborhoods." Unfortunately, the proposed Assessment Tool (the Tool) may have the unintended effect of leading local governments to take actions that may not serve the needs and priorities of their communities, and does not recognize the real-world constraints under which local governments operate. We are deeply concerned that completion of this tool will interfere with our ability to make fair and locally based decisions about the most pressing needs facing our City.

To improve the Tool's utility and its ability to further fair housing opportunity, while also ensuring that localities not become overburdened with excessive regulations, the City provides the following comments.

### 1. Timing of release of the proposed tool

The proposed Tool is presented as the mechanism by which program participants will conduct an Assessment of Fair Housing (AFH), as outlined by the 2013 Proposed Rule regarding the obligation to affirmatively further fair housing. The proposed Tool also would replace the Analysis of Impediments (AI) process currently in use.

On September 17, 2013, the City submitted extensive comments to HUD on the Proposed Rule. While expressing support for the goal of increasing access to high-opportunity

1



neighborhoods for historically marginalized populations, the City expressed a number of reservations and concerns about the Proposed Rule. Because neither a revised nor Final Rule has been published, program participants including the City have received no indication on whether the concerns expressed have been or will be addressed.

Asking for public comment on specific aspects of the Tool implementing a non-Final Rule, without having first addressed the comments offered on that proposal, is premature and we urge another opportunity to comment be offered once the Final Rule is published.

**2. Format of the Tool**

While the City appreciates HUD's goal of providing a Tool to help guide respondents' analysis of their communities' progress in affirmatively furthering fair housing, the City is deeply concerned about the Tool's format. The format is particularly problematic if HUD intends to develop and release the Tool as a pre-formatted template similar to the IDIS Consolidated Planning formulation and submission tool (eConPlan). The City found using the eConPlan template difficult because each response box for the pre-formulated question was limited to 4,000 characters in total. (The limit not only included alpha-numeric and punctuation characters but also special formatting characters such as Bold On/Off which further decreased the amount of characters available.) This system limitation in some cases restricted the City's ability to provide an in-depth comprehensive response to the question asked.

Short- or limited-capacity windows for narratives restrict a respondent's ability to fully answer questions. Equally limiting are multiple-choice options which provide insufficient opportunity to reflect the housing realities of large communities. In particular, the Tool does not include a way for large communities, with complex data and many neighborhoods with different ethnic and religious concentrations to adequately describe the circumstances and nature of their communities. In some circumstances, religious, immigrant or ethnic enclaves may result from residents' preferences, not segregation, and it is important that the Tool provide the opportunity to include such descriptions. Throughout the Tool we find instances of needing to describe these situations in a narrative form, and to include documentation regarding local housing conditions.

As another example, the draft Tool limits respondents' ability and opportunity to report critical information such as HUD recognitions of de-concentration attainments.

**3. Sources of data and information to complete the Assessment of Fair Housing**

HUD specifically seeks public comment on whether the Notice's description of available local data and local knowledge helps program participants understand how these terms are being used and also whether program participants understand the extent of their obligations to obtain and use data and other information. HUD also seeks comment on whether it has described clearly the circumstances under which a program participant may need to respond that there is no relevant data or local knowledge that allows the question to be accurately addressed.

As a municipality that expends tremendous resources to chart our housing demographics via the City's Housing Vacancy Survey (HVS), we appreciate HUD's recognition of the importance and

## 7. Lists of Determinants

As stated above, notably absent from the draft Tool's list of possible determinants are market forces and affordability. The Tool does not reflect a recognition or acknowledgment of the historical and multifaceted factors, characteristic of New York and other larger cities, that may cause immigrant and second-generation populations to choose housing options in communities or enclaves offering culturally defined businesses, social services and/or religious institutions. Nor does it give the City the opportunity to indicate the presence of these factors here. Consideration of such factors is essential to make a meaningful assessment of the fair housing landscape in the City.

The City is troubled by the failure of the Tool to distinguish between areas marked by intentional, discrimination-based segregation and racially/ethnically concentrated areas of poverty. For this reason, the City objects to HUD's use of the term "segregation" in reference to areas where particular populations are concentrated. There are non-invidious reasons for a particular ethnic group to be concentrated in a particular area. For this reason, we propose that HUD substitute "concentration" for "segregation."

The City recommends that those questions in the Tool seeking information about both segregated housing and R/ECAPs be divided into two separate inquiries to yield more useful guidance in developing an affirmative fair housing plan. For example, Question 5 of the Tool, "Determinants of Segregation/R/ECAPs," asks about the extent to which the factors listed contributed to "segregated housing patterns or R/ECAPs." A separate question for each type of housing pattern is likely to yield more valuable data.

## 8. Addressing Disability and Access Issues Separately

The City commends HUD for seriously examining specific issues related to challenges encountered by people with disabilities when seeking housing. We appreciate that HUD well understands the fact that high-cost markets such as the City's pose challenges of affordability.

People with disabilities face the same issues as those without disabilities – the affordability of the housing, segregation by race, ethnic or national origin, and discrimination against families with children -- but a disability often means that those problems are exacerbated. It therefore would be useful to include people with disabilities as a group to be considered when discussing general topics such as affordability, integration and family status.

We agree with HUD that it is crucial to include the sections of the Assessment Tool that focus on information specific to people with disabilities, such as the number of accessible units, location of accessible units throughout the jurisdiction, and ease of reasonable accommodation requests. That said, the City questions whether HUD has the capacity to provide program participants with sufficiently comprehensive demographic data on housing patterns of persons with disabilities given the large number of physical and mental health and mobility problems encompassed within federal disability definitions. The Tool directs program participants to "solicit input" from individuals with disabilities and from disability advocates. While advocacy groups can provide useful recommendations pertaining to housing opportunities for individuals

7

The cover page of the Tool requires a signature affirming that, "the program participant(s) have prepared an assessment that fulfills the requirements at 24 CFR §§ 5.150-5.164 or comparable replacement regulations of the Department of Housing and Urban Development." The affirmation's referral to "comparable replacement regulations" is unclear. If a City official or employee is to affix his or her signature to a pre-prepared statement, the statement should clearly reference what the employee is signing off on.

## 12. Conclusion

The City's primary concern with the draft Assessment Tool is its requirement that respondents identify "determinants" of fair housing issues. While data and local knowledge may be sufficient to draw correlations, grantees will be hard-pressed to ascertain causal relationships, as the Tool compels participants to do. The Tool encourages, and may be used to require, grantees to create policy on the basis of incomplete information and personal and anecdotal perceptions. While local governments frequently have to make policy decisions on the basis of incomplete information, a tool that forces localities to assume unproven causal conclusions will not necessarily further grantees' ability to effectively increase fair housing choice and could lead to policies with negative unintended consequences. The stakes of drawing unsupported causal conclusions are high because of the critical importance of these issues, and the difficulty of having thoughtful discussions about the issues against the backdrop of local politics.

The stakes also are unknown, given the lack of clarity about the potential uses of the implications of causality the Tool asks localities to draw. It is unclear, for example, whether and how grantees' future funding could be affected by such implications. Continued federal support for local housing programs is essential to the nation's efforts to affirmatively further fair housing. At a minimum, to assure local governments across the nation that the tool will be used to help localities develop more effective programs, rather than serving as a basis for litigation and punitive actions, the tool should make clear that localities will be given a safe harbor period in which to further evaluate any causal implications drawn from the assessment and to formulate appropriate responses to any problems the assessment reveals.

The City appreciates the opportunity HUD has offered to receive stakeholders' views on this important policy initiative. If you have any questions or concerns, please do not hesitate to contact HPD's Director of Legislative Affairs and Federal Policy, Jordan Press, at pressj@hpd.nyc.gov.

Sincerely,

*[signature]*

Vicki Been
Commissioner, New York City Department of Housing Preservation and Development

*[signature]*

Carl Weisbrod
Director, New York City Department of City Planning

9