**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SHAUNA NOEL and EMMANUELLA SENAT,

      Plaintiffs,

  -against-           15-CV-5236 (LTS) (KHP)

CITY OF NEW YORK,

      Defendant.

**BRIEF *AMICUS CURIAE* OF**
**LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW**
<u>**IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

Thomas Silverstein
Lawyers' Committee for Civil Rights
Under Law
1500 K Street NW
Suite 900
Washington, DC 20005
(202) 662-8316

Daniel I. Wolf (DW1975)
Brandon A. Levey
Christian S.C. Carey
Janet Sanchez
Gilbert LLP
700 Pennsylvania Avenue SE
Suite 400
Washington, DC 20003
(202) 772-2428
wolfd@gilbertlegal.com

*Counsel for Amicus Curiae*
*Lawyers' Committee for Civil Rights*
*Under Law*

## <u>TABLE OF CONTENTS</u>

STATEMENT OF INTEREST OF THE *AMICUS CURIAE* ........................................................... 1

PRELIMINARY STATEMENT ..................................................................................................... 2

ARGUMENT .................................................................................................................................. 6

I.  HUD's 2020 Rule Constitutes an Impermissible Interpretation of the Fair Housing
    Act, Rendering Chevron Deference Inappropriate. ............................................................ 6

    A.  The 2020 HUD Rule Is Manifestly Contrary to the Statute....................................... 7

    B.  The Rule Is Arbitrary and Capricious. ................................................................... 10

II. New York City's Community Preference Policy Causes Multiple Disparate Impacts
    that Cannot Be Offset...................................................................................................... 11

    A.  Countenancing the City's Defense Would Validate What Is Tantamount to a
        Separate but Equal Approach to Allocating Housing Opportunities. .................. 12

III. The City's Purported Interest in Convincing Its Own Legislative Branch to Support
     Affordable Housing Is Too Speculative to Be a Valid Interest and Is an
     Impermissible Accommodation to Intentional Discrimination......................................... 15

    A.  The City's Justification Is Too Speculative to Be a Valid Interest Under
        the FHA................................................................................................................... 16

    B.  The City's "Convincing-Itself" Justification. ...................................................... 18

IV. The City's Proposed Standard of Proof for Perpetuation of Segregation Claims Is
    Contrary to Longstanding Precedent. ............................................................................ 18

V.  The City Advances an Incorrect Standard for Evaluating Intent at the Summary
    Judgment Stage. .............................................................................................................. 21

CONCLUSION............................................................................................................................ 23

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                        **Page(s)**

*2922 Sherman Ave. Tenants' Ass'n v. D.C.*,
    444 F.3d 673 (D.C. Cir. 2006) ..............................................................................3

*Brown v. Board of Education*,
    347 U.S. 483 (1954)...............................................................................12, 14

*Buchanan v. Warley*,
    245 U.S. 60 (1917)...........................................................................................14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)......................................................................6, 7, 10, 11

*Comer v. Cisneros*,
    37 F.3d 775 (2d Cir. 1994)......................................................................12, 13, 20

*Cooling Water Intake Structure Coal. v. U.S. Env't. Prot. Agency*,
    905 F.3d 49 (2d Cir. 2018)..............................................................................6

*Cuomo v. Clearing House Ass'n*,
    557 U.S. 519 (2009)........................................................................................6

*Encino Motorcars, LLC v. Navarro*,
    136 S. Ct. 2117 (2016)....................................................................................6

*Griggs v. Duke Power Co.*,
    401 U.S. 424 (1971)......................................................................................14

*Gurung v. Barr*,
    929 F.3d 56 (2d Cir. 2019)..............................................................................10

*Huntington Branch, NAACP v. Town of Huntington*,
    844 F.2d 926 (2d Cir. 1988), *aff'd in part sub nom. Town of Huntington, N.Y.*
    *v. Huntington Branch, NAACP*, 488 U.S. 15 (1988) ....................................... *passim*

*Jones v. Alfred H. Mayer Co.*,
    392 U.S. 409 (1968)......................................................................................14

*Langlois v. Abington Hous. Auth.*,
    234 F. Supp. 2d 33 (D. Mass. 2002) .............................................................13, 20

*Mass. Fair Hous. Cent. v. U.S. Dep't. of Hous. and Urb. Dev.*,
    No. 20-11765-MGM, 2020 WL 6390143 (D. Mass. Oct. 25, 2020) ......................4, 9, 10, 11

*Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*,
    558 F.2d 1283 (7th Cir. 1977) ........................................................................ *passim*

*Mhany Management, Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016)................................................................................ *passim*

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*,
    182 F.3d 157 (2d Cir. 1999)....................................................................................21

*New York v. U.S. Dep't of Homeland Sec.*,
    No. 19-3591, 2020 WL 4457951 (2d Cir. Aug. 4, 2020) ....................................6, 7

*Resident Advisory Bd. v. Rizzo*,
    564 F.2d 126 (3d Cir. 1977)......................................................................................8

*S.E.C. v. Chenery Corp.*,
    318 U.S. 80 (1943)..................................................................................................10

*Schware v. Bd. of Bar Examiners of the State of New Mexico*,
    353 U.S. 232 (1957)................................................................................................17

*Texas Department of Housing & Community Affairs v. Inclusive Communities
    Project, Inc.*,
    576 U.S. 519 (2015)........................................................................................ *passim*

*Tsombanidis v. W. Haven Fire Dep't*,
    352 F.3d 565 (2d Cir. 2003)....................................................................................19

*Ungar v. New York City Hous. Auth.*,
    363 F. App'x 53 (2d Cir. 2010) ..............................................................................19

*United States v. City of Black Jack, Missouri*,
    508 F.2d 1179 (8th Cir. 1974) ..................................................................................2

*United States v. Mitchell*,
    580 F.2d 789 (5th Cir. 1978) ..................................................................................12

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d Cir. 1987)..................................................................................22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)..........................................................................................21, 22

## Statutes and Regulations

24 C.F.R. § 100.500 (2013) ................................................................................ *passim*

78 Fed. Reg. 11,460 (Feb.15, 2013) (codified at 24 C.F.R. pt. 100) .............................3

78 Fed. Reg. at 11,470 ................................................................................................16

5 U.S.C. § 706(2)(A).............................................................................................6, 10

**Other Authorities**

A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322
  (2012) ........................................................................................................................7

H.R. Rep. No. 100–711, p. 21, n.52, 89–93 (1988) .......................................................8

U.S. Dep't of Hous. & Urban Dev., Office of General Counsel Guidance on
  Application of Fair Housing Act Standards to the Use of Criminal Records by
  Providers of Housing and Real Estate-Related Transactions, 5 (Apr. 4, 2016) ......................17

Walter Goodman, *The Battle of Forest Hills–Who's Ahead*, The N.Y. Times (Feb.
  20, 1972) ....................................................................................................................22

## <u>STATEMENT OF INTEREST OF THE *AMICUS CURIAE*</u>

The brief is submitted on behalf of proposed *amicus curiae* the Lawyers' Committee for Civil Rights Under Law (the "Lawyers' Committee") in support of Plaintiffs' partial motion for summary judgment and in opposition to Defendant's motion for summary judgment.[1] The Lawyers' Committee was founded in 1963 at the request of President John F. Kennedy to marshal the leadership and resources of the private bar to combat racial discrimination and the resulting inequality of opportunity. Housing discrimination is one of these evils: it threatens our society's most marginalized groups' access to a basic human need.

The tools, public and private, that maintain segregated neighborhoods and effectuate structural discrimination in housing are continually evolving. Though overt discrimination is undoubtedly still rampant, today's iterations of discriminatory policies are often more subtle. These discriminatory practices become evident through evidence of their disproportionate adverse effect, or disparate impact, on members of groups protected from discrimination by the federal Fair Housing Act ("FHA"), and on Black individuals and families in particular.

The Lawyers' Committee has played a pivotal role in the development of the FHA's disparate impact standard, both nationally and within the Second Circuit. Specifically, the Lawyers' Committee served as counsel in *Mhany Management, Inc. v. County of Nassau*, 819 F.3d 581 (2d Cir. 2016), the landmark challenge to exclusionary zoning that preserved residential racial segregation in a predominantly white Long Island suburb in which the Second Circuit set forth the current standard for disparate impact claims within its jurisdiction. Additionally, the Lawyers' Committee participated as *amicus* in many precedent-setting

---

[1] This brief was principally authored by *amicus curiae* along with Gilbert LLP, counsel for *amicus curiae*. No party's counsel authored this brief in whole or in part. Neither any party nor any party's counsel contributed money related to the preparation or submission of this brief. No person other than *amicus curiae*, their members, and their counsel contributed money related to the preparation or submission of this brief.

disparate impact cases, including *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) ("*ICP*"), in which the U.S. Supreme Court held that disparate impact claims were cognizable under the FHA. The Lawyers' Committee's disparate impact FHA litigation has encompassed wide-ranging issues such as exclusionary zoning, suburban residency preferences for Housing Choice Vouchers, criminal background screening in rental housing, the geographic distribution of subsidized housing, and the provision of basic municipal services like water and sewer. Robust disparate impact protections, along with traditionally strong perpetuation-of-segregation liability, are key to the Lawyers' Committee's ability to advance its mission in these areas and in general.

## PRELIMINARY STATEMENT

*Amicus curiae* respectfully submits this brief in order to highlight the important ways in which the positions urged on this Court by Defendant City of New York (the "City") would not only deprive the Plaintiffs (and hundreds of thousands of other New York City households) of their fair housing rights, but would, if accepted, also deal devastating blows to the ability of anyone in the United States to vindicate the rights guaranteed them by the FHA.

Starting in 1974, courts began developing frameworks—originally borrowed from analogous Title VII jurisprudence—for evaluating disparate impact claims. *See, e.g.*, *United States v. City of Black Jack, Missouri*, 508 F.2d 1179, 1185 (8th Cir. 1974). The Second Circuit officially adopted such a framework in *Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 936 (2d Cir. 1988), *aff'd in part sub nom. Town of Huntington, N.Y. v. Huntington Branch, NAACP*, 488 U.S. 15 (1988), which has remained the seminal case in the Second Circuit's disparate impact jurisprudence. *See Mhany Mgmt., Inc.*, 819 F.3d at 617, *remanded to* No. 05-cv-2301 (ADS)(ARL), 2017 WL 4174787 (E.D.N.Y. Sept. 19, 2017) (citing "*Huntington*

2

*Branch* and its progeny" in describing the Circuit's longstanding approach to disparate impact

liability). By 2013, all 11 circuits that had addressed the issue of disparate impact under the FHA

held that such claims were cognizable. Moreover, most had adopted some version of a burden-

shifting framework, with only small deviations. *See* Implementation of the Fair Housing Act's

Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,460–61 (Feb.15, 2013) (codified at 24

C.F.R. pt. 100) (explaining that with the exception of some "minor variations," the 11 circuits

had all adopted a disparate impact standard similar to the one HUD sought to codify in its 2013

rule); *see also 2922 Sherman Ave. Tenants' Ass'n v. D.C.*, 444 F.3d 673, 679 (D.C. Cir. 2006)

("[E]very one of the eleven circuits to have considered the issue has held that the FHA similarly

prohibits not only intentional housing discrimination, but also housing actions having a disparate

impact."). HUD, in hopes of providing clarity to interested parties, codified and standardized this

longstanding framework in its 2013 "Implementation of the Fair Housing Act's Discriminatory

Effects Standard" Rule. 24 C.F.R. § 100.500 (2013) ("2013 HUD Rule").

     In 2015, the Supreme Court not only affirmed that disparate impact liability is cognizable

under the FHA but also endorsed the long-standing approach of the circuit courts. *ICP*, 576 U.S.

at 545–46 ("The Court holds that disparate-impact claims are cognizable under the Fair Housing

Act upon considering its results-oriented language, the Court's interpretation of similar language

in Title VII and the ADEA, Congress' ratification of disparate-impact claims in 1988 against the

backdrop of the unanimous view of nine Courts of Appeals, and the statutory purpose."); *see

also Mhany Mgmt., Inc.*, 819 F.3d at 618 (finding that "[t]he Supreme Court implicitly adopted

HUD's approach" in *ICP*). Accordingly, *ICP* should not be read as merely an approval of HUD's

agency action, but of the 40 years of precedent underlying that rule.

In the case at hand, the City advances a series of arguments that run contrary to this longstanding precedent. At issue is the City's "community preference" policy (its "CP policy"), which reserves one-half of units in affordable housing lotteries for existing residents of the community district ("CD") in which the development is located. As applied in lotteries in majority-white CDs, for example, those helped most are insider applicants who are disproportionately white; Black households, who make up a larger share of outsiders than of insiders in this context, are among those hurt by the policy. In attempts to justify this policy, the City relies on a number of troubling arguments that, if accepted, could thwart the efficacy of disparate impact liability in all future cases.

For one, the City prematurely cited the 2019 Notice of Proposed Rulemaking that preceded the promulgation of a new rule, the Implementation of the Fair Housing Act's Disparate Impact Standard ("2020 HUD Rule"), 24 C.F.R. § 100.500 (2020), in its summary judgment briefing. Def.'s Mem. in Opp'n to Pls.' Mot. for Partial Summ. J. 57, ECF No. 902 ("Def.'s Br."). The Rule is invalid both procedurally and substantively and was preliminarily enjoined prior to its effective date. *Mass. Fair Hous. Cent. v. U.S. Dep't. of Hous. and Urb. Dev.*, No. 20-11765-MGM, 2020 WL 6390143, at *8–9 (D. Mass. Oct. 25, 2020). But even if it were valid, the City misconstrues the Rule to justify the City's discriminatory policy. Specifically, the City points to the 2019 Notice of Proposed Rulemaking's suggested removal of language requiring that its interest "not be hypothetical or speculative," a deletion which was carried out in the 2020 HUD Rule, as support for the sufficiency of its justification for the CP policy challenged in this case. *Id.* The City uses this change to argue that it bears a lower burden of justification. Indeed, the City goes so far as to argue that the policy is justified by the alleged political necessity to convince its own legislative arm to take action in support of affordable

4

housing. Taken to its logical extension, the City implies that if a policy, no matter how discriminatory, would be useful in winning over elected officials, such a justification would be sufficient to withstand a disparate impact challenge.

Likewise, the City advances a number of troubling theories related to what is required to constitute disparate impact or perpetuation of segregation. The City, for example, argues that because Black and Latinx residents are helped by the policy in lotteries in some CDs, the policy does not violate the FHA when it hurts them in lotteries in other CDs, reasoning that amounts to a revival of "separate but equal" doctrine. Next, the City misrepresents the challenged policy, arguing that because the City's affordable housing lottery as a whole has contributed to integration, the associated CP policy cannot be found to perpetuate segregation. This argument fundamentally mistakes what the appropriate comparison is for purposes of perpetuation of segregation analysis. Further, the City urges the Court to require analyzing the dissimilarity index—an argument that lacks basis in both precedent and statistical analysis. This manipulation of the appropriate comparators and metrics, if accepted, would enable defendants to avoid liability in even the most egregious examples of discrimination. Accordingly, the stakes of this case both for disparate impact challenges under the FHA generally and for attacks on separate and unequal policies like the City's are high.

Finally, the City, in the face of evidence of intentional discrimination produced by Plaintiffs that both quantitatively and qualitatively exceeds that which is usually available in an FHA case, has nevertheless plunged ahead with seeking summary judgment in respect to that claim, too. Without authority, and without a frank explanation of how it is seeking to reshape the law, the City apparently and wrongly believes that all inferences should be made against the non-

moving party. It is difficult to see what, other than a defendant's explicit confession of liability, would allow any case to proceed under the City's view.

## ARGUMENT

### I.  HUD's 2020 Rule Constitutes an Impermissible Interpretation of the Fair Housing Act, Rendering Chevron Deference Inappropriate.

The City's reliance on the 2020 HUD Rule should be rejected. First, the 2019 Notice of Proposed Rulemaking has no force of law. The City's reliance on the Rule is therefore premature. Moreover, the Rule is also an impermissible reading of the FHA, in violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Accordingly, the Rule should not be entitled to *Chevron* deference, as discussed below. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).

An agency's rule is entitled to deference only "if the statute is ambiguous and if the agency's interpretation is reasonable." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016). In deciding if an agency rule merits *Chevron* deference, the court asks whether "the statute is silent or ambiguous with respect to the specific issue." *Chevron*, 467 U.S. at 843. If the court determines the statute does not speak to the specific issue, the court proceeds to the second step of *Chevron*, in which it evaluates "whether the agency's answer is based on a permissible construction of the statute." *Id.*; *Cooling Water Intake Structure Coal. v. U.S. Env't. Prot. Agency*, 905 F.3d 49, 64–65 (2d Cir. 2018). "[W]hile an agency may 'give authoritative meaning to the statute within the bounds of th[e] uncertainty' implicit in congressional intent, 'the presence of some uncertainty' does not prevent us from 'discern[ing] the outer limits of [a statutory] term[.]'" *New York v. U.S. Dep't of Homeland Sec.*, No. 19-3591, 2020 WL 4457951, at *22 (2d Cir. Aug. 4, 2020) (quoting *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 525 (2009)). Put another way, "[i]f Congress passed a statute leaving it unclear whether a term of the

6

statute means A, B, or C, an appropriate federal agency will receive deference in concluding that the proper meaning is any one of A, B, or C. But it does not follow that, because the statutory term could mean either A, B, or C, the agency will receive deference in interpreting it to mean X or Y or Z, because such an interpretation would be inconsistent with the meaning of the statute." *Id.*

While there is no ambiguity regarding the *existence* of disparate impact liability under the FHA, there is some ambiguity as to what constitutes disparate impact liability. Accordingly, the bulk of the analysis required in respect to the 2020 HUD Rule falls in "step two"—whether the agency's interpretation is a permissible one. It is not. In addition to being "manifestly contrary to the statute," *Chevron*, 467 U.S. at 844, the 2020 HUD Rule is arbitrary and capricious such that it is not entitled to *Chevron* deference. Accordingly, the City's reliance on the Rule—specifically that it alters the standard for what defendants must show in proving a valid interest—is misguided and should be rejected by the Court.

### A.     The 2020 HUD Rule Is Manifestly Contrary to the Statute.

The 2020 HUD Rule runs contrary to precedent—including that of the Second Circuit—that had been ratified in the 1988 amendments to the FHA. *ICP*, 576 U.S. at 535 (citing *Huntington* as first example of precedent that had been ratified by 1988 amendments). As the *ICP* court noted, the 1988 Congress "made a considered judgment to retain the relevant statutory text," *id*. at 536, explaining that "if a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation." *Id.* at 536‒37 (quoting A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)). Prior to 1988, the following principles were well-established, precedential interpretations of the FHA:

7

1.      That it is the defendant's burden to demonstrate that the policy in question serves a valid "interest." *See, e.g.*, *Huntington Branch, NAACP*, 844 F.2d at 936 ("[T]he defendant must prove that its actions furthered, in theory and in practice, a legitimate, bona fide governmental interest."); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 1293 (7th Cir. 1977) ("The third factor which we find to be important is the interest of the defendant in taking the action which produces a discriminatory impact.").

2.      That defendants' proof of "valid interest" can be rebutted by demonstrating that a less discriminatory practice would serve that same interest, without showing that the policy serve said interest in an "equally effective manner" and imposes no materially greater costs on the defendants. *Huntington Branch, NAACP*, 844 F.2d at 936 ("[T]he defendant must prove . . . that no alternative would serve that interest with less discriminatory effect." (*citing Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3d Cir. 1977) (finding that it must be shown that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact" and that said alternative policy be "no more intrusive than *is necessary to remedy proved constitutional violations*." (emphasis added))).

Indeed, these precedents were so well established that Congress is assumed to have adopted these judicial interpretations of disparate impact liability in passing the 1988amendments. *See ICP*, 576 U.S. at 539 (court stating that by the time of Congress's 1988 amendments, Congress was aware that all nine Courts of Appeals to have addressed the question had unanimously concluded the FHA encompassed disparate-impact claims and rejected a proposed amendment that would have eliminated disparate-impact liability for certain zoning decisions) (citing cases and H.R. Rep. No. 100-711, p. 21, n.52, 89–93 (1988)).

The 2020 HUD Rule, however, is inconsistent with these ratified precedents. It requires plaintiffs to show that the policy in question is "arbitrary, artificial, and unnecessary," rather than first requiring the defendant to demonstrate the policy's valid purpose. 2020 HUD Rule § 100.500(b)(1). Likewise, it imposes far more stringent burdens on the plaintiffs in requiring them to show that the proposed alternate policy is "equally effective" as the challenged policy and does not impose materially greater costs. 2020 HUD Rule § 100.500(c)(1)–(3). These provisions all directly contradict the precedents ratified by the 1988 amendments, such that the 2020 HUD Rule is an impermissible reading of the FHA.

Further textual analysis only casts more doubt on the Rule's validity. It is well established that the FHA's disparate impact liability mirrors that of Title VII and the ADEA, *see ICP*, 576 U.S. at 530–31, but the 2020 HUD Rule dramatically deviates from jurisprudence under these two statutes. Namely, the requirement that plaintiffs prove that their proposed alternatives are *less costly* and *no more burdensome* than the challenged policy has no analog in disparate impact cases under Title VII and ADEA—for good reason. In effect, these purported requirements imply that a plaintiff is only entitled to be free from discrimination in the sale or rental of housing if it less costly than discrimination.

Beyond running afoul of the text, the 2020 HUD Rule runs contrary to the spirit of the FHA. The cumulative effect of the 2020 HUD Rule's changes it to make it overly burdensome for plaintiffs to demonstrate disparate impact. *See Mass. Fair Hous. Cent.*, 2020 WL 6390143, at *4 ("[T]hese changes constitute a massive overhaul of HUD's disparate impact standards, to the benefit of putative defendants and to the detriment of putative plaintiffs."). In a time where discrimination is still rampant, yet often more subtle, disparate impact liability is a crucial tool in fighting against systemic discrimination. In making it more difficult to prove disparate impact,

the 2020 HUD Rule actively undermines the FHA's purpose. It is thereby an impermissible

reading of the statute within the meaning of APA, 5 U.S.C. § 706(2)(A), and is not entitled to

*Chevron* deference.

### B.     The Rule Is Arbitrary and Capricious.

An agency action will also fail under *Chevron* step 2 if it is "arbitrary" or "capricious."

*Chevron*, 467 U.S. at 844. In determining whether a rule is arbitrary or capricious, courts have

long held that "if the action is based upon a determination of law as to which the reviewing

authority of the courts does come into play, an order may not stand if the agency has

misconceived the law." *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943). The Second Circuit

reaffirmed this holding as recently as 2019, stating that an order may not stand "[w]hen an

administrative agency . . . has based its decision in part on a legal error." *Gurung v. Barr*,

929 F.3d 56, 62 (2d Cir. 2019) (*citing Chenery*, 318 U.S. at 94).

In the instant case, the City echoes HUD's dubious claim that the 2020 HUD Rule is

necessary to bring the disparate impact standards in compliance with *ICP*. *See* Def.'s Br. at 57.

This argument is not supported by the text or outcome of *ICP* and is inconsistent with Second

Circuit precedent. In fact, the *ICP* Court repeatedly grounded its decision in the longstanding

burden-shifting approach that the Rule had codified, often citing the 2013 HUD Rule explicitly.

*ICP*, 576 U.S. at 527.[2] Contrary to HUD's claims, the language of the 2020 HUD Rule is not

derived from *ICP*—or any other case, for that matter. Indeed, at least one federal court has

acknowledged as much in litigation challenging the 2020 HUD Rule under the APA. *See Mass.*

*Fair Hous. Ctr.*, 2020 WL 6390143, at *7 (holding that the language of the 2020 HUD Rule's

---

[2] This led the Second Circuit to defer to the 2013 HUD Rule in *Mhany Mgmt. Inc.* and to conclude that the Supreme Court had implicitly adopted a key portion of the 2013 HUD Rule's burden-shifting framework. 819 F.3d at 618–20.

key provisions "[was] not, as far as the court [was] aware, found in any judicial decision").[3] The 2020 HUD Rule is not compelled by *ICP* and runs contrary to the decision's reasoning, which highlighted the FHA's important remedial goals of eliminating barriers to housing choice and fostering more integrated communities. *ICP*, 576 U.S at 539–41, 546–47.

The provision of the 2020 HUD Rule on which the City relies that purports to remove the requirement that a defendant's justification for a policy cannot be "speculative or hypothetical" is also neither compelled nor permitted by the text of *ICP*. There, the Supreme Court held that defendants can be "allowed to maintain a policy if they can prove it is necessary to achieve a valid interest." *ICP*, 576 U.S. at 541. First, therefore, it is clear that the 2020 HUD Rule, when it provides that a plaintiff has the burden of proof in respect to justification, is not following *ICP* but contravening it. In addition, the statement in *ICP*, though using different wording, also affirms the 2013 HUD Rule's prohibition on speculative or hypothetical justifications—after all, proving something is by definition demonstrating it is not merely speculative. Thus, HUD's claim that the language of *ICP* requires this omission from the 2020 HUD Rule is incorrect, and *Chevron* deference is not appropriate.

## II.   New York City's Community Preference Policy Causes Multiple Disparate Impacts that Cannot Be Offset.

Operating against the backdrop of intense residential racial segregation, the City's CP policy both perpetuates that segregation and has disparate impacts, including those that work to the disadvantage of Black and Latinx households. To understand the policy's disparate impacts, it is important to observe that the fundamental harm challenged through this action is that of

---

[3] Despite HUD's claims, the court found that none of the following provisions had any basis in case law: the requirement that a plaintiff prove the existence of a "less discriminatory" and "equally effective" alternative policy; the "outcome prediction" defense; the conflation of the plaintiff 's prima facie burden and pleading burden; and the additional language in 2020 HUD Rule § 100.500(b)(1)—"such as a practical business, profit, policy consideration." *Mass. Fair Hous. Ctr.*, 2020 WL 6390143 at *7, citing 2020 HUD Rule § 100.500(c)(3), (d)(1), and (d)(2)(iii).

being denied the opportunity to compete for an affordable housing unit, regardless of where one lives. *See Comer v. Cisneros*, 37 F.3d 775, 794 (2d Cir. 1994) (holding that the injury sufficient to confer standing in a challenge to a residency preference for admission to the Section 8 program "is the missed opportunity to compete for suburban housing on an equal footing with the local residents"). The City's contention that greater access to affordable housing units in Black and Latinx community districts for Black and Latinx households both misapprehends the nature of the harm at issue in this lawsuit and risks validating the long-discarded idea of "separate but equal."

### A. Countenancing the City's Defense Would Validate What Is Tantamount to a Separate but Equal Approach to Allocating Housing Opportunities.

The City has effectively argued that, because Black and Latinx individuals are able to secure affordable housing in disproportionately Black and Latinx community districts in sufficient numbers to ensure that they are not underrepresented in affordable housing units overall, the policy has no disparate impact. Accepting the City's position would amount to a tacit endorsement of the concept of "separate but equal," condemned in *Brown v. Board of Education*, 347 U.S. 483 (1954). Since the passage of the FHA in 1968, the courts have never countenanced the notion that, whether in the context of intentional discrimination or disparate impact, making a housing opportunity available in a predominantly Black or Latinx area would cancel out the denial of a housing opportunity in a predominantly white area.[4] Doing so would be contrary to

---

[4] Courts have spoken to policies and practices limiting the availability of such housing opportunities based on race as violating the FHA, however. *See, e.g.*, *Metro. Hous. Dev. Corp.*, 558 F.2d at 1291 (finding that, where village's discriminatory zoning policies resulted in greater deprivation of housing opportunities for Black people than for white people, "[t]he fact that the conduct complained of adversely affected white as well as nonwhite people . . . [was] not by itself an obstacle to relief under the Fair Housing Act") (citing cases); *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978) (Fifth Circuit affirmed that defendant steering Black tenants to a particular section of apartment complex "made unavailable or denied 'a dwelling to any person because of race'" because "race was a consideration and played some role in the real estate transaction," evidencing an "intent to influence the choice of the renter on an impermissible racial basis."); *Huntington Branch, NAACP*, 844 F.2d at 937–38 (court found town's refusal to rezone to permit the low-cost housing "impede[d] integration by restricting low-income housing needed by minorities to an area already 52% minority.").

the remedial purpose of the FHA to counteract segregation and, if adopted by this Court, would lead to absurd and unacceptable results.

Take, for example, a different and more frequently litigated permutation of the policy at issue in this case: residency preferences in predominantly white suburban areas. Residency preference policies that advantage residents of predominantly white suburban communities for affordable housing or voucher assistance over disproportionately Black or Latinx residents of nearby cities have long been the subject of disparate impact litigation. *See, e.g.*, *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994) (reversing a dismissal of a challenge to a residency preference for housing vouchers instituted by a suburb of Buffalo, New York; the case settled on remand); *Langlois v. Abington Hous. Auth.*, 234 F. Supp. 2d 33 (D. Mass. 2002) (holding that plaintiffs had established a prima facie case of disparate impact with respect to several suburban public housing authorities' residency preferences). It is well established that a suburban residency preference for housing vouchers in a predominantly white community within a more diverse metropolitan region would have a disparate impact. However, under the City's view, there would be no such disparate impact if a state government dissolved the public housing authorities within its jurisdiction, assumed responsibility for administering vouchers in the areas once served by those public housing authorities (targeting the same number of vouchers to each area and requiring initial lease-up to occur in the respective target areas), and then instituted a series of county-by-county or city-by-city preferences. If the State of New York instituted a policy dictating that only residents of Nassau County would be eligible for a set number of vouchers that would be the only vouchers eligible for initial lease-up in Nassau County, the ability of Queens County residents to compete for a presumably larger number of vouchers available for initial lease-up in Queens could not possibly cure the discriminatory nature of the

13

policy. Likewise, if a property management company excluded individuals with criminal records from certain rental units but gave such individuals a competitive advantage for separate (but allegedly equal) units, the idea that there would be no disparate impact would rightfully be considered absurd. Indeed, the City's separate-but-equal argument promotes a premise not just rejected in 1968 (with the passage of the FHA), or back in 1954 (with the decision in *Brown*), but one not countenanced by the Supreme Court more than a century ago. In *Buchanan v. Warley*, 245 U.S. 60 (1917), the Supreme Court rejected as unconstitutional a municipal ordinance that "equally" prevented Black households from purchasing or occupying property in majority-white blocks and prevented white households from purchasing or residing in property on majority-Black blocks. Yet the City's current argument would have asked the *Buchanan* court to look at the arrangement as more benign: with both Black and white households being helped by reduced competition for housing in their respective areas. There is no meaningful distinction between intentional discrimination claims and disparate impact claims on this point in light of a fundamental principle of disparate impact jurisprudence: a defendant is not permitted to accomplish via impact what it is prohibited from doing directly. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (holding that "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability").

The FHA prohibits both the total denial of housing and policies that consign Black and Latinx households to separate housing options from white households. It does so in order to effectuate the FHA's purpose of eliminating the badges and incidents of slavery pursuant to the Thirteenth Amendment of the U.S. Constitution. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968) (noting the substantive overlap between 42 U.S.C. § 1982 and the FHA and that the

Thirteenth Amendment provided Congress authority to prohibit private housing discrimination). This Court must not go down the slippery slope presented by the City's unsupported view of disparate impact liability.

**III.** **The City's Purported Interest in Convincing Its Own Legislative Branch to Support Affordable Housing Is Too Speculative to Be a Valid Interest and Is an Impermissible Accommodation to Intentional Discrimination.**

The City has advanced a novel argument that its CP policy is justified because it serves the purportedly valid interest of convincing members of its own legislative branch to support affordable housing development. For the reasons discussed below, that argument must fail, both because it is speculative and because its acceptance would turn anti-discrimination law on its head.

In the Second Circuit, after a plaintiff has made a prima facie showing of disparate effect, the defendant carries the burden of proving that the challenged practice is necessary to achieve a substantial, legitimate, and non-discriminatory interest. *Mhany Mgmt. Inc.*, 819 F.3d at 617 (citing 2013 HUD Rule § 100.500(c)(2)). In the 2013 HUD Rule, HUD also stated that a legally sufficient interest cannot be "hypothetical or speculative." 2013 HUD Rule § 100.500(b)(2). As discussed *supra*, the Second Circuit has adopted the standard of the 2013 HUD Rule for disparate impact FHA claims. *Mhany Mgmt. Inc.*, 819 F.3d at 617–19. The 2020 HUD Rule attempts to eliminate the requirement that a legally sufficient interest—rephrased as a "valid interest" in the 2020 HUD Rule—cannot be hypothetical or speculative. *See* 2020 HUD Rule § 100.500 (c)(2). Here, the City relies in part on this deletion in its attempt to convince the Court of the sufficiency of its interest, which would be inadequate under the existing standards.

15

### A.     The City's Justification Is Too Speculative to Be a Valid Interest Under the FHA.

The City's assertion that its CP policy is justified because it is necessary to convince members of the City Council to support affordable housing is improperly hypothetical and speculative. The City has not offered any empirical evidence that any of the members of its legislative branch would oppose affordable housing initiatives in the absence of the CP policy.[5] Instead, the City merely speculates that its members *might* oppose affordable housing initiatives. Should the City's hypothetical interest in convincing itself to support affordable housing be held to be sufficient under the FHA, virtually every future defendant could manufacture justification for a discriminatory policy by relying on similarly unsupported speculation. Indeed, this scenario is what HUD sought to avoid through the 2013 HUD Rule's statement that requiring a defendant to put forth a substantial, legitimate, nondiscriminatory interest "is intended to ensure that a justification is genuine." 78 Fed. Reg. at 11,470.

The City's argument relies on a future occurrence: if the CP policy were withdrawn, City councilmembers might oppose affordable housing development, even though many of the same legislators are on the record in support of increased affordable housing.  The City's purported justification presupposes that certain councilmembers will oppose affordable housing if such development fostered more residential integration (i.e., provided equal access to all New Yorkers in need of affordable housing, regardless of where in New York City they were coming from). This is entirely speculative. The City has not attempted to administer its lottery in the equal-access fashion that would not perpetuate segregation nor cause disparate impacts. It thus does not know whether such a change in policy would undermine City Council support for affordable

---

[5] As Housing and Economic Development Deputy Mayor Vicki Been admitted in her deposition, "I don't know for a fact what councilmembers would do in that hypothetical." Mem. in Supp. of Pls.' Mot. for Partial Summ. J. at 60, ECF No. 882.

housing. Pls.' Reply Br. To Def.'s Opp'n. to Pls.' Mot. for Partial Summ. J. at 58, ECF. No. 918. ("Pls.' Reply Br."). This is especially true as councilmember opposition because of the absence of the policy would serve no legitimate interest.[6] The opposition would deny affordable housing to such a councilmember's constituents and to the residents of the City as a whole and would achieve nothing.

Using the City's interpretation of the 2020 HUD Rule—which seems to disregard the 2020 HUD Rule's admonition against "non-substantial" justifications—a speculative interest could be argued by virtually every defendant in an FHA case. Under this interpretation, housing providers could justify denying housing to applicants with arrest records based on a purely speculative fear that tenants with an arrest record are more likely to commit future crimes.[7] Or municipalities could justify exclusionary zoning on the basis of speculative concerns about school overcrowding, increased traffic and crime, and decrease in property values.[8] These and other nearly limitless examples highlight how enabling speculative hypotheticals to be labeled as "legitimate" deprives the court of any mechanism for discerning pretextual and ad hoc excuses. If interpreted too broadly, this standard could become a toothless rational basis test creating the standard that as long as the defendant can offer a rationally related interest to the policy, it will be deemed valid, even if it results in a significant disparate impact.

---

[6] Opposing affordable housing because the lottery for it was equal-access and thus promoted residential integration more than a lottery with a preference policy, of course, is not a legitimate interest.

[7] This interpretation flies directly in the face of Supreme Court precedent and 2016 HUD guidance recognizing that "[b]ald assertions based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record are not sufficient to satisfy this burden." U.S. Dep't of Hous. & Urban Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions, 5 (Apr. 4, 2016); *see also Schware v. Bd. of Bar Examiners of the State of New Mexico*, 353 U.S. 232, 241 (1957) ("The mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct. An arrest shows nothing more than that someone probably suspected the person apprehended of an offense.").

[8] *Mhany Mgmt. Inc.*, 819 F.3d at 613 (affirming the district court's holding that Garden City residents' "concern about the possibility of affordable housing and the residents who might occupy it, [and] . . . mundane problems such as traffic and school overcrowding . . . were insufficiently weighty to justify a shift [in zoning policy] in the absence of discriminatory intent.").

17

### B.     The City's "Convincing-Itself" Justification.

New York City argues that its CP policy is necessary to appease its own councilmembers' opposition to affordable housing. *See* Def.'s Br. at 54. The City is essentially saying that, regardless of any disparate impact or perpetuation of segregation, the fact that officers of the City want a policy is enough to justify it. The City is holding to this position despite its own acknowledgment that it would not be in the interest of the City or its residents for councilmembers to oppose affordable housing development if the policy were repealed. This kind of justification is both unprecedented and, if accepted, would have devastating consequences on the ability of plaintiffs to bring successful disparate impact claims, including those against public entities.

The consequences of accepting a municipal entity's circular reasoning are breathtaking. Any branch of any government anywhere could hold action in the jurisdiction's interest hostage to the continuation of a discriminatory policy. Consequently, the protections of the FHA would take a back seat to the political convenience of elected officials. A law designed to eradicate residential segregation may not be subordinated in this way.

### IV.    The City's Proposed Standard of Proof for Perpetuation of Segregation Claims Is Contrary to Longstanding Precedent.

In addition to disparate impact, the Second Circuit has long recognized that the FHA prohibits "harm to the community generally by the perpetuation of segregation" as an independent means of liability. *Huntington Branch, NAACP*, 844 F.2d at 937. The 2013 HUD Rule formally acknowledged perpetuation-of-segregation claims, 2013 HUD Rule § 100.500(a), (specifying that discriminatory impact includes "perpetuat[ing] segregated housing patterns").

It is in this light that the City attempts to avoid liability based on perpetuation of segregation, arguing for changes in the traditional analysis that would effectively preclude any

successful perpetuation-of-segregation claims. First, the City uses the incorrect comparison in analyzing the segregative effects of the CP policy. Second, the City baselessly sets forth a requirement for use of the dissimilarity index that has no basis in case law or statistical methods. As explained herein, neither argument is sufficient.

### 1.    The City Relies on the Incorrect Comparator in Evaluating Their Policy's Impact on Segregation.

In the instant case, the CP policy of preferring "insiders" to "outsiders" stymies integrative efforts and perpetuates segregation. *See* Pls.' Reply Br. at 32. It is well established that the first step in making a prima facie case in a perpetuation of segregation claim is pointing to an "outwardly neutral" practice. *Mhany Mgmt. Inc.*, 819 F.3d at 617. This inquiry is relatively straightforward. *See, e.g.*, *id.* at 617; *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565 (2d Cir. 2003); *Ungar v. New York City Hous. Auth.*, 363 F. App'x 53, 55 (2d Cir. 2010). However, it is important insofar as it defines the scope of the inquiry.

Here, the "outwardly neutral" practice that Plaintiffs point to is the CP policy, applicable to 50 percent of units. Pls.' Br. at 2. The existence of this policy is undisputed, and all subsequent analysis should stem from this fact. But the City deliberately misconstrues the policy in question, broadening it to include the underlying affordable housing lottery of which the CP policy is a part. In doing so, the City makes the misleading claim that the policy overall contributes to integration, and therefore cannot violate the FHA. Put in other words, the City's argument would allow a private or governmental actor to nest purposefully an integration-stymieing policy within a broader policy, such that the broader policy still had some pro-integrative effect.[9] This nonsensical approach, if taken to its logical limits, would undermine the

---

[9] It is important to note that the greater level of integration that would result from an equal-access lottery is not something that is being imposed on participants in the lottery, but rather flows from *the application choices that lottery applicants who are outsiders have themselves made.*

FHA's purpose and slow integrative efforts to a glacial pace. A defendant cannot simply redefine the policy in question as a means of avoiding liability. Such a precedent would enable bad actors to justify any number of forms of discrimination, as they continually lowered the bar by which their policies should be measured.

The *Comer* and *Langlois* decisions further illustrate the point. If the City's position were accepted, a public housing authority in a predominantly white suburban area could argue that its policy of operating the Housing Choice Voucher program fosters integration, even if the entity maintains a residency preference. After all, if the entity ceased to administer vouchers altogether, there would be even fewer housing opportunities for Black and Latinx households within their jurisdiction. This absurd result is manifestly contrary to Second Circuit case law and should not be countenanced here.

### 2.    The City Incorrectly Relies on the Dissimilarity Index.

The City asks this Court to disregard the myriad metrics that demonstrate the CP policy's harm, in favor of the dissimilarity index, a test that housing experts consider irrelevant to testing for a policy's perpetuation of segregation and regarding the application of which the City cannot provide examples. The City claims that the dissimilarity index is key in determining whether perpetuation of segregation has occurred, despite the fact that the seminal Second Circuit cases finding perpetuation of segregation used no such tool. *See, e.g.*, *Mhany Mgmt. Inc.*, 819 F.3d at 617 (finding disparate impact without evaluating dissimilarity index); *Huntington Branch, NAACP*, 844 F.2d at 929–31, 937–38 (finding perpetuation of segregation without using dissimilarity index). The City's cherry-picking of statistical analyses, in addition to being entirely devoid of basis in the case law, also lacks support in sound statistics. Relying on this metric, which is extremely insensitive to micro-level changes in integration, would effectively

immunize all forms of segregation that occurred on a small-to-medium scale or that had their effect over an extended period of time. Only policies impacting the City as a whole would be sufficient to move the needle and prove discrimination.

## V.   The City Advances an Incorrect Standard for Evaluating Intent at the Summary Judgment Stage.

Lastly, the City attempts to rewrite even the most well-established standards of review. In determining if a party is entitled to summary judgment, a court will "resolve all ambiguities and draw all reasonable inferences in favor of the [nonmoving] party." *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999). In the fair housing context, this is an especially crucial standard, as it is often difficult to prove discriminatory intent prior to discovery. Indeed, it is why the Supreme Court held that "[d]etermining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Court went on to describe a number of forms of circumstantial evidence that could be sufficient to demonstrate discriminatory intent at the summary judgment stage, including "historical background," "specific sequence of events leading up to the challenged decision," departures from the normal procedural and substantive factors, and legislative or administrative history. *Id.* at 266–67.[10]

Here, the City seeks summary judgment on the intentional discrimination claim. Thus, all inferences from the evidence related to the City's intent must be resolved in favor of Plaintiffs. The Plaintiffs have offered more than enough circumstantial evidence of discriminatory intent

---

[10] The City claims that the Plaintiffs' proffered evidence did not fit into the categories established in *Arlington Heights*. In addition to being patently false, this is an improperly restrictive reading of *Arlington Heights*, which explicitly says that the categories of evidence listed were "without purporting to be exhaustive." *Arlington Heights*, 429 U.S. at 268.

that falls clearly within the types of acceptable evidence, as outlined by the Supreme Court in *Arlington Heights*, 429 U.S. at 266. The City seemingly interprets the categories outlined in *Arlington Heights* as a stringent obstacle to overcome, rather than an expansion of the types of evidence that might indicate discriminatory intent. In doing so, the City conflates what is required of plaintiffs to make a prima facie showing with what is required to survive a motion for summary judgment. The City attempts to nitpick at factual discrepancies between the parties, failing to realize that in doing so, it confirms the existence of genuine issues of material fact. The City's heightened standard, if accepted, would preclude parties from successfully pleading disparate treatment claims, absent the most egregious forms of discrimination—which even the worst actors in real estate have learned are key to avoiding litigation.

Particularly salient, and clearly demonstrating the existence of triable issues of fact, are Plaintiffs' allegations that the City has engaged in intentional discrimination because it has acted in a manner that is knowingly responsive to individuals motivated by discriminatory intent. Pls.' Reply Br. at 73 (citing *Mhany Mgmt, Inc.*, 819 F.3d at 606). Second Circuit case law clearly illustrates both the importance of this method of proving intentional discrimination and the long history of racially motivated opposition to affordable housing development in predominantly white areas in the broader region. *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1192 (2d Cir. 1987) (involving a City Council meeting concerning housing development with a "predominantly white audience" where "emotionally charged" discussion frequently referenced the effect that subsidized housing would have on the neighborhood's character and where the final speaker "stated that the Bronx had been ruined when [B]lacks moved there and that he supported the condominium proposal because he did not want the same thing to happen in Yonkers."). New York City itself is no stranger to this phenomenon. *See* Walter Goodman, *The*

*Battle of Forest Hills–Who's Ahead*, The N.Y. Times (Feb. 20, 1972), https://www.nytimes.com/

1972/02/20/archives/the-battle-of-forest-hills-whos-ahead-battle-of-forest-hills.html (describing

opposition to public housing development in predominantly white neighborhoods in the 1970s).

Between the strength of Plaintiffs' evidence that the City has been knowingly responsive to

individuals motivated by intentional discrimination in the adoption and maintenance of its policy

and the litany of evidence Plaintiffs have for each element of the *Arlington Heights* test,

Plaintiffs have clearly made out a triable intentional discrimination claim.

## CONCLUSION

For the foregoing reasons, *amicus curiae* respectfully supports Plaintiffs' Motion for

Partial Summary Judgment on the grounds that the community preference policy causes an

unjustified disparate impact and perpetuation of segregation and opposes Defendant's Motion for

Summary Judgment.

Dated:  January 5, 2021

/s/  *Daniel I. Wolf*
Daniel I. Wolf (DW1975)
Brandon A. Levey
Christian S.C. Carey
Janet Sanchez
Gilbert LLP
700 Pennsylvania Avenue SE, Suite 400
Washington, DC 20003
(202) 772-2428
wolfd@gilbertlegal.com

*Counsel for Amicus Curiae*
*Lawyers' Committee for Civil Rights Under Law*

Thomas Silverstein
Lawyers' Committee for Civil Rights Under
Law
1500 K Street NW, Suite 900
Washington, DC 20005
(202) 662-8316