UNITED STATES DISTRICT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- x

SHAUNA NOEL, and EMMANUELLA SENAT,

                                                         Plaintiffs,

                                                                      15 CV 5236 (LTS) (KHP)

                              -against-

CITY OF NEW YORK,

                                                         Defendant.

------------------------------------------------------------------------- x


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**


                                        JAMES E. JOHNSON
                                        Corporation Counsel of
                                        the City of New York
                                        Attorney for Defendant
                                        100 Church Street
                                        New York, New York
                                        10007 (212) 356-4371


SHERYL R. NEUFELD,
MELANIE V. SADOK,
FRANCES POLIFIONE,
GATI DALAL,
              Of Counsel.


February 11, 2021

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. 1

PRELIMINARY STATEMENT ........................................................................ 1

ARGUMENT

    POINT I

        PLAINTIFFS CANNOT ESTABLISH INTENTIONAL DISCRIMINATION ....................................... 8

        A.  Preliminary Matters ........................................................... 11

        B.  Knowledge of Race-Based Resistance to Residential Racial Change is Not "Knowing Responsiveness" ................................................ 12

        C.  "Political Sensitivity" Around Desegregation is Not Evidence of Intentional Discrimination ..................... 17

        D.  The City Did Not Depart from Its Normal Decision Making ................................................................. 18

        E.  Other Policies are not Evidence of Intent ......................... 19

        F.  There is No Evidence of Pretext or Consciousness of Guilt ............................................... 21

    POINT II

        THE CP POLICY DOES NOT HAVE A DISPARATE IMPACT ................................................... 24

        A.  Dr. Beveridge's Analysis Based Upon His Race-Based "CD typologies" is Contrary to the Law ............................................................................... 25

            (a)  CD Typologies Have No Nexus to the CP policy ............................................................ 25

            (b)  Using CD Typologies Does not Reflect Applicants' Preferences ........................................ 26

            (c)  Units are Fungible and thus There is No Basis for CD typologies ........................................ 27

i

**Page**

       (d)    Plaintiffs' Reliance Upon *Comer* and *Langlois* Fails........................................................28

B.    Plaintiffs' Analysis Fails to Show an Impact on a Protected Class ............................................. 29

C.    Plaintiffs' Comparison of CP beneficiaries with non-CP Beneficiaries Does Not Assess the Impact of the CP Policy ...................................... 32

D.    Plaintiffs Analyze the Incorrect Lottery Stages ................................ 34

E.    Plaintiffs' Statistical Significance Tests Must be Disregarded ...................................................... 35

F.    Plaintiffs Fail to Demonstrate Robust Causation............................. 36

G.    Disparate Impact Analysis Done Properly ....................................... 37

POINT III

THE LOTTERY WITH THE CP POLICY INTEGRATES AND DOES NOT PERPETUATE SEGREGATION.................................................. 44

A.    Integrating Less is Not Perpetuating Segregation ......................................................... 45

B.    The Dissimilarity Index is the Proper Measure and Plaintiffs' Alternative Approaches are Improper ........................................................... 48

       (a)    The Dissimilarity Index is an Appropriate Measure of Integration........................49

       (b)    Plaintiffs' Alternative "Measures" are Improper......................................................51

       (c)    Dr. Beveridge's Calculation of His Ratios is Incorrect ....................................52

C.    Dr. Beveridge's New Attack on the Simulation is Meritless......................................................... 53

POINT IV

**Page**

THE CP POLICY IS NECESSARY TO ACHIEVE
VALID INTERESTS .................................................................. 54

A.  The City's Interests are Not Speculative and the
Evidentiary Standard Plaintiffs Seek to Impose
is Unsupported by the Law ................................................ 55

B.  Preventing Neighborhood Displacement is a
Substantial Interest .......................................................... 59

C.  Responding to a Legitimate Concern During
the Legislative Process is Not "Enhancing
Political Convenience" .................................................... 63

POINT V

THERE ARE NO LESS DISCRIMINATORY
ALTERNATIVES .................................................................. 65

CONCLUSION ................................................................................ 68

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AD/SAT v. Associated Press,*
    885 F Supp. 511 (S.D.N.Y. 1995) ........................................................16

*Bennett v. Health Mgt. Sys., Inc.,*
    92 A.D.3d 29 (1st Dep't 2011) ...........................................................22

*Berk v. St. Vincent's Hosp. & Med. Ctr.,*
    380 F Supp. 2d 334 (S.D.N.Y. 2005).................................................16

*Brown v. Crowdtwist,*
    2014 U.S. Dist. LEXIS 52067 (S.D.N.Y. Apr. 15, 2014)....................22

*Bryan v. Koch,*
    627 F.2d 612 (2d Cir. 1980)................................................................66

*Cadet-Legros v. N.Y. Univ. Hosp. Ctr.,*
    135 A.D.3d 196 (1st Dep't 2015) .......................................................11

*Cartier v Lussier,*
    955 F.2d 841 (2d Cir. 1992)................................................................23

*Churches United for Fair Hous., Inc. v. De Blasio,*
    180 A.D.3d 549 (1st Dep't 2020) .......................................................19

*Congregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona,*
    N.Y., 945 F.3d 83 (2d Cir. 2019)...................................................13, 16

*Connecticut v. Teal,*
    457 U.S. 440 (1982).......................................................................38, 39

*Crigger v. Fahnestock & Co.,*
    2005 U.S. Dist. LEXIS 6382 (S.D.N.Y. Apr. 13, 2005).....................39

*Davis v. NYCHA,*
    60 F. Supp. 2d 220 (S.D.N.Y 1999)...............................................45, 46

*Eastway Constr. Corp. v. New York,*
    762 F.2d 243 (2d Cir. 1985)...........................................................20, 23

*Farley v. Davis,*
    1994 U.S. Dist. LEXIS 5589 (S.D.N.Y. Apr. 29, 1994)......16, 46, 48, 60

**Cases**                                                                    **Pages**

*Ferrill v. Parker Group, Inc.*,
   168 F3d 468 (11th Cir. 1999) ...................................................................11

*Gallagher v. St. Paul*
   619 F.3d 823 (8th Circuit 2010) .............................................................16

*Gilmore v. Montgomery*,
   417 U.S 556 (1974)..................................................................................48

*Goodman v. Lukens Steel Co.*,
   482 U.S. 656 (1987)................................................................................11

*Grewcock v Yale-New Haven Health Servs. Corp.*,
   2018 US Dist LEXIS 34850 (D Conn Mar. 4, 2018)...............................17

*Hollander v. American Cyanamid Co.*,
   172 F.3d 192 (2d. Cir. 1999)..............................................................27, 28

*Huntington Branch NAACP v. Town of Huntington*,
   844 F.2d 926 (2d Cir.)*, aff'd*, 488 U.S. 15 (1988) ...........................48, 55

*Massachusetts Fair Hous. Ctr. v. U.S. HUD*,
   2020 U.S. Dist. LEXIS 205633 (D. Mass. Oct. 25, 2020).......................8

*McLaughlin v. Diamond State Port Corp.*,
   2004 U.S. Dist. LEXIS 26351 (D. Del. Dec. 30, 2004)..........................17

*Meredith Corp. v. Sesac, LLC*,
   1 F Supp. 3d 180 (S.D.N.Y. 2014) .........................................................12

*MHANY Mgt. v. County of Nassau*,
   819 F.3d 581 (2d Cir. 2016)............................................................ *passim*

*Mhany Mgt. v Inc. Vil. of Garden City & Garden City Bd. of Trustees*,
   985 F Supp 2d 390 (EDNY 2013) ..........................................................17

*In re Motel 6 Secs. Litig.*,
   161 F. Supp. 2d 227 (S.D.N.Y. 2001).......................................................7

*Nippo Corp./International Bridge Corp. v. Amec Earth & Envtl.*,
   2011 U.S. Dist. LEXIS 34994 (E.D. Pa. Mar. 30, 2011).........................7

*Point Prods. A.G. v. Sony Music Entertainment, Inc.*,
   2004 U.S. Dist. LEXIS 2676 (S.D.N.Y. Feb. 20, 2004)...........................6

**Cases**                                                                  **Pages**

*Richardson v. City of N.Y.*,
 2020 U.S. Dist. LEXIS 181491 (S.D.N.Y. Aug. 24, 2020) ....................................16

*Rose v. City of Utica*,
 2018 U.S. Dist. LEXIS 220803 (N.D.N.Y. Apr. 19, 2018) ....................................6

*Smith v. Xerox Corp.*,
 196 F.3d 358 (2d. Cir. 1999), *overruled on unrelated grounds by Meacham v.*
 *Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006) ................................ *passim*

*Tex. Dep't of Hous. & Cmty. Affiairs v. Inclusive Cmtys. Project*,
 135 S. Ct. 2507 (2015) ..........................................................................4, 48, 62, 66

*Trustees of the Local 8A-28A Welfare Fund v. Am. Group Adm'rs*,
 2017 U.S. Dist. LEXIS 137365 (E.D.N.Y. Aug. 25, 2017) ..................................12

*U.S. v. City of N.Y.*,
 637 F Supp. 2d 77 (E.D.N.Y. 2009) ........................................................................6

*United States v. Yonkers Board of Education*,
 837 F.2d 1181 (2d Cir. 1987), *cert. denied*, 486 U.S. 1055 (1988) ............................13, 14, 20

*Valenti v. Penn Mut. Life Ins. Co.*,
 850 F Supp. 2d 445 (S.D.N.Y. 2012) .................................................................15, 22

*Vaughn v. Empire City Casino*,
 2017 U.S. Dist. LEXIS 109742 (S.D.N.Y. July 14, 2017) ....................................12

*Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*,
 429 U.S. 252 (1977) ............................................................................................15, 20

*Wal-mart Stores v. Duke*,
 564 U.S. 338 (2011) ...............................................................................................27

*Weiss v. La Suisse*,
 141 F App'x 31 (2d Cir. 2005) ................................................................................11

**Statutes**

42 U.S.C. § 1981 .......................................................................................................11

42 U.S.C. § 3604(a) ..................................................................................................30

Code § 8-107(17)(a)(2) .............................................................................................66

Fair Housing Act .........................................................................................................7

**Cases**                                                              **Pages**

**Other Authorities**

24 C.F.R. § 100.500 (2013) ...................................................................................7

F.R.C.P. 26(2)(B) and (D) ....................................................................................41

7 Moore's Federal Practice § 37.60(1) (2000).....................................................7

N.Y.C. Admin. Code § 8-107(17)(a)(1) ...............................................................30

N.Y.C. Admin. Code § 8-107(17)(b)......................................................................37

Rule 26 ...................................................................................................................7

Rule 37 ...................................................................................................................7

Rule 408 ...............................................................................................................39

## PRELIMINARY STATEMENT

New York City is aggressively and actively promoting the preservation and development of affordable housing across the city through financing, passing legislation to mandate it with private investment, and successfully lobbying to expand the availability of tax credits earned through the development of affordable housing all throughout the city. *See* Declaration of Vicki Been, dated August 14, 2020 ("Been Dec.") (ECF 899) at ¶¶ 25-27. The City has financed the construction or rehabilitation and preservation of hundreds of thousands of affordable housing units since the 1980s. *See* Been Dec. at ¶¶ 22, 24. The City's continued investment in the preservation and development of affordable housing is just one crucial part of the many steps the City has taken to make New York City a more just and equitable place to live for all New Yorkers.

In addition to aggressively subsidizing and mandating affordable housing development, the City is working to address barriers to fair housing. In its Where We Live NYC ("WWL") Report, the City set forth concrete steps it will take toward that goal. *See* Declaration of Frances Polifione, dated February 11, 2021 ("Polifione Reply. Dec.") Ex 58 (WWL Report). The Community Preference policy ("CP policy"), which prevents the displacement of low-income New Yorkers from their communities and helps address their fear of displacement when new development comes to their neighborhood is a small, but essential component of those steps.

Plaintiffs' (and *amicus curiae's*)[1] attempt to impose the paradigm of the typical fair housing case onto this case is like trying to squeeze a square peg into a round hole; it simply does not work. Unlike the situation in most fair housing cases, the City has subsidized or

---

[1] This brief is also in response to the brief filed by *amicus curiae*, the Lawyers' Committee for Civil Rights Under the Law (ECF 935).

supported hundreds of thousands of affordable homes (financing enough affordable housing just in the past 7 years to house more than 400,000 people, for example), and that housing is distributed all across the City, in areas that were predominantly white as well as areas with many Black and Brown residents. Of the projects studied for this case, 2,031 units were located in Dr. Beveridge's majority White CD typology, while almost the same number – 2,308 - were located in majority Black CD typologies. Further, a total of 798 units were located in plurality White CD typologies while 274 were located in plurality Black CD typologies. Black and Hispanic New Yorkers disproportionately occupy the City's affordable housing, even in majority White neighborhoods. *See* Reply Declaration of Bernard R. Siskin, PhD., dated February 10, 2021 ("Siskin Reply") ¶ 95.

Another key distinction between this case and the typical fair housing case is that much of the opposition to affordable housing in New York City comes from Black and Brown communities. The opposition from these communities "is not about race-based exclusion of others for the purpose of hoarding resources or protecting advantages" (see Declaration of Edward G. Goetz, dated August 14, 2020, ("Goetz Aug. Dec.") (ECF 898) at ¶ 79), but is from a fear of displacement that cannot be understood outside the context of a history of displacement of Black and Brown communities. *See* Goetz Aug. Dec. at ¶ 73. Consequently, as the factual backdrop of this case is wholly different than the typical fair housing case, Plaintiffs' and *amicus curiae's* attempt to frame this case as analogous is misplaced.

The City is entitled to summary judgment on each and every claim. Nothing in Plaintiffs' 95-page reply and opposition brief ("Pls. Reply") or the supporting declarations creates an issue of fact that precludes granting summary judgment to the City. Contrary to Plaintiffs' assertion,

and although the inferences of the evidence must be made in favor of the non-movant,[2] summary judgment can and should be granted to the City on Plaintiffs' intentional discrimination claim. Evidentiary inferences must be reasonable, and the inferences Plaintiffs seek to have this court make are not. Rather, Plaintiffs argue their case by ignoring the evidence (or data) before them, manipulating the evidence in a self-serving way, attempting to pit their priorities against the City's (when no such conflict exists), and making bald declarations of their "truth." Significantly, Plaintiffs' purported evidence of intentional discrimination fails to demonstrate that the CP policy is responsive to invidious opposition to affordable housing and animus toward Black and Hispanic New Yorkers, and therefore fails as a matter of law.

Summary judgment can and should also be granted to the City on Plaintiffs' disparate impact and perpetuation of segregation claims. Plaintiffs' disparate impact analysis is fundamentally flawed in that it fails to conclude that Black or Hispanic affordable housing applicants are disparately impacted in their ability to compete fairly for housing, as alleged in the Second Amended Complaint ("SAC" or "complaint"). Instead, Plaintiffs pursue their case on behalf of fluid subgroups of the protected class, finding that some Black and some Hispanic applicants are disparately impacted depending on (1) their CP status (CP beneficiary or non-CP beneficiary), (2) the racial demographics of where they apply, and (3) the stage of the application process, while also finding that other Black and Hispanic applicants are not disparately impacted. Not only is such approach unsupported by the law, it is undisputed that this is the result of Dr. Beveridge's "CD typologies" and CP status methodology.

Dr. Beveridge's improper methodology and analytical framework leads to outrageous results. For instance, according to Plaintiffs' analytical approach, a Black applicant who is not a

---

[2] Plaintiffs did not move for summary judgment on their intentional discrimination claim.

CP beneficiary may be injured and part of the protected class when applying to a project in a majority Hispanic CD typology but not when applying to a project in a majority Black CD typology, simply because she is the same race as the "dominant" race of the CD typology. Yet, Plaintiffs somehow conclude that it is the CP policy which has caused this purported injury, even though the applicant is subject to the "disadvantage" of being a non-CP beneficiary for both applications. Moreover, Plaintiffs' own disjointed, manipulated analysis results in a finding that 61.20 % of apparently eligible applicants are not disparately impacted by the CP policy. *See* Declaration of Bernard R. Siskin, Ph.D., dated August 13, 2020 ("Siskin Aug. Dec.") (ECF 897) Table 1. Plaintiffs do not dispute these numbers. *See* Reply Declaration of Andrew A. Beveridge, dated October 29, 2020 ("Bev. Reply") (ECF 914) ¶¶ 71-72.

As to Plaintiffs' claims of perpetuation of segregation, Plaintiffs have presented no case law to support their proposition that reducing the amount of potential integration constitutes perpetuation of segregation and, thus, the City is likewise entitled to summary judgment dismissing this claim. It is undisputed that the lottery with the CP policy has an integrative effect, and that both CP beneficiaries' and non-CP beneficiaries' moves, as a result of being awarded an affordable housing unit through the lottery, are net integrative. While it is true that the lottery would be trivially more integrative without the CP policy, as a matter of law this fact does not dictate a finding of perpetuation of segregation. Moreover, such a definition of "perpetuating segregation" would require governmental decision-making to focus first and foremost on promoting the maximum amount of integration at the expense of other critical policies.  That flies in the face of the Supreme Court's warning that "[t]he FHA is not an instrument to force housing authorities to reorder their priorities." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project,* 135 S. Ct. 2507, 2522 (2015) ("*Inclusive Communities*").

Even if achieving less than the maximum possible integration could constitute "perpetuation of segregation," the amount of "less integration" the CP policy causes is trivial, and thus not legally significant. Plaintiffs' efforts to demonstrate that the CP policy significantly perpetuates segregation are strained beyond the breaking point. Plaintiffs' expert undertook no independent perpetuation of segregation analysis, accepted Dr. Siskin's findings, but then recast those findings in a misleading and exaggerated manner.

Plaintiffs spend a significant amount of time attacking the City's disparate impact and perpetuation of segregation analyses, mostly with name calling and mischaracterizations. However, they seem to forget that they moved for summary judgment on these claims (ECF 892), and that it is their burden of proof to establish a *prima facie* case. This Court can find that Plaintiffs failed to meet their burden without even considering whether the City's analyses were proper. Nevertheless, the City offered a proper disparate impact and perpetuation of segregation analysis as a means to better demonstrate the flaws in Plaintiffs' analyses, and to give the Court assurances that when done properly, the analysis shows that the CP policy does not in fact cause a disparate impact or perpetuate segregation. Indeed, according to Dr. Siskin's analysis, Black apparently eligible applicants' consideration rate is 97.97% of the consideration rate of White apparently eligible applicants, *see* Siskin Aug. Dec. Table 3, and if the CP policy were not in place, only 141 (or 3.9%) more awards would have gone to Black applicants. *See* Siskin Aug. Dec. Table 4. And, as noted above, even with the CP policy in place, the lottery has an integrative effect. In fact, it is undisputed that even in Dr. Beveridge's majority White CD typology, the demographics of those that reside in lottery housing is much more diverse than the demographics of those living in the neighborhood around the housing. *See* Siskin Aug. Dec. ¶ 147.

Plaintiffs' ever-expanding analysis and briefing at each stage of the summary judgment process reflects their desperation to overcome these undisputed facts.[3] As noted in the City's August 14, 2020 brief ("initial brief" or "City's Aug. Brief") (ECF 902) at 33 and 49, Plaintiffs' expert Dr. Beveridge presented a significant amount of analysis never disclosed during expert discovery.[4] In his reply declaration, Dr. Beveridge has yet again introduced more new analysis, also never disclosed during expert discovery.[5] In addition to this new analysis, Dr. Beveridge attacked the City's use of the simulation for the first time, alleging that the simulation results are "diluted." These new analyses, arguments, and the conclusions drawn from them are not admissible and should be struck from the record. *See* Federal Rules of Civil Procedure ("F.R.C.P.")26(a)(2)(B) and (D) and 37(c)(1)*; Point Prods. A.G. v. Sony Music Entertainment, Inc.*, 2004 U.S. Dist. LEXIS 2676, at *32 (S.D.N.Y. Feb. 20, 2004) (finding that expert affidavits that contain new analysis and opinions that are submitted after the close of discovery would "eviscerate the purpose of the expert disclosure rules."); *U.S. v. City of N.Y.,* 637 F Supp. 2d 77, 107-108 (E.D.N.Y. 2009) (finding that when City's expert presented new opinions at summary judgment stage, plaintiffs would have been prejudiced to respond at that stage of the litigation and thus the expert opinions were excluded.); *Rose v. City of Utica*, 2018 U.S. Dist. LEXIS 220803, at *25-26 (N.D.N.Y. Apr. 19, 2018) (finding that plaintiffs' expert's new opinions presented for the first time in opposition to a motion for summary judgment were improper and

---

[3] A list of the new analyses and opinions presented during the summary judgment briefing and which should be struck from the record is set forth as Exhibit 64 to the Polifone Reply Dec. There is no reason Dr. Beveridge could not have undertaken this analysis or expressed these opinions during expert discovery. Other than in one instance, as discussed in footnote 45, *infra*, Dr. Beveridge does not even attempt to justify his new analysis. Dr. Beveridge's expert disclosures, which do not contain the analyses or opinions set forth in Ex. 64, are annexed to the Declaration of Frances Polifine, dated August 14, 2020, ("Polifine Aug. Dec.") (ECF 903 and 905) as Exs. 46-48.

[4] Notably, Plaintiffs do not dispute this, as they cannot.

[5] In fact, eight of the ten tables in his reply Declaration contain analysis findings that were not previously disclosed. Clearly acknowledging that they undertook new analysis, Plaintiffs produced the back up programs for this new analysis, as had been exchanged by the parties during expert discovery.

excluded.); *In re Motel 6 Secs. Litig.*, 161 F. Supp. 2d 227, 243 (S.D.N.Y. 2001) (holding that "Rule 37 mandates that a party is precluded from using evidence which was not properly disclosed during discovery"*); Nippo Corp./International Bridge Corp. v. Amec Earth & Envtl.*, 2011 U.S. Dist. LEXIS 34994, at *16-18 (E.D. Pa. Mar. 30, 2011) (striking opinions that were not disclosed during expert discovery); 7 Moore's Federal Practice § 37.60(1) (2000) (explaining the preclusion sanction and the incentives and need for full disclosure under Rule 26). Nevertheless, the City addressed the new material in its initial brief, and also addresses it herein.

The City is entitled to summary judgment dismissing the disparate impact and perpetuation of segregation claims because Plaintiffs have failed to meet their burden to establish a *prima facie* case.  But even if the Court found an issue of fact with regard to one or both claims, the City is entitled to summary judgment because the CP policy is necessary to achieving legitimate governmental interests, namely preventing displacement of low-income residents from their neighborhoods and addressing their fear of displacement. Plaintiffs' unsupported arguments about the legitimacy of the City's interests blatantly disregard the ample evidence the City presented to the Court. Plaintiffs try to create a false choice between addressing displacement and prioritizing other goals. The City can and does address multiple priorities at once. Having other policy priorities does not reduce the substantiality of the City's interest in preventing displacement and overcoming the fear of displacement from one's neighborhood.

Moreover, Plaintiffs still fail to present case law to support the evidentiary standard they seek to impose, as there is none. Instead, Plaintiffs spend a significant amount of time briefing why the 2020 HUD disparate impact rule[6] should not be applied in this case. Yet, the validity of

---

[6] In 2013, HUD issued a rule setting forth the standard and burden shifting for a disparate impact claim under the Fair Housing Act. *See* 24 C.F.R. § 100.500 (2013) annexed as Ex. 1 to the Oct. 29, 2020 Gurian Dec. In 2020, HUD repealed that rule and passed a new disparate impact rule. *See* 24 C.F.R. § 100.500 (2020). Implementation of the

the 2020 HUD rule is not before this Court. Contrary to Plaintiffs' assertions, the City did not argue that the new HUD rule is the applicable law.[7] The City's arguments are grounded in the case law, whereas Plaintiffs' are not.

Finally, Plaintiffs have failed to meet their burden to establish that there are less discriminatory alternatives that meet the City's interests. Plaintiffs present no evidence that any of their proposals are less discriminatory, let alone how much less discriminatory. Nor do any of the alternatives they propose address the City's interests for having the CP policy whatsoever, and even are based upon delegitimizing those interests. Consequently, as Plaintiffs have failed to meet this burden of proof as a matter of law, even if the Court were to find a question of fact on the first prong of the disparate impact or perpetuation of segregation analysis, the City is nonetheless entitled to summary judgment dismissing all the claims asserted in the SAC.

**ARGUMENT**

**POINT I**

**PLAINTIFFS CANNOT ESTABLISH INTENTIONAL DISCRIMINATION**

Plaintiffs' arguments and "evidence" in support of their intentional discrimination claim ignore the context of the City's programs and policies to provide affordable housing in safe, thriving neighborhoods across the City, to ensure equal access to quality housing and neighborhood amenities to all, and to prevent displacement and housing instability for the most vulnerable New Yorkers. The evidence of those programs and policies show that the City has consistently worked toward creating a more equitable and just city. *See* Polifione Reply. Dec. Ex

---

new HUD rule has been stayed. *See Massachusetts Fair Hous. Ctr. v. U.S. HUD*, 2020 U.S. Dist. LEXIS 205633 (D. Mass. Oct. 25, 2020).

[7] In fact, the entire issue may soon become moot as the Biden administration directed HUD to reassess its 2020 disparate impact rule. *See*  (last accessed February 10, 2021).

8

58 (WWL Report), Ex 62 (Housing New York ("HNY")), Ex 63 (HNY 2.0), Ex 59 (HNY Three

Years of Progress Report); *see also*, Polifone Aug. Dec. at ¶¶ 64-65.

Indeed, Plaintiffs fail to address, or even acknowledge, the City's extensive and

aggressive efforts to preserve and build new affordable housing throughout the city. In addition

to providing financial subsidies and leveraging City-owned property for the development of

affordable housing, the City has programs in place to incentivize and mandate private investment

in affordable housing, including in high-cost, amenity rich neighborhoods. *See* Been Dec. at ¶¶

17, 25-26. Despite the hundreds of documents produced during discovery about this

administration's ground-breaking legislative reform mandating the development of affordable

housing (Mandatory Inclusionary Housing or "MIH"), Plaintiffs' papers fail to mention this or

any of the other components of the City's housing plan, which has successfully resulted in the

preservation of 120,852 and the construction of 57,119 affordable housing units as of December

31, 2020.[8]

Further, Plaintiffs' fail to discuss or acknowledge the WWL process and reports, except

in those circumstances in which they believe it is helpful to them. WWL was a voluntary, 24-

month-long process that resulted in a final report setting forth the City's comprehensive

assessment of the inequities that continue to be a legacy of past discrimination and segregation,

and its specific strategies for overcoming those inequities.[9] Through this process, the City

---

[8] See https://www1.nyc.gov/site/housing/action/by-the-numbers.page (last accessed February 9, 2021). In addition to
MIH, the City has had a voluntary inclusionary housing program in place since the Bloomberg administration,
incentivizing developers to build affordable housing in high-cost areas. Similarly, the City has successfully lobbied
the State to expand its tax credit program which incentivizes the private development of affordable housing in
conjunction with luxury housing. For a more complete explanation of the City's housing initiatives please see Been
Dec. at ¶¶ 12, 25 -26.

[9] WWL began as part of the City's compliance with the HUD requirement to undertake an Assessment of Fair
Housing. However, prior to the Spring 2018 public launch of the WWL process, the Trump administration
suspended the requirement. The City chose to proceed with the WWL process.

engaged thousands of New Yorkers through activities such as stakeholder meetings, focus groups in 15 languages, multi-media displays in public spaces, public hearings, and solicitation of feedback through HPD's website, in order to identify and address ongoing and complex barriers to fair housing. *See* Been Dec. at ¶ 29. This process included directly addressing the history of segregation, identifying barriers to integration, and defining what an integrated community means to New Yorkers. It tackled tough questions about fair housing, taking a holistic approach by considering the many dimensions to fair housing beyond actual housing, such as access to transportation, environmental health, schools, crime, and open space. See Polifone Reply Dec. Ex 58 (WWL Report) and Ex 61 (WWL Community Conversations).

Plaintiffs' argument that the CP policy could maintain the racial "status quo" is nonsensical. The CP policy only applies to 50% of the affordable housing units in affordable housing projects, thus, the other 50% of the units will be filled by applicants from anywhere in the city. Further, units awarded through the CP policy are not subject to the CP policy upon re-rental. *See* Been Dec. at ¶ 63. Even if all the CP units in a project were to go to the majority race in the area where the project was built, which the analysis demonstrates is not the case, the impact that would have on the racial demographics of the neighborhood would be *de minimis* and temporary. Further, the racial demographics of many New York City neighborhoods have changed significantly in the past thirty years. *See* Reply Declaration of Edward Goetz, dated February 10, 2021 ("Goetz Reply) ¶ 32. Consequently, the underlying premise of Plaintiffs' intentional discrimination case is unfounded.

Plaintiffs attempt to paint a picture of a City government that is afraid to address issues of race and segregation, to create an inference that the City is hiding its true discriminatory motive regarding the purpose of the CP policy. Plaintiffs' efforts are so strained, and the inferences they

make so unreasonable, that the City is entitled to summary judgment dismissing Plaintiffs' intentional discrimination claim.

## A.    Preliminary Matters

Two preliminary matters must be addressed before we turn to the specific issues. First, Plaintiffs are arguing that they can demonstrate intentional discrimination by merely showing that the challenged "action [is] premised on race," Pls. Reply at 73, and that they do not need to demonstrate animus. However, the three cases Plaintiffs rely upon, set forth in footnote 243 of their reply brief, are not FHA cases, but were brought pursuant to 42 U.S.C. Section 1981.[10] Section 1981 does not prohibit discrimination, as does the FHA, but prohibits specific conduct. The cases Plaintiffs rely upon clarify that discriminatory animus need not be established for a Section 1981 claim, but when it comes to the FHA, the Second Circuit has clearly articulated that one must make "a showing of animus..." *MHANY Mgt. v. County of Nassau*, 819 F.3d 581, 606, 611 (2d Cir. 2016). While Plaintiffs quote this same language, they are trying to get this Court to adopt a standard that is contrary to the Second Circuit's explicit holding.[11] *See* Pls. Reply at 73.

Second, Plaintiffs have improperly tried to expand their briefing by making their arguments about intentional discrimination in the appendix to their response to the City's 56.1 Statement. Instead of explaining why and how they believe their evidence shows intentional discrimination on the part of the City in their 95 page brief, they devote 33 pages in their 56.1 response appendix to arguments about why the evidence presented in the appendix proves intent

---

[10] *Goodman v. Lukens Steel Co.*, 482 U.S. 656 (1987); *Weiss v. La Suisse*, 141 F App'x 31 (2d Cir. 2005); *Ferrill v. Parker Group, Inc*., 168 F3d 468 (11th Cir. 1999).

[11] Plaintiffs' reliance upon *Cadet-Legros v. N.Y. Univ. Hosp. Ctr*., 135 A.D.3d 196 (1st Dep't 2015) is likewise misplaced. Although the HRL provides for a lesser standard on what a plaintiff must present in order to proceed with a pretext argument, the HRL still requires a plaintiff to present some evidence that the reason for the action is false, misleading or incomplete. As will be discussed below, Plaintiffs have failed to present even the bare bones of evidence to link any pretext to the reasons for the CP policy.

to discriminate. This is improper, as a response to a 56.1 Statement should not contain argument. *See Vaughn v. Empire City Casino*, 2017 U.S. Dist. LEXIS 109742, at *2, n 1 (S.D.N.Y. July 14, 2017) ("A 56.1 statement is not an opportunity to present arguments that do not fit in the briefing"); *Meredith Corp. v. Sesac, LLC*, 1 F Supp. 3d 180, 186, n 3 (S.D.N.Y. 2014) ("many of plaintiffs' responses [to the 56.1 Statement] consist of *improper argument* or recitations of different facts.") (emphasis added); *Trustees of the Local 8A-28A Welfare Fund v. Am. Group Adm'rs*, 2017 U.S. Dist. LEXIS 137365, at *11 (E.D.N.Y. Aug. 25, 2017) ("The Court disregards any legal arguments in the 56.1 Statements; such arguments should be limited to the memoranda of law."). Thus, any argument contained in Plaintiffs' response to the City's 56.1 Statement or in the appendix to the response should be disregarded by the Court,[12] and has not been directly addressed by the City.[13]

## B.   Knowledge of Race-Based Resistance to Residential Racial Change is Not "Knowing Responsiveness"

Plaintiffs attempt to demonstrate intentional discrimination by arguing that the city knowingly responded to race-based opposition to affordable housing through the CP policy. Plaintiffs apparently are disputing that the CP policy is responsive to opposition stemming from the fear of displacement, and asserting that it is in actuality in response to race-based opposition. Plaintiffs desperately search for evidence to support that theory, but find none.

Plaintiffs first argue that the City was and is aware of "extensive" race-based resistance to integration among New Yorkers. Pls. Reply at 75. The City has never denied that some opposition to the development of affordable housing may be race-based, but has disagreed about

---

[12] Nor should Plaintiffs be permitted to incorporate such argument into their sur-reply memorandum of law. That would be highly prejudicial to the City as it would not have the opportunity to respond to such arguments.

[13] The City only responded to arguments that were set forth in the brief.

the extent of such opposition and whether specific instances of opposition were in fact race-based.[14] But awareness that some opposition to affordable housing may be race-based is not proof that the City intended to discriminate by adopting the CP policy. *See* C*ongregation Rabbinical College of Tartikov, Inc. v. Vill. of Pomona*, N.Y., 945 F.3d 83, 116 (2d Cir. 2019) ("municipalities may resist development pressures for legitimate reasons unrelated to discriminatory animus.").

Instead, Plaintiffs' evidence must demonstrate that the City has been *knowingly responsive* to race-based resistance through the CP policy. *See MHANY* 819 F.3d at 606, 611-612 (concluding that the correct standard was whether "City officials knowingly acquiesced to race-based citizen opposition."). Plaintiffs have no such evidence. Indeed, it is telling that almost all of the documents Plaintiffs rely upon as proof that the City was aware of race-based opposition, contain no mention of the CP policy whatsoever.[15]

Plaintiffs point to a single document, created by a community organization and not the City, that connected the desire to maintain a Latino identity with the CP policy. Plaintiffs fail to share the testimony about what occurred when the City became aware of the misrepresentation by the community organization—namely that the City required that the flyer be corrected. *See* Polifone Reply Dec., Ex 70 (Brown Deposition at 230:7- 234:11).

This case is unlike *United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir. 1987)*, cert. denied,* 486 U.S. 1055 (1988), or *MHANY*, where courts found that the decision

---

[14] *See e.g.,* Polifone Reply Dec., Ex 67 (Been I Deposition at 111:8-124:17, 154:23-162:23, 166:3-172:18); Ex 68 (Been II Deposition 21:4-23:5); Ex 70 (Brown Deposition at 141:8-143:8, 231:6-234:11); Ex 74 (Donovan Deposition at 133:16-134:10); Ex 75 (Weisbrod Deposition at 99:22-102:22).

[15] The only example of race-based opposition to affordable housing that the *amicus curiae* cites is an article from the 1970s, which also makes no mention of the CP policy (as it had not yet been adopted). Clearly if this were a regular phenomenon in New York City (and one which would necessitate the implementation of the CP policy), they would have located an article addressing it that is less than fifty years old.

makers refused to approve affordable housing in response to race-based opposition. In *MHANY*, there was a sudden shift in the village's approach to the rezoning necessary for the affordable housing soon after residents' race-based opposition was voiced. In *Yonkers*, councilmembers acknowledged that they were responsive to race-based opposition, and one even admitted that his opposition was "pretextual." *See Yonkers*, 837 F.2d at 1221. In fact, the District Court found that not only were councilmembers responsive to the race-based opposition, but some even "led the fight." *Id*. at 1223. The evidence in this case could not be more different.

Here, the CP policy helps get affordable housing built. The City has not "knowingly acquiesced to race-based citizen opposition" in order to block affordable housing, but instead adopted the CP policy to provide the opportunity for existing residents to not be displaced from the neighborhood. *MHANY*, 819 F.3d at 612. There is ample evidence of the City's legitimate governmental interests behind the CP policy—preventing displacement and responding to the fear of displacement.

Even the evidence Plaintiffs rely upon shows the City is not acquiescing to race-based opposition. Specifically, Plaintiffs point to a draft memorandum from HPD, *see* Ex. 36 (ECF 916-36) to the November 5, 2020 Declaration of Roger G. Maldonado ("MD"), which Plaintiffs acknowledge was intended to help "get various outside actors to push back against a CM's resistance to an affordable housing project." Pls. Reply at 78. While Plaintiffs focus on a single comment in the document in support of their argument that the City is "fraught" to address desegregation, *see* Pls. Reply at 79, the draft memorandum shows otherwise. It is an example of HPD actively working to overcome opposition to a project that HPD had reason to believe was based, at least in part, in discriminatory motive. It demonstrates that HPD sought to confront the exclusionary nature of the opposition, not appease it. Significantly, reminding the CM of the CP

14

policy was not a strategy included on the memorandum, even though the drafters of the memo clearly believed there was a race-based exclusionary component to the opposition.[16]

Thus, even accepting that some of those opposing affordable housing may be racially motivated, proving that such opposition exists is not enough to defeat summary judgment as Plaintiffs have failed to provide evidence to show or allow a reasonable inference that the City was knowingly responsive to this discriminatory opposition through the use of the CP policy. *See Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 269-70 (1977) (although the District Court found that some opponents of plaintiffs' requested zoning change "might have been motivated by opposition to minority groups," the evidence evaluated by the Supreme Court did not warrant the conclusion that this motivated defendants). To the contrary, the evidence, and common sense, clearly demonstrate that the CP policy is not responsive to such opposition.

Plaintiffs insist that the case law necessitates that summary judgment be defeated because the inferences must be read in favor of the non-movant. While it is true that in assessing whether there is an issue of fact courts should resolve ambiguities and draw inferences against the moving party, the inferences drawn must be reasonable.[17] *See Valenti v. Penn Mut. Life Ins. Co.*, 850 F Supp. 2d 445, 448 (S.D.N.Y. 2012) (mere speculation was not enough to warrant inferences in the non-movant's favor.). The Court cannot make unreasonable inferences in

---

[16]The project was withdrawn by the developer, although a smaller affordable housing development, responsive to the council members' concerns about the height of the building first proposed, is now working its way through the approval process. The smaller project has received the support of the local community board. *See* https://jacksonheightspost.com/phipps-rezoning-application-faces-headwinds-developer-slammed-at-public-hearing (last accessed February 9, 2021).

[17] *Amicus curiae* quotes a case stating the same. However, it then goes on to argue that this standard is "especially crucial" because it is difficult to prove discriminatory intent before discovery. Amicus brief at 21. *Amicus curiae* is clearly unaware of the extensive discovery in this case over more than three years, including the production of over 27,000 documents, 23 fact depositions, and multiple days of 30(b)(6) depositions from multiple witnesses. *See* Polifione Aug. Dec. at ¶ 68 and Polifione Reply Dec. at ¶ 30.

Plaintiffs' favor, or ignore evidence that has been presented in order to make inferences favorable to the non-movant. *See Richardson v. City of N.Y.*, 2020 U.S. Dist. LEXIS 181491, at *21-22 (S.D.N.Y. Aug. 24, 2020); *Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F Supp. 2d 334, 342, 345-46 (S.D.N.Y. 2005) (the non-movant cannot "pick and choose" which parts of the record the Court should credit to create an issue of fact). A non-moving party must present more than conclusory allegations, some "metaphysical doubt," mere speculation or conjecture, or reliance on the allegations or denials of the pleadings to show there is a genuine issue of fact for trial or to oppose and succeed on summary judgment. *Farley v. Davis*, 1994 U.S. Dist. LEXIS 5589, at *9-11 (S.D.N.Y. Apr. 29, 1994) (internal citations omitted). *See also Gallagher v. St. Paul* 619 F.3d 823 (8th Circuit 2010) ("Merely calling these statements evidence of racial animus is not enough to create a genuine dispute of fact."); *AD/SAT v. Associated Press*, 885 F Supp. 511, 517-518 (S.D.N.Y. 1995).

Plaintiffs here are asking for more than a reasonable inference in their favor. They are asking the Court to infer merely from the existence of some race-based opposition to affordable housing that a policy that encourages affordable housing by being responsive to opposition due to the fear of displacement is a response to such invidious opposition. Moreover, the inferences they seek to make are based upon their unreasonable interpretations of the documents and their unsupported conclusions. Simply put, Plaintiffs cannot rely upon "inferences" to substitute for their lack of evidence forming a nexus between the CP policy and the race-based opposition in order to defeat summary judgment. *See Congregation Rabbinical,* 945 F.3d at 118 (rejecting an inference of discriminatory intent based upon the "mere facts" that the project was proposed by Hasidic Jews and opposed by the municipality). As Plaintiffs have presented no evidence or

evidence that could result in a reasonable inference to support Plaintiffs' theory that the CP policy is responsive to race-based opposition, the City is entitled to summary judgment.

## C.   "Political Sensitivity" Around Desegregation is Not Evidence of Intentional Discrimination

Plaintiffs next argue that the Court should infer discriminatory intent behind the CP policy because the City has treated desegregation as "fraught." Plaintiffs cite to no case law to support that such a showing is an appropriate inference of discriminatory intent, nor is the City aware of any such case law. Moreover, acknowledging political sensitivity and not acting because of that political sensitivity are two very different things. Despite the "political sensitivity," the same evidence Plaintiffs rely upon also demonstrates that the City still sought to address fair housing issues, including segregation.

Plaintiffs heavily rely upon HPD's "Preliminary Guide to the Assessment of Fair Housing," which was just that—an early, brainstorming document about the fair housing issues that would need to be addressed in the City's then-required Assessment of Fair Housing ("AFH").[18] *See* Polifione Reply Dec. Ex 72 (Matthew Murphy Deposition at 84:22-85:17), Ex 73 (Declaration of David Quart at ¶¶ 7-13). The City confronted the barriers raised in the preliminary guide head on during the WWL process, even though President Trump's HUD suspended the requirement to undertake an AFH. *See* Polifione Reply Dec. Ex 58 (WWL Report

---

[18] Plaintiffs' attempt to use documents such as this document which are part of the City's efforts to overcome barriers to fair housing against the City as "evidence" of intentional discrimination is contrary to public policy and should not be countenanced. Efforts by governments to address discrimination and other issues of public policy concern should not be used against them, akin to how remedial measures are not admissible to demonstrate liability. *See e.g.,. Grewcock v Yale-New Haven Health Servs. Corp*., 2018 US Dist LEXIS 34850 at *8 (D Conn Mar. 4, 2018); *Mhany Mgt. v Inc. Vil. of Garden City & Garden City Bd. of Trustees,* 985 F Supp 2d 390, 415-16 (EDNY 2013) (giving little weight to the adoption of an anti-discrimination policy when assessing whether there is evidence of intentional discrimination).*McLaughlin v. Diamond State Port Corp.,* 2004 U.S. Dist. LEXIS 26351 *11 (D. Del. Dec. 30, 2004) (finding evidence of a defendant's attempt to reverse allegedly discriminatory practices inadmissible and stating that "[i]t would be perverse indeed if attempts to reverse discrimination could be used to condemn a defendant.").

at 10). The City also specifically addressed the continuing problem of segregation in the HNY plan, and made fostering diverse and livable neighborhoods its first priority. *See* Polifone Reply Dec. Ex 62 (HNY at 27).

Additionally, Plaintiffs' reliance upon HPD's draft memorandum intended to help overcome opposition to affordable housing is misplaced. *See* Ex. 36 to MD.  In addition to the reasons discussed above, Plaintiffs chose to exclude Deputy Mayor Been's testimony explaining why she included the comment Plaintiffs point to as their evidence that the City is "fraught" to address issues of segregation (that there should not be a mention of FHA violations). *See* MD Ex 36. In sum and substance, Deputy Mayor Been explained that she did not believe speaking in legal terms would be persuasive and that avoiding those terms would move the substance of the conversation along more productively. *See* Polifone Reply Dec Ex. 67 (Been Deposition I at 196:10-197:24). Thus, the evidence demonstrates that the City squarely took on the challenge of developing strategies to overcome the legacy of racial discrimination and segregation.  The fact that the City recognized the "fraughtness" of those issues shows a practical approach to moving forward most successfully, not a desire to avoid the issues.

## D.    The City Did Not Depart from Its Normal Decision Making[19]

Plaintiffs also attempt to demonstrate an inference of discriminatory intent behind the CP policy through an alleged deviation from "normal" agency procedures. This is a clear indication of the weakness of their "evidence" and their desperation to create an illusion of discrimination. Plaintiffs' argument predominantly rests on a quote from a news article that said HPD

---

[19] Plaintiffs also seek an inference of intent from the purported disparate impact and perpetuation of segregation they claim is caused by the policy. The City clearly disputes that there is a disparate impact or perpetuation of segregation caused by the CP policy. Moreover, to the extent the Court finds no disparate impact or perpetuation of segregation, one must wonder how there can be a finding of intentional discrimination if there has been no finding of disparate impact (or discrimination) in the first instance.

commissioners collected facts and weighed options in making decisions on how to juggle the multiple goals and interests of the agency. *See* MD Ex. 39, Pls. Reply at 80. Plaintiffs then conclude that because a perpetuation of segregation analysis was not undertaken when the CP policy was expanded in 2002 that this was a shift from normal practice. Nothing in the article states (nor have Plaintiffs proven otherwise) that the City regularly performs perpetuation of segregation analyses to evaluate policies[20] or that the City has an obligation to do so but did not do so in the context of the CP policy.[21] Plaintiffs also point to two comments on proposed Consolidated Plans; Annual Performance Reports[22] alleging that the CP policy perpetuates segregation, and asserts that because the City did not substantively respond to those comments, the City is not following normal procedure. *See* Pls. Reply at 81. However, Plaintiffs have not established that the City substantively responded to each and every comment on draft AFFH statements, but disregarded the comments about the CP policy. No matter how favorably the Court is to consider the non-movant's evidence, no reasonable inference can be drawn that the City failed to follow the normal procedures when expanding and maintaining the CP policy.

### E.     Other Policies are not Evidence of Intent

Plaintiffs also attempt to convince the Court that the City has intentionally discriminated through the CP policy by pointing to other policies that they claim are "segregation-perpetuating," that the City has not remedied. *See* Pls. Reply at 82. Plaintiffs specifically point to

---

[20] From a purely practical standpoint Plaintiffs argument that such analysis was, or should have been, part of the City's normal practice is ridiculous. The disparate impact and perpetuation of segregation analyses for this litigation were the result of many hours of complex and costly work by experts, which could never be undertaken on a regular basis. Moreover, the data for such analyses came from the City's housing connect database, which was only first introduced in 2012. Prior to that time, the city did not have an electronic database from which it could undertake such analysis, nor did it have all the data necessary to undertake such an analysis. .

[21] In fact, the Courts have held such analysis is not required. *See Churches United for Fair Hous., Inc. v. De Blasio*, 180 A.D.3d 549 (1st Dep't 2020).

[22] These are City submissions to HUD. Plaintiffs refer to them as "AFFH statements," see MD Exhibits 42 and 43.

zoning changes made during the Bloomberg administration and HPD's siting of affordable housing. Plaintiffs' reliance upon these other policies as circumstantial evidence regarding the intent behind the CP policy is misplaced. These policies are well beyond the scope of relevant circumstantial evidence. Although the Second Circuit in *Yonkers* considered past decisions regarding the siting of subsidized housing, that case was brought as a "pattern and practice" case about the siting of affordable housing. *Yonkers*, 837 F.2d at 1192. This case is not siting case nor a "pattern and practice" case, and thus looking beyond the discrete policy challenged is not warranted. Indeed, Magistrate Judge Parker denied discovery on these issues, deeming them too attenuated to necessitate discovery. Moreover, the *Arlington Heights* factors focus on the history and process related to the policy or practice that is allegedly discriminatory. *Arlington Heights*, 429 U.S. at 267-68.

Additionally, there has not been a finding that the City's zoning changes under the Bloomberg administration or the City's siting policies have perpetuated segregation. Plaintiffs have not proven this to be the case, nor is this summary judgment motion the place for the parties to litigate those issues.[23] Plaintiffs' self-serving conclusory opinion about the impact of these policies is insufficient to serve as circumstantial evidence of discriminatory intent or to create an issue of fact.[24] *See Eastway Constr. Corp. v. New York*, 762 F.2d 243, 249 (2d Cir. 1985) ("The

---

[23] The City disputes Plaintiffs' characterizations of these policies. To the extent Plaintiffs are relying upon the maps annexed to Dr. Beveridge's reply declaration, Exhibits 12-17, those maps show where projects subsidized by the U.S. Department of Housing and Urban Development (HUD) are located -- *not* HPD, nor the City. While there is some overlap between HUD and HPD projects, they are by no means the same, and thus the maps in Exhibits 12-17 do not represent the location of HPD's affordable housing projects. Dr. Beveridge's Exhibit 18, as well as the map on HPD's website at https://www1.nyc.gov/site/hpd/about/the-housing-plan.page (last accessed February 9, 2021), better reflect the siting of HPD's recent projects since 2014. Moreover, Plaintiffs' characterization of the Bloomberg era "downzonings" lacks nuance and accuracy. See Polifione Reply Dec., Ex 69 (Kapur Deposition at 43:15 – 47:7).

[24] Plaintiffs' reliance upon a statement that the City does not have a policy targeted at ending residential segregation is also meaningless. Plaintiffs have not asserted that the City has an obligation to have such a policy, nor does it have an obligation to have such a policy. Moreover, Plaintiffs conveniently ignore the City's aggressive housing

mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment. Moreover, in opposing a motion, a party may not rest upon mere conclusory allegations or denials.... (internal citations and quotations removed)).

## F.      There is No Evidence of Pretext or Consciousness of Guilt

Plaintiffs' last point, addressing pretext and "consciousness of guilt," is in actuality the crux of Plaintiffs' intentional discrimination case. Recognizing that the evidence does not support their argument that the City has intentionally discriminated through the maintenance of the CP policy, Plaintiffs now argue that the City's rationales are pre-textual. Again, Plaintiffs' efforts fall short of creating an issue of fact to defeat summary judgment.

First, Plaintiffs' evidence of pretext comes down to 1) the City's acknowledgement that the rationale for the CP policy has "evolved" over the last thirty years; 2) Plaintiffs' assertion that the policy is overbroad, such that it may help others in addition to the people it is directed at; 3) that a City employee was trying to gather evidence to support the rationale during the litigation; and 4) that the Deputy Mayor expressed an opinion about the CP policy that Plaintiffs disagree with. *See* Pls. Reply at 83-84. There is no reasonable inference from this evidence that could support a finding that the City's interests in addressing displacement and the fear of displacement are pre-textual. Nor is there any evidence of animus that may lead one to question whether the rationales are pre-textual in the first place. This is particularly true in light of the overwhelming evidence supporting the City's rationales for the policy, including Plaintiffs' and Plaintiffs' experts' acknowledgments that displacement is a serious public policy concern that

---

plan and the fair housing work the City pursues. *See* Polifine Aug. Dec. at ¶¶ 62-66; Polifine Reply Dec., Exs 58 and 62 (WWL Report and HNY).

necessitates a governmental response. *See* Polifione Reply Dec. Ex 78 (Senat Deposition at 151:17-152:13; 167:6-12), Ex 79 (Beveridge Deposition at 33:19-35:18), Ex 80 (Orfield Deposition at 52:21-56:20).

Plaintiffs next attempt to demonstrate pretext through what they believe is evidence of "consciousness of guilt." An inference of consciousness of guilt is established only once it has been demonstrated that the defendant lied or was misleading in its defense. *See Bennett v. Health Mgt. Sys., Inc*., 92 A.D.3d 29, 43 (1st Dep't 2011) (stating that once evidence is proffered that there is a false, misleading or incomplete reason, then the determination of whether such evidence constitutes proof of consciousness of guilt, an attempt to cover up the alleged discriminatory conduct, or an improper discriminatory motive that was mixed with other legitimate reasons goes to the jury.); *Brown v. Crowdtwist*, 2014 U.S. Dist. LEXIS 52067 (S.D.N.Y. Apr. 15, 2014). Plaintiffs have not established that any of the "evidence" they claim is false or misleading, is in fact false or misleading. They simply assume it is. However, Plaintiffs cannot succeed by merely stating that they do not agree with a statement or document or by calling it false. *See Valenti*, 850 F Supp. 2d at 448 ("the nonmoving party must produce evidence in the record and 'may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible.'") (internal citations omitted).

For instance, the Mayor making a statement based upon his personal experience having lived in and worked for the City over many years, is not a false or misleading statement simply because it was not based upon specific data. As to the Deputy Mayor's statement that people worry about the economics of their neighborhoods changing, Plaintiffs simply conclude it is false, and willfully ignore the evidence and testimony explaining why there is a fear of economic change, for example, market rent units and investment in the neighborhood attracting people

with higher incomes.[25] Nor did the Deputy Mayor "withhold" anything from the Court simply because she did not repeat every aspect of her deposition testimony. Pls. Reply at 84. Moreover, Plaintiffs' misconstrue the Deputy Mayor's testimony about race, ignoring her fuller testimony which is consistent with her statements in her declaration. *See* Polifione Reply Dec. Ex 67 (Been I deposition at 137:22-150:22); Ex 68 (Been II deposition at 24:10-24)   Similarly, there is nothing false or misleading about former HPD Commissioner Torres-Springer's desire to express nuance around issues of race and segregation, and not immediately answering a deposition question the way that Plaintiffs' counsel wanted her to.[26] Finally, disagreeing with former HPD Commissioner Donovan's answer to a deposition question does not establish that such answer is false. Nor does the lack of having a specific policy toward the goal of eliminating racial segregation in housing mean that former Commissioner Donovan did not work toward that goal. In short, Plaintiffs have failed to establish the City has lied or been misleading in any of the instances Plaintiffs claim it has.

Plaintiffs' "evidence" of false or misleading statements, which they assert constitute consciousness of guilt, also has nothing to do with the City's defense or reasons for the CP policy.[27] To establish pretext, Plaintiffs must cast doubt about the legitimacy of the City's

---

[25] See Been Dec. at ¶¶ 11, 14, 42, 47, 56; *see also, e.g.,* Polifione Reply Dec, Ex 67 (Been I deposition at 137:22-150:22), Ex 68 (Been II deposition at 125:3-126:3); Ex 75 (Weisbrod Deposition at 47:8-51:22); Ex 77 (Bozorg Deposition at 26:13-27:21, 129:7-133:3); Ex 82 (Perine Deposition at 199:5-14, 217:5-218:25); Ex 83 (Press Deposition at 92:21-94:13; 95:25-96:12).

[26] Former HPD Commissioner Torres-Springer repeatedly answered Plaintiffs' counsel's question, confirming that race was one of the protected classes that was part of the discussion and that the op-ed had to be viewed in light of the context for which it was written. Because Plaintiffs' counsel wanted a different answer – the one he believed was the correct answer – he repeatedly asked essentially the same question to which Torres-Springer answered each time. However, her answers explained that the issue Plaintiff was asking about was more complex and included more factors than Plaintiffs' counsel tried to limit it to. *See* Polifione Reply Dec. Ex 71 (Maria Torres-Springer Deposition at 52-59).

[27] Thus, even if there were an issue of fact, because these are not material facts, summary judgment is not precluded. *See Cartier v Lussier*, 955 F.2d 841, 845 (2d Cir. 1992); *Eastway Constr. Corp.*, 762 F.2d at 249 (2d Cir. 1985).

defense in order to allow an inference that racial discrimination was the true motive. However, their approach is backward—they ask the Court to infer that because the City has purportedly lied or been misleading about segregation, that the City is also lying about their rationale for the CP policy. In other words, Plaintiffs ask this Court to infer discriminatory intent behind the CP policy because the City allegedly has consciousness of guilt around segregation. This backward approach highlights the weakness of Plaintiffs' arguments—their inability to overcome the City's evidence of its interests and their inability to create a nexus between the CP policy and the race-based opposition. No reasonable inference of intentional discrimination could be drawn from Plaintiffs' evidence, as it fails to cast doubt on the City's rationales or tie the CP policy to race-based opposition.[28] Therefore, the City is entitled to summary judgment dismissing the intentional discrimination claim.

## POINT II

## THE CP POLICY DOES NOT HAVE A DISPARATE IMPACT

In its initial briefing, the City set forth several fundamental flaws with Dr. Beveridge's disparate impact analysis. These flaws include: 1) the use of CD typologies; 2) that Dr. Beveridge's protected class is not a legally recognized protected class and is instead subgroups of protected classes that are fluid; 3) that Dr. Beveridge focuses on comparing CP beneficiaries with non-CP beneficiaries rather than the impact of the CP policy; 4) Plaintiffs' analysis is done at the incorrect stage of the lottery process; 5) Plaintiffs' "statistical significance analysis," which Dr. Beveridge did not include in his expert reports or supplemental reports, was conducted

---

[28] Plaintiffs argue that the City cannot succeed on a mixed-motive theory. Pls. Reply at 88. The Court does not need to even consider this because, as explained above, Plaintiffs have failed to present any evidence that the City intentionally discriminated. Moreover, the City also explained in detail why, *arguendo*, under the FHA, even if there was a determination that there was a discriminatory motive found, the City could still succeed on summary judgment. *See* Def. Aug. brief at 13-15 and 51-64

improperly and should not be considered; and 6) Plaintiffs failed to meet their burden to demonstrate that the CP policy causes the purported impact that they claim. Plaintiffs' attempt to overcome these flaws fails. Plaintiffs' responses to these criticisms lack merit and do not create an issue of fact.  Thus, for the reasons set forth below, and in the City's initial brief, the City is entitled to summary judgment on the disparate impact claims.

## A.   Dr. Beveridge's Analysis Based Upon His Race-Based "CD typologies" is Contrary to the Law

Dr. Beveridge's analysis of data grouped into race-based CD typologies is statistically improper and contrary to the law. Before addressing Plaintiffs' responses to the City's attack on their use of CD typologies, it is important to point out that use of CD typologies is the fundamental dispute between the parties. Despite Dr. Siskin's disagreement with Dr. Beveridge's analytical methodology, he applied Dr. Beveridge's methodology to the citywide data rather than CD typologies and found no disparate impact. Consequently, despite the many flaws discussed below, resolution of the first prong of the disparate impact analysis ultimately comes down to a determination as to whether the analysis ought to be taken on the CD typologies as Plaintiffs assert or the citywide data as the City asserts.[29]

### (a) CD Typologies Have No Nexus to the CP policy

Reading Plaintiffs' reply papers, one might think that CD typologies are an actual geography or grouping relied upon by the City. That is not the case. CD typologies are a fiction—they were created by Dr. Beveridge for the sole purpose of obtaining the results he sought. CD typologies are not the same as CDs. They are based upon the racial demographics of the CP areas for projects. Plaintiffs did not undertake their analysis by grouping projects in a CD

---

[29] However, because it is Plaintiffs' burden of proof to establish a *prima facie* case of disparate impact, in order to grant the City summary judgment, the Court need not decide that Dr. Siskin's analysis on the citywide data is correct, but only needs to determine that Dr. Beveridge's analysis using CD typologies is incorrect.

together,[30] but instead deliberatively grouped projects according to racial demographics.[31] Moreover, there is nothing "location-based" about Plaintiffs' CD typologies.[32] Each of their CD typologies consists of projects from multiple CDs and boroughs. Nor do the Plaintiffs' CD typologies allow Plaintiffs to assess the ability of an applicant to compete in a "*specific* lottery," as Plaintiffs did not undertake a project-by-project analysis, but grouped the lotteries into their CD typologies. Pls. Reply at 10. Thus, contrary to Plaintiffs' assertions otherwise, undertaking the analysis by CD typologies is not necessary to assess whether an applicant can compete *where*ver they apply, nor does it actually assess that issue.

### (b) Using CD Typologies Does not Reflect Applicants' Preferences

Plaintiffs also justify the use of their CD typologies as being necessary to reflect applicants' preferences. However, Dr. Beveridge has conceded that he does not know applicants' preferences. *See* Ex. 45 to the Polifione Aug. Dec. (September 24, 2019 Beveridge Deposition at 112:24-113:1) Moreover, underlying such argument is the unproven and unstated assumption that applicants' primary consideration of whether to apply to a project is the racial demographics surrounding the project. Yet Plaintiffs themselves never indicated that race was a factor in their decision as to where to apply for affordable housing. *See* Polifione August Dec. at Ex 42 (at 52:2-13 and 89: 17-19), Ex. 43 (at 32:20-33:3; 33:14-20). Consequently, by choosing to group the projects by racial demographics and by ignoring applications made by applicants in other CD

---

[30] This is not to say that it would have been appropriate for Plaintiffs to group projects by CD either. However, if Plaintiffs had done so, their argument would be more plausible.

[31] For instance, projects with CP areas (typically the CD the project is located in) that are majority White are grouped together for analysis, whereas projects with CP areas that are majority Black are grouped together for analysis.

[32] Furthermore, disparate impact analysis is not intended to see whether "racial patterns exist in relation to the benefit and harm caused by the policy." It is meant to determine in the first instance whether in fact there is a disproportionate harm caused by the policy. *See* Pls. Reply at 19-20

typologies, the CD typologies reflect Dr. Beveridge's unsupported judgment calls on the preferences of applicants rather than reflecting applicants' preferences.

### (c) Units are Fungible and thus There is No Basis for CD typologies

From a statistical perspective, there is no basis to undertake a disparate impact analysis based upon smaller groupings, such as Plaintiffs' CD typologies, given that Dr. Beveridge treats the units in each CD typology as interchangeable (or fungible). Indeed, Plaintiffs do not dispute that Dr. Beveridge treated the units as fungible or interchangeable, but nevertheless insist that from the perspective of the applicants, the units are not fungible, as they may *prefer* some units over others. As noted above, Plaintiffs did not express preferences regarding the racial demographics of the neighborhoods to which they would like to move. Moreover, the case law is clear that in circumstances where a challenged policy is being applied consistently across multiple locations, there is no basis to analyze each location separately. *See e.g., Williams,* 879 F. Supp. 2d at 337-338 (suggesting that a proper disparate impact analysis of a policy that applied to all NYCHA complexes should not be limited to a single complex so as to use the proper population for comparison). *Cf. Wal-mart Stores v. Duke*, 564 U.S. 338 (2011) (denying class certification for disparate impact claim because each store's act of discretion in hiring women was unique). As the CP policy is uniformly applied across the city, it should be analyzed based upon the citywide data and not smaller groupings. *See, e.g., Smith v. Xerox Corp.*, 196 F.3d 358, 369-70 (2d. Cir. 1999), *overruled on unrelated grounds by Meacham v. Knolls Atomic Power Lab.*, 461 F.3d 134 (2d Cir. 2006).

Plaintiffs' attempt to distinguish *Xerox* and *Hollander v. American Cyanamid Co*., 172 F.3d 192, 203 (2d. Cir. 1999) (another case also rejecting the manipulation of data) is unavailing. Plaintiffs argue that the difference between *Xerox* and this case is that, in *Xerox*, the plaintiffs alleged that there was "*a* disparate impact" and "were not alleging that there was either a

disparate impact only to some of *Xerox's* work groups, or that there was more than one impact within any protected class category." Pls. Reply at 20. This argument implies that here, Plaintiffs alleged that there were multiple disparate impacts against subgroups or that there is more than one impact in any protected class category. This simply is not the case. The SAC alleges that Blacks and Hispanics (the protected classes) have been discriminated against in their ability to compete fairly for housing. The complaint says nothing about subgroups or multiple impacts. That Plaintiffs' expert undertook analysis inconsistent with Plaintiffs' pleadings does not change the claims in the case. Moreover, *Xerox's* holding is not based upon how the plaintiffs plead the case, but is based upon the Second Circuit's understanding of proper disparate impact analysis – i.e., that "[i]t would be nonsensical for a court to decide that only some of these plaintiffs established a prima facie case of disparate impact when they all purport to specify the identical...practice as causing a disparate impact." *Xerox Corp.*, 196 F.3d at 369.

As to *Hollander*, Plaintiffs claim it is distinguishable because the expert changed the age bands to capture the plaintiff's age. Pls. Reply at 20. While indeed the facts of the two cases are distinct, the manipulation of the grouping of the data analyzed to create self-serving results remains the same. In *Hollander*, the expert expanded the age range analyzed to capture data that would demonstrate an impact. *See Hollander*, 172 F.3d at 203. Here, Dr. Beveridge created small groups of the data based upon race to create the illusion of a racial impact. Thus, as in *Hollander*, this Court should not find Dr. Beveridge's results, based upon his self-serving gerrymandering of the data, probative of discrimination.

### (d) **Plaintiffs' Reliance Upon *Comer* and *Langlois* Fails**

Plaintiffs' response to the City's explanation of why neither *Comer* nor *Langlois* offers support for their use of CD typologies is almost as confusing and strained as Plaintiffs' first attempt to rely upon them. Plaintiffs insist that "like *Langlois*, the policy presents multiple pools

(CD-typologies) [and that] [t]he effects on competition within each typology must be assessed separately." Pls. Reply at 29. Again, no matter how many times Plaintiffs assert it, the CP policy has nothing to do with CD typologies. CD typologies were created by Dr. Beveridge for his analysis in this case. Moreover, there were no "separate pools" in *Langlois*, but separate towns, each with different types of data, and different dates they implemented the preference at issue. Here, there is a single defendant, a single set of records, single source of data, and a single policy at issue. CD typologies are a fiction created by Dr. Beveridge and have no relationship to the CP policy.

In sum, Plaintiffs have failed to set forth a viable explanation for their creation of the CD typologies, which are obviously biased and wholly unsupported by the law. In contrast, the City has cited to several Second Circuit decisions that reject analogous manipulation of data and use of subgroups, which Plaintiffs failed to distinguish (as they cannot). *See* City Aug. Brief at 21. Consequently, the City is entitled to summary judgment dismissing Plaintiffs' disparate impact claim as their reliance upon Dr. Beveridge's CD typology-based analysis fails as a matter of law.

**B.     Plaintiffs' Analysis Fails to Show an Impact on a Protected Class**

As a direct result of the use of CD typologies and the comparison of CP beneficiaries with non-CP beneficiaries, Dr. Beveridge's analysis is undermined by yet another fatal flaw—the failure to demonstrate a disparate impact on a legally recognized protected class. As explained in the initial brief, Plaintiffs' asserted protected class translates to "applicants depending on the racial demographics of where they apply for housing and their CP status when applying." However, also as discussed in the City's initial brief, not having the CP (or being an "outsider" in Plaintiffs' terms) and not being the same race as the dominant race of the "CD typology" in

which you apply to housing is not a protected class under the law.[33] *See* 42 U.S.C. § 3604(a); N.Y.C. Admin. Code § 8-107(17)(a)(1). *See also Tsombanidis,* 352 F.3d at 575; *Willliams* 879 F. Supp. 2d at 336.

By claiming that their protected class is defined and static for each CD typology, Plaintiffs demonstrate their lack of understanding of disparate impact analysis. First, a protected class is a legally defined group. Second, a protected class should not change or be defined by the data grouping. The point of disparate impact analysis is to determine whether there is a disproportionate impact on a protected class, not to determine who the protected class should be.

Black and Hispanic applicants are the protected class as alleged in the SAC. But the "protected class" that Plaintiffs now want to focus on is applicants of the non-dominant race (as compared to the CD typology where they apply) who are non-CP beneficiaries. This at best translates to Black (or Hispanic) applicants who apply as non-CP beneficiaries to Plaintiffs' made-up CD typologies (which bear no relation to the reality of how applicants would apply) in which the dominant race is not Black (or Hispanic). However, as the City argued in its initial brief, not only is the "non-dominant race" not a protected class, the law does not recognize disparate impact claims on behalf of concocted subgroups. *See Xerox,* 196 F.3d 369; City's Aug. Brief at 18.[34]

In reality, Plaintiffs have not even brought their case on behalf of a subgroup of a protected class. Because even that "non-dominant race" "protected class" was not disparately impacted in each CD typology and at each stage of the lottery process analyzed, Plaintiffs have

---

[33] Although discussed separately from other criticism of the CD typologies, Plaintiffs' lack of protected class is directly the result of Plaintiffs' race-based CD typologies.

[34] As discussed above, Plaintiffs' attempt to distinguish *Xerox* fails. Moreover, Plaintiffs did not even attempt to distinguish the other cases the City relied upon for the proposition that Courts reject disparate impact claims on behalf of a subgroup of a protected class.

cherry-picked even smaller subgroups from which they assert their claims of disparate impact.[35] Determining the protected class based upon the analysis results is not only legally unsupported, *see Xerox,* 196 F.3d at 369-71, but is an invalid statistical analysis. *See* Siskin Aug. Dec. ¶¶ 37-38.

Contrary to Plaintiffs' assertion otherwise, ignoring the circumstances in which no disparate impact was found on the "protected class" and only pursuing a claim of disparate impact on behalf of a manipulated subgroup of a contrived subgroup of the protected class is absolutely "cherry-picking." Even if Plaintiffs have studied each applicant relevant to each CD typology, based upon the results from that analysis, they only assert a claim of disparate impact on behalf of some of those applicants. As Dr. Siskin's undisputed analysis demonstrates, set forth in his Table 1, Plaintiffs' cherry-picking means that Plaintiffs are only asserting a claim of disparate impact in being awarded a unit on behalf of 43.08% of the Black apparently eligible applicants who are not the dominant race in a particular CD typology, and 35.01% of Hispanic apparently eligible applicants. Looking at all the races together, Plaintiffs do not dispute that 61.20% of all apparently eligible applications – which they originally alleged were disparately impacted in getting awards – are not, in fact, disparately impacted.

Dr. Beveridge did not dispute Dr. Siskin's Table 1 findings, but instead argues that the remaining claims represent 71.4% of awards. *See* Bev. Reply ¶¶ 71-72. However, as Dr. Siskin explained, looking at awards to assess the abandoned claims is not appropriate. Awardees are not

---

[35] Most notably, Plaintiffs have abandoned any claim on behalf of any race regarding awards in any plurality CD typology because Dr. Beveridge's analysis demonstrates that the dominant group for each plurality CD typology is *not* the dominant group selected. For example, in a plurality White CD typology, Blacks are the group with the highest percentage of CP awards. *See* Beveridge Dec. (ECF 883) at Table 10 ¶ 130; Table 8 ¶ 121. *See also* Siskin Aug. Dec. ¶ 34.

injured, as they have obtained housing. It is the apparently eligible applicants that were allegedly unable to compete fairly that would be injured. *See* Siskin Reply ¶¶ 24-26.

In addition to the fact that Plaintiffs' ever-narrower definition of the subgroup is designed just to abandon the claims for which Plaintiffs' own analysis found no disparate impact in the ability to compete, Plaintiffs' fluid "protected class" causes other outrageous and inconsistent results. It means that an applicant can be part of a "protected class" and not part of a "protected class" at the same time, even if for both applications they are not a CP beneficiary. Plaintiffs do not dispute these inconsistent outcomes, but merely assert that they are not problematic.

## C. Plaintiffs' Comparison of CP beneficiaries with non-CP Beneficiaries Does Not Assess the Impact of the CP Policy

The third fatal flaw in Dr. Beveridge's analysis is that it improperly focuses on comparing the results of CP and non-CP beneficiaries. However, as previously explained, what is at issue here is whether and to what extent the CP *policy* has a disparate *impact* on Black and Hispanic affordable housing applicants in their ability to compete for housing. *See* Siskin Aug. Dec. ¶ 48. The allegation in the complaint is *not* that Black New Yorkers are being discriminated against in their ability to be CP beneficiaries.[36]

Plaintiffs defend their CP status approach not by actually responding to the City's arguments as to why such analysis fails to study the impact of the CP policy, but simply by insisting that their approach is appropriate. They try to characterize the City's argument as attempting to impose a "selection rate" analysis and claim that the City's argument is at odds with the Supreme Court's holding that statistics come in an "infinite variety." Pls. Reply at 24.

---

[36] Additionally, to the extent Plaintiffs are using the non-CP beneficiary group as a proxy for what would occur without the CP policy in place, it is unnecessary. Dr. Siskin simulated what would occur with and without the policy in place, and thus one need not guess using the non-CP beneficiary group. *See* Siskin Aug. Dec. ¶¶ 103-107; Table 4. Dr. Siskin also demonstrated that such a proxy is inaccurate in comparison to the actual results provided by the simulation. *See* Siskin Reply Appendix K.

That is not the case. While statistics may come in an "infinite variety," statistical analysis must be undertaken in a manner that studies the relevant question and best isolates the impact of the policy challenged. Dr. Beveridge's analyses do neither.[37]

Indeed, Plaintiffs are silent about the inconsistent and outrageous results that occur due to Dr. Beveridge's CD typology and CP status approach.[38] As the City explained, even though Plaintiffs claim that the outcome of interest is being a CP beneficiary, their own analysis shows that being a non-CP beneficiary does not determine the alleged harm.  If a Black non-CP beneficiary applies to a majority Black CD typology, for example, Dr. Beveridge would claim that she is not harmed. Yet if a White non-CP beneficiary applies to a project in that same CD typology, where her race is not the majority race, she would be harmed. Such inconsistent results, when both applicants are non-CP beneficiaries, undermines Plaintiffs' analytical framework. Indeed, it appears that it is the applicant's race in comparison to the made-up CD typology, not her CP status, that determines whether she is harmed.

Dr. Beveridge attempts to explain away Dr. Siskin's demonstration that Dr. Beveridge's methodology is statistically invalid. Dr. Beveridge argues that his analysis is not subject to the mathematical axiom that a statistical formula should result in consistent results applied to all facts because he is undertaking "empirical" math. However, as Dr. Siskin explained, "[e]mpirical analysis is simple applied mathematics…. Simply put, the rules of mathematics apply to the empirical world." Siskin Reply Dec. ¶ 39. In other words, the mathematical axiom applies even

---

[37] Moreover, Dr. Beveridge's Method 2 (highest insider share) is a form of a "selection rate."

[38] In light of the case law presented by the City explaining what the proper comparisons are, Plaintiffs also appear to abandon their claim that such approach is necessary because they cannot compare those affected by the policy with those not affected, as all are affected.

to empirical math and thus Dr. Beveridge's analysis, which resulted in inconsistent results, is flawed.

Nevertheless, even if, *arguendo*, the issue before the Court were to determine which group had the most CP beneficiaries and could take advantage of the policy most, and Dr. Beveridge's methodologies were statistically valid, Plaintiffs' claim would fail. Dr. Siskin undertook Dr. Beveridge's analysis on the citywide data (at the entrants, apparently eligible applicants, and awardees stages) and demonstrated that there is no disparate impact. *See* Siskin Aug. Dec. Appendix E.

### D.      Plaintiffs Analyze the Incorrect Lottery Stages

The City is also entitled to summary judgment because the Plaintiffs have not studied the correct stage of the Lottery Process to establish their claim that the CP policy causes a disparate impact in the ability to compete for affordable housing opportunities. The CP policy has no impact at the application (or entrant) and apparently eligible application stages. Anyone can apply for a unit in an affordable housing project. Similarly, the CP policy has no role in the determination of which applications are apparently eligible (i.e. satisfy income and household eligibility criteria for at least one unit based upon self-reported information).

Plaintiffs argue that CP beneficiary entrants' odds of being awarded housing are better than non-CP beneficiary entrants' odds, and that this is not later cured.[39] While that may be correct, an entrant that is not apparently eligible cannot compete for housing and the CP policy does not effect apparent eligibility. To the extent that Plaintiffs assert that even an apparently *ineligible* applicant will be reached sooner and given the opportunity to appeal, Dr. Beveridge

---

[39] This is because entrants include apparently eligible applicants that would benefit from the CP policy. For entrants who are not eligible, the odds of being selected are zero regardless of whether they are CP beneficiaries. *See* Siskin Reply ¶ 48.

never undertook any analysis to determine whether there is a disproportionate racial impact on this portion of applicants. Dr. Siskin, on the other hand, looked at the racial mix of apparently ineligible CP beneficiaries and non-preference applicants and determined that there is no meaningful difference in the racial mix of the two groups, and thus there is no reason to believe that there would be a disproportionate impact based on race.[40] *See* Siskin Aug. Dec Table 2. Dr. Beveridge has never disputed this finding, yet repeats the unsupported argument that the CP has a disparate impact at the entrant stage.

Although the CP policy is intended to, and does, affect awards, any disparate racial impact found in the probability of an award will not be solely due to the CP policy, as there are many factors other than the CP policy that affect whether an applicant is awarded a unit, including an applicant's actual eligibility and continued interest. *See* Siskin Aug Dec. ¶ 66; Siskin Reply ¶ 54. As more fully discussed in subsection F, *infra*, Dr. Beveridge fails to control for these other factors that influence whether an award is granted, and thus any racial "impact" his analysis finds cannot be solely attributed to the CP policy.[41]

## E.     Plaintiffs' Statistical Significance Tests Must be Disregarded

In response to the City's criticism that Dr. Beveridge improperly applied the 80% rule to analyses other than selection rates, Plaintiffs simply assert that it can be applied in other contexts. Plaintiffs point to no statistical literature or cases in which the 80% rule has been applied outside the context of selection rates. Indeed, Dr. Siskin has represented that he is not

---

[40] Table 2 also shows that there is very little difference in the racial makeup of apparently eligible CP beneficiaries and non-preference applicants.

[41] Dr. Siskin adjusted for some of these factors and demonstrated that the purported "impact" on awards presented by Dr. Beveridge is in actuality significantly lower, and -- when citywide data is used -- passes the 80% test. *See* Appendix E, Table E5. However, there are still factors other than the CP policy that could not be adjusted for, and consequently, even the adjusted analysis at best establishes correlation between impact of the CP policy on awards and not that the CP policy causes an impact on awards.

aware of any literature that discusses its application outside of selection rates. *See* Siskin Reply ¶ 63.

The United States Equal Employment Opportunity Commission ("EEOC") and other federal agencies adopted the 80% rule because in their judgment, if the selection rate of the protected class is within 80% of the group with the highest rate then the difference is not practically significant and should not result in disparate impact liability. *See* Siskin Reply ¶ 63. While it is true that one can compare a difference between any two numbers by dividing to see if the difference is less than 80%, Dr. Beveridge has not provided any explanation as to why this approach is an appropriate measure of practical significance, or more specifically, why the 80% threshold is appropriate.

As to statistical significance, Dr. Beveridge argues that his analysis was done correctly. However, upon examination of the programs Dr. Beveridge provided, Dr. Siskin found that the incorrect program had been applied and the comparison of races was inconsistent with the Dr. Beveridge's own underlying analysis. *See* Siskin Reply ¶ 72. Furthermore, it is the practical significance that measures the true impact. *See* Siskin Reply ¶ 117.

**F.      Plaintiffs Fail to Demonstrate Robust Causation**

Plaintiffs' analysis does not isolate the disparate racial impact of the CP policy. It at best demonstrates that the CP policy is correlated with a disparate impact. But correlation is not causation. Dr. Beveridge's methodology fails to control for many other factors that affect whether an applicant is a CP beneficiary or is likely to be awarded a unit. For example, as Dr. Siskin explained, racial differences within the CP group cannot be due to the CP policy, as each applicant is a CP beneficiary. *See* Siskin Aug Dec. ¶¶ 74-80. Thus, the fact that a racial group has more CP beneficiaries than another racial group tells us nothing about the *effect CP policy has* on the probability of an award for different racial groups. Dr. Siskin further demonstrated

how one could adjust for the differences by race within the CP group and within the non-CP group when examining awards on the citywide data, and that in doing so, the purported impact that Dr. Beveridge wholly attributed to the CP policy without the adjustments was greatly reduced and passed the 80% test. *See* Siskin Aug. Dec. Appendix E, Table E5.

It is important to note however, that even with the adjustments made, Dr. Beveridge's analysis does not establish causation. Factors other than the CP policy that cause differences between the CP and non-CP beneficiary groups have not been adjusted for. *See* Siskin Reply ¶ 42. Thus, Dr. Beveridge's analysis at best establishes a correlation between the CP policy and the purported impacts, but not causation.[42]

## G.  Disparate Impact Analysis Done Properly

While the City is entitled to summary judgment because Plaintiffs have failed to meet their burden to demonstrate a disparate impact as a matter of law, the City's expert undertook a proper disparate impact analysis, which demonstrates that the CP policy does not disparately impact Black or Hispanic New Yorkers applying for affordable housing. Plaintiffs and *amicus curiae* try to divert attention from those findings by using inflammatory rhetoric like "separate but equal," but the fact remains that the data, when analyzed as the case law requires, shows that Black and Hispanic New Yorkers are not disparately impacted in their ability to compete for housing, and in fact benefit most from the City's affordable housing lottery.[43] Pls. Reply 8; *Amicus* brief at 5, 11, and 12.

---

[42] Plaintiffs appear to have dropped their argument that the NYC HRL does not require causation, as the City pointed to the sections of the NYC HRL that Plaintiffs disregarded, which clearly states that a statistical imbalance must be caused by a policy. *See* N.Y.C. Admin. Code § 8-107(17)(b)

[43] *Amicus curiae's* reliance upon *Buchanan v. Warley* is wholly misplaced. The CP policy does not prohibit (intentionally or unintentionally) people of any race from applying for and obtaining housing in any neighborhood in New York City. Indeed, it is undisputed that the lottery with the CP policy in effect has an overall integrative effect, and that the moves of both CP beneficiaries and non-CP beneficiaries are net integrative.

Nor is the citywide analysis based on "offsetting" injuries. Dr. Siskin's analysis is based upon citywide data because the CP policy is applied citywide and because Dr. Beveridge never identified a reason to treat the affordable housing projects differently. *See* Siskin Reply ¶ 6. As Dr. Beveridge has recognized, each race will be helped and hurt by the CP policy. *See* Declaration of Andrew A. Beveridge, dated March 4, 2019 ("Bev. Mar. Dec.") ¶ 28. Thus, to determine whether there is a disparate impact on a protected class, one must look at all of the data together. This is not an offset, but simply the appropriate manner by which to undertake disparate impact analysis on a citywide policy. *See* Siskin Reply ¶ 9; *Xerox,* 196 F.3d at 369-70; *Williams,* 879 F. Supp. 2d at 337-338. Moreover, Plaintiffs' own analysis "offset[s]" some applications with others. *See* Pls. Reply at 10. Plaintiffs ignore applications made in other CD typologies and circumstances in which the applicants are favored or deemed not injured per Dr. Beveridge's definitions, and instead only focus on circumstances in which the applicants are not favored or deemed injured, i.e., where they find a disparate impact.

Furthermore, Plaintiffs' reliance upon *Connecticut v. Teal*, 457 U.S. 440 (1982), for the proposition that an injury in applying to one project cannot be undone by being helped in another project fails. *Teal* addressed the fact that if an employment exam discriminated against Black applicants, the employer could not be freed from liability even if the number of Black applicants hired was not disproportionate. *Teal* says nothing about how the data should be analyzed, but addresses the appropriate stages of the hiring process at which the data should be analyzed (specifically, if the challenge is to a part of the hiring process, analysis should be done at the relevant dispositive stage of the process, not on the "bottom-line,"). *See Teal,* 457 U.S. at 452. In this case, Plaintiffs can not argue that Dr. Siskin, like the employer in *Teal* used some "bottom line" like the number or share of people of a particular race who secure affordable housing

through the lottery to offset a disparate impact at some earlier stage of the lottery process. Instead the "offset" Plaintiffs complain about is the fact that some applicants of a particular race are helped to secure housing by the CP policy while others are not – just as in *Teal,* some test takers of a particular race may have passed the test because of its design while others may have failed the test.

Plaintiffs' argument that the City's citywide approach is a "post hoc" rationalization likewise lacks merit. Deputy Mayor Been's statements as HPD Commissioner regarding possibly modifying the CP policy to settle a HUD compliance review have nothing to do with how to undertake disparate impact analysis properly.[44]

Plaintiffs' and *amicus curiae's* arguments also reflect their attempt to conflate disparate impact analysis and perpetuation of segregation analysis. Disparate impact analyzes whether applicants are able to compete fairly for housing irrespective of the location of the housing. Disparate impact analysis does not address the question of *where* (or the racial demographics of where) housing is located—that is a question of perpetuation of segregation (and in analyzing perpetuation of segregation both parties agree the analysis should be undertaken on citywide data, not CD typologies, and that the lottery has an integrative effect). *See* Pls. Reply at 32; Bev. Reply Dec. ¶ 103.

While the racial demographics of where people live may be central to perpetuation of segregation claims, they are not relevant to the appropriate unit of study for the disparate impact analysis of a citywide policy. Here, Plaintiffs seek to have the CP policy permanently enjoined across the City, not just in particular neighborhoods with particular racial demographics. *See*

---

[44] Moreover, as Plaintiffs seek to rely on documents containing settlement negotiations between the City and HUD, those documents would not be admissible in any event. *See Crigger v. Fahnestock & Co*., 2005 U.S. Dist. LEXIS 6382, at *3-4 (S.D.N.Y. Apr. 13, 2005) (Rule 408 applies with same applicability for settlement discussions between the parties as those between a party and a third party.)

SAC Prayer for Relief (b). Although some of the pleadings address access to predominantly White neighborhoods or neighborhoods of opportunity, Plaintiffs' expert analysis is not limited to White neighborhoods, but looks at each race's "ability to compete" in each CD typology (including finding that White applicants are disparately impacted in certain CD typologies). Dr. Beveridge does not rank the CD typologies in any way, so one CD typology is no more important to the disparate impact analysis than another.   Further, Plaintiffs seek to have the policy overturned across the city despite claiming that racial demographics are not a factor in where they seek to live.   They cannot have it both ways – arguing that the policy cannot stand anywhere in the city, but undertaking their disparate impact analysis based upon small subsets of the data in "typologies" of areas within the City concocted based upon the racial demographics of those areas.

### i.      Consideration Study

Plaintiffs do not attack Dr. Siskin's consideration study, but instead misdirect the Court to an irrelevant issue—whether and to what extent CP beneficiaries are considered more often than non-CP beneficiaries. There is no dispute that more CP beneficiaries are considered than non-CP beneficiaries. The issue is whether there is a racial disparity in which applicants are considered. Dr. Siskin's analysis answers that question and demonstrates that the consideration rate was 12.54% for Black apparently eligible applicants, 12.30% for Hispanic apparently eligible applicants, and 12.80% for White apparently eligible applicants. Black applicants passed the 80% test at 97.97%, while Hispanics passed the 80% test at 96.09%. Indeed, compared to the overall consideration rate, the consideration rate for Black applicants was .14% greater, giving Black applicants an advantage. *See* Siskin Aug. Dec Table 3 and ¶ 97.

Unable to dispute these clear findings, Dr. Beveridge undertook two new analyses in his reply declaration.[45] Specifically, using his CD typology framework, Dr. Beveridge attempts to measure the difference in the consideration rate between CP beneficiaries and non-CP beneficiaries.[46] *See* Bev. Reply Ex. 24; ¶ 31. He also applied his outsider vs. insider methodology to Dr. Siskin's consideration study findings. *See* Bev. Reply Table 17.

As Dr. Siskin explained, such analysis is:

> unnecessary and undermine[s] the purpose of the consideration study. The consideration study incorporates and measures the impact of the CP policy on who is considered and is thus able to compete to be awarded a unit. There is no reason to break that down to "insiders" and "outsiders," as [Dr. Siskin's] findings already reflect the effect of the CP policy. While CP status is relevant to whether an applicant will be considered, once we know who has been considered, it is irrelevant and superfluous.

---

[45] Plaintiffs claim that this new analysis was "necessary" because the City "purports to reopen an issue as to which there had been agreement." Pls. Reply at 15. This attempt at an excuse to undertake new analysis that Plaintiffs could have taken during expert discovery fails. First, Plaintiffs point to no case law that supports the notion that "reopening an issue" is an exception to the rule that all expert analysis and opinions must be disclosed during expert discovery. *See* F.R.C.P. 26(2)(B) and (D). Nor did the City "reopen an issue." In response to Plaintiffs' 56.1 statement paragraph 51, the City noted that based on those definitions, it agreed that a greater percentage of CP beneficiaries are reached and considered because Plaintiffs had not measured the rates. The City then defined the vague terms and stated that based on those definitions, it agreed that a greater percentage of CP beneficiaries are reached and considered. Moreover, Dr. Siskin agreed in his deposition that a "significantly greater percentage" of CP applicants were considered. There was no reference to being "reached" in the deposition, nor did he agree to the proffered statement of "materially greater." Thus, there had never been an agreement to Plaintiffs' proffered statement, nor did the City outright object to the statement. Third, Dr. Beveridge's new analysis goes well beyond the 56.1 statement at issue. Not only does he attempt to measure the difference in consideration rate between CP beneficiaries and non-CP beneficiaries for the first time, he also looks at the differences by race in CD typologies—something never raised in the 56.1 statement or addressed by Dr. Siskin in his deposition. Dr. Beveridge also applies his methodology to the consideration findings, something not discussed during the deposition, 56.1 paragraph referenced, or previously undertaken by Dr. Beveridge. Plaintiffs had every opportunity to conduct this analysis during expert discovery and the City's response to the partially-related 56.1 statement provides no grounds to impose this new analysis in the middle of summary judgment briefing.

[46] Plaintiffs claim that they are using an "abandoned regression" analysis as the foundation for this analysis. However, the "abandoned regression" is based upon Dr. Siskin's consideration study. This is nothing more than a misleading attempt to distance themselves from the fact that they cannot and do not dispute Dr. Siskin's consideration study. Moreover, there is no obligation to use every analysis undertaken during discovery in motion practice. On the other hand, there is an obligation to not use any analysis not previously disclosed. Plaintiffs have violated that obligation.

Siskin Reply ¶ 77. In other words, Dr. Siskin's analysis studies the CP policy's impact on who is considered. Dr. Beveridge's analysis adds nothing but confusion.

In addition to this new analysis, Plaintiffs make two meaningless criticisms of the consideration analysis. First, Plaintiffs attack Dr. Siskin's employment analogy provided to the Court to better understand when the CP policy has its impact and what stage of the lottery should be studied to capture that impact. Despite attacking the analogy, Plaintiffs concede that one needs to be considered in order to compete for housing.[47] *See* Bev. Reply ¶ 91.

Second, Plaintiffs argue that the consideration study does not represent the full harm purportedly caused by the CP policy. Specifically, Plaintiffs repeat their baseless assertions that it does not measure the extent to which outsiders are "fully closed out" and does not measure the harm to "partially closed out" applicants.[48]  As previously explained, the consideration study reflects whether a particular race is fully closed-out. As to being "partially closed-out," it is impossible to know whether a partially closed out applicant is harmed by being partially closed out without knowing each applicants' unit size preferences, which the data does not reflect. Finally, while the City did not analyze the "partially closed out" applicants, neither did Plaintiffs, and it is their burden to establish disparate impact.

---

[47] Dr. Siskin also easily reframed the analogy in response to Plaintiffs' criticism. *See* Siskin Reply ¶ 82 fn 24. It does not change the fact that the consideration stage is the appropriate stage to study to best capture the CP policy's impact.

[48] A "fully closed out" applicant is an apparently eligible applicant for whom there are no units that match the applicant's eligibility (household and income size) available at the time the developer reached the applicant's log number. A "partially closed out" applicant is an apparently eligible applicant who was apparently eligible for more than one unit type (such as a 1 bedroom and a studio), but to whom (at the time their application is reached by the developer) fewer units than all the unit types for which they were apparently eligible are available (although at least one unit type is still available).

### ii.      Simulation

Unable to dispute the clear findings of the simulation which demonstrates that there is a very small difference in outcomes with the CP policy in place, and no disparate impact, Dr. Beveridge and Plaintiffs again improperly attack Dr. Siskin's simulation on new grounds and undertake new analysis, not previously disclosed during expert discovery.

As with the consideration study, Dr. Beveridge's new analysis is based upon Dr. Siskin's simulation findings, which are undisputed. Previously, Dr. Beveridge broke down Dr. Siskin's simulation with the CP preference, then applied his CP status and CD typology methodology to that breakdown. But, apparently recognizing the weakness of his CP status approach, Dr. Beveridge has now taken Dr. Siskin's results comparing the simulation with the CP policy and without the CP policy and broken those results into CD typologies. *See* Bev. Reply Tables 19 and 20. However, as discussed above, Dr. Beveridge's CD typology approach is fundamentally flawed and incorrect as a matter of law.

Plaintiffs also assert for the first time that the simulation findings are "diluted" because the CP policy only really impacts the CP units, or 50% of the units. Pls. Reply at 27. This is incorrect. The CP policy affects not only the CP units but also the non-CP units and, thus, the underlying premise that the impact is only in the 50% of units with the CP is wrong. *See* Siskin Reply at ¶¶ 88-91. Comparing the lottery with and without the CP policy actually isolates and measures the impact of the CP policy, and Dr. Beveridge is on record agreeing with that premise. *See* Polifione Aug. Dec. at Ex. 47 at ¶ 83 (stating that the appropriate "baseline comparison is an equal-access lottery (no community preference)"). Further, as Dr. Siskin demonstrated, not accounting for all the units (by focusing only on the 50% CP units) causes inconsistent results. *See* Siskin Reply ¶ 90 and Illustration 1.

Plaintiffs' "dilution" argument is consistent with Dr. Beveridge's repeated tactic of carving data into those groupings that allow him to reach the findings he seeks. For instance, reporting results by CD typology ignores all the other applications made outside that CD typology (ignoring that groups are advantaged in other CD typologies and only focusing on the purported disadvantage); asserting claims only on behalf of those in the "protected class" for which an injury was demonstrated ignores the 61.20% of apparently eligible applicants that don't fit that gerrymander; defining the "protected class" as only non-CP beneficiaries not of the dominant race ignores the impact of the CP policy on non-CP beneficiaries that are the dominant race) comparing CP beneficiaries with non-CP beneficiaries based upon the incorrect assumption that non-CP beneficiaries are not affected by the CP policy; and in his perpetuation of segregation analysis, using the incorrect denominator in creating his ratios (see section III.B. (c)). As demonstrated by Dr. Siskin, ignoring the data in each of these instances causes exaggerated outcomes and inconsistent results. *See* Siskin Reply ¶ 90. In short, Dr. Beveridge's "impacts" are the product of his selective sifting of the data.  Therefore, Dr. Beveridge's criticism of Dr. Siskin's disparate impact analysis is misplaced and his own analysis fails as a matter of law.

### POINT III

### THE LOTTERY WITH THE CP POLICY INTEGRATES AND DOES NOT PERPETUATE SEGREGATION

Plaintiffs have also failed as a matter of law to establish that the CP policy perpetuates segregation. It is undisputed that the lottery with the CP policy is integrative, that the moves of CP beneficiaries and non-CP beneficiaries are integrative, and that the CP policy results, at most, in a trivial amount of less integration. It is further undisputed that the New Yorkers who are awarded affordable housing in Dr. Beveridge's majority White CD typology are significantly

more diverse than the demographics of this typology. *See* Siskin Aug. Dec. ¶ 147. Finally, it is undisputed that the perpetuation of segregation analysis should be undertaken on a citywide basis and that Dr. Siskin's analysis is accurate. *See* Pls. Reply at 32. What remains in dispute is what constitutes perpetuation of segregation under the law, how one assesses it, and whether Dr. Beveridge's attempt to measure it is flawed.

## A.    Integrating Less is Not Perpetuating Segregation

Given these undisputed facts, Plaintiffs urge this Court to find that they have established a *prima facie* case of perpetuation of segregation because the lottery with the CP policy results in slightly less integration than would occur without the CP policy. In response to the City's assertion that Plaintiffs have failed to cite to any case law for the proposition that "integrating less" constitutes perpetuation of segregation, Plaintiffs still fail to point to any case law directly on point. Instead, Plaintiffs discuss two cases, namely *MHANY* and *Davis v. NYCHA*, from which they hope to convince the Court that such a legal standard is appropriate.

Contrary to Plaintiffs' assertion otherwise, *MHANY* does not support the notion that integrating less, in the minimal manner that the CP policy does, constitutes perpetuation of segregation. In MHANY there were two proposals before the Village, one which would have an integrative effect and the other which would result in no racial change. *See MHANY*, 819 F.3d at 598. The Court thus compared those two proposals and found that by adopting the proposal that would not result in racial change, and rejecting the proposal that would, the Village had perpetuated segregation. Here, however, there are not two proposals that were before the City. The CP policy is a longstanding policy that is part of the lottery system, which has an integrative effect. It also helps prevent the displacement of low-income people and helps get affordable housing built by helping overcome the fear of displacement. Finding that a municipality perpetuates segregation if it does not abolish a policy because that policy does not maximize

integration is different than finding that a municipality perpetuates segregation if it rejects a proposal that would lead to desegregation and instead adopts one that will not lead to any racial change in a segregated place. Simply put, the facts and circumstances of MHANY do not fit what is occurring here, and thus Plaintiffs attempt to apply the comparison made in MHANY is inapposite.

Nor does Plaintiffs' reliance upon *Davis v. NYCHA,* 60 F. Supp. 2d 220 (S.D.N.Y 1999), support their argument that integrating less constitutes perpetuation of segregation. In *Davis*, there was a consent decree directing the desegregation of certain NYCHA properties. Thus, instances where the challenged policy *significantly* delayed that desegregation were deemed to perpetuate segregation. There is no such consent decree in this case directing how the City should allocate its affordable housing, nor is there any legal obligation that the City allocate its housing to achieve the maximum integrative effect at all times, regardless of other legitimate policy goals. Nothing in *Davis* stands for the proposition that if the status quo integrates, the City can nevertheless be liable for perpetuation of segregation because removing a component of the status quo would trivially increase that integrative effect.

The *amicus curiae's* argument that the CP policy should not be looked at as part of the Lottery Process because then that would allow a municipality to "nest purposefully an integration-stymieing policy within a broader policy" likewise fails. *See* Amicus brief at 19. If a municipality *purposefully* sought to stymie integration, then the municipality could potentially be liable for intentional discrimination. However, what we are dealing with here is the perpetuation of segregation prong of disparate impact, in which the intent to discriminate need not be proven. In any event, as demonstrated above, there is no intentional discrimination behind the CP policy.

The *amicus curiae* further makes the specious argument that the City's position is akin to a public housing authority in a white suburban area claiming that their housing voucher program with a local preference integrates as it is more integrative than no housing voucher program. Such hypothetical analogy has no relevance to the facts before this Court. The City is not claiming that the lottery with the CP policy is more integrative than no lottery. The City acknowledges that the lottery would be trivially more integrative without the CP policy, but asserts that, because the lottery is integrative with the CP policy in place, there should not be a finding that the CP policy perpetuates segregation. The relevant question is whether, when a policy is integrative, a component of that policy can nonetheless be deemed to perpetuate segregation because it results in less than the maximum possible integration. The City asserts that the answer to that question is no and neither Plaintiffs nor the *amicus curiae* have provided case law to the contrary.

Adopting Plaintiffs' (and the *amicus curiae's*) interpretation of perpetuation of segregation to include policies that achieve less than the maximum possible integration would have extreme practical ramifications for municipalities. Such an interpretation would require municipalities to assess each component of their policies and programs to ensure that they are as integrative as possible compared to not pursuing that component of the policy or program, even if the policy or program overall is integrative. In other words, it would require municipalities to prioritize maximizing integration over any other policy goal as, under Plaintiffs' definition, if not pursuing the policy or component of a policy or program is more integrative than pursuing it, the municipality must abandon the policy/component, or be threatened with liability for perpetuating segregation. The law does not require a municipality to maximize integration, but prohibits the

municipality from taking actions that perpetuate segregation. There is a distinction between the two that cannot and should not be muddled in the manner Plaintiffs seek.

While Plaintiffs claim that the City could then simply assert a defense of a legitimate governmental interest, the point is that the City (and other municipalities) should not have to be vulnerable to claims of perpetuation of segregation or findings of a *prima facie* case of perpetuation of segregation in the first instance under such circumstances. The City should not be forced to justify every policy or component of a program in litigation when the policy or program is overall actually integrative, and when there was no rejection of a more integrative alternative that addresses the City's interests. Such an outcome is inconsistent with the Supreme Court's ruling in *Inclusive Communities*.[49] Indeed, the Supreme Court opined that "[t]he FHA is not an instrument to force housing authorities to reorder their priorities." *Inclusive Communities*, 135 S. Ct. at 2522.

**B.     The Dissimilarity Index is the Proper Measure and Plaintiffs' Alternative Approaches are Improper**

Even if the Court were to find that integrating less can constitute perpetuation of segregation, Plaintiffs would also need to demonstrate that the CP policy's reduction of integration is legally significant in size. *See Davis* 166 F.3d at 438, *Huntington Branch NAACP v. Town of Huntington*, 844 F.2d 926, 938 (2d Cir.)*, aff'd*, 488 U.S. 15 (1988). *See also Gilmore v. Montgomery*, 417 U.S 556 (1974). Plaintiffs appear to concede this to be the case, as Dr. Beveridge undertook new analysis in his initial declaration and in his reply attempting to measure and demonstrate the practical significance of his perpetuation of segregation findings. *See* Bev. Aug. Dec. Tables 12 and 13; Bev. Reply Tables 22-24 and 26. However, Dr. Beveridge

---

[49]Nevertheless, as discussed in section IV, *supra*, and in the City's initial Brief at 51-64, the CP policy serves legitimate interests.

did not properly undertake such measurements. First, Dr. Beveridge did not use the dissimilarity index, which is the proper measure, as Dr. Siskin did.[50] Second, as discussed below in subsection (c), Dr. Beveridge's calculations are flawed.

### (a) The Dissimilarity Index is an Appropriate Measure of Integration

As previously discussed, Dr. Siskin measured the CP policy's impact on integration on the dissimilarity index, the index commonly relied upon when measuring the overall level of segregation in a city (and relied upon by Dr. Beveridge for this purpose). Dr. Siskin looked at both the impact of the consideration stage, the stage in which the CP policy has its impact, and compared the impact of the lottery on integration with and without the CP policy, thereby isolating the impact of the CP policy. As Dr. Siskin demonstrated, the consideration stage reduces the potential Black-White integrative effect of the lottery by .00053. Based on the simulation, the lottery without the CP policy in place would be .00044 more integrative in the Black-White pairing on the dissimilarity index. These are trivial effects. *See* Siskin Aug. Dec. Tables 7 and 8.

In an obvious effort to distract the Court from these undisputed facts, and faced with having not undertaken any independent perpetuation of segregation analysis (despite it being Plaintiffs' burden), Plaintiffs have argued that assessing perpetuation of segregation with the dissimilarity index is improper. Plaintiffs ask this Court to assess perpetuation of segregation based upon how integrative CP beneficiaries are in comparison to non-CP beneficiaries (and it is not in dispute that both groups are integrative). In other words, they ask this Court to ignore the actual measurement of the impact of the CP policy on the dissimilarity index and instead assume

---

[50] Additionally, as previously discussed, Dr. Beveridge's analysis is flawed in that it compares the integrative effect of CP beneficiaries with non-CP beneficiaries. *See* Siskin Aug. Dec. ¶¶ 134-135.

that because non-CP beneficiaries are more integrative than CP beneficiaries (although Plaintiffs admit that both groups are net integrative) that there would be even greater integration without the CP policy in place.

Plaintiffs' arguments as to why the use of the dissimilarity index is not appropriate fail.[51] Plaintiffs first argue that courts do not look to the dissimilarity index as a tool to measure perpetuation of segregation. While it is true that the cases cited to by Plaintiffs do not use the dissimilarity index, it is also true that Plaintiffs cite to no cases in which a court has held that using the dissimilarity index is improper, nor is the City aware of any such case. As Dr. Beveridge has recognized, much more data is available in this case than is typical in other fair housing cases. *See* Bev. Reply ¶ 112. Other cases likely did not have the correct data to undertake such analysis. Simply because other experts have not pursued this approach does not mean that it is improper.

Plaintiffs next argue that because of an issue of scale, use of the dissimilarity index would "undermine" the FHA because it would make it possible that "every or nearly every case [would be] thrown out."  Pls. Reply at 35. Plaintiffs explain this assertion by claiming that given the large number of housing units in New York City (and other jurisdictions), no housing policy that would be challenged in a FHA case could move the dissimilarity index on its own. Yet that is not true even in this case. Dr. Siskin demonstrated that if, hypothetically, all the units studied had been filled with awardees that had an integrative effect, or, conversely, had been filled with awardees that had a segregative effect, the dissimilarity index would shift by .011. *See* Siskin Aug. Dec. ¶ 116; Siskin Reply ¶ 103. While this may appear to be a small change, the

---

[51] Plaintiffs' attempt to undermine Dr. Siskin's use of the dissimilarity index by pointing out that he is less familiar with housing segregation than Dr. Beveridge is. However, Dr. Beveridge, who purports to be a segregation expert, put forth no perpetuation of segregation analysis, and relied upon Dr. Siskin's findings.

dissimilarity index is typically reported in the second decimal place, and, therefore a change in the second decimal place is meaningful. If the CP policy and, more generally, the lottery process had truly perpetuated segregation (which they do not), the dissimilarity index could have been impacted in a meaningful manner in this case. Consequently, there is no reason to find that the real change in the dissimilarity index in the fourth decimal place is meaningless in this case; in fact, it clearly shows that the CP policy did not perpetuate segregation meaningfully. While an issue of scale may be a concern with using the dissimilarity index in other cases, it is not an issue here, and thus there is no reason to dismiss its findings.[52]

### (b) Plaintiffs' Alternative "Measures" are Improper

Plaintiffs present two alternative "measures" to the dissimilarity index. Originally, they compared the net integrative effect of CP beneficiaries with non-CP beneficiaries based upon Dr. Siskin's analysis findings. Although Dr. Beveridge concedes that the net integrative numbers were calculated consistent with calculating the dissimilarity index, *see* Bev. Reply ¶ 103, he did not take the next logical step to calculate the dissimilarity index, but instead converted the net integrative numbers to ratios, and then undertook an "80% test." *See* Bev. Mar. Dec. Tables 12, 13; Bev. Reply Tables 22, 23. Second, for the first time in his reply declaration, Dr. Beveridge compared the integrative effect of the simulation with the CP policy in place to the integrative effect of simulation without the CP policy. *See* Bev. Reply Table 26. Yet again, Dr. Beveridge did this through his "80% test" rather than absolute numbers.[53] As Dr. Siskin explained, the 80%

---

[52] It is worth noting that despite arguing that the dissimilarity index is not the proper measure, Dr. Beveridge's "analysis" is based upon the measures created for use on the dissimilarity index (the net integrative numbers). Rather than taking the expected next step to assess the practical significance of those numbers on the dissimilarity index, he has created ratios to skew the absolute results.

[53] This differs from the new analysis he improperly presented in his initial declaration, which attempted to measure the difference between the CP beneficiaries and non-CP beneficiaries using ratios and his "80% rule."

rule is not applicable here as there is no selection rate,[54] nor has Dr. Beveridge explained why the 80% threshold in such a circumstance would be appropriate. Indeed, if one were to compare a dissimilarity index rating of .80 with a rating of .64, most demographers would believe that the .16 difference is meaningful. However, applying the 80% rule, the conclusion would be that there is no meaningful difference. *See* Siskin Reply ¶ 114.

Furthermore, as demonstrated by Dr. Siskin, the absolute numbers are small and have a trivial impact on the dissimilarity index, which is the barometer by which they are supposed to be measured. As Dr. Siskin explained, the ratio makes the small absolute numbers look much larger than they are. However, "[a] large percentage of a very small number is still a very small number."[55] *See* Siskin Reply ¶116. Thus, as the dissimilarity index is measured in absolute numbers, and the net integrative numbers that Dr. Beveridge uses are meant for application to the dissimilarity index, the only value in converting these numbers to ratios is to give a false impression that the differences are larger than they actually are.

### (c)  Dr. Beveridge's Calculation of His Ratios is Incorrect

Plaintiffs' and Dr. Beveridge's defense of Dr. Beveridge's ratios is so extensive that one would think the calculation of Dr. Beveridge's ratios is the key issue in dispute regarding whether the CP policy perpetuates segregation. To the contrary, Dr. Siskin's attack on the calculation is simply a small technical attack on Dr. Beveridge's methodology, that is in addition to Dr. Siskin's substantive attacks on other grounds. Siskin Aug. Dec. Section V. Nevertheless, if one were to adopt Dr. Beveridge's flawed methodology, it is important to note that his

---

[54] Wherever Dr. Siskin relies upon the 80% rule, there is a selection rate at issue.

[55] The example Dr. Siskin provided is that a $20 raise on a salary of $100,000 is twice as large as a $10 raise on a salary of $100,000. Saying the raise was twice as large makes it appear large, but in reality, the difference between $10 and $20, when compared to a $100,000 salary, is trivial. *See* Siskin Reply ¶ 115.

conversion of the net integrative numbers to ratios (which are then used to calculate his "80% test") is done improperly. As Dr. Siskin demonstrated in his Illustration 2, Dr. Beveridge's denominator that excludes the "not in group" causes inconsistent results and exaggerates the difference between the net integrative effect of CP and non-CP beneficiaries. *See* Siskin Reply Illustration 2; ¶¶ 119-121.

While Dr. Beveridge's new tables comparing his method to what he claims is Dr. Siskin's method (Bev. Reply Tables 22, 23, and 24) do not show large differences in the calculation of his 80% test, it is the *difference* between the net integrative ratios that is exaggerated. It is that exaggerated difference that Dr. Siskin previously pointed out. *See* Siskin Reply ¶¶ 123-126 and Illustration 2; Siskin Aug. Dec. ¶¶ 136; 138-140. Dr. Beveridge's calculation of his ratio makes it appear as if the net integration of non-CP beneficiaries is 10% higher than that of CP beneficiaries, when in fact it is only 5% greater, therefore doubling the impact of the CP policy. *See* Siskin Reply ¶ 125. Thus, Dr. Beveridge's new 80% rule tables fail to respond to Dr. Siskin's criticism about the exaggerated differences between the net integrative ratios and are absolutely irrelevant.

## C.    Dr. Beveridge's New Attack on the Simulation is Meritless

As he also argued in the context of disparate impact, Dr. Beveridge argues for the first time that the perpetuation of segregation simulation results dilute the true effect of the CP policy. *See* Bev. Reply ¶¶137-38. As discussed above in the disparate impact section, the CP policy does not only affect the 50% of units with CP, but effects all the units.[56] This is just another example of Dr. Beveridge's choice to not analyze all the data in an effort to exaggerate outcomes. As Dr.

---

[56]Furthermore, this "dilution" argument does not apply to the consideration study. Dr. Siskin demonstrated that the consideration stage has the result of reducing the amount of Black-White integration by .00053. This is a conservative estimate of the impact of the CP policy, as factors other than the CP policy influence which applicants are considered. *See* Siskin Aug. Dec. Table 7; Siskin Reply ¶ 91 fn 7.

Siskin demonstrated in his Illustration 1, accounting for only the units reserved under the preference policy can lead you to the absurd result that removing the 5% Municipal Employee preference policy ("ME preference")[57] is more integrative than removing the CP policy. *See* Siskin Reply ¶ 90; Illustration 1. Therefore, Dr. Beveridge's new dilution theory is nothing more than another desperate attempt to inflate the purported impact of the CP policy.[58]

**POINT IV**

**THE CP POLICY IS NECESSARY TO ACHIEVE VALID INTERESTS**

As the City stated in its previous briefing, the CP policy is necessary to address two significant, bona fide public policy issues: preventing the displacement of low-income residents, thereby giving them a greater opportunity to remain in their communities if they choose, and responding to the fear of displacement, which in turn helps overcome opposition to the construction of new affordable housing and helps garner necessary approvals for affordable housing. *See* City's Aug. Brief at Point IV at 51-63.

Plaintiffs make three primary arguments in response. First, they continue to assert that these interests are speculative, trying to convince the Court to impose an unsupported evidentiary standard necessitating statistical evidence. *See* Pls. Brief at 42. Second, in an attempt to overcome the Plaintiffs' agreement that addressing displacement is a legitimate government interest, Plaintiffs attempt to make it seem as if the City suddenly changed its rationale for the CP policy, so that they can "dispute" that "new" rationale as insubstantial. Finally, Plaintiffs further continue to mischaracterize the role that the CP policy plays in supporting the

---

[57] The ME preference gives preference to City employees for 5% of the affordable housing units in a lottery. *See* the Declaration of Margaret Brown, dated August 14, 2020 (ECF 900) at ¶ 17.

[58] This "dilution" argument does not apply to either of Dr. Siskin's consideration studies, the validity of which are undisputed. *See* Siskin Reply ¶ 91 and fn 27.

54

development of affordable housing, attempting to transform the City's appropriate response to a legitimate concern into a nefarious political scheme. These attempts to undermine the validity and substantiality of the legitimate interests served by the CP policy fail.

A.   **The City's Interests are Not Speculative and the Evidentiary Standard Plaintiffs Seek to Impose is Unsupported by the Law**

Plaintiffs' assertions that displacement and the fear of displacement are speculative and that the CP policy is not designed to achieve the prevention of displacement from one's neighborhood lack merit. Plaintiffs have cited to no case law to support the evidentiary burden they seek to impose, which would include data measuring the scope of the displacement and measuring the CP policy's success in addressing displacement. The case law they rely upon of course mandates the defendant to produce some evidence in support of the legitimacy of their non-discriminatory interest, but such cases do not impose the data-driven evidentiary standard Plaintiffs claim is applicable.

As the Second Circuit explained in *Huntington*, "the inquiry is whether the proffered justification is of substantial concern such that it would justify a reasonable official in making this determination. Of course, a concern may be non-frivolous, but may not be sufficient because it is not reflected in the record." *Huntington*, 844 F.2d at 939. Unlike in *Huntington*, there is ample evidence in the record supporting the City's interests and a clear demonstration of how these interests and the CP policy intersect. *See* Been Dec., generally; Goetz Aug. Dec., generally; Goetz Reply, generally; Polifione Aug. Dec. Exs 4-40, 53-57, and ¶ 42; Polifione Reply Dec. Exs 67 -71, 74-80, 82-84. Plaintiffs' attempt to ignore this evidence and impose an evidentiary burden that most municipalities would never be able to meet should be rejected.

In order to run an efficient and fair process to distribute the City's precious affordable housing, the City does not try to determine whether each recipient of a CP unit is at risk of

displacement at the time of submitting their application. This by no means undermines the CP policy's impact on addressing displacement in New York City. Plaintiffs' own expert has demonstrated that approximately 70,000 affordable housing CP beneficiary applicants are rent burdened, which is his definition of at risk of displacement. *See* Bev. Mar. Dec. ¶ 197. There is also a severe affordable housing crisis in New York City, with more than half of renters in New York City considered rent burdened. *See* Been Dec. at ¶ 33. Thus, there is no reason to believe that the recipients of CP units are not at risk of displacement by Plaintiffs' own definition. Nor does the fact that the CP policy may be over-inclusive in benefitting some people who are not at risk of displacement undermine its legitimacy. The law does not require such perfect tailoring.

Moreover, the fact that non-CP beneficiaries are also at risk of displacement is of no moment. As Professor Goetz explained, "[t]he fact that households who live outside of the CD are also at risk of displacement in no way diminishes the utility and importance of a policy like community preference that protects households within a particular CD from being displaced from their communities when new development comes to their neighborhoods. When a lottery occurs in their CD, the CP policy will be in place to enhance their chances of staying in that CD should they wish to apply. The legitimacy of that opportunity does not depend on whether there is a risk of displacement elsewhere in the City." Goetz Reply at ¶ 62. Furthermore, given the scope and complexity of the issue, the CP policy is just one of many anti-displacement tools intended to help New Yorkers.

Similarly, the City's inability to measure precisely the scope of neighborhood displacement does not delegitimize the City's interests in preventing displacement. As Professor Goetz explained, "government agencies routinely address public policy questions that they cannot precisely quantify. To constrain the government from acting on such issues would be to

keep it from addressing carbon emissions, homelessness, child abuse, and a range of additional problems that observers agree are pressing though there is no agreed upon estimate of the precise size of the problem." Goetz Reply ¶ 66. While of course data is helpful to formulate and assess policy, contrary to Plaintiffs' assertions otherwise, the lack of such data does not negatively reflect on the need for or efficacy of a policy.

Additionally, it is well understood that measuring displacement is complex. *See* Goetz Aug. Dec. ¶ 24; Been Aug. Dec. at ¶ 69; Polifione Reply Dec. Ex 79 (Beveridge deposition at 30:16-32:9). Nevertheless, even without a concrete study, the City has a plethora of other data and information at its disposal from which the City can assess the need to prevent displacement from one's neighborhood. *See* City's Aug. Brief at 58-59; Polifione Reply. Dec. Ex 84; Been Dec. at ¶ 69.[59]

Plaintiffs make the same meritless complaints with regard to the City's interest in addressing and overcoming the fear of displacement. They also continue to misrepresent the context in which the CP policy is responsive to the fear of displacement in order to make it seem like an "amorphous" rationale. The CP policy is responsive to the fear of displacement from one's neighborhood, which is often expressed by New Yorkers during the public review process that many affordable housing projects (or rezonings to facilitate same) must undergo. Many low-income communities oppose the construction of affordable housing, because they fear that a housing development or the amenities that accompany such development will trigger or further facilitate increasing rents and higher costs of living in their neighborhood, consequently making

---

[59] For examples of presentations given by Deputy Mayor Been when she was HPD Commissioner in which data points relevant to displacement were noted and discussed, see Ex 40. For more information on the HVS and DCP demographic studies specifically, see Been Dec. at ¶ 69, n. 48 and n. 49. Moreover, this data and information used by the City to understand displacement is in addition to the anecdotal evidence heard by the City through multiple types of interactions with the public, community groups and council members, see fn 60, *infra*.

it unaffordable for them to stay in their community. *See* Goetz Reply at ¶ 38; Been Aug. Dec. ¶¶ 47, 56; Polifione Aug. Dec. Exs. 38-39, ¶ 42. HPD is regularly asked to confirm the applicability of the CP policy at public meetings with regard to specific developments or accessing affordable housing more generally. *See* Been Aug. Dec. at ¶¶ 46, 48, 53, 59. Being promised that half of new affordable homes will go to existing community members helps overcome the connection that many residents have made between displacement and new development, which helps overcome some of the opposition to the development of new affordable housing. Additionally, as Plaintiffs do not contest that displacement is a concern, it is illogical that they discount the fear of displacement and ignore the City's clear evidence that it is responding to these concerns of residents.

Although Plaintiffs claim that the fear of displacement is not supported by the evidence, despite the numerous documents and public hearing transcripts and articles provided to the Court, *see* Polifione Aug. Dec. Exs. 6, 8-10, 12-13, 15-33, 35, 38-39, and ¶ 42, Plaintiffs themselves make a wholly unsupported argument that the CP policy must increase the fear of displacement for non-CP beneficiaries. Moreover, this assertion again makes no sense when one understands the context in which the fear of displacement that the CP policy is aimed at addressing is expressed—i.e. when new development is being proposed in one's neighborhood.

In sum, Plaintiffs want a data driven, clearly quantified answer as to exactly how many households at risk of displacement or that feared displacement were helped by the CP policy, which the City admittedly does not have. However, the case law does not support placing such a burden on the City. Further, Plaintiffs ignore the copious amounts of evidence presented regarding displacement and the impassioned voices of residents fearing being displaced as new

development comes to their neighborhoods.[60] There is nothing speculative about the City's interests.

## B.    Preventing Neighborhood Displacement is a Substantial Interest

Desperate to overcome their and their experts' agreement regarding the legitimacy of preventing displacement and the need to address displacement as a public policy issue, Plaintiffs are trying to make it appear that the City is just now revealing that the CP policy is only meant to address neighborhood displacement and not imminent displacement from one's home. *See* Pls. Reply at 48-49. They are now claiming that displacement from one's neighborhood is not a substantial interest, while continuing to note their agreement that displacement from one's home and the city are legitimate and substantial. Pls. Reply at 50. First, there is nothing new about the fact that the CP policy is directed at preventing displacement from one's neighborhood or that it does not address imminent displacement. The City has never said otherwise, and has openly acknowledged this throughout discovery and elsewhere.[61]

Second, simply declaring that working to prevent neighborhood displacement is not substantial, as Plaintiffs have done, does not mean that it is in fact not a substantial government

---

[60] Specifically, for examples of email and other correspondence between community members or community groups and the City regarding fears of being displaced, see Polifione Aug. Dec, Exs 6, 9-10, 12, 19, 21-22, 24, 26, 31 and 31. For examples of news articles reporting on communities' fears of displacement, see id. Exs 8, 15-18, 25, 27-30, and 32. For examples of other documents and memoranda documenting expressed community fear of displacement, see id. Exs 13-14, 20, 23, and 33. For examples of ULURP testimony, CPC reports and videos of hearings in which displacement concerns were voiced, see id. Exs 38-39 and ¶ 42.

[61] In multiple depositions, Plaintiffs' counsel thought to ask witnesses about "imminent" displacement. No witness answered in a manner in which Plaintiffs would believe that the CP policy addressed imminent displacement. However, if there was any confusion or uncertainty about the connection if any between the CP policy and "imminent displacement," he failed to follow up or further clarify how or if the CP policy was meant to address what plaintiffs meant by "imminent" displacement. For example, in Deputy Mayor Been's first deposition, Plaintiffs asked her about imminent displacement and after she answered, never followed up for further clarification. *See* Polifione Reply Dec., Ex 67 (Been Depo I at 103:12- 111:7). They also asked former HPD Commissioner Torres-Springer at her deposition how the CP policy assisted with "imminent" displacement. She explained that it helped affordable housing to be approved and built and that residents would have an opportunity to live in those new units. Her response on how the CP policy helps address displacement and the fear of it, consistent with how it has been explained by the City throughout this litigation and this briefing. *See id.*, Ex 71 (Torres-Springer Deposition at 113:19-114:12, 157:5-157:17); *see also id.* Ex 75 (Weisbrod Deposition at 62:7-18, 133:14-134:14).

interest or that they have created an issue of fact. *See* Pls. Reply at 50. *See Farley* 1994 U.S. Dist. LEXIS 5589, at *9-11. This is especially true when they have willfully ignored the evidence presented to them. It is well established that residents can have close ties to their neighborhoods, that being forced out of their neighborhoods can and does have harms, and that the City is aware of these facts. *See* Been Dec. at ¶ 71; Goetz Aug. Dec. ¶¶ 41-50.

Plaintiffs' argument shows their complete disregard for the seriousness of displacement as a public policy issue and the serious harms of displacement. *See* Goetz Aug. Dec. ¶¶ 41-50. That the CP policy focuses on displacement from one's community does not make it any less important a public policy issue. The City has policies and programs that are intended to address the multifaceted nature of displacement, including preventing imminent displacement from one's home through eviction, and the non-imminent displacement from one's neighborhood through gentrification. *See* Been Aug. Dec. at ¶¶ 67, 76-78. Plaintiffs' judgement on which facet of displacement warrants a public policy response and which does not, does not undermine the legitimacy of the CP policy.

Moreover, the fact that Deputy Mayor Been agrees that having housing is more important than where that housing is located does not mean that the interest to prevent displacement from one's neighborhood is not valid and substantial. *See* Pls. Reply at 50. By Plaintiffs' standard, a legitimate policy becomes "insubstantial" because there are other significant housing issues, or even housing (or non-housing) issues of equal or greater importance. This is one of many "false choices" that Plaintiffs seek to impose. *See* Goetz Reply ¶¶ 6, 11, 25.

Displacement is multifaceted and the anti-displacement tools are likewise multifaceted. There is nothing frivolous or insubstantial about preventing neighborhood displacement of low-income residents and being responsive to the legitimate fear of displacement. This is particularly

true given the history of displacement of Black and Brown communities from their homes and neighborhoods. *See* Goetz Aug. Dec. ¶¶ 75, 79.

Creating another false dichotomy, Plaintiffs claim that the City prefers "insiders." The City is not choosing insiders over outsiders, nor is the City choosing a desire to not be displaced from one's neighborhood over a desire to move from one's neighborhood. The City has policies and programs in place to help generate mobility, including by supporting the development of 57,119 new affordable housing units across the city since 2014, passing the most aggressive mandatory inclusionary housing legislation in the country ("MIH"), and lobbying to expand the applicability of the 421-a tax exemption so that more affordable housing can be built in more places across the city. At the same time, the City is investing in neighborhoods that have lacked investment for many years, helping residents that want to stay in their neighborhood during these positive changes to their neighborhood be able to do so, despite displacement pressures, as well as addressing other aspects of displacement. *See* Been Aug. Dec. at ¶¶ 3, 24-27; 76-78. That Plaintiffs and presumably many New Yorkers value mobility does not mean that the City's interests in preventing displacement are invalid.

Plaintiffs' continued reliance upon Housing Connect data to attempt to demonstrate that applicants prefer to live outside their CD is misplaced. Dr. Beveridge himself conceded that he does not know what it shows in terms of preferences. *See* Ex. 45 to the Polifione Aug. Dec. (September 24, 2019 Beveridge Deposition at 112:24-113:1). Plaintiffs also point to single page of the community conversations report, which was part of the WWL process, quoting the portion of the page that they believe helps them (that many residents ended up in neighborhoods due to circumstances out of their control), but ignoring the large graphic on the page that states that 55% of the people surveyed would like to remain in their neighborhoods. *See* MD Ex. 11. In

contrast, in addition to WWL, the City is relying upon the countless expressions of community members and leaders about the fear of being displaced from one's home and community. Plaintiffs conveniently ignore this evidence the City has provided.

As to Plaintiffs' argument that the CP policy is a "misleading" response to the fear of displacement, this is just another iteration of their argument that the CP policy is not valid unless it prevents the displacement of all applicants at risk of displacement. There is no evidence that the City promises all community district members housing. The promise is a preference. Dr. Beveridge has demonstrated that the CP policy does in fact result in a preference. *See* Bev. Aug. Dec. Tables 2 and 5. If that preference were not meaningful, this litigation would not have been commenced.

Again, Plaintiffs fail to cite to any case law to support their assertion that helping to prevent displacement from one's neighborhood is not sufficiently substantial. Perhaps that is because the case law clearly does not support Plaintiffs' position. When ruling that a disparate impact claim may be pursued under the FHA, fully understanding that the assertion of legitimate government interests occurs after a finding of disparate impact, the Supreme Court acknowledged that traffic patterns and historic preservation may constitute legitimate interests. *See Inclusive Communities,* 135 S. Ct. at 2523. Similarly, in *MHANY*, the Second Circuit, after affirming a finding of perpetuation of segregation, "agree[d] that [the d]efendants identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools." *MHANY*, 819 F.3d at 620. Clearly if traffic, historic preservation, and a strain on public schools are sufficient bona fide governmental interests, so is attempting to prevent the displacement of low-income households from their communities and addressing those households' legitimate fear of displacement, which in turn helps overcome opposition to

affordable housing. Plaintiffs' arguments are nothing but desperate attempts to overcome this case law and their own admissions regarding the significance and importance of responding to displacement.

## C. Responding to a Legitimate Concern During the Legislative Process is Not "Enhancing Political Convenience"

Plaintiffs yet again mischaracterize the City's legitimate interest in addressing the fear of displacement, which also helps overcome opposition to affordable housing, as "enhancing political convenience."[62] Pls. Reply at 57. Plaintiffs emphasize that the City did not dispute that "this kind of justification" is unprecedented, would undermine the FHA and City HRL, and is speculative. Pls. Reply at 56. That is because the "kind of justification" Plaintiffs describe is not the City's rationale for the CP policy.

There is nothing nefarious about the executive branch having a policy that addresses the legitimate concerns of residents and legislators, such as the fear of displacement, which is also helpful to overcoming opposition to affordable housing based upon those concerns. Moreover, while the City Council is often the final decision maker on affordable housing projects, if a project is so unsupported by the community during the earlier stages of the public review process, it may never make its way to the Council. In other words, the opposition faced that the CP policy helps overcome is not just from council members. Thus, while it is true that the City has expressed that the CP policy helps overcome opposition to affordable housing, which in turn helps get more affordable housing built, overcoming opposition from Councilmembers is only one small component.

---

[62] *Amicus curiae* copy Plaintiffs' arguments, and disregard the interests the City actually put forth, preventing displacement from one's neighborhood and mitigating the fear of displacement. *Amicus curiae's* silence on the legitimacy of those interests speaks volumes.

Plaintiffs' argument that DM Been's declaration is a "sham" because her statement in her declaration stating that she is concerned that affordable housing projects would not get passed without the CP policy is purportedly inconsistent with her deposition testimony is nothing but desperate mud-slinging. Pls. Reply at 58. First, DM Been has been on record, prior to the declaration, as have other City employees, as stating that there is a concern that affordable housing would not be approved without the CP policy. *See* Polifione Reply Dec.[63] Indeed, Plaintiffs conveniently fail to inform the Court that during Deputy Mayor Been's second deposition, Plaintiffs' counsel asked her to list those Councilmembers she believed would not vote to approve an affordable housing project if the CP policy were less than 50%, and that DM Been proceeded to answer that question, naming particular Councilmembers based upon her impressions during conversations with them. *See* Polifione Reply. Dec. Ex. 68 (Been II at 28:12 through 31:17).[64] Deputy Mayor Been's testimony in her first deposition was in response to improper "but-for" hypotheticals, which is wholly irrelevant and not comparable to her testimony in her second deposition and her statement in her declaration, which were based on her personal experiences.

Moreover, the speculative hypotheticals lack relevance to the legitimacy of the City's governmental interests.[65] The City's rationale for the CP policy is not that affordable housing would never be built without it—but that there is currently significant opposition to affordable

---

[63] *See* Polifione Reply Dec., Ex 68 (Been II Deposition 104:13-105:13, 188:5-12); Ex 71 (Torres-Springer Deposition at 123:5-124:5, 199:22-205:23), Ex 74 (Donovan Deposition at 130:3-131:16); Ex 75 (Weisbrod Deposition at 37:2-39:4); Ex 76 (Cestero Deposition at 73:4-75:20); Ex 77 (Bozorg Deposition at 303:4-304:25); Ex 83 (Press Deposition at 98:5-99:2, 100:17-101:3, 103:3-104:11, 106:22-107:3, 108:3-112:3, 114:22-116:23, 117:9-118:12).

[64] Former HPD Commissioner Torres-Springer likewise provided such a list. *See* Polifione Reply Dec., Ex 71 (Tores-Springer Deposition at 121:8 – 121:21).

[65] Indeed, lack of relevance was part of Magistrate Judge Parker's rationale for granting the City's motion to quash discovery from the councilmembers. *See* ECF 183. This Court found that Judge Parker's decision was not clearly erroneous or contrary to the law. *See* ECF 656.

housing by community members and councilmembers out of the fear of the displacement of low-income community members. That fear is a legitimate fear, and consequently, important to address in order to overcome that opposition and help get affordable housing built. Plaintiffs yet again mischaracterize the City's interests to suit their needs.[66]

Finally, Plaintiffs continue to rely upon a public statement made by Speaker Johnson over two years ago about his apparent willingness to consider a reduction in the CP policy. However, nothing has materialized from this statement. Whether DM Been or anyone in the administration spoke to Speaker Johnson about his comments is of no moment. Speaker Johnson himself has not acted on his comments. *See* Been Aug. Dec. at ¶ 93, n. 74.

In sum, Plaintiffs' attacks on the City's interests as lacking evidentiary support, insubstantial, and nefarious political games are unsupported by the facts and the law. The City has more than met its burden, and thus the burden shifts back to Plaintiffs.[67]

## POINT V

## THERE ARE NO LESS DISCRIMINATORY ALTERNATIVES

If the Court finds that the City established that the CP policy serves its legitimate government interests, then the burden shifts to Plaintiffs to show "that [there] is 'an available alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'"

---

[66] Plaintiffs' appear to be attempting to re-litigate this Court's decision overruling Plaintiffs' objection to Magistrate Judge Parker's decision granting the City's motion to quash discovery from Councilmembers. *See* ECF 656. Contrary to Plaintiffs' assertions, there is nothing "unfair" about that decision. As noted above, Plaintiffs' mischaracterize Deputy Mayor Been's prior testimony, and the City's rationale for the CP policy. The City is not relying upon the testimony of Councilmembers, which this Court previously explained, "mitigat[es] the fairness concerns." ECF 656 at 3. Further, Plaintiffs' reliance upon cases addressing waiving the attorney-client privilege on fairness grounds is misplaced. The attorney-client privilege is not applicable here, nor is the City asserting a rationale for the CP policy that Plaintiffs have not been able to undertake discovery of. As noted above, there is nothing new about Deputy Mayor Been's statement in her declaration regarding her concern about not being able to get affordable housing passed.

[67] Alternatively, even if the Court does not agree that the City established its defense as a matter of law, certainly the City raised issues of fact that necessitate denying Plaintiffs' motion for summary judgment.

*Inclusive Communities,* 135 S. Ct. at 2518 (quoting *Ricci v. DeStefano*, 557 U.S. 557, 578 (2009)). While Plaintiffs are correct that it is the City's burden of persuasion under the City HRL to demonstrate that the proposed alternatives would "not serve [it] as well," Plaintiffs have not met their burden to first demonstrate through "substantial evidence" that there is an alternative policy that is less discriminatory. *See* N.Y.C. HRL (Admin. Code § 8-107(17)(a)(2)). Moreover, even if, *arguendo*, they had met such burden, the City has demonstrated how Plaintiffs' proposals will not meet its needs. *See* Been Dec. at ¶¶ 82-95.

To the extent that Plaintiffs are arguing that under the FHA, the alternatives proposed need not meet the City's interests "as well," such argument lacks merit. Alternatives must be reasonable and "comparable." *Bryan v. Koch*, 627 F.2d 612, 619 (2d Cir. 1980).[68] An alternative that does not meet the City's interests "as well" is neither reasonable nor comparable. However, this issue is nothing but a red-herring, as Plaintiffs alternatives fail to address the City's interests whatsoever. In fact, many are based upon the assumption that the City's interests are not legitimate.

In their brief, Plaintiffs propose what they would consider nine alternatives to the CP policy. They are the following: (1) be honest with the public about the policy, (2) an education campaign to inform CMs and residents about the need to reduce residential segregation to the maximum extent possible and the need to fight the affordable housing crisis on a citywide level, (3) communicate improvements in rent regulations and tenant protections, (4) build and preserve more affordable housing throughout the city to combat neighborhood displacement, (5) mobility counseling, (6) provide funding for neighborhood renewal and enhancement, (7) implement a no net loss policy, (8) eliminate the "councilmanic veto", and/or (9) merge CDs to create preference

areas that more closely match the citywide racial demographics.[69] Even now, after further explanation of what they propose, Plaintiffs' purported alternatives still fail to serve the City's legitimate needs *and* to have less of a disparate impact.[70]

None of these alternatives are new or substantially expanded from earlier statements by Plaintiffs and their experts, which the City addressed in its initial brief and filings.[71]  Plaintiffs are silent in response to the City's explanations as to why these alternatives are not valid alternatives, and the City's explanations, as stated in its initial brief at 64-67 and Been Aug. Dec. at ¶¶ 82-95, remain the same. Plaintiffs have failed to actually explain or show how any of them would meet the "serves the entity's legitimate needs" requirement and the "less disparate impact" requirement.

Indeed, none of Plaintiffs alternatives even purport to address the same interests as the CP policy. Clearly unable to respond to the City's explanations for why Plaintiffs' "alternatives" fail, they try to convince the Court that the City's priorities should be different. Yet when we reach this stage in the burden shifting, it has already been established that the City's interests are legitimate. Contrary to Plaintiffs' assertion that the City "misapprehends" their alternatives, Pls. Reply at 63, Plaintiffs "misapprehend" their burden. Thus, as Plaintiffs' have failed to meet their

---

[69] Orfield makes the same could be "alternatives," which mirror the alternatives presented in Plaintiffs' brief. *See* Orfield Dec at ¶¶ 99-133. Additionally, for the first time in the summary judgment briefing, Dr. Beveridge also presents his opinions on Plaintiffs' proposal to combine CDs. See Beveridge Reply at ¶¶ 178-182. It should be noted that also did not address the reasons Deputy Mayor Been explained by it would not be easily understandable if the policy was applied to multiple CDs, instead he focused on explaining why it would reduce any disparate impact. However, Dr. Beveridge – Plaintiffs' data and statistical expert – provided no data or analysis to support that combining CDs would (let alone by how much) would reduce any disparate impact.

[70] Although the City has shown that there is no discriminatory effect caused by the CP policy, as explained above in Points II and III and so there is no need to reach this analysis, for the purposes of this section, the City will assume that the policy was found to be discriminatory so as to need to undergo this stage of the legal analysis.

[71] The City has filed a Daubert motion seeking to exclude Professor Orfield's declaration and opinions.

burden to demonstrate that there is a less discriminatory alternative to meet the City's legitimate interests, the City is entitled to summary judgment.

## <u>CONCLUSION</u>

In light of the foregoing, Plaintiffs' motion for partial summary judgment should be denied and Defendant's cross-motion for summary judgment on all of Plaintiffs' claims should be granted.

Dated:      New York, New York
             February 11, 2021

JAMES E. JOHNSON
Corporation Counsel of the
  City of New York
Attorney for Defendant
100 Church Street, Room 5-192
New York, New York 10007
(212) 356-4371

By:   /s/_____
        Melanie V. Sadok
        Frances Polifione