UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SHAUNA NOEL and
EMMANUELLA SENAT,

        Plaintiffs,

   -v-                            No.  15-CV-5236-LTS

CITY OF NEW YORK,

        Defendant.

-------------------------------------------------------x

<u>MEMORANDUM OPINION AND ORDER</u>

        Plaintiffs Shauna Noel and Emmanuella Senat ("Plaintiffs"), who are African-American, bring this action against the City of New York, seeking monetary, declaratory and injunctive relief under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 et seq., and the New York City Human Rights Law ("NYCHRL"), NYC Admin Code § 8-107, et seq.  Plaintiffs allege that the City of New York's community preference policy for affordable housing distribution has a discriminatory effect, causing a disparate impact on the basis of race and perpetuates segregation.  Plaintiffs also assert a disparate treatment claim, alleging that the City of New York ("Defendant" or the "City") engaged in intentional discrimination on the basis of race in enacting, expanding, and maintaining the policy.  Plaintiffs have moved for partial summary judgment on their discriminatory effect claims.  Defendant has cross-moved for summary judgment dismissing all of Plaintiffs' claims.[1]  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1331 and 1367.

---

[1]      The City has also moved to exclude the report and testimony of Plaintiffs' purported expert witness, Professor Myron W. Orfield, Jr.  (Docket entry no. 893.)  Because it was

The Court has considered the submissions of both parties carefully[2] and, for the following reasons, denies Plaintiffs' motion for summary judgment in its entirety, grants Defendant's motion for summary judgment to the extent it is directed to Plaintiffs' disparate impact claim, and denies Defendant's motion in all other respects.

BACKGROUND

The factual background of this longstanding dispute has been discussed in the Court's prior decisions.  (See, e.g., docket entry nos. 42, 148, 217.)  The following summary is focused on the material facts pertinent to the instant motion practice.[3]

Plaintiffs challenge the community preference policy ("CP Policy" or the "Policy") that the City utilizes in allocating housing made available through its affordable housing lottery program (the "Lottery").  (Pl. 56.1 St. ¶ 14; Def. 56.1 St. ¶¶ 1-2.)  New York City is currently facing a "housing crisis" whereby there is "an overall shortage of units, especially units renting at the lower end of the market, an increasing lack of affordability as rents rise faster than incomes, a decline in apartment rentals that have rent restrictions or regulations, and a high

---

not necessary for the Court to evaluate the challenged aspects of Professor Orfield's testimony in reaching its decisions on the summary judgment motions, the Court will address the exclusion motion in a separate opinion and order.

[2] See docket entry no. 950 for a list of the docket entries filed by the parties in connection with this motion practice.

[3] Unless otherwise stated, the facts presented or recited as undisputed are drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1, or from evidence as to which there is no non-conclusory factual proffer.  Citations to Plaintiffs' Local Civil Rule 56.1 Statement (docket entry no. 881-1 ("Pl. 56.1 St.")) and Defendants' Local Civil Rule 56.1 Statement (docket entry no. 904 ("Def. 56.1 St.")) incorporate by reference citations to the underlying evidentiary submissions.  The Court has also considered each party's responses and objections to the Local Civil Rule 56.1 Statements.  (Docket entry nos. 901 and 917.)

rate of displacement among residents." (Docket entry no. 898 ("Goetz Decl.") ¶ 8.) The City, through the provision of tax incentives, loans, and zoning density bonuses, subsidizes housing projects including units committed to be provided on an affordable basis in accordance with certain criteria, which are constructed by private developers. (Docket entry no. 900 ("Brown Decl.") ¶ 3.) Many housing projects that are granted these benefits are required to allocate the affordable housing units located within these projects through the Lottery. (Def. 56.1 St. ¶ 24.) When a person wants to apply for an affordable housing unit within a development project, the individual can submit either an electronic application through the City's centralized, online database, called Housing Connect, which contains information regarding all newly-constructed housing projects offering affordable housing units and accepting applications, or submit a paper application. (Id. ¶¶ 26-27.)

Once the application process has closed for affordable housing units within a particular housing project, each application is assigned a random number, which becomes the application's "log number," by Housing Connect. (Def. 56.1 St. ¶¶ 29-30.) The log numbers are listed in sequential order on a document called the log,[4] which is used by developers to track and process the applications for the affordable housing units in the project. (Id. ¶¶ 31-32.) The applications are reviewed in sequential order, subject to certain set-asides and preferences. (Id. ¶¶ 31-33.) A "preference means that applicants with specific qualifications are prioritized for a certain number of units." (Id. ¶ 35.) Through the CP Policy, a percentage of the affordable housing units are set aside for applicants with a community preference (generally, applicants living in the Community District ("CD")[5] in which the housing project is located). (Id. ¶¶ 2, 36-

---

[4]     Plaintiffs refer to this document as the "initial log." (Docket entry no. 917 ¶ 31.)

[5]     There are 59 CDs within New York City. (Pl. 56.1 St. ¶ 15.)

37.)  The CP Policy, as originally implemented in or about 1988, set aside 30 percent of units for applicants with a community preference, but in 2002, HPD increased to 50% the proportion of units set aside for applicants with the preference.  (Id. ¶¶ 6, 8.)  The Policy applies to affordable housing projects throughout the City during the initial lease-up of available housing units available within a project.  (Id. ¶¶4, 18.)  Neither the length of time an applicant has resided within a CD, nor the applicant's housing conditions at the time of the application, affects the applicant's eligibility for the community preference under the Policy.

Developers allocate the affordable housing units in log number order through each of the preference categories until the number of set-aside units is exhausted for a particular preference category.  (Def. 56.1 St. ¶ 46; see also Pl. 56.1 St. ¶ 23 (explaining how log-number order "becomes subordinate" to preference order).)  Affordable housing units not allocated through preference categories are available to any eligible applicant, subject to a general priority for New York City residents relative to non-residents.[6]  (Def. 56.1 St. ¶ 52.)  In addition, once the 50 percent block of units set aside for community preference applicants has been exhausted, community preference applicants may continue to compete for housing units, subject to the remaining preferences and log-number order.  (Pl. 56.1 St. ¶ 31.)

Preference-order and log-number order aside, applicants will not be awarded affordable housing units unless they meet certain eligibility requirements and a unit type for which they are eligible remains to be filled at the time their log number is reached.  (Def. 56.1 St. ¶¶ 33, 48, 54, 57.)  An applicant is "apparently eligible" if their household size and income level,

---

[6]     If the 50 percent block of units set aside for community preference applicants is not filled, the housing developer, with approval from HPD or HDC, may fill the remaining units within that block with applicants who are not eligible for the preference.  (Def. 56.1 St. ¶ 35.)

as reported in their application, meet the requirements for at least one type of unit within the project.  (Id. ¶ 39.)  If, at the time an apparently eligible applicant's log number is reached, there is at least one unit type available for which that applicant is eligible, the applicant must appear for a meeting with the developer and provide further documentation in order to confirm their eligibility before being awarded the unit.  (Id. ¶ 51.)  An applicant who does not attend the interview with the property developer, or who does not meet eligibility requirements, will not be awarded a unit, unless the applicant succeeds in appealing an unfavorable eligibility determination.  (Id. ¶¶ 159-162.)

Plaintiffs filed the Second Amended Complaint in this action on June 22, 2018.  (Docket entry no. 469 ("SAC").)  Plaintiff Noel is an African-American New Yorker, who at the time the SAC was filed was a resident of Queens.  (SAC ¶ 14.)  She applied to several affordable housing Lotteries between 2015 and 2018 (Def. 56.1 St. ¶¶ 264-65), including Lotteries for housing projects in Manhattan CDs.  (SAC ¶ 14.)  Ms. Noel alleges that she was not selected to be interviewed for units in the developments to which she applied.  (Id.)  Plaintiff Senat is an African-American New Yorker who, at the time the SAC was filed, resided in Manhattan.  (Id. ¶ 15.)  She applied for several affordable housing Lotteries between 2014 and 2018, both within and outside the CD in which she resided, and was ultimately awarded a housing unit through a Lottery in 2018.  (Def. 56.1 St. ¶¶ 268-271.)  Both Plaintiffs have alleged that they intend to continue to apply to the City's affordable housing unit developments in the future.  (SAC ¶¶ 14-15.)

Plaintiffs assert that the CP Policy is unlawful under the FHA and the NYCHRL because the Policy operates to perpetuate residential segregation in the City and causes Plaintiffs to suffer a race-based disparate impact on their opportunity to compete for affordable housing

units.  (SAC ¶¶ 183-86.)  Plaintiffs also claim that the CP Policy is unlawful because it is the product of intentional racial discrimination and thus violates the FHA and the NYCHRL.  (Id. ¶¶ 187-190.)


<u>DISCUSSION</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is to be granted in favor of a moving party where that party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Rojas v. Roman Catholic Diocese of Rochester</u>, 660 F.3d 98, 104 (2d Cir. 2011) (citation omitted).  In evaluating a motion for summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor."  <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010).

The FHA prohibits racial discrimination in the provision of housing, making it unlawful "to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. §3604(a).

<u>Discriminatory Effect Claims</u>

In order to prove the discriminatory effect of a housing policy, plaintiffs may advance one or both of two methods: "(1) 'adverse impact on a particular minority group,' and (2) 'harm to the community generally by the perpetuation of segregation.'"  <u>Mhany Mgmt. Inc.</u>

v. Cty. Of Nassau, 819 F.3d 581, 619 (2d Cir. 2016) (quoting Huntington Branch N.A.A.C.P. v. Town of Huntington, 844 F.2d 926, 937 (2d Cir. 1988), aff'd, 488 U.S. 15 (1988)).

Disparate Impact

In order to establish a prima facie case of disparate impact, Plaintiffs must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Winfield v. City of New York, No. 15-CV-5236-LTS-DCF, 2016 WL 6208564, at *5 (S.D.N.Y. Oct. 24, 2016) (quotation omitted); see also Texas Dep't of Housing & Community Affairs v. Inclusive Cmtys. Project, Inc., 576 U.S. 519, 524 (2015) [hereinafter Inclusive Cmtys.] ("[A] plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities . . . .") (internal quotation and citation omitted). The Plaintiff must satisfy a "robust causality requirement" to demonstrate that "defendant's Policy [is] causing that disparity." Inclusive Cmtys, 576 U.S. at 542; see also Tsombanidis v. West Haven Fire Dep't, 352 F.3d 564, 575 (2d. Cir. 2003) ("A plaintiff has not met its burden if it merely raises an inference of discriminatory impact.").

If a plaintiff establishes a prima facie case of disparate impact under the FHA, the "defendant . . . may rebut the prima facie case by proving that the 'challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests'" of the defendant. Mhany, 819 F.3d at 617 (quoting 24 C.F.R. section 100.500(c)(1)-(2)[7]). If the

---

[7] This citation refers to the 2013 rule promulgated by the Department of Housing and Urban Development ("HUD") relating to the standard for a disparate impact claim under the FHA. At the time of briefing, Plaintiffs represented in their submission that the 2013 rule, as opposed to the disparate impact rule published by the agency in 2020, should govern this dispute. (See docket entry no. 928 ("Pl. Opp.") at 5-7.) Defendant did not contest that approach, arguing in its submission that "the validity of the 2020 HUD rule is not before this Court" because "[i]mplementation of the new HUD rule has been stayed" in the decision,

defendant meets this burden, "the burden of proof shifts back to the <u>plaintiff</u> to show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'"   <u>Id.</u> (quoting 24 C.F.R. section 100.500(c)(3)) (emphasis in original).

Plaintiffs argue that the CP Policy "distort[s]" the Lottery process and creates disparate impacts by "helping and hurting different demographic groups depending on" where the "applied-for housing is located."  (Docket entry no. 882 ("Pl. MSJ Mem.") at 1-3.)  Plaintiffs submit that the Policy "takes the highly diverse citywide applicant pool that is generated each time a [L]ottery is announced and artificially splits that pool into two sub-pools": (1) "applicants who live in the community district . . . where the development is located[,]" whom they refer to as "insiders" or "CP beneficiaries"; and (2) "applicants who live outside of the CD where the development is located[,]" whom they refer to as "outsiders" or "non-beneficiaries."  (<u>Id.</u> at 2.) Because, Plaintiffs argue, the "insider sub-pool is typically" less diverse than the "the outsider sub-pool," and the Policy operates to the advantage of the "insider sub-pool" by giving insiders priority for 50 percent of the units of an affordable housing project, Defendant cannot "operate its policy without causing disparate impacts" on the basis of race.  (<u>Id.</u> at 3.)

In support of their argument, Plaintiffs rely heavily on the analysis proffered by their expert witness, Professor Andrew Beveridge.  Professor Beveridge analyzed the data associated with 168 affordable housing Lotteries which had application deadlines "as early as

---

<u>Massachusetts Fair Hous. Ctr. v. U.S. HUD</u>, 496 F. Supp. 3d 600 (D. Mass. 2020).  (Docket entry no. 941 ("Def. Opp.") at 6-7 n.6.)  The Court agrees that the standard set forth in the 2013 rule is applicable here.  Since briefing was completed in connection with this motion, HUD distributed and published a new preamble and final rule in March 2023, reinstating and maintaining the standard set forth in the 2013 rule.  (<u>See</u> docket entry nos. 966, 966-1, 968, 968-1.)

August 2012 and as late as February 2017" and resulted in 10,245 awards of affordable housing units.  (Docket entry no. 883 ("Beveridge Decl.")  ¶¶ 17-18.)  His declaration explains that, although the Policy "was in force citywide, it was implemented in each case at the CD level," and thus the "analyses . . . needed to recognize how the demographics of different CDs vary" in order to "prove or disprove the existence of . . . localized disparities."  (Id. ¶ 21.)  Thus, Professor Beveridge "grouped New York City's CDs into seven community district typologies: majority White, majority African American, majority Latino, majority Asian, plurality White, plurality African American, and plurality Latino."  (Pl. MSJ Mem. at 3; Beveridge Decl. ¶ 21.) The "majority typologies" included "at least 50 percent of a given non-Hispanic race group or Hispanics" while the "percentage difference between the dominant group . . . and the next largest group" was "much less" in the plurality typologies.  (Beveridge Decl. ¶ 23.)

Professor Beveridge performed two statistical analyses in order to assess whether the Policy creates disparities based on race.  These analyses were performed on three individual data sets within the larger data universe compiled from the 168 affordable housing Lotteries: (1) the "full set of applicants to [L]otteries[,]" whom Professor Beveridge also refers to as "entrants"; (2) applicants "whose household size and income . . . met the income- and household-size requirements for at least one unit-type in a [L]ottery[,]" whom Professor Beveridge refers to as "'apparently eligible' applicants"; and (3) the applicants who were awarded units, whom he refers to as "awardees."  (Beveridge Decl. ¶ 27.)

Professor Beveridge's first analysis, referred to as his "outsider-to-insider-change" method, involved calculating "the relative change" for "each of the four demographic groups being analyzed – Whites, African Americans, Latinos, and Asians –" from "their share of all outsiders to their share of all insiders."  (Beveridge Decl. ¶¶ 64-65.)  To start, Professor

Beveridge examined the total number of applicants in a CD typology who were non-beneficiaries of the Policy ("outsiders"), examined the total number of applicants in a CD typology who were beneficiaries ("insiders"), and determined the demographic distributions of both groups.  He then subtracted each demographic "group's share of all outsiders from the group's share of all insiders and then divid[ed] the difference by the group's share of all outsiders."  (Id.)  If the result was a positive number, it represented "an advantage being conferred on the group by the community preference policy (for that CD typology)."  (Id. ¶ 66.)  If the result was a negative number, it represented "a disadvantage being conferred on the group" by the Policy for that CD typology. (Id.)

Professor Beveridge found, in each CD typology, that "it was the corresponding majority or plurality group that enjoyed the greatest benefit [from the CP Policy] as reflected by relative size of increase from non-beneficiary entrant share to CP beneficiary entrant share." (Beveridge Decl. ¶ 71.)  According to Professor Beveridge's analysis, "the disparity between the most advantaged" demographic group (the corresponding majority or plurality group within a CD typology) and "each of the other demographic groups is substantial."  (Id. ¶ 73.)  These results were mimicked when the methodology was performed on the data set of apparently eligible applicants, with the exception of the plurality Hispanic typology.  (Id. ¶ 103.)  These results were also mimicked when the methodology was performed on the data set of awardees in the majority typologies, but not the plurality typologies.[8]  (Id. ¶¶ 121-24.)

---

[8]   Dr. Beveridge noted that he was "advised by [P]laintiffs' counsel that [P]laintiffs will not be proffering evidence of disparities for awardees in plurality typologies."  (Beveridge Decl. ¶ 122 n.52.; see also docket entry no. 902 ("Def. MSJ Mem.") at 19 n.24 ("Plaintiffs have abandoned any claim on behalf of any race regarding awards in any plurality CD typology because Dr. Beveridge's analysis demonstrates that the dominant group for each plurality CD typology is *not* the dominant group selected.  For example, in a plurality White CD typology,

Dr. Beveridge's second analytical methodology, referred to as the "highest-insider-share" approach, "looks only at insiders" and calculates the "share of insiders for each demographic group as a percentage of that demographic group's total [entrants/apparently eligible applicants/awardees] for each CD typology." (Beveridge Decl. ¶ 74.) "A higher share means a greater percentage of the demographic group is taking advantage of the CP beneficiary status." (Id.) When comparing the percentages of CP beneficiaries across demographic groups, Dr. Beveridge concluded that the corresponding majority or plurality demographic group within a CD typology was the most benefitted by the Policy, or experienced the greatest share of the CP beneficiary status. (Id. ¶¶ 79-81.) In addition, when the data was compared across demographic groups, five of the seven CD typologies – majority White, majority Black, majority Hispanic, majority Asian, and plurality Black, showed a "substantial disadvantage to all three of the non-dominant [demographic] groups" within the CD typology. (Id. ¶ 87.) For example, in the Majority White CD typology, Whites are the group most advantaged by the CP Policy, and Blacks, Hispanic, and Asian applicants are substantially disadvantaged. (Id. ¶ 81 n. 37.) In the majority Black CD typology, Blacks are the group most advantaged by the CP Policy, and White, Hispanic, and Asian applicants are substantially disadvantaged. (Id.) In the plurality White and Hispanic CD typologies, the results are more mixed. (Id. ¶¶ 88-89.) These conclusions were also reached when the methodology was applied to the data sets of apparently eligible applicants. (Id. ¶¶ 108, 111-12.) For the data set consisting of awardees, Dr. Beveridge found that in the majority CD typologies, the results again showed that the "demographic group most benefitted [from the Policy] . . . is the dominant demographic group of the CD typology and

Blacks are the group with the highest percentage of CP awards." (emphasis in original) (citing Beveridge Decl. Table 10 ¶ 130).)

all other demographic groups suffer relative detriment" (id. ¶ 130), with the disparity as to at least one demographic group being statistically significant.  (Id. ¶ 132.)[9]

Plaintiffs proffer that Dr. Beveridge's expert analysis demonstrates that "there are one or more non-dominant demographic groups being substantially disadvantaged in relation to the dominant group in each of the four majority CD typologies" in terms of their ability to take advantage of the benefit bestowed on insiders by the CP Policy.  (Pl. MSJ Mem. at 32.)  They contend that they are only "obligated to show that there was a local impact on *one* demographic group," and by showing that multiple demographic groups were disadvantaged depending on the CD typology examined, "[t]hey have far exceeded their burden."  (Id.)  Plaintiffs argue that the Policy is the cause of these disparate impacts because "applicants would begin with the ability to compete on a level playing field were it not for the [P]olicy" and "[t]he [P]olicy is determinative in taking that level playing field away."  (Pl. Opp. at 16.)

Defendant puts forth several arguments in support of its position that Plaintiffs have failed to demonstrate that the Policy causes a disparate impact on the basis of race. Defendant asserts that Plaintiffs have failed to show that "the CP [P]olicy has a disparate impact on Blacks as a group, or any protected class, no matter where or when they apply for affordable housing."  (Def. MSJ Mem. at 16.)  Instead, Plaintiffs' analysis shows "the CP Policy 'generally operates to the material detriment of members of a racial or ethnic group when members of that group are applying for housing outside of the CD typology in which they are dominant.'"  (Id. (quoting Beveridge Decl. ¶ 8).)  Thus, Defendant argues that Plaintiffs improperly seek to bring a

---

[9]     Plaintiffs "put forward only the results of the majority CD typologies" in regard to the analysis conducted on the data set of awardees, because, they proffer, the results concerning these typologies are "where the substantial disparities remain most consistent."  (P MSJ Mem. at 25.)

disparate impact action "based upon a fluid subgroup of a protected class"—namely, "Black applicants when they are non-CP beneficiaries and the non-dominant group in [the] CD typology" where the housing project is located (id. at 19)— because, under Plaintiffs' theory, "a Black New Yorker who is a non-CP beneficiary applying in a majority Black CD typology would not be harmed" (id. at 17 n.23), because it is the majority group within a CD typology that "enjoy[s] the greatest benefit" from the Policy (Beveridge Decl. ¶ 71), but "when that same Black non-CP beneficiary applies to a majority White CD typology, she is allegedly harmed and is part of the protected class." (Def. MSJ Mem. at 17 n.23.) Defendant submits that this approach not only is legally improper, because a protected class is a "static and defined group of individuals" (id. at 17), but also amounts to "an acknowledgement by Plaintiffs" that a significant proportion of "Black apparently eligible applications are not disparately impacted in their ability to be awarded a unit." (Id. at 19.)

Defendant further argues that Dr. Beveridge's approach, in "group[ing] [affordable housing unit] projects together based upon the racial demographics of the community preference area . . . in which projects are located," through his creation of CD typologies, was the improper lens through which to conduct a disparate impact analysis. (Def. MSJ Mem. at 20.) The City contends that the CP Policy is uniformly "applied throughout the city, irrespective of the racial demographics of the location in which the project is built" and, therefore, the impact of the Policy "should be analyzed based upon the citywide data, and not smaller race-based groupings." (Id.) Moreover, the City argues that the CD typology approach is not relevant here because Plaintiffs do not put forth "any analysis to support the proposition that there are" certain CD typologies that are the most "preferred areas" in which applicants seek to live. (Id. at 24.) "Plaintiffs' analysis treats all CD typologies . . . as interchangeable" and Dr. Beveridge "never

identifies what the preferred affordable housing units are, what the preferred CD typologies are, or any criteria for how such determinations would be made." (Id. at 24-25.) Instead, "Plaintiffs' only differentiation between CD typologies is race" and their approach is based on "the unproven and unstated assumption that the only consideration people make when deciding where to live is the racial demographics of the CD typology." (Id. at 25 n.31.)

The Court concludes that Plaintiffs have failed to demonstrate that the Policy causes a disparate impact by race as a matter of law. In order to establish a prima facie case of disparate impact, Plaintiffs must demonstrate that the CP Policy causes an "adverse impact on a particular minority group." Mhany, 819 F.3d at 619 (quotation omitted); see also Tsombanidis, 352 F.3d at 576-77 (explaining plaintiffs "must first identify members of a protected group that are affected by the neutral policy and then identify similarly situated persons who are unaffected by the policy" to succeed on a disparate impact claim). Here, the crux of Plaintiffs' claim is that "there are one or more non-dominant demographic groups being substantially disadvantaged in relation to the dominant group in each of the four majority CD typologies" (Pl. MSJ Mem. at 32), and therefore, the Policy causes "multiple racial disparities" depending on the CD typology where the affordable housing project is located. (Pl. Opp. at 26.) This means that, applying Plaintiffs' approach, in the Majority White CD typology, Black, Hispanic, and Asian applicants and apparently eligible applicants are substantially disadvantaged by the Policy (Beveridge Decl. ¶¶ 87, 111); in the Majority Black CD typology, White, Hispanic, and Asian applicants and apparently eligible applicants are substantially disadvantaged by the Policy (id.); in the Majority Hispanic typology, White, Black, and Asian applicants and apparently eligible applicants are substantially disadvantaged by the Policy (id.); and in the Majority Asian CD typology, White,

Black, and Hispanic applicants and apparently eligible applicants are substantially disadvantaged by the Policy. (Id.)

Although Plaintiffs have shown that multiple racial demographic groups are affected within multiple CD typologies, they have failed to make the requisite showing that members of the protected class at issue—African American New Yorkers—are disproportionately or disparately impacted by the CP Policy. To the contrary, Plaintiffs have proffered evidence showing that the advantages and disadvantages of the CP Policy largely correlate to the preexisting racial demographics of the CD typology in which the affordable housing unit is located, and therefore, members of each demographic group are both "help[ed] and hurt[]" by the Policy depending on where "the applied-for housing is located." (Pl. MSJ Mem. at 1-3); see Inclusive Cmtys., 576 U.S. at 542 (explaining importance of preventing "defendants from being held liable for racial disparities they did not create").

Plaintiffs submit that "[a]n injury that accrues when one is denied an equal opportunity to compete without regard to race in one CD typology cannot be 'undone' by what happens in respect to the right to compete equally, without regard to race, for housing opportunities in *other* CD typologies." (Pl. Opp. at 10.) This argument would be meaningful if Plaintiffs were to demonstrate that certain CD typologies are inherently more desirable, due to, for example, the availability of certain amenities or opportunities that they provide, and that by being disadvantaged in their ability to compete for housing in the more universally-desirable CD typologies, the Policy creates a disproportionately adverse impact on African American New Yorkers. However, Plaintiffs have disclaimed this approach,[10] stating that they are not seeking

---

[10]     The Court notes that the SAC focused on the disadvantages conveyed by the policy on African-American applicants seeking to move to "neighborhoods of opportunity". (SAC ¶ 7.) However, Plaintiffs have abandoned this approach in connection with the motion

to remedy "harms associated with being excluded from particular CD typologies that offer greater opportunities." (Pl. Surreply at 28.) To the contrary, they contend that "*whatever* choices that the applicant . . . has made about where he or she is applying to live, the applicant is entitled to equal consideration in every instance." (Pl. Opp. at 22.)

Plaintiffs' approach conflates the right not to be discriminated against on the basis of race, or another protected status, in the provision of housing with their alleged right to equal competition among all applicants. The Second Circuit has cautioned that "[w]hile a local preference may be neither per se unconstitutional, nor per se unfair, where a government erects a local preference that has the effect of filtering only a small percentage of minorities to the locally preferred area, such government action is suspect to being a proxy for race." Comer v. Cisneros, 37 F.3d 775, 793 (2d Cir. 1994). Because Plaintiffs assert that no particular CD typology or typologies are preferable to others, and proffer evidence that the Policy bestows advantages and disadvantages on African American New Yorkers seeking affordable housing in a manner commensurate with its impact on applicants from other racial demographic groups, Plaintiffs have failed, as a matter of law, to demonstrate that the Policy causes a disparate impact on the basis of race. CP Policy beneficiary or non-beneficiary status does not uniformly correlate to any particular race(s).

---

practice currently before the Court. (See, e.g., Pl. Opp. at 22-23 ("*[W]hatever* choices that the applicant . . . has made about where he or she is applying to live, the applicant is entitled to equal consideration in every instance." . . . . "This is altogether different from defendant's notion that an applicant has to 'prefer' one area over another in order for this injury to count."); docket entry no. 949 ("Pl. Surreply") at 28 (explaining that the action "simply deals with the fact that the right to a level playing field exists from the outset of the application process, regardless of whether an applicant makes a showing that she or he 'really likes a neighborhood a lot.' Contrary to defendant's assertions, applicant 'preference' has 'nothing to do with what CD typologies an applicant 'prefers' beyond the applicant preferring (and having a right) to be able to compete equally at all times.").)

For the foregoing reasons, Defendant's motion for summary judgment is granted as to Plaintiffs' disparate impact claim.

<u>Perpetuation of Segregation</u>

Plaintiffs submit that, even if they cannot prove that the CP Policy creates a disparate impact on the basis of race as a matter of law, they are still entitled to summary judgment on their discriminatory effect claim under the theory that the CP Policy perpetuates segregation.

As an initial matter, the parties disagree on the legal standard governing claims alleging perpetuation of segregation.  Plaintiffs submit that the proper "examination is whether one course of action is more segregation-perpetuating (less integration-permitting) than another" and argue that the City will be liable if it is found that "the [P]olicy actually permits less integration than the equal-access Lottery alternative[,]" which would operate without the community preference.  (Pl. MSJ Mem. at 35, 40.)  Defendant disputes this premise and argues that, to establish a prima facie case of perpetuation of segregation, "Plaintiffs must demonstrate that the CP Policy 'significantly' perpetuates segregation[,]" meaning that the perpetuation of segregation is found to be "legally significant."  (Def. MSJ Mem. at 42 (citations omitted).)  Defendant also submits that a practice "with an integrative effect" cannot be found to perpetuate segregation "if removing or changing one aspect of the practice would result in an even greater integrative effect."  (<u>Id.</u> at 44.)  In other words, Defendant argues that a system (the affordable housing Lottery) that integrates less than it would without one particular element (the CP Policy) cannot be found to perpetuate segregation as a matter of law.  (<u>Id.</u> at 43-44.)

Both parties' approaches represent deviations from the applicable legal standard. The Second Circuit has explained that, in order to demonstrate a differential effect through the

perpetuation of segregation, Plaintiffs would need to demonstrate that the impact of the CP

Policy is "legally significant."  Davis v. NYCHA, 278 F.3d 64, 83 (2d Cir. 2002).  Plaintiffs are

thus incorrect that it would be sufficient as a matter of law to demonstrate that the Policy causes

less amelioration of segregation than an alternative approach available to the City.  In fact,

Plaintiffs' proposed standard is incompatible with the Supreme Court's recognition that officials

must often make decisions based on a mix of factors, and that "[t]he FHA does not decree a

particular vision of urban development[,]" nor does it "put housing authorities and private

developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city

core or to promote new low-income housing in suburban communities."  See Inclusive Cmtys.,

576 U.S. at 542.

   The Court is not convinced, however, that a municipality cannot be held liable for

perpetuating segregation as long as its policy or practice results in some integration, no matter

how minimal, as Defendant suggests.  To the contrary, the Second Circuit has noted that

although the "caselaw gives us little guidance as to what constitutes legal significance . . . . [a]

reasonable premise [is] that past segregation may be perpetuated by actions that slow the pace of

desegregation, even though they do not reverse it."  Davis, 278 F.3d at 83; see also id. (finding

the district court's focus on "the issue of desegregation and the differences between the existing

and the proposed procedures in achieving desegregation" to be reasonable).  Thus, the Court

concludes that Plaintiffs may be able to prove that the CP Policy causes a discriminatory effect

through the perpetuation of segregation, should they proffer sufficient evidence demonstrating

that the CP Policy has a significant effect on inhibiting integration.

   Defendant next submits that, "even if . . . the Court were to agree that a prima

facie case of perpetuation can be made based upon a finding that the challenged policy results in

less integration than may be possible without it," "Plaintiffs' attempt to measure the amount of additional integration that would occur without the CP Policy in place is seriously flawed." (Def. MSJ Mem. at 46-47.)

   In support of their respective positions, the parties have each proffered analyses conducted by their expert witnesses, each of whom undertakes a different approach to assessing whether the impact of the CP Policy on the Lottery's overall integrative effect is significant. The City submits analyses conducted by its expert, Dr. Bernard R. Siskin. Dr. Siskin examined 145 housing Lotteries and analyzed the impact of each housing award on the level of segregation, or racial imbalance, between racial groups. (Docket entry no. 897 ("Siskin Decl.") ¶¶ 114-123; docket entry no. 939 ("Siskin Reply Decl.") ¶¶ 99-100.) He also ran a simulated Lottery process with both the CP Policy in effect and not in effect, classifying the simulated awards along the same lines. (Siskin Decl. ¶¶ 124-27.) Using the data from both methods, Dr. Siskin mapped his findings onto the Dissimilarity Index in order to measure the impact of the CP Policy on the levels of segregation between racial groups. (Siskin Decl. ¶¶ 112-13, 124.) The Dissimilarity Index, Dr. Siskin submits, is "the most commonly used index to measure segregation" for pairs of races. (Id. ¶ 112.) On a scale from zero to one, the Dissimilarity Index measures the extent to which the representation of the racial groups in a census tract differs from their representation citywide. (Def. MSJ Mem. at 43 and n.53.) The closer the index is to one, the more the races' representation in the census tract varies from their overall representation citywide, "or in other words, the more segregated the two races are in comparison to each other." (Id. at 43.) Dr. Siskin found that "the Lottery Process with the CP Policy in place has the effect of reducing the Dissimilarity Index for all pairs of races, and thus has an overall integrative effect on the City." (Siskin Decl. ¶ 127.) Comparing the results of the simulation with the CP Policy in effect with

the CP Policy not in effect, Dr. Siskin determined that that Policy "has a trivial and insignificant effect" of increasing the Dissimilarity Index, or "reducing the Lottery Process's level of integration for all pairs of races."  (Id.)

In his analysis, Dr. Beveridge utilized the same data sets as Dr. Siskin – namely, the data from 145 of the City's affordable housing Lotteries – but, rather than mapping the data onto the Dissimilarity Index, Dr. Beveridge adopted a different methodology to measure the overall impact of the CP Policy on the levels of segregation between racial groups.  Specifically, Dr. Beveridge disaggregated and classified the data "by whether the awardee was a CP beneficiary or a non-beneficiary" in order to "compare the influence each [award] has," on the levels of segregation and evaluate whether ending the CP Policy would allow more integration than has historically been the case.  (Beveridge Decl. ¶¶ 153, 158.)  Because Dr. Beveridge ultimately concluded that there is "substantial disparity" in the net integrative effect of non-CP beneficiaries compared with CP beneficiaries (Pl. MSJ Mem. at 41-42), and the Policy "takes an applicant pool that is overwhelmingly made up of outsiders and filters that pool down so that outsiders are not competing for most or all of 50 percent of the units," Plaintiffs argue they have demonstrated that the Policy perpetuates segregation as a matter of law.  (Id. at 36-37.)

Each party argues that the methodology utilized by its opponent's expert witness was improper.  First, Plaintiffs argue that the Dissimilarity Index, relied upon by Dr. Siskin, "is *not* looked to in order to measure perpetuation of segregation" (Pl. Opp. at 34), and refers the Court to cases in which other courts did not rely upon the Dissimilarity Index in their perpetuation of segregation analyses.  (Id.)  Plaintiffs also argue that, even if the Dissimilarity Index is a recognized tool for measuring segregation levels, it is not useful for measuring the impact of one factor, such as the CP Policy, on the levels of segregation in New York City

because "[i]n a city like New York, with more than *three million* housing units . . . , there is not likely to be *any* housing initiative . . . that, *on its own*, moves the City's dissimilarity index by a large amount over a limited period of time." (Pl. Opp. at 35.) Defendant, in turn, submits that Dr. Beveridge's "categoriz[ation of] the outcomes [from Dr. Siskin's study] . . . to evaluate whether CP beneficiaries are more integrative than non-CP beneficiaries" was "[f]lawed." (Def. MSJ Mem at 49.) The City contends that "there was no valid reason to take [that] additional step" of categorizing the data by CP status because "an applicant's CP status is irrelevant to whether that applicant will have an effect on the level of segregation in New York City if awarded housing." (Id.; see also Siskin Decl. ¶ 137 (noting "all that is relevant is the awardees' race, and the racial demographics of the areas from which the awardee moved, or will move to").) Furthermore, the City argues that this approach fails to satisfy the "robust causation" requirement for differential effect claims (Def. MSJ Mem. at 50) because "[t]o the extent Dr. Beveridge is using the non-CP beneficiaries (or 'outsiders') as a proxy for what would occur if the CP Policy were not in effect, this [is] not accurate[,]" as "[w]hether someone is awarded a unit is not wholly based on CP status" and "[s]ome CP beneficiaries will still receive housing even if the CP Policy were not in effect[.]" (Siskin Decl. ¶¶ 135-137.)

       The Court has considered the arguments proffered by both parties carefully, and concludes that neither party has demonstrated that it is entitled to judgment as a matter of law on the issue of whether the CP Policy unlawfully perpetuates segregation. Having grounded their analyses in the same data, the parties ask the Court to determine whether Dr. Beveridge's approach, in utilizing the data to make comparisons between the net integrative effect of CP-beneficiary moves and the net-integrative effect of non-CP beneficiary moves, or Dr. Siskin's approach, in mapping the data onto the Dissimilarity Index, is the appropriate and persuasive

methodology.  The Court declines to do so, noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); see also Pope v. Cnty. Of Albany, 687 F.3d 565, 581 (2d Cir. 2012) ("The question of what weight to accord expert opinion is a matter committed to the sound discretion of the factfinder. . . . A factfinder may certainly consider the bases for an expert's opinion and may accord the opinion less, or even no, weight if the record suggests that the bases are defective, incomplete, or questionable.").  Both Plaintiffs and the City have proffered evidence from which a reasonable jury could decide in that party's favor.  Rojas, 660 F.3d at 104; see Perez v. Rios, No. 06-CV-873-BSJ, 2007 WL 9809150, at *8 (S.D.N.Y. Nov. 8, 2007) ("Summary judgment is inappropriate where, as here, the parties have presented conflicting expert testimony.").

Defendant argues that, even if the Court were to find that there "is an issue of fact as to whether [Plaintiffs] could establish their *prima facie* case[,]" "summary judgment should still be granted to the City because the City can demonstrate with irrefutable evidence that the CP Policy is 'necessary to achieve a valid interest'" and Plaintiffs have failed to meet their burden to demonstrate that there is a less discriminatory alternative to adequately address the City's valid interest.  (Def. MSJ Mem. at 51 (citation omitted); docket entry no. 941 ("Def. Reply") at 67-68.) The City submits that the CP Policy addresses "two significant, bona fide public policy issues: preventing the displacement of low-income residents, thereby giving them a greater opportunity to remain in their communities if they choose, and responding to the fear of displacement, which in turn helps overcome opposition to the construction of new affordable housing and helps garner necessary approvals for affordable housing."  (Def. Reply at 54.)  In particular, the City argues that the Policy is "responsive to the fear of displacement from one's neighborhood" because

residents "fear that a housing development or the amenities that accompany such development will trigger . . . increasing rents and higher costs of living in their neighborhood, consequently making it unaffordable for them to stay in their community." (Id. at 57-58.) By "promis[ing] that half of new affordable homes will go to existing community members[,]" the CP Policy "helps overcome the connection that many residents have made between displacement and new development[.]" (Id. at 58.)

Plaintiffs, in turn, argue that the City's justifications for the CP Policy are speculative and that the City has failed to meet its burden to demonstrate that the CP Policy, as implemented, "*advances the goal of mitigating displacement*," or the fear of displacement, from one's neighborhood. (Pl. Opp. at 43-49.) Plaintiffs also submit that there is "no substantial interest" in "singling out the neighborhood level in respect to displacement or fear of displacement." (Id. at 50.)

For the reasons described in more detail below in connection with Plaintiffs' intentional discrimination claim, see infra, the Court finds that neither party has demonstrated that it is entitled to summary judgment on the issue of whether the City has met its burden of showing that the CP Policy is "necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." Mhany, 819 F.3d at 617. As the Court will explain, the evidence proffered by both parties frames genuine factual disputes as to whether the City's proffered interests in addressing displacement, and the fear of displacement, are indeed "nondiscriminatory interests," see id., or whether these interests are motivated, to some extent, by residents' resistance to racial change in their neighborhoods. The extent to which the CP Policy is necessary to address residents' fear of being dislocated from their neighborhoods through the rising costs associated with development, as opposed to the fear that such development will

foster racial change in their communities, is a question that the fact-finder must resolve after weighing the competing evidence and evaluating witnesses' credibility.

Thus, the Court denies both parties' motions for summary judgment with respect to Plaintiffs' claim that the CP Policy creates a discriminatory effect through the perpetuation of segregation.

Intentional Discrimination Claim

The City has also moved for summary judgment on Plaintiffs' claim that the City has engaged in intentional racial discrimination through its implementation, expansion, and maintenance of the CP Policy.[11]  Plaintiffs may establish a prima facie case of disparate treatment, or intentional discrimination, "by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive."  Mhany, 819 F.3d at 606; see

---

[11]     The City argues, in a footnote, that Plaintiffs "are barred from challenging the adoption and expansion of the CP policy by the applicable statute of limitations" because "the adoption" of the policy "occurred in 1998 and the expansion in 2002."  (Def. MSJ Mem. at 5 n.12.)  42 U.S.C. section 3613(a)(1)(A) provides that an "aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." Section 8-502(a) of the NYCHRL provides that a "civil action . . . must be commenced within three years after the alleged unlawful discriminatory practice or act of discriminatory harassment . . . occurred."  The Court refuses to consider "an argument mentioned only in a footnote to be adequately raised[,]" especially given the "enormous volume of briefs and arguments" presented by the parties in support of their cross motions for summary judgment.  United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir. 1993); see also In re MF Global Holdings Ltd. Inv. Litig., No. 11-CV-7866-VM, 2014 WL 8184606, at *2 (S.D.N.Y. Mar. 11, 2014) ("It is generally inappropriate to make substantive arguments in footnotes."); In re Crude Oil Commodity Litig., No. 06-CV-6677, 2007 WL 2589482, at *3 (S.D.N.Y. Sept. 7, 2007) ("Arguments which appear in footnotes are generally deemed to have been waived.")  The Court will not fault Plaintiffs for failing to respond to this passing argument and denies any request by the City for partial summary judgment based on this argument.  Moreover, it is worth noting that Plaintiffs also challenge the maintenance of the CP policy, which the City admits is not barred by the statute of limitations.  (Def. MSJ Mem. at 5 n.12.)

id. at 605 ("The Supreme Court has long held, in a variety of circumstances, that a governmental

body may not escape liability under the Equal Protection Clause merely because its

discriminatory action was undertaken in response to the desires of a majority of its citizens."

(quoting U.S. v. Yonkers Bd. of Educ., 837 F.2d 1181, 1224 (2d Cir. 1987)).  "Because

discriminatory intent is rarely susceptible to direct proof, a district court facing a question of

discriminatory intent must make 'a sensitive inquiry into such circumstantial and direct evidence

of intent as may be available.'"  Mhany, 819 F.3d at 606 (quoting Vill. of Arlington Heights v.

Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977)); see also Yonkers Bd. of Educ., 837 F.2d at

1221 (noting intent to discriminate "may be 'inferred from the totality of the relevant facts'"

(quoting Washington v. Davis, 426 U.S. 229, 242 (1976))).  The extent to which the impact of

the Policy "bears more heavily on one race than another may provide an important starting

point," Mhany, 819 F.3d at 606 (quotation omitted), and other relevant considerations include

"the historical background of the decision ... particularly if it reveals a series of official actions

taken for invidious purposes, departures from the normal procedural sequence, substantive

departures, and the legislative or administrative history . . . especially where there are

contemporary statements by members of the decisionmaking body, minutes of its meetings, or

reports."  Id. (quoting Arlington Heights, 429 U.S. at 267-68) (internal modifications and

quotation marks omitted); see also Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC,

478 F. Supp. 3d 259, 303-304 (D. Conn. 2020) (recapping Arlington Heights standard).

   Plaintiffs rely on the theory that the City has been "[k]nowing[ly] responsive[]" to

those who wish to preserve the racially segregated status quo" in maintaining the CP Policy.  (Pl.

Opp. at 73.)  Plaintiffs posit (1) that Defendant is aware that resistance to residential racial

change exists and has acknowledged that such resistance exists; (2) Defendant has treated the

prospect of residential racial integration as "fraught and politically sensitive"; (3) the CP Policy

has caused a disparate impact and perpetuates segregation; (4) expansion and maintenance of the

Policy "represent departures from how HPD Policy is usually made"; (5) defendant has a history

of other segregation-perpetuation housing practices; and (6) defendant's justifications for the

Policy are pretextual.  (Id. at 75-87.)

   As explained above, the evidence proffered by Plaintiffs has framed a triable issue

of fact as to whether the CP Policy creates a discriminatory effect on the basis of race through

the perpetuation of segregation.  This determination weighs slightly in Plaintiffs' favor, but the

Court declines to afford it undue weight in the disparate treatment analysis at this procedural

juncture.  See Mhany, 819 F.3d at 606 ("[U]nless a clear pattern, unexplainable on grounds other

than race, emerges, impact alone is not determinative, and the Court must look to other

evidence." (internal modifications and quotation marks omitted)); Fortune Society v. Sandcastle

Towers Housing Development Fund Corp., 388 F. Supp. 3d 145, 178 (E.D.N.Y. 2019)

(explaining disparate "impact standing alone is insufficient to sustain a disparate treatment

claim").

   In response to Plaintiffs' argument that the City knowingly acquiesced to race-

based opposition in maintaining the Policy, the City submits that it "has never denied that some

opposition to the development of affordable housing may be race-based," but argues that such

"awareness . . . is not proof that the City intended to discriminate by adopting the CP Policy."

(Def. Reply at 12-13.)  To the contrary, the City proffers that it "has not 'knowingly acquiesced

to race-based citizen opposition' in order to block affordable housing, but instead adopted the CP

[P]olicy to provide the opportunity for existing residents to not be displaced from their

neighborhood."  (Id. at 14 (citation omitted) (explaining that the "legitimate governmental

interests behind the CP [P]olicy" are "preventing displacement and responding to the fear of displacement").)

The City has proffered evidence in support of its position that the CP Policy responds to legitimate interests, including displacement and the fear of displacement.  (See Def. MSJ Mem. at 8 (citing docket entry no. 899 ("Been Decl.") ¶ 41); see also Been Decl. ¶ 46 (noting "concerns" voiced in "town halls, community meetings," and other forums about "residents being priced out of their neighborhoods and . . . being displaced").)  Specifically, the City proffers that the CP Policy is "essential to overcoming opposition to affordable housing" "stemming from" "the belief that investment in [residents'] communities will attract an influx of higher-income residents, which will increase the cost of living in the neighborhood as neighborhood services and amenities, as well as rents, change to accommodate newer residents" and that "low-income people [may be] forced to move to less expensive areas."  (Been Decl. ¶ 14; see also Goetz Decl. ¶ 38 ("The fear of displacement among low-income persons who know their vulnerability to market changes and redevelopment is difficult to overemphasize[.]").)  By "ensur[ing] that at least some local residents will be able to obtain affordable units in their existing communities and be able to enjoy the benefits the investment will bring to the neighborhood[,]" the Policy "makes it more likely that the City will be able to overcome the opposition to new development."  (Been Decl. ¶ 60.)

Plaintiffs, however, have proffered and pointed to evidence in the record indicating that the fear of displacement, voiced by opponents to affordable housing, may be multi-faceted, and may be grounded, at least partially, in residents' resistance to racial change in

their neighborhoods.[12]  (Pl. Opp. at 76-87; <u>see</u> docket entry no. 927 ("Maldonado Decl."), Ex. 32

at 215:3-20 (deposition testimony from Matthew Murphy, who served as HPD's deputy

commissioner for strategic planning, in which, when asked whether "there are people both in

white neighborhoods and in neighborhoods dominated by other racial groups that - - where racial

change or the prospect of racial change makes them feel uncomfortable; is that right?" he

responded, "I think it's likely and I think people correlate that change to development, new

housing development[,]" and "[s]o as a result, they oppose housing development, especially

Affordable Housing development."); Pl. Opp. at 76 (describing presentation by then-

Commissioner of HPD, Ms. Been, about "fears of neighborhood change[,]" in which Plaintiffs

assert she explained that residents of communities were seeing "people . . . coming in" who may

"look different" and have "different demographics" and who may worry that even if they stay in

their neighborhood, "the sense of the neighborhood may change"[13]); Maldonado Decl., Ex. 7 at

138:9–141:7 (Ms. Been confirming that "race and ethnicity are part of demographics" and

describing that her presentation referenced above concerned "people who are currently in the

neighborhood," as well as "people who have left the neighborhood but still have feelings about

---

[12]    The City contends that "Plaintiffs have improperly tried to expand their briefing by
making their arguments about intentional discrimination in the appendix to their response
to the City's 56.1 Statement."  (Def. Reply at 11.)  The Court finds that the appendix to
Plaintiffs' response to the City's 56.1 statement does contain improper argument.  The
Court has not considered the improper argument in deciding the outcome of Defendant's
motion.  <u>See</u> <u>Von Stein v. Pruyne</u>, No. 15-CV-7039-CS, 2020 WL 3498431, at *1 n.2
(S.D.N.Y. June 29, 2020) (noting the Court "will not consider" portions of Plaintiffs'
56.1 Statement that constitutes "improper argument[,]" "the time it would take to have
Plaintiff resubmit . . . is not a good use of the Court's or the parties' time[,]" and "it
would not change the outcome of this Opinion").

[13]    <u>See</u> Media Site, *City Law Breakfast Series 11/13/2015*, YOUTUBE (Aug. 31, 2018),
https://m.youtube.com/watch?v=Eepr0XkiZzg&feature=youtu.be.

the neighborhood" because "[t]he people who were coming in may look different; may be

wealthier; may have different demographics[.]"); Been Decl. ¶ 14 (testifying that the fear of

displacement not only extends to the idea of "low-income people being forced to move to less

expensive areas" but also encompasses fear surrounding how "changes may . . . make" "those

who are able to stay in the neighborhood . . . feel like the neighborhood is no longer welcoming

or familiar").)

    Plaintiffs also have pointed to evidence in the record that they argue indicates the

City's stated rationale for the Policy, to "ensure that local residents – who may have endured

years of unfavorable conditions, worked hard to stabilize the neighborhood, and may have deep

roots in the neighborhood – have a chance to participate in their neighborhoods' revitalization[]"

(Been Decl. ¶ 13), is pretextual, because, as the City concedes, "neither the length of time an

applicant resides in the [neighborhood] in which the affordable units are being built nor an

applicant's housing conditions affect eligibility under the [P]olicy[.]"  (Pl. Opp. at 84; see docket

entry no. 901 ¶ 111.)  Plaintiffs proffer an email from Mr. Murphy to a colleague at HPD

referring to a "Community Preference working group" and stating: "We justify the [P]olicy

because it prevents displacement.  But we don't have good metrics to show that displacement is

occurring.  What I'd like to do is start building a 'case' for anti-displacement policy."

(Maldonado Decl., Ex. 48.)

    Considering this evidence in the context of the entire record and in the light most

favorable to Plaintiffs, and resolving all ambiguities in Plaintiffs' favor, see Dickerson, 604 F.3d

at 740, the Court concludes that Plaintiffs have framed a triable issue of fact as to whether the CP

Policy constitutes intentional discrimination.  Specifically, there is a triable issue of fact in regard

to whether, and the extent to which, the fear of racial change, as opposed to the fear of being

dislocated from one's neighborhood due to rising costs associated with development, motivates the City's maintenance of the Policy.  This is a question for the fact-finder to evaluate after having the opportunity to weigh the competing evidence and evaluate the credibility of the parties' witnesses.  See e.g., CoreLogic, 478 F. Supp. 3d at 304 (denying defendant's motion for summary judgment on FHA disparate treatment claim and permitting claim to proceed to trial).  Thus, the Court denies Defendant's motion for summary judgment on Plaintiffs' claim of intentional discrimination.

NYCHRL Claims

The NYCHRL prohibits the refusal "to sell, rent, lease . . . or otherwise deny to or withhold from any person or group of persons a housing accommodation or an interest therein" because of the "actual or perceived race . . . [,]"  NYC Admin Code § 8-107(5)(a)(1), and is construed more broadly than its federal and state counterparts.  L.C. & Fair Hous. Just. Ctr., Inc. v. LeFRAK Org., Inc., 987 F. Supp. 2d 391, 403 (S.D.N.Y. 2013).  "New York courts have held" that they are required to "construe [the NYCHRL] broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  (Id. at 404 (quoting Albuno v. City of New York, 922 N.Y.S.2d 244, 246 (2011)).  Because this Court has held that Defendants are not entitled to summary judgment on Plaintiffs' FHA claims that (1) the CP Policy creates a discriminatory effect through the perpetuation of segregation, and (2) the City has engaged in intentional discrimination through the CP Policy, the Court similarly denies Defendants' motion for summary judgment as to these claims as they arise under the NYCHRL.  However, the City is entitled to summary judgment dismissing Plaintiffs' discriminatory effect claim to the extent it is based on disparate impact, for substantially the reasons set forth above in connection with Plaintiffs' federal disparate impact claim.  Plaintiffs have failed to raise a genuine issue of

material fact as to whether members of the protected class at issue—African American New Yorkers—are disproportionately or disparately impacted by the CP Policy and, instead, have proffered evidence demonstrating that the Policy provides advantages and disadvantages to different racial groups depending on the racial demographics of the CP typology in which the affordable housing unit is located.  Because the NYCHRL, like the FHA, requires a showing of disparate impact on a racial demographic group, Plaintiffs have failed, as a matter of law, to demonstrate that they can prove this essential element of their disparate impact-based claims. See 42 U.S.C. § 3604(a); NYC Admin Code § 8-107(5)(a)(1).

<u>CONCLUSION</u>

       For the foregoing reasons, Plaintiffs' motion for summary judgment is denied in its entirety.  Defendant's motion for summary judgment is granted as to Plaintiffs' claim that the CP Policy has a discriminatory effect, to the extent that claim rests on a disparate impact theory.  Defendant's motion for summary judgment is denied in all other respects.

       The final pretrial conference in this case is hereby rescheduled to September 22, 2023, at 10:30 a.m., and the parties are directed to prepare for and make their conference-related submissions in accordance with the Pre-Trial Scheduling order (docket entry no. 53) by reference to that date.  The case will be referred to Magistrate Judge Parker for settlement purposes.  Upon referral, the parties are hereby directed to contact Magistrate Judge Parker's Chambers to set a status conference in the near term for settlement purposes.  The parties are further directed to file a joint status report by July 31, 2023, stating whether they expect to proceed to trial, the approximate length of time needed for the presentation of evidence, and whether both parties

consent to trial before Judge Parker.  The Memorandum Opinion and Order resolves docket entry

numbers 881 and 896.

      SO ORDERED.

Dated: April 28, 2023
      New York, New York

                  /s/Laura Taylor Swain
                  LAURA TAYLOR SWAIN
                  Chief United States District Judge