UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

SHAUNA NOEL and
EMMANUELLA SENAT,

      Plaintiffs,

  -v-                                               No.  15 CV 5236-LTS

CITY OF NEW YORK,

      Defendant.

-------------------------------------------------------x

MEMORANDUM ORDER

      Plaintiffs Shauna Noel and Emmanuella Senat ("Plaintiffs") bring this action for relief under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604 et seq., and the New York City Human Rights Law ("NYCHRL"), NYC Admin Code § 8-107, et seq., seeking compensatory and punitive damages and injunctive and declaratory relief.  Plaintiffs assert that the City of New York's community preference policy regarding affordable housing distribution creates a disparate impact on the basis of race and perpetuates segregation.  Plaintiffs also claim that the City of New York ("Defendant" or the "City") engaged in intentional discrimination on the basis of race in enacting, expanding, and maintaining the policy.  By an Opinion and Order issued on April 28, 2023, the Court granted the City's motion for summary judgment on Plaintiffs' disparate impact claim but denied the parties' cross-motions for summary judgment on Plaintiffs' perpetuation of segregation and intentional discrimination claims.  (See docket entry no. 970 ("MSJ Opinion").)  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1331 and 1367.

In support of their claims, Plaintiffs have proffered testimony from their expert witness, Professor Myron Orfield. Before the Court is Defendant's motion to exclude the report and past and future testimony of Professor Orfield. The Court has considered the submissions of both parties carefully and, for the following reasons, grants Defendant's motion to exclude, in part, and denies it, in part.

## BACKGROUND

The Court assumes familiarity with the procedural history and underlying facts of this case and hereby incorporates the background information concerning the case that is set forth in the MSJ Opinion.

This case presents a challenge to the community preference policy ("CP Policy" or the "Policy") implemented by the City in connection with its affordable housing lottery. Plaintiffs assert that the CP Policy is unlawful under the FHA and the NYCHRL, arguing that the Policy operates to perpetuate residential segregation in the City and that its expansion and maintenance are the products of intentional discrimination. In support of their claims, Plaintiffs proffer testimony from Professor Orfield, a professor of Civil Rights and Civil Liberties Law at the University of Minnesota Law School and the Director of the Institute for Metropolitan Opportunity, where he studies racial segregation in schools and housing, whom they present as an expert witness. (Docket entry no. 894-1 ("Orfield Report" or the "Report") ¶¶ 1, 3.) Professor Orfield submits that his areas of expertise include "fair housing, including the process of and requirements for affirmatively furthering fair housing[,] school desegregation[,] state and local government law[,] land use planning[,] state and local finance[,] transit and regional governance[,] and the legislative process." (Id. ¶ 6.) He previously served in the Minnesota House of Representatives and the Minnesota Senate, where he claims he was the "architect of a

series of important changes" in fair housing, including the passage of a "region-wide fair share housing law."  (Id. ¶ 5.)  Professor Orfield also worked at the Metropolitan Area Research Corporation, where he completed more than "30 reports studying the racial, fiscal and land-use patterns in the 50 largest U.S. metropolitan areas" and wrote a book on patterns of racial segregation in the United States.  (Id. ¶ 7.)  His research and work with civil rights groups on housing and school desegregation cases "has helped lead to legislative . . . reforms" at both the federal level and the state level in "Minnesota, Illinois, Michigan, California, New Jersey, Connecticut, Massachusetts, Washington, Oregon, and Maryland."  (Id. ¶ 10.)  At the federal level, Professor Orfield's experience includes serving as an "appointed commissioner on the National Commission on Fair Housing and Equal Opportunity[,]" the recommendations of which "formed the basis for President Obama's fair housing agenda"; an advisor to "President Obama's transition team for urban policy and to the White House Office of Urban Affairs"; and as a consultant to the U.S. Housing and Urban Development Department's Office for Fair Housing and Equal Opportunity.  (Id. ¶¶ 11-12.)

In his Report, Professor Orfield draws on his experience to discuss and analyze trends underlying residential segregation in American cities, the harms of segregation, the common forms of resistance to integration by certain stakeholders, and the ways in which that resistance is often expressed.  He also proffers his opinions as to why it is "implausible that NYC officials are unaware of or unaffected by the fear of racial change" among their constituents and also that "[m]any less discriminatory alternatives exist for accomplishing the policy goals the community preference [policy] purports to accomplish."  (Id. ¶¶ 69-105.)  Professor Orfield further discusses his opinions on these topics in his deposition testimony and in the declaration

he submitted in support of Plaintiff's motion for partial summary judgment and in opposition to Defendant's motion for summary judgment.  (See docket entry nos. 894-3, 913.)

## DISCUSSION

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  Pursuant to Federal Rule of Evidence 702, the district court performs a "'gatekeeping' function" and is responsible for "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  In re Mirena IUS Levonorgestrel-Related Prod. Liab. Litig. (No. II), 982 F.3d 113, 122–23 (2d Cir. 2020) (quoting Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993)).  "[E]xpert testimony is not admissible under Federal Rule of Evidence 702 if it 'usurp[s] . . . the role of the jury in applying th[e] law to the facts before it,' as such testimony 'undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's.'"  Callahan v. Wilson, 863 F.3d 144, 153 (2d Cir. 2017) (quoting Nimely v. City of N.Y., 414 F.3d 381, 397 (2d Cir. 2005)).  District courts have "broad discretion" to carry out their gatekeeping function with respect to expert testimony.  Id.; see also McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1042 (2d Cir. 1995) ("The decision to admit expert testimony . . . will be overturned only when manifestly erroneous.").

Defendant raises three principal arguments in support of its motion to strike Professor Orfield's Report and testimony: (1) the Report and testimony are unreliable because Professor Orfield fails to proffer a rational relationship between his experience and his conclusions; (2) portions of his Report and testimony are irrelevant to the issues in this case; and (3) Professor Orfield renders opinions that improperly usurp the role of the Court and the factfinder.

Reliability

Defendant argues that Professor Orfield's Report and testimony are unreliable because he "relies solely on his prior experience[,]" which is "based primarily in the Midwest" without grounding his opinions in facts or evidence applicable to New York City.  (Docket entry no. 895 ("Def. Mem.") at 2, 8.)  This renders Professor Orfield's opinions particularly unreliable, in Defendant's view, because Professor Orfield "did no research on the housing conditions, housing policy, or neighborhood demographics in New York City" but rather relies on "vague anecdotes from his personal experience outside of New York City to support his otherwise unfounded claims." (Id. at 9-11.)  In response, Plaintiffs argue that Professor Orfield's experiences, including his work developing national and regional fair housing law and policy, render him qualified to opine on "propositions of general applicability" regarding the prevalence of segregation, the resulting harms, and the common forms of opposition to integration, as he did in his Report.  (See docket entry no. 920 ("Pl. Opp.") at 6.)  Plaintiffs contend that while "New York City has unique characteristics[,]" it is not "immune to the persistent and widespread patterns that Professor Orfield has observed" and described in his Report.  (Id.)  Moreover, Plaintiffs argue, any objections as to the geographic focus of Professor Orfield's experiences go to the weight, rather than the admissibility, of his testimony.  (Id. at 9.)

It is well settled that an expert witness may be qualified based merely on their experience, rather than by education or training.  See, e.g., Reach Music Pub., Inc. v. Warner Chappel Music, Inc., 988 F. Supp. 2d 395, 401 (S.D.N.Y. 2013).  Where an expert's qualifications are predominantly based in their experiences, the expert "must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinions offered by the expert, and how that experience is reliably applied to the facts."  Joffe v. King & Spalding LLP, No. 17-CV-3392-VEC, 2019 WL 4673554, at *6 (S.D.N.Y. Sept. 24, 2019) (quoting Gyllenhammer v. Am. Nat'l Red Cross, No. 15-CV-1143, 2018 WL 1956426, at *6 (N.D.N.Y. Jan. 23, 2018); see also Mahoney v. JJ Weiser and Co., No. 04-CV-2592-VM-HBP, 2007 WL 3143710, at *5 (S.D.N.Y. Oct. 25, 2007) (explaining that courts focus on whether there is a rational relationship between the expert's experience and the opinion rendered).  The Court's "gatekeeping function requires more than simply 'taking the expert's word for it,'" LinkCo, Inc. v. Fujitsu Ltd., No. 00-CV-7242-SAS, 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) (quoting Fed. R. Evid. 702 Advisory Committee's Notes), and to be sufficiently reliable, the expert must do more "than aver conclusorily that his experience led to his opinion."  Id. (internal quotation marks and citation omitted).  "The test for reliability of expert testimony is flexible," however, "especially in cases where the expert's knowledge is non-scientific and based on his experience."  Price v. L'Oreal USA, Inc., No. 17-CV-614-LGS, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (citation omitted).

To the extent that Professor Orfield's Report and testimony reflect his opinions about the prevalence of segregation in U.S. metropolitan areas, the common harms that result from segregation, and the political and social dynamics that underpin efforts both for and against desegregation (see Orfield Report, §§ II-IV), the Court finds that Professor Orfield has connected

his experiences to his opinions sufficiently to satisfy the requirements of Federal Rule of Evidence 702.  Professor Orfield explains that, "[t]hrough [his] extensive personal involvement in desegregation and integration planning, as well as [his] academic research, [he has] developed insight and expertise into the practical political and policymaking dynamics through which residential segregation is maintained."  (Id. ¶ 25.)  He further submits that he has seen instances of "fear of and resistance to prospective racial change" "firsthand" through his service as a state representative and state senator in Minneapolis, where he "represented some areas undergoing racial transition."  (Id. ¶¶ 27, 30.)  His opinions also stem from his work on "siting affordable housing and pro-integrative housing programs in the suburbs of Chicago[,] New York[,] . . . and . . . other places."  (Id. ¶ 31.)  Professor Orfield could have, admittedly, provided more details about the specific experiences he encountered that gave rise to his views, but the Court finds his explanations sufficient to support the relatively straightforward propositions he advances regarding segregation and the political and social dynamics surrounding integration initiatives in U.S. regions.  See, e.g., SR Int'l Business Ins. Co., Ltd. v. World Trade Ctr. Properties, LLC, 467 F.3d 107, 132 (2d Cir. 2006) (finding that expert witness sufficiently connected experience to opinions where he "testified that he had over 30 years of experience in the insurance industry . . . and he was familiar with practices in the industry," and that "through these experiences," he was able to identify customary industry practices); Reach Music, 988 F. Supp. 2d at 405 (finding expert's explanations that he worked in music industry for more than 18 years and never encountered practices at issue in the lawsuit to be sufficient to "support the relatively simple proposition" he was advancing).  Dr. Orfield's opinions on the prevalence of segregation and resistance to integration in U.S. metropolitan regions, though often unsurprising, will assist the jury to understand various social and political dynamics at issue in fair housing debates.  To the

extent the City believes these opinions stem from one-sided experiences – serving and working in "predominantly white neighborhoods" (Def. Mem. at 9) – or are insufficiently detailed or inadequately supported through citations to research on New York City demographics (id. 9-11 (objecting to Professor Orfield's "vague anecdotes"); docket entry no. 942 ("Def. Reply") at 6-7 (arguing that Professor Orfield fails to "lend credibility" to his opinions because he does not cite "to any research or field work done by others that would support his assertions")), those issues go to the weight and credibility of Professor Orfield's testimony, rather than its admissibility, and the City can explore the issues on cross-examination.[1] See, e.g., McCullock, 61 F.3d at 1042-43 (finding objections to expert's alleged lack of "formal education" and "experience" on particular issues were "properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility"); see id. at 1044 ("Disputes as to the strength of his credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); Ge Dandong v. Pinnacle Performance, Ltd., No. 10-CV-8086-JMF, 2013 WL 5658790, at *14-15 (S.D.N.Y. Oct. 17, 2013) (explaining that objection regarding failure of expert on U.S. financial industry to not

---

[1] The City's passing argument that Professor Orfield's opinions are unreliable because he relies on "out of court statements" that would be considered "hearsay" (Def. Mem. at 14) is unavailing because "expert witnesses can testify to opinions based on hearsay or other inadmissible evidence if experts in the field reasonably rely on such evidence in forming their opinions." United States v. Mulder, 273 F.3d 91, 102 (2d Cir. 2001) (rejecting argument that expert police officer could not rely on statements from informants and victim contractors to reach opinion). Professor Orfield, as an expert witness on the social and political dynamics surrounding segregation in the realm of affordable housing, may properly rely on his experiences in the field, including out-of-court statements by policymakers or activists, to support his opinions.

tailor his research to the geographic area at issue in the lawsuit – the Singapore marketplace – went "more to weight than to admissibility" of the evidence).[2]

Professor Orfield fails, however, to sufficiently connect his experiences to the opinions he proffers about alternatives to the CP Policy that, in his view, would be "less discriminatory" while still "accomplishing the policy['s] goals." (Orfield Report ¶¶ 81–105.) These opinions are not "propositions of general applicability" or "sky is blue propositions[,]" as Plaintiffs suggest (see Pl. Opp. at 6 (internal quotations omitted)), but rather are speculation concerning the practicality and efficacy of alternatives to the policy at issue in this litigation. Section VI of Professor Orfield's Report proffers his observations as to what the City "could" do in lieu of the CP policy to supposedly achieve the goals of the policy. (Orfield Report ¶¶ 81–105.) For example, he speculates that: the "[C]ity could recognize and promote the view that . . . [its] affordable housing stock belongs equally to all similarly economically situated residents" (id. ¶ 85); the City "could reorient its messaging around the city's affordable housing system" (id. ¶ 87); the City could "reduc[e] . . . the percentage of [affordable housing] units awarded on a

---

[2]   Professor Orfield may also reliably point to examples from evidence in this case that are consistent or inconsistent with the general trends he has witnessed during his experiences. (See, e.g., Orfield Report ¶ 54 (explaining that acknowledgements from City officials about resistance to integration and "fear of demographic change" "correspond to the reality" he has seen "virtually everywhere [he has] worked")); see also Hnot v. Willis Grp. Holdings Ltd., No. 01-CV-6558-GEL, 2007 WL 1599154, at *3 (June 1, 2007) (permitting expert to "identify particular circumstances allegedly present in the evidence as consistent with the phenomena he describes as a general matter" because he "does not undertake to tell the jury what to think about the particular facts of the case[,]" but rather is "illustrat[ing] general principles by reference to evidence in the record"); Price, 2020 WL 4937464, at *3 (expert could properly opine on consumers' expectations as to a product's ingredients based on the product's name and his general experience in advertising); Deutsch v. Novartis Pharm. Corp., 768 F. Supp. 2d 420, 437-443 (E.D.N.Y. 2011) (explaining that expert witness was permitted to "opine on his interpretation of whether certain information contained in [defendant's] internal documents indicated certain risks").

preference basis" (id. ¶ 96); or that the City "could remove the effective councilmanic veto as to zoning changes or development approvals needed for affordable housing construction" (id. ¶ 99). Professor Orfield, however, fails to explain why or how he believes his suggested alternatives would be effective, or even feasible, in New York City. Nor does he proffer any rational link between his experience and the speculations he offers as to which options the City could realistically pursue as part of its affordable housing strategy. Because Professor Orfield has provided no information as to how he reached his conclusions as to which alternative paths the City "could" implement – through his experience or otherwise – the Court, in performing its gatekeeping function, cannot deem Professor Orfield's speculations in Section VI of his Report to be reliable. See LinkCo, Inc., 2002 WL 1585551, at *4 (explaining that the "gatekeeping function" requires the Court to do more than "simply tak[e] the expert's word for it"); Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural[.]"). Indeed, Professor Orfield's opinions in this section consist of a one-sided narrative of the evidence in this case, which embodies the perspective of Plaintiffs' attorneys and is devoid of any explanation as to how his experience and expertise lead him to believe that his proffered alternatives to the CP Policy are applicable to or appropriate for New York City. His opinions therefore are outside the scope of his expertise, improperly "supplant[ing] the role of counsel in making argument at trial, and the role of the jury [in] interpreting the evidence[,]" and the Court concludes they are inadmissible. Highland Cap. Mgmt. L.P. v. Schneider, 379 F. Supp. 2d 461, 468-470 (S.D.N.Y. 2005) (finding expert's testimony "simply rehashing otherwise admissible evidence about which he has no personal knowledge" to be inadmissible because "an expert cannot be presented to the jury solely for the purpose of constructing a factual narrative based upon record evidence"); see

also In re Lyman Good Dietary Supplements Litig., No. 17-CV-8047-VEC, 2019 WL 5682880, at *3 (S.D.N.Y. Oct. 31, 2019) (explaining that evidence must be excluded when "expert testimony offers nothing more than what lawyers representing the parties could provide during their closing arguments") (internal quotation marks and citation omitted); Media Spot & Arts. s.r.l. v. Kinney Shoe Corp., No. 95-CV-3901-PKL, 1999 WL 946354, at *3-4 (S.D.N.Y. Oct. 19, 1999) (excluding testimony on whether a contract was formed between the parties as such testimony "concern[ed] matters outside [the expert's] area of expertise[,]" was "not based on personal knowledge[.]").

The case, Joffe v. King & Spalding LLP, No. 17-CV-3392-VEC, 2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019), on which both parties rely (see Pl. Opp. at 9; Def. Reply at 5), is illustrative of the deficiencies in Plaintiffs' proffer of Dr. Oldfield's testimony. In that case, the plaintiff, a former associate at King & Spalding, alleged that his termination was wrongful and in retaliation for his efforts to comply with applicable professional rules of conduct. Joffe, 2019 WL 4673554, at *1. In support of his claims, he proffered expert testimony from a vocational expert – a legal recruiter – on issues relating to his employability at law firms given his level of experience. Id. at *4. The defendant moved to exclude the expert's testimony on the basis that the expert witness was "not qualified to opine on Plaintiff's employability in the New York market because he [was] a Seattle-based recruiter" who had "never successfully placed a senior litigation associate in New York." Id. The court determined that the expert was qualified to testify as to "Plaintiff's employability at national law firms, including in the New York market" because, in part, the defendant failed to provide any authority "for the requirement that a vocational expert must be familiar with local employment conditions in order to testify about an individual's employability" and "whatever differences there may be in competitiveness

between the Seattle and New York markets, those differences are unlikely to be so fundamental as to render [the expert's] experience wholly inapposite." Id. at *4-5.  The court, however, agreed with the defendant that the expert's opinion that "Plaintiff may have been promoted to counsel or partner at [King & Spalding]" had he not been terminated was unreliable, and therefore inadmissible, because the expert possessed "no knowledge of [King & Spalding's] promotion practices, nor did he make any effort to acquire such knowledge." Id. at *6.  The expert's opinions as to the plaintiff's advancement opportunities at King & Spalding were therefore rejected as conjectural and outside the scope of any specialized knowledge.  See id.

Similarly, the Court concludes that Professor Orfield's testimony – to the extent that he generally opines on fair housing and associated trends regarding segregation and the methods by which it is maintained – is reliable.  Like the defendant in Joffe, the City has failed to persuasively establish that the general trends and phenomena the expert identifies would not have some applicability to New York City.  Moreover, Professor Orfield provides adequate explanation for how his wide-ranging experiences on fair housing and segregation issues at both the state and national level support his conclusions.  That said, however, like the expert's opinions as to King and Spalding's specific promotion policies in Joffe, Professor Orfield's speculative observations as to viable and potentially less discriminatory alternatives to the CP policy that could, in his view, be implemented in New York are inadmissible because Professor Orfield has failed to establish any rational link between his experience and the City's particular circumstances, affordable housing policy and goals.  Therefore, the Court precludes the admission of any testimony offering the opinions set forth on this topic in Professor Orfield's Report.  (See Orfield Report, § VI.)

Relevance

Defendant argues that portions of Professor Orfield's testimony should be excluded as irrelevant.  The Court need not address the City's argument that Professor Orfield's opinions on alternatives to the City's CP policy are irrelevant, because those opinions have already been excluded as unreliable.  That aside, the City further argues that Professor Orfield's discussions about school segregation and racial residential preferences are inadmissible on relevance grounds.  The City submits that, although "there may be a connection between school segregation and residential segregation, Plaintiffs are only challenging the CP policy as it is applied within the affordable housing lottery, and schools are not connected in any way to the operation of the CP policy."  (Def. Mem. at 15.)  Furthermore, Defendant argues that any discussion of racial preferences in residential neighborhoods is irrelevant to the issues before the Court because "the CP policy does not ask lottery applicants their racial residential preferences and applicants may apply to any lotter[y/(ies)] they wish."  (Def. Reply at 9-10.)  Neither argument is availing.

At this point in the litigation, the Court is not convinced that Professor Orfield's opinions on the topics of school segregation and racial residential preferences would inevitably be irrelevant to the issues in dispute.  Plaintiffs' intentional discrimination claim centers on the theory that City officials knowingly acquiesce to the fear of racial change held by their constituents, and they argue that the City's proffered rationale for the CP policy – the fear of displacement – is merely pretextual.  Regarding school segregation, Professor Orfield explains that "[c]oncerns about schools are often a major source of opposition to affordable housing" and he draws on research regarding residents' resistance to racial change in schools to further elucidate the common sources of resistance to racial change in neighborhoods.  (Orfield Report

¶ 59.)  Professor Orfield proffers that "[r]esearch suggests that residents see racial change in schools as a proxy for educational quality, and will express concern that new housing, or housing with a different composition than currently exists in the neighborhood, will erode the quality of the schools."  (Id.; see also id. ¶ 60 (opining that "concerns about school-based demographic change extend to concerns about residential racial change"); id. ¶ 35 (explaining that "polling about residential diversity has been relatively limited" and school diversity, which has "been polled for many decades" serves as a "reasonable proxy" for measuring residents' attitudes to integration in their neighborhoods).  With respect to Professor Orfield's opinions about racial residential preferences, Professor Orfield's explanations regarding social dynamics and attitudes about racial change in one's neighborhood similarly may help to elucidate the potential rationales underlying the CP Policy, including those motivating policy decisions that maintain a neighborhood's historic demographics.  Professor Orfield's opinions on these topics, therefore, may be relevant to the issue of whether the City's motivations for the CP Policy are legitimate or pretextual, and the Court declines to preclude them at this juncture as irrelevant.

Helpful to the Factfinder

The City argues that Professor Orfield's opinions supporting his view that it is "implausible that New York City officials are unaware of or unaffected by the fear of racial change" (Orfield Report § V) are inadmissible because they "improperly usurp the role of the factfinder" in determining the intentions and motivations of City officials.  (Def. Mem. at 21-22.)  The City also argues that, to reach such conclusions, Professor Orfield improperly relied on his interpretation of documents produced in this litigation, none of which "require[s] any specialized knowledge to understand" and thus should be left to the factfinder to evaluate.  (Id. at 21.)

The City's objections to this section of Professor Orfield's report have merit. Professor Orfield asserts that "available evidence" in the case "shows clearly" that City officials are aware of the "fear of and resistance to potential racial change that leads to opposition to affordable housing development" (Orfield Report ¶ 70; see also id. ¶ 77); that "[p]oliticians characteristically believe that this vein of thought cannot be ignored but must be mollified" (id. ¶ 79); and that awareness of the "sensitivity of . . . acting upon key factors causing and maintaining segregation" has led to a "program of action" by the City that is "compromised to adapt to [the] status quo" (id. ¶ 72). "Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony." In re Rezulin Prods. Liability Litig., 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (explaining that the question of intent is left to the factfinder); Anderson News L.L.C. v. Am. Media, Inc., No. 9-CV-22227-PAC, 2015 WL 5003528, at *2-3 (S.D.N.Y. Aug. 20, 2015) (excluding testimony opining on the "parties' knowledge, motivations, and intent" because it would usurp the jury's judgment "in determining the import of both spoken words and written documents"). Professor Orfield's opinions about the intentions of City officials are speculative, devoid of any connection to his experience, and unhelpful to the fact finder, and therefore are inadmissible. Professor Orfield improperly assumes the role of the jury in assessing the question of the intent held by City officials in maintaining the CP policy and also the role of counsel in constructing legal argument that proffers a particular interpretation of the evidence in this case.[3] See Linkco, Inc., 2002 WL 1585551, at *2 (excluding expert testimony

---

[3]     The City additionally submits that certain statements Professor Orfield proffered in support of his opinions that it is "implausible that New York officials are unaware of or unaffected by the fear of racial change" (Orfield Report § V) and and "[m]any less discriminatory alternatives exist for accomplishing the policy goals the community preference purports to accomplish" (id. § VI) amount to legal conclusions that the City violated the FHA and are therefore inadmissible. (Def. Mem. at 17.) The Court agrees and concludes that Sections V and VI of Professor Orfield's Report and the opinions

that did "no more than [what] counsel for [plaintiff] will do in argument") (citation omitted).
Direct testimony from "fact witnesses familiar with [the] documents" produced in this case, and relied upon by Professor Orfield, would be far more appropriate and helpful to the factfinder than Professor Orfield's proffered "secondhand knowledge" of their content.  Highland Cap. Mgmt., 379 F. Supp. 2d at 469 (citations omitted).  Orfield's opinions on the state of mind and intent of City officials are therefore excluded from this litigation.  (See Orfield Report, § V.)[4]

CONCLUSION

For the foregoing reasons, Defendant's motion to exclude the Report and testimony of Plaintiff's expert witness, Professor Orfield, is granted to the extent that Sections V and VI of Professor Orfield's Report, and his related testimony regarding his opinions on the

---

expressed therein are inadmissible for the additional reasons that Professor Orfield states "ultimate legal conclusions" based on the facts of the case (see Orfield Report ¶ 72) and also "instructs the jury as to applicable principles of law" (see, e.g., id. ¶¶ 94-95.)  See, e.g., In re Initial Public Offering Secs. Litig., 174 F. Supp. 2d 61, 64 (S.D.N.Y. 2001) ("[W]hile an expert may provide an opinion to help a jury or a judge understand a particular fact, 'he may not give testimony stating ultimate legal conclusions based on those facts.'" (quoting United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1992)); see also Bilzerian, 926 F.2d at 1294 (explaining that opinions "that encroach upon the court's duty to instruct on the law" are inadmissible).

[4] In its reply brief, the City objects to Professor Orfield's inclusion of "examples, studies, and explanations" in his declaration submitted in support of Plaintiff's motion for summary judgment and in opposition to Defendant's motion for summary judgment that were allegedly "not part of his expert disclosures or deposition testimony."  (Def. Reply at 10.)  Because the Court determined that Professor Orfield's declaration was not material to its decision on the cross-motions for summary judgment, and Plaintiffs have not had the opportunity to contest the City's assertion raised in its reply brief, the Court declines to strike sections of Professor Orfield's declaration at this juncture.  The Court cautions the parties, however, that moving forward to trial, any expert opinions proffered beyond "new facts and 'evidentiary details,'" Congregational Rabbinical College of Tartikov, Inc. v. Village of Pomona, 138 F. Supp. 3d 352, 398 (S.D.N.Y. 2015) (citation omitted), that were not previously disclosed in accordance with Rule 26 of the Federal Rules of Civil Procedure, will be excluded.

mental states, motivations, and intentions of City officials and the potential alternatives to the City's community preference policy, are excluded, and is otherwise denied.

The Memorandum Order resolves docket entry number 893.

SO ORDERED.

Dated: April 28, 2023
      New York, New York

                                               /s/Laura Taylor Swain
                                               LAURA TAYLOR SWAIN
                                               Chief United States District Judge