UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

SHAUNA NOEL and EMMANUELLA SENAT,   :

        Plaintiffs,           :

        -against-          :      15-CV-5236 (LTS) (KHP)

CITY OF NEW YORK,         :

        Defendant.        :

-----------------------------------------------------------------x


**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION TO RECONSIDER APRIL 28, 2023 DECISION AND ORDER (ECF 970)
INSOFAR AS IT RELATES TO DISPARATE IMPACT LIABILITY**

Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, 7th Floor
New York, New York 10177
(212) 537-5824
*Co-Counsel for Plaintiffs*

Mariann Meier Wang
Cuti Hecker Wang LLP
305 Broadway, Suite 607
New York, New York 10007
(212) 620-2600
*Co-Counsel for Plaintiffs*

May 5, 2023


*On the brief:*
Craig Gurian

**<u>Table of Contents</u>**

INTRODUCTION…………..…………………………………………………………....1

ARGUMENT…………………………...…………………………………………………2

POINT I: THE SJ OPINION MISAPPRENDED BOTH THE CONCERN
EXPRESSED IN *INCLUSIVE COMMUNITIES* AND HOW AND WHEN
"PREEXISTING RACIAL DEMOGRAPHICS" OF A CD TYPOLOGY
COME INTO PLAY……………….…………………………………………..…………….2

POINT II: THE SJ OPINION MISAPPLIED CONTROLLING LAW AND
STATUTORY LANGUAGE AND IGNORED CRITICAL EVIDENCE, ALL
CONTRIBUTING TO THE ERRONEOUS PROPOSITION THAT DISTINCT
DISPARATE IMPACTS CAN BALANCE EACH OTHER OUT………..……………4

    A. <u>The SJ Opinion misstated plaintiffs' position</u>………………..……………..4

    B. <u>The SJ Opinion failed to appreciate when injury occurs</u>………..…………..5

    C. <u>The SJ Opinion failed to appreciate case law and evidence that different
    protected groups can be helped and hurt at the same time without that
    circumstance immunizing the challenged practice</u> …………....……………9

    D. <u>The "weighing of injury against advantage" approach is not
    countenanced by the case law and the idea that all apartments are
    fungible *to an individual* is entirely unsupported</u>……………………….11

    E. <u>Additional considerations</u>……………………………………………………12

POINT III: THE SJ OPINION FAILS TO CONDUCT THE INDEPENDENT
ANALYSIS REQUIRED BY THE CITY HUMAN RIGHTS LAW AND IS
INCONSISTENT WITH ITS REQUIRED CONSTRUCTION
PRINCIPLES……………………………………………………………………………14

CONCLUSION…………………………………..……………………………………15

i

## Table of Authorities

**CASES**

*Albunio v. City of New York,*
   16 N.Y.3d 472 (N.Y. 2011)………………………………………………………..14

*Bennett v. Health Mgmt. Sys., Inc.,*
   92 A.D.3d 29 (N.Y. App. Div. 1st Dept. 2011)………………………………...……14

*Buchanan v. Warley,*
   245 U.S. 60 (1917)…………………………………………………………...…………9

*Comer v. Cisneros,*
   37 F.3d 775 (2d Cir. 1994) …………...………………………………...…………..…..7, 12

*Connecticut v. Teal,*
   457 U.S. 440 (1982)…………………………………………………………………14

*Griggs v. Duke Power Co.,*
   401 U.S. 424 (1971)………………...…………………………………………………9

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982)………………………………………………………...…………8

*Noel and Senat v. City of New York,*
   2023 WL 3160261 (S.D.N.Y. Apr, 28, 2023)……………...……………...…………*passim*

*RST 2005 Inc. v. Research in Motion, Ltd.,*
   597 F. Supp. 2d 362 (S.D.N.Y. 2009)……………………………………………………2

*Spokeo, Inc. v. Robins,*
   578 U.S. 330 (2016)…………………………………………...………………………8

*Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
   576 U.S. 519 (2015) ……………………………………………………………..3

*Williams v. NYCHA,*
   61 A.D.3d 62 (N.Y. App. Div. 1st Dept. 2009)…………………………………………14

*Winfield v. City of New York,*
   2016 WL 6208564 (S.D.N.Y. Oct. 24, 2016)…………………………………...……..7

**FEDERAL STATUTES**

42 U.S.C. § 3604……………………………………………………….……………………………….7

**NEW YORK CITY ADMINISTRATIVE CODE AND LOCAL LAWS**

NYC Admin. Code §§ 8-107…………………………………………....…………………………7

NYC Admin. Code § 8-502…………………………………………………………………….8

NYC Local Law 35 of 2016 (March 28, 2016)……………………………………………....…...14

**REGULATIONS**

HUD, Preamble and Final Disparate Impact Rule,
    88 Fed. Reg. 19450 (March 31, 2023)……………………………………………..…..3

INTRODUCTION

This motion for reconsideration is made only in connection with that portion of the Court's recent Opinion and Order, ECF 970, *Noel and Senat v. City of New York*, 2023 WL 3160261 (S.D.N.Y. Apr, 28, 2023) ("SJ Opinion") that addressed the parties' cross-motions as to disparate impacts.

The SJ Opinion identified the seven community district typologies into which plaintiffs' expert, Professor Andrew A. Beveridge, organized the lottery results (majority White, majority Black, majority Hispanic, majority Asian, plurality White, plurality Black, and plurality Hispanic), and described different analyses that Professor Beveridge performed. SJ Opinion, at *4-6. Professor Beveridge analyzed more than seven million applications, over three million of which were "apparently eligible."[1] As Beveridge summarized, the outsider-restriction policy resulted in "disparate impacts found in all seven typologies in respect to entrants; in six typologies in respect to apparently eligible applicants; and in all four majority typologies when it came to awards."[2] As the SJ Opinion pointed out, the Beveridge analysis proffered that there were often multiple, non-dominant demographic groups in a CD typology that were substantially disadvantaged by the policy. SJ Opinion, at *4-6.  Indeed, the SJ Opinion found that "Plaintiffs *have shown* that multiple racial demographic groups are affected within multiple CD typologies." *Id.*, at *7 (emphasis added).

---

[1] *See* Defendant's responses and objections to Plaintiffs' Rule 56.1 Statement, ECF 901 ("Def. 56.1 Responses and Objections"), ¶¶ 38-39, and 42, at 15. The parties agree that "apparently eligible applicants" are those whose self-reported information on their applications showed that they met the income- and household-size requirements of at least one unit-type being offered in the lottery in question. *Id.*, at ¶ 39.

[2] See Professor Beveridge's March 8, 2021 Declaration in Reply to Defendant's February 2021 Submission, ECF 948 ("Beveridge Reply Declaration"), ¶ 11, at 3-4.

Nevertheless, the SJ Opinion concluded that these significant impacts did not constitute disparate impact under either the Fair Housing Act or New York City Human Rights Law. It is both counter-intuitive and contrary to law that the existence of multiple disparate impacts on defined protected-class groups in specific, well-defined geographies of the city would operate to shield defendant from the liability it would face if it had discriminated against fewer groups in fewer geographies. The reasoning underpinning the SJ Opinion fails to recognize that individuals – who have a wide variety of reasons for choosing to apply to a particular lottery, regardless of whether the community district where the housing is being sought is "inherently more desirable" (SJ Opinion, at *7) – are entitled *never* to be disadvantaged because of race.

Because the SJ Opinion misstated or ignored controlling case law, omitted or misinterpreted critical evidence before the Court, and created requirements inconsistent with the language and intent of the relevant statutes, reconsideration is necessary to correct clear errors and prevent manifest injustice. *See, e.g., RST 2005 Inc. v. Research in Motion, Ltd.*, 597 F. Supp. 2d 362, 365 (S.D.N.Y. 2009) (identifying these bases for a Local Rule 6.3 motion).

<u>ARGUMENT</u>

<u>POINT I</u>

THE SJ OPINION MISAPPREHENDED BOTH THE CONCERN EXPRESSED IN *INCLUSIVE COMMUNITIES* AND HOW AND WHEN "PREEXISTING RACIAL DEMOGRAPHICS" OF A CD TYPOLOGY COME INTO PLAY.

The SJ Opinion misinterpreted the way the Supreme Court wanted to curtail the risk of a defendant being held liable for racial disparities it did not create, and appeared to suggest that the result here (deprivation of the right to compete on an equal playing field without regard to race) is merely a function of pre-existing racial demographics that obtain in the various CD typologies. SJ Opinion, at *7.

In fact, *Texas Dept. of Hous. and Cmty. Affairs v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519 (2015), had a specific solution to avoid that risk. As HUD states in the Preamble of the recently issued Final Disparate Impact Rule, *Inclusive Communities* has explained that:

> a robust causality requirement means that a plaintiff must "point to a defendant's policy causing [a] disparity'" and "allege facts at the pleading stage or produce statistical evidence demonstrating a causal connection" between the policy and the disparity/ imbalance, as opposed to simply relying on a statistical disparity or racial imbalance alone, and noting that *this requirement [of pointing to a policy] safeguards against defendants being held liable for disparities they did not create*, which might encourage the use of racial quotas).[3]

Here, plaintiffs have done exactly what is required: pointed to a specific policy as the cause for the racial disparities (and gone on to prove it).

The SJ Opinion's reasoning that there is merely "correlat[ion]" between distribution of advantage and disadvantage, on one hand, and "preexisting racial demographics," on the other, SJ Opinion, at *7, is incorrect and overlooks a critical fact and element of analysis. The application pool in a lottery does *not* correlate to the preexisting racial demographics of the community district in which the housing is located. That pool is made up of applicants from all over the city and, as such, varies considerably from the preexisting racial demographics of the community district. Absent the policy (a scenario not analyzed in the SJ Opinion), each applicant *would* compete equally, with an individual's chances determined by lottery number, *not* insider or outsider status.

The preexisting demographics of a community district *only become salient* when defendant effectuates the policy where those belonging to a group that is disproportionately already living in a community district are given advantages. Though not cited in the SJ Opinion, it is undisputed that, at the moment the lottery application submission period closes (and preference is

---

[3] *See* Preamble and Final Disparate Impact Rule, 88 Fed. Reg. 19450, at 19483, n.290 (March 31, 2023), *citing Inclusive Communities*, at 540-43 (emphasis added), Exhibit 1 to ECF 968.

superimposed on the existing lottery order), the odds of CD-beneficiary (insider) applicants and apparently eligible applicants being awarded a lottery unit become much better than the odds of non-beneficiaries (outsiders) because of the policy.[4] Likewise, once the policy has initially and substantially improved the odds on the playing field in favor of insiders, those improved odds are never undone.[5]

Accordingly, the function of the analyses performed by Professor Beveridge in connection with disparate impact was to take a policy that was *racially facially neutral* when it intentionally distinguished between insiders and outsiders, and determine whether, at the CD-typology level, the advantages and disadvantages distributed by that facially neutral policy corresponded to race. It turned out that they did, over and over again. As Professor Beveridge put it, "This case . . . presents an unusually diverse and robust set of disparities due to many groups being hurt by the policy in many typologies at multiple stages and consequences of the lottery process."[6]

POINT II

THE SJ OPINION MISAPPLIED CONTROLLING LAW AND STATUTORY LANGUAGE AND IGNORED CRITICAL EVIDENCE, ALL CONTRIBUTING TO THE ERRONEOUS PROPOSITION THAT DISTINCT DISPARATE IMPACTS CAN BALANCE EACH OTHER OUT.

A.   The SJ Opinion misstated plaintiffs' position.

In the first instance, the SJ Opinion was incorrect when it stated that plaintiffs' approach "conflates the right not to be discriminated against on the basis of race, or another protected status,

---

[4] *See* Def. 56.1 Responses and Objections, ¶¶ 48-49, at 19-20.

[5] *See id.*, ¶ 50, at 20.

[6] *See* Beveridge Reply Declaration, ¶ 13, at 4 (emphasis omitted).

in the provision of housing with their alleged right to equal competition among all applicants." SJ

Opinion, at *8. As plaintiffs have stated consistently:

> When a New Yorker *specifically* applies to a *specific* lottery and is denied by the policy an equal opportunity to compete <u>without regard to race</u>, he or she is injured at that moment. An injury that accrues when one is denied an equal opportunity to compete without regard to race in one CD typology cannot be "undone" by what happens in respect to the right to compete equally, <u>without regard to race</u>, for housing opportunities in *other* CD typologies.[7]

B.   <u>The SJ Opinion failed to appreciate when injury occurs.</u>

The SJ Opinion effectively concluded that the law prohibiting disparate impact does not

prevent a Black New Yorker living in Central Harlem who applies in a lottery for housing on the

Upper East Side from being told, "Don't complain that you are being *disadvantaged* on the basis

of race in the lottery on the Upper East Side; at some point there will be a lottery in Central Harlem

and you might decide to apply there and yield an *advantage* on the basis of race. Being

discriminated against in one place and potentially being favored in another place balance each

other out, unless you show that the Upper East Side lies within an 'inherently more desirable'

community district."[8]

Plaintiffs respectfully submit that the SJ Opinion conflated the existence, established by

analyses of a large universe of lotteries, of specific discriminatory patterns, on the one hand, with

---

[7] *See* Plaintiffs' memorandum of law in reply and in opposition, Nov. 24, 2020, ECF 928 ("Pl. MOL in Reply and Opposition"), at 10 (italics in original; underlining added). *See also* Plaintiffs' memorandum of law in sur-reply to Defendant's reply brief, Mar. 8, 2021, ECF 949, at 28, n.109 (stating the same proposition).

[8] *See* SJ Opinion, at *7 (stating that plaintiffs' argument that an "injury that accrues when one is denied an equal opportunity to compete without regard to race in one CD typology cannot be 'undone' by what happens in respect to the right to compete equally, without regard to race, for housing opportunities in *other* CD typologies" is only "meaningful" if plaintiffs "were to demonstrate that certain CD typologies are inherently more desirable…").

the very separate question of an individual's application on the playing field of a single lottery, on the other. It is a conflation that undermines both case law and statutory language.

The policy creates distinct geographic areas[9] of disadvantage for distinct and specified protected-class groups[10] when applying in the policy-created category of "outsider."[11] We know this from Professor Beveridge's analysis of data from many lotteries. SJ Opinion, at *4-7. These combinations (disadvantage for specific protected-class groups in specific geographic areas) do not change. When an individual Black New Yorker, for example, applies as an outsider for housing in a majority White community district he or she will reliably face a race-based disadvantage.

But when that Black New Yorker does make an application, he or she is not applying to 168 developments – he or she is making just one application in one lottery. It is undisputed that, "[i]nterested households choose whether to apply to *a lottery for a particular development* (in contrast to being put on a multi-development or centralized list, or on a waiting list for any development that may thereafter become available)."[12]

---

[9] The term used in this litigation – "CD typologies" – sounds technical, but CD typologies simply represent large collections of neighborhoods that are just as physically concrete, specific, and mappable as any other level of geography, whether borough, school district, village, or town.

[10] White, Black, Hispanic, and/or Asian.

[11] Those same distinct geographic areas become areas of advantage for another protected-class group when applying in the policy-created category of "insider." To the extent that the SJ Opinion suggested that plaintiffs did not identify the members "of a protected group" that are adversely impacted, SJ Opinion, at *7, it was again mistaken. As made clear to the Court, Professor Beveridge "accounted for each applicant of each racial group in each typology." *See* Beveridge Reply Declaration, ¶ 10, at 3. Professor Beveridge's analyses accounted for all members of all racial groups in all typologies, he did not prejudge which protected-class groups were being denied a level playing field without regard to race in which CD typologies: he let the data speak for themselves, and then showed where members of which protected-class groups could reliably expect to be advantaged (not discriminated against) or reliably expect to be disadvantaged (discriminated against). *See id.*, ¶ 41, at 12.

[12] *See* Def. 56.1 Responses and Objections, ¶ 11, at 6 (emphasis added).

As such, the playing field on which the actual, individual applicant is competing is the playing field of *one lottery*. Controlling case law makes clear that this playing field must be level, without regard to race. *See Comer v. Cisneros,* 37 F.3d 775, 794 (2d Cir. 1994) ("The injury is not the failure to obtain housing assistance in the suburbs, but is the missed opportunity to compete for suburban housing on an equal footing with the local residents"); *see also* this Court's decision denying defendant's motion to dismiss, *Winfield v. City of New York*, 2016 WL 6208564, at *4 (S.D.N.Y. Oct. 24, 2016) (plaintiffs' injury "relates to denial of the opportunity to compete on an equal footing for fair housing *in their desired neighborhoods . . .*") (emphasis added).

Because of the race-based impacts of the policy, that single lottery's playing field is *not* level in racial terms. Both *Comer* and *Winfield* are only consistent with the proposition that the individual's "missed opportunity" to compete on a level playing field without regard to race in that one lottery is a discrete violation that is completed when it occurs.

Only this interpretation is consistent with the operative sections of the Fair Housing Act and the City Human Rights Law. The former proscribes making unavailable (or discriminating in terms and conditions) in connection with "a dwelling" (singular). 42 U.S.C. §§ 3604(a) and (b). The latter has comparable provisions addressed to "a housing accommodation" (singular). NYC Admin. Code §§ 8-107(5)(a)(1) and (2). A violation is completed when there is a denial of "a dwelling" or "a housing accommodation."

 Indeed, the simplest circumstance in the intentional discrimination context underlines the point. A landlord rejects an applicant based on race and then, a year later, the same landlord in the same building decides to rent an apartment to that same applicant. The subsequent conduct has nothing to do with liability for the first violation: the applicant had been denied "a dwelling."

Likewise, examination of what happens to an individual when he or she competes on the playing field for a single lottery – without comparing other potential playing fields – is consistent with controlling case law and statute relating to "injury." *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982) (internal citations and quotation marks omitted) (even a fair housing tester who approached a real estate agent "fully expecting that he would receive false information, and without any intention of buyer or renting a home, does not negate the simple fact of injury within the meaning of [42 U.S.C. § 3604(d)]," because injury may exist "solely by virtue of statutes creating legal rights, the invasion of which creates standing"); *Spokeo, Inc. v. Robins*, 578 U.S. 330, 348 (2016) (Thomas, J., concurring) ("A plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right"); *see also* NYC Admin. Code § 8-502(h)(2) ("A person is aggrieved even if that person's only injury is the deprivation of a right granted or protected"). How good or bad an apartment being sought in a lottery (and how good or bad the community district in which the apartment is located) is irrelevant. All that counts is deprivation of a right protected by statute. When an applicant to a lottery is disadvantaged based on race, that is an immediate injury – regardless of any of the innumerable reasons for which the applicant may have chosen to compete.

Even if, at some point in the future, an applicant applied to lotteries not part of the distinct geographic areas of disadvantage for people of that applicant's protected-class group (a matter of speculation), such applications would merely mean that, in connection with those subsequent playing fields, the *individual applicant* did not experience discrimination.[13] That lack of subsequent discrimination does not change the existence of the circumstance where the individual

---

[13] The same is true if there were a previous occasion when the individual was not discriminated against.

*did* apply as an outsider in distinct geographic areas of disadvantage for members of his or her racial or ethnic group.

    None of the foregoing is accounted for in the SJ Opinion.

C.   <u>The SJ Opinion failed to appreciate case law and evidence that different protected groups can be helped and hurt at the same time without that circumstance immunizing the challenged practice.</u>

    The SJ Opinion appears also to have overlooked in its entirely the *amicus* brief submitted on behalf of plaintiffs by the Lawyers' Committee for Civil Rights Under Law.[14] In that brief, the Lawyers' Committee, *inter alia*, pointed to a Supreme Court case that establishes that a policy that helps and hurts different racial groups at the same time is nonetheless still discriminatory:

> [T]he City's separate-but-equal argument promotes a premise not just rejected in 1968 (with the passage of the FHA), or back in 1954 (with the decision in *Brown*), but one not countenanced by the Supreme Court more than a century ago. In *Buchanan v. Warley*, 245 U.S. 60 (1917), the Supreme Court rejected as unconstitutional a municipal ordinance that "equally" prevented Black households from purchasing or occupying property in majority-white blocks and [also] prevented white households from purchasing or residing in property on majority-Black blocks. Yet the City's current argument would have asked the *Buchanan* court to look at the arrangement as more benign: with both Black and white households being helped by reduced competition for housing in their respective areas.[15]

The Lawyers' Committee went on to state:

> There is no meaningful distinction between intentional discrimination claims and disparate impact claims on this point in light of a fundamental principle of disparate impact jurisprudence: a defendant is not permitted to accomplish via impact what it is prohibited from doing directly. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971) (holding that "good intent or absence of discriminatory intent does not redeem employment procedures or testing mechanisms that operate as 'built-in headwinds' for minority groups and are unrelated to measuring job capability").[16]

---

[14] ECF No. 935, Jan. 5, 2021.

[15] *Id.,* at 14; *see also id.*, at 12-15.

[16] *Id.,* at 14.

Even in 1917, the answer was not that the restrictions "balanced each other out," but rather that both elements of the discrimination had to be removed.

Defendant itself (prior to reincarnating the separate-but-equal approach) has in the past appreciated that different racial advantages and disadvantages that were imposed concurrently in different parts of the city because of the policy had to be addressed; it examined the issue on a community-district by community-district basis. As stated in plaintiffs' brief in reply and opposition[17] but overlooked by the SJ Opinion:

> In 2014, when then-HPD Commissioner Vicki Been was corresponding with HUD about "HUD's concerns about the fair housing implications" of the policy, the information she detailed was at *the CD level*.[18] Commissioner Been had eight CDs at the top of her list for potential reduction in preference: four majority-White; two majority-Black and two majority-Hispanic. These were CD-by-CD choices,[19] contravening the idea of "offset" for members of a racial group citywide.[20]

In other words, *even defendant* was proposing to reduce advantages where they existed most severely by reducing the preference in White, Black, *and* Hispanic majority community districts – not by arguing that the advantages in some places "offset" disadvantages in others.

---

[17] Pl. MOL in Reply and Opposition, at 11. The following quotation from that brief includes the same two footnotes that were originally included.

[18] *See* Been letter to HUD, Sept. 5, 2014, [ECF 927], Ex 3, at 3 ("we have analyzed a variety of ways in which we might modify the community district preference"); and *id.* (in the next section on "Measuring the diversity of community districts," noting that the "racial diversity index" of "individual community districts ranged from a low of .21 (BK 17: Flatbush, Brooklyn) to a high of .84 (QN 10: South Ozone Park and Howard Beach, Queens). The RDIs for all 59 community districts are arrayed in Appendix A").

[19] *See id.* at 4 ("[W]hile we had talked about adjusting the preference for the ten least diverse community districts, it would make sense to depart from the usual community district preference rules either for the 4 CBs falling below 0.4 [on the "racial diversity index"] or for the 8 falling below 0.45."). *See also* App. A, at 4 (last page) (showing that the eight most-segregated (ranked 52-59) include, as confirmed by https://communityprofiles.planning.nyc.gov/, four majority-White, two majority-Black, and two majority-Hispanic CDs).

[20] Pl. MOL in Reply and Opposition, at 11.

D.  The "weighing of injury against advantage" approach is not countenanced by the case law and the idea that all apartments are fungible *to an individual* is entirely unsupported.

When the SJ Opinion stated that plaintiffs' position that disadvantage in one place cannot be offset by advantage in another is only "meaningful" if plaintiffs "were to demonstrate that certain CD typologies are inherently more desirable," SJ Opinion, at *7, the implicit premise was that, in the absence of such a showing, different housing accommodations should be understood to be fungible (being disadvantaged for one *is* offset by advantage for another). The premise is neither accurate nor relevant.

First, an individual may not be looking for an apartment at a time when housing in an area of advantage is available.

Second, while different community districts (or CD typologies) can be characterized by more positive or more negative features (including parks, schools, crime rates, etc.), the SJ Opinion failed to distinguish between an external, "objective" view of a CD typology, on the one hand, and an individual's personal considerations for a particular housing accommodation, on the other. What the SJ Opinion characterized as "more universally-desirable CD typologies," SJ Opinion, at *7, may or may not correspond to what *an individual is looking for at any particular moment*. People apply to housing for all kinds of reasons: perhaps the apartment is near the applicant's workplace; perhaps it is close to an excellent public school for applicant's child; perhaps it is in a community district that does have some negative features, but it is a particularly spiffy apartment in a particularly spiffy new building with particularly spiffy amenities.[21] In other words, there is

_____

[21] Note that here are also vast differences in the *number* of lotteries to which applicants apply (although, across race and ethnicity, at least 75 percent of them apply outside of their current community district about 85 percent of the time).  *See* Declaration of Professor Andrew A. Beveridge, March 6, 2020, ECF 883, Table 15, at 59, and Chart 1, at 61.

no way of telling why a particular person may want an apartment, or "how much" a person wants an apartment. The only indicum of wanting an apartment is applying for it.

And defendant does not offer a different view. Defendant's expert, Dr. Bernard Siskin, acknowledged that he does not know whether lotteries are fungible *and that he doesn't consider fungibility from the point of view of the applicant.*[22]

Third, fungibility in any event is irrelevant. There is nothing in the pertinent statutes or case law relating to fair housing liability that excuses liability because a different housing opportunity that is "just as good" may at some point be available.[23] The entire point of fair housing law is to honor the choices that the individual makes for herself or himself.

The SJ Opinion relied on this passage in *Comer* for the offset proposition:

> The Second Circuit has cautioned that "[w]hile a local preference may be neither *per se* unconstitutional, nor *per se* unfair, where a government erects a local preference that has the effect of filtering only a small percentage of minorities to the locally preferred area, such government action is suspect to being a proxy for race." *Comer v. Cisneros*, 37 F.3d 775, 793 (2d Cir. 1994).[24]

In so doing, the SJ Opinion misinterpreted the term "locally preferred area" to mean "the area that is preferable" as opposed to the actual meaning, which is "the area in which the preference has effect." No other authority was presented for the offset proposition.

E.     Additional considerations.

Allowing for this "discrimination-offset" – that is, permitting disparate impacts at the lottery level because they are "balanced out" in the City overall – is breathtakingly consequential and pernicious. Plaintiffs explored a hypothetical with defendant's expert of a four-borough city,

---

[22] Cited in Pl. MOL in Reply and Opposition, at 22, n.72.

[23] The question could arise in the entirely different context of compensatory damages.

[24] SJ Opinion, at *8 (emphasis added).

each borough of which was populated exclusively by one demographic group (Whites, Blacks, Hispanics, or Asians). Without the hypothetical preference policy, "25 percent of the apparently eligible applicants reviewed by the developer in each lottery in each borough would be members of each of the four demographic groups, and 25 percent of the awards in each lottery and in each borough would go to members of each of the four demographic groups."[25] On the other hand, with the policy, "in each lottery in each borough, it was only members of the dominant group that were reviewed by the developer, and the dominant group in each borough in each lottery was the group that received 100 percent of awards in the corresponding borough (*i.e.*, Whites got all the awards in the White borough and Blacks got all the awards in the Black borough, etc.)."[26]

Notwithstanding this disparity, because the results when aggregated to the citywide level showed that the same percentage of each demographic group was being reviewed by the developer and that the same percentage of each demographic group got awards of units, Dr. Siskin's conclusion was that, "this would not have a disparate impact in terms of allocation of units"; "under my understanding of disparate impact, it would not have a disparate impact."[27]

The SJ Opinion stated unmistakably that, presuming that none of the fully segregated boroughs was "inherently more desirable" or preferred, no one would have a cause of action for deprivation based on race of the right to compete on a level playing field.  That cannot be correct as a matter of law or policy.

Finally, the SJ Opinion's section on disparate impact ended with the statement that "CP Policy beneficiary or non-beneficiary status does not uniformly correlate to any particular race(s).

---

[25] This was presented to the Court. *See* Def. 56.1 Responses and Objections, ¶¶ 83-84, at 39-40.

[26] *Id.*

[27]  *Id.*

SJ Opinion, at *8. But "uniform correlation" of such status is not required. *See Connecticut v. Teal*, 457 U.S. 440, 455-56 (1982) (neither a victim of disparate treatment nor disparate impact may be told that "he has not been wronged because other persons of his or her race or sex were hired"). The question is what the policy does to different protected-class groups. And the results presented and relied on are disparities that are substantial at the CD-typology level.

POINT III

THE SJ OPINION FAILS TO CONDUCT THE INDEPENDENT ANALYSIS REQUIRED BY THE CITY HUMAN RIGHTS LAW AND IS INCONSISTENT WITH ITS REQUIRED CONSTRUCTION PRINCIPLES.

Local Law 35 of 2016 expressly ratified the holdings and analyses of *Albunio, Williams,* and *Bennett*. *Williams* had explained that "the text and legislative history represent a desire that the City HRL 'meld the broadest vision of social justice with the strongest law enforcement deterrent'"; that amendments to the City HRL "have expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with no tolerance for discrimination in public life"; and that analysis of the City HRL must be guided by the need to make sure that discrimination plays no role.[28]

The SJ Opinion did not engage in the required process of applying those interpretative principles. If it had, it would be seen that the City HRL's "no tolerance for discrimination" approach is altogether incompatible with allowing continuing and widespread discrimination (a policy that, when implemented locally, each time denies members of *some* protected-class groups

---

[28] Plaintiffs' memorandum of law in support of plaintiffs' motion for partial summary judgment, Mar. 6, 2020, ECF No. 882, at 33, 33 n.34, 43, n.46; *see also* Pl. MOL in Reply and Opposition, at 35, n.119. The full citations to the three cases referenced above are *Albunio v. City of New York*, 16 N.Y.3d 472 (N.Y. 2011); *Williams v. NYCHA*, 61 A.D.3d 62 (N.Y. App. Div. 1st Dept. 2009); and *Bennett v. Health Mgmt. Sys., Inc.,* 92 A.D.3d 29 (N.Y. App. Div. 1st Dept. 2011).

the opportunity to compete on a level playing field without regard to race). Instead of allowing multiple victims of multiple acts of discrimination, the principles set out for City HRL interpretation would require proscribing them all.

CONCLUSION

New Yorkers do not apply to lotteries in a bundle. Each time they choose where to apply, they are (each time, all of them) entitled to compete on a level playing field, without regard to race. Without the policy, they could do so; with the policy, doing so is impossible. An abundance of violations should not result in the policy being insulated from the strictures of either the Fair Housing Act or the City Human Rights Law.

Both clear error of fact and law, and overlooked fact and law, require the Court to reverse the SJ Opinion insofar as it relates to disparate impact. Defendant's cross-motion as to disparate impact should be denied; plaintiffs' motion as to disparate impact should be granted.

Dated: New York, New York
        May 5, 2023

*Craig Gurian*

Craig Gurian
Anti-Discrimination Center, Inc.
250 Park Avenue, 7th Floor
New York, New York 10177
(212) 537-5824
Co-Counsel for Plaintiffs